## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EQUIL IP HOLDINGS LLC,

                    Plaintiff,

          v.

AKAMAI TECHNOLOGIES, INC.,

                    Defendant.

Case No. 22-677-RGA

**JURY TRIAL DEMANDED**

## AKAMAI'S FIRST AMENDED ANSWER AND DEFENSES TO EQUIL IP HOLDINGS LLC'S FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Defendant Akamai Technologies, Inc. ("Akamai" or "Defendant"), by and through its undersigned attorneys, hereby provides its First Amended Answer and Defenses to the First Amended Complaint for Patent Infringement ("FAC") of Plaintiff Equil IP Holdings LLC ("Equil" or "Plaintiff").

## GENERAL DENIAL

Unless as hereinafter expressly admitted, qualified, or otherwise admitted, Akamai specifically denies each and every allegation, statement, matter, and thing contained in the FAC. A denial by Akamai constitutes a specific denial by Akamai except as expressly admitted, qualified, or otherwise admitted in the same paragraph.

## RESPONSES TO SPECIFIC ALLEGATIONS

Akamai hereby responds to the numbered paragraphs of the FAC with the following correspondingly numbered responses:

## NATURE OF THIS ACTION

1.      Akamai admits that the FAC purports to allege infringement of U.S. Patent Nos. 8,495,242 (the "'242 patent"), 9,158,745 (the "'745 patent"), and 6,792,575 (the "'575 patent"). Akamai admits that the '242 patent is entitled "Automated media delivery system," and on its face states that it issued July 23, 2013.  Akamai admits that the '745 patent is entitled "Optimization of media content using generated intermediate media content," and on its face states that it issued October 13, 2015.  Akamai admits that the '575 patent is entitled "Automated processing and delivery of media to web servers," and on its face states that it issued September 14, 2004.  However, Equil's allegations of infringement with respect to the '242 patent and '575 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations of infringement of the '242 and '575 patents and denies that the '242 patent and '575 patent are "Asserted Patents" in this lawsuit.  Akamai further denies that it has committed any acts of patent infringement.  Akamai denies any remaining allegations in Paragraph 1.

2.      Akamai admits that the face of the '745 patent identifies U.S. Patent Nos. 6,964,009 (the "'009 patent") and 8,381,110 (the "'110 Patent") (together, the "Related Patents"), as well as the '575 patent, as related to the '745 patent.  Akamai admits that the face of the '242 patent identifies the '009 patent, as well as the '575 patent, as related to the '242 patent. Akamai admits that the '745 patent and the '242 patent each on their faces identify the Related Patents. Akamai denies that the '242, '745, and '110 patents are entitled to priority to the '009 and '575 patents.  The intended meaning of the phrase "members of a family" as used in this

paragraph is ambiguous and, on that basis, Akamai denies this allegation.  Equil's allegations of infringement with respect to the '242 patent and '575 patent have been dismissed with prejudice. Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations of infringement of the '242 and '575 patents and denies that the '242 patent and '575 patent are "Asserted Patents" in this lawsuit.  Akamai denies any remaining allegations in Paragraph 2.

3.      Denied.

## PARTIES

4.      Akamai is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 4, and therefore, denies them.

5.      Akamai is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 5, and therefore, denies them.

6.      Denied.

7.      Akamai admits that Akamai is a Delaware corporation with a principal address of 145 Broadway, Cambridge, MA 02142.  Akamai denies any remaining allegations of Paragraph 7.

## JURISDICTION AND VENUE

8.      Akamai admits that the FAC alleges an action arising under the patent laws of the United States, Title 35 of the United States Code.  Akamai admits that this Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1138(a).  Akamai denies any remaining allegations in Paragraph 8.

9.      For purposes of this litigation, Akamai admits that this Court has personal jurisdiction over Akamai, and that Delaware is Akamai's state of incorporation.  Akamai

expressly denies any allegation that it has committed an infringing act, including within this district. Akamai denies any remaining allegations in Paragraph 9.

10.     For purposes of this litigation, Akamai admits that venue is proper under 28 U.S.C. §§ 1391(b) and 1400(b) and that Delaware is Akamai's state of incorporation.  Akamai otherwise denies any remaining allegations in Paragraph 10.

## THE EQUILIBRIUM PATENTS AND "MEDIARICH SERVER"

11.     Akamai is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 11, and therefore, denies them.

12.     Akamai is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12, and therefore, denies them.

13.     Akamai admits that the '575 patent bears, on its face, a filing date of October 21, 1999.  The remainder of the allegations in Paragraph 13 of the FAC are ambiguous and/or Akamai is without knowledge or information sufficient to form a belief as to any remaining allegations in Paragraph 13, and therefore, Akamai denies them.

14.     Akamai admits that the '575 patent bears, on its face, an issue date of September 14, 2004 and an application number of 09/425,326.  Akamai admits that Exhibit A to the FAC purports to be a copy of the '575 patent.  Akamai denies that the '575 patent should have been issued by the United States Patent and Trademark Office.  Akamai otherwise denies any remaining allegations in Paragraph 14.

15.     Akamai admits that Application No. 60/226,043 bears, on its face, a filing date of August 16, 2000, and that the '009 patent bears, on its face, an application number of 09/929,904, a filing date of August 14, 2001, and an issue date of November 8, 2005.  Akamai admits that, on its face, the '009 patent states that it is a continuation-in-part of application No.

09/425,326, filed on Oct. 21, 1999. Akamai admits that Exhibit B to the FAC purports to be a copy of the '009 patent. Akamai denies that the '009 patent should have been issued by the United States Patent and Trademark Office. Akamai otherwise denies any remaining allegations in Paragraph 15.

16.    Akamai admits that the '110 patent bears, on its face, an application number of 12/238,842, a filing date of September 26, 2008, and an issue date of February 19, 2013. Akamai admits that, on its face, the '110 patent states that it is a division of application No. 12/173,747, filed on July 15, 2008. Akamai admits that Exhibit C to the FAC purports to be a copy of the '110 patent. Akamai denies that the '110 patent should have been issued by the United States Patent and Trademark Office. Akamai otherwise denies any remaining allegations in Paragraph 16.

17.    Akamai admits that the '242 patent bears, on its face, an application number of 12/713,637, a filing date of February 26, 2010, and an issue date of July 23, 2013. Akamai admits that, on its face, the '110 patent states that it is a division of application No. 12/173,747, filed on July 15, 2008. Akamai admits that Exhibit D to the FAC purports to be a copy of the '242 patent. Akamai denies that the '242 patent should have been issued by the United States Patent and Trademark Office. Akamai otherwise denies any remaining allegations in Paragraph 17.

18.    Akamai admits that U.S. Patent No. 8,656,046 (the "'046 patent") bears, on its face, an application number of 12/173,747, a filing date of July 15, 2008, and an issue date of February 18, 2014. Akamai admits that, on its face, the '046 patent states that it is a division of application No. 11/269,916, filed on Nov. 7, 2005. Akamai admits that Exhibit E to the FAC purports to be a copy of the '046 patent. Akamai denies that the '046 patent should have been

issued by the United States Patent and Trademark Office.  Akamai otherwise denies any remaining allegations in Paragraph 18.

19.    Akamai admits that the '745 patent bears, on its face, an application number of 13/752,110, a filing date of January 28, 2013, and an issue date of October 13, 2015.  Akamai admits that, on its face, the '745 patent states that it is a continuation of application No. 12/238,842, filed on Sep. 26, 2008.  Akamai admits that Exhibit F to the FAC purports to be a copy of the '745 patent.  Akamai denies that the '745 patent should have been issued by the United States Patent and Trademark Office.  Akamai otherwise denies any remaining allegations in Paragraph 19.

20.    Akamai is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20, and therefore, denies them.

21.    Denied.

22.    Denied.

23.    Akamai admits that it is the assignee of U.S. Patent Nos. 7,653,706 (entitled "Dynamic image delivery system"), 7,725,602 (entitled "Domain name resolution using a distributed DNS network"), 7,912,978 (entitled "Method for determining metrics of a content delivery and global traffic management network"); 7,996,533 (entitled "HTML delivery from edge-of-network servers in a content delivery network (CDN)"); 8,805,965 (entitled "Methods and apparatus for image delivery"); 9,418,353 (entitled "Methods and systems for delivering content to differentiated client devices"); 9,419,852 (entitled "Systems and methods for identifying and characterizing client devices"); 9,509,804 (entitled "Scalable content delivery network request handling mechanism to support a request processing layer"); 9,544,183 (entitled "Methods and apparatus for providing content delivery instructions to a content server");

9,654,579 (entitled "Scalable content delivery network request handling mechanism"); 9,742,858 (entitled "Assessment of content delivery services using performance measurements from within an end user client application"); and 9,817,916 (entitled "Methods and apparatus for accelerating content authored for multiple devices"). Akamai admits that the face of each of these patents, with the exception of the 9,509,804 and 9,654,579 patents, identifies the '575 patent as a reference cited. Akamai admits that during prosecution of Application Nos. 11/009,273, 11/768,935, and 12/693,413, the examiner cited disclosures from the '575 patent. The remaining allegations in this paragraph are ambiguous; on that basis and because Akamai is without knowledge or information sufficient to form a belief as to the truth of those allegations, Akamai denies the remaining allegations in Paragraph 23.

24.    Akamai is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 24, and therefore, denies them.

25.    Akamai is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 25, and therefore, denies them.

26.    Akamai is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 26, and therefore, denies them.

27.    Akamai denies that any technology purportedly claimed in either the '745 patent or any of the Equilibrium Patents purportedly practiced by MediaRich solves any purported technical problems, including any purported technical problems associated with delivering rich media content over the Internet. Akamai is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 27, and therefore, denies them.

28.    Akamai is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 28, and therefore, denies them.

## THE AKAMAI "INTELLIGENT EDGE" NETWORK

29.    Denied.

30.    Akamai admits that it was founded in the late 1990s.  Akamai admits that it builds, delivers, and secures digital experiences for leading companies around the world.  Akamai admits that, with the world's most distributed compute platform—from cloud to edge—Akamai makes it easier for customers to develop and run applications, while keeping experiences closer to users and threats farther away.  Akamai otherwise denies any remaining allegations in Paragraph 30.

31.    Denied.

32.    Akamai admits that Paul Sagan was Chief Operating Officer at Akamai from October 1998 until 1999.  Akamai admits that Mr. Sagan was Akamai's Chief Executive Officer from April 2005 through December 2012.  Akamai otherwise denies any remaining allegations in Paragraph 32.

33.    Denied.

34.    Akamai admits that it has an Intelligent Edge Platform.  Akamai otherwise denies any remaining allegations in Paragraph 34.

35.    Akamai admits it has a "Media Technology Partner (MTP)" program.  Akamai admits that partners in this program have included IBM, Microsoft, and Oracle.  Akamai admits that Paragraph 35 includes a quote that is purportedly from Akamai.  Akamai is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 35, and therefore, denies them.

36.    Akamai admits that Akamai's website listed Equilibrium as a technology partner.  Akamai admits that Paragraph 36 includes images purporting to be internet archive captures of Akamai's website, which appear to be captured from

https://web.archive.org/web/20041209064352/www.akamai.com/en/html/partners/equilibrium_c ompanyinfo.html and

https://web.archive.org/web/20041209121047/http://www.akamai.com/en/html/partners/equilibri um_product.html.  Akamai admits that these captures include language stating, "As a recognized leader in automated imaging solutions, the company's award-winning DeBabelizer® has automated digital asset preparation on the desktop for over a decade," and "Equilibrium's MediaRich is server-based software that automates image production and enables dynamic delivery of images anywhere. MediaRich brings true state-of-the-art automation tools to the Enterprise, allowing companies to create more engaging customer experiences while reducing production time and costs." Akamai is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 36, and therefore, denies them.

37.     Akamai is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 37, and therefore, denies them.

38.     Akamai admits that John Bishop joined Akamai in 2014 as a Chief Technology Officer.  Akamai is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 38, and therefore, denies them.

39.     Akamai admits that it had a product called "Image Manager."  Akamai denies that Image Manager is "[j]ust like Equilibrium's MediaRich service." Akamai is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 39, and therefore, denies them.

40.     Akamai admits that it had a 2016 Annual Report that included the following language: "*Web and Mobile Performance Solutions* [¶] The ultimate goal of our web and mobile performance business is to make dynamic websites and applications have instant response times,

no matter where the user is, what device or browser they are using, or how they are connected to the Internet. This is accomplished through a variety of advanced technologies embedded into our platform, which can be thought of as a virtual Internet overlaying the real Internet. Key offerings include: … Image Manager – To help our customers cope with the multitude of devices used by their consumers and varying connection quality, Image Manager automatically optimizes online images for the best combination of size, quality, and file format suited for each image and device and offloads the artistic transformation of derivative assets to the cloud." Akamai otherwise denies any remaining allegations in Paragraph 40.

41.    Akamai denies that it provides anything to customers that is "[j]ust like MediaRich" and, on at least that basis, denies the allegations in Paragraph 41.

42.    Akamai admits that Paragraph 42 includes a quote that is purportedly from Akamai.  Akamai is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 42, and therefore, denies them.

43.    Akamai admits that Paragraph 43 includes a quote that is purportedly from Akamai.  Akamai is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 43, and therefore, denies them.

44.    Denied.

**EQUILIBRIUM'S [ALLEGEDLY] PATENTED INVENTIONS**

45.    Akamai admits that in the FAC, Equil purports to assert the '242, '745, and '575 patents.  Akamai admits that the '575 patent issued before the '242 and '745 patents.  However, Equil's allegations of infringement with respect to the '242 patent and '575 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations of infringement of the '242 and '575 patents.  Akamai denies that the '745, '242, and '575 patents

should have been issued by the United States Patent and Trademark Office.  Akamai otherwise

denies any remaining allegations in Paragraph 45, and specifically denies that it is liable for

infringement of any patent.

46.     Akamai admits that the '745 patent is entitled "Optimization of media content

using generated intermediate media content," and on its face states that it issued October 13,

2015.  Akamai admits that the '745 patent bears, on its face, a priority claim to an application

filed on October 21, 1999.  Akamai denies that this priority claim is valid.  Akamai denies that

the '745 patent should have been issued by the United States Patent and Trademark Office.

Akamai denies any remaining allegations in Paragraph 46.

47.     Denied.

48.     Denied.

49.     Denied.

## MARKING

50.     Denied.

51.     Akamai admits that claim 1 of the '745 patent and claim 9 of the '242 patent

purport to recite method claims.  Akamai denies the remaining allegations in Paragraph 51.

## THE ACCUSED PRODUCTS

52.     Akamai admits that it provides "Akamai Intelligent Edge" to its customers as a

content delivery solution.  Akamai denies any remaining allegations in Paragraph 52, and

specifically denies that it is liable for infringement of any patent.

*[Allegations Relating To] Image and Video Manager*

53.     Denied.

11

54.     Akamai admits that Paragraph 54 appears to accurately quote claim 1 of the '745 patent as it appears in Exhibit F of the FAC.  Akamai denies any remaining allegations in Paragraph 54, and specifically denies that it is liable for infringement of any patent.

55.     Denied.

56.     Akamai admits that the quoted language in Paragraph 56 appears in Exhibit H to the FAC.  Akamai admits that Exhibit H appears to show an excerpt of an Akamai web page.  Akamai otherwise denies any remaining allegations in Paragraph 56, and specifically denies that it is liable for infringement of any patent.

57.     Akamai admits that the excerpt in Paragraph 57 appears in Exhibit H to the FAC.  Akamai admits that Exhibit H appears to show an excerpt of an Akamai web page.  Akamai otherwise denies any remaining allegations in Paragraph 57, and specifically denies that it is liable for infringement of any patent.

58.     Akamai admits that the quoted language in Paragraph 58 appears in Exhibit I to the FAC.  Akamai admits that Exhibit I appears to show an excerpt of an Akamai web page.  Akamai otherwise denies any remaining allegations in Paragraph 58, and specifically denies that it is liable for infringement of any patent.

59.     Denied.

60.     Denied.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Denied.

*[Allegations Relating To] Adaptive Media Delivery*

65.    Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

66.    Akamai admits that Paragraph 66 appears to accurately quote claim 9 of the '242 patent as it appears in Exhibit D of the FAC. Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the remaining allegations in this paragraph.

67.    Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

68.    Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

69.    Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

70.    Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

71.    Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

72.     Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

73.     Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

74.     Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

75.     Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

76.     Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

*[Allegations Relating To] Front-End Optimization*

77.     Equil's allegations of infringement with respect to the '575 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

78.     Equil's allegations of infringement with respect to the '575 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

79.     Equil's allegations of infringement with respect to the '575 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

80.     Equil's allegations of infringement with respect to the '575 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

81.     Equil's allegations of infringement with respect to the '575 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

82.     Equil's allegations of infringement with respect to the '575 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

83.     Equil's allegations of infringement with respect to the '575 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

84.     Equil's allegations of infringement with respect to the '575 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

85.     Akamai admits that it maintains technical information about its technology that is not publicly accessible. Akamai denies any remaining allegations in Paragraph 85, and specifically denies that it is liable for infringement of any patent.

**WILLFUL INFRINGEMENT**

86.    Equil's allegations of willful infringement have been dismissed for failure to state a claim.  *See* Dkt. No. 30, at 3.  On that basis, Akamai denies the allegations in Paragraph 86, and specifically denies that it is liable for any alleged acts of infringement, including willful infringement.

87.    Equil's allegations of willful infringement have been dismissed for failure to state a claim.  *See* Dkt. No. 30, at 3.  On that basis, Akamai denies the allegations in Paragraph 87, and specifically denies that it is liable for any alleged acts of infringement, including willful infringement.

88.    Equil's allegations of willful infringement have been dismissed for failure to state a claim.  *See* Dkt. No. 30, at 3.  On that basis, Akamai denies the allegations in Paragraph 88, and specifically denies that it is liable for any alleged acts of infringement, including willful infringement.

89.    Equil's allegations of willful infringement have been dismissed for failure to state a claim.  *See* Dkt. No. 30, at 3.  On that basis, Akamai denies the allegations in Paragraph 89, and specifically denies that it is liable for any alleged acts of infringement, including willful infringement.

90.    Equil's allegations of willful infringement have been dismissed for failure to state a claim.  *See* Dkt. No. 30, at 3.  On that basis, Akamai denies the allegations in Paragraph 90, and specifically denies that it is liable for any alleged acts of infringement, including willful infringement.

91.    Equil's allegations of willful infringement have been dismissed for failure to state a claim.  *See* Dkt. No. 30, at 3.  On that basis, Akamai denies the allegations in Paragraph 91,

and specifically denies that it is liable for any alleged acts of infringement, including willful infringement.

92.     Equil's allegations of willful infringement have been dismissed for failure to state a claim.  *See* Dkt. No. 30, at 3.  On that basis, Akamai denies the allegations in Paragraph 92, and specifically denies that it is liable for any alleged acts of infringement, including willful infringement.

## THE AMENDED COMPLAINT

93.     Akamai admits that Equil filed its original Complaint in this action on May 24, 2022.  Akamai admits that the parties agreed to an extended time to file a pleading responsive to the complaint.  *See* Dkt. No. 8.  Akamai admits that on July 19, 2022, Equil contacted Akamai regarding filing an amended complaint.  Akamai admits that on July 21, 2022, Akamai was still considering Equil's proposed amended complaint.  Akamai admits that it filed a motion to dismiss on July 22, 2022.  Akamai denies any remaining allegations in Paragraph 93.

## COUNT I
## [ALLEGED] INFRINGEMENT OF U.S. PATENT NO. 9,158,745

94.     Akamai incorporates and re-alleges its responses to the allegations set forth in Paragraphs 1-93 as if fully set forth herein.

95.     Denied.

96.     Equil's allegations of willful infringement have been dismissed for failure to state a claim.  *See* Dkt. No. 30, at 3.  On that basis, Akamai denies the allegations in Paragraph 96, and specifically denies that it is liable for any alleged acts of infringement, including willful infringement.

97.     Denied.

## COUNT II
## [ALLEGED] INFRINGEMENT OF U.S. PATENT NO. 8,495,242

98.     Akamai incorporates and re-alleges its responses to the allegations set forth in Paragraphs 1-97 as if fully set forth herein.

99.     Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

100.    Equil's allegations of willful infringement have been dismissed for failure to state a claim. *See* Dkt. No. 30, at 3.  Additionally, Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On these bases, Akamai denies the allegations in Paragraph 100, and specifically denies that it is liable for any alleged acts of infringement, including willful infringement.

101.    Equil's allegations of infringement with respect to the '242 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

## COUNT III
## [ALLEGED] INFRINGEMENT OF U.S. PATENT NO. 6,792,575

102.    Akamai incorporates and re-alleges its responses to the allegations set forth in Paragraphs 1-101 as if fully set forth herein.

103.    Equil's allegations of infringement with respect to the '575 patent have been dismissed with prejudice.  Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

104.    Equil's allegations of willful infringement have been dismissed for failure to state a claim. *See* Dkt. No. 30, at 3.  Additionally, Equil's allegations of infringement with respect to

the '575 patent have been dismissed with prejudice. Dkt. Nos. 63, 64. On these bases, Akamai denies the allegations in Paragraph 104, and specifically denies that it is liable for any alleged acts of infringement, including willful infringement.

105.    Equil's allegations of infringement with respect to the '575 patent have been dismissed with prejudice. Dkt. Nos. 63, 64. On that basis, Akamai denies the allegations in this paragraph.

## DEMAND FOR JURY TRIAL

106.    Equil's request for a jury trial for any issues so triable by right does not make any allegation, and Akamai is not required to respond. Akamai does not contest Equil's request for a jury trial and also demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

107.    Paragraphs a-g set forth Equil's statement of requested relief and no response is required. Akamai denies that Equil is entitled to any relief from Akamai, including the relief specified in Paragraphs a-g of this section of Equil's FAC.

## AKAMAI'S AFFIRMATIVE AND OTHER DEFENSES

108.    Subject to the responses above, Akamai specifically alleges and asserts the following defenses, undertaking the burden of proof as to only those defenses deemed affirmative defenses by law. Akamai reserves all rights to raise additional defenses that become known through the course of discovery.

## FIRST DEFENSE: FAILURE TO STATE A CLAIM

109.    Equil fails to state a claim upon which relief may be granted against Defendant including, but not limited to, failure of Equil's FAC to meet the standard for pleading set by the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

## SECOND DEFENSE: INVALIDITY

110.    The claims of the '745 patent are invalid and unenforceable for failure to meet the requirements of Title 35, United States Code, including but not limited to Sections 101, 102, 103, and/or 112 thereof, and the rules, regulations, and laws pertaining thereto, including the doctrine of non-statutory obviousness-type double patenting.

## THIRD DEFENSE: NON-INFRINGEMENT

111.    Akamai does not infringe and has not infringed (whether directly, contributorily, or by inducement), either literally or under the doctrine of equivalents, and is not liable for infringement of any valid and enforceable claim of the '745 patent.

## FOURTH DEFENSE: LIMITATION ON PATENT DAMAGES

112.    Equil's claim for damages, if any, against Akamai for alleged infringement of the '745 patent is limited by 35 U.S.C. §§ 286, 287, and/or 288 including, without limitation, for Equil's failure to provide actual notice to Akamai complying with § 287, and/or its failure to make reasonable efforts to ensure third parties' compliance with § 287.

## FIFTH DEFENSE: ENSNAREMENT

113.    Equil's claims of patent infringement under the doctrine of equivalents, if any, are barred under the doctrine of ensnarement.

## SIXTH DEFENSE: ESTOPPEL AND/OR DISCLAIMER

114.    As a result of the proceedings before the United States Patent and Trademark Office ("USPTO") during the prosecution of the applications that led to the '745 patent, one or more of the claims asserted against Defendant are barred, in whole or in part, by prosecution history estoppel.

## SEVENTH DEFENSE: STANDING

115.    To the extent Equil does not have substantially all the rights or all the rights to the '745 patent, or to the extent the purported assignments of the '745 patent are defective for any reason, Equil lacks standing to bring this action.

## EIGHTH DEFENSE: NO WILLFUL INFRINGEMENT

116.    Equil is not entitled to a finding of willful infringement with a corresponding increase in damages under 35 U.S.C. § 284.  *See* Dkt. No. 30, at 3.

## NINTH DEFENSE: NOT AN EXCEPTIONAL CASE

117.    Equil is not entitled to a finding that this case is exceptional warranting attorneys' fees under 35 U.S.C. § 285 to Equil, or pursuant to the Court's inherent power.

## TENTH DEFENSE: INEQUITABLE CONDUCT

118.    The '745 patent is unenforceable due to inequitable conduct for several reasons. Mr. Barger, Equil, and Equilibrium made and continue to make intentional material misrepresentations during prosecution of the '745 patent and patents to which it claims priority, including by (1) intentionally and falsely identifying persons as purported named inventors who did not contribute to the alleged invention recited in the claims of the '745 patent and the '009 patent (to which the '745 patent claims priority); (2) intentionally and falsely omitting as named inventors persons who did contribute to the alleged invention recited in the claims of the '745

21

patent and other patents to which it claims priority; (3) failing to properly correct inventorship during the life of the '745 patent and other patents to which it claims priority; and (4) continuing to fail to correct inventorship even after the '745 patent and other patents to which it claims priority already expired, despite clear knowledge of incorrectly named inventors. These misrepresentations are material because they affect the patentability of the '745 patent and other patents to which the '745 patent claims priority. For example, Equilibrium and Mr. Barger materially misrepresented the inventorship of the '745 patent and other related patents by removing previously-named inventors in parent applications when Equilibrium and Mr. Barger were engaged in litigation with these previously-named inventors. Equil and Mr. Barger also misrepresented the inventorship of the '009 patent when it added Mr. Barger as an inventor in order to avoid Akamai's IPR challenge to the '745 patent claims based on the publication of the application leading to the '009 patent.

119.    On information and belief, Sean Barger founded Plaintiff's predecessor-in-interest, Equilibrium Technologies, Inc. ("ETI") in 1989. *See* Ex. 1. On October 21, 1999, ETI filed U.S. Patent Application No. 09/425,326 (*see* Dkt. No. 13-1, Ex. A), which led to the '575 patent, listing Christopher Samaniego as the first named inventor, and not listing Mr. Barger as an inventor. Mr. Barger subsequently left the company in 2001. *See* Ex. 1.

120.    On information and belief, in 2003, ETI entered into a partnership with Scene7, Inc. ("Scene7"). *See* Ex. 1. Scene7 became the exclusive distributor for MediaRich—the product Plaintiff here alleges practices each of the asserted patents. *See* Ex. 1; Dkt. No. 13 ¶¶24-28. Around the same time, Mr. Samaniego left ETI to join Scene7. *See* Ex. 2.

121.    On information and belief, in 2004, Mr. Barger re-acquired ETI through Equilibrium and, through that entity, subsequently sued Mr. Samaniego, Scene7, and ETI's prior

ownership, for alleged fraudulent misconduct related to transferring intangible and tangible assets from ETI to Scene7 ("Barger Litigation").  *See* Ex. 1; Ex. 3.  The Barger Litigation—which at least in part centered on questions of who would control the MediaRich technology that was the subject of the '745 patent application at issue here—continued from 2004 until 2007.  *See* Ex. 3.  Each defendant was represented by the same counsel, David Burtt.  Ex. 3.

122.    On information and belief, in November 2005, with the Barger Litigation ongoing, the Barger-controlled Equilibrium filed U.S. Patent Application No. 11/269,916 ("'916 application"), which named the same inventors as in '575 patent (i.e., including Mr. Samaniego but not Mr. Barger), but Equilibrium did not include signatures from any of the inventors named on the originally-filed application that issued as the '575 patent for that application.  *Compare* Ex. 4, 68-70 *with* Dkt. No. 13-1, Ex. A.  Shortly thereafter, the PTO therefore issued a notice that the '916 application was missing signed inventorship oaths or declarations, and required submission of the same to avoid abandonment of the application.  Ex. 4, 76-77.

123.    On May 12, 2006, Mr. Barger and Equilibrium filed a response including (1) a Rule 47 petition to proceed without a declaration signed by the inventors and attesting that Mr. Samaniego—who Mr. Barger was actively litigating against—could not be reached after "diligent efforts," (2) one FedEx letter to Mr. Samaniego returned as undeliverable as evidence of those "diligent efforts" for the Rule 47 petition, (3) a Rule 48 statement in which Mr. Barger—signing on behalf of Equilibrium—consented to adding himself as an inventor, and (4) Mr. Barger's signed inventorship declaration asserting that he was also an inventor of the '916 application.  Ex. 4, 78-98.  Importantly, the attestation of "diligent efforts" did not notify the PTO about the ongoing litigation against Mr. Samaniego, let alone about the fact that, due to that litigation, Equilibrium could contact Mr. Samaniego through Mr. Burtt—and had in fact recently

done so by serving Samaniego with an Amended Complaint on March 15, 2006.  Ex. 4, 78-98; Ex. 3, 6.  That service was successful as Mr. Samaniego subsequently filed an Answer on April 17, 2006.  Ex. 3, 7.  Equilibrium and Mr. Barger thus knew how to contact Mr. Samaniego, had successfully done so when serving Mr. Samaniego with the Amended Complaint, and then chose not to inform the PTO about these facts when seeking to amend the inventorship on the '916 application.

124.    Reflecting Equilibrium's lack of diligence, the PTO dismissed Equilibrium's Rule 47 petition, stating that "[o]ne returned mailing does not rise to the level of diligence required to obtain Rule 47 status."  Ex. 4, 112-13.  The dismissal stated that a "showing of **diligence** is critical in obtaining Rule 47 status" (emphasis in original) and that "a diligent effort to find the inventor must be made."  Ex. 4, 113.  Several months later, and in response, Mr. Barger and Equilibrium requested reconsideration, again attesting that they were unable to locate Mr. Samaniego and again failing to disclose the Barger Litigation or Mr. Samaniego's role in it.  Ex. 4, 116-17.  This second attestation attached a "411.com" webpage purporting to show that 411.com did not return any results when searching for "Christopher Samaniego" at an address (461 Second Street, San Francisco, CA) that Equilibrium and its counsel already knew was non-working.  Ex. 4, 129-30; *see also id.*, 116-41.  This attestation states that it was provided as "documentary evidence of further efforts to locate the non-signing inventors."  *See* Ex. 4, 117.  It did not reference the separate fact that Equilibrium and Mr. Barger could readily contact Mr. Samaniego through his attorney Mr. Burtt, and indeed had already done so.  *See* Ex. 4, 116-41; Ex. 3, 9.

125.    On information and belief, even as Equilibrium purported not to know how to contact Mr. Samaniego, Equilibrium reached a settlement with the defendants in the Barger

Litigation, including Mr. Samaniego. Ex. 3, 9, 12. This required communicating with Mr. Samaniego (either directly or through his counsel), during both negotiations and the eventual execution of the settlement. But even after this settlement, Equilibrium still did not notify the PTO about its ability to communicate with Mr. Samaniego. On June 26, 2007, barely a month after the settlement and dismissal of the Barger Litigation, the PTO accepted Equilibrium's second false attestation, thus allowing for the continued prosecution of the '916 application—and the eventual filings of the follow-on applications leading to the '242 and '745 patents. Ex. 4, 156.

126. Importantly, if the PTO had known the truth, it would not have accepted the false attestations as meeting the requisite showing of diligence. *See* Ex. 4, 112-13, 156; *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Inc.*, 292 F.3d 1363, 1369, 1376 (Fed. Cir. 2002) (affirming finding of inequitable conduct based on omission of an inventor where the applicant submitted false declarations under Rule 47, which governs applications filed when the inventor cannot be found or refuses to sign). And if the PTO had not accepted the diligence shown in the '916 application, then the '916 application would have been abandoned and—because there were no other patent applications in the purported family that were pending at the time—that abandonment would have prevented Mr. Barger and Equilibrium from filing the subsequent application that later issued as the '745 patent.

127. Equilibrium filed the application that later issued as the '745 patent on January 28, 2013. The '745 patent and the '009 patent share a substantively identical specification, but the '745 patent is identified as a continuation-in-part of the '009 patent. As a result of Equilibrium's changes in inventorship, prior to 2023, the '745 patent, as well as each of the other patents that claimed priority to the '916 application, share no common inventors with the earlier-

filed patent applications—despite their common specification.  The named inventors on the patents/applications in the same family as the patents-in-suit are summarized below:

| | Pat. 6,792,575 | Prov. Appl. 60/226,043 | Pat. 6,964,009 Pub. 2002/0078093 | Appl. 11/269,916 | Appl. 12/489,308 | Pat. 8,656,046 | Pat. 8,495,242 | Pat. 8,381,110 | Pat. 9,158,745 | Appl. 14/879,671 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Christopher Samaniego** | X | X | X | X | | | | | | |
| **Nelson H. "Rocky" Offner** | X | X | X | X | | | | | | |
| **Adrian D. Thewlis** | X | X | X | X | | | | | | |
| **David R. Boyd** | X | X | X | X | | | | | | |
| **David C. Salmon** | | X | X | X | | | | | | |
| **Joshua N. Devan** | | X | X | X | | | | | | |
| **Sean Barger** | | | **Added in 2023** | X | X | X | X | X | X | X |
| **Steve Johnson** | | | | | X | X | X | X | | |
| **Matt Butler** | | | | | | X | X | X | X | X |
| **Jerry Destremps** | | | | | X | X | X | X | | |
| **David Pochron** | | | | | X | X | X | X | X | X |
| **Trent Brown** | | | | | X | X | X | X | | |
| **Brian Rice** | | | | | | | | | X | X |

128.    On January 10, 2023, Akamai filed IPRs challenging the '242 and '745 patents. Among the grounds in these IPRs, Akamai demonstrated that the claims of the '242 and '745 patents should have been found invalid over U.S. Pub. 2002/0078093 ("'093 publication"; Ex. 5).  Ex. 6, 41-56; Ex. 7, 49-68.  The '093 publication is the publication of the 09/929,904 application, which issued as the '009 patent and was filed before the '916 application to which Mr. Barger added himself.  On information and belief, because the '093 publication did not share any inventors with the '242 and '745 patents at the time that Akamai filed its IPRs, the publication should have been invalidating prior art—indeed, it shares the same specification as these patents.  *See* D.I. 13, Ex. D; Ex. F; Ex. 6, 41-56; Ex. 7, 49-68.

129.    Faced with this issue, and now 22 years after-the-fact, Mr. Barger and Equil (the alleged successor-in-interest to Equilibrium as to the patents-in-suit) made the strategic decision to respond to Akamai's IPR petitions by filing a Petition Under 37 C.F.R. § 1.324(a) to Correct Inventorship in a Patent with the USPTO on April 3, 2023 and, after Equil submitted a Supplemental Statement for Correction and Request for a Certificate of Correction on April 24, 2023 (Ex. 8 ('009 Patent File History), 159-85 ), which included both the petition for correction of inventorship and a request to issue a certificate of correction, the USPTO granted the Petition with respect to its request to correct inventorship on April 27, 2023.  But, on May 9, 2023, the USPTO denied the Request for a Certificate of Correction due to a procedural deficiency in the request.  Ex. 8, 186-91.  On May 9, 2023, Mr. Barger and Equil again submitted a Petition Under 37 C.F.R. § 1.324(a) to Correct Inventorship in a Patent ("Inventorship Petition") with the USPTO, purportedly correcting the alleged procedural deficiency.  Ex. 8, 192-200.  On May 31, 2023, the USPTO approved the Request for a Certificate of Correction, and on June 13, 2023, a Certificate of Correction adding Mr. Barger as an alleged inventor to the '009 patent was issued.  Ex. 8, 201-03.

130.    The Patent Trial and Appeal Board ("PTAB") subsequently denied institution of Akamai's IPR challenging the '745 patent on July 21, 2023.  Ex. 9.  As relevant to this defense, the PTAB reasoned that "[f]ollowing correction of the inventorship of the '009 patent …, Samaniego is excluded as prior art."  Ex. 9, 36.

131.    In parallel with the PTAB proceedings, Equil filed a motion to strike Akamai's inequitable conduct defense on April 3, 2023.  Dkt. No. 40.  In its opening brief, Equil stated that "Equilibrium has since collected declarations from *all* of the originally named inventors stating that they agree (or do not dispute) that Mr. Barger should be added to the list of joint inventors *in*

*all of the patents and applications in the chain of priority* leading to the '242 and '745 patents-in-suit (on which he is already named as an inventor). Equil has applied to the Patent and Trademark Office Director to correct the inventorship to name Mr. Barger as a joint inventor in the priority applications." Dkt. No. 40, 8. Despite this representation to the Court about Equil's awareness of errors in alleged inventorship, on information and belief Equil has filed only the Inventorship Petition for the '009 patent, and has not filed any other petitions to purportedly correct inventorship.

132.    Equil and Mr. Barger's inventorship-related conduct constitutes inequitable conduct that renders the '745 patent unenforceable for several reasons.

133.    **First**, on information and belief, Mr. Barger and Equilibrium knowingly named persons as alleged inventors on the '745 patent who were not involved in conceiving of or reducing to practice the alleged inventions purportedly recited in the '745 patent's claims. The '745 patent currently names as alleged inventors Sean Barger, Brian Rice, Matt Butler, and David Pochron. On information and belief, the inventorship of the '745 patent is incorrect with respect to each of these named inventors as they did not invent and could not have invented the claimed subject matter of the '745 patent. The '745 patent purports to be a continuation-in-part of both the '009 patent and '575 patent, shares a substantively identical specification with the '009 patent, and has a similar specification to the '575 patent. But the named inventors of the '745 patent (Messrs. Barger, Butler, Pochron, and Rice) are different than the named inventors of each of these predecessor patents. For example, the '745 patent specification is substantively identical to the '009 patent specification, but does not have any overlapping named inventors, with the exception of Mr. Barger, whom Equil recently added as an alleged inventor to the '009 patent using the Inventorship Petition. In addition, the claims of the '745 patent and '009 patent cover similar concepts (e.g., "performing…transformation operations" ('745 patent);

"determining if dynamic processing is required and…operating upon said media by a dynamic content generator" ('009 patent)).  Only Mr. Barger is a named inventor on both patents (by virtue of having recently been added as an inventor to the '009 patent), but on information and belief Mr. Barger did not contribute to the claimed inventions of the '745 patent or '009 patent. For example, on information and belief, Equil cannot produce evidence demonstrating, suggesting, implying, or corroborating Mr. Barger's alleged inventorship of the claims of either the '745 patent or '009 patent.

134.    On information and belief, Matt Butler is incorrectly named as an inventor of the '745 patent.  In particular, Mr. Butler is not a named inventor of the '009 patent and, on information and belief, did not contribute to any invention disclosed in the specifications of or claimed in the '009 patent or '745 patents, whose specifications are substantively identical.

135.    On information and belief, David Pochron is incorrectly named as an inventor of the '745 patent.  In particular, Mr. Pochron is not a named inventor of the '009 patent and, on information and belief, did not contribute to any invention disclosed in the specifications of or claimed in the '009 patent or '745 patents, whose specifications are substantively identical.

136.    On information and belief, Brian Rice is incorrectly named as an inventor of the '745 patent. In particular, Mr. Rice is not a named inventor of the '009 patent and, on information and belief, did not contribute to any invention disclosed in the specifications of or claimed in the '009 patent or '745 patents, whose specifications are substantively identical.

137.    **Second**, Equilibrium knowingly did not name persons as alleged inventors on the '745 patent who were involved in conceiving of or reducing to practice the alleged inventions purportedly recited in the '745 patent's claims.  When the '009 patent was filed, it named six different named inventors, none of whom is named as an inventor on the '745 patent, despite the

fact that the '745 patent has a substantially identical specification to the '009 patent. For example, the '745 patent names none of Messrs. Samaniego, Offner, Thewlis, Boyd, Salmon, or Devan as alleged inventors.

138.    On information and belief, Messrs. Christopher Samaniego, Nelson H. "Rocky" Offner, Adrian D. Thewlis, David R. Boyd, David C. Salmon, and/or Joshua N. Devan are incorrectly omitted as an alleged inventor of the '745 patent. In particular, on information and belief, Messrs. Samaniego, Offner, Thewlis, Boyd, Salmon, and Devan are named inventors of the '009 patent and contributed to alleged invention(s) disclosed in the specification of the '009 patent, which is substantively identical to the specification of the '745 patent. Additionally, the claims recited in the '009 patent recite features that are similar to those recited in the claims of the '745 patent. Thus, on information and belief based on, e.g., the identicality of the specifications and overlaps in the claims and Equil's own representations about conception of the purported inventions claimed in the '745 patent, Messrs. Samaniego, Offner, Thewlis, Boyd, Salmon, and/or Devan contributed to one or more of the purported inventions recited in the claims of the '745 patent, and should have been identified as an inventor of the '745 patent. On information and belief, Equil and Mr. Barger are aware that Messrs. Samaniego, Offner, Thewlis, Boyd, Salmon, and/or Devan should have been named as an alleged inventor on the '745 patent, and have nonetheless failed to file a petition seeking to correct the alleged inventorship of the '745 patent.

139.    On information and belief, the decision to omit these earlier inventors was intentional, and motivated by a dispute between Mr. Barger, Equilibrium, and one or more of the originally named inventors, including at least Mr. Samaniego. On information and belief, Mr. Barger was actively involved in the Barger Litigation adverse to Mr. Samaniego from 2004 to

2007. *See* Ex. 3.  Prior to the filing of the Barger Litigation, patents to which the '745 patent claims priority named Mr. Samaniego, and other former employees, as named inventors.  During the Barger Litigation, Mr. Barger and Equilibrium sought to file further applications claiming priority to the '575 patent and '009 patent. But because of the disputes with at least Mr. Samaniego, on information and belief Mr. Barger and Equilibrium chose not to further discuss or credit Mr. Samaniego or other former employees as named inventors on Equilibrium patents.  As a result, when the USPTO indicated that it needed the named inventors to sign forms during prosecution of the '916 application, on information and belief, Mr. Barger and Equilibrium made the conscious decision to remove the previously-named inventors from future patent filings, and instead changed the inventors named on later applications to Mr. Barger, and persons who still worked with Mr. Barger and are loyal to Mr. Barger.  As a result, none of the named inventors on the '745 patent is among the inventors originally named on the '009 patent.  Because the '009 patent and '745 patent share substantially the same specification, this difference in named inventors cannot and does not reflect differences in the persons involved in the conception and reduction to practice of the alleged inventions recited in the claims.

140.    **Third**, Mr. Barger and Equilibrium continued to intentionally identify the incorrect inventors during the life of the '745 patent and patents to which it claims priority.  The application that issued as the '745 patent was filed January 28, 2013 and expired no later than July 20, 2020.  For at least the reasons outlined in paragraphs 118 to 139, on information and belief Mr. Barger and Equilibrium knew throughout the life of the '745 patent that the named inventors identified on the face of the '745 patent did not accurately identify the persons who contributed to the alleged inventions recited in the claims of the '745 patent.

141.    **Fourth**, even after the '745 patent and patents to which it claims priority already expired, and despite clear knowledge of incorrectly named inventors, Mr. Barger and Equil have recently only selectively corrected inventorship, and continue to fail to correct inventorship on several of Equil's related patents, including the '745 patent.  Equil has now contended that, in its view, Mr. Barger should have been added to the list of joint inventors in all of the patents and applications in the chain of priority leading to the '745 patent.  Dkt. No. 40, 8.  Despite this allegation, Equil has not done so.  Equil and Mr. Barger thus know that the '745 patent and patents to which it claims priority each fail to properly identify named inventors—thereby deceiving the public and the USPTO by not providing accurate notice of the proper alleged inventors.

142.    Equil now contends in litigation that Equilibrium had a company policy of incorrectly naming inventors by naming as alleged inventors whatever engineers were actively working on the software coding implementing the alleged invention, despite the fact that, on information and belief, Equil, Equilibrium, and its attorneys are aware of and understand the correct legal standard for inventorship.  In any event, Equil and Equilibrium have not produced any evidence in litigation substantiating this purported company policy.

143.    The existence of this purported company policy is also belied by Equil's own representations in this litigation.  Mr. Barger was not included as a named inventor on any patent applications relating to the '745 patent until after the USPTO notified the applicant of missing signatures from named inventors.  Mr. Barger was identified as a named inventor only after Equilibrium purportedly could not identify the originally-named inventors on the applications. Moreover, even to the extent this policy existed, Equil still knowingly has maintained a false identification of named inventors on the '745 patent and other patents to which it claims priority.

Equil has represented that Mr. Offner was the Director of Engineering Chief, and was working closely with Mr. Samaniego, who was at the time a software engineer at Equilibrium. According to Equil, Mr. Offner and Mr. Samaniego were involved in and conceived of the alleged inventions disclosed and claimed in the independent claims of the '745 patent. The fact that engineers, including software engineer Mr. Samaniego, were involved in the conception of and reduction to practice of the alleged inventions claimed in the '745 patent and yet were not named on the '745 patent demonstrates both that there was no policy of identifying only engineers actively working on software coding as alleged inventors, and that even if such a policy existed, Equilibrium deliberately chose not to comply with that policy by excluding Mr. Offner and Mr. Samaniego from the list of named inventors.

144.    Additionally, on information and belief, Mr. Barger was improperly added as a named inventor to the '009 patent. On information and belief, Mr. Barger did not contribute to the conception or reduction to practice of any of the inventions allegedly claimed in the '745 patent's claims.

145.    These misrepresentations by Equil, Equilibrium, and Mr. Barger are material misrepresentations. Omitting inventors materially affects the USPTO's and the public's—including Akamai's—ability to be fully aware of the rights in the '745 patent because the patent does not properly put the public on notice of who contributed to the claims of the '745 patent and, as a result, who may still have rights to that patent. Because Equil intentionally "corrected" these errors in inventorship in order to "enhance [its] position regarding legal rights" in this litigation, the materiality standard "must be met." *See Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231, 1240 (Fed. Cir. 2018) ("[T]he 'immediate and necessary relation' standard [for materiality], in its natural meaning, generally must be met if the conduct normally would

enhance the claimant's position regarding legal rights that are important to the litigation if the impropriety is not discovered and corrected," and is also met when the misconduct "is discovered before it bears fruit, as long as its objective potential to have done so is sufficient."). Indeed, the Federal Circuit has stated that inventorship is "a critical requirement for obtaining a patent" and has affirmed findings of inequitable conduct based on false declarations that improperly identify named inventors on a patent. *See PerSeptive Biosystems, Inc.*, 225 F.3d 1315, 1321 (citing pre-AIA 35 U.S.C. §§ 102(f), 116); *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Inc.*, 292 F.3d 1363, 1369, 1376 (Fed. Cir. 2002) (affirming finding of inequitable conduct based on omission of an inventor where the applicant submitted false declarations under Rule 47, which governs applications filed when the inventor cannot be found or refuses to sign). Equil's, Equilibrium's, and Mr. Barger's misrepresentations are particularly material here because of the requirement of overlapping inventorship to maintain continuity of a serial set of patent applications. *See* 35 U.S.C. § 120. Indeed, on information and belief, Mr. Barger, on behalf of Equil, made the decision to add himself as a named inventor to patents including the '745 patent, and then made the further decision on behalf of Equil to add himself as a named inventor to the '009 patent in order to overcome Akamai's IPR challenging the '745 patent—not because Mr. Barger contributed to the alleged inventions recited in the '745 patent's claims. Equil's misrepresentations of inventorship have thus already significantly and materially prejudiced Akamai and the public: Akamai relied on Equil's misrepresentations of the inventorship of the '745 patent when electing the grounds to assert in its IPR challenging the '745 patent. When Equil then further misrepresented the inventorship of the '009 patent by adding Mr. Barger to that patent, it materially prejudiced Akamai by purportedly disqualifying the '093 publication as prior art. Equil's continued failure to accurately name the correct

inventors continues to be material because these misrepresentations impact Akamai's and the public's ability to establish, with certainty, the correct priority date for the claims of the '745 patent and assess what corresponding prior art can be used to challenge the '745 patent and related patents.

146.    Equil's past and ongoing intentional misrepresentations of inventorship, including its decisions about whether and when to amend inventorship for strategic reasons instead of diligently working to ensure that correct inventors are identified on patents, constitutes a material misrepresentation.  Equil's intentional conduct in failing to properly name the true inventors on the '745 patent and patents to which the '745 patent claims priority thus is material, and qualifies as inequitable conduct that renders the '745 patent unenforceable.

## ELEVENTH DEFENSE: EQUITABLE DOCTRINES

147.    Equil's claims for relief are barred in whole or in part by reason of waiver, estoppel, acquiescence, laches, prosecution laches, unclean hands, and/or other equitable doctrines.

148.    For example, with respect to unclean hands, Akamai incorporates and re-alleges the allegations set forth in Paragraphs 118-146 as if fully set forth herein.  As reflected in those allegations, Equil and/or Equilibrium have unclean hands because of misstatements and misrepresentations during prosecution of the '745 patent and related applications to which it claims priority as well as after these patents issued.

149.    Additionally, Equil and/or Equilibrium also have unclean hands for the separate and independent reason that, on information and belief, they falsely represented that the '745 patent was entitled to an earlier priority date in order to preserve the validity of that patent against prior art challenges, which is an act of litigation misconduct.  Akamai incorporates and re-alleges the allegations set forth in Paragraphs 118-146 as if fully set forth herein.  Specifically,

during prosecution of the '745 patent and the patents and applications to which it purports to claim priority, Equilibrium identified the '745 patent as a continuation-in-part and/or divisional of those earlier purported priority patents and applications in order to avoid certain prior art from being identified with respect to the '745 patent, including, e.g., the priority applications themselves. *See* Dkt. No. 13-1, Exs. D, F.

150.    On information and belief, Equilibrium and/or Equil's correction of the inventorship of the '009 patent, via its attorneys and Mr. Barger's declaration, involved fraud, deceit, unconscionability, and bad faith because (1) Equilibrium knew that Mr. Barger was not named on the '009 patent based on actions during prosecution of the '916 application yet never sought to correct inventorship before the patent expired and (2) sought to correct inventorship only after Akamai raised a challenge to the '745 patent based on the lack of common inventorship. That fraudulent, deceitful, unconscionable, and bad faith conduct is directly related to a matter in issue—whether the '093 publication invalidates the '745 patent—and injured Akamai while affecting the balance of equities between the litigants at least because Akamai relied on the correctness of the inventorship of the '009 patent in developing and raising IPR challenges ultimately obviated by the late-filed correction of inventorship.

151.    On information and belief, Equilibrium and/or Equil's correction of the inventorship of the '009 patent, via its attorneys and Mr. Barger's declaration, involved fraud, deceit, unconscionability, and bad faith because Mr. Barger is not actually an inventor of the '009 patent and Equil only sought to correct inventorship nearly 18 years after the patent issued—when evidence rebutting such a claim is less likely to be uncovered—and after Akamai raised a challenge to the '745 patent based on the lack of common inventorship.  That fraudulent, deceitful, unconscionable, and bad faith conduct is directly related to matter in issue—whether

36

the '093 publication invalidates the '745 patent—and injured Akamai while affecting the balance of equities between the litigants at least because Akamai relied on the correctness of the inventorship of the '009 patent in developing and raising IPR challenges ultimately obviated by the late-filed and false change to the inventorship.

152.    On information and belief, Equil and Equil's predecessor-in-interest, Equilibrium, misled and omitted information from the PTO as to their diligence in attempting to contact Mr. Samaniego, and as to the priority date of the '745 patent.  Those misstatements and omissions amount to, at a minimum, bad faith.  Specifically, because the '745 patent did not share any named inventors with the '904 application (or its '093 publication) until Equil sought to add Mr. Barger in 2023, the '745 patent improperly claimed priority to the earlier applications.  These misstatements have harmed the public, including Akamai, as the '745 patent was improperly and erroneously issued and is now being asserted—skewing the balance of equities between the parties.

153.    Based on conduct both during prosecution of the '745 patent and patents and applications to which it claims priority, as well as in anticipation of litigation, Equil and/or Equilibrium have unclean hands, and should be barred from enforcing the '745 patent, and its family members, as well as from making any further changes to the alleged inventorship of the '745 patent and any patents or applications to which it claims priority, as well as from obtaining equitable relief in this action.

## EXCEPTIONAL CASE

154.    On information and belief, this is an exceptional case entitling Akamai to an award of its attorneys' fees incurred in connection with defending and prosecuting this action pursuant to 35 U.S.C. § 285, as a result of, *inter alia*, Equil's assertion of the '745 patent against

Akamai with the knowledge that Akamai does not infringe any valid or enforceable claim of the '745 patent and/or that the claims of the '745 patent are invalid and/or unenforceable.

## **PRAYER FOR RELIEF**

WHEREFORE, Akamai requests that the Court enter judgment in its favor and against Equil as follows:

a) dismissing the FAC with prejudice, denying each and every prayer for relief therein, and entering judgment for Akamai;

b) finding that Akamai has not infringed and is not infringing any valid and enforceable claim of the '745 patent, either literally or under the doctrine of equivalents, or in any other way;

c) finding that the claims of the '745 patent are invalid and unenforceable;

d) finding this case exceptional under 35 U.S.C. § 285, and awarding Akamai its reasonable costs and expenses of litigation, including reasonable attorneys' fees and expert witness fees;

e) limiting or barring Equil's ability to enforce the Patents-in-Suit in equity;

f) limiting or barring Equil from further changing alleged inventorship of the '242 and '745 patents and any applications or patents to which they claim priority;

g) limiting or barring Equil's ability to obtain equitable relief in this action;

h) enjoining Equil and/or any successors-in-interest to the Patents-in-Suit from further amending the inventorship of the Patents-in-Suit or any patents or applications to which they claim priority; and

i) granting Akamai such other and further relief as the Court may deem necessary, just, or proper.

Dated: March 20, 2024

Of Counsel:

**ROPES & GRAY LLP**
James R. Batchelder
James L. Davis, Jr.
Daniel W. Richards
1900 University Avenue
East Palo Alto, California 94303
Tel: (650) 617-4000
Fax: (650) 617-4090
james.batchelder@ropesgray.com
james.l.davis@ropesgray.com
daniel.richards@ropesgray.com

Scott S. Taylor
800 Boylston St.
Boston, MA 02199
Tel: (617) 951-7000
Fax: (617) 235-0236
scott.taylor@ropesgray.com

Colin P. Dunn
1211 Avenue of the Americas
New York, NY 10036
Tel: (212) 596-9000
Fax: (212) 596-9090
colin.dunn@ropesgray.com

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

/s/ *Adam W. Poff*
Adam W. Poff (#3990)
Robert M. Vrana (#5666)
Alexis N. Stombaugh (#6702)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
rvrana@ycst.com
astombaugh@ycst.com

*Attorneys for Defendant*
AKAMAI TECHNOLOGIES, INC.

# EXHIBIT 1



The Wayback Machine - https://web.archive.org/web/20080421191837/http://www.northbaybusinessjourn…



**North Bay**
# Business Journal
NORTH SAN FRANCISCO BAY AREA: SONOMA, NAPA, AND MARIN COUNTIES

| T[          ] GO | 2008 | Call us at 707-579-2900 or e-mail us |

E-mail Story | Print-Friendly Version

sources | Contact

**NORTH BAY BUSINESS JOURNAL EVENT**

**COMMERCIAL REAL ESTATE NETWORKING RECEPTION**
Thursday, May 1, 2008, 5:30-7:30 p.m., Sheraton Sonoma County, Petaluma

**2008 CONSTRUCTION CONFERENCE**
Building the North Bay: What's on the horizon? Tuesday, May 20, 2008, 8-11:30 a.m., Hyatt Vineyard Creek, Santa Rosa

**E-Mail Express**
Name:
[                    ]
Company:
[                    ]
E-mail:
[                    ]
Phone:
[                    ]
[ Subscribe ]

OFFICE TECHNOLOGY TODAY

## Internet video startup gets $3.5 million
*EQUILIBRIUM TO USE CASH TO EXPAND STAFF, EXTEND REACH OF WEB TECHNOLOGY*

Monday, April 14, 2008

by Loralee Stevens

Staff Reporter

SAUSALITO – Equilibrium, the maker of the MediaRich Media Server, an engine to automate and deliver images, video and audio to Web sites, has caught the eye of a Japanese digital-content management developer.

Tokyo-based, publicly traded Celartem, through its U.S. subsidiary Extensis, has led an investment of $3.5 million in 14-employee Equilibrium with the intention of broadening the video processing portion of its technology, according to Equilibrium Director of Marketing Frank Colin.

The agreement also gives Celartem Japanese and South Korean distribution rights to Equilibrium's current products.

Equilibrium is what its founder, chairman and CEO Sean Barger calls an "upstart" rather than a startup.

**Related Articles**

Office Technology: Nelson program addresses needs of project work (04/14/2008)

Got MPLS? New tech for networks (04/14/2008)

Nelson undertakes two new WorkforceLogic programs (03/03/2008)

OFFICE TECHNOLOGY: Ex-Vanzebo co-founder starts own printer enterprise (03/03/2008)

Web-based mailer sees 'intelligent barcode' helping business (03/03/2008)

HIGH TECH & BIOTECH: Network expert KLH Consulting acquires DataFlow (12/03/2007)

COMMENTARY: Dangerous first impressions: Why audit your Web site? (12/03/2007)



**Tamalpais**Bank

Select a category:
[ Search all        ▾ ]
Keyword(s)(optional)

◉ Any  ○ Exact  ○ All
[ Search ]

In 1989, he founded the company to develop computer games and to market the first automated graphics-processing software, DeBabelizer, and sold it to media conglomerate CMGI in 1999.

In 2004, Mr. Barger repurchased the company along with its new flagship product, MediaRich. DeBabelizer is still a popular graphics management tool.

MediaRich is customizable server middleware that's used to repurpose and deliver digital content to any device in real time. A common use is to allow customers on a retail site to zoom in on products, turn them around and change their color. AOL uses MediaRich to thumbnail its collection of videos.

Seattle-based Extensis is a digital-asset management company that will strengthen its technology with the MediaRich engine.

"The agreement has three significant purposes," said Mr. Colin. "It gives Celartem MediaRich to market in Asia as well as a future in the video processing technology we'll continue to develop; it brings Extensis a powerful new engine for their digital-asset management software; and it allows us to grow."

The money, the first significant investment Equilibrium has received since it was acquired from CMGI, will be used for research and development and to grow the staff, said Mr. Colin. "We'll at least double our staff this year," he said. Equilibrium is committed to remaining in Marin as it grows.

"There's a lot of development talent locally. Our employees in San Francisco don't mind making the trip and neither do our clients," he said.

For more information, visit www

.equilibrium.com.

Copyright 2008 - North Bay Business Journal
5464 Skylane Blvd., Suite B - Santa Rosa, CA 95403
Phone: 707-579-2900 - Fax: 707-579-0188

# EXHIBIT 2

# Chris Samaniego

Principal Scientist at Adobe
San Rafael

## Contact

www.linkedin.com/in/chris-samaniego-18b6a01 (LinkedIn)

## Top Skills

Agile Methodologies
SaaS
IntelliJ IDEA

## Patents

Automated processing and delivery of media to web servers
Imprint for visualization and manufacturing
Automated media delivery system

## Experience

### Adobe Systems
15 years 3 months

Principal Scientist
August 2013 - Present (9 years)

Software Architect working on various projects including Creative Cloud Enterprise, Creative Cloud Storage, and Marketing Cloud integrations.

Sr. Engineering Manager
May 2007 - July 2013 (6 years 3 months)

Managing a team responsible for Template Publishing features for the Scene7 platform.  This includes web to print technology for serving up print ready PDFs that can be dynamically manipulated via a URL.  The team also implemented a new feature to dynamically compile Flash FLA files to SWF on the server. The FLAs can also be dynamically updated on the server before generating a SWF.

The technology includes workflow tools to manage and create the assets for the servers.  This includes plugins for Illustrator, InDesign, and Photoshop. There is also a flex SDK to allow developers to utilize the technology in their web applications.

### Scene7
VP Technical Services
December 2003 - May 2007 (3 years 6 months)
Novato

Created a new organization responsible for consulting and development of custom applications for Scene7 customers. Managed a team of developers, project managers, user experience designers, and consultants.  Worked with sales to close new business for the consulting team.  Worked closely with customers to scope projects, deliver technology, provide technical training, and support custom applications.

Custom applications include online product configurators, product zoom viewers, integrations with commerce systems and content management systems.

## Equilibrium
### CTO/Director of Engineering/Lead Engineer
April 1997 - November 2003 (6 years 8 months)

Designed and invented Equilibrium's MediaRich image serving product. Worked with the executive team and marketing to raise capital for the company. Helped with product vision, business model, competitive research, and partnerships.

Lead the development of Debabelizer 3.0 for Macintosh. Worked on the development team for Debabelizer on Windows.

## Ominiview/IPIX
### Software Engineering Consultant
October 1996 - April 1997 (7 months)

Designed and implemented Omniview Photobubble Director Xtra for the Macintosh. Omniview Photobubbles are 360 degree photographs that can be navigated through a special viewer.

## Advance Reality Interactive
### Software Engineer
March 1996 - April 1997 (1 year 2 months)

Designed and implemented several features of an interactive full motion video game. Created the user interface, installer, and autoplay for the game. Designed several authoring tools for the production of the video game including: an audio path tool to aid with the composition of music, script verification tools, script searching tools, script manipulation tools, and a video preview tool. Implemented and maintained mail server and corporate website.

## Light Source Computer Images
### Software Engineer / QA Tools Engineer
September 1993 - February 1996 (2 years 6 months)

Designed, implemented, and tested the Colortron device driver for the Macintosh and Windows 95. Created a driver utility application to test device driver and assist third party developers. Wrote the documentation for the device driver SDK and implemented the API for the device driver

SDK.  Designed and implemented a factory calibration application to aid the manufacturing of Colortrons.

Designed and implemented an automated test harness to execute QA Partner test scripts over a network.  Implemented test scripts for Colortron.  Created test programs to aid in the testing of the Colortron hardware.

## Autodesk
### Test Engineer
September 1991 - September 1993 (2 years 1 month)

Designed sample and test applications using the CyberSpace virtual reality SDK.  Helped with code maintenance and bug fixing.  Ported the CyberSpace libraries, sample applications, and test code to various compilers. Created windows applications to test the DDE implementation of a Windows molecular modeling package. Tested AutoSketch.

## National Semiconductor
### Programmer Analyst
January 1990 - August 1991 (1 year 8 months)
Santa Clara

Maintained data production systems and created reports and systems for finance, production, marketing, and engineering.  Created a military data sheet system using an OCR engine to retrieve schematics and CAD packaging data. Created PC to mainframe interface systems so data can be manipulated on a PC and uploaded to a mainframe.

_____

# Education

## University of Michigan
BSCE, Computer Engineering · (1985 - 1990)

# EXHIBIT 3

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN | | | |
|---|---|---|---|
| BARGER-GREAT SOUTH VENTURES, LLC. | | DATE FILED: | 9/8/2004 |
| PLAINTIFF(s) | | CASE TYPE: | COMPLAINT |
| VS. | | CASE SUBTYPE: | FRAUD |
| EQUILIBRIUM TECHNOLOGIES, INC., ET AL. | | DATE OF LAST ACTIVITY: | 5/7/2007 |
| DEFENDANT(s) | | DATE/TIME RUN: | 06/07/2022 04:02 PM |
| REGISTER OF ACTIONS | | CASE NUMBER: | CIV 043997 |

INVOLVED PERSON/PARTY AND ATTORNEY SUMMARY:

AUTOMATED MEDIA PROCESSING SOLUTIONS, INC. is the PLAINTIFF and is represented by: THOMPSON, RODERICK M.

SCENE7 INC., A CALIFORINA CORPORATION is the DEFENDANT and is represented by: BURTT, DAVID R.

MACK, DOUGLAS is the DEFENDANT and is represented by: BURTT, DAVID R.

SAMANIEGO, CHRIS is the DEFENDANT and is represented by: BURTT, DAVID R.

BIGONESS, TIM is the DEFENDANT and is represented by: BURTT, DAVID R.; KOO, JONMI N.

ROULSTEN, KIRK is the DEFENDANT and is represented by: BURTT, DAVID R.

NOEL, PETER is the DEFENDANT and is represented by: BURTT, DAVID R.

REGISTER OF ACTIONS:

| | |
|---|---|
| 09/08/2004 | CASE OPEN / ACTIVE STATUS HON. LYNN O'MALLEY TAYLOR |
| 09/08/2004 | FILING FEE PROCESSED: PLTF, BARGER-GREAT SOUTH VENTURES, LLC. - 293.00 |
| 09/08/2004 | COMPLAINT/FIRST PAPER COMPLAINT FOR FRAUD, DECEIT, FRAUDULENT TRANSFER, FORECLOSURE ON SECURITY, CONSTRUCTIVE TRUST, BREACH OF FIDUCIARY DUTY, AND CIVIL CONSPIRACY |
| 09/08/2004 | SUMMONS ISSUED |
| 09/08/2004 | HEARING CONFIRMED FOR: 11/17/2004 AT: 09:00 AM FOR APPEARANCE TYPE: OSCH IN DEPARTMENT: 03 |
| 09/08/2004 | HEARING CONFIRMED FOR: 12/17/2004 AT: 09:00 AM FOR APPEARANCE TYPE: OSCH IN DEPARTMENT: 03 |
| 09/08/2004 | HEARING CONFIRMED FOR: 01/26/2005 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 03 |
| 11/17/2004 | HEARING CONTINUED TO: 01/26/2005 AT: 09:00 AM FOR APPEARANCE TYPE: OSCH IN DEPARTMENT: 03 FROM DATE: 11/17/2004 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: OSCH FROM DEPARTMENT: 03 |
| 11/17/2004 | APPEARANCE DROPPED FOR 12/17/2004 AT: 09:00 AM FOR APPEARANCE TYPE: OSCH IN DEPARTMENT: 03 DROP REASON: AT THE REQUEST OF J. ERLICH 11-16-04. CASE MAY SETTLE |
| 12/28/2004 | CASE REASSIGNED TO JUDGE HON. VERNON F. SMITH |
| 12/28/2004 | APPEARANCE MOVED TO: 01/26/2005 AT: 09:00 AM FOR APPEARANCE TYPE: OSCH IN DEPARTMENT: 06 MOVE REASON: JUDICIAL REASSIGNMENT FROM DATE: 01/26/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: OSCH FROM DEPARTMENT: 03 |
| 12/28/2004 | APPEARANCE MOVED TO: 01/26/2005 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 06 MOVE REASON: JUDICIAL REASSIGNMENT FROM DATE: 01/26/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: CMGT FROM DEPARTMENT: 03 |
| 12/29/2004 | NOTICE OF CASE REASSIGNMENT AND NOTICE OF HEARING MAILED TO THE PARTIES |
| 01/20/2005 | APPEARANCE MOVED TO: 04/21/2005 AT: 09:00 AM FOR APPEARANCE TYPE: OSCH IN DEPARTMENT: 06 MOVE REASON: PER EHRLICH'S LETTER OF 1/10/05 FROM DATE: 01/26/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: OSCH FROM DEPARTMENT: 06 |
| 01/20/2005 | APPEARANCE MOVED TO: 04/21/2005 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 06 MOVE REASON: PER EHRLICH'S LETTER OF 1/10/05 FROM DATE: 01/26/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: CMGT FROM DEPARTMENT: 06 |
| 02/07/2005 | AMENDED COMPLAINT FILED (1ST) BY ATTY. EHRLICH FOR PLTF.; ADDING DEFENDANTS: CHRIS SAMANIEGO; TIM BIGONESS; NIGEL WARREN; KIRK ROULSTEN; PETER NOEL AND DOES |
| 02/22/2005 | SUMMONS ISSUED 1ST AMENDED COMPLAINT |
| 04/15/2005 | PROOF OF SERVICE FILED, AS TO: DEFT, SCENE7 INC., A CALIFORINA CORPORATION NOTICE AND ACKNOWLEDGMENT OF RECIPT 03/31/05 |
| 04/15/2005 | PROOF OF SERVICE FILED, AS TO: DEFT, KIRK ROULSTEN NOTICE AND ACKNOWLEDGMENT 03/31/05 |
| 04/15/2005 | PROOF OF SERVICE FILED, AS TO: DEFT, TIM BIGONESS NOTICE AND ACKNOWLEDGMENT 03/31/05 |

Disclaimer: This Register of Actions is not an official court record. For an official and/or certified record, visitors must obtain it from the Court.

Page 1 of 12

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN

| | | | |
|---|---|---|---|
| BARGER-GREAT SOUTH VENTURES, LLC. | | DATE FILED: | 9/8/2004 |
| PLAINTIFF(s) | | CASE TYPE: | COMPLAINT |
| VS. | | CASE SUBTYPE: | FRAUD |
| EQUILIBRIUM TECHNOLOGIES, INC., ET AL. | | DATE OF LAST ACTIVITY: | 5/7/2007 |
| DEFENDANT(s) | | DATE/TIME RUN: | 06/07/2022 04:02 PM |
| REGISTER OF ACTIONS | | CASE NUMBER: | CIV 043997 |

| | |
|---|---|
| 04/15/2005 | PROOF OF SERVICE FILED, AS TO: DEFT, CHRIS SAMANIEGO NOTICE AND ACKNOWLEDGMENT OF RECEIPT 03/31/05 |
| 04/15/2005 | PROOF OF SERVICE FILED, AS TO: DEFT, DOUGLAS MACK NOTICE AND ACKNOWLEDGMENT OF REEIPT 03/31/05 |
| 04/21/2005 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON SMITH , REPORTER TERESA THOMAS , DEP CLK LOUISE MORRIS |
| | ATTORNEY JOSEPH EHRLICH APPEARED FOR PLAINTIFF |
| | NO APPEARANCE BY OR FOR THE DEFENDANTS |
| | COUNSEL REPORTS THAT ALL DEFENDANTS HAVE BEEN SERVED EXCEPT NIGEL WARREN. MEDIATION IS UNDERWAY. THE COURT CONTINUES THIS HEARING FOR FILING OF ALL PROOFS OF SERVICE, ANSWERS OR DISMISSALS TO 7/20/05 AT 9AM IN DEPT. F. |
| | PLAINTIFF MUST PROVIDE NOTICE OF THIS ORDER TO DEFENDANTS |
| | HEARING CONTINUED TO: 07/20/2005 AT: 09:00 AM FOR APPEARANCE TYPE: OSCH IN DEPARTMENT: 06 FROM DATE: 04/21/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: OSCH FROM DEPARTMENT: 06 |
| | HEARING CONTINUED TO: 07/20/2005 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 06 FROM DATE: 04/21/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: CMGT FROM DEPARTMENT: 06 |
| | ENTERED BY: LMM |
| 05/04/2005 | PROOF OF SERVICE FILED, AS TO: DEFT, PETER NOEL; BY NOTICE AND ACKNOWLEDGMENT OF RECEIPT SIGNED ON 3-31-05 |
| 05/13/2005 | FILING FEE PROCESSED: DEFT, SCENE7 INC., A CALIFORINA CORPORATION - 293.00  (1ST  APPEARANCE) |
| 05/13/2005 | FILING FEE PROCESSED: DEFT, DOUGLAS MACK - 293.00  (1ST  APPEARANCE) |
| 05/13/2005 | FILING FEE PROCESSED: DEFT, CHRIS SAMANIEGO - 293.00  (1ST  APPEARANCE) |
| 05/13/2005 | FILING FEE PROCESSED: DEFT, TIM BIGONESS - 293.00  (1ST  APPEARANCE) |
| 05/13/2005 | FILING FEE PROCESSED: DEFT, KIRK ROULSTEN - 293.00  (1ST  APPEARANCE) |
| 05/13/2005 | FILING FEE PROCESSED: DEFT, PETER NOEL - 293.00  (1ST  APPEARANCE) |
| 06/15/2005 | AMENDED COMPLAINT FILED (2ND) AMENDED COMPLAINT AGAINST SCENE7, DOUGLAS MACK, CHRIS SAMANIEGO, TIM BIGONESS, NIGEL WARREN, KIRK ROULSTEN, PETER NOEL FILED BY EHRLICH FOR PLTF. |
| 07/18/2005 | HEARING CONFIRMED FOR: 09/07/2005 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 06 |
| 07/20/2005 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON SMITH , REPORTER ELAINE NINKOVICH , DEP CLK LOUISE MORRIS |
| | COURT CALL APPEARANCE BY JOSEPH EHRLICH FOR PLAINTIFF |
| | COURT CALL APPEARANCE BY DAVID BURTT FOR ALL DEFENDANTS EXCEPT EQUILBRIUM TECHNOLOGIES |
| | COUNSEL'S REQUEST TO REQUEST A 90 DAY CONTINUANCE IS DENIED. COUNSEL EHRLICH INDICATES THAT DEFENDANT NIGEL WARREN WILL BE DISMISSED. PER COUNSEL BURTT INDICATES THAT EQUILIBRIUM TECHNOLOGIES WILL BE DISMISSED. THE COURT CONTINUES OSC RE: PROOF OF SERVICE TO 9/7/05. THE OSC RE; ANSWER TRAILS THE DEMURRER HEARING SET ON 9/7/05 THIS HEARING IS CONTINUED TO 9/7/05 AT 9AM IN DEPT.F |
| | HEARING CONTINUED TO: 09/07/2005 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 06 FROM DATE: 07/20/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: CMGT FROM DEPARTMENT: 06 |
| | HEARING CONTINUED TO: 09/07/2005 AT: 09:00 AM FOR APPEARANCE TYPE: OSCH IN DEPARTMENT: 06 FROM DATE: 07/20/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: OSCH FROM DEPARTMENT: 06 |
| | ENTERED BY: LMM |
| 08/26/2005 | APPEARANCE MOVED TO: 10/12/2005 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 06 MOVE REASON: STIPULATION SIGNED 8/26/05 FROM DATE: 09/07/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: LMCV FROM DEPARTMENT: 06 |

Disclaimer: This Register of Actions is not an official court record.  For an official and/or certified record, visitors must obtain it from the Court.

Page 2 of 12

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN | | |
|---|---|---|
| BARGER-GREAT SOUTH VENTURES, LLC. | DATE FILED: | 9/8/2004 |
| PLAINTIFF(s) | CASE TYPE: | COMPLAINT |
| VS. | CASE SUBTYPE: | FRAUD |
| EQUILIBRIUM TECHNOLOGIES, INC., ET AL. | DATE OF LAST ACTIVITY: | 5/7/2007 |
| DEFENDANT(s) | DATE/TIME RUN: | 06/07/2022 04:02 PM |
| REGISTER OF ACTIONS | CASE NUMBER: | CIV 043997 |

| | |
|---|---|
| 09/07/2005 | PARTIAL DISMISSAL  AS TO: DEFT, NIGEL WARREN WITH PREJUDICE |
| 09/07/2005 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON F. SMITH , REPORTER ELAINE NINKOVICH , DEP CLK TERESA RAMIREZ |
| | ATTORNEY JOSEPH EHRLICH APPEARED FOR PLAINTIFF |
| | ATTORNEY DAVID ONGARO APPEARED FOR DEFENDANT'S |
| | COUNSEL STATES DEFENDANT WARREN IS DISMISSED. |
| | THE LAW AND MOTION MATTER IS SET FOR 10/12/05. |
| | CASE MANAGEMENT CONT. TO 10/12/05 @ 9:00AM. |
| | HEARING CONTINUED TO: 10/12/2005 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 06 FROM DATE: 09/07/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: CMGT FROM DEPARTMENT: 06 |
| | HEARING CONTINUED TO: 10/12/2005 AT: 09:00 AM FOR APPEARANCE TYPE: OSCH IN DEPARTMENT: 06 FROM DATE: 09/07/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: OSCH FROM DEPARTMENT: 06 |
| | NO ADDITIONAL STATEMENTS ARE NEEDED. |
| | ENTERED BY: T. RAMIREZ |
| 10/12/2005 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON F. SMITH , REPORTER ELAINE NINKOVICH , DEP CLK TERESA RAMIREZ |
| | ATTORNEY DAVID ONGRO APPEARED FOR DEFENDANTS |
| | ATTORNEY JOSEPH BRUBAKER-APPEARED LATE APPEARED FOR PLAINTIFF |
| | PLAINTIFF'S COUNSEL CAME LATE- MATTER REHEARD. |
| | SANCTIONS PREVIOUSLEY ORDERED TODAY IS STRICKEN. |
| | CASE MANAGEMENT CONT. TO 12/01/05 @ 9:00AM. |
| | MR. ONGRO MUST PROVIDE NOTICE OF THIS ORDER TO ALL PARTIES |
| | HEARING CONTINUED TO: 12/01/2005 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 06 FROM DATE: 10/12/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: CMGT FROM DEPARTMENT: 06 |
| | ENTERED BY: T. RAMIREZ |
| 10/12/2005 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON F. SMITH , REPORTER ELAINE NINKOVICH (NOT REPORTED) , DEP CLK TERESA RAMIREZ |
| | NO APPEARANCE BY OR FOR THE PARTIES |
| | THE COURT MAKES THE FOLLOWING TENTATIVE RULING AS FOLLOWS: |
| | DEFENDANTS' DEMURRER TO THE SECOND AMENDED COMPLAINT IS SUSTAINED IN PART AND OVERRULED IN PART.  INITIALLY, THE COURT FINDS THAT PLAINTIFF'S ALTER EGO ALLEGATIONS ARE DEFICIENT.  AS TO THE EQUILIBRIUM INDIVIDUALS, PLAINTIFF ALLEGES IN CONCLUSORY FASHION THAT THEY "TREATED EQUILIBRIUM AS THEIR ALTER EGO" AND "IGNORED THE CORPORATE FORM OF EQUILIBRIUM."  THESE ARE CONCLUSIONS, NOT FACTS.  THE ONLY FACTUAL ALLEGATION IS THAT "THEIR ACTIONS RESULTED IN AN UNDERCAPITALIZATION OF EQUILIBRIUM, AND THE DIVERSION OF EQUILIBRIUM TANGIBLE AND INTANGIBLE ASSETS OF EQUILIBRIUM TO THEIR OWN USES."  HOWEVER, PLAINTIFF'S ALLEGATIONS SHOW THAT EQUILIBRIUM BECAME UNDERCAPITALIZED AND LOST ASSETS AS A RESULT OF THE TRANSFER OF ASSETS TO SCENE7.  THIS IS NOT A SITUATION WHERE THE INDIVIDUALS TREATED THE ASSETS OF EQUILIBRIUM AS THEIR OWN.  EVEN IF IT WERE, SEVERAL FACTORS MUST BE PRESENT IN ORDER TO FIND THAT THE CORPORATION IS AN ALTER EGO OF THE INDIVIDUALS.  (SEE UNITED COMMUNITY CHURCH V. GARCIN (1991) 231 CAL. APP.3 D 327, 342-343, CONCURRING OPINION.) |

Disclaimer: This Register of Actions is not an official court record.  For an official and/or certified record, visitors must obtain it from the Court.

Page 3 of 12

| BARGER-GREAT SOUTH VENTURES, LLC. | DATE FILED: | 9/8/2004 |
| --- | --- | --- |
|    PLAINTIFF(s) | CASE TYPE: | COMPLAINT |
|    VS. | CASE SUBTYPE: | FRAUD |
| EQUILIBRIUM TECHNOLOGIES, INC., ET AL. | DATE OF LAST ACTIVITY: | 5/7/2007 |
|    DEFENDANT(s) | DATE/TIME RUN: | 06/07/2022 04:02 PM |
| REGISTER OF ACTIONS | CASE NUMBER: | CIV 043997 |

PLAINTIFF'S ALLEGATIONS ARE SIMILARLY DEFICIENT AS TO SCENE7 AND THE INDIVIDUALS ASSOCIATED WITH IT.  PLAINTIFF'S ALLEGATIONS THAT THEY "TREATED EQUILIBRIUM AS SCENE7'S ALTER EGO" AND "IGNORED THE CORPORATION FORM OF EQUILIBRIUM" ARE CONCLUSIONS.  FURTHER THE FACT THAT EQUILIBRIUM'S ASSETS WERE TRANSFERRED TO SCENE7 DOES NOT SHOW THAT THERE WAS "SUCH UNITY OF INTEREST AND OWNERSHIP THAT THE SEPARATE PERSONALITIES OF THE CORPORATION(S) NO LONGER EXIST(ED)." (IBID.)  DEFENDANTS' DEMURRER TO THE SECOND CAUSE OF ACTION FOR CONSPIRACY TO DEFRAUD IS SUSTAINED.  PLAINTIFF FAILS TO ALLEGE THAT DEFENDANTS CONSPIRED WITH CMGI OR EQUILIBRIUM, THE PARTIES WHO ALLEGEDLY MADE THE REPRESENTATIONS, TO DEFRAUD PLAINTIFF.  INSTEAD, PLAINTIFF ALLEGES THAT DEFENDANTS "CONSPIRED AND AGREED WITH MONKS AND OTHERS AT EQUILIBRIUM TO EFFECTIVELY TRANSFER ALL OF EQUILIBRIUM'S ASSETS TO SCENE 7..." ALTHOUGH PLAINTIFF ALLEGES THAT THE REPRESENTATIONS WERE MADE IN ORDER TO PRODUCE THE DISMISSAL OF PLAINTIFF'S LAWSUIT AGAINST CMGI, THE EARLIER ALLEGATIONS SHOW THAT IT WAS BARGER WHO DISMISSED HIS LAWSUIT (E.G., RELIED).  BARGER IS NOT THE PLAINTIFF.

PLAINTIFF MUST SHOW THAT CMGI AND EQUILIBRIUM INTENDED TO DECEIVE PLAINTIFF AND THAT PLAINTIFF RELIED UPON THE REPRESENTATIONS.  FINALLY, PLAINTIFF FAILS TO ALLEGE WHO MADE THE REPRESENTATIONS.  (SEE TARMANN V. STATE FARM MUT. AUTO. INS. CO. (1991) 2 CAL. APP.4TH 153, 157.)

DEFENDANTS' DEMURRER TO THE FOURTH CAUSE OF ACTION FOR INTERFERENCE WITH CONTRACT IS SUSTAINED AS FOLLOWS: A) PROMISSORY NOTE AND NON-DILUTABLE STOCK WARRANTS (56): EVEN IF THE COURT ASSUMES THAT THE EQUILIBRIUM INDIVIDUALS KNEW OF THESE AGREEMENTS BY VIRTUE OF THEIR STATUS AS OFFICERS AND MEMBERS OF THE BOARD OF DIRECTORS, PLAINTIFF ALLEGES NO FACTS SHOWING THAT SCENE7 AND THE INDIVIDUALS ASSOCIATED WITH IT HAD KNOWLEDGE OF THE STOCK WARRANTS.  FURTHER, PLAINTIFF ALLEGES NO FACTS SHOWING THAT ANY OF THE DEFENDANTS HAD KNOWLEDGE THAT CMGI ASSIGNED THE PROMISSORY NOTE AND NON-DILUTABLE STOCK WARRANTS TO PLAINTIFF. B) TRANSACTION AGREEMENT AND OTHER SECURITY DOCUMENTS (57):

AGAIN, EVEN IF THE COURT ASSUMES THAT THE EQUILIBRIUM INDIVIDUALS KNEW OF THESE AGREEMENTS, PLAINTIFF FAILS TO SHOW THAT SCENE7 AND THE INDIVIDUALS ASSOCIATED WITH IT HAD KNOWLEDGE OF THESE AGREEMENTS OR THAT ANY OF THE DEFENDANTS HAD KNOWLEDGE THAT THESE AGREEMENTS WERE ASSIGNED BY CMGI TO PLAINTIFF.  ADDITIONALLY, THERE ARE NO FACTS SHOWING HOW DEFENDANTS DISRUPTED THESE CONTRACTS.  FINALLY, THERE ARE NO FACTS SHOWING HOW PLAINTIFF WAS DAMAGED AS A RESULT OF THESE BREACHES.

C) EMPLOYEE AGREEMENTS (58):  THERE ARE NO FACTS SHOWING THAT SCENE7 OR THE INDIVIDUALS ASSOCIATED WITH IT HAD KNOWLEDGE OF THESE AGREEMENTS.  AS TO THE INDIVIDUALS ASSOCIATED WITH EQUILIBRIUM, IT IS NOT CLEAR WHETHER PLAINTIFF IS REFERRING TO THEIR CONTRACTS WITH EQUILIBRIUM OR THE CONTRACTS OF OTHER UNIDENTIFIED EMPLOYEES WHO WENT TO WORK FOR SCENE7.  IN EITHER EVENT, THE CAUSE OF ACTION IS IMPROPER."...(A) PARTY TO A CONTRACT OWES NO TORT DUTY TO REFRAIN FROM INTERFERENCE WITH ITS PERFORMANCE..." (APPLIED EQUIPMENT CORP. V. LITTON SAUDI ARABIA, LTD. (1994) 7CAL. 4TH 503, 514.)"...(I)T IS WELL ESTABLISHED THAT CORPORATE AGENTS AND EMPLOYEES ACTING FOR AND ON BEHALF OF A CORPORATION CANNOT BE HELD LIABLE FOR INDUCING A BREACH OF THE CORPORATION'S CONTRACT.'..." (REYNOLDS V. BEMENT (2005) 36 CAL. 4TH 1075, 1087.)  AS TO ALL OF THE DEFENDANTS, PLAINTIFF HAS NOT ALLEGED THAT DEFENDANTS INTENTIONALLY INTERFERED WITH THESE CONTRACTS AND THERE ARE NO FACTS SHOWING HOW EQUILIBRIUM WAS INJURED BY THE INTERFERENCE.

D) CUSTOMER MAINTENANCE AGREEMENTS (59):  THERE ARE NO FACTS SHOWING THAT ANY OF THE DEFENDANTS HAD KNOWLEDGE OF THESE AGREEMENTS.  PLAINTIFF DOES NOT ALLEGE THAT DEFENDANTS INTENDED TO INTERFERE WITH THE CONTRACTS. PLAINTIFF HAS NOT CLEARLY ALLEGED HOW EQUILIBRIUM WAS DAMAGED BY THE INTERFERENCE.  BECAUSE PLAINTIFF HAS IDENTIFIED THE NATURE OF THE CONTRACTS, IT DOES NOT NEED TO IDENTIFY EVERY CUSTOMER. (SEE ACCUIMAGE DIAGNOSTICS CORP. V. TERARECON, INC. (N.D.CAL. 2003) 260 F. SUPP. 2D 941,956.)

Disclaimer: This Register of Actions is not an official court record.  For an official and/or certified record, visitors must obtain it from the Court.

Page 4 of 12

| | | |
|---|---|---|
| BARGER-GREAT SOUTH VENTURES, LLC. | DATE FILED: | 9/8/2004 |
| PLAINTIFF(s) | CASE TYPE: | COMPLAINT |
| VS. | CASE SUBTYPE: | FRAUD |
| EQUILIBRIUM TECHNOLOGIES, INC., ET AL. | DATE OF LAST ACTIVITY: | 5/7/2007 |
| DEFENDANT(s) | DATE/TIME RUN: | 06/07/2022 04:02 PM |
| REGISTER OF ACTIONS | CASE NUMBER: | CIV 043997 |

DEFENDANTS' DEMURRER TO THE FIFTH CAUSE OF ACTION FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING IS SUSTAINED AS TO THE INDIVIDUAL DEFENDANTS AND OVERRULED AS TO SCENE7. AS TO THE INDIVIDUALS, THOSE WHO ARE NOT PARTIES TO THE AGREEMENT ARE NOT SUBJECT TO AN IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING. (GRUENBERG V. AETNA INS. CO. (1973) 9 CAL. 3D 566, 576.) AS TO SCENE7, DEFENDANTS DO NOT ARGUE THAT PLAINTIFF HAS NOT STATED A CAUSE OF ACTION BASED UPON THE SCENE7-EQUILIBRIUM LICENSE AGREEMENT AND EXCLUSIVITY AGREEMENT. "ORDINARILY, A GENERAL DEMURRER DOES NOT LIE AS TO A PORTION OF A CAUSE OF ACTION, AND IF ANY PART OF A CAUSE OF ACTION IS PROPERLY PLEADED, THE DEMURRER WILL BE OVERRULED." (FIRE INS. EXCHANGE V. SUPERIOR COURT (2004) 116 CAL. APP. 4TH 446, 452.)

NO OPPOSITION AND GOOD CAUSE APPEARING THEREFOR, DEFENDANTS' DEMURRER TO THE SIXTH CAUSE OF ACTION FOR CONVERSION-MISAPPROPRIATION OF TRADE SECRETS IS SUSTAINED.

DEFENDANTS' DEMURRER TO THE SEVENTH CAUSE OF ACTION FOR MISAPPROPRIATION OF CORPORATE OPPORTUNITIES IS SUSTAINED. PLAINTIFF ARGUES THAT EQUILIBRIUM OWES PLAINTIFF A FIDUCIARY DUTY (SEE OPPOSING BRIEF AT 9:1-16), BUT THE CAUSE OF ACTION IS BASED UPON WRONGS COMMITTED AGAINST EQUILIBRIUM.

DEFENDANTS' DEMURRER TO THE EIGHTH CAUSE OF ACTION FOR CONSPIRACY TO MISAPPROPRIATE CORPORATE OPPORTUNITIES IS SUSTAINED. ALTHOUGH THE COMPLAINT CONTAINS A GENERIC BOILERPLATE AGENCY ALLEGATION, THE FACTS DO NOT SUPPORT A CONCLUSION THAT SCENE7, MACK AND NOEL WERE ACTING AS AGENTS OF MONKS WHEN MONKS BREACHED HIS FIDUCIARY DUTY TO EQUILIBRIUM, (SEE EVEREST INVESTORS 8 V. WHITEHALL REAL ESTATE LIMITED PARTNERSHIP XI (2002) 100 CAL. APP.4TH 1102, 1104.) EVEN IF THE COURT WERE TO ACCEPT THE GENERAL AGENCY ALLEGATION, PLAINTIFF HAS ALLEGED NO FACTS SHOWING THAT SCENE7, MACK AND NOEL WERE ACTING FOR THEIR OWN BENEFIT IN ORDER TO AVOID THE AGENT'S IMMUNITY RULE. (IBID.)

DEFENDANTS' DEMURRER TO THE NINTH CAUSE OF ACTION FOR INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE IS SUSTAINED. PLAINTIFF ALLEGES NO FACTS SHOWING THAT ANY RELATIONSHIPS WERE DISRUPTED. DEFENDANTS' REMAINING ARGUMENTS HAVE NO MERIT. AMID V. HAWTHORNE COMMUNITY MEDICAL GROUP, INC. (1989) 212 CAL. APP.3D 1383 DOES NOT STAND FOR THE PROPOSITION THAT PLAINTIFF IS REQUIRED TO IDENTIFY EVERY CUSTOMER. THE FACTS SHOW THAT SCENE7, MACK AND NOEL INTENDED TO INTERFERE WITH THE RELATIONSHIP BETWEEN EQUILIBRIUM AND ITS CUSTOMERS. (SEE 31)

DEFENDANTS' DEMURRER TO THE ELEVENTH CAUSE OF ACTION FOR VIOLATION OF STATUTORY DUTY/NEGLIGENCE PER SE/PRIMA FACIE TORT IS OVERRULED. DEFENDANTS AGREE PLAINTIFF HAS PROPERLY ALLEGED NEGLIGENCE PERE SE. "IF THE COMPLAINT STATES A CAUSE OF ACTION UNDER ANY THEORY, REGARDLESS OF THE TITLE UNDER WHICH THE FACTUAL BASIS FOR RELIEF IS STATED, THAT ASPECT OF THE COMPLAINT IS GOOD AGAINST A DEMURRER..." (QUELIMANE CO. V. STEWART TITLE GUARANTY CO. (1998) 19 CAL 4TH 26, 38.)

DEFENDANTS' DEMURRER TO THE TWELFTH CAUSE OF ACTION FOR LIBEL IS OVERRULED. PLAINTEFF ALLEGES THAT "DEFENDANTS" PUBLISHED THE PRESS RELEASE. THE FACT THAT PARAGRAPH 26 IDENTIFIES THE PRESS RELEASE AS "SCENE7('S)...PRESS RELEASE" DOES NOT MEAN THAT IT WAS NOT PUBLISHED BY "DEFENDANTS," THE CAUSE OF ACTION IS NOT UNCERTAIN SINCE DEFENDANTS CAN EASILY ADMIT OR DENY THE ALLEGATIONS, (WEIL AND BROWN, CAL. PRACTICE GUIDE: CIVIL PROCEDURE BEFORE TRIAL (TRG 2005) 7:85.)

DEFENDANTS' DEMURRER TO THE THIRTEENTH CAUSE OF ACTION FOR CONSPIRACY IS OVERRULED. ALTHOUGH IT IS IN CETAIN RESPECTS DUPLICATIVE OF OTHER CAUSES OF ACTION OR IS RENDERED MERITLESS BY VIRTUE OF THE COURT'S ORDER SUSTAINING DEMURRERS TO THE UNDERLYING CAUSES OF ACTION, THE CAUSE OF ACTION IS NOT DUPLICATIVE TO THE EXTENT IT ALLEGES CONSPIRACY TO CONVERT. AS NOTED EARLIER, "(O)RDINARILY, A GENERAL DEMURRER DOES NOT LIE AS TO A PORTION OF A CAUSE OF ACTION, AND IF ANY PART OF A CAUSE OF ACTION IS PROPERLY PLEADED, THE DEMURRER WILL BE OVERRULED." (FIRE INS. EXCHANGE, SUPRA, 116 CAL.4TH AT 452.)

THE MATTER IS NOT HEARD OR REPORTED. THE TENTATIVE RULING IS FINAL.

ENTERED BY: T. RAMIREZ

HEARING CONTINUED TO: 12/01/2005 AT: 09:00 AM FOR APPEARANCE TYPE: OSCH IN DEPARTMENT: 06 FROM DATE: 10/12/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: OSCH FROM DEPARTMENT: 06

10/21/2005    STIPULATION AND ORDER TO EXTEND TIME TO FILE THIRD AMENDED COMPLAINT HON. VERNON F. SMITH

Disclaimer: This Register of Actions is not an official court record. For an official and/or certified record, visitors must obtain it from the Court.

Page 5 of 12

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN

| | |
|---|---|
| BARGER-GREAT SOUTH VENTURES, LLC. | DATE FILED: 9/8/2004 |
| PLAINTIFF(s) | CASE TYPE: COMPLAINT |
| VS. | CASE SUBTYPE: FRAUD |
| EQUILIBRIUM TECHNOLOGIES, INC., ET AL. | DATE OF LAST ACTIVITY: 5/7/2007 |
| DEFENDANT(s) | DATE/TIME RUN: 06/07/2022 04:02 PM |
| REGISTER OF ACTIONS | CASE NUMBER: CIV 043997 |

| | |
|---|---|
| 11/04/2005 | AMENDED COMPLAINT FILED (3RD) BY ATTY., JOSEPH EHRLICH |
| 12/01/2005 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON SMITH , REPORTER ELAINE NINKOVICH , DEP CLK LOUISE MORRIS |
| | ATTORNEY JOHN EHRLICH APPEARED FOR PLAINTIFF |
| | ATTORNEY DAVID BURETT APPEARED FOR DEFENDANTS |
| | A THIRD AMENDED COMPLAINT HAS BEEN FILED. THERE IS A POSSIBLE DEMURRER HEARING |
| | HEARING CONTINUED TO: 12/22/2005 AT: 09:00 AM FOR APPEARANCE TYPE: OSCH IN DEPARTMENT: 06 FROM DATE: 12/01/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: OSCH FROM DEPARTMENT: 06 |
| | HEARING CONTINUED TO: 12/27/2006 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 06 FROM DATE: 12/01/2005 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: CMGT FROM DEPARTMENT: 06 |
| | ENTERED BY: LMM |
| | APPEARANCE MOVED TO: 02/27/2006 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 06 MOVE REASON: CLERICAL ERROR FROM DATE: 12/27/2006 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: CMGT FROM DEPARTMENT: 06 |
| 12/06/2005 | PARTIAL DISMISSAL  AS TO: DEFT, DAVID MONKS,   WITH PREJUDICE |
| 12/06/2005 | PARTIAL DISMISSAL  AS TO: DEFT, EQUILIBRIUM TECHNOLOGIES, INC., A CA CORPORATION,   WITH PREJUDICE |
| 12/08/2005 | ANSWER DEFT, SCENE7 INC., A CALIFORINA CORPORATION (TO 3RD AMENDED COMPLAINT) |
| 12/08/2005 | ANSWER DEFT, DOUGLAS MACK (TO 3RD AMENDED COMPLAINT) |
| 12/08/2005 | ANSWER DEFT, CHRIS SAMANIEGO (TO 3RD AMENDED COMPLAINT) |
| 12/08/2005 | ANSWER DEFT, TIM BIGONESS (TO 3RD AMENDED COMPLAINT) |
| 12/08/2005 | ANSWER DEFT, KIRK ROULSTEN (TO 3RD AMENDED COMPLAINT) |
| 12/08/2005 | ANSWER DEFT, PETER NOEL (TO 3RD AMENDED COMPLAINT) |
| 12/08/2005 | APPEARANCE DROPPED FOR 12/22/2005 AT: 09:00 AM FOR APPEARANCE TYPE: OSCH IN DEPARTMENT: 06 DROP REASON: ANSWERS FILED |
| 02/10/2006 | SUBSTITUTION OF ATTORNEY FILED, AS TO: PLTF., BARGER-GREAT SOUTH VENTURES, LLC; FORMER ATTY. JOSEPH EHRLICH; PRESENT ATTY. KELLY A. WOODRUFF |
| 02/27/2006 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON SMITH , REPORTER ELAINE NINKOVICH , DEP CLK LOUISE MORRIS |
| | ATTORNEY KELLY WOODRUFF APPEARED FOR PLAINTIFF |
| | ATTORNEY DAVID ONGARO APPEARED FOR DEFENDANTS |
| | COUNSEL REPORT THAT MEDIATION OCCURRED. PLAINTIFF MIGHT BE FILING ANOTHER AMENDED COMPLAINT SUBSTITUTING A NEW PLAINTIFF. MATTER IS CONTINUE TO FILE AN AMENDED COMPLAINT AND COMPLETE ANY MOTION HEARING BY 4/27/06. |
| | HEARING CONTINUED TO: 04/27/2006 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 06 FROM DATE: 02/27/2006 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: CMGT FROM DEPARTMENT: 06 |
| | ENTERED BY: LMM |
| 03/15/2006 | AUTOMATED MEDIA PROCESSING SOLUTIONS, INC., A DELAWARE CORPORATION, DBA EQUILIBRIUM, DBA SUCCESSOR IN INTEREST TO BARGER-GREAT SOUTH VENTURES LLC |
| 03/15/2006 | AMENDED COMPLAINT FILED (4TH) BY ATTY. KELLY A. WOODRUFF ON BEHALF OF PLAINTIFF. (ADDING PLAINTIFF AND DELETING PLAINTIFF) |
| 03/15/2006 | STIPULATION FOR LEAVE TO FILE FOURTH AMENDED COMPLAINT AND ORDER HON. VERNON F. SMITH |
| 04/10/2006 | STIPULATION PROTECTIVE ORDER REGARDING CONFIDENTIAL INFORMATION HON. VERNON F. SMITH |

Disclaimer: This Register of Actions is not an official court record.  For an official and/or certified record, visitors must obtain it from the Court.

| BARGER-GREAT SOUTH VENTURES, LLC. | DATE FILED: | 9/8/2004 |
|---|---|---|
| PLAINTIFF(s) | CASE TYPE: | COMPLAINT |
| VS. | CASE SUBTYPE: | FRAUD |
| EQUILIBRIUM TECHNOLOGIES, INC., ET AL. | DATE OF LAST ACTIVITY: | 5/7/2007 |
| DEFENDANT(s) | DATE/TIME RUN: | 06/07/2022 04:02 PM |
| REGISTER OF ACTIONS | CASE NUMBER: | CIV 043997 |

| | |
|---|---|
| 04/17/2006 | DEFTS. SCENE 7, INC., DOUGLAS MACK, CHRIS SAMANIEGO, TIM BIGONESS, KIRK ROULSTEN, AND PETER NOEL ANSWER PLTFS. (4TH) AMENDED COMPLAINT. |
| 04/17/2006 | CROSS-COMPLAINT FILED (1) BY ATTY. JONMI N. KOO FOR CRCO SCENE 7, INC., A CALIFORNIA CORPORATION (AGAINST AUTOMATED MEDIA PROCESSING SOLUTIONS, INC., A DELAWARE CORPORATION DBA EQUILIBRIUM; SEAN BARGER; RON WOOD; EQUILIBRIUM TECHNOLOGIES, INC., A DELAWARE CORPORATION) |
| 04/17/2006 | SUMMONS ISSUED FOR (1) CROSS-COMPLAINT |
| 04/18/2006 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON F. SMITH , REPORTER ELAINE NINKOVICH , DEP CLK TERESA RAMIREZ |
| | ATTORNEY DAVID ONGARO APPEARED FOR DEFENDANT |
| | EX PARTE MINUTE ORDER |
| | MATTER COMES BEFORE THE COURT ON DEFENDANT'S EXPARTE APPLICATION  REGARDING LETTERS ROGATORY FOR THE DEPOSITION OF CMGI INC. IN THE COMMONWEALTH OF MASSACHUSETTS; |
| | MOTION(S) HEARD AND ARGUED. |
| | MOTION GRANTED |
| | COURT SIGNS THE FOLLOWING ORDERS IN OPEN COURT. GRANTING SCENE 7, INC'S EXPARTE APPLICATION FOR ISSUANCE OF COMMISSION AND LETTERS ROGATORY FOR OUT-OF-STATE DEPOSITION; LETTERS ROGATORY FOR THE DEPOSITION OF CMGI INC. IN THE COMMONWEALTH OF MASSACHUSETTS AND COMMISSION FOR THE DEPOSITION OF CMGI, INC IN THE COMMONWEALTH OF MASSACHUSETTS. |
| | ENTERED BY: T. RAMIREZ |
| 04/18/2006 | IT IS ORDERED: GRANTING SCENE 7, INC'S EX PARTE APPLICATION FOR ISSUANCE OF COMMISSION AND LETTERS ROGATORY FOR OUT-OF-STATE DEPOSITION HON. VERNON F. SMITH |
| 04/18/2006 | IT IS ORDERED: LETTERS ROGATORY FOR THE DEPOSITION OF CMGI, INC. IN THE COMMONWEALTH OF MASSACHUSETTS HON. VERNON F. SMITH |
| 04/18/2006 | IT IS ORDERED: COMMISSION FOR THE DEPOSITION OF CMGI, INC. IN THE COMMONWEALTH OF MASSACHUSETTS HON. VERNON F. SMITH |
| 04/27/2006 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON F. SMITH , REPORTER ELAINE NINKOVICH , DEP CLK TERESA RAMIREZ |
| | ATTORNEY RUTH ANN CASTRO APPEARED FOR PLAINTIFF & CRDF'S |
| | ATTORNEY DAVID ONGARO APPEARED FOR DEFENDANT'S & CRCO |
| | COUNSEL STATES THAT CROSS-DEFENDANT'S TO BE SERVED. |
| | CASE MANAGEMENT CONT. TO 6/28/06 @ 9:00AM. |
| | HEARING CONTINUED TO: 06/28/2006 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 06 FROM DATE: 04/27/2006 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: CMGT FROM DEPARTMENT: 06 |
| | ENTERED BY: T. RAMIREZ |
| 05/26/2006 | ANSWER CRDF, AUTOMATED MEDIA PROCESSING SOLUTIONS, INC. TO (1) CROSS-COMPLAINT |
| 05/26/2006 | ANSWER CRDF, SEAN BARGER TO (1) CROSS-COMPLAINT |
| 05/26/2006 | ANSWER CRDF, RON WOOD TO (1) CROSS-COMPLAINT |
| 06/14/2006 | MINUTE ORDER POSTED |
| | ATTORNEY KELLY WOODRUFF APPEARED FOR PLAINTIFFS & CROSS-DEFENDANTS |
| | ATTORNEY DAVID ONGARO APPEARED FOR DEFENDANTS & CROSS-COMPLAINENTS |
| | EX PARTE MINUTE ORDER APPLICATION TO SHORTEN TIME TO HEAR CROSS-DEFENDANTS' MOTION FOR SANCTIONS |

Disclaimer: This Register of Actions is not an official court record.  For an official and/or certified record, visitors must obtain it from the Court.

Page 7 of 12

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN

| BARGER-GREAT SOUTH VENTURES, LLC. | DATE FILED: | 9/8/2004 |
|---|---|---|
| PLAINTIFF(s) | CASE TYPE: | COMPLAINT |
| VS. | CASE SUBTYPE: | FRAUD |
| EQUILIBRIUM TECHNOLOGIES, INC., ET AL. | DATE OF LAST ACTIVITY: | 5/7/2007 |
| DEFENDANT(s) | DATE/TIME RUN: | 06/07/2022 04:02 PM |
| REGISTER OF ACTIONS | CASE NUMBER: | CIV 043997 |

| | |
|---|---|
| | AFTER HEARING FROM BOTH SIDES AND READING THE PLEADINGS, THE COURT OFFERS TO HEAR THE MOTION ON JULY 12TH. COUNSEL WOODRUFF IS NOT AVAILABLE ON THAT DAY. COURT DENIES APPLICATION TO SHORTEN TIME SINCE THE COURT ALREADY OFFERED 7/12/06. THE COURT COULD HEAR IT ON JULY 19, 2006 AT 9AM IN COURTROOM F. COUNSEL SHOULD RESERVE THAT DATE AT THE LAW/MOTION DESK. |
| | ENTERED BY: LMM |
| 06/15/2006 | HEARING CONFIRMED FOR: 07/19/2006 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 06 |
| 06/21/2006 | FILING FEE PROCESSED: CRDF, SEAN BARGER - 320.00 |
| 06/21/2006 | FILING FEE PROCESSED: CRDF, RON WOOD - 320.00 |
| 06/28/2006 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON SMITH , REPORTER ELAINE NINKOVICH , DEP CLK LOUISE MORRIS |
| | COURT CALL APPEARANCE BY RUTH CASTRO FOR PLAINTIFFS AND CROSS-DEFENDANTS |
| | ATTORNEY DAVID ONGARO APPEARED FOR DEFENDANTS |
| | COUNSEL REPORT THAT SECOND ROUND OF MEDIATION HAS NOT OCCURRED. |
| | THERE IS A MOTION HEARING SCHEDULED FOR 7/19/06.  THIS HEARING IS CONTINUED TO SAME DATE AND TIME AS MOTION HEARING. |
| | HEARING CONTINUED TO: 07/19/2006 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 06 FROM DATE: 06/28/2006 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: CMGT FROM DEPARTMENT: 06 |
| | ENTERED BY: LMM |
| 07/11/2006 | HEARING CONFIRMED FOR: 08/09/2006 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 06 |
| 07/19/2006 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON SMITH , REPORTER ELAINE NINKOVICH , DEP CLK LOUISE MORRIS |
| | ATTORNEY RODERICK THOMPSON APPEARED FOR PLAINTIFF |
| | ATTORNEY DAVID ONGARO APPEARED FOR DEFENDANT |
| | THE COURT WILL NOT SET TRIAL DATE BECAUSE OF THE PENDING CROSS-COMPLAINT ISSUES. MATTER IS CONTINUED TO 9/7/06 TO SET TRIAL DATE |
| | HEARING CONTINUED TO: 09/07/2006 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 06 FROM DATE: 07/19/2006 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: CMGT FROM DEPARTMENT: 06 |
| | ENTERED BY: LMM |
| 07/19/2006 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON SMITH , REPORTER ELAINE NINKOVICH , DEP CLK LOUISE MORRIS |
| | ATTORNEY RODERICK THOMPSON APPEARED FOR PLAINTIFF |
| | ATTORNEY DAVID ONGARO APPEARED FOR DEFENDANTS |
| | THE TENTATIVE RULING IS HEARD, ARGUED AND TAKEN UNDER SUBMISSION FOR THE COURT TO READ THE "HART" CASE AND REVIEW THE DECLARATION. THE COURT'S FINAL RULING WILL BE AVAILABLE ON JULY 26, 2006 AT 9AM IN DEPT. F. NO FURTHER ARGUMENT WILL BE PERMITTED. |
| | APPEARANCE ADDED ON FOR: 07/26/2006 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 06 |
| | ENTERED BY: LMM |
| | CASE UNDER SUBMISSION |
| 07/26/2006 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON F. SMITH , REPORTER NOT REPORTED , DEP CLK TERESA RAMIREZ |
| | NO APPEARANCE BY OR FOR THE PARTIES |
| | THE COURT MAKES THE FOLLOWING TENTATIVE RULING AS FOLLOWS: |

Disclaimer: This Register of Actions is not an official court record.  For an official and/or certified record, visitors must obtain it from the Court.

Page 8 of 12

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN | | |
|---|---|---|
| BARGER-GREAT SOUTH VENTURES, LLC. | DATE FILED: | 9/8/2004 |
| PLAINTIFF(s) | CASE TYPE: | COMPLAINT |
| VS. | CASE SUBTYPE: | FRAUD |
| EQUILIBRIUM TECHNOLOGIES, INC., ET AL. | DATE OF LAST ACTIVITY: | 5/7/2007 |
| DEFENDANT(s) | DATE/TIME RUN: | 06/07/2022 04:02 PM |
| REGISTER OF ACTIONS | CASE NUMBER: | CIV 043997 |

PLAINTIFF AND CROSS-DEFENDANTS' MOTION FOR SANCTIONS UNDER CODE CIV. PROC. 1287, AGAINST CROSS-COMPLAINANT ON THE GROUND CROSS-COMPLAINANT FILED THE ORIGINAL CROSS-COMPLAINT KNOWING THE ALTER EGO ALLEGATIONS CONTAINED THERE HAD NO FACTUAL OR LEGAL BASIS, IS DENIED.

THE SANCTIONS MOTION IS PROCEDURALLY DEFICIENT.  THE MOTION SERVED ON CROSS-COMPLAINT DID NOT CONTAIN ALL THE SAME DOCUMENTS THAT WERE FILED WITH THIS COURT. (CODE CIV. PROC. 128.7 (C)(1).)  THE NOTICE OF MOTION SERVED ON CROSS-COMPLAINANT MUST BE IDENTICAL TO THE NOTICE OF MOTION FILED WITH THE COURT.  (SEE HART V. AVETOOM (2002) 95 CAL. APP. 4TH 414.)  CROSS-DEFENDANTS SERVED A DRAFT MEMORANDUM OF POINTS AND AUTHORITIES.  THEY DID NOT SERVE A NOTICE OF MOTION PURSUANT TO CODE CIV. PROC. 1010, AS STATUTORILY REQUIRED, NOR DID THEY SERVE THE DECLARATION OF KELLY WOODRUFF, WHICH WAS ALSO FILED IN SUPPORT OF THEIR MOTION.

ON THE FACTS OF THIS MATTER, CROSS-COMPLAINANT IS AWARDED REASONABLE ATTORNEY FEES IN THE AMOUNT OF $1145.00 AS SANCTIONS AGAINST CROSS-DEFENDANTS AND THEIR COUNSEL (CODE CIV. PROC. 128.7(C).).

CROSS-COMPLAINT'S MOTION FOR LEAVE TO FILE A FIRST AMENDED CROSS-COMPLAINT, IS GRANTED.  (CODE CIV. PROC. 473(A)(1), 576.)  WHERE THE MOTION IS TIMELY MADE AND THE AMENDMENT WILL NOT PREJUDICE THE OPPOSING PARTY, IT IS ERROR TO REFUSE PERMISSION TO AMEND. (BERMAN V. BROMBERG (1997) 56 CAL. APP. 4TH 936, 945 ("THUS UNDER THE STATE'S LIBERAL RULES OF PLEADING, "THE RIGHT OF A PARTY TO AMEND TO CORRECT INADVERTENT MISSTATEMENTS OF FACTS OR ERRONEOUS ALLEGATIONS OF TERMS CANNOT BE DENIED." (CITATION.)")

THERE IS NO CONTENTION OF PREJUDICE TO CROSS-DEFENDANT.  IN FACT, CROSS-DEFENDANTS' COUNSEL OFFERED TO STIPULATE THAT IF THIS COURT DENIED IT'S SANCTION MOTION, SCENE 7'S PROPOSED AMENDED COMPLAINT MAY BE FILED.

ALSO, CROSS-DEFENDANTS HAVE FAILED TO SUSTAIN THEIR BURDEN TO SHOW THE AMENDED PLEADING FAILS TO STATE A CAUSE OF ACTION FOR ALTER EGO LIABILITY. (SEE CALIFORNIA CAS GEN. INS. CO. V. SUPERIOR COURT (1985) 173 CAL.APP.3D 274, 280-281, DIS. ON OTHER GROUNDS, DRANSCO V. AMERICAN EMPIRE SURPLUS LINES INS. CO. (2000) 23 CAL. 4TH 390, 407.)  THEIR OPPOSITION CONTAINS NO CITATION TO AUTHORITY OR LEGAL DISCUSSION SHOWING THE PROPOSED AMENDMENTS FAIL TO SUPPORT A CLAIM OF ALTER EGO LIABILITY.

AFTER REVIEW, THE COURT ADOPTS ITS TENTATIVE AS FINAL.  (SEE HART V. AVETOOM 95 CAL. APP. 4TH 410, 414.)

ENTERED BY: T. RAMIREZ

| | |
|---|---|
| 07/26/2006 | CASE NO LONGER UNDER SUBMISSION |
| 08/02/2006 | AMENDED COMPLAINT FILED (1ST) CROSS-COMPLAINT BY ATTY. DAVID R. ONGARO FOR CRCO., SCENE1, INC., A CALIFORNIA CORP. |
| 08/04/2006 | APPEARANCE DROPPED FOR 08/09/2006 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 06 DROP REASON: R/O EXPIRES 8/4/07. PER ATTY BURTT'S OFC, & AGREEMENT |
| 08/09/2006 | CRDF.'S AUTOMATED MEDIA PROCESSING SOLUTIONS, INC., SEAN BARGER, AND RON WOOD ANSWER PLTF.'S (1ST) AMENDED COMPLAINT |
| 08/17/2006 | DISMISSAL FILED DISMISSING FOLLOWING ACTIONS WITHOUT PREJUDICE FROM THE FOURTH AMENDED COMPLAINT:            2ND CAUSE OF ACTION (CONSPIRACY TO DEFRAUD);            6TH CAUSE OF ACTION (BREACH OF THE COVENANT OF GOOD FAITHA& FAIR DEALING) 9TH CAUSE OF ACTION (CONSPIRACY TO MISAPPRORIATE CORPORATE OPPORTUNITIES) 12TH CAUSE OF ACTION  (VIOLATION OF STATUTORY DUTY/NEGLIGENCE PER SE/PRIMA) 13TH CAUSE OF ACTION  (LIBEL) |
| 09/07/2006 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON F. SMITH , REPORTER ELAINE NINKOVICH , DEP CLK TERESA RAMIREZ |
| | ATTORNEY ROBERT THOMPSON APPEARED FOR PLAINTIFF |
| | ATTORNEY DAVID ONGARO APPEARED FOR DEFENDANT'S & CRCO'S |
| | COURT NOTES: SOME PARTIES HAVE BEEN RESOLVED/DISMISSED |
| | JURY TRIAL DATE SET FOR 3/27/07 @ 9:00AM. ESTIMATE 5-7 DAYS, ISSUE CONFERENCE IS SAME DATE AS TRIAL AND SETTLEMENT CONFERENCE DATE SET FOR 03/05/07 @ 1:30PM. |

Disclaimer: This Register of Actions is not an official court record.  For an official and/or certified record, visitors must obtain it from the Court.

| BARGER-GREAT SOUTH VENTURES, LLC. | DATE FILED: | 9/8/2004 |
|---|---|---|
| PLAINTIFF(s) | CASE TYPE: | COMPLAINT |
| VS. | CASE SUBTYPE: | FRAUD |
| EQUILIBRIUM TECHNOLOGIES, INC., ET AL. | DATE OF LAST ACTIVITY: | 5/7/2007 |
| DEFENDANT(s) | DATE/TIME RUN: | 06/07/2022 04:02 PM |
| REGISTER OF ACTIONS | CASE NUMBER: | CIV 043997 |

| | |
|---|---|
| | HEARING CONFIRMED FOR: 03/05/2007 AT: 01:30 PM FOR APPEARANCE TYPE: STLC IN DEPARTMENT: 06 |
| | HEARING CONFIRMED FOR: 03/27/2007 AT: 09:00 AM FOR APPEARANCE TYPE: TRCL IN DEPARTMENT: 06 |
| | ENTERED BY: T. RAMIREZ |
| 10/20/2006 | HEARING CONFIRMED FOR: 11/08/2006 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 06 |
| 11/08/2006 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON SMITH , REPORTER ELAINE NINKOVICH , DEP CLK LOUISE MORRIS |
| | ATTORNEY KELLY WOODRUFF APPEARED FOR PLAINTIFF |
| | ATTORNEY DAVID ONGARO APPEARED FOR DEFENDANTS |
| | TENTATIVE RULING IS HEARD, ARGUED AND ADOPTED. |
| | SUMMARY OF RULING: DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AS TO THE 4TH AMENDED COMPLAINT IS DENIED. |
| | ENTERED BY: LMM |
| 12/04/2006 | IT IS ORDERED: DENYING DEFENDANT SCENE7, INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS. HON. VERNON F. SMITH |
| 12/08/2006 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON SMITH , REPORTER ELAINE NINKOVICH , DEP CLK LOUISE MORRIS |
| | ATTORNEY RODERICK THOMPSON APPEARED FOR CROSS-DEFENDANTS |
| | NO APPEARANCE BY OR FOR THE PLAINTIFF AND OTHER DEFENDANTS |
| | EX PARTE MINUTE ORDER TO SET MOTION FOR SUMMARY ADJUDICATION |
| | COUNSEL THOMPSON INDICATES THAT THERE IS NO OPPOSITION TO THIS REQUEST. THE COURT GRANTS THE MOTION AND RESERVES THE DATE OF 2/28/07 FOR HEARING. |
| | ENTERED BY: LMM |
| 12/11/2006 | HEARING CONFIRMED FOR: 02/28/2007 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 06 |
| 12/18/2006 | CASE REASSIGNED TO JUDGE HON. TERRENCE R. BOREN |
| 12/18/2006 | APPEARANCE MOVED TO: 02/28/2007 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 02 MOVE REASON: JUDICIAL REASSIGNMENT FROM DATE: 02/28/2007 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: LMCV FROM DEPARTMENT: 06 |
| 12/18/2006 | APPEARANCE MOVED TO: 03/05/2007 AT: 01:30 PM FOR APPEARANCE TYPE: STLC IN DEPARTMENT: 02 MOVE REASON: JUDICIAL REASSIGNMENT FROM DATE: 03/05/2007 FROM TIME: 01:30 PM FROM APPEARANCE TYPE: STLC FROM DEPARTMENT: 06 |
| 12/18/2006 | APPEARANCE MOVED TO: 03/27/2007 AT: 09:00 AM FOR APPEARANCE TYPE: TRCL IN DEPARTMENT: 02 MOVE REASON: JUDICIAL REASSIGNMENT FROM DATE: 03/27/2007 FROM TIME: 09:00 AM FROM APPEARANCE TYPE: TRCL FROM DEPARTMENT: 06 |
| 12/19/2006 | NOTICE OF CASE REASSIGNMENT AND NOTICE OF HEARING MAILED TO THE PARTIES |
| 12/21/2006 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE VERNON SMITH , REPORTER BRANDY CARRIER , DEP CLK LOUISE MORRIS |
| | EX PARTE MINUTE ORDER PLAINTIFF'S REQUEST TO PLACE DOCUMENTS UNDER SEAL |
| | ATTORNEY GABRIELA RUIZ APPEARED FOR PLAINTIFF |
| | AFTER READING THE STIPULATION TO PLACE DOCUMENTS UNDER SEAL, THE COURT DOES NOT SIGN THE STIPULATION. THE COURT INDICATES THAT A MOTION HEARING ON THIS ISSUE NEEDS TO BE SET.. COUNSEL INDICATES THAT A MOTION HEARING RE; MOTION TO COMPEL HAS ALREADY BEEN SET. . THE MOTION FOR SEALING WILL BE SET AT THE SAME DATE AND TIME. NO ORDER IS SIGNED. |
| | ENTERED BY: LMM |

Disclaimer: This Register of Actions is not an official court record. For an official and/or certified record, visitors must obtain it from the Court.

Page 10 of 12

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN | | |
|---|---|---|
| BARGER-GREAT SOUTH VENTURES, LLC. | DATE FILED: | 9/8/2004 |
| PLAINTIFF(s) | CASE TYPE: | COMPLAINT |
| VS. | CASE SUBTYPE: | FRAUD |
| EQUILIBRIUM TECHNOLOGIES, INC., ET AL. | DATE OF LAST ACTIVITY: | 5/7/2007 |
| DEFENDANT(s) | DATE/TIME RUN: | 06/07/2022 04:02 PM |
| REGISTER OF ACTIONS | CASE NUMBER: | CIV 043997 |

| | |
|---|---|
| 12/26/2006 | HEARING CONFIRMED FOR: 01/17/2007 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 06 |
| 12/26/2006 | APPEARANCE DROPPED FOR 01/17/2007 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 06 DROP REASON: PER MOVING PARTY KATHY SMALL AND AGREEMENT |
| 01/05/2007 | HEARING CONFIRMED FOR: 01/31/2007 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 02 |
| 01/23/2007 | HEARING CONFIRMED FOR: 03/07/2007 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 02 |
| 01/31/2007 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE TERRENCE BOREN , REPORTER SUSAN KLOTZ , DEP CLK LOUISE MORRIS |
| | ATTORNEY KELLY WOODRUFF APPEARED FOR PLAINTIFF |
| | ATTORNEY DAVID ONGARO APPEARED FOR SCENE 7 |
| | THE TENTATIVE RULING IS HEARD, ARGUED AND ADOPTED. |
| | SUMMARY OF RULING: PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS IS DENIED. PLAINTIFF HAS NOT SHOWN THAT THE "CRIME-FRAUD" EXCEPTION TO THE ATTORNEY-CLIENT PRIVILEGE APPLIES. PLAINTIFF CITES NO AUTHORITY TO THE EFFECT THAT THE CONTRADICTORY EVIDENCE NEED BE CONCLUSIVE. NO MONETARY SANCTIONS ARE AWARDED. |
| | ENTERED BY: LMM |
| 02/13/2007 | IT IS ORDERED: ORDER GRANTING SCENE7, INC.'S EX PARTE APPLICATION TO SET MOTION HEARING DATE PRIOR TO NON=EXPERT DISCOVERY MOTION DEADLINE, JUDGE TERRENCE R. BOREN |
| 02/13/2007 | IT IS ORDERED: ORDER GRANTING SCENE7, INC.'S MOTION FOR LEAVE TO FILE DOCUMENTS UNDER SEAL; JUDGE TERRENCE R. BOREN |
| 02/13/2007 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE TERRENCE BOREN , REPORTER SUSAN KLOTZ , DEP CLK LOUISE MORRIS |
| | EX PARTE MINUTE ORDER 1) DEFENDANTS' REQUEST FOR ALTERNATE BRIEFING SCHEDULE 2)DEFENDANT'S REQUEST TO SET A MOTION TO COMPEL GLOSTER'S DEPOSITION  3)DEFENDANTS' REQUEST TO FILE DOCUMENTS UNDER SEAL |
| | ATTORNEY DAVID ONGARO APPEARED FOR DEFENDANTS |
| | NO APPEARANCE BY OR FOR THE PLAINTIFF |
| | AFTER READING THE EXPARTE PAPERS AND SPEAKING WITH COUNSEL, THE COURT SIGNS ORDER TO ALTERNATE BRIEFING SCHEDULED. THE COURT SETS HEARING ON 3/14/07 AT 9AM IN DEPT.B FOR DEFENDANT'S MOTION TO COMPEL GLOSTER'S DEPOSITION THE COURT SIGNS ORDER TO FILE DOCUMENTS UNDER SEAL. |
| | ENTERED BY: LMM |
| 02/14/2007 | HEARING CONFIRMED FOR: 03/14/2007 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 02 |
| 02/27/2007 | APPEARANCE DROPPED FOR 03/07/2007 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 02 DROP REASON: NOTICE OF SETTLEMENT FILED 2/22/07 MOTIONS MOVED TO 3/14/07 BASED ON CT.ORDER OF 2/27/07 |
| 02/28/2007 | MINUTE ORDER POSTED |
| | JUDGE/PROTEM/REFEREE TERRENCE BOREN , REPORTER NOT REPORTED , DEP CLK LOUISE MORRIS |
| | NO APPEARANCE BY OR FOR THE PARTIES |
| | BASED ON AN EXPARTE HEARING YESTERDAY, THIS HEARING IS CONTINUED TO 3/14/07 AT 9AM IN DEPT.B. |
| | ENTERED BY: LMM |
| 03/05/2007 | APPEARANCE DROPPED FOR 03/27/2007 AT: 09:00 AM FOR APPEARANCE TYPE: TRCL IN DEPARTMENT: 02 DROP REASON: CASE SETTLED PER BURTT'S LETTER OF 3/5/07 |
| 03/05/2007 | APPEARANCE DROPPED FOR 03/14/2007 AT: 09:00 AM FOR APPEARANCE TYPE: LMCV IN DEPARTMENT: 02 DROP REASON: CASE SETTLED PER BURTT'S LETTER OF 3/5/07 |
| 03/05/2007 | APPEARANCE DROPPED FOR 03/05/2007 AT: 01:30 PM FOR APPEARANCE TYPE: STLC IN DEPARTMENT: 02 DROP REASON: CASE SETTLED PER FAX ON 3/5/07 FROM DAVID BURTT |

Disclaimer: This Register of Actions is not an official court record.  For an official and/or certified record, visitors must obtain it from the Court.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN**

| | | |
|---|---|---|
| BARGER-GREAT SOUTH VENTURES, LLC. | DATE FILED: | 9/8/2004 |
| PLAINTIFF(s) | CASE TYPE: | COMPLAINT |
| VS. | CASE SUBTYPE: | FRAUD |
| EQUILIBRIUM TECHNOLOGIES, INC., ET AL. | DATE OF LAST ACTIVITY: | 5/7/2007 |
| DEFENDANT(s) | DATE/TIME RUN: | 06/07/2022 04:02 PM |
| REGISTER OF ACTIONS | CASE NUMBER: | CIV 043997 |

| | |
|---|---|
| 03/09/2007 | HEARING CONFIRMED FOR: 05/23/2007 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 02 |
| 05/04/2007 | PARTIAL DISMISSAL  AS TO: CRCO, SCENE 7, INC., A CALIFORNIA CORPORATION (1);  WITH PREJUDICE |
| 05/04/2007 | PROOF OF SERVICE FILING REMOVED , AS TO: CRCO, SCENE 7, INC., A CALIFORNIA CORPORATION (1);   (CLERK ERROR) |
| 05/04/2007 | PARTIAL DISMISSAL  AS TO: CRDF, AUTOMATED MEDIA PROCESSING SOLUTIONS, INC. (1);  WITH PREJUDICE |
| 05/04/2007 | PARTIAL DISMISSAL  AS TO: CRDF, SEAN BARGER (1);   WITH PREJUDICE |
| 05/04/2007 | PARTIAL DISMISSAL  AS TO: CRDF, EQUILIBRIUM TECHNOLOGIES, INC., A DELAWARE CORP. (1);   WITH PREJUDICE |
| 05/04/2007 | PARTIAL DISMISSAL  AS TO: CRDF, RON WOOD  (1);  WITH PREJUDICE |
| 05/07/2007 | CASE DISPOSED BEFORE TRIAL;  DISMISSED - OTHER REASONS WITH PREJUDICE |
| 05/07/2007 | CASE DISPOSED IN ENTIRETY |
| 05/07/2007 | APPEARANCE DROPPED FOR 05/23/2007 AT: 09:00 AM FOR APPEARANCE TYPE: CMGT IN DEPARTMENT: 02 DROP REASON: DISMISSAL FILED |

Disclaimer: This Register of Actions is not an official court record.  For an official and/or certified record, visitors must obtain it from the Court.

# EXHIBIT 4

PTO/SB/05 (08-03)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office. U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# UTILITY PATENT APPLICATION TRANSMITTAL

*(Only for new nonprovisional applications under 37 CFR 1.53(b))*

| | |
|---|---|
| Attorney Docket No. | EQUI0001CIP-C |
| First Inventor | Samaniego et al |
| Title | Automated Media Delivery System |
| Express Mail Label No. | EV 643013657 US |

## APPLICATION ELEMENTS
*See MPEP chapter 600 concerning utility patent application contents.*

**ADDRESS TO:** Mail Stop Patent Application
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

1. [x] Fee Transmittal Form (e.g., PTO/SB/17)
   *(Submit an original and a duplicate for fee processing)*
2. [x] Applicant claims small entity status.
   See 37 CFR 1.27.
3. [x] Specification [Total Pages 41]
   *(preferred arrangement set forth below)*
   - Descriptive title of the invention
   - Cross Reference to Related Applications
   - Statement Regarding Fed sponsored R & D
   - Reference to sequence listing, a table,
     or a computer program listing appendix
   - Background of the Invention
   - Brief Summary of the Invention
   - Brief Description of the Drawings *(if filed)*
   - Detailed Description
   - Claim(s)
   - Abstract of the Disclosure

4. [X] Drawing(s) (35 U.S.C. 113) [Total Sheets 23]

5. Oath or Declaration [Total Sheets 03]
   a. [ ] Newly executed (original or copy)
   b. [ ] Copy from a prior application (37 CFR 1.63(d))
      *(for continuation/divisional with Box 18 completed)*
      i. [ ] DELETION OF INVENTOR(S)
         Signed statement attached deleting inventor(s)
         name in the prior application, see 37 CFR
         1.63(d)(2) and 1.33(b).

6. [ ] Application Data Sheet. See 37 CFR 1.76

7. [ ] CD-ROM or CD-R in duplicate, large table or Computer Program *(Appendix)*
8. Nucleotide and/or Amino Acid Sequence Submission
   *(if applicable, all necessary)*
   a. [ ] Computer Readable Form (CRF)
   b. Specification Sequence Listing on:
      i. [ ] CD-ROM or CD-R (2 copies); or
      ii. [ ] Paper
   c. [ ] Statements verifying identity of above copies

## ACCOMPANYING APPLICATION PARTS

9. [ ] Assignment Papers (cover sheet & document(s))
10. [ ] 37 CFR 3.73(b) Statement [x] Power of
    *(when there is an assignee)* Attorney
11. [ ] English Translation Document *(if applicable)*
12. [ ] Information Disclosure [ ] Copies of IDS
    Statement (IDS)/PTO-1449 Citations
13. [ ] Preliminary Amendment
14. [x] Return Receipt Postcard (MPEP 503)
    *(Should be specifically itemized)*
15. [ ] Certified Copy of Priority Document(s)
    *(if foreign priority is claimed)*
16. [ ] Nonpublication Request under 35 U.S.C. 122
    (b)(2)(B)(i). Applicant must attach form PTO/SB/35
    or its equivalent.
17. [X] Other: Certificate of Mailing

18. If a CONTINUING APPLICATION, *check appropriate box, and supply the requisite information below and in the first sentence of the specification following the title, or in an Application Data Sheet under 37 CFR 1.76:*

[ ] Continuation  [ ] Divisional  [X] Continuation-in-part (CIP)  of prior application No. 09/929,904

*Prior application information:* Examiner Bashore, William L.    Art Unit: 2176

For CONTINUATION OF DIVISIONAL APPS only; The entire disclosure of the prior application, from which an oath or declaration is supplied under Box 5b, is considered a part of the disclosure of the accompanying continuation or divisional application and is hereby incorporated by reference. The incorporation <u>can only</u> be relied upon when a portion has been inadvertently omitted from the submitted application parts.

## 19. CORRESPONDENCE ADDRESS

[X] Customer Number: 22862    OR  [ ] Correspondence address below

| | | | | |
|---|---|---|---|---|
| Name | | | | |
| Address | | | | |
| City | | State | | Zip Code |
| Country | | Telephone | | Fax |

| | | | | |
|---|---|---|---|---|
| Name (Print/Type) | Christopher Peil | Registration No. (Attorney/Agent) | 45,005 | |
| Signature | | | Date | 7 November 2005 |

This collection of information is required by 37 CFR 1.53(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Mail Stop Patent Application, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/SB/17 (12-04)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

# FEE TRANSMITTAL
## For FY 2005

*Effective on 12/08/2004.*
*Fees pursuant to the Consolidated Appropriations Act, 2005 (H.R. 4818).*

☑ Applicant claims small entity status. See 37 CFR 1.27

| TOTAL AMOUNT OF PAYMENT | ($) | 700.00 |
|---|---|---|

**Complete if Known**

| | |
|---|---|
| Application Number | Unknown |
| Filing Date | 7 November 2005 |
| First Named Inventor | Samaniego et al |
| Examiner Name | Unknown |
| Art Unit | Unknown |
| Attorney Docket No. | EQUI0001CIP-C |

## METHOD OF PAYMENT (check all that apply)

☐ Check   ☐ Credit Card   ☐ Money Order   ☐ None   ☐ Other (please identify): _____

☑ Deposit Account   Deposit Account Number: 07-1445   Deposit Account Name: Glenn Patent Group

For the above-identified deposit account, the Director is hereby authorized to: (check all that apply)

☑ Charge fee(s) indicated below          ☐ Charge fee(s) indicated below, **except for the filing fee**

☑ Charge any additional fee(s) or underpayments of fee(s)    ☑ Credit any overpayments
   under 37 CFR 1.16 and 1.17

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

## FEE CALCULATION

### 1. BASIC FILING, SEARCH, AND EXAMINATION FEES

| Application Type | FILING FEES Fee ($) | Small Entity Fee ($) | SEARCH FEES Fee ($) | Small Entity Fee ($) | EXAMINATION FEES Fee ($) | Small Entity Fee ($) | Fees Paid ($) |
|---|---|---|---|---|---|---|---|
| Utility | 300 | 150 | 500 | 250 | 200 | 100 | 500.00 |
| Design | 200 | 100 | 100 | 50 | 130 | 65 | _____ |
| Plant | 200 | 100 | 300 | 150 | 160 | 80 | _____ |
| Reissue | 300 | 150 | 500 | 250 | 600 | 300 | _____ |
| Provisional | 200 | 100 | 0 | 0 | 0 | 0 | _____ |

### 2. EXCESS CLAIM FEES

| Fee Description | Fee ($) | Small Entity Fee ($) |
|---|---|---|
| Each claim over 20 or, for Reissues, each claim over 20 and more than in the original patent | 50 | 25 |
| Each independent claim over 3 or, for Reissues, each independent claim more than in the original patent | 200 | 100 |
| Multiple dependent claims | 360 | 180 |

| Total Claims | Extra Claims | Fee ($) | Fee Paid ($) | Multiple Dependent Claims Fee ($) | Fee Paid ($) |
|---|---|---|---|---|---|
| 16 - 20 or HP = | 0 x | 0 = | 0 | 0 | 0 |

HP = highest number of total claims paid for, if greater than 20

| Indep. Claims | Extra Claims | Fee ($) | Fee Paid ($) |
|---|---|---|---|
| 5 - 3 or HP = | 2 x | 100.00 = | 200.00 |

HP = highest number of independent claims paid for, if greater than 3

### 3. APPLICATION SIZE FEE

If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

| Total Sheets | Extra Sheets | Number of each additional 50 or fraction thereof | Fee ($) | Fee Paid ($) |
|---|---|---|---|---|
| 64 - 100 = | 0 / 50 = | 0 (round up to a whole number) x | 0 = | 0 |

### 4. OTHER FEE(S)

| | Fees Paid ($) |
|---|---|
| Non-English Specification,  $130 fee (no small entity discount) | 0 |
| Other: _____ | 0 |

## SUBMITTED BY

| Signature | | Registration No. (Attorney/Agent) | 45,005 | Telephone | 650-474-8400 |
|---|---|---|---|---|---|
| Name (Print/Type) | Christopher Peil | | | Date | 7 November 2005 |

This collection of information is required by 37 CFR 1.136. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/SB/92 (12-97)
Approved for use through 9/30/00. OMB 0651-0031
Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

GLENN PATENT GROUP
Customer No. 22862
3475 Edison Way, Suite L
Menlo Park, CA 94025
(Tel) 650-474-8400
(Fax) 650-474-8401

# Certificate of Mailing under 37 CFR 1.10

Express Mail Label No. EV 643013657 US

I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as Express Mail in an envelope addressed to:

COMMISSIONER FOR PATENTS
Mail Stop - Patent Applications
P. O. Box 1450
Alexandria, VA 22313-1450                    Docket No. EQUI0001CIP-C

on ___07 November 2005___.
                Date

_____ Signature

Della Revecho
_____
Typed or printed name of person signing Certificate

Note: Each paper must have its own certificate of mailing, or this certificate must identify each submitted paper.

Attached to this cover-sheet please find the following documents:

1. Certificate of Express Mailing (1 sheet);
2. Utility Patent Application Transmittal (1 page);
3. Fee Transmittal (1 page, in duplicate);
4. Declaration and Power of Attorney - unsigned (3 pages);
5. Specification, Claims, and Abstract (41 pages);
6. Drawings (23 pages); and
7. Return postcard

Burden Hour Statement: This form is estimated to take 0.03 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

# Automated Media Delivery System

## BACKGROUND OF THE INVENTION

5

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a Continuation-in-Part of U.S. Serial No. 09/929,904, filed August 14, 2001, now U.S. Patent No. 6,964,009 granted on November 8, 2005, which is a

10 Continuation of U.S. Serial No., 09/425,326, filed October 21, 1999, now U.S. Patent No. 6,792,575, granted on September 14, 2004, all of which are hereby incorporated in its entirety by reference.

15

### TECHNICAL FIELD

The invention relates to software systems. More particularly, the invention relates to an Internet server-based software system that provides delivery of automated graphics and other media to Web sites for access by an end user or consumer.

20

### DESCRIPTION OF THE PRIOR ART

Most Web sites today are primarily handmade. From the guy publishing a simple online technology newsletter from his home, to the Fortune 1000 company's multi-

25 tiered site with hundreds of pages of text, images, and animations, the Web developer and each of his HTML-coding and graphics-producing coworkers toil page by page and image by image. Thousands of established online companies employ hundreds of highly-skilled workers just to produce and maintain their Web sites. After all, the Web is now a major selling vehicle and marketing medium for many of

30 these companies. The Web has even sprouted service industries such as, for example, public companies with multi-billion dollar valuations created just to consult and produce Web sites for others.

1

Most Web developers who use established WYSIWYG tools in the industry still must produce each page on their Web site one by one. The same rate applies to preparing and placing images, animations, and other visual assets. Each page represents its own set of issues ranging from whether to use GIF, JPEG, or PNG file
5    formats, to finding the optimum bit depth for each image to ensure the fastest downloading through the different browsers of the consumer. The bottlenecked state of the customer's workflow to produce graphics for Web pages can be described as follows:

10

**Current Workflow for Creating Web Graphics**

- Original Artwork/Asset Creation
  - Use third-party point products
- Asset Editing
15    - Scale/reduce/slice
- Asset Format Conversion
  - JPEG/GIF/PNG
- Asset Staging
  - Place in Web file system
20    - Edit HTML
- Create/Modify HTML for particular page
- Store HTML on Web server
- View final pages
- Repeat process for each version of each graphic on each page

25

Estimated time
  - Two hours per page times the number of pages

Also, from a user's perspective, the current state of the art is to offer the consumer
30    zooming and panning capabilities so that by clicking on an image the consumer can view more closely or from a different angle. On the horizon are pages with three-dimensional imagery that enable a user to move around a page that can look more

2

like a room than a brochure. While interesting, these features are merely incremental improvements to a consumer's surfing experience.

D. C. A. Bulterman, *Models, Media, and Motion: Using the Web to Support*
5    *Multimedia Documents,* Proceedings of 1997 International Conference on Multimedia Modeling, Singapore, 17-20 Nov. 1997 discloses "an effort underway by members of industry, research centers and user groups to define a standard document format that can be used in conjunction with time-based transport protocols over the Internet and intranets to support rich multimedia presentations.
10   The paper outlines the goals of the W3C's Synchronized Multimedia working group and presents an initial description of the first version of the proposed multimedia document model and format."

*Text and Graphics on UMI's ProQuest Direct: The Best (yet) of both Worlds,* Online,
15   vol. 21, no. 2, pp. 73-7, March- April 1997 discloses an information system that offers "periodical and newspaper content covering a wide range of business, news, and professional topics... letting the user search both text and graphics and build the product to suit. Articles can be retrieved in varying levels of detail: citation, abstracts, full text, and text with graphics. Images come in two flavors: Page Image,
20   a virtual photocopy, and Text+Graphics, in which graphics are stored separately from the text and are manipulable as discrete items. ...[The system] comes in two versions: Windows and Web."

John Mills Dudley, *Network-Based Classified Information Systems*, AU-A-53031/98
25   (27/08/98) discloses a "system for automatically creating databases containing industry, service, product and subject classification data, contact data, geographic location data (CCG-data) and links to web pages from HTML, XML, or SGML encoded web pages posted on computer networks such as Internets or Intranets....The... databases may be searched for references (URLs) to web pages
30   by use of enquiries which reference one or more of the items of the CCG-data. Alternatively, enquiries referencing the CCG-data in the databases may supply contact data without web page references. Data duplication and coordination is reduced by including in the web page CCG-data display controls which are used by

3

**Page 6**

web browsers to format for display the same data that is used to automatically update the databases."

Cordell *et al*, *Automatic Data Display Formatting with A Networking Application*, U.S.

5    Patent No. 5,845,084 (Dec. 1, 1998) discloses a placeholder image mechanism. "When a data request is made, the data transfer rate is monitored. When the receive data transfer rate is slow, and the data contains an embedded graphical image of unknown dimensions, a small placeholder image is automatically displayed for the user instead of the actual data. The small placeholder image holds a place on a

10    display device for the data or the embedded graphical image until the data or embedded graphical image is received. When embedded graphical image is received, the placeholder image is removed, and the display device is reformatted to display the embedded graphical image."

15    Jonathon R. T. Lewis, *System For Substituting Tags For Non-Editable Data Sets In Hypertext Documents And Updating Web Files Containing Links Between Data Sets Corresponding To Changes Made To The Tags*, U.S. Patent No. 5,355,472 (Oct. 11, 1994) discloses a "hypertext data processing system wherein data sets participating in the hypertext document may be edited, the data processing system inserting tags

20    into the data sets at locations corresponding to the hypertext links to create a file which is editable by an editor and the data processing system removing the tags, generating a revised data set and updating the link information after the editing process. Its main purpose is to preserve the linking hierarchy that may get lost when the individual data sets get modified."

25

Wistendahl *et al*, *System for Mapping Hot Spots in Media Content Interactive Digital Media Program*, U.S. Patent No. 5,708,845 (Jan. 13, 1998) discloses a "system for allowing media content to be used in an interactive digital media (IDM) program [that] has Frame Data for the media content and object mapping data (N Data)

30    representing the frame addresses and display location coordinates for objects appearing in the media content. The N Data are maintained separately from the Frame Data for the media content, so that the media content can be kept intact without embedded codes and can be played back on any system. The IDM program has established linkages connecting the objects mapped by the N Data to other

4

functions to be performed in conjunction with display of the media content. Selection of an object appearing in the media content with a pointer results in initiation of the interactive function. A broad base of existing non-interactive media content, such as movies, videos, advertising, and television programming can be converted to interactive digital media use. An authoring system for creating IDM programs has an object outlining tool and an object motion tracking tool for facilitating the generation of N Data. In a data storage disk, the Frame Data and the N Data are stored on separate sectors. In a network system, the object mapping data and IDM program are downloaded to a subscriber terminal and used in conjunction with presentation of the media content."

Rogers *et al*, *Method for Fulfilling Requests of A Web Browser*, U.S. Patent No. 5,701,451 (Dec. 23, 1997) and Lagarde *et al*, *Method for Distributed Task Fulfillment of Web Browser Requests*, U.S. Patent No. 5,710,918 (Jan. 20, 1998) disclose essentially "improvements which achieve a means for accepting Web client requests for information, obtaining data from one or more databases which may be located on multiple platforms at different physical locations on an Internet or on the Internet, processing that data into meaningful information, and presenting that information to the Web client in a text or graphics display at a location specified by the request."

Tyan *et al*, *HTML Generator*, European Patent Application No. EP 0843276 (May 20, 1998) discloses "generating an HTML file based on an input bitmap image, and is particularly directed to automatic generation of an HTML file, based on a scanned-in document image, with the HTML file in turn being used to generate a Web page that accurately reproduces the layout of the original input bitmap image."

TrueSpectra has a patent pending for the technology employed in its two products, IrisAccelerate and IrisTransactive. These products are designed for zooming and panning and simple image transformations and conversions, respectively. They support 10 file formats and allow developers to add new file formats via their SDK. They do not require the use of Flashpix for images. However, their documentation points out that performance is dependent on the Flashpix format. The system would be very slow if a non-Flashpix format was used.

5

TrueSpectra allows the image quality and compression to be set for JPEGs only. The compression setting is set on the server and all images are delivered at the same setting.

5    TrueSpectra has a simple caching mechanism. Images in the cache can be cleared out automatically at certain times and it does not have any dependency features for image propagation. The Web server needs to be brought down in order to update any original assets.

10    TrueSpectra does not require plug-ins to operate features such as zooming/panning or compositing. The alternative to plug-ins is using their Javascript or active server page technology. These technologies are used by many Web sites to provide interactivity, but not all Web browsers work correctly with these technologies.

15    TrueSpectra relies on Flashpix as its native file format and does not support media types such as multi-GIFs and sound formats. Flashpix files are typically larger than most file formats. Access to files is faster for zooming and panning, but appears to be quite slow.

20    The key to IrisTransactive is the compositing subsystem. It requires three things to build a shopping solution using image composition.

   1) The original images must be created. It is suggested that the image be converted to Flashpix for better performance.

   2) All of the individual images must be described in XML using the image
25    composer program. The program allows the editor to specify anchor points, layer attributes, and layer names. The resulting file is between 5k and 50k.

   3) The Web designer must place HTML referring to the XML in the Web site. By specifying parameters to the XML, the Web designer can turn on or off layers.

30    The herein above process for compositing images enables Web designers to create shopping sites. However, a lot of overhead is the result. The XML documents add 5k-50k to a Web site. The compositing commands that are embedded in the HTML are difficult to understand. And, because the compositing feature requires several

6

steps to implement, it is not suitable for every image on a Web site. The process seems to be designed for the specific purpose of shopping.

5    MediaBin(TM) is limited to activities behind the firewall automating only the "post-creative busywork." In addition, MediaBin requires the use of an application server to function through a web interface. Thus images may not be directly added to any existing web page.

10    Macromedia's Generator operates by embedding variables in their proprietary Flash format. Therefore the actual imaging operations are somewhat limited and cannot be controlled directly from a web page request.

MGI Software sells point solutions that require end-users to download a viewer to process a proprietary image format.

15

PictureIQ offers a server-side image-processing appliance that provides a limited set of Photoshop functionalities. This appliance runs on the web-page server, processes information embedded in the web page, and rewrites the web page with image data.

20

The disclosed prior art fail to provide systems and methodologies that result in a quantum leap in the *speed* with which they can modify and add images, video, and sound to sites, in the *volume* of data they can publish internally and externally, and in the *quality* of the output. The development of such an automated media delivery
25    system would constitute a major technological advance.

It would be advantageous to empower an end user with flexibility and control by providing *interactive* page capabilities.

30    It would be advantageous from an end user's perspective to generate Web pages that contain *active* graphics. For example, clicking on a Corvette image will cause a simple menu to pop up suggesting alternative colors and sizes in which to see the car. Clicking on portions of the image, such as a fender, can call up a close-in view of the fender.

7

It would be advantageous to provide an automated graphics delivery system that becomes part of the *Web site infrastructure* and operates as part of the *Web page transaction* and that thereby provides a less expensive and less time-consuming
5     process.

It would be advantageous to provide a system for automated processing and delivery of media (images, video, and sound) to a Web server whereby it eliminates the laborious post-production and conversion work that must be done before a
10    media asset can be delivered on a Web server.

It would be advantageous to create a dynamic Web site, wherein images are generated on demand from original assets, wherein only the original assets need to be updated, and wherein updated changes propagate throughout the site.

15

It would be advantageous to provide a system that generates media based on current Web server traffic thereby optimizing throughput of the media through the Web server.

20    It would be advantageous to provide a system that generates media that is optimized for the Web client, wherein client connection speed determines optimum quality and file size.

It would be advantageous to provide a system that generates media, whereby the
25    media is automatically uploaded.

It would be advantageous to provide a system that automatically caches generated media so identical requests can be handled without regeneration of images.

30    It would be advantageous to provide a system that resides behind the Web server, thereby eliminating security issues.

It would be advantageous to provide a system wherein the client browser does not require a plug-in.

8

It would be advantageous to provide a system wherein the system does not require any changes to a Web server.

5    It would be advantageous to provide a system wherein the system manages the Web server media cache.

It would be advantageous to provide a system wherein the Web media is generated only if requested by a client browser.

10

It would be advantageous for a system to reduce the need for a Web author to create different versions of a Web site, the system automatically handling image content.

15    It would be advantageous to provide dynamic imaging capabilities, have a more complete set of image processing functionality, and be controlled directly through an image URL.

It would be advantageous to provide an end-to-end solution requiring only a
20    standard browser that is completely controllable using the proprietary tags contained within a simple image link in the web page.

It would be advantageous to run an image application as a separate server controlled directly by single image requests to that server, such that any web server,
25    even one that is only sending static HTML can access imaging features.


## SUMMARY OF THE INVENTION

An automatic graphics delivery system that operates in parallel with an existing Web
30    site infrastructure is provided. The system streamlines the post-production process by automating the production of media through content generation procedures controlled by proprietary tags placed within URLs embedded within Web documents. The author simply places the original media in the system, and adds proprietary tags

9

to the URLs for accessing that media. The system automatically processes the URL encoded tags and automatically produces derivative media for the web site from the original media.

5    The system takes as input the client connection, server traffic, content generation procedures, and proprietary tags placed within the URL to generate optimized media for the client. The need for the Web author to create different versions of a Web site is reduced because the image content of the site is automatically handled by the system. In addition, generated media is cached such that further requests for the
10    same media require little overhead.

Because the invention takes the original media, content generation procedures, and proprietary URL tags as inputs for generating the Web media, it is possible to modify any of these inputs and have the system automatically update the media on the
15    associated Web pages.

## BRIEF DESCRIPTION OF THE DRAWINGS

20    Fig. 1 is a schematic diagram showing the placement of the system within a current Web infrastructure according to the invention;

Fig. 2 is a schematic diagram showing how a typical Web site delivers an HTML document and its graphics to a Web browser according to the prior art;

25

Fig. 3 is a schematic diagram showing delivery of an HTML document and media to a Web browser according to the invention;

Fig. 4 is a schematic diagram showing the components involved in Web site
30    administration according to the prior art;

10

**Page 13**

Fig. 5 is a schematic diagram showing the components of the system involved in Web site administration according to the invention;

Fig. 6 is a simple overview showing the components of the system according to the invention;

Fig. 7 is a schematic diagram showing the process flow of a proprietary enabled page delivered to a Web browser according to the invention;

Fig. 8 is a flow chart showing an authoring process according to the invention;

Fig. 9 is a flow chart showing an HTML parsing process according to the invention;

Fig. 10 is a flow chart showing a media creation process according to the invention;

Fig. 11 is a screen shot showing an administration tool according to the invention;

Fig. 12 displays a structure of a database record used for the system according to the invention;

Fig. 13 shows original media to be processed according to the invention;

Fig. 14 shows a portion on an HTML document with a proprietary tag according to the invention;

Fig. 15 shows an HTML document and an HTML document source according to the invention;

Fig. 16 shows a generated GIF image according to the invention;

Fig. 17 is a schematic diagram of an image system within a typical Web infrastructure according to the invention;

11

Fig. 18 is a schematic diagram showing delivery of an HTML document and original media according to the invention;

Fig. 19 is a schematic diagram showing components of Web site administration
5   according to a preferred embodiment of the invention;

Fig. 20 is a simple overview showing components of the image system according to a preferred embodiment of the invention;

10  Fig. 21 is a schematic diagram showing process flow of a proprietary enabled page delivered to a Web browser according to a preferred embodiment of the invention;

Fig. 22 shows a flowchart of a content generation procedure according to a preferred embodiment of the invention; and
15

Fig. 23 is a flow chart showing an authoring process according to a preferred embodiment of the invention.


20              **DETAILED DESCRIPTION OF THE INVENTION**


An automatic graphics delivery system that operates in parallel with an existing Web site infrastructure is provided.  The system streamlines the post-production process by automating the production of media through content generation procedures
25  controlled by proprietary tags placed within URLs embedded within Web documents. The author simply places the original media in the system, and adds proprietary tags to the URLs for accessing that media.  The system automatically processes the URL encoded tags and automatically produces derivative media for the web site from the original media.
30

The system takes as input the client connection, server traffic, content generation procedures, and proprietary tags placed within the URL to generate optimized media for the client.  The need for the Web author to create different versions of a Web site

12

**Page 15**

is reduced because the image content of the site is automatically handled by the system. In addition, the generated media is cached so that further requests for the same media require little overhead.

5    Because the invention takes the original media, content generation procedures, and proprietary URL tags as inputs for generating the Web media, it is possible to modify any of these inputs and have the system automatically update the media on the associated Web pages.

10    A detailed description of such automatic media delivery system operating in parallel with existing Web site infrastructure is found below in the section under the heading as such.

Fig. 1 is a schematic diagram showing the placement of the system within a current 15    Web infrastructure according to a preferred embodiment of the invention. The system 100 is attached to a Web server 110, which is connected to multiple client browsers 120(a-d) via the Internet 130.

Fig. 2 is a schematic diagram showing how a typical Web site delivers an HTML 20    document and its graphics to a Web browser according to the prior art. An original media 200 is passed to post-production systems 210, wherein the media 200 is manipulated by hand and prepared for the Web. The result is a Web media 220. The Web media 220 and an associated HTML document 230 referring to the media 220 by media tags are input to a Web server 110 for a Web browser 120 to view via 25    the Internet 130.

Fig. 3 is a schematic diagram showing delivery of an HTML document and media to a Web browser according to a preferred embodiment of the invention. An original media 200 and an HTML document embedded with proprietary media tags 300 are 30    input into the system 100. The system 100 generates a Web-safe media 220 and a modified HTML document 230 that refers to the Web media, and automatically loads them onto the Web server 110 for view by a Web browser 120 via the Internet 160.

13

Fig. 4 is a schematic diagram showing components involved in Web site administration according to the prior art.  Original media assets 400 are original images, video, or sound that have not been prepared for the Web.  Web sites usually need to manage the placement of media on the network for easy retrieval by

5    Web designers.  Post-production systems 410 vary from Web site to Web site. Post-production systems 410 are usually custom procedures that Web designers use to convert an original media, such as an image, to one that can be displayed on the Web.  Post-production systems 410 also upload finished images to Web image systems.  Web images 420 are Web versions of the original images.  Web images

10   420 are ready for retrieval by the Web server 110 to be delivered to a Web browser 120.  Any image to be modified or updated must pass through the herein above three components before it can be delivered to the Web browser 120.  HTML pages 460 have references to Web images 420.

15   Fig. 5 is a schematic diagram showing the components involved in Web site administration according to a preferred embodiment of the invention.  Web site administration is simplified using the claimed invention.  Asset management, automatic image manipulation, automatic image conversion, automatic image upload, and automatic disk management 500 are provided by the claimed invention.

20

Fig. 6 is a simple overview showing the components of the system according to a preferred embodiment of the invention.  HTML with proprietary tags 300 is the original HTML document that is embedded with proprietary tags which describe how the images are to be manipulated for the Web.  Java servlet engine 600 is a third-

25   party product that allows the system 100 to interface with the Web server 110 and execute Java servlet code.  The Web server 110 is third-party software that delivers Web pages to a Browser 120.  The Browser 120 views Web pages that are sent from the Web server 110.  Modified HTML with system created images 230 are a final result of the system.  Modified HTML 230 is a standard HTML document

30   without proprietary embedded tags and with standard Web graphics.


**The System.**

A preferred embodiment of the system 100 is provided.


14

HTML parsing subsystem 610 parses through an HTML document and searches for proprietary tags. If it finds a proprietary tag it hands it to a media caching subsystem 620 for further processing. The media caching subsystem 620 returns a standard HTML tag. The HTML parsing subsystem 610 then replaces the proprietary tag it found with the returned tag. The parsing subsystem 610 then continues searching for a next proprietary tag, repeating the process herein above. The process is finished when no more proprietary tags can be found.

The media caching subsystem 620 determines if an image has been created for the requested proprietary tag. If the image has already been created and the files that built that image have not been modified, the media caching subsystem 620 returns an HTML tag that refers to a previously-generated image. If the image has not been created, the media caching subsystem 620 hands the HTML tag to a media creation subsystem 630. The media creation subsystem 630 returns an image to the media caching subsystem 620. The media caching subsystem 620 adds the created image and the HTML tag to a media cache database 640.

The media cache database 640 contains references to the created images 645. In a preferred embodiment, the references are the script used to create the image, the names of the images used to create the image, the dates of those files, and the HTML that represents the created image. The media caching subsystem 620 performs lookups in this database to determine if the image has been created. If the image has not been created the media caching subsystem 620 calls upon the media creation subsystem 630 to create the image and then store the results in the media cache database 640.

The media creation subsystem 630 takes a proprietary tag from the media caching subsystem 620 and generates an image. The image is generated by deciphering the tag and handing it to the media processing engine 650. After the image is created, the media creation subsystem returns the name of the newly created image to the media caching subsystem 620.

15

The media processing engine 650 interprets the proprietary tag and generates the image. The media processing engine 650 looks up images in a media repository to obtain the location of the original file.

5    The media repository 660 contains original images 665 used in the system 100.

Fig. 7 is a schematic diagram showing the process flow of a proprietary enabled page delivered to a Web browser according to a preferred embodiment of the invention. An original media 200 is created. The media 200 is placed into the
10   system 100 in the media repository 660. Similarly, an HTML document with proprietary tags 300 is created and placed on a Web server 110. A user requests a Web page from a Web browser 120. The Web server 110 passes the requested page to an HTML parser 610. The HTML parser 610 parses HTML looking for media tags. The parser 610 looks up media tags in a media tags database 640. If
15   the media tag is found, then the system 100 produces a modified HTML document 230. Otherwise, the media creation subsystem 630 uses the media tag to generate a Web media 220. The generated Web media 220 is placed in a media cache subsystem 620. The proprietary media tag is converted by a converter 700 to a standard HTML tag that refers to the generated media 220 in cache. The media tag
20   and the HTML equivalent are stored in the media tags database 640. Media tags are replaced by standard HTML equivalent to provide a modified HTML document 230. The modified HTML document 230 is delivered to the Web server 110. The Web server 100 delivers the modified HTML document 230 to the browser 120 via the Internet for a user to view.

25

Fig. 8 is a flow chart showing an authoring process according to a preferred embodiment of the invention. The process starts (800) when a user adds an original graphic to the system (810). The user then creates an HTML document that contains proprietary media tags (820). The user then places the HTML document
30   on a Web server (830) and ends the authoring process (840).

Fig. 9 is a flow chart showing an HTML parsing process according to a preferred embodiment of the invention. The process starts (900) when a consumer requests a Web page (910). A Web server hands the request of the Web page to the system

16

(920).  The system parses the Web page (930).  The system looks for a media tag (940).  If found, the system retrieves the HTML equivalent of the media tag (950) and replaces the media tag with the HTML equivalent tag (960).  The system continues parsing the Web page for tags (970) by returning to step (940).  When no more tags are found, the system delivers the modified Web page to the Web server (980) and therein ends the process (990).

Fig. 10 is a flow chart showing a media creation process according to a preferred embodiment of the invention.  The process starts (1000) when the system requests an HTML equivalent to a proprietary media tag (1010).  The Media tag is combined with bandwidth information (1020).  The subsystem checks if the media tag already exists in the media tag database (1030).  If it does, the subsystem checks if any of the original assets used to create the media have been changed (1040).  If not, then the subsystem retrieves the HTML equivalent tag from the database (1050) and returns the HTML equivalent tag to the requesting system (1060).  If any of the original assets used to create the media have been changed (1040), then the subsystem removes the media tag entry from the media database (1070) and creates the media using the media tag (1080).  The subsystem then stores the media in a media cache (1090).  The subsystem generates the HTML referring to the generated media (1100) and places the media tag and the HTML equivalent in the media tag database (1110).  The HTML equivalent is returned to the requesting system (1060) and the process stops (1120).

The differences between using HTML and the proprietary tags disclosed herein are noted.  HTML allows Web designers to create Web page layouts.  HTML offers some control of the images.  HTML allows the Web designer to set the height and width of an image.  However, all of the other image operations disclosed herein are supported by the claimed invention and are not supported by HTML.

Table A herein below provides the claimed proprietary tags according to a preferred embodiment of the invention. The use of the term "freeride" refers to an internal code name for the invention.

Table A

17

**Page 20**

**Tags**

**Generate image**

<freerideimage> mediascript </freerideimage>

5   Generate a standard Web image.

**Generate thumbnail image linked to full image**

<freerideimagethumbnail> mediascript <xs=size ys=size /freerideimagethumbnail>

Generate a thumbnail of specified size and link it to the full size version.

10

**Generate zoom and pan image**

<freerideimagezoom> mediascript </freerideimagezoom>

Generate a zoomable/panable image.

15   **Security**

Specifies that all images found between these tags are secured images and the system will determine access before generating.

20

Table B herein below provides the claimed script commands according to a preferred embodiment of the invention. Additional commands may be added as needed.

25                                     Table B


**Media processing script commands**


**Add Noise**

30   Noise_AddNoise( [amount=<value 1..999>] [gaussian] [grayscale] )

This command adds noise to the image.


**Adjust HSB**

AdjustHsb([hue @ <value ±255>] [saturation @ <value ±255>]  [brightness @ <value ±255>])

35   This command allows the HSB of an image to be altered. This can be applied to images of all supported bit-depths.


**Adjust RGB**

AdjustRgb( [brightness @ <value ±255>] [contrast @ <value ±255>] [red @ <value ±255>]

40   [green @ <value ±255>] [blue @ <value ±255>] [noclip @ <true, false>] [invert @ <true, false>] )


18

This command allows the contrast, brightness, and color balance of an image to be altered.

**Blur**

5      Blur( radius @ <value 0..30>)

This command applies a simple blur filter on the image.

**Blur Convolve**

Blur_Blur()

10     This command commands perform a simple 3x3 convolution for blurring.

**Blur Convolve More**

Blur_MoreBlur()

This command commands perform a stronger 3x3 convolution for blurring.

15

**Blur Gaussian**

Blur_GaussianBlur( [radius=<value 0.1..250>] )

This command applies a Gaussian blur to the image.

20     **Blur Motion**

Blur_MotionBlur( [distance=<value 1..250>] [angle=<degrees>] )

This command applies motion blurring to the image using the specified distance and angle.

25     **Brush Composite**

Composite( source @ {<User-Defined Media Object name>} [x @ <pixel>] [y @ <pixel>] [onto] [opacity @ <value 0..255>] [color @ <color in hexadecimal>] [colorize @ <true, false>] [saturation @ <value 0..255>] )

This command composites the specified "brush" (foreground) image onto the
30     current "target" (background) image.

**Colorize**

Colorize( color @ <color in hexadecimal> [saturation @ <value 0..255>] )

This command changes the hue of the pixels in the image to the specified color.

35

**Convert**

Convert( rtype @ <bit-depth> {dither @ <value 0..10>] )

This command converts the image to the specified type/bit-depth.

40     **Convolve**

Convolve( Filter @ <filtername> )

This command applies a basic convolution filter to the image. In a user interface driven system, the filters could be stored in files and edited/created by the user.

19

**Crop/Resize Canvas**

Crop( [xs @ {<pixels>, <percentage + "%">}] [ys @ {<pixels>, <percentage + "%">}] [xo @ <left pixel>]

5    [yo @ <top pixel>] [padcolor @ <color in hexadecimal>] [padindex @ <value 0..255>] )

This command crops the media to a specified size.

**Discard**

Discard()

10    This command removes the designated Media Object from memory.

**Drop Shadow**

DropShadow( [dx @ <pixels>] [dy @ <pixels>] [color @ <color in hexadecimal>] [opacity @ <value 0..255>] [blur @ <value 0..30>] [enlarge @ <true, false>])

15    This command adds a drop shadow to the image based on its alpha channel.

**Equal**

Equal( source @ {<User-Defined Media Object name>})

This command compares the current media with the one specified. If the media are

20    different in any way, an error value is returned.

**Equalize**

Equalize( [brightness @ <-1, 0..20>] [saturation @ <-1, 0..20>])

This command equalizes the relevant components of the media. Equalization takes the

25    used range of a component and expands it to fill the available range.

**Export Channel**

ExportGun( Channel @ <channelname> )

This command exports a single channel of the source as a grayscale image.

30

**Find Edges**

Stylize_FindEdges( [threshold=<value 0..255>] [grayscale] [mono] [invert] )

This command finds the edges of the image based on the specified threshold value.

35    **Fix Alpha**

FixAlpha()

This command adjusts the RGB components of an image relative to its alpha channel.

**Flip**

40    Flip( <horizontal, vertical> @ <true, false> )

This command flips the media vertically or horizontally.

20

**Frame Add**

FrameAdd( Source @ <filename> )

This command adds the given frame(s) to the specified Media Object.

**Glow/Halo**

Glow( Size @ <value 0..30>  [halo @ <value 0..size>]  [color @ <color in hexadecimal>] [opacity @ <value 0..255>] [blur @ <value 0..30>] [enlarge @ <true, false>] )

This command produces a glow or halo around the image based on the image's alpha.

**High Pass**

Other_HighPass( [radius=<value 0.1..250>] )

This command  replaces each pixel with the difference between the original pixel and a Gaussian blurred version of the image.

**Import Channel**

ImportGun( channel @ <channel name> source @ {<User-Defined Media Object name>} [rtype @ <bit-depth>])

This command imports the specified source image (treated as a grayscale) and replaces the selected channel in the original.

**Load**

Load( Name @ <filename> [type @ <typename>] [transform @ <true, false>] )

This command loads a media from the specified file.

**Maximum**

Other_Maximum( [radius=<value 1..10>] )

This command scans the area specified by the radius surrounding each pixel, and then replaces the pixel with the brightest pixel found.

**Minimum**

Other_Minimum( [radius=<value 1..10>] )

This command scans the area specified by the radius surrounding each pixel, and then replaces the pixel with the darkest pixel found.

**Normalize**

Normalize( [clip @ <value 0..20>] )

This command expands the volume of the sample to the maximum possible.

**Pixellate Mosaic**

Pixellate_Mosaic( [size=<value 2..64>] )

This command converts the image to squares of the specified size, where each square contains the average color for that part of the image.

**Pixellate Fragment**

Pixellate_Fragment( [radius=<value 1..16>] )

21

**Page 24**

This command produces four copies of the image displaced in each direction (up, down, left, right) by the specified radius distance and then averages them together.

**Quad Warp**

QuadWarp( [tlx=<position>] [tly=<position>] [trx=<position>] [try=<position>] [blx=<position>] [bly=<position>] [brx=<position>] [bry=<position>] [smooth] )

This command takes the corners of the source image and moves them to the specified locations, producing a warped effect on the image.

**Reduce to Palette**

Reduce( [colors @ <num colors>] [netscape @ <true, false>] [b&w @ <true, false>] [dither @ <value 0..10>] [dithertop @ <value 0..10>] [notbackcolor] [pad @ <true, false>] )

This command applies a specified or generated palette to the image.

**Rotate**

Rotate( Angle @ <value 0..359> [smooth @ <true, false>] [enlarge @ <true, false>] [xs @ <pixels>]
[ys @ <pixels>] )

This command rotates the media by the specified angle in degrees.

**Rotate 3D**

Rotate3d( [anglex @ <angle ±89>] [angley @ <angle ±89>] [distance @ <value>] )

This command rotates the image in 3D about either the x-axis or y-axis.

**Save**

Save([type @ <image-type>])

This command saves a media to the specified file.

**Scale**

Scale( [xs @ {<pixels>, <percentage + "%">}] [ys @ {<pixels>, <percentage + "%">}]
[constrain @ <true, false>] [alg @ {"fast", "smooth", "outline"}] [x1 @ <pixels>] [y1 @ <pixels>]
[x2 @ <pixels>] [y2 @ <pixels>] )

This command scales the image to the specified size.

**Select**

Selection( [source @ <User-Defined media Object>] [remove @ <true, false>] [invert @ <true, false>]
[backcolor] [color=<color>] [index=<value>] [opacity @ <value 0..255>] )

This command manages the selected region for the current Media Object.

**Set Color**

SetColor( [backcolor @ <color in hexadecimal>] [forecolor @ <color in hexadecimal>]
[backindex @ <value 0..255>] [foreindex @ <value 0..255>] [transparency @ ("on","off")] )

This command allows the background color, foreground color, and transparency state of an image to be set.

**Set Resolution**

SetResolution( [dpi @ <value>] [xdpi @ <value>] [ydpi @ <value>] )

22

This command changes the DPI of the image in memory.

**Sharpen**

Sharpen_Sharpen()

This command sharpens the image by enhancing the high-frequency component of the image.

**Sharpen More**

Sharpen_SharpenMore()

This command sharpens the image by enhancing the high-frequency component of the image, but is stronger than the standard sharpening.

**Stylize Diffuse**

Stylize_Diffuse( [radius=<value 0..>] [lighten] [darken] )

This command diffuses the image by randomizing the pixels within a given pixel radius.

**Stylize Embose**

Stylize_Emboss( [height=<value 1..10>] [angle=<degrees>] [amount=<percentage 1..500>])

This command converts the image to an embossed version.

**Text Drawing**

DrawText( Text @ <string> Font @ <font file>  [size @ <value>]
[color @ <color in hexadecimal>] [smooth @ <true, false>] [<left, right, top, bottom> @ <true, false>]
[x @ <pixel>] [y @ <pixel>] [wrap @ <pixel-width>] [justify @ {left,center,right}] [angle @ <angle>])

This command composites the specified text string onto the image.

**Text Making**

MakeText( text @ <string> font @ <font file> [path @ <path to font directory>] [size @ <value 1..4095>]
[color @ <color in hexadecimal>] [smooth @ <true, false>] [wrap @ <pixel-width>]
[justify @ {left,center,right}] [angle @ <angle>] )

This command creates a new image that includes only the specified text.

**Trace Contour**

Stylize_TraceContour( [level=<value 0..255>] [upper] [invert] )

This command traces the contour of the image at the specified level (for each gun).

**Unsharpen Mask**

Sharpen_UnsharpMask( [amount=<percentage 1..500>] [radius=<value 0.1..250>]
[threshold=<value 0..255>] )

This command enhances the edges and detail of an image by exaggerating differences between the image and a gaussian blurred version of the same image.

23

**Zoom**

Zoom( [xs @ <pixels>] [ys @ <pixels>] [scale @ <value>] [x @ <left pixel>] [y @ <top pixel>] )

This command zooms in on a specified portion of the media and fits it to the specified size. This constitutes a crop followed by a scale.

5

Table C herein below provides a list of features provided by a preferred embodiment of the invention. It is noted that the list of features included in Table C is by no means complete. In other embodiments, the list of features is expanded or reduced

10 as needed.

.

Table C -System Feature List

- Reads and writes various file formats:
15          BMP, GIF, JPG, PNG, TIF, PICT, TGA, PSD, FPX;
- Supports many image processing operations;
- Dynamically creates Web images from original assets;
- Dynamically creates thumbnail images;
- Dynamically creates images that can be panned and zoomed without browser plug-ins or special
20    file formats;
- Automatically propagates changes of original assets throughout a Web site;
- Uses an intelligent caching mechanism:
          Clean up image cache on demand;
          Eliminates orphaned image files; and
25          Optimizes Web server cache by providing most recent images;
- Renders TrueType fonts on the server instead of browser;
- Uses intelligent scaling of line drawings;
- Allows Web designers to manipulate images with proprietary tags;
- Preserves original image assets;
30 - Optimizes Web server traffic by adjusting the bandwidth of graphics;
- Optimizes images for client connection speed;
- Allows clients to specify the quality of images on a Web site; and
- Allows Web designers to dynamically create images by manipulating proprietary tags in their
    applications (server or client side).

35

Fig. 11 is a screen shot showing an administration tool according to a preferred embodiment of the invention. Specifically, Fig. 11 shows an administration page

24

that contains cached images of generated scripts. The use of the term "freeride" refers to an internal code name for the invention.

Fig. 12 displays a structure of a database record used for the system according to a preferred embodiment of the invention. A Script Table 1200 has 5 columns, Media Script 1210, HTML Equivalent 1220, Bandwidth 1230, Generated File 1240, and Dependency List 1250. A Dependency Table 1260 has two columns, File Name 1270 and Modification Date 1280.

5

**Snowboard Store Example.**

10

Background.

The snowboard store highlights several features of the claimed system. The snowboard store is an imaginary store that allows a user to configure his or her snowboard. The store consists of five logos, five board colors, and four boards. The consumer clicks on the buttons to change the snowboard represented in the middle of the screen. When the consumer has configured the snowboard they the snowboard can be purchased by selecting a buy button.

15

Prior Art Method.

To create the snowboard site today, the Web designer must render all possible combinations of the board. The number of combinations is five logos x five board colors x four boards = 100. The designer also must render all the buttons. The creation process is very tedious and involves a lot of production work. Typically, most Web sites do not even attempt such an endeavor. Also, other issues must be addressed, such as, for example, updating the Web site and scripting. For example, updating a single logo involves updating a minimum of 20 images.

20

25

The prior art method sustains a graphic intensive site that requires management of at least 100 images. Updates to the Web site are time-consuming and prone to human error.

30

The Claimed Method.

A preferred embodiment of the method scripts the image creation process in HTML to create a dynamic Web site. There is no need to create over 100 images. The

25

claimed system generates images on demand.  The Web site only needs to create original assets.  The scripting process involves writing the proprietary scripts.  In the current example herein, scripting buttons is very simple.  Once one button is created, simply copy and paste the HTML to create another button or many buttons.

5    Only the name of the image to be overlaid on the button must be changed.  The Webmaster then creates a simple program that reads what object a user has clicked on and generates a proprietary tag.  The tag is then sent to the claimed system to generate a center image.

10   The claimed method allows the creation of all 100 combinations automatically. When the Web site receives an updated image, only the original image needs to be updated.  Any change to the original image automatically propagates throughout the system.  The Web site is easier to manage.  Testing of the Web site is easier because there is no need to test all 100 combinations.  A small subset of

15   combinations will guarantee adequate coverage.


**Processing of an Image Tag Example (Fig. 13-16).**
Fig. 13 shows two original images 1300 and 1310 to be processed according to a preferred embodiment of the invention.

20

Fig. 14 shows a portion on an HTML document with a proprietary tag 1400, <freerideimage></freerideimage> according to a preferred embodiment of the invention. The use of the term "freeride" refers to an internal code name for the invention.

25

Fig. 15 shows an HTML document 1500 as viewed in a browser and an HTML document source 1510, according to a preferred embodiment of the invention. The use of the term "freeride" refers to an internal code name for the invention.

30   Fig. 16 shows a generated GIF image 1600 according to a preferred embodiment of the invention.


**Automatic media delivery system operating in parallel with existing Web site infrastructure.**

26

It should be noted that the words, media, graphics, and images are used herein interchangeably.

An automatic graphics delivery system that operates in parallel with an existing Web
5    site infrastructure is provided. The system streamlines the post-production process by automating the production of media through content generation procedures controlled by proprietary tags placed within URLs embedded within Web documents. The author simply places the original media in the system, and adds proprietary tags to the URLs for accessing that media. The system automatically processes the URL
10    encoded tags and automatically produces derivative media for the web site from the original media.

The system takes as input the client connection, server traffic, content generation procedures, and proprietary tags placed within the URL to generate optimized media
15    for the client. The need for the Web author to create different versions of a Web site is reduced because the image content of the site is automatically handled by the system. In addition, the generated media is cached so that further requests for the same media require little overhead.

20    Because the invention takes the original media, content generation procedures, and proprietary URL tags as inputs for generating the Web media, it is possible to modify any of these inputs and have the system automatically update the media on the associated Web pages.

25    A preferred embodiment of the invention is described with reference to Fig. 17. Fig. 17 is a schematic diagram of an image system within a typical Web infrastructure according to the invention. The image system 100 is placed in parallel to an existing Web server 110. The image system 100 may be on-site or off-site to the Web infrastructure. Multiple client browsers 120a-120d communicate with both the Web
30    server 110 and the image server 100 via the Internet 130.

The delivery of an HTML document and media according to a preferred embodiment of the invention is described with reference to Fig. 18. Resource locators (URLs) are placed within HTML documents 301 accessible to the Web server 110. These URLs

27

**Page 30**

direct browsers to generate requests for media to the system 100. The system processes such URLs by interpreting the proprietary tags, executing the indicated image generation procedures on the original media 200, and returning derivative Web-safe media to client browsers 120a-120d via the Internet 130. Additionally,

5      such generated media is cached on the image server 100 and, therefore need not be regenerated for subsequent requests.

Web site administration according to another preferred embodiment of the invention is described with reference to Fig. 19. Fig. 19 is a schematic diagram showing the

10     components of Web site administration according to a preferred embodiment of the invention, whereby Web site administration is simplified. The preferred embodiment provides, but is not limited to the following services: asset management, automatic image manipulation, automatic image conversion, automatic image upload, automatic image customization based on browser characteristics, automatic disk

15     management, automatic control of proxy caching, and image delivery 501.

Fig. 20 is a simple overview showing components of the system according to a preferred embodiment of the invention. HTML pages with proprietary URL tags 301 describe how referenced media therein is to be manipulated for Web. Browsers 120

20     send such tags to the image system 100 as media requests. A server 2000 within the image system 100 receives the media requests, decodes the URL tags, and retrieves any media that already exists in the media caching system 2010. Non-existent media is subsequently generated by a media creation system 2020 using original media 2050 stored in a media repository 2040 and using content generation

25     procedures 2030.

The Image System.
Following is a detailed description of the preferred embodiment of the invention with reference to Fig. 21 below.

30                                    `

The system receives a request for media through a URL containing proprietary tags for controlling image generation. The system parses this URL to determine the content generation procedure to execute, input to the content generation procedure, post-processing directives for, for example, zoom/pan/slice, browser properties, and

28

any cache control directives. Such data is handed to a media caching subsystem that returns the requested image if found. If the image is not found, the information is handed to the media generation subsystem that executes the specified content generation procedure to produce a derivative image. The media generation

5    subsystem returns one or more images to the media caching system for subsequent reuse.

The media caching subsystem is a mechanism for associating final or intermediate derivative media with the procedure, input, and user characteristics used to generate

10    said media, specified through proprietary tags within the requested URL. This system may be implemented using a database, file system, or any other mechanism having capability to track such associations.

The media generation subsystem executes a primary content generation procedure

15    to produce a derivative image whose identifier is provided to the media caching subsystem. This derivative image is composed of one or more original images acquired from the media repository. This media is then passed to the dynamic image content system, if necessary, to generate a subsequent derivative media suitably modified for the needs of zooming, panning, or slice. The resulting media is

20    passed to the user profile system where it is again modified to account for any specific user browser characteristics specified using the proprietary URL tags. This media is then returned to the browser, along with any cache control directives encoded within the URL, and its identifier is passed to the media caching system for subsequent retrieval.

25

The dynamic content system operates on intermediate derivative images to generate image subsets or scalings used by Web· site designers to implement zooming in on an image, panning across an image, slicing an image into parts, and the like for special Web page effects. The input to this system is cached by the

30    media caching system such that the intermediate image need not be regenerated.

The user profile system operates on the final image about to be returned to the browser and may modify the image to account for individual needs of Web site

29

**Page 32**

users. The designer of a site is able to implement freely custom post-processing of images to meet the specific needs of their clients.

Fig. 21 is a schematic diagram showing the process flow of a proprietary enabled page delivered to a Web browser according to a preferred embodiment of the invention. Original media 200 is created and placed into the system 100 in a media repository 2040. A content generation procedure 2140 is created with instructions on how the media is to be transformed to create the desired Web page content. An HTML page 301 is created for the Web site comprising the system 100, the page containing one or more URLs directing a browser 120 to request the specified content generation procedure 2140 from the system 100 using input parameters specified with proprietary tags encoded within the URL. The browser 120 requests the Web page 301 from the Web site 110. Upon receipt of the page 301, the browser contacts the system 100 requesting media specified in the URL. The system parses the URL 2100 to determine the content generation procedure 2140 to execute, any corresponding input parameters to be used by such procedure, any dynamic content processing 2150 to be performed by dynamic media procedures, any user profile information 2160 to be used to modify the resulting image, and any cache control HTTP headers 2190 the site instructs to accompany the resulting image.

The parser generates a unique primary lookup key 2110 for the specified resulting media. If the key corresponds to an existing generated media 2180, such media is returned immediately to the browser 120 through a media cache 2120, and the transaction is complete. Otherwise, a media generation occurs. In the case of media generation requiring dynamic content processing, a unique secondary lookup key corresponding to intermediate media is generated 2130. If intermediate media 2170 corresponding to this key is found, such media is passed directly to the dynamic media content system 2150 having dynamic media procedures, wherein appropriate action is taken to generate the required derivative from the intermediate media data. A unique key is generated for the derivative 2130 and passed to the media caching system 2120. If the media caching system finds no such intermediate image, such intermediate image is generated according to instructions specified by the content generation procedure, cached by the media cache system

30

2120 as a secondary cached media 2170, and passed to the dynamic media system 2150. Again, appropriate action is taken to generate the required derivative from the intermediate image data.

5    The resulting image after any dynamic media processing is complete, is checked to ensure that the image is in a valid Web image format.    If not, the image is automatically converted into a valid format.

The final media is passed to a user profile system 2160 wherein browser
10    characteristics specified through proprietary tags within the URL are inspected, and appropriate modification to the media is performed, based on such characteristics. The resulting image is handed to the media cache system 2120 for caching and returned to the browser 120.

15    Fig. 22 shows a flowchart of the content generation procedure according to a preferred embodiment of the invention.  A URL containing proprietary tags (2200) is parsed (2210) to determine the content generation procedure to execute, any dynamic modifications to the media, user profile characteristics, and proxy-cache control.  A unique final lookup key is generated for the media (2220) and the media
20    cache is checked (2230).  If the indicated media exists, control passes to proxy-cache control (2290) and the media is delivered to the browser (2295).  Otherwise, dynamic media system tags are separated from content generation control tags (2240) and a unique intermediate image lookup key is generated (2250).  The cache is then checked for such intermediate media (2261). If such intermediate media is
25    found, it is used directly for dynamic processing, if required.  Otherwise, content is generated (2262) and cached (2263), and the result is evaluated for dynamic processing (2270).  If dynamic processing is required, the media is operated upon by the dynamic content generator (2271), otherwise it is evaluated for valid content type (2272).  If the content type is invalid, the media is automatically converted to a
30    valid type (2273).   The resulting image is then customized by the user profiling system (2280) for specified browser or client attributes.  Finally, any cache-control directives specified are attached to the response (2290) and the media is delivered to the browser (2295).

31

Fig. 23 is a flow chart showing an authoring process according to a preferred embodiment of the invention.  The process starts (2300) when a user adds an original graphic or other media (2310) to the system.  The author then creates a content generation procedure (2320) containing instruction on how the original

5    media should be processed to generate the desired Web page content.  The user then creates an HTML document (2330) that refers to that image by using a URL pointing to a content generation procedure on the image server.  The system ends (2340).  The authoring subsystem assists the Web site designer with choosing parameters and with designing the content generation procedure such that the

10    desired Web site graphic is obtained.

It should be appreciated that differences exist between specifying an image with a URL and requesting an image using a content creation process that interprets proprietary parameters encoded within a URL.  That is, URLs allow Web site

15    designers to load specific graphic images into a Web page.  In contrast and according to the invention, URLs containing proprietary content creation tags initiate a process whereby graphic images for a site are automatically produced.

Table D below is a list of example proprietary URL tags used for content generation

20    within the system according to the preferred embodiment of the invention. Additional tags may be added to the system as necessary.

Table D – Tags

f=function

25           Names the content creation procedure used to generate all or part of the desired graphic.

args=arguments

           Supplies page dependent parameters used to control the content creation procedure from within the Web page.

cr=crop rectangle

30           Specifies that portion of the image generated by the content generation procedure to be returned to the browser.

32

st=slice table

Specifies a rectangular grid to be placed over the image produced by the content generation procedure, each portion of which can be returned to the browser.

sp= slice position

5

Specifies that portion of the slice table grid placed over the image generated by the content creation procedure to be returned to the browser.

is=image size parameter

Specifies scale factors to be applied to any portion of an image generated by any combination of a content generation procedure, arguments, crop rectangles, slice tables, and slice positions.

10      p=user profile string

Specifies a user profile identifier used to modify the final image prior to returning the image to the browser, thus allowing clients to modify the image returned to the browser to account for individual browsing conditions.

c=cache control

15

Specifies a proxy-cache control string to accompany the returned image within an HTTP header.

Table E below is a list of example supported content creation commands according to a preferred embodiment of the invention.  Additional commands may be added as

20     necessary.

Table E – Content Creation Commands

Adjust HSB

Allows the HSB of an image to be altered.

25      Adjust RGB

Allows the contrast, brightness, and color balance of an image to be altered.

Colorize

Alters the hue of the pixels in the image to that of the specified *color*.

Brush Composite

30

Composites the specified brush image onto the current target image.

Convert

Converts the rasters to the specified type/bit-depth.

33

Crop

    Crops the media to the specified size.

Dropshadow

    Adds a drop shadow to the image, based on the alpha-channel.

5    Equalize

    Performs an equalization on the relevant components of the media.

FixAlpha

    Adjusts the RGB components of an image relative to its alpha-channel.

Flip

10    Flips the media vertically or horizontally.

Glow

    Produces a glow or halo around the image.

Load

    Loads in a media from the specified file.

15    Normalize

    Similar to equalize, but for audio.

Reduce

    Reduces the image to a specified palette.

Rotate

20    Rotates the media clockwise by the specified *angle* in degrees.

Save

    Saves the media to the specified file.

Scale

    Scales the media to the specified size.

25    SetColor

    Allows the background color, foreground color, and transparency state of the media to be set.

Text Drawing

    Composites the specified text onto the image.

34

**Page 37**

Text Making

>    This command, instead of compositing text onto the target, creates a new image that just encloses the text.

Zoom

5

>    Zooms in on a specified portion of the media, and fits it to the specified size. Effectively this constitutes a crop followed by a scale.

Table F below lists comprises some, and is not limited to all major features of a preferred embodiment of the invention.    Additional features may be added as

10    necessary.

Table F - System Features

Reads and writes various file formats;

15    Supports many image processing operations;

Dynamically creates Web images from original assets;

Dynamically creates thumbnail images;

Dynamically and efficiently creates images that can be panned, zoomed, or sliced from original assets without Browser plugins;

20    Automatically propagates changes in original assets throughout the Web site;

Uses an intelligent caching mechanism for both final and intermediate graphics, comprising:

> Clean up cache on demand;

> Eliminates orphaned Web files; and

> Optimizes Web server cache by providing most recent images;

25    Renders True-Type fonts on server instead of browser;

Uses intelligent scaling of line drawings;

Allows Web designers to manipulate images using a combination of content generation procedures and proprietary URL tags;

Preserves original image assets;

30    Optimizes Web server traffic by adjusting the bandwidth of graphics;

Optimizes images for client connection speed;

Allows clients to specify the quality of images on a Web site;

Allow site-specific customized image optimizations for a variety of purposes; and

Allows Web designers to dynamically create images by manipulating proprietary URL tags in

35    applications.

Accordingly, although the invention has been described in detail with reference to a particular preferred embodiment, persons possessing ordinary skill in the art to

35

which this invention pertains will appreciate that various modifications and enhancements may be made without departing from the spirit and scope of the claims that follow.

**Page 39**

## CLAIMS

1. A computer implemented method for generating and delivering content comprising media, comprising the steps of:

parsing a link containing tags to determine any of:

a content generation procedure to execute and corresponding input to said procedure;

dynamic modifications to perform on said media;

user profile characteristics; and

proxy-cache control;

generating a unique final lookup key for said media;

checking a media cache, using said final lookup key;

if said media exists in said media cache, then

passing control to said proxy-cache control; and

delivering said media;

if said media does not exist in said media cache, then

separating dynamic media system tags from content generation control tags; and

generating a unique intermediate image lookup key;

checking said media cache using said intermediate image lookup key;

if said intermediate media exists in said media cache, then

using said intermediate media for further processing;

if said intermediate media does not exist in said media cache, then

generating and caching said media, using said intermediate image lookup key;

determining if dynamic processing is required and, if affirmative, then

operating upon said media by a dynamic content generator;

determining if content type is valid and, if negative, then

converting said media automatically to a valid type;

customizing said media for specified browser or client attributes using a user profiling system;

attaching any specified cache-control directives to a response; and

delivering said media.

37

2.  The method of Claim 1, wherein dynamic processing comprises directives for zoom, pan, slice, and the like.

5    3.  A computer implemented method for an end user to generate content comprising media, comprising the steps of:

adding original media to an image system;

creating a content generation procedure containing instructions for processing said original media for said content; and

10    creating a document referring to said processed media by using a link pointing to said content generation procedure on said image system.

4.  The method of Claim 3, further comprising:

providing an authoring subsystem, said subsystem assisting with choosing

15    parameters and with designing said content generation procedure.

5.  An apparatus for generating media, using a page having a link, said link having encoded tags, said apparatus comprising:

a server for receiving media requests and delivering said media;

20    a media repository for storing original media;

a content generation procedure containing instructions for transforming said original media into said media;

a link tag parser for determining any of:

said content generation procedure to execute and any corresponding

25    input parameters to be used by said procedure for generating a primary media to be cached;

dynamic content processing to be performed, if necessary by dynamic media procedures;

user profile information, if any to be used for modification of a resulting

30    image; and

cache control headers, if any, to accompany said resulting image;

a unique primary lookup key generated by said parser and associated with said primary cached media, wherein said primary cached media, if existing, is delivered as said media through a media cache; and

38

**Page 41**

a unique secondary lookup key corresponding to intermediate media requiring said dynamic media processing by said dynamic media procedures, thereby generating corresponding derivative intermediate media, and said unique secondary lookup key corresponding to said derivative intermediate media stored in a secondary media cache.

6. The apparatus of Claim 5, wherein any of said original media, said content generation procedure, and said link tags are links modified, thereby rendering an automatically updated media.

7. The apparatus of Claim 5, wherein said apparatus is configured in parallel to a server infrastructure, said existing server infrastructure providing said media requests.

8. The apparatus of Claim 7, wherein said apparatus is configurable to work either on-site or off-site to said server infrastructure.

9. The apparatus of Claim 5, wherein said primary cached media is composed of one or more original media images acquired from said media repository.

10. The apparatus of Claim 5, wherein said derivative intermediate media is suitably modified for the needs of zooming, panning, slicing, or the like.

11. An apparatus for delivering a document and derivative media, comprising:

means for placing within said document having tags, and said document accessible to a server by a browser;

means for, through said browser, said links generating a request for media from an image system;

means for said image system:

processing said links by interpreting said tags;

executing an image generation procedure on said media, said procedure indicated within said tags; and

delivering derivative media and said document.

39

12. The apparatus of Claim 11, wherein said generated media is cached on said image system, and, whereby upon subsequent requests for said cached media, said image system retrieves and delivers said cached media.

5    13. The apparatus of Claim 11, wherein original media is stored in a media repository.

14. The apparatus of Claim 11, wherein changes in said media are automatically propagated to a user.

10

15. The apparatus for delivering digital assets to a user, comprising:

means for placing links within said asset comprising tags that are used to execute commands with regards to said assets:

means for processing said links to execute commands expressed by said

15    tags; and

delivering media, as acted upon by said commands, to said user.

16. The apparatus of Claim 15, wherein said media is automatically delivered to said user.

20

40

**Page 43**

# Automated Media Delivery System

5                                    **ABSTRACT**


An automatic graphics delivery system that operates in parallel with an existing Web site infrastructure is provided.  The system streamlines the post-production process
10    by automating the production of media through content generation procedures controlled by proprietary tags placed by an author within URLs embedded within Web documents.

41

*1/23*



*FIG. 1*

2/23



*FIG. 2*
*(PRIOR ART)*

3/23



FIG. 3

4/23



**FIG. 4**
*(PRIOR ART)*

5/23



FIG. 5

6/23



FIG. 6

*7/23*



*FIG. 7*

8/23

AUTHORING FLOWCHART



FIG. 8

*9/23*

HTML PARSING FLOWCHART



*FIG. 9*

*10/23*

## MEDIA CREATION FLOWCHART



*FIG. 10*

11/23

FIG. 11



12/23

DATABASE DESCRIPTION



FIG. 12

*13/23*

ORIGINAL IMAGES



FIG.13

14/23

HTML DOCUMENT WITH PROPRIETARY TAG

1400



FIG.14

*15/23*

1500

## HTML DOCUMENT VIEWED IN BROWSER



1510

## HTML DOCUMENT SOURCE



**FIG.15**

16/23

GENERATED GIF IMAGE



1600

FIG.16

17/23



*FIG. 17*

18/23



*FIG. 18*

19/23



FIG. 19

20/23



*FIG. 20*

21/23



FIG. 21

22/23



*FIG. 22*

23/23



*FIG. 23*

Attorney Docket No.  EQUI0001CIP-C

<u>DECLARATION FOR PATENT APPLICATION</u>

As a below named inventor, I hereby declare that:

My residence, post office address, and citizenship are as stated below next to my name;

I believe I am the original, first, and sole inventor (if only one name is listed below) or an original, first, and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

# Automated Media Delivery System

the specification of which (check one) _____ is attached hereto, or __ was filed on _____ as Application Serial No. _____ and was amended on _____ (if applicable).

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, Section 1.56(a).

=========================================================
I hereby claim foreign priority benefits under Title 35, United Sates Code, Section 119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

Prior Foreign Application(s)                              Priority Claimed
                                                          Yes      No

_____              ____    ____
Number   Country   Day/Month/Year Filed

_____              ____    ____
Number   Country   Day/Month/Year Filed

=========================================================

POWER OF ATTORNEY:  As a named inventor, I hereby appoint the following attorney(s) and/or agent(s) to prosecute this application and transact all business in the Patent and Trademark Office connected therewith:

     MICHAEL A. GLENN, Reg. No. 30,176
     DONALD M. HENDRICKS, Reg. No. 40,355
     JULIA A. THOMAS, Reg. No. 52,283
     CHRISTOPHER PEIL, Reg. No. 45,005

SEND CORRESPONDENCE TO:

   MICHAEL A. GLENN, 3475 Edison Way, Suite L, Menlo Park, CA 94025

=========================================================

- 1 -

Attorney Docket No.  EQUI0001CIP-C

I hereby claim the benefit under Title 35, United States code, Section 120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, Section 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, Section 1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

| 09/929,904 | 08/14/2001 | Pending |
|---|---|---|
| Application Ser. No. | Filing Date | Status: Patented, Pending, Abandoned |
| 6,792,575 | 9/14/2004 | Patented |
| Patent Number | Filing Date | Status: Patented, Pending, Abandoned |
| | | |
| Application Ser. No. | Filing Date | Status: Patented, Pending, Abandoned |
| | | |
| Patent Number | Grant Date | Status: Patented, Pending, Abandoned |

===============================================================================

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full name of sole or first inventor:    CHRISTOPHER SAMANIEGO

Inventor's signature _____    _____
                                                                                          Date
Residence _____ 461 Second Street, San Francisco, California  94107 _____

Post Office Address _____

Citizenship _____ United States of America _____

Full name of second joint inventor:    NELSON H. "ROCKY" OFFNER

Inventor's signature _____    _____
                                                                                          Date
Residence _____ 172 Ardmore Road, Kensington, California  94707 _____

Post Office Address _____

Citizenship _____ United States of America _____

- 2 -

**Page 69**

Attorney Docket No.  EQUI0001CIP-C

Full name of third joint inventor: _____ ADRIAN D. THEWLIS _____

Inventor's signature _____  _____
                                                                                              Date
Residence_____ 439 Sherwood Drive, Apt. 204, Sausalito, California  94965 _____

Post Office Address _____

Citizenship ____ Australia _____


Full name of fourth joint inventor: _____ DAVID R. BOYD _____

Inventor's signature _____  _____
                                                                                              Date
Residence_____ 1256 Kearny Street, San Francisco, California  94133 _____

Post Office Address _____

Citizenship ____ United States of America _____


Full name of fifth joint inventor: _____ DAVID C. SALMON _____

Inventor's signature _____  _____
                                                                                              Date
Residence_____ 42 Sandalwood Court, San Rafael, California 94903 _____

Post Office Address _____

Citizenship ____ United States of America _____


Full name of sixth joint inventor: _____ JOSHUA N. DEVAN _____

Inventor's signature _____  _____
                                                                                              Date
Residence_____ 25 Stetson Avenue, Lower,  Kentfield, California 94904 _____

Post Office Address _____

Citizenship ____ United States of America _____

- 3 -

**Page 70**

PTO/SB/06 (12-04)
Approved for use through 7/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## PATENT APPLICATION FEE DETERMINATION RECORD
Substitute for Form PTO-875    Effective December 8, 2004

Application or Docket Number: 11769916

### APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) | SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) | | RATE ($) | FEE ($) |
| BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | 150.00 | | N/A | 300.00 |
| SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A. | N/A | $250 | | N/A | $500 |
| EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | $100 | | N/A | $200 |
| TOTAL CLAIMS (37 CFR 1.16(i)) | 16 minus 20 = | O | X$ 25 | | OR | X$50 | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | 5 minus 3 = | 2 | X100 | | | X200 | |
| APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | |
| MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | +180= | | | +360= | |
| | | | TOTAL | 700 | | TOTAL | |

* If the difference in column 1 is less than zero, enter "0" in column 2.

### APPLICATION AS AMENDED – PART II

1
3
S. 15
11

| | | (Column 1) | (Column 2) | (Column 3) | SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|
| **AMENDMENT A** | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDI-TIONAL FEE ($) | | RATE ($) | ADDI-TIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus ** | = | X$ 25 = | | OR | X$50 = | |
| | Independent (37 CFR 1.16(h)) | * | Minus *** | = | X100 = | | OR | X200 = | |
| | Application Size Fee (37 CFR 1.16(s)) | | | | | | | +180= | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | +180= | | OR | +360= | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

| | | (Column 1) | (Column 2) | (Column 3) | SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|
| **AMENDMENT B** | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDI-TIONAL FEE ($) | | RATE ($) | ADDI-TIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus ** | = | X$ 25 = | | OR | X$50 = | |
| | Independent (37 CFR 1.16(h)) | * | Minus *** | = | X100 = | | OR | X200 = | |
| | Application Size Fee (37 CFR 1.16(s)) | | | | | | | | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | +180= | | OR | +360= | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

PATENT APPLICATION SERIAL NO _____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

11/10/2005 KBETEMA1 00000054 071445   11269916

```
01 FC:2011      150.00 DA
02 FC:2111      250.00 DA
03 FC:2311      100.00 DA
04 FC:2201      200.00 DA
```

PTO-1556
  (5/87)

*U.8 Government Printing Office: 2002 — 488-267/88023

PTO/SB/05 (08-03)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office. U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# UTILITY
# PATENT APPLICATION
# TRANSMITTAL

*(Only for new nonprovisional applications under 37 CFR 1.53(b))*

| Attorney Docket No. | EQUI0001CIP-C |
|---|---|
| First Inventor | Samaniego et al |
| Title | Automated Media Delivery System |
| Express Mail Label No. | EV 643013657 US |

## APPLICATION ELEMENTS
*See MPEP chapter 600 concerning utility patent application contents.*

**ADDRESS TO:** Mail Stop Patent Application
Commissioner for Patents
P.O. Box 1450
Alexandria VA  22313-1450

1. [x] Fee Transmittal Form (e.g., PTO/SB/17)
   *(Submit an original and a duplicate for fee processing)*
2. [x] Applicant claims small entity status.
   See 37 CFR 1.27.
3. [x] Specification    *[Total Pages __41__ ]*
   *(preferred arrangement set forth below)*
   - Descriptive title of the invention
   - Cross Reference to Related Applications
   - Statement Regarding Fed sponsored R & D
   - Reference to sequence listing, a table,
     or a computer program listing appendix
   - Background of the Invention
   - Brief Summary of the Invention
   - Brief Description of the Drawings *(if filed)*
   - Detailed Description
   - Claim(s)
   - Abstract of the Disclosure
4. [X] Drawing(s) (35 U.S.C. 113)    [Total Sheets __23__ ]
5. Oath or Declaration    [Total Sheets __03__ ]
   a. [ ] Newly executed (original or copy)
   b. [ ] Copy from a prior application (37 CFR 1.63(d))
      *(for continuation/divisional with Box 18 completed)*
      i. [ ] **DELETION OF INVENTOR(S)**
         Signed statement attached deleting inventor(s)'
         name in the prior application, see 37 CFR
         1.63(d)(2) and 1.33(b).
6. [ ] Application Data Sheet. See 37 CFR 1.76

7. [ ] CD-ROM or CD-R in duplicate, large table or
       Computer Program *(Appendix)*
8. Nucleotide and/or Amino Acid Sequence Submission
   *(if applicable, all necessary)*
   a. [ ] Computer Readable Form (CRF)
   b. Specification Sequence Listing on:
      i. [ ] CD-ROM or CD-R (2 copies); or
      ii. [ ] Paper
   c. [ ] Statements verifying identity of above copies

## ACCOMPANYING APPLICATION PARTS

9. [ ] Assignment Papers (cover sheet & document(s))
10. [ ] 37 CFR 3.73(b) Statement    [x] Power of
    *(when there is an assignee)*          Attorney
11. [ ] English Translation Document *(if applicable)*
12. [ ] Information Disclosure    [ ] Copies of IDS
    Statement (IDS)/PTO-1449          Citations
13. [ ] Preliminary Amendment
14. [x] Return Receipt Postcard (MPEP 503)
    *(Should be specifically itemized)*
15. [ ] Certified Copy of Priority Document(s)
    *(if foreign priority is claimed)*
16. [ ] Nonpublication Request under 35 U.S.C. 122
    (b)(2)(B)(i). Applicant must attach form PTO/SB/35
    or its equivalent.
17. [X] Other: Certificate of Mailing

18. If a CONTINUING APPLICATION, *check appropriate box, and supply the requisite information below and in the first sentence of the specification following the title, or in an Application Data Sheet under 37 CFR 1.76:*

[ ] Continuation    [ ] Divisional    [X] Continuation-in-part (CIP)    of prior application No. __09/929,904__

*Prior application information:*    Examiner __Bashore, William L.__    Art Unit: __2176__

For CONTINUATION OR DIVISIONAL APPS only; The entire disclosure of the prior application, from which an oath or declaration is supplied under Box 5b, is considered a part of the disclosure of the accompanying continuation or divisional application and is hereby incorporated by reference. The incorporation <u>can only</u> be relied upon when a portion has been inadvertently omitted from the submitted application parts.

## 19. CORRESPONDENCE ADDRESS

[x] Customer Number: __22862__    OR    [ ] Correspondence address below

| Name | |
|---|---|
| Address | |

| City | | State | | Zip Code | |
|---|---|---|---|---|---|
| Country | | Telephone | | Fax | |

| Name (Print/Type) | Christopher Peil | Registration No. (Attorney/Agent) | 45,005 |
|---|---|---|---|
| Signature | *[signature]* | Date | 7 November 2005 |

This collection of information is required by 37 CFR 1.53(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case.  Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA  22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Mail Stop Patent Application, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/SB/17 (12-04)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

| | | Complete if Known |
|---|---|---|
| *Effective on 12/08/2004.*<br>*Fees pursuant to the Consolidated Appropriations Act, 2005 (H.R. 4818).*<br># FEE TRANSMITTAL<br>## For FY 2005 | **Application Number** | Unknown |
| | **Filing Date** | 7 November 2005 |
| | **First Named Inventor** | Samaniego et al |
| ☑ Applicant claims small entity status. See 37 CFR 1.27 | **Examiner Name** | Unknown |
| | **Art Unit** | Unknown |
| **TOTAL AMOUNT OF PAYMENT** ($) 700.00 | **Attorney Docket No.** | EQUI0001CIP-C |

## METHOD OF PAYMENT (check all that apply)

☐ Check  ☐ Credit Card  ☐ Money Order  ☐ None  ☐ Other (please identify): _____

☑ Deposit Account  Deposit Account Number: 07-1445  Deposit Account Name: Glenn Patent Group

For the above-identified deposit account, the Director is hereby authorized to: (check all that apply)

☑ Charge fee(s) indicated below  ☐ Charge fee(s) indicated below, **except for the filing fee**

☑ Charge any additional fee(s) or underpayments of fee(s) under 37 CFR 1.16 and 1.17  ☑ Credit any overpayments

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

## FEE CALCULATION

### 1. BASIC FILING, SEARCH, AND EXAMINATION FEES

| | FILING FEES | | SEARCH FEES | | EXAMINATION FEES | | |
|---|---|---|---|---|---|---|---|
| **Application Type** | Fee ($) | Small Entity Fee ($) | Fee ($) | Small Entity Fee ($) | Fee ($) | Small Entity Fee ($) | **Fees Paid ($)** |
| Utility | 300 | 150 | 500 | 250 | 200 | 100 | 500.00 |
| Design | 200 | 100 | 100 | 50 | 130 | 65 | _____ |
| Plant | 200 | 100 | 300 | 150 | 160 | 80 | _____ |
| Reissue | 300 | 150 | 500 | 250 | 600 | 300 | _____ |
| Provisional | 200 | 100 | 0 | 0 | 0 | 0 | _____ |

### 2. EXCESS CLAIM FEES

| Fee Description | Fee ($) | Small Entity Fee ($) |
|---|---|---|
| Each claim over 20 or, for Reissues, each claim over 20 and more than in the original patent | 50 | 25 |
| Each independent claim over 3 or, for Reissues, each independent claim more than in the original patent | 200 | 100 |
| Multiple dependent claims | 360 | 180 |

| Total Claims | | Extra Claims | | Fee ($) | | Fee Paid ($) | | Multiple Dependent Claims | |
|---|---|---|---|---|---|---|---|---|---|
| 16 - 20 or HP = | | 0 | x | 0 | = | 0 | | Fee ($) | Fee Paid ($) |
| HP = highest number of total claims paid for, if greater than 20 | | | | | | | | 0 | 0 |
| Indep. Claims | | Extra Claims | | Fee ($) | | Fee Paid ($) | | | |
| 5 - 3 or HP = | | 2 | x | 100.00 | = | 200.00 | | | |
| HP = highest number of independent claims paid for, if greater than 3 | | | | | | | | | |

### 3. APPLICATION SIZE FEE

If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

| Total Sheets | | Extra Sheets | | Number of each additional 50 or fraction thereof | | Fee ($) | | Fee Paid ($) |
|---|---|---|---|---|---|---|---|---|
| 64 - 100 = | | 0 | / 50 = | 0 (round up to a whole number) | x | 0 | = | 0 |

### 4. OTHER FEE(S)

| | Fees Paid ($) |
|---|---|
| Non-English Specification, $130 fee (no small entity discount) | 0 |
| Other: _____ | 0 |

## SUBMITTED BY

| Signature | *[signature]* | Registration No. (Attorney/Agent) | 45,005 | Telephone | 650-474-8400 |
|---|---|---|---|---|---|
| Name (Print/Type) | Christopher Peil | | | Date | 7 November 2005 |

This collection of information is required by 37 CFR 1.136. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/SB/92    (12-97)
Approved for use through 9/30/00.  OMB 0651-0031
Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

GLENN PATENT GROUP
Customer No. 22862
3475 Edison Way, Suite L
Menlo Park, CA 94025
(Tel) 650-474-8400
(Fax) 650-474-8401

## Certificate of Mailing under 37 CFR 1.10

Express Mail Label No. EV 643013657 US

I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as Express Mail in an envelope addressed to:

COMMISSIONER FOR PATENTS
Mail Stop - Patent Applications
P. O. Box 1450
Alexandria, VA  22313-1450                     Docket No. EQUI0001CIP-C

on    07 November 2005                  .
                Date

_____/  Signature
Della Revecho
_____
        Typed or printed name of person signing Certificate

Note:  Each paper must have its own certificate of mailing, or this certificate must identify each submitted paper.

Attached to this cover-sheet please find the following documents:

1.  Certificate of Express Mailing (1 sheet);
2.  Utility Patent Application Transmittal (1 page);
3.  Fee Transmittal (1 page, in duplicate);
4.  Declaration and Power of Attorney - unsigned (3 pages);
5.  Specification, Claims, and Abstract (41 pages);
6.  Drawings (23 pages); and
7.  Return postcard

Burden Hour Statement:  This form is estimated to take 0.03 hours to complete.  Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC  20231.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.  SEND TO: Assistant Commissioner for Patents, Washington, DC  20231.



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371 (c) DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NUMBER |
|---|---|---|---|
| 11/269,916 | 11/07/2005 | Christopher Samaniego | EQUI0001CIP-C |

22862
GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK, CA 94025

**CONFIRMATION NO. 5707**
**FORMALITIES**
**LETTER**

Date Mailed: 12/12/2005

# NOTICE TO FILE MISSING PARTS OF NONPROVISIONAL APPLICATION

### FILED UNDER 37 CFR 1.53(b)

***Filing Date Granted***

<u>**Items Required To Avoid Abandonment:**</u>

An application number and filing date have been accorded to this application. The item(s) indicated below, however, are missing. Applicant is given **TWO MONTHS** from the date of this Notice within which to file all required items and pay any fees required below to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

- The oath or declaration is unsigned.

The applicant needs to satisfy supplemental fees problems indicated below.

The required item(s) identified below must be timely submitted to avoid abandonment:

- To avoid abandonment, a surcharge (for late submission of filing fee, search fee, examination fee or oath or declaration) as set forth in 37 CFR 1.16(f) of $65 for a small entity in compliance with 37 CFR 1.27, must be submitted with the missing items identified in this letter.

<u>**SUMMARY OF FEES DUE:**</u>

Total additional fee(s) required for this application is **$65** for a Small Entity

- **$65** Surcharge.

Replies should be mailed to:    Mail Stop Missing Parts
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

*A copy of this notice __MUST__ be returned with the reply.*

Office of Initial Patent Examination (571) 272-4000, or 1-800-PTO-9199, or 1-800-972-6382
PART 3 - OFFICE COPY

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the application of : Samaniego et al    Attorney Docket:   EQUI0001CIP-C
Serial No.  11/269,916    Art Unit:   2176
Filed:  November 7, 2005    Examiner:   Unassigned
Title:   AUTOMATED MEDIA DELIVERY SYSTEM

12 May 2006

Commissioner of Patents
Mail Stop -- Missing Parts
P.O. Box 1450
Alexandria, VA  22313-1450

## RESPONSE TO NOTICE TO FILE MISSING PARTS

Sir:

In response to the Notice to File Missing Parts mailed December 12, 2005, enclosed herewith are the following:

- Certificate of E-Filing (1 page);
- Copy of Notification of Missing Requirements (2 pages);
- Response to Notification of Missing Requirements (1 sheet in duplicate);
- Petition Based Upon Unavailability Of Inventor  (2 pages);
- Copy of Letters to Inventors (6 sheets);
- Copy of Federal Express Receipts (6 sheets);
- New Declaration-Oath (3 pages);
- Statement of Sean Barger (1 page);
- Consent of Assignee (1 page); and
- Petition for Extension of Time (1 page in duplicate)

The Commissioner is authorized to charge the fee of $65.00 for the late Oath and Declaration, and any additional fees that may be due and credit any overpayments to Deposit Account No. 07-1445 (Order No. EQUI0001CIP-C).  A copy of this sheet is enclosed for accounting purposes.

Respectfully submitted,

*Julia A Thomas*

Julia A. Thomas
Reg. No. 52,283

Customer No. 22862

**COPY**

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the application of : Samaniego et al     Attorney Docket:    EQUI0001CIP-C
Serial No.  11/269,916                  Art Unit:            2176
Filed:  November 7, 2005             Examiner:       Unassigned
Title:   AUTOMATED MEDIA DELIVERY SYSTEM

12 May 2006

Commissioner of Patents
Mail Stop -- Missing Parts
P.O. Box 1450
Alexandria, VA  22313-1450

## RESPONSE TO NOTICE TO FILE MISSING PARTS

Sir:

       In response to the Notice to File Missing Parts mailed December 12, 2005, enclosed herewith are the following:

- Certificate of E-Filing (1 page);
- Copy of Notification of Missing Requirements (2 pages);
- Response to Notification of Missing Requirements (1 sheet in duplicate);
- Petition Based Upon Unavailability Of Inventor  (2 pages);
- Copy of Letters to Inventors (6 sheets);
- Copy of Federal Express Receipts (6 sheets);
- New Declaration-Oath (3 pages);
- Statement of Sean Barger (1 page);
- Consent of Assignee (1 page); and
- Petition for Extension of Time (1 page in duplicate)

       The Commissioner is authorized to charge the fee of $65.00 for the late Oath and Declaration, and any additional fees that may be due and credit any overpayments to Deposit Account No. 07-1445 (Order No. EQUI0001CIP-C).  A copy of this sheet is enclosed for accounting purposes.

                  Respectfully submitted,

                  *Julia A. Thomas*

                  Julia A. Thomas
                  Reg. No. 52,283

Customer No. 22862

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the application of : Samaniego et al | Attorney Docket: | EQUI0001CIP-C

Serial No.  11/269,916 | Art Unit: | 2176

Filed: November 7, 2005 | Examiner: | Unassigned

For:  AUTOMATED MEDIA DELIVERY SYSTEM

12 May 2006

## PETITION BASED UPON UNAVAILABILITY OF INVENTOR
## (37 CFR § 1.47/MPEP 409.03)

Sir/Madam:

1. Applicant petitions pursuant to 37 CFR §1.47 that the examination of the above-identified patent application proceed in the absence of a Declaration signed by the inventors: Christopher Samaniego, Nelson H. Offner, Adian D. Thewlis, David R. Boyd, David C. Salmon and Joshua N. Devan.

2. Applicant provides herewith copies letters sent via Federal Express to above-mentioned inventors, at their last known addresses, which was returned from Federal Express, with no forwarding addresses. A copy of the subject patent application and oath and declaration accompanied each letter. Copies of the Federal Express return envelopes are enclosed.

3. Diligent efforts have been used to reach the inventors.

4. Applicant provides herewith a Statement from Inventor Sean Barger, Consent of Assignee, and a Declaration signed by Mr. Barger.

5. I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title

18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this statement is directed.

5.  This action is necessary to prevent irreparable damage and to preserve the rights of the parties.

The Commissioner is authorized to charge any fees forth in 37 CFR 1.17 (i), and any additional fees that may be due and credit any overpayments to Deposit Account No. 07-1445 (Order No. EQUI0001CIP-C).

Respectfully submitted,

Julia A. Thomas

Reg. No. 52,283

Customer No. 22862



Glenn Patent Group          Tel 650 474 8400
3475 Edison Way, Suite L     Fax 650 474 8401
Menlo Park, CA 94025         glenn-law.com



13 April 2006
<u>Via Federal Express</u>

**CHRISTOPHER SAMANIEGO**
461 Second Street
San Francisco, CA 94107

Re: Application Entitled Automated Media Delivery System
Application No. 11/269,916
Our File: EQUI0001CIP-C

Dear Christopher:

Enclosed please find a copy of the above-referenced application (specification, claims and figures) filed on 07 November 2005, naming you a joint inventor. Additionally enclosed is the Declaration and Oath, which requires your signature.

Please sign and date where indicated, and **fax** (to 650-474-8401) or mail the documents to our office by **20 April 2006**. If mailing, a self-addressed, postage paid FedEx envelope is provided herewith.

If we do not receive the signed documents by this date, we will assume that you refused to cooperate and sign the declaration for the above-referenced application.

We look forward to hearing from you soon. For any questions or need further information, please contact our office to speak with Michael Glenn, Equilibrium's attorney.

We look forward to receiving the signed Declaration.

Regards,

Della Revecho
Patent Administrator

/dcr
Enclosures

Glenn Patent Group
3475 Edison Way, Suite L
Menlo Park, CA 94025

Tel 650 474 8400
Fax 650 474 8401
glenn-law.com



13 April 2006
<u>Via Federal Express</u>

NELSON OFFNER
172 Ardmore Road
Kensington, CA  94707

Re: Application Entitled Automated Media Delivery System
Application No.  11/269,916
Our File:  EQUI0001CIP-C

Dear Nelson:

Enclosed please find a copy of the above-referenced application (specification, claims and figures) filed on 07 November 2005, naming you a joint inventor. Additionally enclosed is the Declaration and Oath, which requires your signature.

Please sign and date where indicated, and **fax** (to 650-474-8401) or mail the documents to our office by **20 April 2006.**  If mailing, a self-addressed, postage paid FedEx envelope is provided herewith.

If we do not receive the signed documents by this date, we will assume that you refused to cooperate and sign the declaration for the above-referenced application.

We look forward to hearing from you soon. For any questions or need further information, please contact our office to speak with Michael Glenn, Equilibrium's attorney.

We look forward to receiving the signed Declaration.

Regards,

Della Revecho
Patent Administrator

/dcr
Enclosures

Glenn Patent Group          Tel 650 474 8400
3475 Edison Way, Suite L     Fax 650 474 8401
Menlo Park, CA 94025         glenn-law.com



13 April 2006
<u>Via Federal Express</u>

ADRIAN D. THEWLIS
439 Sherwood Drive, Apt. 204
Sausalito, CA  94965

Re: Application Entitled Automated Media Delivery System
Application No.  11/269,916
Our File:  EQUI0001CIP-C

Dear Adrian:

Enclosed please find a copy of the above-referenced application (specification, claims and figures) filed on 07 November 2005, naming you a joint inventor. Additionally enclosed is the Declaration and Oath, which requires your signature.

Please sign and date where indicated, and **fax** (to 650-474-8401) or mail the documents to our office by **20 April 2006.** If mailing, a self-addressed, postage paid FedEx envelope is provided herewith.

If we do not receive the signed documents by this date, we will assume that you refused to cooperate and sign the declaration for the above-referenced application.

We look forward to hearing from you soon. For any questions or need further information, please contact our office to speak with Michael Glenn, Equilibrium's attorney.

We look forward to receiving the signed Declaration.


Regards,

Della Revecho
Patent Administrator

/dcr
Enclosures

COPY

Glenn Patent Group          Tel 650 474 8400
3475 Edison Way, Suite L    Fax 650 474 8401
Menlo Park, CA 94025        glenn-law.com



13 April 2006
<u>Via Federal Express</u>

DAVID R. BOYD
1256 Kearny Street
San Francisco, CA  94133

Re: Application Entitled Automated Media Delivery System
Application No.  11/269,916
Our File:  EQUI0001CIP-C

Dear David:

Enclosed please find a copy of the above-referenced application (specification, claims and figures) filed on 07 November 2005, naming you a joint inventor. Additionally enclosed is the Declaration and Oath, which requires your signature.

Please sign and date where indicated, and **fax** (to 650-474-8401) or mail the documents to our office by **20 April 2006.**  If mailing, a self-addressed, postage paid FedEx envelope is provided herewith.

If we do not receive the signed documents by this date, we will assume that you refused to cooperate and sign the declaration for the above-referenced application.

We look forward to hearing from you soon. For any questions or need further information, please contact our office to speak with Michael Glenn, Equilibrium's attorney.

We look forward to receiving the signed Declaration.

Regards,

Della Revecho
Patent Administrator

/dcr
Enclosures

COPY

Glenn Patent Group
3475 Edison Way, Suite L        Fax 650 474 8401
Menlo Park, CA 94025            glenn-law.com



13 April 2006
<u>Via Federal Express</u>

DAVID C. SALMON
42 Sandalwood Court
San Rafael, CA 94903

Re: Application Entitled Automated Media Delivery System
Application No. 11/269,916
Our File: EQUI0001CIP-C

Dear David:

Enclosed please find a copy of the above-referenced application (specification, claims and figures) filed on 07 November 2005, naming you a joint inventor. Additionally enclosed is the Declaration and Oath, which requires your signature.

Please sign and date where indicated, and **fax** (to 650-474-8401) or mail the documents to our office by **20 April 2006.** If mailing, a self-addressed, postage paid FedEx envelope is provided herewith.

If we do not receive the signed documents by this date, we will assume that you refused to cooperate and sign the declaration for the above-referenced application.

We look forward to hearing from you soon. For any questions or need further information, please contact our office to speak with Michael Glenn, Equilibrium's attorney.

We look forward to receiving the signed Declaration.

Regards,

Della Revecho
Patent Administrator

/dcr
Enclosures



Glenn Patent Group
3475 Edison Way, Suite L
Menlo Park, CA 94025

Tel 650 474 8400
Fax 650 474 8401
glenn-law.com



13 April 2006
<u>Via Federal Express</u>

JOSHUA N. DEVAN
25 Stetson Avenue, Lower
Kentfield, CA  94904

Re: Application Entitled Automated Media Delivery System
Application No.  11/269,916
Our File:  EQUI0001CIP-C

Dear Joshua:

Enclosed please find a copy of the above-referenced application (specification, claims and figures) filed on 07 November 2005, naming you a joint inventor. Additionally enclosed is the Declaration and Oath, which requires your signature.

Please sign and date where indicated, and **fax** (to 650-474-8401) or mail the documents to our office by **20 April 2006.**  If mailing, a self-addressed, postage paid FedEx envelope is provided herewith.

If we do not receive the signed documents by this date, we will assume that you refused to cooperate and sign the declaration for the above-referenced application.

We look forward to hearing from you soon. For any questions or need further information, please contact our office to speak with Michael Glenn, Equilibrium's attorney.

We look forward to receiving the signed Declaration.


Regards,

Della Revecho
Patent Administrator


/dcr
Enclosures



**COPY**

From:  Origin ID: (650)474-8400
GLENN PATENT GROUP

3475 Edison Way, Ste. L

Menlo Park, CA 94025


FedEx
Express

Ship Date: 13APR06
ActWgt: 1 LB
System#: 2949728/INET2400
Account#: S *********

REF: EQUI0001CIP-C

Delivery Address Bar Code

CLS*22386/86/19

SHIP TO:  (000)000-0000        BILL SENDER

**Christopher Samaniego**

**461 Second Street**

**San Francisco, CA 94107**



**PRIORITY OVERNIGHT**            **FRI**

TRK#  **7914 4542 0838**   FORM    Deliver By:
                                            0201    14APR06

**94107**   -CA-US                 **SFO**    A1

**WA JCCA**



---

# Shipping Label

**This shipping label constitutes the air waybill for this shipment.**

~~View all labels~~

1. Use the "Print" feature from your browser to send this page to your laser printer.

2. Fold the printed page along the horizontal line.

3. Place label in shipping label pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit,attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

From: Origin ID: (650)474-8400
GLENN PATENT GROUP

3475 Edison Way, Ste. L

**Menlo Park, CA 94025**



FedEx
Express

**E**

CL5022386/16/18

Ship Date: 13APR06
ActWgt: 1 LB
System#: 2949728/INET2400
Account#: S *********

REF: EQUI0001CIP-C



Delivery Address Bar Code

---

SHIP TO: (000)000-0000          **BILL SENDER**

**Nelson Offner**

**172 Ardmore Road**

**Kensington, CA 94707**



---

**PRIORITY OVERNIGHT**                    **FRI**

Deliver By:
14APR06

TRK# **7914 4544 0840**    FORM
0201

                                                **OAK**    A1

**94707**    -CA-US

**WA JEMA**



---

# Shipping Label

**This shipping label constitutes the air waybill for this shipment.**

1. Use the "Print" feature from your browser to send this page to your laser printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping label pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit,attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

View all labels

**Page 89**



From:    Origin ID: (650)474-8400
GLENN PATENT GROUP

3475 Edison Way, Ste. L

Menlo Park, CA 94025



Ship Date: 13APR06
ActWgt: 1 LB
System#: 2949728/INET2400
Account#: S ********

REF: EQUI0001CIP-C

Delivery Address Bar Code

SHIP TO:    (000)000-0000          BILL SENDER
**Adrian D. Thewlis**

**439 Sherwood Drive**
**Apt. 204**
**Sausalito, CA 94965**



**PRIORITY OVERNIGHT**                    **FRI**

TRK#    **7908 8591 6930**   FORM 0201        Deliver By:
                                              14APR06

                                    **OAK**    AA

**94965**    -CA-US

**WA SRFA**

---

# Shipping Label

**This shipping label constitutes the air waybill for this shipment.**

1. Use the "Print" feature from your browser to send this page to your laser printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping label pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit,attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



DAVID BOYD

COPY

From:   Orrin  ID: (650)474-8400
GLENN PATENT GROUP

3475 Edison Way, Ste. L

Menlo Park, CA 94025


**FedEx**
Express

Ship Date: 13APR06
ActWgt: 1 LB
System#: 2949728/INET2400
Account#: S ********

REF: EQUI0001CIP-C

Delivery Address Bar Code

SHIP TO:   (000)000-0000          BILL SENDER
**David R. Boyd**

**1256 Kearny Street**

**San Francisco, CA 94133**



**PRIORITY OVERNIGHT**                    **FRI**

TRK#   **7914  4548  2273**   FORM
0201                           Deliver By:
14APR06

**94133**   -CA-US              **SFO**      A1

**WA APCA**



# Shipping Label

**This shipping label constitutes the air waybill for this shipment.**

1. Use the "Print" feature from your browser to send this page to your laser printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping label pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit,attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

View all labels



From: Origin ID: (650)424-8400
GLENN PATENT GROUP

3475 Edison Way, Ste. L

Menlo Park, CA 94025

Ship Date: 13APR06
ActWgt: 1 LB
System#: 2949728/INET2400
Account#: S *********

REF: EQUI0001CIP-C

Delivery Address Bar Code

SHIP TO:   (000)000-0000      BILL SENDER
**David C. Salmon**

**42 Sandalwood Court**

**San Rafael, CA 94903**

**PRIORITY OVERNIGHT**                    **FRI**

TRK#   **7903 9401 7656**    FORM 0201        Deliver By: 14APR06

**OAK**   A2

**94903**   -CA-US
DSR

# WA SRFA

# Shipping Label

**This shipping label constitutes the air waybill for this shipment.**

1. Use the "Print" feature from your browser to send this page to your laser printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping label pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



From:    Origin ID:    (650)474-8400
GLENN PATENT GROUP

3475 Edison Way, Ste. L

Menlo Park, CA 94025

FedEx Express

E

CLS022306/16/19

Ship Date: 13APR06
ActWgt: 1 LB
System#: 2949728/INET2400
Account#: S *********

REF: EQUI0001CIP-C



Delivery Address Bar Code

SHIP TO:    (000)000-0000        BILL SENDER
**Joshua N. Devan**

**25 Stetson Avenue, Lower**

**Kentfield, CA 94904**



**PRIORITY OVERNIGHT**                    **FRI**
                                                            Deliver By:
TRK#    **7914  4550  6116**    FORM    14APR06
                                              0201
                                                        **OAK**    A2

**94904**    -CA-US

**WA SRFA**



---

# Shipping Label

**This shipping label constitutes the air waybill for this shipment.**    View all labels

1. Use the "Print" feature from your browser to send this page to your laser printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping label pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

Attorney Docket No.  EQUI0001CIP-C

## **<u>DECLARATION FOR PATENT APPLICATION</u>**

As a below named inventor, I hereby declare that:

My residence, post office address, and citizenship are as stated below next to my name;

I believe I am the original, first, and sole inventor (if only one name is listed below) or an original, first, and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

# **Automated Media Delivery System**

the specification of which (check one)  _____  is attached hereto, or  _X_  was filed on  _11/07/2005_  as Application Serial No.  _11/269,916_  and was amended on  _____  (if applicable).

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, Section 1.56(a).

I hereby claim foreign priority benefits under Title 35, United Sates Code, Section 119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

Prior Foreign Application(s)

Priority Claimed

Yes    No

_____        ____    ____

Number    Country    Day/Month/Year Filed

_____        ____    ____

Number    Country    Day/Month/Year Filed

Attorney Docket No.  EQUI0001CIP-C

POWER OF ATTORNEY:  As a named inventor, I hereby appoint the following attorney(s) and/or agent(s) to prosecute this application and transact all business in the Patent and Trademark Office connected therewith:

      MICHAEL A. GLENN, Reg. No. 30,176

      DONALD M. HENDRICKS, Reg. No. 40,355

      JULIA A. THOMAS, Reg. No. 52,283

      CHRISTOPHER PEIL, Reg. No. 45,005

      JEFFREY BRILL, Reg. No. 51,198

SEND CORRESPONDENCE TO:

      MICHAEL A. GLENN, 3475 Edison Way, Suite L, Menlo Park, CA 94025

I hereby claim the benefit under Title 35, United States code, Section 119(3)120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, Section 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, Section 1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

| 6,964,009 | 11/08/2005 | Patented |
|---|---|---|
| Patent Number | Grant Date | Status: Patented, Pending, Abandoned |

| 6,792,575 | 9/14/2004 | Patented |
|---|---|---|
| Patent Number | Grant Date | Status: Patented, Pending, Abandoned |

| | | |
|---|---|---|
| Application Ser. No. | Filing Date | Status: Patented, Pending, Abandoned |

Attorney Docket No.  EQUI0001CIP-C

| Application Ser. No. | Filing Date | Status: Patented, Pending, Abandoned |

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full name of sole or first inventor: _____ SEAN BARGER _____

Inventor's signature _____ 4/4/06

Residence _222 Marguerite Ave. M.ll Valley, CA 94941___

Post Office Address _Same_____

Citizenship _____ United States of America_____

Full name of second or joint inventor: _____ CHRISTOPHER SAMANIEGO _____

Inventor's signature _____
                                                            Date
Residence _____ 461 Second Street, San Francisco, California  94107_____

Post Office Address _Same_____

Citizenship _____ United States of America_____

Full name of third or joint inventor: __NELSON H. "ROCKY" OFFNER _____

Inventor's signature _____
                                                            Date
Residence _____ 172 Ardmore Road, Kensington, California  94707_____

Post Office Address _Same_____

Citizenship _____ United States of America_____

— 3 —

**Page 96**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of: Barger et al          Docket No.: EQUI0001CIP-C

Serial No. : 11/268,916                     Art Unit:    Unassigned

Filed: 11/07/2005              Examiner:    Unassigned

Title: Automated Media Delivery System


Date: 7 April 2006


Commissioner for Patents
OIPE - Customer Service Center
P. O. Box 1450
Alexandria, VA  22313-1450


## STATEMENT OF SEAN BARGER UNDER
## 37 CFR § 1.48(a)

I, SEAN BARGER, residing at _222 Marguerite Avenue, Mill Valley, CA 94941_____, state the following:

1. That I am a citizen of _United States_;

2. That I am an inventor in the above-named application; and

3. That the error by which I was not named as an inventor occurred without any deceptive intention on my part.


_____          _____
Sean Barger                         Date   4/4/06

-1-

# equilibrium

April 4th, 2006

Michael Glenn
Glenn Patent Group
3475 Edison Way, Suite L
Menlo Park, CA 94025
USA

Re: Consent of Assignee

To whom it may concern:

This letter is to confirm that Automated Media Processing Solutions, Inc.
dba Equilibrium (Assignee) hereby agrees that Mr. Sean B. Barger shall be
added as an inventor to the Automated Media Delivery System, Serial #
11/268,916.

Please let me know if there is any questions regarding this matter.

Sean B. Barger

Founder
CEO
Automated Media Processing Solutions, Inc.
Dba Equilibrium

PTO/SB/22 (12-04)
Approved for use through 07/31/2006. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARMENT OF COMMERCE
Under the paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless if displays a valid OMB control number.

| PETITION FOR EXTENSION OF TIME UNDER 37 CFR 1.136(a) FY 2005 *(Fees pursuant to the Consolidated Appropriations Act, 2005 (H.R. 4818).)* | Docket Number (Optional) |
|---|---|
| Application Number  11/269,916 | Filed     11/07/2005 |
| For  AUTOMATED MEDIA DELIVERY SYSTEM | Inventor:  Samaniego et al |
| Art Unit   2176 | Examiner  Unassigned |

This is a request under the provisions of 37 CFR 1.136(a) to extend the period for filing a reply in the above identified application.

The requested extension and fee are as follows (check time period desired and enter the appropriate fee below):

|  |  | Fee | Small Entity Fee |  |
|---|---|---|---|---|
| ☐ | One month (37 CFR 1.17(a)(1)) | $120 | $60 | $_____ |
| ☐ | Two months (37 CFR 1.17(a)(2)) | $450 | $225 | $_____ |
| ☒ | Three months (37 CFR 1.17(a)(3)) | $1020 | $510 | $ 510.00 |
| ☐ | Four months (37 CFR 1.17(a)(4)) | $1590 | $795 | $_____ |
| ☐ | Five months (37 CFR 1.17(a)(5)) | $2160 | $1080 | $_____ |

☑ Applicant claims small entity status. See 37 CFR 1.27.

☐ A check in the amount of the fee is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The Director has already been authorized to charge fees in this application to a Deposit Account.

☑ The Director is hereby authorized to charge any fees which may be required, or credit any overpayment, to Deposit Account Number  07-1445 (Glenn Patent Group).    I have enclosed a duplicate copy of this sheet.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

☐ applicant/inventor.

☐ assignee of record of the entire interest. See 37 CFR 3.71.
     Statement under 37 CFR 3.73(b) is enclosed (Form PTO/SB/96).

☐ attorney or agent of record. Registration Number _____

☑ attorney or agent under 37 CFR 1.34.
     Registration number if acting under 37 CFR 1.34     52,283

| *(signature)* Julia A. Thomas | 12 May 2006 |
|---|---|
| Signature | Date |
| Julia A. Thomas | 650-474-8400 |
| Typed or printed name | Telephone Number |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below.

☑  Total of _____1_____ forms are submitted.

This collection of information is required by 37 CFR 1.136(a). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

COPY

PTO/SB/22 (12-04)
Approved for use through 07/31/2006. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARMENT OF COMMERCE
Under the paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless if displays a valid OMB control number.

| PETITION FOR EXTENSION OF TIME UNDER 37 CFR 1.136(a)<br>FY 2005<br>(Fees pursuant to the Consolidated Appropriations Act, 2005 (H.R. 4818).) | Docket Number (Optional) | |
|---|---|---|
| Application Number   11/269,916 | Filed | 11/07/2005 |
| For  AUTOMATED MEDIA DELIVERY SYSTEM | Inventor:  Samaniego et al | |
| Art Unit   2176 | Examiner  Unassigned | |

This is a request under the provisions of 37 CFR 1.136(a) to extend the period for filing a reply in the above identified application.

The requested extension and fee are as follows (check time period desired and enter the appropriate fee below):

|  | | Fee | Small Entity Fee | |
|---|---|---|---|---|
| ☐ | One month (37 CFR 1.17(a)(1)) | $120 | $60 | $_____ |
| ☐ | Two months (37 CFR 1.17(a)(2)) | $450 | $225 | $_____ |
| ☒ | Three months (37 CFR 1.17(a)(3)) | $1020 | $510 | $ 510.00 |
| ☐ | Four months (37 CFR 1.17(a)(4)) | $1590 | $795 | $_____ |
| ☐ | Five months (37 CFR 1.17(a)(5)) | $2160 | $1080 | $_____ |

☑ Applicant claims small entity status. See 37 CFR 1.27.

☐ A check in the amount of the fee is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The Director has already been authorized to charge fees in this application to a Deposit Account.

☑ The Director is hereby authorized to charge any fees which may be required, or credit any overpayment, to Deposit Account Number  07-1445 (Glenn Patent Group).     I have enclosed a duplicate copy of this sheet.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

☐ applicant/inventor.

☐ assignee of record of the entire interest. See 37 CFR 3.71.
Statement under 37 CFR 3.73(b) is enclosed (Form PTO/SB/96).

☐ attorney or agent of record. Registration Number _____

☑ attorney or agent under 37 CFR 1.34.
Registration number if acting under 37 CFR 1.34      52,283

| _Julia A. Thomas_ (signature) | 12 May 2006 |
|---|---|
| Signature | Date |
| Julia A. Thomas | 650-474-8400 |
| Typed or printed name | Telephone Number |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, as shown below.

☑ Total of _____1_____ forms are submitted.

This collection of information is required by 37 CFR 1.136(a). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

**Page 100**

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 11269916 |
| **Filing Date:** | 07-Nov-2005 |
| **Title of Invention:** | Automated media delivery system |
| **First Named Inventor:** | Christopher Samaniego |
| **Filer:** | Michael Glenn/Della Revecho |
| **Attorney Docket Number:** | EQUI0001CIP-C |

Filed as Small Entity

## Utility    Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| Post-Allowance-and-Post-Issuance: | | | | |
| **Extension-of-Time:** | | | | |
| Extension - 3 months with $0 paid | 2253 | 1 | 510 | 510 |

**Page 101**

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| **Total in USD ($)** | | | | 510 |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 1046596 |
| **Application Number:** | 11269916 |
| **Confirmation Number:** | 5707 |
| **Title of Invention:** | Automated media delivery system |
| **First Named Inventor:** | Christopher  Samaniego |
| **Customer Number:** | 22862 |
| **Filer:** | Michael Glenn/Della Revecho |
| **Filer Authorized By:** | Michael Glenn |
| **Attorney Docket Number:** | EQUI0001CIP-C |
| **Receipt Date:** | 12-MAY-2006 |
| **Filing Date:** | 07-NOV-2005 |
| **Time Stamp:** | 19:35:44 |
| **Application Type:** | Utility |
| **International Application Number:** | |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment was successfully received in RAM | $510.0 |
| RAM confirmation Number | 353 |
| Deposit Account | 071445 |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:
        Charge any Additional Fees required under 37 C.F.R. Section 1.16 and 1.17

## File Listing:                              Page 103

| Document Number | Document Description | File Name | File Size(Bytes) | Multi Part | Pages |
|---|---|---|---|---|---|
| 1 | | RespMPeFiled51206.pdf | 360109 | yes | 26 |

| Multipart Description | | | |
|---|---|---|---|
| **Doc Desc** | | **Start** | **End** |
| Transmittal to TC | | 1 | 1 |
| Transmittal to TC | | 2 | 3 |
| Applicant Response to Pre-Exam Formalities Notice | | 4 | 5 |
| Applicant Response to Pre-Exam Formalities Notice | | 6 | 7 |
| Applicant Response to Pre-Exam Formalities Notice | | 8 | 19 |
| Oath or Declaration filed | | 20 | 22 |
| Request under Rule 48 correcting inventorship | | 23 | 23 |
| Request under Rule 48 correcting inventorship | | 24 | 24 |
| Transmittal to TC | | 25 | 26 |

| | | | | | |
|---|---|---|---|---|---|
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Fee Worksheet (PTO-875) | fee-info.pdf | 8129 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | 368238 | | |

**Page 104**

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

# E-FILING COVERSHEET

Application Serial No. 11/269,916          Attorney Docket No.EQUI0001CIP-C

I hereby certify that this correspondence is being ELECTRONICALLY FILED  to the United States Patent and Trademark Office

From: GLENN PATENT GROUP
Customer No.: 22,862
Tel:  (650) 474-8400
Fax: (650) 474-8401

on  12 May 2006                              .
　　　　　Date

_____
　　　　　　　　　Signature

Della Revecho
_____
Typed or printed name of person signing Certificate

Note: Each paper must have its own certificate of transmission, or this certificate
　　　　must identify each submitted paper.

Attached to this cover-sheet please find the following documents:

• Certificate of E-Filing (1 page);
• Copy of Notification of Missing Requirements (2 pages);
• Response to Notification of Missing Requirements (1 sheet in duplicate);
• Petition Based Upon Unavailability Of Inventor  (2 pages);
• Copy of Letters to Inventors (6 sheets);
• Copy of Federal Express Receipts (6 sheets);
• New Declaration-Oath (3 pages);
• Statement of Sean Barger (1 page);
• Consent of Assignee (1 page); and
• Petition for Extension of Time (1 page in duplicate)

This collection of information is required by 37 CFR 1.8. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1.8 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA  22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Page 1 of 2



 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371 (c) DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NUMBER |
|---|---|---|---|
| 11/269,916 | 11/07/2005 | Christopher Samaniego | EQUI0001CIP-C |

**CONFIRMATION NO. 5707**

22862
GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK, CA 94025

**FORMALITIES
LETTER**

Date Mailed: 12/12/2005

# NOTICE TO FILE MISSING PARTS OF NONPROVISIONAL APPLICATION

## FILED UNDER 37 CFR 1.53(b)

### *Filing Date Granted*

**Items Required To Avoid Abandonment:**

An application number and filing date have been accorded to this application. The item(s) indicated below, however, are missing. Applicant is given **TWO MONTHS** from the date of this Notice within which to file all required items and pay any fees required below to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

- The oath or declaration is unsigned.

The applicant needs to satisfy supplemental fees problems indicated below.

The required item(s) identified below must be timely submitted to avoid abandonment:

- To avoid abandonment, a surcharge (for late submission of filing fee, search fee, examination fee or oath or declaration) as set forth in 37 CFR 1.16(f) of $65 for a small entity in compliance with 37 CFR 1.27, must be submitted with the missing items identified in this letter.

**SUMMARY OF FEES DUE:**

Total additional fee(s) required for this application is **$65** for a Small Entity

- **$65** Surcharge.

Replies should be mailed to:    Mail Stop Missing Parts
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

COPY

*A copy of this notice **MUST** be returned with the reply.*

Office of Initial Patent Examination (571) 272-4000, or 1-800-PTO-9199, or 1-800-972-6382
PART 2 - COPY TO BE RETURNED WITH RESPONSE



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371 (c) DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NUMBER |
|---|---|---|---|
| 11/269,916 | 11/07/2005 | Christopher Samaniego | EQUI0001CIP-C |

CONFIRMATION NO. 5707

22862
GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK, CA 94025

**FORMALITIES
LETTER**

Date Mailed: 12/12/2005

## NOTICE TO FILE MISSING PARTS OF NONPROVISIONAL APPLICATION

### FILED UNDER 37 CFR 1.53(b)

***Filing Date Granted***

**Items Required To Avoid Abandonment:**

An application number and filing date have been accorded to this application. The item(s) indicated below, however, are missing. Applicant is given **TWO MONTHS** from the date of this Notice within which to file all required items and pay any fees required below to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

- The oath or declaration is unsigned.

The applicant needs to satisfy supplemental fees problems indicated below.

The required item(s) identified below must be timely submitted to avoid abandonment:

- To avoid abandonment, a surcharge (for late submission of filing fee, search fee, examination fee or oath or declaration) as set forth in 37 CFR 1.16(f) of $65 for a small entity in compliance with 37 CFR 1.27, must be submitted with the missing items identified in this letter.

**SUMMARY OF FEES DUE:**

Total additional fee(s) required for this application is $65 for a Small Entity

- $65 Surcharge.

Replies should be mailed to:     Mail Stop Missing Parts
                                 Commissioner for Patents
                                 P.O. Box 1450
                                 Alexandria VA 22313-1450

08/16/2006 VVAN11   00000016 071445   11269916
01 FC:2051        65.00 DA

*A copy of this notice __MUST__ be returned with the reply.*

Office of Initial Patent Examination (571) 272-4000, or 1-800-PTO-9199, or 1-800-972-6382

PART 3 - OFFICE COPY



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(c) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 11/269,916 | 11/07/2005 | Sean Barger | EQUI0001CIP-C |

22862
GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK, CA 94025

**CONFIRMATION NO. 5707**
**WITHDRAWAL**
**NOTICE**

Date Mailed: 08/18/2006

## WITHDRAWAL OF PREVIOUSLY SENT NOTICE

It has come to the attention of the Office that the Notice mailed on 12/12/2005 was sent in error. The Notice is hereby withdrawn. The application is complete and will be processed for examination. The Official Filing Receipt is enclosed. The office regrets any inconvenience the error may have caused.

*A copy of this notice **MUST** be returned with the reply.*

Customer Service Center
Initial Patent Examination Division (571) 272-4000, or 1-800-PTO-9199, or 1-800-972-6382
PART 3 - OFFICE COPY

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK CA 94025

COPY MAILED

OCT 3 0 2006

OFFICE OF PETITIONS

In re Application of          :
Barger, et al.               :          ON PETITION
Application No.: 11/269,916  :
Filed:  November 7, 2005     :
Attorney Docket No.: EQUI0001CIP-C   :

This is a decision on the petition under 37 CFR 1.47(a), filed May 12, 2006.

The petition is **DISMISSED**.

Any request for reconsideration of this decision must be submitted within TWO (2) MONTHS from the mail date of this decision. Extensions of time under 37 CFR 1.136(a) are permitted. Any response should be entitled "Request for Reconsideration of Petition Under 37 CFR 1.47(a)" and <u>may</u> include an oath or declaration executed by the inventor. **Failure to respond will result in abandonment of the application.**

The above-identified application was filed on November 7, 2005. On December 12, 2005, the Office mailed a Notice to File Missing Parts of Nonprovisional Application, requiring submission of an executed declaration and a $65.00 late declaration surcharge. On May 12, 2006, petitioners filed, *inter alia*, a request for three month extension of time, a petition under 37 CFR 1.47(a) and a declaration signed by one of seven joint inventors. The petition states that a copy of the application and a declaration were mailed to each inventor for his signature, but that all mailings of the aforementioned documents were returned to sender. No forwarding addresses were provided.

A grantable petition under 37 CFR 1.47(a) requires:
    (1)     a petition including proof of the pertinent facts establishing that the joint inventor(s) refuses to join, or cannot be found or reached after diligent effort,
    (2)     a proper oath or Declaration executed by the available joint inventor(s),
    (3)     the petition fee of $200, and
    (4)     the last known address of the omitted inventor(s).

This petition lacks items (1) and (2) above.

Application No. 11/269,916                                                    Page 3

As to item (1), applicant has failed to establish that the inventors cannot be reached.

A showing of **diligence** is critical in obtaining Rule 47 status when an inventor cannot be located or reached. One returned mailing does not rise to the level of diligence required to obtain Rule 47 status.

Petitioners should engage in further efforts to locate the non-signing inventors. The following is a list of evidentiary sources that are commonly relied upon to prove inability to locate an inventor: searches of Internet databases; inquiries of local telephone directories; telegrams; and documented inquiries of last known employers. Every listed type of search need not be done. However, a diligent effort to find the inventor must be made. Please provide documentary evidence of the searches, if possible, from parties with first hand knowledge of the searches.

As to item (2), an oath or declaration for the patent application in compliance with 37 CFR 1.63 and 1.64 still has not been presented. The declaration submitted with the present petition only lists three joint inventors. An oath or declaration in compliance with 37 CFR 1.63 and 1.64 signed by the Rule 1.47 applicant on behalf of the non-signing inventors is REQUIRED. See MPEP 409.03(a).

Pursuant to petitioner's authorization, deposit account no. 07-1445 will be charged a $200.00 Rule 47 petition fee.

Further correspondence with respect to this matter should be addressed as follows:

**By mail:**         Mail Stop PETITION
                     Commissioner for Patents
                     Post Office Box 1450
                     Alexandria, VA 22313-1450


**By hand:**         U.S. Patent and Trademark Office
                     Customer Service Window, Mail Stop Petition
                     Randolph Building
                     401 Dulany Street
                     Alexandria, VA 22314

**By FAX:**          (571) 273-8300 - ATTN: Office of Petitions

Telephone inquiries should be directed to the undersigned at (571) 272-3230.

Shirene Willis Brantley
Senior Petitions Attorney
Office of Petitions

**Page 113**

Application Serial No. 11/269,916

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the application of : Samaniego et al    Attorney Docket:    EQUI0001CIP-C

Serial No.  11/269,916    Art Unit:    2176

Filed: November 7, 2005    Examiner:    Unassigned

For:   AUTOMATED MEDIA DELIVERY SYSTEM


12 May 2006

### PETITION BASED UPON UNAVAILABILITY OF INVENTOR
### (37 CFR § 1.47/MPEP 409.03)

Sir/Madam:

1. Applicant petitions pursuant to 37 CFR §1.47 that the examination of the above-identified patent application proceed in the absence of a Declaration signed by the inventors: Christopher Samaniego, Nelson H. Offner, Adian D. Thewlis, David R. Boyd, David C. Salmon and Joshua N. Devan.

2.   Applicant provides herewith copies letters sent via Federal Express to above-mentioned inventors, at their last known addresses, which was returned from Federal Express, with no forwarding addresses. A copy of the subject patent application and oath and declaration accompanied each letter. Copies of the Federal Express return envelopes are enclosed.

3. Diligent efforts have been used to reach the inventors.

4. Applicant provides herewith a Statement from Inventor Sean Barger, Consent of Assignee, and a Declaration signed by Mr. Barger.

5. I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title

10/30/2006 CKHLOK    00000013 071445    11269916
01 FC:1463        200.00 DA

-1-

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(c) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 11/269,916 | 11/07/2005 | Sean Barger | EQUI0001CIP-C |

**CONFIRMATION NO. 5707**

22862
GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK, CA 94025

**Title:** Automated media delivery system

**Publication No.** US-2006-0265476-A1
**Publication Date:** 11/23/2006

## NOTICE OF PUBLICATION OF APPLICATION

The above-identified application will be electronically published as a patent application publication pursuant to 37 CFR 1.211, et seq. The patent application publication number and publication date are set forth above.

The publication may be accessed through the USPTO's publically available Searchable Databases via the Internet at www.uspto.gov. The direct link to access the publication is currently http://www.uspto.gov/patft/.

The publication process established by the Office does not provide for mailing a copy of the publication to applicant. A copy of the publication may be obtained from the Office upon payment of the appropriate fee set forth in 37 CFR 1.19(a)(1). Orders for copies of patent application publications are handled by the USPTO's Office of Public Records. The Office of Public Records can be reached by telephone at (703) 308-9726 or (800) 972-6382, by facsimile at (703) 305-8759, by mail addressed to the United States Patent and Trademark Office, Office of Public Records, Alexandria, VA 22313-1450 or via the Internet.

In addition, information on the status of the application, including the mailing date of Office actions and the dates of receipt of correspondence filed in the Office, may also be accessed via the Internet through the Patent Electronic Business Center at www.uspto.gov using the public side of the Patent Application Information and Retrieval (PAIR) system. The direct link to access this status information is currently http://pair.uspto.gov/. Prior to publication, such status information is confidential and may only be obtained by applicant using the private side of PAIR.

Further assistance in electronically accessing the publication, or about PAIR, is available by calling the Patent Electronic Business Center at 703-305-3028.

Pre-Grant Publication Division, 703-605-4283

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the application of : Samaniego et al     Attorney Docket:    EQUI0001CIP-C

Serial No.     1/269,916             Art Unit:           2176

Filed:         November 7, 2005        Examiner:       Unassigned

Title:   AUTOMATED MEDIA DELIVERY SYSTEM

January 30, 2007

## REQUEST FOR RECONSIDERATION OF
## PETITION UNDER 37 CFR § 1.47(a)

Examiner:

1. Applicant petitions pursuant to 37 CFR §1.47(a) that the examination of the above-identified patent application proceed in the absence of a Declaration signed by the inventors: Christopher Samaniego, Nelson H. Offner, and Joshua N. Devan.

2. Applicant provides herewith copies of letters sent via Federal Express to above-mentioned inventors, at their last known addresses, which was returned from Federal Express, with no forwarding addresses. A copy of the subject patent application and Oath and Declaration accompanied each letter. Copies of the Federal Express return envelopes are enclosed for:

- Christopher Samaniego with **last known address** of 461 Second Street, San Francisco, California 94107
- Nelson H. Offner with **last known address** of 172 Ardmore Road, Kensington, California 94707
- Joshua N. Devan with **last known address** of 25 Stetson Avenue, Lower, Kentfield, California 94904

3. Applicant also provides herewith the relevant portion of an email from CEO, Sean Barger indicating that the company was unable to get signatures from the inventors: Christopher Samaniego, Nelson H. Offner, and Joshua N. Devan. Such provides documentary evidence of a search from a party with first hand knowledge of the search.

Application Serial No. 11/269,916

4.  The free Internet Search from 411.com Online Directory Assistance which indicates no matching results for the missing inventors.  Such is documentary evidence of further efforts to locate the non-signing inventors.

5.   Further diligent efforts were made to contact three inventors whose signature appears on the newly executed Oath-Declaration.

6. Applicant provides herewith the following documents: Copies of the Statement from Inventor Sean Barger, Consent of Assignee, and a Declaration signed by Mr. Barger.

7.  I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this statement is directed.

8.  This action is necessary to prevent irreparable damage and to preserve the rights of the parties.

The Commissioner is authorized to charge any fees forth in 37 CFR 1.17 (i), and any additional fees that may be due and credit any overpayments to Deposit Account No. 07-1445 (Order No. EQUI0001CIP-C).


Respectfully submitted,

*Julia A. Thomas*

Julia A. Thomas
Reg. No. 52,283


Customer No. 22862

Attorney Docket No.  EQUI0001CIP-C

# DECLARATION FOR PATENT APPLICATION

As a below named inventor, I hereby declare that:

My residence, post office address, and citizenship are as stated below next to my name;

I believe I am the original, first, and sole inventor (if only one name is listed below) or an original, first, and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

## Automated Media Delivery System

the specification of which (check one) _____ is attached hereto, or _X_ was filed on _11/07/2005_ as Application Serial No. _11/269,916_ and was amended on _____ (if applicable).

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, Section 1.56(a).

I hereby claim foreign priority benefits under Title 35, United Sates Code, Section 119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

Prior Foreign Application(s)

Priority Claimed

Yes        No

_____      _____

Number    Country    Day/Month/Year Filed

_____      _____

– 1 –

**Page 118**

Attorney Docket No.  EQUI0001CIP-C

Number    Country    Day/Month/Year Filed

POWER OF ATTORNEY:  As a named inventor, I hereby appoint the following attorney(s) and/or agent(s) to prosecute this application and transact all business in the Patent and Trademark Office connected therewith:

MICHAEL A. GLENN, Reg. No. 30,176

DONALD M. HENDRICKS, Reg. No. 40,355

JULIA A. THOMAS, Reg. No. 52,283

CHRISTOPHER PEIL, Reg. No. 45,005

JEFFREY BRILL, Reg. No. 51,198

SEND CORRESPONDENCE TO:

MICHAEL A. GLENN, 3475 Edison Way, Suite L, Menlo Park, CA 94025

I hereby claim the benefit under Title 35, United States code, Section 119(3)120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, Section 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, Section 1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

6,964,009                   11/08/2005                Patented
Patent Number          Grant Date              Status: Patented, Pending, Abandoned

6,792,575                   9/14/2004                 Patented
Patent Number          Grant Date              Status: Patented, Pending, Abandoned

– 2 –

**Page 119**

Attorney Docket No. EQUI0001CIP-C

| Application Ser. No. | Filing Date | Status: Patented, Pending, Abandoned |
|---|---|---|

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full name of sole or **first** inventor: SEAN BARGER

Inventor's signature _____    Date

Residence _____ 222 Marguerite Ave., Mill Valley, CA 94941

Post Office Address  Same

Citizenship _____ United States of America

Full name of **second** or joint inventor: _____ CHRISTOPHER SAMANIEGO

Inventor's signature _____    Date

Residence _____ 461 Second Street, San Francisco, California 94107

Post Office Address  Same

Citizenship _____ United States of America

Full name of **third** or joint inventor: _____ NELSON H. "ROCKY" OFFNER

Inventor's signature _____    Date

Residence _____ 172 Ardmore Road, Kensington, California 94707

Post Office Address  Same

Citizenship _____ United States of America

– 3 –

**Page 120**

Attorney Docket No.  EQUI0001CIP-C

Full name of **fourth** or joint inventor: _____ ADRIAN D. THEWLIS _____

Inventor's signature _____ *Adrian Thew.* _____ 1/19/07.

Residence _____ 24 ADRIAN TERRACE , SAN RAFAEL, CA 94903 Date
~~439 Sherwood Drive, Apt. 204, Sausalito, California 94965~~

Post Office Address  Same

Citizenship _____ ~~Australia~~  UNITED STATES OF AMERICA

Full name of **fifth** or joint inventor: _____ DAVID R. BOYD

Inventor's signature _____ 1/4/2007

Residence _____ 1256 Kearny Street, San Francisco, California 94133 Date

Post Office Address  Same

Citizenship _____ United States of America

Full name of **sixth** or joint inventor: _____ DAVID C. SALMON

Inventor's signature _____ *David C. S___* _____ 1/8/2007

Residence _____ 42 Sandalwood Court, San Rafael, California 94903 Date

Post Office Address  Same

Citizenship _____ United States of America

Full name of **seventh** or joint inventor: _____ JOSHUA N. DEVAN

Inventor's signature _____

Residence _____ 25 Stetson Avenue, Lower,  Kentfield, California 94904 Date

Post Office Address  Same

Citizenship _____ United States of America

– 4 –

**Page 121**

# COPY

## Della Revecho

**From:** Sean Barger [sbarger@equilibrium.com]
**Sent:** Thursday, April 06, 2006 9:59 AM
**To:** Della
**Subject:** Re: [EQUI0001CIP-C]

Della,

We have attempted to get signatures from the following people:
Chris Samaniego, Rocky Offner, Adrian Thewlis (think we may be still able to find him), Joshua Devan to no avail.

Dave Salmon and David Boyd should be coming soon.  However, we already have an assignment from all these people...do we really need to spend our time on this for something that is already assigned?

Please let us know.

sbb

Sean Barger
CEO
Equilibrium
3 Harbor Drive, Suite 100
Sausalito, CA 94965

+1 415.332.4343 x201
+1 415.465.5556 mobile
+1 415.331.8374 fax
http://www.equilibrium.com
mailto:sbarger@equilibrium.com
The leader in Automated Media Processing Solutions.

ショーン B. バーガー
取締役会長および最高経営責任者
sbarger@equilibrium.com
直通 +1.415.332.4343 内線 201
携帯 +1.415.465.5556

イクイリブリアム

〒 94965 米国カリフォルニア州
サウザリート市
ハーバードライブ 3 番地 100 号室
直通 +1.415.332.4343
ファックス +1.415.331.8374
www.equilibrium.com

---

**From:** Della <della@glenn-law.com>
**Organization:** Glenn Patent Group
**Date:** Tue, 4 Apr 2006 13:22:40 -0700
**To:** EQUILIBRIUM-Sean Barger <sbarger@equilibrium.com>
**Cc:** EQUILIBRIUM-Steve Denebeim <sdenebeim@equilibrium.com>
**Subject:** FW: [EQUI0001CIP-C]

Sean,

We have not received further instructions concerning the Declaration.

For your convenience, I've attached another copy of the Declaration-Oath, for the inventors to sign.

**Please note that the 3rd and final extension is May 12, 2006.**

We look forward to hearing from you.

Regards,
Della

---



Glenn Patent Group
3475 Edison Way, Suite L
Menlo Park, CA 94025

Tel 650 474 8400
Fax 650 474 8401
glenn-law.com



13 April 2006
<u>Via Federal Express</u>

CHRISTOPHER SAMANIEGO
461 Second Street
San Francisco, CA  94107

Re: Application Entitled Automated Media Delivery System
Application No.  11/269,916
Our File:  EQUI0001CIP-C

Dear Christopher:

Enclosed please find a copy of the above-referenced application (specification, claims and figures) filed on 07 November 2005, naming you a joint inventor. Additionally enclosed is the Declaration and Oath, which requires your signature.

Please sign and date where indicated, and **fax** (to 650-474-8401) or mail the documents to our office by **20 April 2006.**   If mailing, a self-addressed, postage paid FedEx envelope is provided herewith.

If we do not receive the signed documents by this date, we will assume that you refused to cooperate and sign the declaration for the above-referenced application.

We look forward to hearing from you soon. For any questions or need further information, please contact our office to speak with Michael Glenn, Equilibrium's attorney.

We look forward to receiving the signed Declaration.

Regards,

Della Revecho
Patent Administrator

/dcr
Enclosures

CHRISTOPHER
SAMANIEGO

COPY



Glenn Patent Group
3475 Edison Way, Suite L
Menlo Park, CA 94025

Tel 650 474 8400
Fax 650 474 8401
glenn-law.com



13 April 2006
Via Federal Express

NELSON OFFNER
172 Ardmore Road
Kensington, CA  94707

Re: Application Entitled Automated Media Delivery System
Application No.  11/269,916
Our File:  EQUI0001CIP-C

Dear Nelson:

Enclosed please find a copy of the above-referenced application (specification, claims and figures) filed on 07 November 2005, naming you a joint inventor. Additionally enclosed is the Declaration and Oath, which requires your signature.

Please sign and date where indicated, and **fax** (to 650-474-8401) or mail the documents to our office by **20 April 2006.**  If mailing, a self-addressed, postage paid FedEx envelope is provided herewith.

If we do not receive the signed documents by this date, we will assume that you refused to cooperate and sign the declaration for the above-referenced application.

We look forward to hearing from you soon. For any questions or need further information, please contact our office to speak with Michael Glenn, Equilibrium's attorney.

We look forward to receiving the signed Declaration.

Regards,

Della Revecho
Patent Administrator

/dcr
Enclosures

**Page 125**

COPY





SHIP DATE: 25APR06  1/1
SYSTEM #6524M04 / CAFE2285
ACCOUNT #: 136053406 MAN-WGT
ACTUAL WGT: 1.0 LBS MAN-WGT

ORIGIN ID: JEMA
FEDEX /JEMA STATION
FDX/JEMA STATION
1600 63RD ST

EMERYVILLE, CA 94608

TO:  RETURNS PATENT GROUP
     GLENN PATENT GROUP
     3475 EDISON WAY STE L
     STE L
     MENLO PARK, CA 94025

BILL RECIPIENT

6614 5480 7922

6614 5480 7922

REF: 7914-4844-0840

EXPRESS SAVER

TRK# 6614 5480 7922   FORM
                      0201

FRI
Deliver by
28APR06
A2

FRI
28APR06
A2

FDX PRI
13.077

SFO

SCHGTA

EXPRESS SAVER

Trk# 6614 5480 7922   FORM
                      0201

94025   -CA-US

SFO

SCHGTA

FedEx Express  **Urgent**

Name  no phone # to call

Company  recip RTS 4/24/06

Address

City, State, Zip  Act  16905  BB 998

Telephone

136596 9/00 MWI



Patent Group
3.. Edison Way, Suite L
Menlo Park, CA 94025

Tel 650 4...
Fax 650 474 8401
glenn-law.com



13 April 2006
<u>Via Federal Express</u>

JOSHUA N. DEVAN
25 Stetson Avenue, Lower
Kentfield, CA  94904

Re: Application Entitled Automated Media Delivery System
Application No.  11/269,916
Our File:  EQUI0001CIP-C

Dear Joshua:

Enclosed please find a copy of the above-referenced application (specification, claims and figures) filed on 07 November 2005, naming you a joint inventor. Additionally enclosed is the Declaration and Oath, which requires your signature.

Please sign and date where indicated, and **fax** (to 650-474-8401) or mail the documents to our office by **20 April 2006.**   If mailing, a self-addressed, postage paid FedEx envelope is provided herewith.

If we do not receive the signed documents by this date, we will assume that you refused to cooperate and sign the declaration for the above-referenced application.

We look forward to hearing from you soon. For any questions or need further information, please contact our office to speak with Michael Glenn, Equilibrium's attorney.

We look forward to receiving the signed Declaration.

Regards,

Della Revecho
Patent Administrator

/dcr
Enclosures



From:   Orign ID:   (650)474-8400
GLENN PATENT GROUP

3475 Edison Way, Ste. L

Menlo Park, CA 94025

Ship Date: 13APR06
ActWgt: 1 LB
System#: 2949728/INET2400
Account#: S *********

**Fe** **Express**

SHIP TO:   (000)000-0000          BILL SENDER

Joshua N. Devan

25 Stetson Avenue, Lower

Kentfield, CA 94904

REF: EQUI0001CIP-C

Delivery Address Bar Code



**PRIORITY OVERNIGHT**                 **FRI**

TRK#   **7914  4550  6116**   FORM 0201   Deliver By:
14APR06

**94904**   -CA-US                OAK   A2

**WA SRFA**

---

# Shipping Label

**This shipping label constitutes the air waybill for this shipment.**

1. Use the "Print" feature from your browser to send this page to your laser printer.

2. Fold the printed page along the horizontal line.

3. Place label in shipping label pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



ACCOUNT | SERVICES | LOGIN REGISTER



WE'RE CLOSER THAN YOU THINK

| WHITE PAGES | YELLOW PAGES | EMAIL SEARCH | REVERSE PHONE | REVERSE ADDRESS | AREA & ZIP CODES | MAILING LISTS |
|---|---|---|---|---|---|---|

FIND NEIGHBORS | INTERNATIONAL DIRECTORIES | BATCH PEOPLE SEARCHES | AUTOMATE PEOPLE LOOKUPS

NEW SEARCH

Sign up right now for Vonage and get 1 month FREE. Click here >

**0 Results** matching "Christopher Samaniego, 461 Second Street, San Francisco, CA"

Search Suggestions

Search for the **last name** Samaniego in San Francisco, CA

Search for Christopher Samaniego in the San Francisco, CA **metro area**

Search for the first name **beginning with** C, last name with Sam in San Francisco, CA

## Revise Your Search

**Christopher Samaniego is in our Database**
**Powered by 1.800.US.SEARCH**

First Name: Christopher       Last Name: Samaniego

City: san francisco       State: CA

[Search]

Search by Social Security Number, Maiden Name, Age and More!

SPONSORED LINK

$510,000 Mortgage for $1,698/Month! Calculate New Payment  LowerMyBills.com

Select Your State
Alabama
Alaska
Arizona

GET RESTAURANT PICKS FOR PRIME BEEF, SEAFOOD, BRUNCH, AND MORE.

GET THEM NOW

My life. My card.  AMERICAN EXPRESS

| Search | Tools | Resources | About Our Searches | WhitePages.com, Inc. |
|---|---|---|---|---|
| Home | About WhitePages | Wedding Center | White Pages | FAQ |
| People Search | Services | Auto Center | Business Search | About Us |
| Business Search | Phone Append | Moving and Home | Reverse Phone Directory | Advertising |
| Business Search | Address Append | Improvement Center | Reverse Address Lookup | Affiliate Program |
| Email Search | XML Lookups | | Email Address Search | Contact Us |
| Reverse Phone | People Search by State | | Area Code and ZIP Code | Tell friends about 411.com |
| Reverse Address | Business Search by State | | Directory | |
| Area Codes | | | | |
| ZIP Codes | | | | |
| Tools & Resources | | | | |
| Site Map | | | | |



Copyright © 1996–2006 411.com. All rights reserved.

Privacy Policy , Legal Notice and Terms under which this service is provided to you.



ACCOUNT | SERVICES | LOGIN REGISTER

WaMu   Get our best free checking + **5.00**% APY Statement Savings
All from one great bank.

| WHITE PAGES | YELLOW PAGES | EMAIL SEARCH | REVERSE PHONE | REVERSE ADDRESS | AREA & ZIP CODES | MAILING LISTS |

FIND NEIGHBORS | INTERNATIONAL DIRECTORIES | BATCH PEOPLE SEARCHES | AUTOMATE PEOPLE LOOKUPS

< SEARCH    Sign up right now for Vonage and get 1 month FREE. Click here >

**0 Results** matching "Nelson Offner, 172 Ardmore Road, Kensington, CA"

Search Suggestions

Search for the **last name** Offner in Kensington, CA
Search for Nelson Offner in the Kensington, CA **metro area**
Search for the first name **beginning with** N, last name with Off in Kensington, CA

**Revise Your Search**

**Nelson Offner is in our Database**
**Powered by 1.800.US.SEARCH**

First Name: Nelson          Last Name: Offner

City: kensington          State: CA

[Search]

Search by Social Security Number, Maiden Name, Age and More!

SPONSORED LINK

$510,000 Mortgage for $1,698/Month! Calculate New Payment LowerMyBills.com

Select Your State
Alabama
Alaska
Arizona

**Page 131**

**Search**
Home
People Search
Business Search
Business Search
Email Search
Reverse Phone
Reverse Address
Area Codes
ZIP Codes
Tools & Resources
Site Map

**Tools**
About WhitePages
Services
Phone Append
Address Append
XML Lookups
People Search by State
Business Search by State

**Resources**
Wedding Center
Auto Center
Moving and Home
Improvement Center

**About Our Searches**
White Pages
Business Search
Reverse Phone Directory
Reverse Address Lookup
Email Address Search
Area Code and ZIP Code
Directory

**WhitePages.com, Inc.**
FAQ
About Us
Advertising
Affiliate Program
Contact Us
Tell friends about 411.com



$510,000 Mortgage for Under $1,698/Month!





Copyright © 1996-2006 411.com. All rights reserved.
Privacy Policy, Legal Notice and Terms under which this service is provided to you.





## Search
Home
People Search
Business Search
Business Search
Email Search
Reverse Phone
Reverse Address
Area Codes
ZIP Codes
Tools & Resources
Site Map

## Tools
About WhitePages
Services
Phone Append
Address Append
XML Lookups
People Search by State
Business Search by State

## Resources
Wedding Center
Auto Center
Moving and Home
Improvement Center

## About Our Searches
White Pages
Business Search
Reverse Phone Directory
Reverse Address Lookup
Email Address Search
Area Code and ZIP Code
Directory

## WhitePages.com, Inc.
FAQ
About Us
Advertising
Affiliate Program
Contact Us
Tell friends about 411.com



Discover health care that's anything but expected.

KAISER PERMANENTE. thrive

Copyright © 1996-2006 411.com. All rights reserved.
Privacy Policy , Legal Notice and Terms under which this service is provided to you.




PTO/SB/22 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARMENT OF COMMERCE
Under the paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PETITION FOR EXTENSION OF TIME UNDER 37 CFR 1.136(a) FY 2006 *(Fees pursuant to the Consolidated Appropriations Act, 2005 (H.R. 4818).)* | Docket Number (Optional) EQUI0001CIP-C | |
|---|---|---|
| Application Number  11/269,916 | Filed | 11/07/2005 |
| For     Automated Media Delivery System | | |
| Art Unit     2176 | Examiner | Unassigned |

This is a request under the provisions of 37 CFR 1.136(a) to extend the period for filing a reply in the above identified application.

The requested extension and fee are as follows (check time period desired and enter the appropriate fee below):

| | | Fee | Small Entity Fee | |
|---|---|---|---|---|
| [X] | One month (37 CFR 1.17(a)(1)) | $120 | $60 | $ 60.00 |
| [ ] | Two months (37 CFR 1.17(a)(2)) | $450 | $225 | $_____ |
| [ ] | Three months (37 CFR 1.17(a)(3)) | $1020 | $510 | $_____ |
| [ ] | Four months (37 CFR 1.17(a)(4)) | $1590 | $795 | $_____ |
| [ ] | Five months (37 CFR 1.17(a)(5)) | $2160 | $1080 | $_____ |

[ ] Applicant claims small entity status. See 37 CFR 1.27.

[ ] A check in the amount of the fee is enclosed.

[ ] Payment by credit card. Form PTO-2038 is attached.

[ ] The Director has already been authorized to charge fees in this application to a Deposit Account.

[X] The Director is hereby authorized to charge any fees which may be required, or credit any overpayment, to Deposit Account Number  07-1445 (Glenn Patent Group).   I have enclosed a duplicate copy of this sheet.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the
- [ ] applicant/inventor.
- [ ] assignee of record of the entire interest. See 37 CFR 3.71.
       Statement under 37 CFR 3.73(b) is enclosed (Form PTO/SB/96).
- [X] attorney or agent of record. Registration Number  52,283
- [ ] attorney or agent under 37 CFR 1.34.
       Registration number if acting under 37 CFR 1.34  _____

| *Julia A. Thomas* (signature) | 01/30/2007 |
|---|---|
| Signature | Date |
| Julia A. Thomas | 650-474-8400 |
| Typed or printed name | Telephone Number |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below.

[X]  Total of  1  forms are submitted.

This collection of information is required by 37 CFR 1.136(a). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

COPY

PTO/SB/22 (09-06)
Approved for use through 03/31/2007. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PETITION FOR EXTENSION OF TIME UNDER 37 CFR 1.136(a) **FY 2006** *(Fees pursuant to the Consolidated Appropriations Act, 2005 (H.R. 4818).)* | Docket Number (Optional) EQUI0001CIP-C |
|---|---|

| Application Number | 11/269,916 | | Filed | 11/07/2005 |
|---|---|---|---|---|

| For | Automated Media Delivery System |
|---|---|

| Art Unit | 2176 | Examiner | Unassigned |
|---|---|---|---|

This is a request under the provisions of 37 CFR 1.136(a) to extend the period for filing a reply in the above identified application.

The requested extension and fee are as follows (check time period desired and enter the appropriate fee below):

| | | Fee | Small Entity Fee | |
|---|---|---|---|---|
| [X] | One month (37 CFR 1.17(a)(1)) | $120 | $60 | $ 60.00 |
| [ ] | Two months (37 CFR 1.17(a)(2)) | $450 | $225 | $_____ |
| [ ] | Three months (37 CFR 1.17(a)(3)) | $1020 | $510 | $_____ |
| [ ] | Four months (37 CFR 1.17(a)(4)) | $1590 | $795 | $_____ |
| [ ] | Five months (37 CFR 1.17(a)(5)) | $2160 | $1080 | $_____ |

[ ] Applicant claims small entity status. See 37 CFR 1.27.

[ ] A check in the amount of the fee is enclosed.

[ ] Payment by credit card. Form PTO-2038 is attached.

[ ] The Director has already been authorized to charge fees in this application to a Deposit Account.

[X] The Director is hereby authorized to charge any fees which may be required, or credit any overpayment, to Deposit Account Number 07-1445 (Glenn Patent Group).  I have enclosed a duplicate copy of this sheet.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

[ ] applicant/inventor.

[ ] assignee of record of the entire interest. See 37 CFR 3.71.
    Statement under 37 CFR 3.73(b) is enclosed (Form PTO/SB/96).

[X] attorney or agent of record. Registration Number 52,283

[ ] attorney or agent under 37 CFR 1.34.
    Registration number if acting under 37 CFR 1.34 _____

| *Julia A. Thomas* (signature) | 01/30/2007 |
|---|---|
| Signature | Date |
| Julia A. Thomas | 650-474-8400 |
| Typed or printed name | Telephone Number |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below.

[X] Total of 1 forms are submitted.

This collection of information is required by 37 CFR 1.136(a). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Page 136**

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 11269916 |
| **Filing Date:** | 07-Nov-2005 |
| **Title of Invention:** | Automated media delivery system |
| First Named Inventor/Applicant Name: | Sean Barger |
| **Filer:** | Michael Glenn/Della Revecho |
| **Attorney Docket Number:** | EQUI0001CIP-C |

Filed as Small Entity

## Utility      Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| Post-Allowance-and-Post-Issuance: | | | | |
| **Extension-of-Time:** | | | | |
| Extension - 1 month with $0 paid | 2251 | 1 | 60 | 60 |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| **Total in USD ($)** | | | | **60** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 1478368 |
| **Application Number:** | 11269916 |
| **International Application Number:** | |
| **Confirmation Number:** | 5707 |
| **Title of Invention:** | Automated media delivery system |
| **First Named Inventor/Applicant Name:** | Sean  Barger |
| **Customer Number:** | 22862 |
| **Filer:** | Michael Glenn/Della Revecho |
| **Filer Authorized By:** | Michael Glenn |
| **Attorney Docket Number:** | EQUI0001CIP-C |
| **Receipt Date:** | 30-JAN-2007 |
| **Filing Date:** | 07-NOV-2005 |
| **Time Stamp:** | 20:35:00 |
| **Application Type:** | Utility |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment was successfully received in RAM | $60 |
| RAM confirmation Number | 1157 |
| Deposit Account | 071445 |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:
    Charge any Additional Fees required under 37 C.F.R. Section 1.16 and 1.17

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes) | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | PetnUncoopEFlIed013007.pdf | 1262012 | yes | 22 |

| Multipart  Description/PDF files in .zip description | | | |
|---|---|---|---|
| Document Description | | Start | End |
| Miscellaneous Incoming Letter | | 1 | 1 |
| Petition for review by the Office of Petitions. | | 2 | 3 |
| Oath or Declaration filed | | 4 | 7 |
| Miscellaneous Incoming Letter | | 8 | 20 |
| Extension of Time | | 21 | 22 |

| Warnings: | | | | | |
|---|---|---|---|---|---|
| Information: | | | | | |
| 2 | Fee Worksheet (PTO-06) | fee-info.pdf | 8136 | no | 2 |
| Warnings: | | | | | |
| Information: | | | | | |

| Total Files Size (in bytes): | 1270148 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

# ELECTRONIC TRANSMITTAL COVER SHEET

Application Serial No.: 11/269,916          Attorney Docket No.  EQUI0001CIP-C

I hereby certify that this correspondence is being ELECTRONICALLY TRANSMITTED to the United States Patent and Trademark Office

From: GLENN PATENT GROUP
Customer No.: 22,862
Tel:  (650) 474-8400
Fax: (650) 474-8401

on January 30, 2007                    .
            Date

_____
                              Signature

Della Revecho
_____
            Typed or printed name of person signing Certificate

Note: Each paper must have its own certificate of transmission, or this certificate
        must identify each submitted paper.

Attached to this cover sheet please find the following documents:

- Electronic Transmittal Cover Sheet (1 page);
- Request for Reconsideration of Petition (2 pages);
- Oath and Declaration (4 pages);
- Copies of: E-mail dated 4/06/06, Returned Letters and Fed-Ex Receipts,
  and 411.com Search (13 pages); and
- Petition for Extension of Time (1 page in duplicate)

This collection of information is required by 37 CFR 1.8. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1.8 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA  22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK CA 94025

**COPY MAILED**

MAR 0 8 2007

**OFFICE OF PETITIONS**

In re Application of                          :
Barger, et al.                                :        ON PETITION
Application No.: 11/269,916                    :
Filed: November 7, 2005                        :
Attorney Docket No.: EQUI0001CIP-C            :

This is a decision on the reconsideration petition under 37 CFR 1.47(a), filed January 30, 2007.

The petition is **DISMISSED**.

Any request for reconsideration of this decision must be submitted within TWO (2) MONTHS from the mail date of this decision. Extensions of time under 37 CFR 1.136(a) are permitted. Any response should be entitled "Request for Reconsideration of Petition Under 37 CFR 1.47(a)" and <u>may</u> include an oath or declaration executed by the inventor. **Failure to respond will result in abandonment of the application.**

The above-identified application was filed on November 7, 2005. On December 12, 2005, the Office mailed a Notice to File Missing Parts of Nonprovisional Application, requiring submission of an executed declaration and a $65.00 late declaration surcharge. On May 12, 2006, petitioners filed, *inter alia*, a request for three month extension of time, a petition under 37 CFR 1.47(a) and a declaration signed by one of seven joint inventors. The petition states that a copy of the application and a declaration were mailed to each inventor for his signature, but that all mailings of the aforementioned documents were returned to sender. No forwarding addresses were provided.

A grantable petition under 37 CFR 1.47(a) requires:
(1)    a petition including proof of the pertinent facts establishing that the joint inventor(s) refuses to join, or cannot be found or reached after diligent effort,
(2)    a proper oath or Declaration executed by the available joint inventor(s),
(3)    the petition fee of $200, and
(4)    the last known address of the omitted inventor(s).

The petition was dismissed on October 30, 2006 for failure to provide items (1) and (2) above.

Application No. 11/269,916                                    Page 3

The present petition was filed on January 30, 2006 with a petition for a one month extension of time and required fee. Four of seven joint inventors signed the declaration filed with the reconsideration petition. Petitioners have shown that non-signing joint inventors Samaniego, Offner, and Devan cannot be located after diligent search.

However, the reconsideration petition lacks item (2).

As to item (2), an oath or declaration for the patent application in compliance with 37 CFR 1.63 and 1.64 still has not been presented. The declaration contains a noninitialed, nondated alteration to Inventor Thewlis' residence and citizenship. 37 CFR 1.52(c) states that "[a]ny interlineation, erasure, cancellation or other alteration of the application papers filed should be made on or before the signing of the accompanying oath or declaration pursuant to 1.63...." This includes the oath or declaration. The Office will not consider whether noninitialed and or nondated alterations were made before or after signing of the oath or declaration but will require a new oath or declaration.

Fortunately, the alterations were to a signing inventor's information. Therefore, pursuant to 37 CFR 1.67(a)(2), Mr. Thewlis may correct his information in a supplemental declaration that lists complete information for all joint inventors, but is executed by only him.

An oath or declaration in compliance with 37 CFR 1.63 and 1.64 signed by the Rule 1.47 applicant on behalf of the non-signing inventor is REQUIRED. See MPEP 409.03(a)

Further correspondence with respect to this matter should be addressed as follows:

**By mail:**       Mail Stop PETITION
                  Commissioner for Patents
                  Post Office Box 1450
                  Alexandria, VA 22313-1450


**By hand:**       U.S. Patent and Trademark Office
                  Customer Service Window, Mail Stop Petition
                  Randolph Building
                  401 Dulany Street
                  Alexandria, VA 22314

**By FAX:**        (571) 273-8300 - ATTN: Office of Petitions

Application No.  11/269,916                                         Page 3

Telephone inquiries should be directed to the undersigned at (571) 272-3230.

*Shirene Willis Brantley*

Shirene Willis Brantley
Senior Petitions Attorney
Office of Petitions

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

|   | | | |
|---|---|---|---|
| 5 | First Named Inventor | : | Barger et al |
| | Serial No. | : | 11/269,916 |
| | Filed | : | November 7, 2005 |
| | Art Unit | : | 2176 |
| | Confirmation Number | : | 5707 |
| | Examiner | : | Unassigned |
| 10 | Title | : | Automated Media Delivery System |
| | Attorney Docket No. | : | EQUI0001CIP-C |

15   June 12, 2007

Commissioner for Patents
Mail Stop – PETITION
P.O. Box 1450
Alexandria, VA  22313-1450

20

## REQUEST FOR RECONSIDERATION OF PETITION
## UNDER 37 CFR § 1.47(a)

25   Dear Examiner:

Applicant respectfully petitions the Commissioner for reconsideration to include the newly signed oath-declaration executed by the inventor Adrian D. Thewlis.

30   This petition is accompanied by the declaration that lists the complete information for all joint inventors, and executed only by Mr. Adrian D. Thewlis.

Respectfully submitted,

35

Michael A. Glenn
Reg. No. 30,176

Customer No. 22862

Attorney Docket No.  EQUI0001CIP-C

## **DECLARATION FOR PATENT APPLICATION**

As a below named inventor, I hereby declare that:

My residence, post office address, and citizenship are as stated below next to my name;

I believe I am the original, first, and sole inventor (if only one name is listed below) or an original, first, and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

# **Automated Media Delivery System**

the specification of which (check one) _____ is attached hereto, or _X_ was filed on _11/07/2005_ as Application Serial No. _11/269,916_ and was amended on _____ (if applicable).

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, Section 1.56(a).

I hereby claim foreign priority benefits under Title 35, United States Code, Section 119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

Prior Foreign Application(s)                                              Priority Claimed

                                                                          Yes        No

_____                                         ____       ____

Number    Country    Day/Month/Year Filed

_____                                         ____       ____

Number    Country    Day/Month/Year Filed

Attorney Docket No. EQUI0001CIP-C

POWER OF ATTORNEY: As a named inventor, I hereby appoint the following attorney(s) and/or agent(s) to prosecute this application and transact all business in the Patent and Trademark Office connected therewith:

      MICHAEL A. GLENN, Reg. No. 30,176

      DONALD M. HENDRICKS, Reg. No. 40,355

      CHRISTOPHER PEIL, Reg. No. 45,005

      JEFFREY BRILL, Reg. No. 51,198

SEND CORRESPONDENCE TO:   CUSTOMER NUMBER **22862**

   MICHAEL A. GLENN, 3475 Edison Way, Suite L, Menlo Park, CA 94025

---

I hereby claim the benefit under Title 35, United States code, Section 119(3)120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, Section 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, Section 1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

| 6,964,009 | 11/08/2005 | Patented |
|---|---|---|
| Patent Number | Grant Date | Status: Patented, Pending, Abandoned |
| 6,792,575 | 9/14/2004 | Patented |
| Patent Number | Grant Date | Status: Patented, Pending, Abandoned |
| | | |
| Application Ser. No. | Filing Date | Status: Patented, Pending, Abandoned |

---

- 2 -

**Page 147**

Attorney Docket No. EQUI0001CIP-C

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full name of sole or **first** inventor: _____ SEAN BARGER _____

Inventor's signature _____ _____

Residence _____ 222 Marguerite Ave., Mill Valley, CA 94941 _____

Post Office Address _Same_____

Citizenship _____ United States of America _____

Full name of **second** or joint inventor: _____ CHRISTOPHER SAMANIEGO _____

Inventor's signature _____ _____
                                                                                           Date
Residence _____ 461 Second Street, San Francisco, California 94107 _____

Post Office Address _Same_____

Citizenship _____ United States of America _____

Full name of **third** or joint inventor: _____ NELSON H. "ROCKY" OFFNER _____

Inventor's signature _____ _____
                                                                                           Date
Residence _____ 172 Ardmore Road, Kensington, California 94707 _____

Post Office Address _Same_____

Citizenship _____ United States of America _____

Full name of **fourth** or joint inventor: _____ ADRIAN D. THEWLIS _____

Inventor's signature *Adrian Thewlis*_____ __5/21/07__
                                                                                           Date
Residence_____ 24 Adrian Terrace, San Rafael, CA 94903 _____

Post Office Address _Same_____

Citizenship _____ United States of America _____

- 3 -

**Page 148**

Attorney Docket No.  EQUI0001CIP-C

Full name of **fifth** or joint inventor: _____ DAVID R. BOYD _____

Inventor's signature _____  _____
                                                                                          Date
Residence_____ 1256 Kearny Street, San Francisco, California  94133 _____

Post Office Address  Same _____

Citizenship _____ United States of America _____


Full name of **sixth** or joint inventor: _____ DAVID C. SALMON _____

Inventor's signature _____  _____
                                                                                          Date
Residence_____ 42 Sandalwood Court, San Rafael, California 94903 _____

Post Office Address  Same _____

Citizenship _____ United States of America _____


Full name of **seventh** or joint inventor: _____ JOSHUA N. DEVAN _____

Inventor's signature _____  _____
                                                                                          Date
Residence_____ 25 Stetson Avenue, Lower,  Kentfield, California 94904 ____

Post Office Address  Same _____

Citizenship _____ United States of America _____

PTO/SB/22 (04-07)
Approved for use through 09/30/2007. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless if displays a valid OMB control number.

| PETITION FOR EXTENSION OF TIME UNDER 37 CFR 1.136(a) <br> FY 2006 <br> *(Fees pursuant to the Consolidated Appropriations Act, 2005 (H.R. 4818).)* | Docket Number (Optional) <br> EQUI0001CIP-C |
|---|---|
| Application Number    11/269,916 | Filed    11/07/2006 |
| For    Automated Media Delivery System | |
| Art Unit    2176 | Examiner   Unassigned |

This is a request under the provisions of 37 CFR 1.136(a) to extend the period for filing a reply in the above identified application.

The requested extension and fee are as follows (check time period desired and enter the appropriate fee below):

|  |  | Fee | Small Entity Fee |  |
|---|---|---|---|---|
| ☐ | One month (37 CFR 1.17(a)(1)) | $120 | $60 | $_____ |
| ☒ | Two months (37 CFR 1.17(a)(2)) | $450 | $225 | $ 225.00 |
| ☐ | Three months (37 CFR 1.17(a)(3)) | $1020 | $510 | $_____ |
| ☐ | Four months (37 CFR 1.17(a)(4)) | $1590 | $795 | $_____ |
| ☐ | Five months (37 CFR 1.17(a)(5)) | $2160 | $1080 | $_____ |

☒ Applicant claims small entity status. See 37 CFR 1.27.

☐ A check in the amount of the fee is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The Director has already been authorized to charge fees in this application to a Deposit Account.

☒ The Director is hereby authorized to charge any fees which may be required, or credit any overpayment, to Deposit Account Number   07-1445   .   I have enclosed a duplicate copy of this sheet.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

☐ applicant/inventor.

☐ assignee of record of the entire interest. See 37 CFR 3.71.
Statement under 37 CFR 3.73(b) is enclosed (Form PTO/SB/96).

☒ attorney or agent of record. Registration Number   30,176

☐ attorney or agent under 37 CFR 1.34.
Registration number if acting under 37 CFR 1.34   _____

| /Michael A. Glenn/ | June 12, 2007 |
|---|---|
| Signature | Date |
| Michael A. Glenn | 650-474-8400 |
| Typed or printed name | Telephone Number |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below.

☒ Total of   1   forms are submitted.

This collection of information is required by 37 CFR 1.136(a). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 11269916 |
| **Filing Date:** | 07-Nov-2005 |
| **Title of Invention:** | Automated media delivery system |
| First Named Inventor/Applicant Name: | Sean Barger |
| **Filer:** | Michael Glenn/Della Revecho |
| **Attorney Docket Number:** | EQUI0001CIP-C |

Filed as Small Entity

## Utility     Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| Post-Allowance-and-Post-Issuance: | | | | |
| **Extension-of-Time:** | | | | |
| Extension - 2 months with $0 paid | | 1 | 225 | 225 |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **225** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 1866102 |
| **Application Number:** | 11269916 |
| **International Application Number:** | |
| **Confirmation Number:** | 5707 |
| **Title of Invention:** | Automated media delivery system |
| **First Named Inventor/Applicant Name:** | Sean  Barger |
| **Customer Number:** | 22862 |
| **Filer:** | Michael Glenn/Della Revecho |
| **Filer Authorized By:** | Michael Glenn |
| **Attorney Docket Number:** | EQUI0001CIP-C |
| **Receipt Date:** | 12-JUN-2007 |
| **Filing Date:** | 07-NOV-2005 |
| **Time Stamp:** | 19:13:24 |
| **Application Type:** | Utility |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment was successfully received in RAM | $ 225 |
| RAM confirmation Number | 3564 |
| Deposit Account | 071445 |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:
    Charge any Additional Fees required under 37 C.F.R. Section 1.16 and 1.17

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes) | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | Petition-EFiled-061207.pdf | 276229 | yes | 7 |

| Multipart  Description/PDF files in .zip description | | |
|---|---|---|
| Document Description | Start | End |
| Miscellaneous Incoming Letter | 1 | 1 |
| Petition for review by the Office of Petitions. | 2 | 2 |
| Oath or Declaration filed | 3 | 6 |
| Extension of Time | 7 | 7 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes) | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | Fee Worksheet (PTO-06) | fee-info.pdf | 8131 | no | 2 |

**Warnings:**

**Information:**

| Total Files Size (in bytes): | 284360 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable.  It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**Page 154**

# ELECTRONIC TRANSMITTAL COVER SHEET

Application Serial No. 11/269,916          Attorney Docket No.  EQUI0001CIP-C

I hereby certify that this correspondence is being ELECTRONICALLY TRANSMITTED to the United States Patent and Trademark Office

From: GLENN PATENT GROUP
Customer No.: 22,862
Tel:  (650) 474-8400
Fax: (650) 474-8401

on June 12,  2007
       Date

_Signature_

Della Revecho
Typed or printed name of person signing Certificate

Note: Each paper must have its own certificate of transmission, or this certificate
      must identify each submitted paper.

Attached to this cover sheet please find the following documents:

- Electronic Transmittal Cover Sheet (1 page);
- Request for Reconsideration of Petition (1 page);
- Oath-Declaration of Inventor Adrian D. Thewlis (4 pages); and
- Petition for Extension of Time (1 page)

This collection of information is required by 37 CFR 1.8. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1.8 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA  22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

_If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2._



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK CA 94025

**COPY MAILED**

JUN 2 6 2007

**OFFICE OF PETITIONS**

| | | |
|---|---|---|
| In re Application of | : | |
| Barger, et al. | : | ON PETITION |
| Application No.: 11/269,916 | : | |
| Filed:  November 7, 2005 | : | |
| Attorney Docket No.:  EQUI0001CIP-C | : | |

This is a decision on the reconsideration petition under 37 CFR 1.47(a), filed June 12, 2007.

The petition is **GRANTED**.

Petitioners have shown that non-signing joint inventors Samaniego, Offner, and Devan cannot be located after diligent search. Petitioners have supplied a declaration executed by the available joint inventors.

The application and papers have been reviewed and found in compliance with 37 CFR 1.47(a). This application is hereby accorded Rule 1.47(a) status.

As provided in 37 CFR 1.47(c), this Office will forward notice of this application's filing to the non-signing inventors at the addresses given in the petition.  Notice of the filing of this application will also be published in the Official Gazette.

After the mailing of this decision, the application will be forwarded to Technology Center Art Unit 2176 for examination in due course.

Telephone inquiries should be directed to the undersigned at (571) 272-3230.

*Shirene Willis Brantley*

Shirene Willis Brantley
Senior Petitions Attorney
Office of Petitions

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

CHRISTOPHER SAMANIEGO
461 SECOND STREET
SAN FRANCISCO CA 94107

**COPY MAILED**

JUN 2 6 2007

**OFFICE OF PETITIONS**

| | | |
|---|---|---|
| In re Application of | : | |
| Barger, et al. | : | LETTER |
| Application No.: 11/269,916 | : | |
| Filed: November 7, 2005 | : | |
| Attorney Docket No.: EQUI0001CIP-C | : | |

Dear Mr. Samaniego:

You are named as a joint inventor in the above-identified United States patent application, filed under the provisions of 35 U.S.C. 116 (United States Code), and 37 CFR 1.47(a), Rules of Practice in Patent Cases. Should a patent be granted on the application you will be designated therein as a joint inventor.

As a named inventor you are entitled to inspect any paper in the file wrapper of the application, order copies of all or any part thereof (at a prepaid cost per 37 CFR 1.19) or make your position of record in the application. Alternatively, you may arrange to do any of the preceding through a registered patent attorney or agent presenting written authorization from you. If you care to join the application, counsel of record (see below) would presumably assist you. Joining the application would entail the filing of an appropriate oath or declaration by you pursuant to 37 CFR 1.63.

Telephone inquiries regarding this communication should be directed to the undersigned at (571) 272-3230. Requests for information regarding your application should be directed to the File Information Unit at (703) 308-2733. Information regarding how to pay for and order a copy of the application, or a specific paper in the application, should be directed to the Certification Division at (571) 272-3150 or 1 (800) 972-6382 (outside the Washington, DC area).

Shirene Willis Brantley
Senior Petitions Attorney
Office of Petitions

ATTORNEYS OF RECORD:      GLENN PATENT GROUP
                          3475 EDISON WAY, SUITE L
                          MENLO PARK CA 94025

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

NELSON H. OFFNER
172 ARDMORE ROAD
KENSINGTON CA 94707

**COPY MAILED**

JUN 2 6 2007

OFFICE OF PETITIONS

In re Application of        :
Barger, et al.              :        LETTER
Application No.: 11/269,916  :
Filed:  November 7, 2005    :
Attorney Docket No.:  EQUI0001CIP-C  :

Dear Mr. Offner:

You are named as a joint inventor in the above-identified United States patent application, filed under the provisions of 35 U.S.C. 116 (United States Code), and 37 CFR 1.47(a), Rules of Practice in Patent Cases. Should a patent be granted on the application you will be designated therein as a joint inventor.

As a named inventor you are entitled to inspect any paper in the file wrapper of the application, order copies of all or any part thereof (at a prepaid cost per 37 CFR 1.19) or make your position of record in the application. Alternatively, you may arrange to do any of the preceding through a registered patent attorney or agent presenting written authorization from you. If you care to join the application, counsel of record (see below) would presumably assist you. Joining the application would entail the filing of an appropriate oath or declaration by you pursuant to 37 CFR 1.63.

Telephone inquiries regarding this communication should be directed to the undersigned at (571) 272-3230. Requests for information regarding your application should be directed to the File Information Unit at (703) 308-2733. Information regarding how to pay for and order a copy of the application, or a specific paper in the application, should be directed to the Certification Division at (571) 272-3150 or 1 (800) 972-6382 (outside the Washington, DC area).

Shirene Willis Brantley
Shirene Willis Brantley
Senior Petitions Attorney
Office of Petitions

ATTORNEYS OF RECORD:        GLENN PATENT GROUP
                            3475 EDISON WAY, SUITE L
                            MENLO PARK CA 94025

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

JOSHUA N. DEVAN
25 STETSON AVENUE
LOWER KENTFIELD  CA 94904

**COPY MAILED**

JUN 2 6 2007

**OFFICE OF PETITIONS**

In re Application of          :
Barger, et al.               :        LETTER
Application No.: 11/269,916   :
Filed:  November 7, 2005     :
Attorney Docket No.:  EQUI0001CIP-C  :

Dear Mr. Devan:

You are named as a joint inventor in the above-identified United States patent application, filed under the provisions of 35 U.S.C. 116 (United States Code), and 37 CFR 1.47(a), Rules of Practice in Patent Cases. Should a patent be granted on the application you will be designated therein as a joint inventor.

As a named inventor you are entitled to inspect any paper in the file wrapper of the application, order copies of all or any part thereof (at a prepaid cost per 37 CFR 1.19) or make your position of record in the application.  Alternatively, you may arrange to do any of the preceding through a registered patent attorney or agent presenting written authorization from you.  If you care to join the application, counsel of record (see below) would presumably assist you.  Joining the application would entail the filing of an appropriate oath or declaration by you pursuant to 37 CFR 1.63.

Telephone inquiries regarding this communication should be directed to the undersigned at (571) 272-3230.  Requests for information regarding your application should be directed to the File Information Unit at (703) 308-2733.  Information regarding how to pay for and order a copy of the application, or a specific paper in the application, should be directed to the Certification Division at (571) 272-3150 or 1 (800) 972-6382 (outside the Washington, DC area).

Shirene Willis Brantley
Senior Petitions Attorney
Office of Petitions

ATTORNEYS OF RECORD:          GLENN PATENT GROUP
                              3475 EDISON WAY, SUITE L
                              MENLO PARK CA 94025



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# *BIBDATASHEET*

Bib Data Sheet

**CONFIRMATION NO. 5707**

| SERIAL NUMBER 11/269,916 | FILING OR 371(c) DATE 11/07/2005 RULE 1.47 | CLASS 707 | GROUP ART UNIT 2176 | ATTORNEY DOCKET NO. EQUI0001CIP-C |
|---|---|---|---|---|

**APPLICANTS**
Sean Barger, M. Valley, CA;
Christopher Samaniego, San Francisco, CA;
Nelson H. Rocky Offner, Kensington, CA;
Adrian D. Thewlis, Sausalito, CA;
David R. Boyd, San Francisco, CA;
David C. Salmon, San Rafael, CA;
Joshua N. Devan, Kentfield, CA;

** CONTINUING DATA ************************
This application is a CIP of 09/929,904 08/14/2001 PAT 6,964,009
which is a CON of 09/425,326 10/21/1999 PAT 6,792,575

** FOREIGN APPLICATIONS *****************

IF REQUIRED, FOREIGN FILING LICENSE GRANTED** SMALL ENTITY **
** 12/08/2005

| Foreign Priority claimed ☐ yes ☐ no 35 USC 119 (a-d) conditions met ☐ yes ☐ no ☐ Met after Allowance Verified and Acknowledged ___Examiner's Signature___ ___Initials___ | STATE OR COUNTRY CA | SHEETS DRAWING 23 | TOTAL CLAIMS 16 | INDEPENDENT CLAIMS 5 |
|---|---|---|---|---|

**ADDRESS**
22862

**TITLE**
Automated media delivery system

| FILING FEE RECEIVED 765 | FEES: Authority has been given in Paper No. _____ to charge/credit DEPOSIT ACCOUNT No. _____ for following: | ☐ All Fees ☐ 1.16 Fees ( Filing ) ☐ 1.17 Fees ( Processing Ext. of time ) ☐ 1.18 Fees ( Issue ) ☐ Other _____ ☐ Credit |
|---|---|---|

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

JUL 1 0 2007

~~RICHARD~~ H. OFFNER
172 ARDMORE ROAD
KENSINGTON CA 94707

**COPY MAILED**

JUN 2 6 2007

OFFICE OF PETITIONS

In re Application of                :
Barger, et al.                      :     LETTER
Application No.: 11/269,916         :
Filed: November 7, 2005            :
Attorney Docket No.:  EQUI0001CIP-C  :

Dear Mr. Offner:

You are named as a joint inventor in the above-identified United States patent application, filed under the provisions of 35 U.S.C. 116 (United States Code), and 37 CFR 1.47(a), Rules of Practice in Patent Cases. Should a patent be granted on the application you will be designated therein as a joint inventor.

As a named inventor you are entitled to inspect any paper in the file wrapper of the application, order copies of all or any part thereof (at a prepaid cost per 37 CFR 1.19) or make your position of record in the application. Alternatively, you may arrange to do any of the preceding through a registered patent attorney or agent presenting written authorization from you. If you care to join the application, counsel of record (see below) would presumably assist you. Joining the application would entail the filing of an appropriate oath or declaration by you pursuant to 37 CFR 1.63.

Telephone inquiries regarding this communication should be directed to the undersigned at (571) 272-3230. Requests for information regarding your application should be directed to the File Information Unit at (703) 308-2733. Information regarding how to pay for and order a copy of the application, or a specific paper in the application, should be directed to the Certification Division at (571) 272-3150 or 1 (800) 972-6382 (outside the Washington, DC area).

*Shirene Willis Brantley*
Shirene Willis Brantley
Senior Petitions Attorney
Office of Petitions

ATTORNEYS OF RECORD:        GLENN PATENT GROUP
                            3475 EDISON WAY, SUITE L
                            MENLO PARK CA 94025



Official Business
Penalty For Private Use, $300

07/07/2007

30  SE 1

NIXIE    945  SE 1

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 22313145050    *2905-07500-07-26

RECEIVED

JUL 1 0 2007

USPTO MAIL CENTER

AN EQUAL OPPORTUNITY EMPLOYER

22313@1450

Page 163

UNITED STATES PATENT AND TRADEMARK OFFICE

JUL 1 0 2007

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

CHRISTOPHER SAMANIEGO
461 SECOND STREET
SAN FRANCISCO CA 94107

**COPY MAILED**

JUN 2 6 2007

**OFFICE OF PETITIONS**

In re Application of                          :
Barger, et al.                                :    LETTER
Application No.: 11/269,916                   :
Filed: November 7, 2005                       :
Attorney Docket No.: EQUI0001CIP-C           :

Dear Mr. Samaniego:

You are named as a joint inventor in the above-identified United States patent application, filed under the provisions of 35 U.S.C. 116 (United States Code), and 37 CFR 1.47(a), Rules of Practice in Patent Cases. Should a patent be granted on the application you will be designated therein as a joint inventor.

As a named inventor you are entitled to inspect any paper in the file wrapper of the application, order copies of all or any part thereof (at a prepaid cost per 37 CFR 1.19) or make your position of record in the application. Alternatively, you may arrange to do any of the preceding through a registered patent attorney or agent presenting written authorization from you. If you care to join the application, counsel of record (see below) would presumably assist you. Joining the application would entail the filing of an appropriate oath or declaration by you pursuant to 37 CFR 1.63.

Telephone inquiries regarding this communication should be directed to the undersigned at (571) 272-3230. Requests for information regarding your application should be directed to the File Information Unit at (703) 308-2733. Information regarding how to pay for and order a copy of the application, or a specific paper in the application, should be directed to the Certification Division at (571) 272-3150 or 1 (800) 972-6382 (outside the Washington, DC area).

*Shirene Willis Brantley*
Shirene Willis Brantley
Senior Petitions Attorney
Office of Petitions

ATTORNEYS OF RECORD:          GLENN PATENT GROUP
                              3475 EDISON WAY, SUITE L
                              MENLO PARK CA 94025

**Page 163**

AN EQUAL OPPORTUNITY EMPLOYER

RECEIVED
JUL 1 0 2007
USPTO MAIL CENTER

Organization _____ Bldg./Room _____
**UNITED STATES PATENT AND TRADEMARK OFFICE**
P.O. Box 1450
Alexandria, VA. 22313-1450
If Undeliverable Return In Ten Days

Official Business
Penalty For Private Use, $300

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

JOSHUA N. DEVAN
25 STETSON AVENUE
LOWER KENTFIELD CA 94904

**COPY MAILED**

JUN 2 6 2007

**OFFICE OF PETITIONS**

In re Application of                          :
Barger, et al.                                :        LETTER
Application No.: 11/269,916                    :
Filed: November 7, 2005                        :
Attorney Docket No.: EQUI0001CIP-C            :

Dear Mr. Devan:

You are named as a joint inventor in the above-identified United States patent application, filed under the provisions of 35 U.S.C. 116 (United States Code), and 37 CFR 1.47(a), Rules of Practice in Patent Cases. Should a patent be granted on the application you will be designated therein as a joint inventor.

As a named inventor you are entitled to inspect any paper in the file wrapper of the application, order copies of all or any part thereof (at a prepaid cost per 37 CFR 1.19) or make your position of record in the application. Alternatively, you may arrange to do any of the preceding through a registered patent attorney or agent presenting written authorization from you. If you care to join the application, counsel of record (see below) would presumably assist you. Joining the application would entail the filing of an appropriate oath or declaration by you pursuant to 37 CFR 1.63.

Telephone inquiries regarding this communication should be directed to the undersigned at (571) 272-3230. Requests for information regarding your application should be directed to the File Information Unit at (703) 308-2733. Information regarding how to pay for and order a copy of the application, or a specific paper in the application, should be directed to the Certification Division at (571) 272-3150 or 1 (800) 972-6382 (outside the Washington, DC area).

Shirene Willis Brantley
Senior Petitions Attorney
Office of Petitions

ATTORNEYS OF RECORD:          GLENN PATENT GROUP
                              3475 EDISON WAY, SUITE L
                              MENLO PARK CA 94025

**Page 165**



AN EQUAL OPPORTUNITY EMPLOYER

RECEIVED
JUN 2 5 2007

FORWARD
L David Cafarelli
Petaluma CA 94952

NIXIE    949    DA 1    OO 07/21/07

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 22313145050    *1417-10207-25-41

Organization _____    Bldg./Room _____
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. Box 1450
Alexandria, VA. 22313-1450
If Undeliverable Return In Ten Days

Official Business
Penalty For Private Use, $300

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

JOSHUA N. DEVAN
25 STETSON AVENUE
LOWER KENTFIELD  CA 94904

**COPY MAILED**

JUN 2 6 2007

**OFFICE OF PETITIONS**

In re Application of                              :
Barger, et al.                                    :        LETTER
Application No.: 11/269,916                        :
Filed:  November 7, 2005                           :
Attorney Docket No.:  EQUI0001CIP-C                :

Dear Mr. Devan:

You are named as a joint inventor in the above-identified United States patent application, filed under the provisions of 35 U.S.C. 116 (United States Code), and 37 CFR 1.47(a), Rules of Practice in Patent Cases. Should a patent be granted on the application you will be designated therein as a joint inventor.

As a named inventor you are entitled to inspect any paper in the file wrapper of the application, order copies of all or any part thereof (at a prepaid cost per 37 CFR 1.19) or make your position of record in the application. Alternatively, you may arrange to do any of the preceding through a registered patent attorney or agent presenting written authorization from you. If you care to join the application, counsel of record (see below) would presumably assist you. Joining the application would entail the filing of an appropriate oath or declaration by you pursuant to 37 CFR 1.63.

Telephone inquiries regarding this communication should be directed to the undersigned at (571) 272-3230. Requests for information regarding your application should be directed to the File Information Unit at (703) 308-2733. Information regarding how to pay for and order a copy of the application, or a specific paper in the application, should be directed to the Certification Division at (571) 272-3150 or 1 (800) 972-6382 (outside the Washington, DC area).

*Shirene Willis Brantley*
Shirene Willis Brantley
Senior Petitions Attorney
Office of Petitions

ATTORNEYS OF RECORD:        GLENN PATENT GROUP
                            3475 EDISON WAY, SUITE L
                            MENLO PARK CA 94025

**Page 167**

# EXHIBIT 5

US 20020078093A1

(19) **United States**

(12) **Patent Application Publication**   (10) Pub. No.: US 2002/0078093 A1

Samaniego et al.                          (43) Pub. Date:        Jun. 20, 2002

(54) **AUTOMATED MEDIA DELIVERY SYSTEM**

(76) Inventors: **Christopher Samaniego**, San Francisco, CA (US); **Nelson H. Rocky Offner**, Kensington, CA (US); **Adrian D. Thewlis**, Sausalito, CA (US); **David R. Boyd**, San Francisco, CA (US); **David C. Salmon**, San Rafael, CA (US); **Joshua N. Devan**, Kentfield, CA (US)

Correspondence Address:
**GLENN PATENT GROUP**
**3475 EDISON WAY**
**SUITE L**
**MENLO PARK, CA 94025 (US)**

(21) Appl. No.:      09/929,904

(22) Filed:         Aug. 14, 2001

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/425,326, filed on Oct. 21, 1999. Non-provisional of provisional application No. 60/226,043, filed on Aug. 16, 2000.

**Publication Classification**

(51) Int. Cl.$^7$ .................................................. G09G 5/12
(52) U.S. Cl. ...................................... 707/513; 707/500.1

(57)              **ABSTRACT**

An automatic graphics delivery system that operates in parallel with an existing Web site infrastructure is provided. The system streamlines the post-production process by automating the production of media through content generation procedures controlled by proprietary tags placed by an author within URLs embedded within Web documents.



Case 1:22-cv-00677-RGA     Document 78-1     Filed 03/20/24     Page 231 of 663 PageID #: 2434



Fig 1



Fig. 2
(PRIOR ART)

Fig. 3



Case 1:22-cv-00677-RGA    Document 78-1    Filed 03/20/24    Page 234 of 663 PageID #:
2437



Fig. 4 (PRIOR ART)

Fig. 5





Fig. 6



Fig. 7

# Authoring Flowchart



Fig. 8

# HTML Parsing Flowchart



Fig. 9

# Me 'ia Creation Flowchart



Fig. 10

Fig. 11



Case 1:22-cv-00677-RGA    Document 78-1    Filed 03/20/24    Page 242 of 663 PageID #: 2445

# Database Description



Fig. 12

Fig. 13

**Original Images**



HTML Document with Proprietary Tag

```
<html>
<head>
<title>
Title Frame
</title>3
</head>
<body>
<imgsrc= <freerideimage>var i = new Media(); i.Load(name @ logo3.tga);
i.Scale(ys @ 65, constrain @ true, alg @ "smooth",); i.Crop(xs @ 80, ys @ 80,
padcolor @ 0xffffff); var i2 = new Media(); i2.Load(name @
thumbnail_mask,tga); i.Composite(source @ i2); i.Scale(xs @ 60, ys @ 60, alg
@ "smooth"); i.Reduce(); i.Save(type @ "gif"); </freerideimage>
heigth=60 width=60 border=0><br>
</body>
</html>
```

1400

Fig. 14

*Fig. 15*

**HTML document viewed in browser**



1500

**HTML document source**



1510

Case 1:22-cv-00677-RGA    Document 78-1    Filed 03/20/24    Page 246 of 663 PageID #: 2449

**Generated GIF image**



1600

Fig. 16

Case 1:22-cv-00677-RGA    Document 78-1    Filed 03/20/24    Page 247 of 663 PageID #: 2450



Fig. 17

Case 1:22-cv-00677-RGA    Document 78-1    Filed 03/20/24    Page 248 of 663 PageID #: 2451



Fig. 18

Case 1:22-cv-00677-RGA     Document 78-1     Filed 03/20/24     Page 249 of 663 PageID #: 2452



Fig. 19



Fig. 20



Fig. 21



Fig. 22

Case 1:22-cv-00677-RGA    Document 78-1    Filed 03/20/24    Page 253 of 663 PageID #: 2456



Fig. 23

1

# AUTOMATED MEDIA DELIVERY SYSTEM

## BACKGROUND OF THE INVENTION

[0001]  1. Technical Field

[0002]  The invention relates to software systems. More particularly, the invention relates to an Internet server-based software system that provides delivery of automated graphics and other media to Web sites for access by an end user or consumer.

[0003]  2. Description of the Prior Art

[0004]  Most Web sites today are primarily handmade. From the guy publishing a simple online technology newsletter from his home, to the Fortune 1000 company's multitiered site with hundreds of pages of text, images, and animations, the Web developer and each of his HTML-coding and graphics-producing coworkers toil page by page and image by image. Thousands of established online companies employ hundreds of highly-skilled workers just to produce and maintain their Web sites. After all, the Web is now a major selling vehicle and marketing medium for many of these companies. The Web has even sprouted service industries such as, for example, public companies with multi-billion dollar valuations created just to consult and produce Web sites for others.

[0005]  Most Web developers who use established WYSI-WYG tools in the industry still must produce each page on their Web site one by one. The same rate applies to preparing and placing images, animations, and other visual assets. Each page represents its own set of issues ranging from whether to use GIF, JPEG, or PNG file formats, to finding the optimum bit depth for each image to ensure the fastest downloading through the different browsers of the consumer. The bottlenecked state of the customer's workflow to produce graphics for Web pages can be described as follows:

[0006]  Current Workflow for Creating Web Graphics

[0007]  Original Artwork/Asset Creation

[0008]  Use third-party point products

[0009]  Asset Editing

[0010]  Scale/reduce/slice

[0011]  Asset Format Conversion

[0012]  JPEG/GIF/PNG

[0013]  Asset Staging

[0014]  Place in Web file system

[0015]  Edit HTML

[0016]  Create/Modify HTML for particular page

[0017]  Store HTML on Web server

[0018]  View final pages

[0019]  Repeat process for each version of each graphic on each page

[0020]  Estimated time

[0021]  Two hours per page times the number of pages

[0022]  Also, from a user's perspective, the current state of the art is to offer the consumer zooming and panning capabilities so that by clicking on an image the consumer can view more closely or from a different angle. On the horizon are pages with three-dimensional imagery that enable a user to move around a page that can look more like a room than a brochure. While interesting, these features are merely incremental improvements to a consumer's surfing experience.

[0023]  D. C. A. Bulterman, Models, Media, and Motion: Using the Web to Support Multimedia Documents, Proceedings of 1997 International Conference on Multimedia Modeling, Singapore, Nov. 17-20, 1997 discloses "an effort underway by members of industry, research centers and user groups to define a standard document format that can be used in conjunction with time-based transport protocols over the Internet and intranets to support rich multimedia presentations. The paper outlines the goals of the W3C's Synchronized Multimedia working group and presents an initial description of the first version of the proposed multimedia document model and format."

[0024]  Text and Graphics on UMI's ProQuest Direct: The Best (yet) of both Worlds, Online, vol. 21, no. 2, pp. 73-7, March-April 1997 discloses an information system that offers "periodical and newspaper content covering a wide range of business, news, and professional topics . . . letting the user search both text and graphics and build the product to suit. Articles can be retrieved in varying levels of detail: citation, abstracts, full text, and text with graphics. Images come in two flavors: Page Image, a virtual photocopy, and Text+Graphics, in which graphics are stored separately from the text and are manipulable as discrete items . . . [The system] comes in two versions: Windows and Web."

[0025]  John Mills Dudley, Network-Based Classified Information Systems, AU-A-53031/98 (Aug. 27, 1998) discloses a "system for automatically creating databases containing industry, service, product and subject classification data, contact data, geographic location data (CCG-data) and links to web pages from HTML, XML, or SGML encoded web pages posted on computer networks such as Internets or Intranets . . . The . . . databases may be searched for references (URLs) to web pages by use of enquiries which reference one or more of the items of the CCG-data. Alternatively, enquiries referencing the CCG-data in the databases may supply contact data without web page references. Data duplication and coordination is reduced by including in the web page CCG-data display controls which are used by web browsers to format for display the same data that is used to automatically update the databases."

[0026]  Cordell et al, Automatic Data Display Formatting with A Networking Application, U.S. Pat. No. 5,845,084 (Dec. 1, 1998) discloses a placeholder image mechanism. "When a data request is made, the data transfer rate is monitored. When the receive data transfer rate is slow, and the data contains an embedded graphical image of unknown dimensions, a small placeholder image is automatically displayed for the user instead of the actual data. The small placeholder image holds a place on a display device for the data or the embedded graphical image until the data or embedded graphical image is received. When embedded graphical image is received, the placeholder image is removed, and the display device is reformatted to display the embedded graphical image."

2

[0027] Jonathon R. T. Lewis, System For Substituting Tags For Non-Editable Data Sets In Hypertext Documents And Updating Web Files Containing Links Between Data Sets Corresponding To Changes Made To The Tags, U.S. Pat. No. 5,355,472 (Oct. 11, 1994) discloses a "hypertext data processing system wherein data sets participating in the hypertext document may be edited, the data processing system inserting tags into the data sets at locations corresponding to the hypertext links to create a file which is editable by an editor and the data processing system removing the tags, generating a revised data set and updating the link information after the editing process. Its main purpose is to preserve the linking hierarchy that may get lost when the individual data sets get modified."

[0028] Wistendahl et al, System for Mapping Hot Spots in Media Content Interactive Digital Media Program, U.S. Pat. No. 5,708,845 (Jan. 13, 1998) discloses a "system for allowing media content to be used in an interactive digital media (IDM) program [that] has Frame Data for the media content and object mapping data (N Data) representing the frame addresses and display location coordinates for objects appearing in the media content. The N Data are maintained separately from the Frame Data for the media content, so that the media content can be kept intact without embedded codes and can be played back on any system. The IDM program has established linkages connecting the objects mapped by the N Data to other functions to be performed in conjunction with display of the media content. Selection of an object appearing in the media content with a pointer results in initiation of the interactive function. A broad base of existing non-interactive media content, such as movies, videos, advertising, and television programming can be converted to interactive digital media use. An authoring system for creating IDM programs has an object outlining tool and an object motion tracking tool for facilitating the generation of N Data. In a data storage disk, the Frame Data and the N Data are stored on separate sectors. In a network system, the object mapping data and IDM program are downloaded to a subscriber terminal and used in conjunction with presentation of the media content."

[0029] Rogers et al, Method for Fulfilling Requests of A Web Browser, U.S. Pat. No. 5,701,451 (Dec. 23, 1997) and Lagarde et al, Method for Distributed Task Fulfillment of Web Browser Requests, U.S. Pat. No. 5,710,918 (Jan. 20, 1998) disclose essentially "improvements which achieve a means for accepting Web client requests for information, obtaining data from one or more databases which may be located on multiple platforms at different physical locations on an Internet or on the Internet, processing that data into meaningful information, and presenting that information to the Web client in a text or graphics display at a location specified by the request."

[0030] Tyan et al, HTML Generator, European Patent Application No. EP 0843276 (May 20, 1998) discloses "generating an HTML file based on an input bitmap image, and is particularly directed to automatic generation of an HTML file, based on a scanned-in document image, with the HTML file in turn being used to generate a Web page that accurately reproduces the layout of the original input bitmap image."

[0031] TrueSpectra has a patent pending for the technology employed in its two products, IrisAccelerate and Iris-Transactive. These products are designed for zooming and panning and simple image transformations and conversions, respectively. They support 10 file formats and allow developers to add new file formats via their SDK. They do not require the use of Flashpix for images. However, their documentation points out that performance is dependent on the Flashpix format. The system would be very slow if a non-Flashpix format was used.

[0032] TrueSpectra allows the image quality and compression to be set for JPEGs only. The compression setting is set on the server and all images are delivered at the same setting.

[0033] TrueSpectra has a simple caching mechanism. Images in the cache can be cleared out automatically at certain times and it does not have any dependency features for image propagation. The Web server needs to be brought down in order to update any original assets.

[0034] TrueSpectra does not require plug-ins to operate features such as zooming/panning or compositing. The alternative to plug-ins is using their Javascript or active server page technology. These technologies are used by many Web sites to provide interactivity, but not all Web browsers work correctly with these technologies.

[0035] TrueSpectra relies on Flashpix as its native file format and does not support media types such as multi-GIFs and sound formats. Flashpix files are typically larger than most file formats. Access to files is faster for zooming and panning, but appears to be quite slow.

[0036] The key to IrisTransactive is the compositing subsystem. It requires three things to build a shopping solution using image composition.

[0037] 1) The original images must be created. It is suggested that the image be converted to Flashpix for better performance.

[0038] 2) All of the individual images must be described in XML using the image composer program. The program allows the editor to specify anchor points, layer attributes, and layer names. The resulting file is between 5 k and 50 k.

[0039] 3) The Web designer must place HTML referring to the XML in the Web site. By specifying parameters to the XML, the Web designer can turn on or off layers.

[0040] The herein above process for compositing images enables Web designers to create shopping sites. However, a lot of overhead is the result. The XML documents add 5 k-50 k to a Web site. The compositing commands that are embedded in the HTML are difficult to understand. And, because the compositing feature requires several steps to implement, it is not suitable for every image on a Web site. The process seems to be designed for the specific purpose of shopping.

[0041] MediaBin(TM) is limited to activities behind the firewall automating only the "post-creative busywork." In addition, MediaBin requires the use of an application server to function through a web interface. Thus images may not be directly added to any existing web page.

[0042] Macromedia's Generator operates by embedding variables in their proprietary Flash format. Therefore the

US 2002/0078093 A1

3

actual imaging operations are somewhat limited and cannot be controlled directly from a web page request.

[0043] MGI Software sells point solutions that require end-users to download a viewer to process a proprietary image format.

[0044] PictureIQ offers a server-side image-processing appliance that provides a limited set of Photoshop functionalities. This appliance runs on the web-page server, processes information embedded in the web page, and rewrites the web page with image data.

[0045] The disclosed prior art fail to provide systems and methodologies that result in a quantum leap in the speed with which they can modify and add images, video, and sound to sites, in the volume of data they can publish internally and externally, and in the quality of the content. The development of such an automated media delivery system would constitute a major technological advance.

[0046] It would be advantageous to empower an end user with flexibility and control by providing interactive page capabilities.

[0047] It would be advantageous from an end user's perspective to generate Web pages that contain active graphics. For example, clicking on a Corvette image will cause a simple menu to pop up suggesting alternative colors and sizes in which to see the car. Clicking on portions of the image, such as a fender, can call up a close-in view of the fender.

[0048] It would be advantageous to provide an automated graphics delivery system that becomes part of the Web site infrastructure and operates as part of the Web page transaction and that thereby provides a less expensive and less time-consuming process.

[0049] It would be advantageous to provide a system for automated processing and delivery of media (images, video, and sound) to a Web server whereby it eliminates the laborious post-production and conversion work that must be done before a media asset can be delivered on a Web server.

[0050] It would be advantageous to create a dynamic Web site, wherein images are generated on demand from original assets, wherein only the original assets need to be updated, and wherein updated changes propagate throughout the site.

[0051] It would be advantageous to provide a system that generates media based on current Web server traffic thereby optimizing throughput of the media through the Web server.

[0052] It would be advantageous to provide a system that generates media that is optimized for the Web client, wherein client connection speed determines optimum quality and file size.

[0053] It would be advantageous to provide a system that generates media, whereby the media is automatically uploaded.

[0054] It would be advantageous to provide a system that automatically caches generated media so identical requests can be handled without regeneration of images.

[0055] It would be advantageous to provide a system that resides behind the Web server, thereby eliminating security issues.

[0056] It would be advantageous to provide a system wherein the client browser does not require a plug-in.

[0057] It would be advantageous to provide a system wherein the system does not require any changes to a Web server.

[0058] It would be advantageous to provide a system wherein the system manages the Web server media cache.

[0059] It would be advantageous to provide a system wherein the Web media is generated only if requested by a client browser.

[0060] It would be advantageous for a system to reduce the need for a Web author to create different versions of a Web site, the system automatically handling image content.

[0061] It would be advantageous to provide dynamic imaging capabilities, have a more complete set of image processing functionality, and be controlled directly through an image URL.

[0062] It would be advantageous to provide an end-to-end solution requiring only a standard browser that is completely controllable using the proprietary tags contained within a simple image link in the web page.

[0063] It would be advantageous to run an image application as a separate server controlled directly by single image requests to that server, such that any web server, even one that is only sending static HTML can access imaging features.

## SUMMARY OF THE INVENTION

[0064] An automatic graphics delivery system that operates in parallel with an existing Web site infrastructure is provided. The system streamlines the post-production process by automating the production of media through content generation procedures controlled by proprietary tags placed within URLs embedded within Web documents. The author simply places the original media in the system, and adds proprietary tags to the URLs for accessing that media. The system automatically processes the URL encoded tags and automatically produces derivative media for the web site from the original media.

[0065] The system takes as input the client connection, server traffic, content generation procedures, and proprietary tags placed within the URL to generate optimized media for the client. The need for the Web author to create different versions of a Web site is reduced because the image content of the site is automatically handled by the system. In addition, generated media is cached such that further requests for the same media require little overhead.

[0066] Because the invention takes the original media, content generation procedures, and proprietary URL tags as inputs for generating the Web media, it is possible to modify any of these inputs and have the system automatically update the media on the associated Web pages.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0067] FIG. 1 is a schematic diagram showing the placement of the system within a current Web infrastructure according to the invention;

4

[0068]  **FIG. 2** is a schematic diagram showing how a typical Web site delivers an HTML document and its graphics to a Web browser according to the prior art;

[0069]  **FIG. 3** is a schematic diagram showing delivery of an HTML document and media to a Web browser according to the invention;

[0070]  **FIG. 4** is a schematic diagram showing the components involved in Web site administration according to the prior art;

[0071]  **FIG. 5** is a schematic diagram showing the components of the system involved in Web site administration according to the invention;

[0072]  **FIG. 6** is a simple overview showing the components of the system according to the invention;

[0073]  **FIG. 7** is a schematic diagram showing the process flow of a proprietary enabled page delivered to a Web browser according to the invention;

[0074]  **FIG. 8** is a flow chart showing an authoring process according to the invention;

[0075]  **FIG. 9** is a flow chart showing an HTML parsing process according to the invention;

[0076]  **FIG. 10** is a flow chart showing a media creation process according to the invention;

[0077]  **FIG. 11** is a screen shot showing an administration tool according to the invention;

[0078]  **FIG. 12** displays a structure of a database record used for the system according to the invention;

[0079]  **FIG. 13** shows original media to be processed according to the invention;

[0080]  **FIG. 14** shows a portion on an HTML document with a proprietary tag according to the invention;

[0081]  **FIG. 15** shows an HTML document and an HTML document source according to the invention;

[0082]  **FIG. 16** shows a generated GIF image according to the invention;

[0083]  **FIG. 17** is a schematic diagram of an image system within a typical Web infrastructure according to the invention;

[0084]  **FIG. 18** is a schematic diagram showing delivery of an HTML document and original media according to the invention;

[0085]  **FIG. 19** is a schematic diagram showing components of Web site administration according to a preferred embodiment of the invention;

[0086]  **FIG. 20** is a simple overview showing components of the image system according to a preferred embodiment of the invention;

[0087]  **FIG. 21** is a schematic diagram showing process flow of a proprietary enabled page delivered to a Web browser according to a preferred embodiment of the invention;

[0088]  **FIG. 22** shows a flowchart of a content generation procedure according to a preferred embodiment of the invention; and

[0089]  **FIG. 23** is a flow chart showing an authoring process according to a preferred embodiment of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

[0090]  An automatic graphics delivery system that operates in parallel with an existing Web site infrastructure is provided. The system streamlines the post-production process by automating the production of media through content generation procedures controlled by proprietary tags placed within URLs embedded within Web documents. The author simply places the original media in the system, and adds proprietary tags to the URLs for accessing that media. The system automatically processes the URL encoded tags and automatically produces derivative media for the web site from the original media.

[0091]  The system takes as input the client connection, server traffic, content generation procedures, and proprietary tags placed within the URL to generate optimized media for the client. The need for the Web author to create different versions of a Web site is reduced because the image content of the site is automatically handled by the system. In addition, the generated media is cached so that further requests for the same media require little overhead.

[0092]  Because the invention takes the original media, content generation procedures, and proprietary URL tags as inputs for generating the Web media, it is possible to modify any of these inputs and have the system automatically update the media on the associated Web pages.

[0093]  A detailed description of such automatic media delivery system operating in parallel with existing Web site infrastructure is found below in the section under the heading as such.

[0094]  **FIG. 1** is a schematic diagram showing the placement of the system within a current Web infrastructure according to a preferred embodiment of the invention. The system **100** is attached to a Web server **110**, which is connected to multiple client browsers **120**(*a-d*) via the Internet **130**.

[0095]  **FIG. 2** is a schematic diagram showing how a typical Web site delivers an HTML document and its graphics to a Web browser according to the prior art. An original media **200** is passed to post-production systems **210**, wherein the media **200** is manipulated by hand and prepared for the Web. The result is a Web media **220**. The Web media **220** and an associated HTML document **230** referring to the media **220** by media tags are input to a Web server **110** for a Web browser **120** to view via the Internet **130**.

[0096]  **FIG. 3** is a schematic diagram showing delivery of an HTML document and media to a Web browser according to a preferred embodiment of the invention. An original media **200** and an HTML document embedded with proprietary media tags **300** are input into the system **100**. The system **100** generates a Web-safe media **220** and a modified HTML document **230** that refers to the Web media, and automatically loads them onto the Web server **110** for view by a Web browser **120** via the Internet **160**.

[0097]  **FIG. 4** is a schematic diagram showing components involved in Web site administration according to the

US 2002/0078093 A1

Jun. 20, 2002

5

prior art. Original media assets **400** are original images, video, or sound that have not been prepared for the Web. Web sites usually need to manage the placement of media on the network for easy retrieval by Web designers. Post-production systems **410** vary from Web site to Web site. Post-production systems **410** are usually custom procedures that Web designers use to convert an original media, such as an image, to one that can be displayed on the Web. Post-production systems **410** also upload finished images to Web image systems. Web images **420** are Web versions of the original images. Web images **420** are ready for retrieval by the Web server **110** to be delivered to a Web browser **120**. Any image to be modified or updated must pass through the herein above three components before it can be delivered to the Web browser **120**. HTML pages **460** have references to Web images **420**.

[0098] **FIG. 5** is a schematic diagram showing the components involved in Web site administration according to a preferred embodiment of the invention. Web site administration is simplified using the claimed invention. Asset management, automatic image manipulation, automatic image conversion, automatic image upload, and automatic disk management **500** are provided by the claimed invention.

[0099] **FIG. 6** is a simple overview showing the components of the system according to a preferred embodiment of the invention. HTML with proprietary tags **300** is the original HTML document that is embedded with proprietary tags which describe how the images are to be manipulated for the Web. Java servlet engine **600** is a third-party product that allows the system **100** to interface with the Web server **110** and execute Java servlet code. The Web server **110** is third-party software that delivers Web pages to a Browser **120**. The Browser **120** views Web pages that are sent from the Web server **110**. Modified HTML with system created images **230** are a final result of the system. Modified HTML **230** is a standard HTML document without proprietary embedded tags and with standard Web graphics.

[0100] The System.

[0101] A preferred embodiment of the system **100** is provided.

[0102] HTML parsing subsystem **610** parses through an HTML document and searches for proprietary tags. If it finds a proprietary tag it hands it to a media caching subsystem **620** for further processing. The media caching subsystem **620** returns a standard HTML tag. The HTML parsing subsystem **610** then replaces the proprietary tag it found with the returned tag. The parsing subsystem **610** then continues searching for a next proprietary tag, repeating the process herein above. The process is finished when no more proprietary tags can be found.

[0103] The media caching subsystem **620** determines if an image has been created for the requested proprietary tag. If the image has already been created and the files that built that image have not been modified, the media caching subsystem **620** returns an HTML tag that refers to a previously-generated image. If the image has not been created, the media caching subsystem **620** hands the HTML tag to a media creation subsystem **630** The media creation subsystem **630** returns an image to the media caching subsystem **620**. The media caching subsystem **620** adds the created image and the HTML tag to a media cache database **640**.

[0104] The media cache database **640** contains references to the created images **645**. In a preferred embodiment, the references are the script used to create the image, the names of the images used to create the image, the dates of those files, and the HTML that represents the created image. The media caching subsystem **620** performs lookups in this database to determine if the image has been created. If the image has not been created the media caching subsystem **620** calls upon the media creation subsystem **630** to create the image and then store the results in the media cache database **640**.

[0105] The media creation subsystem **630** takes a proprietary tag from the media caching subsystem **620** and generates an image. The image is generated by deciphering the tag and handing it to the media processing engine **650**. After the image is created, the media creation subsystem returns the name of the newly created image to the media caching subsystem **620**.

[0106] The media processing engine **650** interprets the proprietary tag and generates the image. The media processing engine **650** looks up images in a media repository to obtain the location of the original file.

[0107] The media repository **660** contains original images **665** used in the system **100**.

[0108] **FIG. 7** is a schematic diagram showing the process flow of a proprietary enabled page delivered to a Web browser according to a preferred embodiment of the invention. An original media **200** is created. The media **200** is placed into the system **100** in the media repository **660**. Similarly, an HTML document with proprietary tags **300** is created and placed on a Web server **110**. A user requests a Web page from a Web browser **120**. The Web server **110** passes the requested page to an HTML parser **610**. The HTML parser **610** parses HTML looking for media tags. The parser **610** looks up media tags in a media tags database **640**. If the media tag is found, then the system **100** produces a modified HTML document **230**. Otherwise, the media creation subsystem **630** uses the media tag to generate a Web media **220**. The generated Web media **220** is placed in a media cache subsystem **620**. The proprietary media tag is converted by a converter **700** to a standard HTML tag that refers to the generated media **220** in cache. The media tag and the HTML equivalent are stored in the media tags database **640**. Media tags are replaced by standard HTML equivalent to provide a modified HTML document **230**. The modified HTML document **230** is delivered to the Web server **110**. The Web server **110** delivers the modified HTML document **230** to the browser **120** via the Internet for a user to view.

[0109] **FIG. 8** is a flow chart showing an authoring process according to a preferred embodiment of the invention. The process starts (**800**) when a user adds an original graphic to the system (**810**). The user then creates an HTML document that contains proprietary media tags (**820**). The user then places the HTML document on a Web server (**830**) and ends the authoring process (**840**).

[0110] **FIG. 9** is a flow chart showing an HTML parsing process according to a preferred embodiment of the invention. The process starts (**900**) when a consumer requests a Web page (**910**). A Web server hands the request of the Web page to the system (**920**). The system parses the Web page

6

(930). The system looks for a media tag (940). If found, the system retrieves the HTML equivalent of the media tag (950) and replaces the media tag with the HTML equivalent (960). The system continues parsing the Web page for tags (970) by returning to step (940). When no more tags are found, the system delivers the modified Web page to the Web server (980) and therein ends the process (990).

[0111]   FIG. 10 is a flow chart showing a media creation process according to a preferred embodiment of the invention. The process starts (1000) when the system requests an HTML equivalent to a proprietary media tag (1010). The Media tag is combined with bandwidth information (1020). The subsystem checks if the media tag already exists in the media tag database (1030). If It does, the subsystem checks if any of the original assets used to create the media have been changed (1040). If not, then the subsystem retrieves the HTML equivalent tag from the database (1050) and returns the HTML equivalent tag to the requesting system (1060). If any of the original assets used to create the media have been changed (1040), then the subsystem removes the media tag

entry from the media database (1070) and creates the media using the media tag (1080). The subsystem then stores the media in a media cache (1090). The subsystem generates the HTML referring to the generated media (1100) and places the media tag and the HTML equivalent in the media tag database (1110). The HTML equivalent is returned to the requesting system (1060) and the process stops (1120).

[0112]   The differences between using HTML and the proprietary tags disclosed herein are noted. HTML allows Web designers to create Web page layouts. HTML offers some control of the images. HTML allows the Web designer to set the height and width of an image. However, all of the other image operations disclosed herein are supported by the claimed invention and are not supported by HTML.

[0113]   Table A herein below provides the claimed proprietary tags according to a preferred embodiment of the invention. The use of the term "freeride" refers to an internal code name for the invention.

TABLE A

| Tags |
|---|
| Generate image |
| <freerideimage> mediascript </freerideimage> |
| Generate a standard Web image. |
| Generate thumbnail image linked to full image |
| <freerideimagethumbnail> mediascript <xs=size ys=size /freerideimagethumbnail> |
| Generate a thumbnail of specified size and link it to the full size version. |
| Generate zoom and pan image |
| <freerideimagezoom> mediascript </freerideimagezoom> |
| Generate a zoomable/panable image. |
| Security |
| <freerideimagesecure> </freerideimagesecure> |
| Specifies that all images found between these tags are secured images and the system will determine access before generating. |

[0114]   Table B herein below provides the claimed script commands according to a preferred embodiment of the invention. Additional commands may be added as needed.

TABLE B

| Media processing script commands |
|---|
| Add Noise |
| Noise__AddNoise( [amount=<value 1..999>] [gaussian] [grayscale] ) |
| This command adds noise to the image. |
| Adjust HSB |
| AdjustHsb([hue @ <value ±255>] [saturation @ <value ±255>] [brightness @ <value ±255>] |
| This command allows the HSB of an image to be altered. This can be applied to images of all supported bit-depths. |
| Adjust RGB |
| AdjustRgb( [brightness @ <value ±255>] [contrast @ <value ±255>] [red @ <value ±255>] |
| [green @ <value ±255>] [blue @ <value ±255>] [noclip @ <true, false>] [invert @ <true, false>] ) |
| This command allows the contrast, brightness, and color balance of an image to be altered. |
| Blur |
| Blur( radius @ <value 0..30>) |
| This command applies a simple blur filter on the image. |
| Blur Convolve |
| Blur__Blur( ) |
| This command commands perform a simple 3×3 convolution for blurring. |
| Blur Convolve More |
| Blur__MoreBlur( ) |
| This command commands perform a stronger 3×3 convolution for blurring. |
| Blur Gaussian |
| Blur__GaussianBlur( [radius=<value 0.1..250>] ) |

TABLE B-continued

Media processing script commands

This command applies a Gaussian blur to the image.
Blur Motion
Blur_MotionBlur( [distance=<value 1..250>] [angle=<degrees>] )
This command applies motion blurring to the image using the specified distance and angle.
Brush Composite
Composite( source @ {<User-Defined Media Object name>} [x @ <pixel>] [y @ <pixel>]
[onto] [opacity @ <value 0..255> > [color @ <color in hexadecimal>] [colorize @ <true, false>]
[saturation @ <value 0..255>] )
This command composites the specified "brush" (foreground) image onto the current
"target" (background) image.
Colorize
Colorize( color @ <color in hexadecimal> [saturation @ <value 0..255>] )
This command changes the hue of the pixels in the image to the specified color.
Convert
Convert( rtype @ <bit-depth> {dither @ <value 0..10>} )
This command converts the image to the specified type/bit-depth.
Convolve
Convolve( Filter @ <filtername> )
This command applies a basic convolution filter to the image. In a user interface driven
system, the filters could be stored in files and edited/created by the user.
Crop/Resize Canvas
Crop( [xs @ {<pixels>, <percentage + "%">}] [ys @ {<pixels>, <percentage + "%">}] [xo @ <left
pixel>]
[yo @ <top pixel>] [padcolor @ <color in hexadecimal>] [padindex @ <value 0..255>] )
This command crops the media to a specified size.
Discard
Discard( )
This command removes the designated Media Object from memory.
Drop Shadow
DropShadow( [dx @ <pixels>] [dy @ <pixels>] [color @ <color in hexadecimal>] [opacity @ <value
0..255>] [blur @ <value 0..30>] [enlarge @ <true, false>] )
This command adds a drop shadow to the image based on its alpha channel.
Equal
Equal( source @ {<User-Defined Media Object name>})
This command compares the current media with the one specified. If the media are different
in any way, an error value is returned.
Equalize
Equalize( [brightness @ <−1, 0..20>] [saturation @ <−1, 0..20>])
This command equalizes the relevant components of the media. Equalization takes the
used range of a component and expands it to fill the available range.
Export Channel
ExportGun( Channel @ <channelname> )
This command exports a single channel of the source as a grayscale image.
Find Edges
Stylize_FindEdges( [threshold=<value 0..255>] [grayscale] [mono] [invert] )
This command finds the edges of the image based on the specified threshold value.
Fix Alpha
FixAlpha( )
This command adjusts the RGB components of an image relative to its alpha channel.
Flip
Flip( <horizontal, vertical> @ <true, false> )
This command flips the media vertically or horizontally.
Frame Add
FrameAdd( Source @ <filename> )
This command adds the given frame(s) to the specified Media Object.
Glow/Halo
Glow( Size @ <value 0..30> [halo @ <value 0..size>] [color @ <color in hexadecimal>]
[opacity @ <value 0..255] > [blur @ <value 0..30>] [enlarge @ <true, false>] )
This command produces a glow or halo around the image based on the image's alpha.
High Pass
Other_HighPass( [radius=<value 0.1..250>] )
This command replaces each pixel with the difference between the original pixel and a
Gaussian blurred version of the image.
Import Channel
ImportGun( channel @ <channel name> source @ {<User-Defined Media Object name>}
[rtype @ <bit-depth>])
This command imports the specified source image (treated as a grayscale) and replaces
the selected channel in the original.
Load
Load( Name @ <filename> [type @ <typename>] [transform @ <true, false>] )
This command loads a media from the specified file.
Maximum
Other_Maximum( [radius=<value 1..10>] )
This command scans the area specified by the radius surrounding each pixel, and then

US 2002/0078093 A1

Jun. 20, 2002

8

TABLE B-continued

Media processing script commands

replaces the pixel with the brightest pixel found.
Minimum
Other_Minimum( [radius=<value 1..10>] )
This command scans the area specified by the radius surrounding each pixel, and then
replaces the pixel with the darkest pixel found.
Normalize
Normalize( [clip @ <value 0.20>] )
This command expands the volume of the sample to the maximum possible.
Pixellate Mosaic
Pixellate_Mosaic( [size=<value 2..64>] )
This command converts the image to squares of the specified size, where each square
contains the average color for that part of the image.
Pixellate Fragment
Pixellate_Fragment( [radius=<value 1..16>] )
This command produces four copies of the image displaced in each direction (up, down,
left, right) by the specified radius distance and then averages them together.
Quad Warp
QuadWarp( [tlx=<position>] [tly=<position>] [trx=<position>] [try=<position>] [blx=<position>]
[bly=<position>] [brx=<position>] [bry=<position>] [smooth] )
This command takes the corners of the source image and moves them to the specified
locations, producing a warped effect on the image.
Reduce to Palette
Reduce( [colors @ <enum colors>] [netscape @ <true, false>] [b&w @ <true, false>]
[dither @ <value 0..10>] [dithertop @ <value 0..10>] [notbackcolor] [pad @ <true, false>] )
This command applies a specified or generated palette to the image.
Rotate
Rotate( Angle @ <value 0..359> [smooth @ <true, false>] [enlarge @ <true, false>] [xs @
<pixels>]
[ys @ <pixels>] )
This command rotates the media by the specified angle in degrees.
Rotate 3D
Rotate3d( [anglex @ <angle ±89>] [angley @ <angle ±89>] [distance @ <value>] )
This command rotates the image in 3D about either the x-axis or y-axis.
Save
Save([type @ <image-type>])
This command saves a media to the specified file.
Scale
Scale( [xs @ {<pixels>, <percentage + "%">}] [ys @ {<pixels>, <percentage + "%">}]
[constrain @ <true, false>] [alg @ {"fast", "smooth", "outline"}] [x1 @ <pixels>] [y1 @ <pixels>]
[x2 @ <pixels>] [y2 @ <pixels>] )
This command scales the image to the specified size.
Select
Selection( [source @ <User-Defined media Object>}] [remove @ <true, false>] [invert @ <true,
false>]
[backcolor] [color=<color>] [index=<value>] [opacity @ <value 0..255>] )
This command manages the selected region for the current Media Object.
Set Color
SetColor( [backcolor @ <color in hexadecimal>] [forecolor @ <color in hexadecimal>]
[backindex @ <value 0..255>] [foreindex @ <value 0..255>] [transparency @ ("on","off")] )
This command allows the background color, foreground color, and transparency state of an
image to be set.
Set Resolution
SetResolution( [dpi @ <value>] [xdpi @ <value>] [ydpi @ <value>] )
This command changes the DPI of the image in memory.
Sharpen
Sharpen_Sharpen( )
This command sharpens the image by enhancing the high-frequency component of the
image.
Sharpen More
Sharpen_SharpenMore( )
This command sharpens the image by enhancing the high-frequency component of the
image, but is stronger than the standard sharpening.
Stylize Diffuse
Stylize_Diffuse( [radius=<value 0..>] [lighten] [darken] )
This command diffuses the image by randomizing the pixels within a given pixel radius.
Stylize Emboss
Stylize_Emboss( [height=<value 1..10>] [angle=<degrees>] [amount=<percentage 1..500>])
This command converts the image to an embossed version.
Text Drawing
DrawText( Text @ <string> Font @ <font file> [size @ <value>]
[color @ <color in hexadecimal>] [smooth @ <true, false>] [<left, right, top, bottom> @ <true,
false>]
[x @ <pixel>] [y @ <pixel>] [wrap @ <pixel-width>] [justify @ {left,center,right}] [angle @ <angle>])
This command composites the specified text string onto the image.

US 2002/0078093 A1                                                                                 Jun. 20, 2002

9

TABLE B-continued

Media processing script commands

Text Making
MakeText( text @ <string> font @ <font file> [path @ <path to font directory>] [size @ <value 1..4095>]
[color @ <color in hexadecimal>] [smooth @ <true, false>] [wrap @ <pixel-width>]
[justify @ {left,center,right}] [angle @ <angle>] )
This command creates a new image that includes only the specified text.
Trace Contour
Stylize__TraceContour( [level=<value 0..255>] [upper] [invert] )
This command traces the contour of the image at the specified level (for each gun).
Unsharpen Mask
Sharpen__UnsharpMask( [amount=<percentage 1..500>] [radius=<value 0.1..250>]
[threshold=<value 0..255>] )
This command enhances the edges and detail of an image by exaggerating differences
between the image and a gaussian blurred version of the same image.
Zoom
Zoom( [xs @ <pixels>] [ys @ <pixels>] [scale @ <value>] [x @ <left pixel>] [y @ <top pixel>] )
This command zooms in on a specified portion of the media and fits it to the specified size.
This constitutes a crop followed by a scale.

[0115]   Table C herein below provides a list of features provided by a preferred embodiment of the invention. It is noted that the list of features included in Table C is by no means complete. In other embodiments, the list of features is expanded or reduced as needed.

[0118]   Snowboard Store Example.

[0119]   Background.

[0120]   The snowboard store highlights several features of the claimed system. The snowboard store is an imaginary

TABLE C

System Feature List

Reads and writes various file formats:
    BMP, GIF, JPG, PNG, TIF, PICT, TGA, PSD, FPX;
Supports many image processing operations;
Dynamically creates Web images from original assets;
Dynamically creates thumbnail images;
Dynamically creates images that can be panned and zoomed without browser plug-ins or special
file formats;
Automatically propagates changes of original assets throughout a Web site;
Uses an intelligent caching mechanism:
    Clean up image cache on demand;
    Eliminates orphaned image files; and
    Optimizes Web server cache by providing most recent images;
Renders TrueType fonts on the server instead of browser;
Uses intelligent scaling of line drawings;
Allows Web designers to manipulate images with proprietary tags;
Preserves original image assets;
Optimizes Web server traffic by adjusting the bandwidth of graphics;
Optimizes images for client connection speed;
Allows clients to specify the quality of images on a Web site; and
Allows Web designers to dynamically create images by manipulating proprietary tags in their
applications (server or client side).

[0116]   FIG. 11 is a screen shot showing an administration tool according to a preferred embodiment of the invention. Specifically, FIG. 11 shows an administration page that contains cached images of generated scripts. The use of the term "freeride" refers to an internal code name for the invention.

[0117]   FIG. 12 displays a structure of a database record used for the system according to a preferred embodiment of the invention. A Script Table 1200 has 5 columns, Media Script 1210, HTML Equivalent 1220, Bandwidth 1230, Generated File 1240, and Dependency List 1250. A Dependency Table 1260 has two columns, File Name 1270 and Modification Date 1280.

store that allows a user to configure his or her snowboard. The store consists of five logos, five board colors, and four boards. The consumer clicks on the buttons to change the snowboard represented in the middle of the screen. When the consumer has configured the snowboard they the snowboard can be purchased by selecting a buy button.

[0121]   Prior Art Method.

[0122]   To create the snowboard site today, the Web designer must render all possible combinations of the board. The number of combinations is five logos×five board colors×four boards=100. The designer also must render all the buttons. The creation process is very tedious and involves a lot of production work. Typically, most Web sites do not

US 2002/0078093 A1

Jun. 20, 2002

10

even attempt such an endeavor. Also, other issues must be addressed, such as, for example, updating the Web site and scripting. For example, updating a single logo involves updating a minimum of 20 images.

[0123]   The prior art method sustains a graphic intensive site that requires management of at least 100 images. Updates to the Web site are time-consuming and prone to human error.

[0124]   The Claimed Method.

[0125]   A preferred embodiment of the method scripts the image creation process in HTML to create a dynamic Web site. There is no need to create over 100 images. The claimed system generates images on demand. The Web site only needs to create original assets. The scripting process involves writing the proprietary scripts. In the current example herein, scripting buttons is very simple. Once one button is created, simply copy and paste the HTML to create another button or many buttons. Only the name of the image to be overlaid on the button must be changed. The Webmaster then creates a simple program that reads what object a user has clicked on and generates a proprietary tag. The tag is then sent to the claimed system to generate a center image.

[0126]   The claimed method allows the creation of all 100 combinations automatically. When the Web site receives an updated image, only the original image needs to be updated. Any change to the original image automatically propagates throughout the system. The Web site is easier to manage. Testing of the Web site is easier because there is no need to test all 100 combinations. A small subset of combinations will guarantee adequate coverage.

[0127]   Processing of an Image Tag Example (FIG. 13-16).

[0128]   FIG. 13 shows two original images 1300 and 1310 to be processed according to a preferred embodiment of the invention.

[0129]   FIG. 14 shows a portion on an HTML document with a proprietary tag 1400, <freerideimage></freerideimage> according to a preferred embodiment of the invention. The use of the term "freeride" refers to an internal code name for the invention.

[0130]   FIG. 15 shows an HTML document 1500 as viewed in a browser and an HTML document source 1510, according to a preferred embodiment of the invention. The use of the term "freeride" refers to an internal code name for the invention.

[0131]   FIG. 16 shows a generated GIF image 1600 according to a preferred embodiment of the invention.

[0132]   Automatic media delivery system operating in parallel with existing Web site infrastructure.

[0133]   It should be noted that the words, media, graphics, and images are used herein interchangeably.

[0134]   An automatic graphics delivery system that operates in parallel with an existing Web site infrastructure is provided. The system streamlines the post-production process by automating the production of media through content generation procedures controlled by proprietary tags placed within URLs embedded within Web documents. The author simply places the original media in the system, and adds proprietary tags to the URLs for accessing that media. The

system automatically processes the URL encoded tags and automatically produces derivative media for the web site from the original media.

[0135]   The system takes as input the client connection, server traffic, content generation procedures, and proprietary tags placed within the URL to generate optimized media for the client. The need for the Web author to create different versions of a Web site is reduced because the image content of the site is automatically handled by the system. In addition, the generated media is cached so that further requests for the same media require little overhead.

[0136]   Because the invention takes the original media, content generation procedures, and proprietary URL tags as inputs for generating the Web media, it is possible to modify any of these inputs and have the system automatically update the media on the associated Web pages.

[0137]   A preferred embodiment of the invention is described with reference to FIG. 17. FIG. 17 is a schematic diagram of an image system within a typical Web infrastructure according to the invention. The image system 100 is placed in parallel to an existing Web server 110. The image system 100 may be on-site or off-site to the Web infrastructure. Multiple client browsers 120a-120d communicate with both the Web server 110 and the image server 100 via the Internet 130.

[0138]   The delivery of an HTML document and media according to a preferred embodiment of the invention is described with reference to FIG. 18. Resource locators (URLs) are placed within HTML documents 301 accessible to the Web server 110. These URLs direct browsers to generate requests for media to the system 100. The system processes such URLs by interpreting the proprietary tags, executing the indicated image generation procedures on the original media 200, and returning derivative Web-safe media to client browsers 120a-120d via the Internet 130. Additionally, such generated media is cached on the image server 100 and, therefore need not be regenerated for subsequent requests.

[0139]   Web site administration according to another preferred embodiment of the invention is described with reference to FIG. 19. FIG. 19 is a schematic diagram showing the components of Web site administration according to a preferred embodiment of the invention, whereby Web site administration is simplified. The preferred embodiment provides, but is not limited to the following services: asset management, automatic image manipulation, automatic image conversion, automatic image upload, automatic image customization based on browser characteristics, automatic disk management, automatic control of proxy caching, and image delivery 501.

[0140]   FIG. 20 is a simple overview showing components of the system according to a preferred embodiment of the invention. HTML pages with proprietary URL tags 301 describe how referenced media therein is to be manipulated for Web. Browsers 120 send such tags to the image system 100 as media requests. A server 2000 within the image system 100 receives the media requests, decodes the URL tags, and retrieves any media that already exists in the media caching system 2010. Non-existent media is subsequently generated by a media creation system 2020 using original media 2050 stored in a media repository 2040 and using content generation procedures 2030.

[0141]    The Image System.

[0142]    Following is a detailed description of the preferred embodiment of the invention with reference to FIG. 21 below.

[0143]    The system receives a request for media through a URL containing proprietary tags for controlling image generation. The system parses this URL to determine the content generation procedure to execute, input to the content generation procedure, post-processing directives for, for example, zoom/pan/slice, browser properties, and any cache control directives. Such data is handed to a media caching subsystem that returns the requested image if found. If the image is not found, the information is handed to the media generation subsystem that executes the specified content generation procedure to produce a derivative image. The media generation subsystem returns one or more images to the media caching system for subsequent reuse.

[0144]    The media caching subsystem is a mechanism for associating final or intermediate derivative media with the procedure, input, and user characteristics used to generate said media, specified through proprietary tags within the requested URL. This system may be implemented using a database, file system, or any other mechanism having capability to track such associations.

[0145]    The media generation subsystem executes a primary content generation procedure to produce a derivative image whose identifier is provided to the media caching subsystem. This derivative image is composed of one or more original images acquired from the media repository. This media is then passed to the dynamic image content system, if necessary, to generate a subsequent derivative media suitably modified for the needs of zooming, panning, or slice. The resulting media is passed to the user profile system where it is again modified to account for any specific user browser characteristics specified using the proprietary URL tags. This media is then returned to the browser, along with any cache control directives encoded within the URL, and its identifier is passed to the media caching system for subsequent retrieval.

[0146]    The dynamic content system operates on intermediate derivative images to generate image subsets or scalings used by Web site designers to implement zooming in on an image, panning across an image, slicing an image into parts, and the like for special Web page effects. The input to this system is cached by the media caching system such that the intermediate image need not be regenerated.

[0147]    The user profile system operates on the final image about to be returned to the browser and may modify the image to account for individual needs of Web site users. The designer of a site is able to implement freely custom post-processing of images to meet the specific needs of their clients.

[0148]    FIG. 21 is a schematic diagram showing the process flow of a proprietary enabled page delivered to a Web browser according to a preferred embodiment of the invention. Original media 200 is created and placed into the system 100 in a media repository 2040. A content generation procedure 2140 is created with instructions on how the media is to be transformed to create the desired Web page content. An HTML page 301 is created for the Web site comprising the system 100, the page containing one or more

URLs directing a browser 120 to request the specified content generation procedure 2140 from the system 100 using input parameters specified with proprietary tags encoded within the URL. The browser 120 requests the Web page 301 from the Web site 110. Upon receipt of the page 301, the browser contacts the system 100 requesting media specified in the URL. The system parses the URL 2100 to determine the content generation procedure 2140 to execute, any corresponding input parameters to be used by such procedure, any dynamic content processing 2150 to be performed by dynamic media procedures, any user profile information 2160 to be used to modify the resulting image, and any cache control HTTP headers 2190 the site instructs to accompany the resulting image.

[0149]    The parser generates a unique primary lookup key 2110 for the specified resulting media. If the key corresponds to an existing generated media 2180, such media is returned immediately to the browser 120 through a media cache 2120, and the transaction is complete. Otherwise, a media generation occurs. In the case of media generation requiring dynamic content processing, a unique secondary lookup key corresponding to intermediate media is generated 2130. If intermediate media 2170 corresponding to this key is found, such media is passed directly to the dynamic media content system 2150 having dynamic media procedures, wherein appropriate action is taken to generate the required derivative from the intermediate media data. A unique key is generated for the derivative 2130 and passed to the media caching system 2120. If the media caching system finds no such intermediate image, such intermediate image is generated according to instructions specified by the content generation procedure, cached by the media cache system 2120 as a secondary cached media 2170, and passed to the dynamic media system 2150. Again, appropriate action is taken to generate the required derivative from the intermediate image data.

[0150]    The resulting image after any dynamic media processing is complete, is checked to ensure that the image is in a valid Web image format. If not, the image is automatically converted into a valid format.

[0151]    The final media is passed to a user profile system 2160 wherein browser characteristics specified through proprietary tags within the URL are inspected, and appropriate modification to the media is performed, based on such characteristics. The resulting image is handed to the media cache system 2120 for caching and returned to the browser 120.

[0152]    FIG. 22 shows a flowchart of the content generation procedure according to a preferred embodiment of the invention. A URL containing proprietary tags (2200) is parsed (2210) to determine the content generation procedure to execute, any dynamic modifications to the media, user profile characteristics, and proxy-cache control. A unique final lookup key is generated for the media (2220) and the media cache is checked (2230). If the indicated media exists, control passes to proxy-cache control (2290) and the media is delivered to the browser (2295). Otherwise, dynamic media system tags are separated from content generation control tags (2240) and a unique intermediate image lookup key is generated (2250). The cache is then checked for such intermediate media (2261). If such intermediate media is found, it is used directly for dynamic processing, if required.

Otherwise, content is generated (2262) and cached (2263), and the result is evaluated for dynamic processing (2270). If dynamic processing is required, the media is operated upon by the dynamic content generator (2271), otherwise it is evaluated for valid content type (2272). If the content type is invalid, the media is automatically converted to a valid type (2273). The resulting image is then customized by the user profiling system (2280) for specified browser or client attributes. Finally, any cache-control directives specified are attached to the response (2290) and the media is delivered to the browser (2295).

[0153] FIG. 23 is a flow chart showing an authoring process according to a preferred embodiment of the invention. The process starts (2300) when a user adds an original graphic or other media (2310) to the system. The author then creates a content generation procedure (2320) containing instruction on how the original media should be processed to generate the desired Web page content. The user then creates an HTML document (2330) that refers to that image by using a URL pointing to a content generation procedure on the image server. The system ends (2340). The authoring subsystem assists the Web site designer with choosing parameters and with designing the content generation procedure such that the desired Web site graphic is obtained.

[0154] It should be appreciated that differences exist between specifying an image with a URL and requesting an image using a content creation process that interprets proprietary parameters encoded within a URL. That is, URLs allow Web site designers to load specific graphic images into a Web page. In contrast and according to the invention, URLs containing proprietary content creation tags initiate a process whereby graphic images for a site are automatically produced.

[0155] Table D below is a list of example proprietary URL tags used for content generation within the system according to the preferred embodiment of the invention. Additional tags may be added to the system as necessary.

TABLE D

| Tags |
| --- |
| f=function |
|     Names the content creation procedure used to generate all or part of the desired graphic. |
| args=arguments |
|     Supplies page dependent parameters used to control the content creation procedure from within the Web page. |
| cr=crop rectangle |
|     Specifies that portion of the image generated by the content generation procedure to be returned to the browser. |
| st=slice table |
|     Specifies a rectangular grid to be placed over the image produced by the content generation procedure, each portion of which can be returned to the browser. |
| sp=slice position |
|     Specifies that portion of the slice table grid placed over the image generated by the content creation procedure to be returned to the browser. |
| is=image size parameter |
|     Specifies scale factors to be applied to any portion of an image generated by any combination of a content generation procedure, arguments, crop rectangles, slice tables, and slice positions. |
| p=user profile string |
|     Specifies a user profile identifier used to modify the final image prior to returning the image to the browser, thus allowing clients to modify the image returned to the browser to account for individual browsing conditions. |
| c=cache control |
|     Specifies a proxy-cache control string to accompany the returned image within an HTTP header. |

[0156] Table E below is a list of example supported content creation commands according to a preferred embodiment of the invention. Additional commands may be added as necessary.

TABLE E

| Content Creation Commands |
| --- |
| Adjust HSB |
|     Allows the HSB of an image to be altered. |
| Adjust RGB |
|     Allows the contrast, brightness, and color balance of an image to be altered. |
| Colorize |
|     Alters the hue of the pixels in the image to that of the specified color. |
| Brush Composite |
|     Composites the specified brush image onto the current target image. |

TABLE E-continued

Content Creation Commands

Convert
    Converts the rasters to the specified type/bit-depth.
Crop
    Crops the media to the specified size.
Dropshadow
    Adds a drop shadow to the image, based on the alpha-channel.
Equalize
    Performs an equalization on the relevant components of the media.
FixAlpha
    Adjusts the RGB components of an image relative to its alpha-channel.
Flip
    Flips the media vertically or horizontally.
Glow
    Produces a glow or halo around the image
Load
    Loads in a media from the specified file.
Normalize
    Similar to equalize, but for audio.
Reduce
    Reduces the image to a specified palette.
Rotate
    Rotates the media clockwise by the specified angle in degrees.
Save
    Saves the media to the specified file.
Scale
    Scales the media to the specified size.
SetColor
    Allows the background color, foreground color, and transparency state of the media to be set.
Text Drawing
    Composites the specified text onto the image.
Text Making
    This command, instead of compositing text onto the target, creates a new image that just
    encloses the text.
Zoom
    Zooms in on a specified portion of the media, and fits it to the specified size. Effectively this
    constitutes a crop followed by a scale.

[0157]    Table F below lists comprises some, and is not limited to all major features of a preferred embodiment of the invention. Additional features may be added as necessary.

TABLE F

System Features

Reads and writes various file formats;
Supports many image processing operations;
Dynamically creates Web images from original assets;
Dynamically creates thumbnail images;
Dynamically and efficiently creates images that can be panned, zoomed, or sliced from original assets
without Browser plugins;
Automatically propagates changes in original assets throughout the Web site;
Uses an intelligent caching mechanism for both final and intermediate graphics, comprising:
    Clean up cache on demand;
    Eliminates orphaned Web files; and
    Optimizes Web server cache by providing most recent images;
Renders True-Type fonts on server instead of browser;
Uses intelligent scaling of line drawings;
Allows Web designers to manipulate images using a combination of content generation procedures and
proprietary URL tags;
Preserves original image assets;
Optimizes Web server traffic by adjusting the bandwidth of graphics;
Optimizes images for client connection speed;
Allows clients to specify the quality of images on a Web site:
Allow site-specific customized image optimizations for a variety of purposes; and
Allows Web designers to dynamically create images by manipulating proprietary URL tags in
applications.

[0158] Accordingly, although the invention has been described in detail with reference to a particular preferred embodiment, persons possessing ordinary skill in the art to which this invention pertains will appreciate that various modifications and enhancements may be made without departing from the spirit and scope of the claims that follow.

1. A method for generating and delivering Web page content comprising media, said method comprising:

parsing a URL containing proprietary tags to determine:

a content generation procedure to execute and corresponding input to said procedure;

dynamic modifications to perform on said media;

user profile characteristics; and

proxy-cache control;

generating a unique final lookup key for said media;

checking a media cache, using said final lookup key;

if said media exists in said media cache, then

passing control to said proxy-cache control; and

delivering said media;

if said media does not exist in said media cache, then

separating dynamic media system tags from content generation control tags; and

generating a unique intermediate image lookup key;

checking said media cache using said intermediate image lookup key;

if said intermediate media exists in said media cache, then

using said intermediate media for further processing;

if said intermediate media does not exist in said media cache, then

generating and caching said media, using said intermediate image lookup key;

determining if dynamic processing is required and, if affirmative, then

operating upon said media by a dynamic content generator;

determining if content type is valid and, if negative, then

converting said media automatically to a valid type;

customizing said media for specified browser or client attributes using a user profiling system;

attaching any specified cache-control directives to a response; and

delivering said media.

2. The method of claim 1, wherein dynamic processing comprises directives for zoom, pan, slice, and the like.

3. A method for an end user to generate Web page content comprising media, said method comprising:

adding original media to an image system;

creating a content generation procedure containing instruction for processing said original media for said Web page content; and

creating an HTML document referring to said processed media by using a URL pointing to said content generation procedure on said image system.

4. The method of claim 3, further comprising:

providing an authoring subsystem, said subsystem assisting with choosing parameters and with designing said content generation procedure.

5. An apparatus for generating Web-safe media, using an HTML page having a URL, said URL having encoded proprietary tags, said apparatus comprising:

a server for receiving media requests and delivering said Web-safe media;

a media repository for storing original media;

a content generation procedure containing instructions for transforming said original media into said Web-safe media;

a URL tag parser for determining:

said content generation procedure to execute and any corresponding input parameters to be used by said procedure for generating a primary media to be cached;

dynamic content processing to be performed, if necessary by dynamic media procedures;

user profile information, if any to be used for modification of a resulting image; and

cache control HTTP headers, if any to accompany said resulting image;

a unique primary lookup key generated by said parser and associated with said primary cached media, wherein said primary cached media, if existing, is delivered as said Web-safe media through a media cache; and

a unique secondary lookup key corresponding to intermediate media requiring said dynamic media processing by said dynamic media procedures, thereby generating corresponding derivative intermediate media, and said unique secondary lookup key corresponding to said derivative intermediate media stored in a secondary media cache.

6. The apparatus of claim 5, wherein any of said original media, said content generation procedure, and said proprietary URL tags are modified, thereby rendering an automatically updated Web-safe media.

7. The apparatus of claim 5, wherein said apparatus is configured in parallel to a Web server infrastructure, said existing Web server infrastructure providing said media requests.

8. The apparatus of claim 7, wherein said apparatus is configurable to work either on-site or off-site to said Web server infrastructure.

9. The apparatus of claim 5, wherein said primary cached media is composed of one or more original media images acquired from said media repository.

10. The apparatus of claim 5, wherein said derivative intermediate media is suitably modified for the needs of zooming, panning, slicing, or the like.

11. An apparatus for delivering an HTML document and derivative Web-safe media, comprising:

US 2002/0078093 A1

15

Jun. 20, 2002

means for placing within said HTML document universal resource locators, herein referred to as URLs, said URLs having proprietary tags, and said HTML document accessible to a Web server by a browser;

means for through a browser said URLs generating a request for media from an image system;

means for said image system:

processing said URLs by interpreting proprietary tags;

executing an image generation procedure on said media, said procedure indicated within said tags; and

returning derivative Web-safe media and said HTML document.

**12**. The apparatus of claim 11, wherein said generated media is cached on said image system, and, whereby upon subsequent requests for said cached media, said image system retrieves and delivers said cached media.

**13**. The apparatus of claim 11, wherein original media is stored in a media repository.

\*  \*  \*  \*  \*

# EXHIBIT 6

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

**AKAMAI TECHNOLOGIES, INC.,**

Petitioner,

**v.**

**EQUIL IP HOLDINGS LLC,**

Patent Owner.

_____

Case IPR2023-00330

U.S. Patent No. 8,495,242

_____

**PETITION FOR *INTER PARTES* REVIEW**

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

## TABLE OF CONTENTS

EXHIBIT LIST ................................................................................................. iv

CHALLENGED CLAIM ................................................................................... vi

I.      INTRODUCTION ...................................................................................1

II.     MANDATORY NOTICES ......................................................................3

        A.      Real Parties-in-Interest ................................................................3

        B.      Related Matters ............................................................................3

        C.      Counsel and Service Information: ...............................................4

III.    PAYMENT OF FEES ..............................................................................5

IV.     REQUIREMENTS FOR *INTER PARTES* REVIEW ...................................5

        A.      Grounds for Standing ..................................................................5

        B.      Identification of Challenge ..........................................................5

                1.      Specific Art on Which the Challenge is Based ...................5

                2.      Statutory Grounds on Which the Challenge is Based ................6

V.      '242 PATENT AND PROSECUTION HISTORY ........................................6

        A.      '242 Patent ...................................................................................6

        B.      Prosecution History of the '242 .................................................7

VI.     §325(d) AND §314(a) DISCRETION DO NOT APPLY ...........................8

        A.      §325(d) .........................................................................................8

        B.      §314(a) .........................................................................................9

VII.    LEVEL OF ORDINARY SKILL .............................................................10

VIII.   CLAIM CONSTRUCTION .....................................................................10

IX.     GROUNDS OF UNPATENTABILITY .......................................................11

        A.      Ground 1: Tso in view of Huang ...............................................11

                1.      Tso ...................................................................................11

                2.      Huang and Motivation to Modify Tso with Huang's Teachings ........................................................................15

                3.      Claim Chart .....................................................................21

        B.      Grounds 2/3: Samaniego ...........................................................41

i

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

|   | 1. | Samaniego | 41 |
|   | 2. | PO Intentionally Changed Inventorship | 43 |
|   | 3. | Claim Chart | 44 |
| C. | | Ground 4: Samaniego in View of Tso | 53 |
| X. | | SECONDARY CONSIDERATIONS | 56 |
| XI. | | CONCLUSION | 56 |

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '009 | U.S. Patent No. 6,964,009 |
| '009 FH | File History of U.S. Application No. 09/929,904 |
| '046 FH | File History of U.S. Application No. 12/173,747 |
| '110 FH | File History of U.S. Application No. 12/238,842 |
| '242 | U.S. Patent No. 8,495,242 |
| '242 FH | File History of U.S. Application No. 12/713,637 |
| '575 | U.S. Patent No. 6,792,575 |
| '575 | U.S. Patent No. 6,792,575 |
| '575 FH | File History of U.S. Application No. 09/425,326 |
| '745 | U.S. Patent No. 9,158,745 |
| '916 | U.S. Patent Application No. 11/269,916 |
| '916 FH | File History of U.S. Application No. 11/269,916 |
| Claim | Claim 9 of U.S. Patent No. 8,495,242 |
| Davis | U.S. Patent No. 5,969,716 |
| Delp | U.S. Patent No. 5,420,967 |
| Huang | U.S. Patent No. 6,438,576 |
| IPR | *Inter Partes* Review |
| Petitioner | Petitioner Akamai Technologies, Inc. |
| PO | Patent Owner Equil IP Holdings LLC |
| POSITA | Person of Ordinary Skill in the Art |
| PTAB | Patent Trial and Appeal Board |
| RHI | Receiver Hint Information |
| Samaniego | U.S. Patent Application No. US 2002/0078093 |
| Tso | U.S. Patent No. 6,421,733 |
| USPTO | United States Patent and Trademark Office |

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

## EXHIBIT LIST

| Ex. 1001 | U.S. Patent No. 8,495,242 ("'242") |
|---|---|
| Ex. 1002 | File History of U.S. Application No. 12/713,637 ("'242 FH") |
| Ex. 1003 | Declaration of Vijay K. Madisetti in Support of Petition for *Inter Partes* Review of U.S. Patent No. 8,495,242 |
| Ex. 1004 | U.S. Patent No. 6,421,733 ("Tso") |
| Ex. 1005 | U.S. Patent No. 6,438,576 ("Huang") |
| Ex. 1006 | (Reserved) |
| Ex. 1007 | U.S. Patent Application Publication No. US 2002/0078093 ("Samaniego") |
| Ex. 1008 | U.S. Patent No. 5,420,967 ("Delp") |
| Ex. 1009 | U.S. Patent No. 5,969,716 ("Davis") |
| Ex. 1010 | File History of U.S. Application No. 11/269,916 ("'916 FH") |
| Ex. 1011 | U.S. Patent No. 6,964,009 ("'009") |
| Ex. 1012 | U.S. Patent No. 6,792,575 ("'575") |
| Ex. 1013 | Redline Comparison of specifications from Samaniego and the '242 patent |
| Ex. 1014 | Loralee Stevens, Internet Video Startup Gets $3.5 Million, N. Bay Bus. J. (Apr. 14, 2008), https://web.archive.org/web/20080421191837/www.northbaybusiness journal.com/article/20080414/BUSINESSJOURNAL/19773530/1207 /BUSINESSJOURNAL02 |
| Ex. 1015 | LinkedIn Profile for Chris Samaniego, https://www.linkedin.com/in/chris-samaniego-18b6a01 |
| Ex. 1016 | *Equil IP Holdings LLC v. Akamai Technologies, Inc.*, 1:22-cv-00677 (D. Del. 2022) First Amended complaint (Aug. 3, 2022) |

iv

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Ex. 1017 | (Reserved) |
|---|---|
| Ex. 1018 | (Reserved) |
| Ex. 1019 | (Reserved) |
| Ex. 1020 | Docket Report for Barger-Great South Ventures LLC v. Equilibrium Techs. |
| Ex. 1021 | Redline Comparison of specifications from Samaniego and Publication No. 2006-0265476 of Application No. 11/269,916 |
| Ex. 1022 | (Reserved) |
| Ex. 1023 | (Reserved) |
| Ex. 1024 | (Reserved) |
| Ex. 1025 | (Reserved) |
| Ex. 1026 | File History of U.S. Application No. 12/173,747 ("'046 FH") |
| Ex. 1027 | File History of U.S. Application No. 12/238,842 ("'110 FH) |
| Ex. 1028 | Redline Comparison of specifications from Samaniego and Publication No. 2009-0070485 of Application No. 12/173,747 |
| Ex. 1029 | Redline Comparison of specifications from Samaniego and Publication No. 2009-0089422 of Application No. 12/238,842 |
| Ex. 1030 | (Reserved) |
| Ex. 1031 | (Reserved) |
| Ex. 1032 | (Reserved) |
| Ex. 1033 | (Reserved) |
| Ex. 1034 | File History of U.S. Application No. 09/425,326 ("'575 FH") |
| Ex. 1035 | File History of U.S. Application No. 09/929,904 ("'009 FH") |
| Ex. 1036 | Declaration of Jonathan Bradford |

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

## CHALLENGED CLAIM

[9.pre] A method for accessing dynamically transcoding media content, the method comprising:

[9.a] an act of receiving a request for media content to be delivered to a client presentation system, wherein the requested media content has a limited number of base transcoding profiles associated therewith, each base transcoding profile corresponding to a cached version of the requested media content;

[9.b] at the time of the request, and without input by a network administrator, an act of automatically identifying transcoding parameters to be applied to the requested media content prior to delivery to the client presentation system, wherein identification of transcoding parameters is based on one or more formats of any client presentation system;

[9.c] an act of determining that the transcoding parameters to be applied to the requested media content prior to delivery to the client presentation system are the same as transcoding parameters that are being applied to the requested media content prior to delivery to another client presentation system;

[9.d] an act of transcoding the requested media content in accordance with the identified transcoding parameters, such that the identified transcoding

parameters are used to perform additional incremental transcoding on top of the base transcoding profile;

[9.e] wherein the act of transcoding the requested media content in accordance with the identified transcoding parameters comprises:

an act of selecting a pre-existing base transcoded version of the requested media content comprising intermediate derivative media that has been transcoded in accordance with only a portion of the identified transcoding parameters; and

[9.f] an act of creating a final version by incrementally performing further transcoding of the pre-existing base transcoded version in accordance with a remaining portion of the identified transcoding parameters;

[9.g] an act of delivering the transcoded media content to both client presentation systems concurrently.

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

Pursuant to §§311-319 and §42.1,[1] Akamai Technologies, Inc. ("Petitioner") petitions for *inter partes* review ("IPR") of claim 9 ("Claim") of U.S. Patent No. 8,495,242 (Ex. 1001, "'242"), assigned to Equil IP Holdings LLC ("PO"). Petitioner requests review of the challenged Claim, and judgment finding it unpatentable under §§102 and 103.

## I.    INTRODUCTION

The purported invention of the '242 is a method of automatically transcoding media content. The method uses information about a client's system (*e.g.*, browser attributes) to select and further process a cached version of content and returns that processed version to the client. *See* '242, 20:7-9, 23:45-24:16; Madisetti, ¶35.

Specifically, the challenged Claim recites that a system receives a request for content for which there are cached versions associated with different base "transcoding profiles." When the request is received, the system automatically identifies transcoding parameters to be applied to the content before transmission, based on one or more formats of the client presentation system. Using these

---

[1] Section cites are to 35 U.S.C. (pre-AIA) or 37 C.F.R. as context indicates. All emphasis/annotations added unless noted. Annotations added to the figures herein generally quote the challenged Claim's language for reference. All citations herein are exemplary and not meant to be limiting.

1

parameters, the system takes a base transcoding profile and performs additional incremental transcoding on top of the base profile in order to complete transcoding, and then returns the content to the client and caches the content. Madisetti, ¶36.

When allowing the challenged Claim, the examiner stated that the prior art does not disclose the steps recited in [9.e]-[9.f], which require "selecting a pre-existing base transcoded version" of the content that has been transcoded "with only a portion of the identified transcoding parameters," and "creating a final version by incrementally performing further transcoding" of that "base transcoded version in accordance with a remaining portion of the identified transcoding parameters." Ex. 1002, 824-25; Madisetti, ¶37.

But these features were known in the art. For example, **Tso** (Ex. 1004) discloses using a "GetScaledObject()" call to retrieve a "particular version of that object" that was previously cached. Tso, 6:9-13. **Huang** (Ex. 1005) further discloses performing additional transcoding on top of a partially-rendered intermediate item retrieved from cache to generate a completely rendered version of the content. Huang, 7:23-8:11; Madisetti, ¶¶38-39.

Separately, as an independent ground, in an earlier patent that qualifies as prior art, PO explained the very same transcoding system. In particular, the '242 purports to claim priority to Application No. 09/929,904, which published as Samaniego (Ex. 1007) on 6/20/2002. Samaniego's specification is substantively

identical to the '242 specification. Madisetti, ¶40. But, Samaniego has no common inventors with the '242, and is therefore §102(b) art to Claim 9. The '242's earliest possible priority date is no earlier than 11/7/2005—the filing date of the earliest identified priority application sharing at least one named inventor with the '242 (*see* Ex. 1010, Application No. 11/269,916). PO presented its priority claim and decided not to name Samaniego's inventors as inventors of the '242—despite the requirement of overlapping inventors for a valid priority claim.

As demonstrated herein, the prior art renders Claim 9 unpatentable, which recites nothing more than known processing steps combined to yield predictable results. Madisetti, ¶41.

Petitioner requests that the Board institute trial and find Claim 9 unpatentable.

## II.    MANDATORY NOTICES

### A.    Real Parties-in-Interest

Petitioner Akamai Technologies, Inc. is the real party-in-interest. No other party had access to or control over the present Petition, and no other party funded or participated in preparation of the present Petition.

### B.    Related Matters

Petitioner is concurrently filing IPR petitions challenging claims of related U.S. Patent Nos. 9,158,745 ("'745") (IPR2023-00332) and 6,792,575 ("'575") (IPR2023-00329). There are no other IPRs pending for the '242 or patents related to the '242 beyond those being concurrently filed.

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

The '242 is the subject of the following co-pending civil action: *Equil IP Holdings LLC v. Akamai Technologies, Inc.*, No. 1-22-cv-00677 (D. Del.).

C.    **Counsel and Service Information:**

James L. Davis, Jr. (Reg. No. 57,325) (Lead)
**ROPES & GRAY LLP**
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303-2284
Phone: 650-617-4000
Fax: 617-235-9492
james.l.davis@ropesgray.com akamai-equil-ropes-ipr-service@ropesgray.com

Scott McKeown (Reg. No. 42,866) (Back-Up)
**ROPES & GRAY LLP**
2099 Pennsylvania Avenue NW
Washington, DC 20006
Phone: 202-508-4740
Fax: 202-383-9335
scott.mckeown@ropesgray.com

Daniel W. Richards (Reg. No. 69,652) (Back-Up)
**ROPES & GRAY LLP**
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303-2284
Phone: 650-617-4000
Fax: 617-235-9492
daniel.richards@ropesgray.com

Customer No. 28120

Mailing address for all PTAB correspondence:
**ROPES & GRAY LLP**, IPRM—Floor 43
Prudential Tower, 800 Boylston Street,
Boston, MA 02199-3600

4

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

Petitioner consents to electronic service of documents to the email addresses of the counsel identified above.

## III.    PAYMENT OF FEES

The USPTO is authorized to charge any fees due during this proceeding to Deposit Account No. 18-1945, under Order No. AKTI-011-652.

## IV.    REQUIREMENTS FOR *INTER PARTES* REVIEW

### A.    Grounds for Standing

Pursuant to §42.104(a), Petitioner certifies that the '242 is available for IPR. Petitioner and the real parties-in-interest are not barred or estopped from requesting IPR challenging the claim on the grounds identified herein.

### B.    Identification of Challenge

Pursuant to §§42.104(b)-(b)(1), Petitioner requests IPR of claim 9, and that the Board cancel the same as unpatentable.

#### 1.    Specific Art on Which the Challenge is Based

Petitioner relies on the following prior art:

| Name | US Patent/ Publication | Exhibit | Filed | Published/ Issued | Prior art under at least |
|------|------------------------|---------|-------|-------------------|--------------------------|
| Tso | 6,421,733 | 1004 | 9/8/1997 | 7/16/2002 | §§102(b)/(e) |
| Huang | 6,438,576 | 1005 | 3/29/1999 | 8/20/2002 | |
| Samaniego | 2002/0078093 | 1007 | 8/14/2001 | 6/20/2002 | §102(b) |

The '242's priority date is no earlier than 11/7/2005, the filing date of Application No. 11/269,916. The '242 cannot claim priority to the earlier-filed purported priority applications (09/425,326 and 09/929,904) because "both §120 and 37 C.F.R. §1.78(c)(1) require the involved application and the earliest application in the priority chain to share at least one common inventor." *Polaris Wireless, Inc. v. TruePosition Inc.*, IPR2013-00323, Pap. 62, *25, *aff'd* 622 F. App'x 915 (Fed. Cir. 2015); *see also* Exs. 1002, 1034-1035.

### 2.    **Statutory Grounds on Which the Challenge is Based**

| Ground | Claim | References |
|---|---|---|
| 1 (§103) | | Tso in view of Huang |
| 2/3 (§§102/103) | 9 | Samaniego |
| 4 (§103) | | Samaniego in view of Tso |

## V.    '242 PATENT AND PROSECUTION HISTORY

### A.    **'242 Patent**

Challenged '242 Claim 9 generally recites a method for processing media by using partially-processed content stored in a cache, and further processing that content to generate a final version of media content to be served in response to a user request. '242, 1:19-23, 17:35-39, 22:24-28. In the method, a client presentation system first issues a request for media content. '242, 23:45-48; *see also* '242, 19:12-15. The requested content item has limited number of associated "base transcoding

profiles" that each correspond to a cached version of content. '242, 23:49-52; *see also* '242, 17:27-34, 19:63-67. The system uses a "user profile procedure" to identify "transcoding parameters" to be applied to the content based on "specified browser or client attributes," and determines whether the same transcoding parameters are being applied prior to delivery to another "client presentation system." '242, 23:53-65; *see also* '242, 19:15-22, 19:48-52, 20:7-9, Figs. 21-22. To transcode the data, the system takes a pre-existing cached version of the requested content transcoded according to only some of the "transcoding parameters," and then applies the remaining "transcoding parameters" to that version. '242, 23:65-24:14; *see also* '242, 19:64-20:1. This transcoded version is then delivered to both the originally-requesting client presentation system, as well as the other "client presentation system" requesting the same content. '242, 24:15-16; *see also* '242, 20:9-11; Madisetti, ¶42.

B.    **Prosecution History of the '242**

During prosecution, the draft claim that issued as Claim 9 was thrice rejected as obvious in view of prior art in response to which the Applicant amended the Claim. Ex. 1002 ('242 FH), 81-109, 124-53, 744-91. After the last rejection during prosecution, the Applicant amended the Claim to recite that the "act of transcoding the requested media content in accordance with the identified transcoding parameters" comprises (1) "selecting a pre-existing base transcoded version of the

7

requested media content comprising intermediate derivative media that has been transcoded in accordance with only a portion of the identified transcoding parameters" and (2) "creating a final version by incrementally performing further transcoding of the pre-existing base transcoded version in accordance with a remaining portion of the identified transcoding parameters." Ex. 1002, 792-814. The Examiner then allowed Claim 9 and stated in the reasons for allowance that these two elements were not disclosed in the cited art. Ex. 1002, 820-26; *see also* Madisetti, ¶43.

## VI.   §325(d) AND §314(a) DISCRETION DO NOT APPLY

### A.   §325(d)

Under *Advanced Bionics v. Med-El Elektromedizinische Gerate*, IPR2019-01469, Pap. 6, *8-9, the Board should not exercise §325(d) discretion.

**This Petition's grounds are not the same or substantially the same as the prosecution art or arguments.** None of the cited references was considered as art during prosecution. The Examiner appears to have overlooked that Samaniego is prior art to the '242 due to differences in inventorship. *See* Ex. 1007. As explained below, **Samaniego** discloses Claim 9, and the cited art also independently renders obvious Claim 9. *See* §IX. The '242 specification also identifies several additional references (*e.g.*, '242, 2:18-45, 3:50-4:15), but these were not included in an information disclosure statement (37 C.F.R. §1.98(a)(1)). Regardless, the

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

disclosures identified to the USPTO from those references do not include disclosures of, *e.g.*, incremental transcoding that are substantially the same as the cited art in this Petition (*see* §IX).

**Even if the art or arguments were substantially the same, the Examiner erred in a manner material to the patentability of the Claim.** The Examiner "did not expressly consider" any of the cited references as prior art, rendering it difficult, if not impossible, to explain "how the Examiner might have considered the arguments presented in the Petition." *Bowtech, Inc. v. MCP IP, LLC*, IPR2019-00379, Pap. 14, *20 (declining to exercise §325(d) discretion). Even if any of the art considered by the USPTO was substantially similar to these references (none is), the Examiner would have erred in not rejecting the Claims. It was also error not to consider Samaniego as prior art during prosecution in light of the difference in inventorship.

The Board should not exercise §325(d) discretion.

B.    **§314(a)**

The co-pending litigation also does not warrant the exercise of discretion under §314(a) based on the *Fintiv* factors.

1: Following institution, Petitioner intends to seek a stay of the Delaware case pending the outcome of this IPR and concurrently-filed IPR2023-00332 and IPR2023-00329.

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

2: No trial date is set.

3: The case is in the pleading stage and the court has not ruled on the initial motion to dismiss.

4: After the final written decision, which is expected before trial even without a stay, the same grounds, arguments, and evidence could not be presented in the litigation.

5: The litigation and PTAB parties are the same.

6: The merits of this Petition are compelling as shown herein.

## VII.   LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art ("POSITA") as of the '242's claimed priority date would have had a bachelor's degree in computer systems, computer science, or the equivalent thereof, and at least two years of experience with networked media delivery or related technologies. Madisetti, ¶¶44-45, 47-48. More education can supplement practical experience, and vice-versa. *Id.*

To the extent PO contends the '242 is entitled to a priority date earlier than November 7, 2005 (it is not—*see* §IV.B.1), the Claims are still unpatentable. Madisetti, ¶¶46, 49-50.

## VIII.  CLAIM CONSTRUCTION

Claim terms subject to IPR are construed using *Phillips*. §42.100(b); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Only terms necessary to

10

resolve the controversy need construction. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor*, 868 F.3d 1013, 1017 (Fed. Cir. 2017). Because the prior art asserted herein discloses embodiments within the Claim's indisputable scope, the Board need not construe the Claim's outer bounds. All claim terms should be construed according to their plain and ordinary meaning. Madisetti, ¶¶51-52.

Regardless of whether the preamble is limiting, the prior art discloses it. *See* §IX; Madisetti, ¶53.

## IX. GROUNDS OF UNPATENTABILITY

This petition is supported by the Declaration of Dr. Vijay Madisetti, which describes the prior art's scope and content at the time of the '242. Madisetti, ¶¶1-34. The art renders Claim 9 unpatentable under each of the Grounds. Madisetti, ¶¶54-58.

### A. Ground 1: Tso in view of Huang

#### 1. Tso

Tso discloses a "system for dynamically transcoding data transmitted between two computers over a communications link." Tso, 1:13-14; Madisetti, ¶59. Fig. 3 annotated below shows an embodiment of this system:

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330



FIG.3

Tso, Fig. 3. A **network client** sends to a **transcoding server** a **request for content,** such as a web page including "image, video, or HTML" content. Tso, 3:10-14, 3:45-53, 4:6-10, 9:54-65, 14:1-7; Madisetti, ¶60.

The request from the client carries "selection criteri[a]" used to specify how content should be transcoded. Tso, 6:64-8:9. Such selection criteria include the "particular content" being requested (Tso, 7:4-7), as well as "network client" information "such as a display dimension, resolution, number of colors, processor type, memory/disk configuration, modem or network interface type" (Tso, 7:20-33)—which are formats of a client presentation system as claimed in the '242. Madisetti, ¶60. The system uses these criteria and "combinations thereof" to select which of the "**transcode service providers 24** are invoked" to generate the version of content to be provided in response to the client's request. Tso, 3:48-65, 7:15-17, 8:10-14; Madisetti, ¶60.

12

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

In addition to the "**transcode service providers**," the transcoding server includes a "**parser**" and a "**cache interface**" connected to a "**cache memory**." Tso, 3:8-17, 3:66-4:5, 4:14-19; Madisetti, ¶61.

Figures 8 and 9 annotated below summarizes the relevant portions of the process disclosed by Tso:



FIG.8    FIG.9

Upon **receiving the request** **from the client**, the system issues, via the parser invoked by the HTTP remote proxy, a "GetScaledObject()" request to the "**cache**

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

memory" to **determine whether a specific version of content exists in cache, such as a version with a "stage" property specifying the progress of "staged refinements"**—which not only renders obvious, but affirmatively discloses, retrieving a partially-transcoded version of content. Tso, 5:36-42, 6:9-23; Madisetti, ¶¶62-63. The cache memory carries "several different versions of an object to support clients with different communications and/or presentation capabilities." *Id.* If the requested content version exists in cache, it is **retrieved from cache memory** and **returned to the client**. If the requested version does not exist in cache memory, the parser uses "predetermined selection criteri[a]" to **determine whether the retrieved content version requires additional transcoding**. The system performs any required additional transcoding using one or more **transcode service providers**, which each perform different transcoding operations, to produce content as requested by the client. Tso, 14:47-50, 7:15-8:9, 6:28-50, 14:50-55, 10:37-49, 4:23-37; Madisetti, ¶63. Additional transcode service providers may be "dynamically added to the system" to perform additional transcoding operations. *Id.*

Tso teaches that caching of "original" and "several different" content versions is integrated into the transcoding process. Tso, 4:1-5, 6:13-23; Madisetti, ¶64. Thus, in servicing future requests for the same object, the transcoding server issues GetScaledObject() requests to retrieve the requested content version from cache and

14

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

**returns requested content to the client's browser for display**. Tso, 6:42-50, 14:52-57; Madisetti, ¶64.

Tso also discloses using multiple-thread processing on servers to handle concurrent requests for content: the content is retrieved only once, and "appropriate versions" are delivered to multiple clients "concurrently." Tso, 5:43-50, 6:51-63, 7:60-8:9; Madisetti, ¶65. Tso also discloses using these teachings to "collaboratively" transcode content using multiple servers and clients. Tso, 14:47-15:6, 16:10-14. During collaborative transcoding, servers partially transcode content before sending it to clients or other servers to complete transcoding; servers thus send, receive, and further transcode partially-transcoded content. *Id.*; Madisetti, ¶65.

### 2. Huang and Motivation to Modify Tso with Huang's Teachings

In the same field of endeavor, Huang teaches an "object rendering" method in which both "partially" and "completely" "rendered objects" are cached "to avoid repeating some object rendering operations with the same proxy server." Huang, Abstract, 6:63-67. "Rendering" processes taught by Huang include, *e.g.*, transcoding processes that "render" content "into different forms or resolutions" or from color to

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

"black-and-white." Huang, 1:17-22, 1:57-58, 6:59-63; Madisetti, ¶66.[2] An embodiment of this process is shown in annotated Fig. 4:



FIG.4

Huang, Fig. 4. At **step 401**, the proxy server searches the cache for a stored version of the requested content that is sufficiently "detailed" to handle the request. Huang, 7:23-36. If further rendering (*e.g.*, by transcoding) of the requested object is necessary, then at **steps 407-408** the proxy server completes the remaining rendering

---

[2] As used herein, "rendering" refers to transcoding. These "resolution" and "bit depth" rendering operations describe similar operations to Tso's "data type, type of encoding/compression," "resolution," and "number of colors" transcoding operations. *See* Tso, 7:15-8:9; Madisetti, ¶66.

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

steps locally. Huang, 7:53-8:4. The system then caches a copy of the requested object (**step 410**), and it returns the requested content to the user (**step 406**). Huang, 8:4-8:11; Madisetti, ¶¶67-68.

Content is stored along with Receiver Hint Information ("RHI") and "object-specific descriptor" "meta-information." Huang, 5:42-52. A server performs "complete or partial rendering based on the associated RHI" by "partition[ing]" the rendering process into "two or more steps" and modifying the RHI to "reflect the processing that [the server] performed." Huang, 6:9-23, 6:56-68. When a new request for previously-cached content is received, the server uses a cached object's RHI to determine if "further rendering is necessary" and whether to "complete the entire rendering process" locally. Huang, 7:43-64; Madisetti, ¶69.

Tso and Huang are analogous prior art and in the same field as the '242—networked media delivery—and reasonably pertinent to the alleged problems identified in the '242—automating media delivery and reducing overhead and time to generate Web pages. '242, 1:20-23 (networked "software system that provides delivery of automated graphics and other media"), 4:50-56, 4:66-5:8, 6:4-8; Tso, 1:10-31 (networked "system for dynamically transcoding data transmitted between two computers"), 1:59-2:5, 4:1-5; Huang, 1:20-26 (networked "proxy servers perform distributed object rendering"), 2:1-10, 2:37-44; Madisetti, ¶70.

17

While **Tso** not only renders obvious, but affirmatively discloses retrieving partially-transcoded content from cache, *e.g.*, as part of staged transcoding (see §IX.A.1), **Huang** explicitly teaches retrieving from the cache and further processing partially transcoded content, and tracking the different versions of content available on the system using RHI information. *E.g.*, Tso, 5:39-41, 14:64-15:6; Huang, 6:9-23, 6:63-67; Madisetti, ¶71. A POSITA would have been motivated to modify **Tso**'s teachings of retrieving a specific version of content and performing "staged" transcoding by implementing these detailed teachings from **Huang** to achieve the beneficial and predictable result of tracking the transcoding status of content on a server and reducing processing involved in re-processing previously-processed data for at least the following independent reasons. Madisetti, ¶¶71.

**First**, **Tso** and **Huang** disclose complementary mechanisms for improving processing efficiency. **Tso's** teachings of storing "several different versions" of content to avoid "re-transcod[ing]" content, sending/receiving partially-transcoded content, a client requesting cached content that requires "additional transcoding," and using partially-transcoded content for, *e.g.*, "staged" or "collaborative" transcoding, provide **Tso** with partially-transcoded cached content. *See* Tso, 4:1-5, 4:39-61, 5:35-42, 6:13-17, 14:57-15:6, 15:66-16:14; *see also* §IX.A.1. For example, partially or fully-transcoded content may be further transcoded "to greyscale for users lacking a color display." Tso, 17:9-15. **Tso** further teaches that such

transcoding of already-cached content improves speed and efficiency by eliminating "the need to re-retrieve" or "re-transcode" "content." Tso, 4:1-5. **Huang** explicitly teaches that retrieving partially-rendered content from local cache also advantageously allows a server to fully render content without unnecessary re-rendering and re-retrieval. Huang, 6:63-67, 7:42-8:11. **Huang** thus provides detailed teachings explaining how to further improve speed and efficiency by utilizing local previously-cached content, including "partially rendered" versions, to avoid "repeating" "rendering operations." Huang, 6:63-67, 2:9-13. Thus, whether retrieving a fully-transcoded file from Tso's cache as "partially rendered" content for further transcoding as suggested by Huang, or retrieving a partially transcoded version for further transcoding (*e.g.*, Tso, 14:57-15:6), both paths would improve Tso's speed and efficiency. Madisetti, ¶72. A POSITA would have been motivated to improve **Tso** with **Huang's** teachings to allow a server with its own locally-cached and partially-rendered/transcoded copy of content to also complete rendering/transcoding on its own, which advantageously avoids unnecessary re-rendering/transcoding and re-retrieval of content. *Id.*; Huang, 7:23-50, 2:8-13; Tso, 4:1-5.

**Second, Huang** provides additional detailed teachings of how to track transcoding status of content. **Tso** broadly teaches using "GetProperties()" and "SetProperties()" calls to track transcoding status, including as part of "staged"

transcoding processes, but leaves it to a POSITA to implement this function. *E.g.*, Tso, 5:36-42, 14:30-36. **Huang** provides additional teachings of using "RHI" information and "object-specific descriptor information" to track transcoding status. Huang, 5:60-6:23, 6:56-58. **Huang** discloses that when a particular version of content is requested and not available, the server uses a "more detailed version" in cache instead of re-retrieving the original object to "avoid repeating some object rendering operations." Huang, 7:23-42, 2:8-13, 6:63-67. The server uses the "RHI" value to track the available content, including the different transcoding statuses of cached versions of the content. *Id.*; Huang, 6:9-23, 7:43-64. For example, Huang teaches "stag[ing]" a rendering process by breaking the process into steps, determining which steps to be performed first, and tracking the progress of performing the transcoding steps using RHI information. Huang, 3:29-49, 4:24-52, 6:9-23, 6:56-58, 8:50-9:3. A POSITA would have found it obvious to modify **Tso** with **Huang's** teachings by using **Tso's** GetScaledObject() and GetProperties() calls to find and retrieve content with properties specifying a partially-rendered, "more detailed version" to be further refined into the requested content item, *e.g.*, as part of staged transcoding, and using **Tso's** SetProperties() calls to update RHI values, allowing the system to use the RHI to track the transcoding profiles of different content items in a manner that allows for the location and retrieval of partially-

transcoded content, thereby advantageously reducing unnecessary repeated retrieval and rendering of content. Madisetti, ¶73.

In light of the above teachings, a POSITA would have had a reasonable expectation of success in modifying **Tso** with **Huang's** teachings of reusing partially-processed content. Indeed, **Tso** already teaches partially processing content to generate requested content and performing such processing at both servers and clients, and that such processing can be "staged" and performed using discrete "transcode service provider[s]." Tso, 5:36-42; 12:53-13:11; Madisetti, ¶74. Indeed, it was understood in the art to be advantageous to use partially-transcoded content when serving content to clients. *E.g.*, Ex. 1008 (Delp), Abstract ("intermediate images generated for one requested image can be used by other requested images"); Ex. 1009 (Davis), 4:2-4 ("the system permits pre-existing media content to be reused in a meaningful way"). Modifying **Tso** with **Huang's** teachings would have been a straightforward application of those teachings in a manner that advantageously improves the efficiency of the system. Madisetti, ¶74.

### 3. Claim Chart

| Claim | Tso in view of Huang |
|---|---|
| [9.pre] A method for accessing dynamically transcoding media content, | To the extent the preamble is limiting, **Tso discloses a method for accessing** (*e.g.*, providing "information transmitted" between a "network server computer and a network client computer") **dynamically transcoding media content** (*e.g.*, "image" or "video" "data content" that has been "dynamically transcode[d]"). |

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|---|---|
| the method comprising: | **_E.g., Tso:_**<br><br>**Tso** discloses a method in which "image" or "video" content is "dynamically transcode[d]" to be provided to and accessed by a "client computer." Madisetti, ¶¶75-77.<br><br>• **2:44-49** ("Embodiments of the present invention provide the ability to _**dynamically transcode information transmitted between, for example, a network server computer and a network client computer**_.")<br><br>• **3:45-54** ("Looking more closely at the embodiment in FIG. 3, transcoder 20 is coupled to HTTP remote proxy 36. Parser 22 manages _**the transcoding of data to be transmitted from transcoding server 34 to network client 12.**_ To this end, parser 22 controls transcode service providers 24 to selectively transcode content based on a predetermined selection criterion. For example, one or more transcode service providers 24 may provide the capability to compress and/or scale _**different types of data content, such as image, video**_, or HTML (HyperText Markup Language).");<br><br>• **8:10-13** ("Applying the above-listed selection criteria, or combinations thereof, embodiments of the present invention may be used to provide a virtually limitless range of _**dynamic transcoding services**_.")<br><br>• **_See also_ Abstract.** |
| [9.a] an act of receiving a request for media content to be delivered to a client presentation system, wherein the requested media content | **Tso discloses an act of receiving a request for media content** (_e.g._, "Network client 12 communicates requests for information to" "network server 10" for "image" or "video" "data content") **to be delivered to a client presentation system** (_e.g._, "Network client 12" "receives information from" "network server 10" and a "browser displays" the content)**, wherein the requested media content has a limited number of base transcoding profiles associated therewith, each base transcoding profile corresponding to a cached version of the requested media content** (_e.g._, |

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|---|---|
| has a limited number of base transcoding profiles associated therewith, each base transcoding profile corresponding to a cached version of the requested media content; | "multiple representations of a given cached object" are cached, along with "descriptive information about each representation," which is "used to determine transcoding properties and transcoding status of a cached object"). <br><br> ***E.g.*, Tso:** <br><br> **Tso** discloses that a server receives a "request[] for information" from "network client 12" for "image" or "video" "data content" to be "display[ed]" on the client's "browser." Tso, 2:56-65, 3:45-54, Figs. 8-9. Requested content items are stored in a cache that stores "multiple representations of a given cache object." Tso, 4:64-5:7. The cache also stores "descriptive information" about cache objects that specifies "transcoding properties and transcoding status," including the transcoding "stage" of a cached version of content specifying how much transcoding has been performed—which discloses a base transcoding profile for each of those objects, on top of which additional transcoding is performed for, *e.g.*, staged transcoding. Tso, 5:36-42, 6:17-23.[3] Tso, 4:62-5:7, 4:35-40; Madisetti, ¶¶78-80. There are only a limited number of profiles because only previously-transcoded copies of content are stored in memory. *See* Tso, 4:1-5; Madisetti, ¶80. |

---

[3] Tso's disclosure of a transcoding profile is similar to the '242's own disclosure of such a profile. '242, 8:51-55.

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|-------|----------------------|
| | <ul><li>**Fig. 5**</li></ul><br><br><ul><li>**Figs. 8-9**</li></ul><br><ul><li>**2:56-65** ("*Network client 12 communicates requests for information to*, *and receives information from*, *network server 10* over a client/server communications link 14. Client/server communications link 14 may</li></ul> |

24

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|---|---|
| | comprise, for example, a so-called "slow network" using, for example, POTS (Plain Old Telephone System) dial-up technology or wireless connections. Alternatively, client/server communications link 14 may comprise a so-called "fast network," such as a LAN or WAN (Wide Area Network),which is capable of operating at much higher speeds than are possible with slow networks.")<br><br>• **3:45-54** (*See* [9.pre])<br><br>• **4:1-5** ("Server-side ***cache memory 30 may be used to store both original and transcoded versions of content*** for later transmission to network client 12 ***without the need to re-retrieve the content from Internet 18 or to re-transcode the content***.")<br><br>• **4:62-5:7** ("Unlike most cache memories, server-side cache interface 28 and server-side cache memory 30 enable maintenance of ***multiple representations of a given cached object***, with ***descriptive information about each representation*** included in server-side cache memory 30. In addition, server-side cache interface 28 and server-side cache memory 30 serve as a synchronization point for multi-threaded accesses to cached objects. It should be noted that the illustrated embodiment does not require any particular configuration for server-side cache interface 28 and/or server-side cache memory 30. Indeed, functionality attributed to these components in the various embodiments described herein may be readily implemented in other system components.")<br><br>• **5:35-42** ("The GetProperties() and SetProperties() calls retrieve and store information about cached objects, including information maintained by transcode service provider 24 used to determine transcoding properties and transcoding status of a cached object. ***Transcode service provider 24 may use such information, for*** |

25

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|---|---|
| | *example, to determine current compression progress for scaled data access and staged refinements*.") |
| | • **14:21-55** ("Referring now to FIG. 8, if the requested URL object is not found in client-side cache memory 56, *HTTP local proxy 48 transmits a request for the object to transcoding server 34* using, for example, a Post of a *GetStage(URL, Stage=0) call* (Step 160). Upon receipt of this call, HTTP remote proxy 36 *invokes parser 22, which in turn issues a GetScaledObject[()]call to server-side cache interface 28 to determine whether a non-transcoded version of the requested hypertext object already exists* in the server-side cache memory 30 (Step 170). If the hypertext object is cached, server-side cache interface 28 issues a GetEntry call to open a stream for the cached object (Step 200). In addition, parser 22 may issue *a GetProperties (URL, ... ) call to server-side cache interface 28 to retrieve information about the transcoding properties and transcoded status (such as the refinement level) of the cached object.* Referring now to FIG. 9, once the requested hypertext object has started to be obtained, *parser 22 determines whether (and how) to transcode the object before transmitting it to network client 12 (Step 240)*. Both this decision making process and exemplary transcoding processes are described in detail above. For purposes of the present illustration, assume parser 22 determined that transcoding was appropriate and therefore generated a transcoded version of the requested hypertext object (Step 250).") |
| | • ***See also*** **4:39-48, 5:8-61, 6:9-28, 10:37-49, 13:39-44, 14:1-36, 14:64-66, 15:1-6, Fig. 7.** |
| [9.b] at the time of the request, and without input by a | **Tso discloses at the time of the request, and without input by a network administrator** (*e.g.*, "when network client 12 requests a hypertext object"), **an act of automatically identifying transcoding parameters to be applied to the** |

26

| Claim | Tso in view of Huang |
|---|---|
| network administrator, an act of automatically identifying transcoding parameters to be applied to the requested media content prior to delivery to the client presentation system, wherein identification of transcoding parameters is based on one or more formats of any client presentation system; | **requested media content prior to delivery to the client presentation system** (*e.g.*, "[p]arser 22" "manages the transcoding of data to be transmitted" by invoking "transcode service providers") **wherein identification of transcoding parameters is based on one or more formats of any client presentation system** (*e.g.*, "transcode service providers" are invoked based on "predetermined selection criterion" including characteristics of "network client 12"). <br><br> ***E.g.*, Tso:** <br><br> *See* [9.a]. <br><br> **Tso** also discloses that when a "network client" requests a "hypertext object," the system automatically identifies the "transcode service providers" used to "selectively transcode content" based on "selection criteri[a]" associated with the request. Tso, 3:45-54, 6:64-7:14. This process is controlled by a "parser" and does not require input by a network administrator. *See id.*; Madisetti, ¶¶81-83. The "predetermined selection criteri[a]" include formats of "network client 12, such as a display dimension, resolution, number of colors, processor type," and other client formats. Tso, 7:15-29; Madisetti, ¶83. <br><br> • **3:45-54** (*See* [9.pre]) <br><br> • **6:9-41** ("***The GetScaledObject() call*** is similar to GetObject(), and is also used to request an object from server-side cache memory 30; however, it ***adds support for requesting a particular version of that object, such as a high-quality rendition***. Unlike traditional caching proxies, ***transcode service providers 24 can use server-side cache memory 30 to store several different versions of an object to support clients with different communications and/or presentation capabilities***. Thus, ***an additional "Stage" parameter may be used to indicate which version of the cached object is to be returned to network client 12.*** Where transcode service provider 24 is configured to scale network content, ***it may use this parameter to request a version of a*** |

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|-------|----------------------|
|       | *cached object having, for example, a default scaled quality, a refinement to a better-quality version, or the original non-scaled version*. *In this embodiment, when network client 12 requests a hypertext object*, *HTTP remote proxy 36 uses either the GetObject() or GetScaledObject() call* (depending on if network client 12 is capable of receiving scaled/transcoded datatypes) to retrieve the hypertext object from parser 22. If the hypertext object is not found, parser 22 uses the CreateEntry() call to *create an entry (in effect, a placeholder) in server-side cache memory 30 for the new object.* The new entry is returned to HTTP remote proxy 36, which requests the hypertext object from Internet 18. As a data stream for the hypertext object is returned, HTTP remote proxy 36 calls parser 22 using the PutObject() call, passing into this call the new entry and the handle to the data stream to be placed into the entry. *Parser 22 selects an appropriate transcode service provider 24 based, for example, on the content type of the data stream.* In this context, *the term content type encompasses* a datatype, an HTTP MIME (Multipurpose Internet Mail Extensions) type, *a content format, and so on*.") <br><br> • **6:64-7:14** ("As noted above, *parser 22 may selectively invoke one of transcode service providers 24 based upon satisfaction of a predetermined selection criterion*. Such selection criterion may comprise, for example, information contained in a header portion of a data packet received by transcoding server 34, such as a MIME type, a URL (Uniform Resource Locator), a last modified time indicator and so on. Alternatively, *the predetermined selection criterion may comprise information contained in a data portion of such a data packet*, such as particular content, key words, structures (for example, heading levels), and so on. Still further, *the predetermined selection criterion may comprise a condition of the device on which* |

28

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|-------|----------------------|
| | *transcoding server 34 is installed* (for example, a current processing load), a condition of a device to which transcoding server 34 is coupled, or a condition of a communications link. Transcoding server 34 may provide the ability to dynamically update such predetermined selection criteria.") <br><br> • **7:15-29** ("*The following discussion provides still more examples of the types of information which may be used to dictate which of transcode service providers 24 are invoked*. It should be noted, however, that these examples are provided by way of illustration only, and are not intended to limit in any way the scope of the invention claimed herein. *The predetermined selection criterion may comprise: (1) network client 12, such as a display dimension, resolution, number of colors, processor type, memory/disk configuration, modem or network interface type*, *installed add-in boards* (for example, hardware compression/decompression), *software configuration* (for example, availability of pre-installed software decompression modules), *physical location/proximity* (for example, as determined by a telephone area code), *and user identity*….") <br><br> • *See also* **5:62-67, 6:64-7:14, 12:55-59.** |
| [9.c] an act of determining that the transcoding parameters to be applied to the requested media content prior to delivery to the client presentation system are the same as | **Tso discloses an act of determining that the transcoding parameters to be applied to the requested media content prior to delivery to the client presentation system** (*see* [9.b]) **are the same as transcoding parameters that are being applied to the requested media content** (*e.g.*, determining that "multiple network clients 12" have made "requests for the same hypertext object") **prior to delivery to another client presentation system** (*e.g.*, prior to delivering "appropriate versions" of the content to both clients "concurrently"). <br><br> ***E.g.*, Tso:** |

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|---|---|
| transcoding parameters that are being applied to the requested media content prior to delivery to another client presentation system; | *See* [9.a]-[9.b].<br><br>**Tso** also discloses that each time a proxy receives a request for a content item, it first checks whether a "copy of the required version" is available. Tso, 10:22-27. As discussed for [9.b], the "required version" is generated using transcoding parameters specified using "selection criteri[a]." *See* [9.b]. When using "multiple-thread processing" to process "requests for the same hypertext object from multiple network clients," the server determines that the two clients are requesting the same content; the content is therefore "retrieved from Internet 18 once" to handle both requests. Tso, 6:51-63. This process occurs while transcoding parameters are being applied to the earlier client system because the results of the transcoding process are transmitted "concurrently"—which not only renders obvious, but affirmatively discloses handling the second request while the content is being transcoded in response to the first request. *Id.* The system determines "appropriate versions" for both clients; if two similar client systems request the same content, the "appropriate versions" are the same version and therefore are generated using the same transcoding parameters. *Id.*; Madisetti, ¶¶84-86.<br><br><ul><li>**6:51-63** ("Multiple-thread processing improves the efficiency of the present embodiment by not waiting for a hypertext object to be received in its entirety by HTTP remote proxy 36, or added in its entirety to server-side cache memory 30, before beginning to send the object to network client 12. ***Another benefit of multiple-thread processing is that parser 22 may efficiently process requests for the same hypertext object from multiple network clients 12. The hypertext object need only be retrieved from Internet 18 once, and appropriate versions may be transmitted to such multiple network clients 12 concurrently. The hypertext object need only be retrieved from Internet 18 once, and appropriate versions may be transmitted to such multiple network clients 12 concurrently***. It</li></ul> |

30

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|-------|----------------------|
|  | should be noted, however, that embodiments of the present invention may be implemented without multiple-thread processing.")<br><br>• **10:22-27** ("HTTP remote proxy 36 may also inform parser 22 of any applicable user preferences (*e.g.*, from client preference table 26). Upon being invoked, ***parser 22 first calls cache interface 28 with the requested hypertext object to determine whether a copy of the required version already resides in server-side cache memory 30***.")<br><br>• *See also* **4:62-5:18, 5:42-51, 6:9-28, 6:45-50, 14:64-15:6.** |
| [9.d] an act of transcoding the requested media content in accordance with the identified transcoding parameters, such that the identified transcoding parameters are used to perform additional incremental transcoding on top of the base transcoding profile; | **Tso discloses an act of transcoding the requested media content in accordance with the identified transcoding parameters** (*e.g.*, "transcod[ing] the object before transmitting it to network client 12" using "an appropriate transcode service provider 24" that is "invoke[d] … based upon satisfaction of a predetermined selection criterion")**.**<br><br>***E.g.*, Tso:**<br><br>*See* [9.a]-[9.c].<br><br>**Tso** also discloses that, when a user issues a request for content, the server uses a "GetScaledObject()" call to retrieve a particular version of content from the cache. Tso, 6:9-41. **Tso** further discloses that cached content has properties including the "current compression progress for scaled data access and staged refinements." Tso, 5:36-42. Once the content is retrieved, the server then performs transcoding based on transcoding parameters specified by "selection criteri[a]." Tso, 7:15-29, 14:47-55. Madisetti, ¶¶87-88, 90. |

31

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|---|---|
| | <ul><li>**Figs. 8-9**</li></ul><br><br><ul><li>**5:35-42, 14:21-55** (*See* [9.a])</li><li>**6:9-41, 7:15-29** (*See* [9.b])</li><li>**15:66-16:44** ("In view of the foregoing description, it should be apparent that it is possible for there to be more than one so-called "smart" proxy arranged between a client device and a content server device. If left unchecked, such a condition can result in content being altered excessively (for example, too many ads inserted, multiple lossy compressions resulting in indecipherable images). To address this problem, an embodiment of the present invention may use ***a special proxy-to-proxy protocol that extends the existing request/ response structures to indicate whether and what sort of transcoding has already been performed on the content***. Such ***a specialized protocol***, in addition to other proxy-to-proxy messages which may be implemented on an as-needed basis, ***enables multiple proxies to work collaboratively***, yet still transparently</li></ul> |

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|-------|----------------------|
| | to users, client software, existing "standard" proxies and content servers.") |
| | • ***See also*** **5:20-31, 6:64-7:3,12:53-13:5, 14:59-15:6.** |
| | **Huang further discloses that the identified transcoding parameters are used to perform additional incremental transcoding** (*e.g.*, "perform the rendering locally" if "further rendering is necessary") **on top of the base transcoding profile** (*e.g.*, use the "RHI" of an object in "local cache" "to see if any further rendering is necessary" before "determin[ing] whether or not" to perform "further rendering"). |
| | ***E.g.*, Huang:** |
| | **Huang** teaches that when the RHI information on the system includes a profile indicating that "a copy of the requested object can be found in the local cache," the system retrieves that copy and, using the RHI information "associated with a particular object," checks whether "any further rendering is necessary," and then performs additional transcoding on top of the stored base transcoding profile to the retrieved copy. Huang, 6:9-23, 6:56-58, 7:43-64; *see also* §IX.A.2 (rendering refers to transcoding). The system then updates the RHI to reflect that the content has been further transcoded. Huang, 6:9-23; Madisetti, ¶¶89-91. |
| | As discussed in §IX.A.2, a POSITA would have been motivated to modify **Tso** with these teachings to advantageously reduce re-transcoding and re-retrieval of content while tracking available versions of content, yielding a system that retrieves a partially-transcoded version of content using a GetScaledObject() call and then incrementally further transcodes content based on a cached base transcoding profile. Tso, 6:9-41; Huang, 7:43-57; Madisetti, ¶92. |
| | • **Abstract** ("The criteria for such a method can include the bandwidth and current load of the network links among proxies, and/or the respective CPU usage of the proxies. If an ***object rendering can be staged, e.g.,*** |

33

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|---|---|
| | *different resolution rendering, it can be performed by more than one of the proxies*. The determination of *which proxy performs which stage of the multistage rendering can also be adaptive* to the dynamic load conditions, as well as network conditions.") |
| | • **4:8-15** ("*At an intermediate node having a less detailed version of the requested object the method includes such information in the RHI*, forwards the request to another node, and at another intermediate node that has a more detailed version of the requested object, *the node decides* whether to return the more detailed version of the requested object, without further local rendering, or *to instead perform some rendering and return a partially rendered object*, or to instead return a completely rendered object.") |
| | • **6:9-23** ("When a requested object passes through the proxy network, *any proxy server* 110, 111, 112 *can perform a complete or partial rendering based on the associated RHI*. For example, *if the entire rendering process can be partitioned into two or more steps, a given one of the proxy servers (e.g., 110) may decide to perform only one of the rendering steps*, and to then forward the partially rendered object to another proxy server (*e.g.*, 111). *The proxy server 110 also modifies the RHI to reflect the processing that it performed*, and forwards the modified RHI as well to the proxy server 111.") |
| | • **6:56-58** ("An object renderer 206, which performs object rendering according to the *RHI associated with a particular object*, may also be included in the proxy server logic 203.") |
| | • **6:63-67** ("*Proxy server logic* 203 may also include a cache *manager 207 which maintains a local copy of the partially rendered or completely rendered objects in order to avoid repeating some object rendering operations with the same proxy server*.") |

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|-------|---------------------|
| | • **7:43-64** ("If a copy of the requested object can be found in the local cache, at Step 402, *the proxy server checks the cached object against the RHI to see if any further rendering is necessary*. Note that the RHI contains the capability specification of the receiving device (i.e. the device that originally requested the object that was just found in the cache). *By checking the RHI, the proxy server 110, 111, 112 can determine if any further rendering is necessary*. If no further rendering is necessary, the proxy server modifies the RHI to indicate its local condition for providing rendering services and returns the object at step 403. *If further rendering is found to be necessary, based on the RHI or the requesting device, then the proxy server executes at step 405 a selection function to determine whether or not it wishes to perform the rendering locally*. If the proxy server decides not to perform any rendering locally, the proxy server modifies the RHI to indicate its local load condition for providing such rendering services and returns the object along with the modified RHI at step 406. *If the proxy server instead decides to perform the rendering locally, it checks the RHI at step 407 to determine if it wishes to complete the entire rendering process*, or just some part of the required rendering process.") |
| | • **10:56-11:5** ("*If, however, for some reason the proxy server elects to not completely render the image object*, or to not render the image object at all, due to, for example, loading considerations or a lack of suitable software, then the PICS label of the image object will not reflect a condition compatible with the display capabilities of the PDD. *For example, assume that a given one of the proxy servers 110, 111, 112 elects to only modify the color encoding of the received image object from 16 level to 1*, then the modified PICS label as received by a next proxy server will be r(c 1 s 1000), which is a form still not |

35

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|-------|----------------------|
| | compatible with the PDDs' RHI of d(c 1 s 2). ***The next proxy server 110, 111, 112 may then elect to render the received image object to reduce the image size from 1000 megabytes to 2 megabytes, resulting in*** the modified PICS label of r(c 1 s 2), which is ***a form that is compatible with the PDDs' RHI of d(c 1 s 2).***") <br><br> • *See also* **10:20-34.** |
| [9.e] wherein the act of transcoding the requested media content in accordance with the identified transcoding parameters comprises: <br><br> an act of selecting a pre-existing base transcoded version of the requested media content comprising intermediate derivative media that has been transcoded in accordance with only a portion of the identified transcoding parameters; and | **Tso discloses wherein the act of transcoding the requested media content is in accordance with the identified transcoding parameter** (*see* [9.d]) **comprises: an act of selecting a pre-existing base transcoded version of the requested media content** (*e.g.*, an act of "requesting a particular version of [the requested] object" using a "Stage" parameter that is tracked with the "descriptive information" stored about each content item) **comprising derivative media that has been transcoded** (*e.g.*, comprising "a version of a cached object having, for example, a default scaled quality" that can be "refine[d] to a better-quality version" as part of "staged" refinement). <br><br> ***E.g.*, Tso:** <br><br> *See* [9.a]-[9.d]. <br><br> **Tso** also discloses that the cache stores "several different versions" of content—each of which is stored with "descriptive information" that describes a pre-existing base transcoded version of the requested media content. Tso, 6:9-23. **Tso** further discloses that cached versions may be used for "staged refinements" such that the content is cached with parameters specifying how much transcoding has been applied already, and how much remains to be applied. Tso, 5:36-42. When receiving a request for content, **Tso** discloses that the system requests a "particular version of the object" such as a "staged" "refinement" of the content using a GetScaledObject() call, which is a derivative version of original content that has been transcoded to reach a transcoding "stage." Tso, 6:9-23; Madisetti, ¶¶93-94, 96. |

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|---|---|
| | <ul><li>**4:62-5:7, 5:35-42** (*See* [9].a)</li><li>**6:9-41** (*See* [9].b)</li><li>*See also* **14:59-63, 15:66-16:14.**</li></ul>**Huang further discloses selecting a pre-existing base transcoded version of the requested media content** (*e.g.*, "determin[ing] if the requested object is available in the cache" in the form of "a local copy of the partially rendered … object") **comprising intermediate derivative media that has been transcoded in accordance with only a portion of the identified transcoding parameters** (*e.g.*, comprising a "partially rendered" media item for which the "RHI" information indicates that "only one" of "two or more" steps is performed and "further rendering is necessary").<br><br>***E.g.*, Huang:**<br><br>*See* [9].d.<br><br>**Huang** also discloses that a cache stores "partially" and "completely" rendered (which includes transcoded—*see* §IX.A.2) versions of content. Huang, 6:63-67. When receiving a request for content, the cache manager will retrieve a "more detailed version" that "may be further rendered … in order to satisfy the request." Huang, 7:34-57. Each content item is stored with "RHI" information specifying "processing" that has already been "performed" on the content, including for example whether only one of "two or more steps" of processing has been performed, and additional steps must be performed for the content to be "rendered into a form" that the client "is capable of displaying." Huang, 6:9-23, 6:56-67, 10:46-56; Madisetti, ¶¶95-97.<br><br>As discussed in §IX.A.2 and for [9.d], a POSITA would have been motivated to modify **Tso** with this teaching to advantageously avoid unnecessarily re-retrieving and re-transcoding content, yielding a system that uses a GetScaledObject() call to request a "more detailed," partially rendered derivative version of the original content stored in |

37

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|---|---|
| | cache for which further transcoding is required, *e.g.*, to take content that has undergone "staged" transcoding, and complete the final stage of transcoding to convert the content to a form the client is capable of displaying. Huang, 7:43-57. Madisetti, ¶98.<br><br>• **6:9-23, 7:43-64** (*see* [9.d])<br><br>• **6:56-67** ("***An object renderer*** 206, which ***performs object rendering according to the RHI associated with a particular object***, may also be included in the proxy server logic 203. Object renderer may be a computer program which renders, by example, a color image into a black-and-white image, or one that reduces a complex HyperText Markup Language (HTML) text into a simple HTML text containing only a summary of the HTML headers. ***Proxy server logic 203 may also include a cache manager 207 which maintains a local copy of the partially rendered or completely rendered objects*** in order to avoid repeating some object rendering operations with the same proxy server.")<br><br>• **7:25-36** ("At Step 401, the object request handler 205 ***checks with the cache manager 207 to determine if the requested object is available in the cache***. It should be noted that ***the cache*** may contain a less detailed version of the requested object, or it ***may contain a more detailed version. A less detailed version*** of the object does not satisfy the requirement and a request for the object must be sent out, typically to the appropriate one of the content servers 120, 121 or to another proxy server. However, ***a more detailed version of the object may be further rendered by the proxy server 110, 111, 112 in order to satisfy the request***.")<br><br>• **10:46-56** ("It can be appreciated that a proxy server 110, 111, 112 that receives an image object having the above-noted PICS label r( c 16 s 1000), in response to a request from the PDD having the above-noted RHI d( c |

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|-------|----------------------|
| | 1 s 2), will be informed that the PDD is incapable of displaying the image object as received, and that ***the image object will need to be rendered into a form that the PDD is capable of displaying***. ***The proxy server may perform the entire rendering process***, ***and will then modify the PICS label of the image object to be r(c 1 s 2), i.e., to indicate a format compatible with the requesting PDD's display capabilities***.") <br><br> • ***See also*** **4:8-15, 9:5-7, 11:15-55.** |
| [9.f] an act of creating a final version by incrementally performing further transcoding of the pre-existing base transcoded version in accordance with a remaining portion of the identified transcoding parameters; | **Huang discloses an act of creating a final version by incrementally performing further transcoding of the pre-existing base transcoded version** (*e.g.*, "complet[ing] the entire rendering process" to produce a "completely rendered… object") **in accordance with a remaining portion of the identified transcoding parameters** (*e.g.*, in accordance with "further rendering [that] is found to be necessary" for a "cached object"). <br><br> ***E.g.*, Huang:** <br><br> *See* [9.d]-[9.e]. <br><br> In addition to **Tso's** disclosure of retrieving a partially-rendered version of content using a GetScaledObject() call (and using such a call as rendered obvious by **Tso** in view of **Huang**) as discussed for [9.e], **Huang** also discloses that when a partially-rendered object is retrieved from cache as discussed in [9.e], the system determines that "further rendering" is necessary, and then will "complete the entire rendering process" in order to "return[] the … completely rendered … object" "to the requesting client device." Huang, 7:43-57, 8:1-11, 9:4-14, 10:46-56. This further processing includes, *e.g.*, the remaining steps of "two or more" steps required to fully render the content. Huang, 6:9-23. Madisetti, ¶¶99-101. <br><br> As discussed for [9.e] and in §IX.A.2, a POSITA would have been motivated to modify **Tso** with this teaching to advantageously reduce unnecessary re-retrieval and re- |

39

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|-------|----------------------|
|       | transcoding of content, yielding a system in which, once an intermediate content item is retrieved by using a GetScaledObject() call, further transcoding is performed based on the retrieved content to complete the remaining transcoding steps to generate the completely rendered object. Tso, 4:39-61, 14:57-15:6; Huang, 7:43-57, 8:1-11, 9:4-14; Madisetti, ¶102. |

<ul>
<li><b>Fig. 5:</b></li>
</ul>



FIG.5

<ul>
<li><b>6:9-23, 6:63-67, 7:43-64</b> (<i>See</i> [9.d])</li>
</ul>

<ul>
<li><b>8:1-11</b> ("In either case, and <b><i>after making the decision to perform local rendering at step 405, the proxy server 110, 111, 112 calls the object renderer 206 to perform the object rendering at Step 408. After the rendering process is complete</i></b> (either a complete or partial rendering), the cache manager 207 is called at step 410 to determine whether or not to cache a copy of the rendered object locally. The proxy server 110, 111, 112 then modifies the RHI at step 406 to reflect its local condition and returns the rendered (completely rendered or partially rendered) object along with the modified RHI.")</li>
</ul>

<ul>
<li><b>10:46-56</b> (<i>See</i> [9.e])</li>
</ul>

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| Claim | Tso in view of Huang |
|---|---|
| | • ***See also*** **4:8-15, 9:4-14.** |
| [9.g] an act of delivering the transcoded media content to both client presentation systems concurrently. | **Tso discloses an act of delivering the transcoded media content to both client presentation systems concurrently** (*e.g.*, "transmit[ing]" "appropriate versions" of "a hypertext object" "to such multiple network clients 12 concurrently"**).**<br><br>***E.g.*, Tso:**<br>*See* [9.c], [9.f].<br><br>**Tso** also discloses that the system simultaneously handles multiple client requests such that, once transcoded content for clients has been generated, the appropriate versions for both clients "may be transmitted to such multiple network clients 12 concurrently." Madisetti, ¶¶103-05.<br><br>• **6:51-63** (*See* [9.c])<br><br>• ***See also*** **4:1-5, 5:25-35, 5:42-61, 6:13-23, 6:37-50, 10:37-49, 12:53-67, 14:47-63.** |

B.    **Grounds 2/3: Samaniego**

1.    **Samaniego**

Samaniego, published on June 20, 2002, is §102(b) prior art as of that date (*see* §IV.B.1) because the earliest possible priority date for the '242 is November 7, 2005—the filing date of Application No. 11/269,916 (Ex. 1010, "'916 application"). The '242 purports to claim priority to the application that published as Samaniego and later issued as the '009 (Ex. 1011) as well as Application No. 09/425,326 that issued as the '575 (Ex. 1012), but both of these priority claims are invalid because none of the '242's named inventors is "name[d] … in the previously filed application[s]." 35 U.S.C. §120. A valid priority claim requires the "involved

41

application" and the "earliest application" to "share at least one common inventor." *Polaris*, IPR2013-00323, Paper 62 at 25. None of the '242's named inventors—Messrs. Barger, Johnson, Butler, Destremps, Pochron, and Brown—is identified as an inventor on Samaniego, the '009, or the '575. *See* Exs. 1007, 1011, 1012. These priority claims therefore are invalid. *Polaris*, IPR2013-00323, Paper 62 at 25. Instead, the earliest purported priority application that shares at least one common inventor with the '242 is the '916 application.[4]

PO cannot dispute that Samaniego fully discloses '242 Claim 9. There is no substantive difference between the '242's and Samaniego's specifications: the only changes are an updated paragraph addressing priority, syntactical edits (*see* Ex. 1013), and more formalized drawings (*compare* '242 and Samaniego Figs. 1-23). Madisetti, ¶¶106-07. If the '242's specification supports Claim 9, then Samaniego anticipates Claim 9 based on those same disclosures. Nonetheless, to the extent PO is permitted to dispute Samaniego's disclosures, as set forth in Grounds 3-4, Samaniego, alone and alternatively in view of Tso, renders obvious claim 9.

---

[4] Petitioner does not take a position as to whether the '242 is actually entitled to the filing date of the '916 application.

### 2.    PO Intentionally Changed Inventorship

The original assignee, Equilibrium, and its current CEO Sean Barger, intentionally identified different inventors in Samaniego and the '242. Before the application published as Samaniego was filed in 2001, Mr. Barger left Equilibrium, and did not return until 2004 when his company (AMPS d/b/a Equilibrium) acquired the assets of Equilibrium. *See* Ex. 1014. Before Mr. Barger returned, Mr. Samaniego left Equilibrium in 2003 to join imaging software company Scene7, which became the exclusive distributor for Equilibrium's MediaRich product, which Equilibrium alleges practices the '242. *See* Exs. 1014-1016. In September of 2004, Mr. Barger sued Mr. Samaniego, Scene7, and Equilibrium's prior ownership alleging misconduct when transferring assets to Scene7. *See* Ex. 1020.

While this litigation was ongoing, Mr. Barger and Equilibrium filed Application No. 11/269,916 ("'916")—an alleged "continuation-in-part," but, as discussed in §IX.B.1, with a substantively identical specification to Samaniego. *See generally* Ex. 1010; Ex. 1021. The '916 and Samaniego initially named the same inventors (*see* Ex. 1010, 68-70; Ex. 1034, 8), but the USPTO in 2005 raised that those named inventors did not sign the application. Ex. 1010, 76-77. In response, Mr. Barger and Equilibrium amended the application, adding Mr. Barger as an inventor, and attested that the applicant was unable to reach any of the original named inventors—an attestation that was blatantly false given Mr. Barger's ongoing

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

and active litigation against Mr. Samaniego. *See* Ex. 1010, 78-98; Ex. 1020, 1. Mr. Barger and Equilibrium then filed Application Nos. 12/173,747 and 12/238,842, both again with substantively identical specifications to Samaniego (*see* Exs. 1026-1029), both of which replaced all of Samaniego's named inventors with new named inventors. *See* Ex. 1026, 76-87; Ex. 1027, 77-86; Ex. 1007. The '242 issued from a divisional of 12/173,747. Equilibrium thus intentionally changed inventorship in the '242—despite maintaining the same specification.

Samaniego therefore qualifies as invalidating prior art under pre-AIA §102(b).[5]

### 3.    Claim Chart

| '242 | Samaniego |
|------|-----------|
| **[9.pre]** <span style="color:red">**A method for accessing dynamically transcoding media content,**</span> | • **[0125]** ("**A preferred embodiment of the method scripts the image creation process in HTML to create a dynamic Web site.**")<br><br>• ***See also*** **[0094], [0143], [0143]-[0144], [0147]-[0148], [0151]-[0152], [0155], [0157], Figs. 21-22.**<br>Madisetti, ¶¶109-10. |

---

[5] PO already changed inventorship both during prosecution of the '242 and a parent application, omitting all of Samaniego's inventors. PO already had the opportunity to identify common inventors in the '242 and Samaniego to preserve the priority chain, but it did not to do so. The Board and the Office should not permit PO to change the inventorship of either Samaniego or the '242 patent.

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

| '242 | Samaniego |
|---|---|
| the method comprising:[6] | |
| **[9.a]** an act of **receiving a request for media content to be delivered to a client presentation system, wherein the requested media content has a limited number of base transcoding profiles associated therewith, each base transcoding profile corresponding to a cached version of the requested media content**; | **Samaniego** discloses that a user requests a web page that has embedded URLs. Samaniego, [0108], [0138]. Those URLs "direct" a user's **"browser"** to **"generate requests for media content."** Samaniego, [138]. **Cached versions of the requested content are stored in a "media cache database."** Samaniego, [0103], Fig. 6. The cache database also stores **"references to the created images."** Samaniego, [0104], Fig. 6. These references **"are the script used to create the image, the names of the images used to create the image, the dates of those files, and the HTML that represents the created image"**—which is a "base transcoding profile." Samaniego, [0104]. These profiles are "limited" because they are created for only previously-cached versions of content. Madisetti, ¶¶111-12. |

---

[6] Color is used consistently through Grounds 2-3 to show disclosures from the cited

art. Madisetti, ¶108.

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| '242 | Samaniego |
|---|---|
| | • **Fig. 6**<br><br>• **[0103]** ("If the image has not been created, the media caching subsystem 620 hands the HTML tag to a media creation subsystem 630 The media creation subsystem 630 returns an image to the media caching subsystem 620. **The media caching subsystem 620 adds the created image** and the HTML tag **to a media cache database 640.**")<br>• **[0104]** ("The **media cache database 640 contains references to the created images 645. In a preferred embodiment, the references are the script used to create the image, the names of the images used to create the image, the dates of those files, and the HTML that represents the created image**. The media caching subsystem 620 performs lookups in this database to determine if the image has been created. If the image has not been created the media caching subsystem 620 calls upon the media creation subsystem 630 to **create the image and then store the results in the media cache database 640**.") |

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

| '242 | Samaniego |
|------|-----------|
| | • **[0108]** ("**A user requests a Web page from a Web browser 120**.") <br><br> • **[0138]** ("The delivery of an HTML document and media according to a preferred embodiment of the invention is described with reference to FIG. 18. Resource locators (URLs) are placed within HTML documents 301 accessible to the Web server 110. These **URLs direct browsers to generate requests for media to the system 100**.") <br><br> • **[0151]** ("The final media is passed to a user profile system 2160 wherein browser characteristics specified through proprietary tags within the URL are inspected, and appropriate modification to the media is performed, based on such characteristics. **The resulting image is** handed to the media cache system 2120 for caching and **returned to the browser 120**.") <br><br> • *See also* **[0097], [111], [0133], [0138], [0148], [0151]-[0152], [0154], Figs. 21-22.** |
| **[9.b] at the time of the request, and without input by a network administrator, an act of automatically identifying transcoding parameters to be applied to the requested media content prior to delivery to the client presentation** | • **[0148]** ("Upon receipt of the page 301, **the browser contacts the system 100 requesting media specified in the URL**. **The system parses the URL 2100 to determine the content generation procedure 2140 to execute,** any corresponding input parameters to be used by such procedure, any dynamic content processing 2150 to be performed by dynamic media procedures, **any user profile information 2160 to be used to modify the resulting image,** and any cache control HTTP headers 2190 the site instructs to accompany the resulting image.") <br><br> • **[0155]** ("**Table D below is a list of example proprietary URL tags used for content generation within the system** according to the preferred embodiment of the invention. Additional tags may be added to the system as necessary.") |

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

| '242 | Samaniego |
|---|---|
| **system, wherein identification of transcoding parameters is based on one or more formats of any client presentation system;** | • **Table D** ("**p-user profile string Specifies a user profile identifier used to modify the final image prior to returning the image to the browser, thus allowing clients to modify the image returned to the browser to account for individual browsing conditions.**")<br><br>• *See also* **[0065], [0108], [0115], [0138], [0145]-[0147], [0151]-[0152], [0154]-[0155], [0157], Figs. 7, 10, 21-22.**<br><br>Madisetti, ¶¶113-14. |
| **[9.c]** an act of determining that the transcoding parameters to be applied to the requested media content prior to delivery to the client presentation system are the same as transcoding parameters that are being applied to the requested media content prior to delivery to another client presentation system; | **Samaniego** discloses that when a request for content is made, a "media caching subsystem" checks whether a previously-generated image has been cached. Samaniego, [0103]. If not, the request is passed to the "media creation subsystem" to generate the content. Samaniego, [0103]. The "media creation subsystem" then returns the created content to the "media caching subsystem" for caching. Samaniego, [0103]. **Samaniego** further discloses that "[m]ultiple client browsers" communicate with the system. Samaniego, [0137]. When multiple requests for the same content are received, subsequent requests are served using previously-generated media to minimize "overhead." Samaniego, [0135]. Madisetti, ¶¶115-16.<br><br>For example, these teachings not only render obvious, but affirmatively disclose that when the claimed request (*see* [9.a]) is received, the system would determine whether the same content is already being created at the media creation subsystem in response to an earlier request in order to reduce "overhead" associated with generating and caching the media. Samaniego, [0135]; Madisetti, ¶117.<br><br>• [0065] ("The system takes as input the client connection, server traffic, content generation procedures, and proprietary tags placed within the URL to generate optimized media for the client. The need for the Web author to create different versions of a Web site is reduced because the image content of the site is |

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

| '242 | Samaniego |
|------|-----------|
| | automatically handled by the system. In addition, **generated media is cached such that further requests for the same media require little overhead**.") |
| | • **[0103]** ("**The media caching subsystem 620 determines if an image has been created for the requested proprietary tag.** If the image has already been created and the files that built that image have not been modified, the media caching subsystem 620 returns an HTML tag that refers to a previously-generated image. If the image has not been created, the media caching subsystem 620 hands the HTML tag to a media creation subsystem 630[.] **The media creation subsystem 630 returns an image to the media caching subsystem 620. The media caching subsystem 620 adds the created image and the HTML tag to a media cache database 640**.") |
| | • **[0104]** ("The media cache database 640 contains references to the created images 645. In a preferred embodiment, the references are the script used to create the image, the names of the images used to create the image, the dates of those files, and the HTML that represents the created image. **The media caching subsystem 620 performs lookups in this database to determine if the image has been created. If the image has not been created the media caching subsystem 620 calls upon the media creation subsystem 630 to create the image and then store the results in the media cache database 640**.") |
| | • **[0135]** ("The system takes as input the client connection, server traffic, content generation procedures, and proprietary tags placed within the URL to generate optimized media for the client. The need for the Web author to create different versions of a Web site is reduced because the image content of the site is automatically handled by the system. In addition, **the** |

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

| '242 | Samaniego |
|---|---|
| | **generated media is cached so that further requests for the same media require little overhead**.") |
| | • **[0137]** ("A preferred embodiment of the invention is described with reference to FIG. 17. FIG. 17 is a schematic diagram of an image system within a typical Web infrastructure according to the invention. The image system 100 is placed in parallel to an existing Web server 110. The image system 100 may be on-site or off-site to the Web infrastructure. **Multiple client browsers 120*a*-120*d* communicate with both the Web server 110 and the image server 100 via the Internet 130.**") |
| | • *See also, e.g.*, [0064], [0090]-[0092], [0094], [0102], [0105], [0108], [0111], [0126], [0134]-[0135], [0138]-[0140], [0143]-[0144], [0147]-[0148]-[0149], [0151]-[0152], [0155], [0157], Figs. 7, 9, 10, 21-22, Tables C, D, F; Madisetti, ¶¶115-17. |
| **[9.d]** **an act of transcoding the requested media content in accordance with the identified transcoding parameters, such that the identified transcoding parameters are used to perform additional incremental transcoding on top of** the base | **Samaniego** discloses that "intermediate media" are generated using "content generation" procedures, and cached as content **corresponding to a "base transcoding profile."** *See* Samaniego [0149]; [9.a]; Madisetti, ¶¶118-20. After an "intermediate media" is generated, when a subsequent request, such as the claimed request (*see* [9.a]), is received, the system selects the previously-generated "intermediate media" using this "base transcoding profile" that has been transcoded according to only some of the transcoding parameters (*e.g.*, on which additional **"dynamic processing"** and processing based on **"user profile characteristics"** is required), and then **further transcodes that media in accordance with the identified transcoding parameters** (*e.g.*, the additional **"dynamic processing"** parameters and transcoding based on **"user characteristics"**). Samaniego, [0149], [0152]; *see also* [9.b]. Madisetti, ¶¶119-20. |
| | • **[0149]** ("The parser generates a unique primary lookup key 2110 for the specified resulting media. If the key corresponds to an existing generated media 2180, such |

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| '242 | Samaniego |
|------|-----------|
| **transcoding profile**; <br><br> **[9.e]** wherein **the act of transcoding the requested media content in accordance with the identified transcoding parameters comprises:** <br><br> **an act of selecting a pre-existing base transcoded version of the requested media content comprising intermediate derivative media that has been transcoded in accordance with only a portion of the identified transcoding parameters**; and <br><br> **[9.f] an act of creating a final** | media is returned immediately to the browser 120 through a media cache 2120, and the transaction is complete. Otherwise, a media generation occurs. In the case of media generation requiring dynamic content processing, a unique secondary lookup key corresponding to intermediate media is generated 2130. **If intermediate media 2170 corresponding to this key is found, such media is passed directly to the dynamic media content system 2150 having dynamic media procedures, wherein appropriate action is taken to generate the required derivative from the intermediate media data. A unique key is generated for the derivative 2130 and passed to the media caching system 2120.** If the media caching system finds no such intermediate image, such intermediate image is generated according to instructions specified by the content generation procedure, cached by the media cache system 2120 as a secondary cached media 2170, and **passed to the dynamic media system 2150. Again, appropriate action is taken to generate the required derivative from the intermediate image data.**") <br><br> • **[0152]** ("FIG. 22 shows a flowchart of the content generation procedure according to a preferred embodiment of the invention. **A URL containing proprietary tags (2200) is parsed (2210) to determine** the content generation procedure to execute, any dynamic modifications to the media, **user profile characteristics**, and proxy-cache control. A unique final lookup key is generated for the media (2220) and the media cache is checked (2230). If the indicated media exists, control passes to proxy-cache control (2290) and the media is delivered to the browser (2295). Otherwise, dynamic media system tags are separated from content generation control tags (2240) and **a unique intermediate image lookup key is generated (2250). The cache is then checked for** |

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

| '242 | Samaniego |
|------|-----------|
| **version by incrementally performing further transcoding of the pre-existing base transcoded version in accordance with a remaining portion of the identified transcoding parameters**; | such intermediate media (2261). If such intermediate media is found, **it is used directly for dynamic processing, if required.** Otherwise, content is generated (2262) and cached (2263), and the result is evaluated for dynamic processing (2270). **If dynamic processing is required, the media is operated upon by the dynamic content generator (2271)**, otherwise it is evaluated for valid content type (2272). If the content type is invalid, the media is automatically converted to a valid type (2273). **The resulting image is then customized by the user profiling system (2280) for specified browser or client attributes.** Finally, any cache-control directives specified are attached to the response (2290) and the media is delivered to the browser (2295).")<br><br>• *See also* **[0144], [0146]-[0147], [0149]-[0152], Figs. 21-22; Madisetti, ¶¶118-20.** |
| **[9.g] an act of delivering the transcoded media content to both client presentation systems concurrently.** | As discussed for [9.c], **Samaniego** discloses that the system determines that the same content is already being created in response to an earlier request to reduce overhead. For similar reasons, Samaniego's teachings that "[m]ultiple client browsers" communicate with the system and request content not only render obvious, but affirmatively disclose, that the "media creation subsystem" generates, and then the "media caching subsystem" caches, this media once and then this same content is "**returned to** the browser" on each of the two systems, thereby reusing the same generated media for both requests concurrently to reduce overhead. *See* [9.c]; Samaniego, [0151]; Madisetti, ¶¶121-22.<br><br>• **[0151]** ("The final media is passed to a user profile system 2160 wherein browser characteristics specified through proprietary tags within the URL are inspected, and appropriate modification to the media is performed, based on such characteristics. **The resulting image is** handed to the media cache system 2120 for caching and **returned to** the browser 120.") |

| '242 | Samaniego |
|------|-----------|
|      | • ***See also, e.g.***, **[0092], [0136]-[0137], [0151]-[0152], Figs. 1, 17-19, 21-22; Madisetti, ¶¶121-22.** |

### C.    Ground 4: Samaniego in View of Tso

To the extent it is argued that Samaniego does not disclose [9.c] or [9.g], as discussed above in §IX.A.3, **Tso** teaches "concurrently" handling two client requests for the same content as recited in these elements using multiple-thread processing. A POSITA would have been motivated to apply these teachings to **Samaniego**. Madisetti, ¶123.

Like **Tso** (*see* §IX.A.1), **Samaniego** is in the same field as the '242—networked media delivery—and indeed the '242 claims priority to and has the same specification as Samaniego. Samaniego, [0002], [0064], [0090]; *see also* '242, Cover; Madisetti, ¶124.

While **Samaniego** teaches that it is advantageous to handle "identical requests …without regeneration of images," **Tso** teaches how to avoid generating two copies of an image for concurrent requests using multiple-thread processing. Samaniego, [0054]; Tso, 6:45-50; Madisetti, ¶125. A POSITA thus would have been motivated to modify **Samaniego** with **Tso's** teachings of multiple-thread processing to achieve the beneficial and predictable result of serving two concurrent requests

for the same media content for at least the following independent reasons. Madisetti, ¶125.

**First**, **Tso** teaches handling concurrent requests for the same media—*e.g.*, before the output from the first request is cached—by using multiple-thread processing to concurrently serve the requests, while **Samaniego** teaches that it is advantageous to handle multiple requests without regenerating the same content. Tso, 6:51-63; Samaniego, [0110]; Madisetti, ¶126. A POSITA would have been motivated to modify **Samaniego** with **Tso's** teachings to reduce unnecessary processing of the same content twice in the same way, as would otherwise occur if the output of the first request is not yet cached when the second request is received. Madisetti, ¶126.

**Second**, **Tso** teaches improving the efficiency and speed of the system by using multiple-thread processing to eliminate the need to "wait[] for a hypertext object" to be added to cache before reusing the object. Tso, 6:51-63; Madisetti, ¶127. **Samaniego** discloses that it is advantageous to improve the "speed" to "add images, video, and sound to sites." Samaniego, [0045]. A POSITA would have been motivated to modify **Samaniego** with **Tso's** teachings to improve the efficiency and speed of the system. Madisetti, ¶127.

**Third**, Tso provides complementary teachings of managing processing load to Samaniego's teaching of adjusting image quality based on such factors as client

"connection speed" and "server traffic." Samaniego, [0115], Table C; Madisetti, ¶128. Tso discloses a method that adjusts content processing based on the "condition of the device" and supplements Samaniego's teachings by identifying additional parameters that are similar to "server traffic" that may be considered as relevant to processing choices, including "current processing load" at the transcoding server. Tso, 6:64-7:14; Madisetti, ¶128. A POSITA would have found it obvious to further consider "current processing load" at the transcoding server when deciding how to modify image bandwidth to beneficially optimize the use of server processing resources. Madisetti, ¶128.

In light of these teachings, a POSITA would have had a reasonable expectation of success in modifying **Samaniego** with **Tso's** teachings of multi-threaded processing. Indeed, **Tso** teaches that its disclosed multiple thread access to cached objects uses a "standard" interface and does not "require any particular configuration" for the cache, while **Samaniego** teaches using a cache to avoid regenerating content for subsequent requests. Tso, 4:48-5:7, 5:2-7; Samaniego, [0135], [0138]. A POSITA therefore would have found it straightforward and obvious to modify **Samaniego** with **Tso's** teachings, yielding a system in which **Samaniego's** teachings are used to concurrently serve content to multiple users using multi-threaded processing. Madisetti, ¶129. A POSITA would have also had a reasonable expectation of success in making this modification because Tso simply

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

discloses additional features to consider when making image bandwidth adjustments similar to those already disclosed in Samaniego. Madisetti, ¶129.

## X.    SECONDARY CONSIDERATIONS

There is no evidence in the '242's prosecution history or elsewhere supporting any secondary considerations arguments, or evidence of nexus to Claim 9. *See generally* '242 FH; Madisetti, ¶130. Indeed, as demonstrated by the prior art referenced herein, any purported solutions to problems or unexpected results in the '242 were already well known. Madisetti, ¶130. To the extent PO asserts the existence of any secondary considerations in its responses, Petitioner reserves the right to address any such evidence.

## XI.    CONCLUSION

Substantial, new, and noncumulative technical teachings have been presented for '242's Claim 9, which is anticipated and obvious for the reasons set forth above. Madisetti, ¶¶131-36. There is a reasonable likelihood that Petitioner will prevail as to Claim 9. *Inter partes* review of Claim 9 is accordingly requested.

Respectfully submitted,

Dated: January 10, 2023               By: */ James L. Davis, Jr./*
                                      Name: James L. Davis, Jr.
                                      Counsel for Petitioner

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

## CERTIFICATE OF COMPLIANCE

Pursuant to §42.24(d), the undersigned certifies that the foregoing Petition for *Inter Partes* Review of U.S. Patent No. 8,495,242 contains, as measured by the word-processing system used to prepare this paper, 12,327 words. This word count does not include the items excluded by §42.24 as not counting towards the word limit.

Respectfully submitted,

Dated: January 10, 2023

By: */Daniel W. Richards/*
Name: Daniel W. Richards
Counsel for Petitioner

U.S. Patent No. 8,495,242
Petition for *Inter Partes* Review - IPR2023-00330

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2023, I caused a true and correct copy of

the foregoing Petition for *Inter Partes* Review of U.S. Patent No. 8,495,242 and

supporting exhibits to be served via express mail on the Patent Owner at the

following correspondence address of record as listed on PAIR:

22862 - GLENN PATENT GROUP
c/o Perkins Coie LLP
P.O. Box 1247
Seattle, WA 98111-1247
UNITED STATES

_____

A courtesy copy was also sent via electronic mail to the Patent Owner's

litigation counsel at the following addresses:

Jason R. Bartlett (jbartlett@mkwllp.com)
Jason A. Crotty (jcrotty@mkwllp.com)
Marc J. Pernick (mpernick@mkwllp.com)
MAURIEL KAPOUYTIAN WOODS LLP
450 Sansome Street, Suite 1005
San Francisco, CA 94111
Tel: (415) 738-6228

Steven Callahan (scallahan@ccrglaw.com)
Christopher T. Bovenkamp (cbovenkamp@ccrglaw.com)
CHARHON CALLAHAN ROBSON &
GARZA, PLLC
3333 Lee Parkway, Suite 460
Dallas, TX 75219
Tel: (214) 521-6400
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Brandon R. Harper (#6418)

U.S. Patent No. 8,495,242

Petition for *Inter Partes* Review - IPR2023-00330

Carson R. Bartlett (#6750)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
bharper@potteranderson.com
cbartlett@potteranderson.com

_____

Dated: January 10, 2023

By: /Jonathan Bradford/
Name: Jonathan Bradford
**ROPES & GRAY LLP**

# EXHIBIT 7

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

**AKAMAI TECHNOLOGIES, INC.,**

Petitioner,

**v.**

**EQUIL IP HOLDINGS LLC,**

Patent Owner.

_____

Case IPR2023-00332

U.S. Patent No. 9,158,745

_____

**PETITION FOR *INTER PARTES* REVIEW**

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ................................................................. iii

EXHIBIT LIST ..................................................................................... iv

LIST OF CHALLENGED CLAIMS ........................................................ vii

I.      INTRODUCTION ..................................................................... 1

II.     MANDATORY NOTICES ......................................................... 3

    A.    Real Parties-in-Interest ...................................................... 3

    B.    Related Matters ................................................................. 3

    C.    Counsel and Service Information ......................................... 3

III.    PAYMENT OF FEES ................................................................ 4

IV.     REQUIREMENTS FOR *INTER PARTES* REVIEW ..................... 5

    A.    Grounds for Standing ......................................................... 5

    B.    Identification of Challenge .................................................. 5

        1.    Specific Art on Which the Challenge is Based ................. 5

        2.    Statutory Grounds on Which the Challenge is Based ........ 6

V.      '745 PATENT AND PROSECUTION HISTORY ......................... 6

VI.     §325(D) AND §314(A) DISCRETION DO NOT APPLY ............... 8

    A.    §325(d) ............................................................................. 8

    B.    §314(a) ............................................................................. 9

VII.    LEVEL OF ORDINARY SKILL ................................................ 10

VIII.   CLAIM CONSTRUCTION ........................................................ 10

    A.    Preambles ......................................................................... 11

    B.    "content generation operations" .......................................... 11

    C.    "transformation operations" ............................................... 11

IX.     GROUNDS OF UNPATENTABILITY .......................................... 12

    A.    Ground 1: Tso in view of Huang (Claims 1-5) ..................... 12

        1.    Tso ............................................................................. 12

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

|   | 2. | Huang and Motivation to Modify Tso with Huang's Teachings | 16 |

    2.    Huang and Motivation to Modify Tso with Huang's Teachings ...................................................16

    3.    Claim Chart ..................................................................21

B.    Ground 2: Tso in view of Huang and Lawler (Claims 6-7) ...............40

    1.    Lawler .........................................................................40

    2.    Motivations to Modify Tso in view of Huang with Lawler's Teachings ..................................................41

    3.    Claim Chart ..................................................................44

C.    Grounds 3/4: Samaniego (Claims 1-7) ...............................................49

    1.    Samaniego ...................................................................49

    2.    PO Intentionally Changed Inventorship .......................50

    3.    Claim Chart ..................................................................52

D.    Ground 5: Samaniego in View of Tso (Claims 2-4). ..........................60

E.    Ground 6: Samaniego in View of Lawler (Claims 6-7).....................63

X.    SECONDARY CONSIDERATIONS ...........................................................68

XI.    CONCLUSION..........................................................................................68

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '009 FH | File History of U.S. Application No. 09/929,904 |
| '046 FH | File History of U.S. Application No. 12/173,747 |
| '110 FH | File History of U.S. Application No. 12/238,842 |
| '242 | U.S. Patent No. 8,495,242 |
| '575 | U.S. Patent No. 6,792,575 |
| '575 FH | File History of U.S. Application No. 09/425,326 |
| '745 | U.S. Patent No. 9,158,745 |
| '745 FH | File History of U.S. Application No. 13/752,110 |
| '916 | U.S. Patent Application No. 11/269,916 |
| '916 FH | File History of U.S. Application No. 11/269,916 |
| Claims | Claims 1-7 of U.S. Patent No. 9,158,745 |
| Davis | U.S. Patent No. 5,969,716 |
| Delp | U.S. Patent No. 5,420,967 |
| Huang | U.S. Patent No. 6,438,576 |
| IPR | *Inter Partes* Review |
| Lawler | U.S. Patent No. 5,905,522 |
| MTM | Motivation to Modify |
| Petitioner | Petitioner Akamai Technologies, Inc |
| PO | Patent Owner Equil IP Holdings LLC |
| POSITA | Person of Ordinary Skill in the Art |
| PTAB | Patent Trial and Appeal Board |
| RHI | Receiver Hint Information |
| Samaniego | U.S. Patent Application No. 2002/0078093 |
| Starnes | U.S. Patent No. 6,144,996 |
| Tso | U.S. Patent No. 6,421,733 |
| USPTO | United States Patent and Trademark Office |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

## EXHIBIT LIST

| Ex. 1001 | U.S. Patent No. 9,158,745 ("'745") |
|---|---|
| Ex. 1002 | File History of U.S. Application No. 13/752,110 ("'745 FH) |
| Ex. 1003 | Declaration of Vijay K. Madisetti in Support of Petition for *Inter Partes* Review of U.S. Patent No. 9,158,745 |
| Ex. 1004 | U.S. Patent No. 6,421,733 ("Tso") |
| Ex. 1005 | U.S. Patent No. 6,438,576 ("Huang") |
| Ex. 1006 | U.S. Patent No. 5,905,522 ("Lawler") |
| Ex. 1007 | U.S. Patent Application Publication No. US 2002/0078093 ("Samaniego") |
| Ex. 1008 | U.S. Patent No. 5,420,967 ("Delp") |
| Ex. 1009 | U.S. Patent No. 5,969,716 ("Davis") |
| Ex. 1010 | File History of U.S. Application No. 11/269,916 ("'916 FH) |
| Ex. 1011 | (Reserved) |
| Ex. 1012 | U.S. Patent No. 6,792,575 ("'575") |
| Ex. 1013 | Redline Comparison of specifications from Samaniego and the '745 patent |
| Ex. 1014 | Loralee Stevens, Internet Video Startup Gets $3.5 Million, N. Bay Bus. J. (Apr. 14, 2008), https://web.archive.org/web/20080421191837/www.northbaybusinessjournal.com/article/20080414/BUSINESSJOURNAL/19773530/1207/BUSINESSJOURNAL02 |
| Ex. 1015 | LinkedIn Profile for Chris Samaniego, https://www.linkedin.com/in/chris-samaniego-18b6a01 |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| Ex. 1016 | *Equil IP Holdings LLC v. Akamai Technologies, Inc.*, 1:22-cv-00677 (D. Del. 2022) First Amended complaint (Aug. 3, 2022) |
|---|---|
| Ex. 1017 | (Reserved) |
| Ex. 1018 | (Reserved) |
| Ex. 1019 | (Reserved) |
| Ex. 1020 | Docket Report for Berger-Great South Ventures LLC v. Equilibrium Techs. |
| Ex. 1021 | Redline Comparison of specifications from Samaniego and Publication No. 2006-0265476 of Application No. 11/269,916 |
| Ex. 1022 | (Reserved) |
| Ex. 1023 | (Reserved) |
| Ex. 1024 | (Reserved) |
| Ex. 1025 | (Reserved) |
| Ex. 1026 | File History of U.S. Application No. 12/173,747 ("'046 FH") |
| Ex. 1027 | File History of U.S. Application No. 12/238,842 ("'110 FH") |
| Ex. 1028 | Redline Comparison of specifications from Samaniego and Publication No. 2009-0070485 of Application No. 12/173,747 |
| Ex. 1029 | Redline Comparison of specifications from Samaniego and Publication No. 2009-0089422 of Application No. 12/238,842 |
| Ex. 1030 | (Reserved) |
| Ex. 1031 | (Reserved) |
| Ex. 1032 | (Reserved) |
| Ex. 1033 | Gerald Graef, *Graphics Formats for Linux*, 23 LINUX J., March 1996, https://dl.acm.org/doi/fullHtml/10.5555/325530.325533 |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| Ex. 1034 | File History of U.S. Application No. 09/425,326 ("'575 FH") |
|---|---|
| Ex. 1035 | File History of U.S. Application No. 09/929,904 ("'009 FH") |
| Ex. 1036 | Luca Delgrossi et al., *Media Scaling in a Multimedia Communication System*, 2 MULTIMEDIA SYS. 172 (1994), https://link.springer.com/article/10.1007/BF01210448 |
| Ex. 1037 | Armando Fox and Eric A. Brewer, *Reducing WWW latency and bandwidth requirements by real-time distillation*, COMPUT. NETWORKS & ISDN SYS., PROCS. 5TH INT'L WORLD WIDE WEB CONF. (May 1996), https://www.sciencedirect.com/science/article/abs/pii/016975529600027X |
| Ex. 1038 | U.S. Patent No. 6,144,996 ("Starnes") |
| Ex. 1039 | Declaration of Jonathan Bradford |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

## LIST OF CHALLENGED CLAIMS

[1.pre] A method in a host computer for developing transformation processing operations to optimize media content play-back to a plurality of playback devices connected with the host computer in a network, the method comprising:

[1.a] receiving a first request from a first playback device for media content;

[1.b] wherein the first request contains information, the information indicating a first original media content, first content generation operations, and first transformation operations;

[1.c] determining whether a previously-generated first intermediate media content is available for reuse, the previously-generated first intermediate media content having been created using the first original media content and the first set of content generation operations; and

[1.d] responsive to determining that a previously-generated first intermediate media content is available, creating a first optimized media content for the first playback device by performing the first set of transformation operations on the previously-generated first intermediate media content; and

[1.e] responsive to determining that a previously-generated first intermediate media content is not available, creating a first optimized media content for the first playback device by creating a first intermediate content using the first original media content and the first set of content generation operations,

and performing the first set of transformation operations on the first intermediate media content; and

[1.f] sending the first optimized media content to the first playback device

[2.pre] The method of claim 1, further comprising:

[2.a] receiving a second request from a second playback device for media content; wherein the second request contains information, the information indicating a second original media content, second set of content generation operations, and second set of transformation operations;

[2.b] wherein the second request is received substantially concurrently with receiving the first request;

[2.c] wherein the first original media content and the second original media content are the same media content;

[2.d] determining whether a second intermediate media content is available having been previously created using the second original media content and the second set of content generation operations; and

[2.e] responsive to determining that the second intermediate media content is available, creating a second optimized media content for the first playback device by performing the second set of transformation operations on the second intermediate media content; and

[2.f] responsive to determining that the second intermediate media content is

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

not available, creating a second optimized media content for the first playback device by creating the second intermediate content using the second original media content and the second set of content generation operations, and performing the second set of transformation operations on the second intermediate media content; and

[2.g] sending the second optimized media content to the second playback device.

[3] The method of claim 2, wherein the first set of content generation operations and the second set of content generation operations are the same, and the first set of transformation operations and the second set of transformation operations are different.

[4] The method of claim 2, wherein the first set of content generation operations and the second set of content generation operations are different, and the first set of transformation operations and the second set of transformation operations are different.

[5.pre] The method of claim 1, further comprising:

[5.a] determining whether a previously-generated first optimized media content is available for reuse, wherein the previously-generated first optimized media content was created using the first original media content, the first content generation operations, and the first transformation operations;

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

[5.b] responsive to determining that the previously-generated first optimized media content is available, sending the previously-generated first optimized media content to the first playback device.

[6.pre] The method of claim 1, further comprising:

[6.a] determining whether the host computer has sufficient processing resources to create the first optimized media content for the first playback device;

[6.b] responsive to determining that the host computer does not have sufficient processing resources to create the first optimized media content, determining an alternate first set of content generation operations or an alternate first set of transformation operations;

[6.c] creating an alternate first optimized media content using the alternate first set of content generation operations or the alternate first set of transformation operations.

[7.pre] The method of claim 6, wherein the first optimized media content is at a first level of quality and the alternate first optimized media content is at a second level of quality, wherein the first level of quality is higher than the second level of quality;

[7.a] wherein a level of quality of a media content is measured based on a compression format, a bit rate, and an image resolution of a media content sent to a playback device.

x

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

Pursuant to §§311-319 and §42.1,[1] Akamai Technologies, Inc. ("Petitioner") petitions for *inter partes* review ("IPR") of claims 1-7 ("Claims") of U.S. Patent No. 9,158,745 (Ex. 1001, "'745"), assigned to Equil IP Holdings LLC ("PO"). Petitioner requests review of the Claims, and judgment finding them unpatentable under §§102 and 103.

## I.    INTRODUCTION

The '745's purported invention is a method of processing web media content via a cache for playback in a network. The Claims purport to provide a method for automated graphics delivery in which graphics are modified from an original file based on specified parameters. Specifically, the Claims recite receiving a content request including information specifying "content generation" and "transformation" operations. The system determines whether an "intermediate" version created using the "content generation" operations is already cached and, if so, generates and applies the "transformation" operations to that version or, if not, applies both operations to an original version of the content. Madisetti, ¶35.

---

[1] Section cites reference 35 U.S.C. (pre-AIA), 37 C.F.R., or internal sections as context indicates. Emphasis/annotations added unless noted. Figure annotations generally quote the Claims. All citations herein are exemplary and not meant to be limiting.

1

But these features were well-known in the art. For example, ***Tso*** (Ex. 1004) discloses a request packet carrying "selection criteria" specifying content properties—*e.g.*, data "type" and "encoding/compression"—and transformation operations—*e.g.*, "the degree of alteration" of content. Tso, 6:64-7:62. Tso's server uses a "GetScaledObject()" call to find a cached "particular version" (*e.g.*, a processed version) of the content. Tso, 6:9-13. If the requested version exists, it is returned to the requestor. Tso, 4:1-5. Otherwise, the original content item is retrieved and processed. Tso, 6:9-50. ***Huang*** (Ex. 1005) further discloses retrieving partially-rendered intermediate content from cache, and completing rendering of that content. Huang, 7:23-8:11. A POSITA would have been motivated to modify Tso with Huang's teachings, yielding a system that retrieves from cache and completes rendering of partially-rendered content. Madisetti, ¶¶36-37.

Separately, PO's own art also discloses the Claims. The '745 purports to claim, but is not entitled to, priority to Application 09/929,904, published as Samaniego (Ex. 1007) on 6/20/2002. Samaniego's and the '745's specifications are substantively identical, but Samaniego shares no common inventors with the '745, and is therefore §102(b) art. Madisetti, ¶38. At earliest, the '745 can claim priority to Application 11/269,916 (*see* Ex. 1010), which shares common inventorship and was filed 11/7/2005. PO is estopped from disputing Samaniego discloses the Claims because the Examiner considered and agreed with PO's argument that Samaniego

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

supports the Claims.

The Claims are rendered obvious by the combinations of **Tso, Huang, Lawler,** and **Samaniego** as set forth herein, and are also anticipated by or obvious in view of **Samaniego.** Madisetti, ¶39. Petitioner requests that the Board institute trial and find the Claims unpatentable.

## II.    MANDATORY NOTICES

### A.    Real Parties-in-Interest

Petitioner Akamai Technologies, Inc. is the real party-in-interest. No other party had access to or control over the present Petition, and no other party funded or participated in preparation of the present Petition.

### B.    Related Matters

Petitioner is concurrently filing IPR petitions challenging claims of related U.S. Patent Nos. 8,495,242 ("'242") (IPR2023-00330) and 6,792,575 ("'575") (IPR2023-00329). There are no other IPRs pending for the '745 or patents related to the '745 beyond those being concurrently filed.

The '745 is the subject of the following co-pending civil action: *Equil IP Holdings LLC v. Akamai Technologies, Inc.*, No. 1-22-cv-00677 (D. Del.).

### C.    Counsel and Service Information

Scott McKeown (Reg. No. 42,866) (Lead)
**ROPES & GRAY LLP**
2099 Pennsylvania Avenue NW
Washington, DC 20006

3

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

Phone: 202-508-4740
Fax: 202-383-9335
scott.mckeown@ropesgray.com
akamai-equil-ropes-ipr-service@ropesgray.com

James L. Davis, Jr. (Reg. No. 57,325) (Back-up)
**ROPES & GRAY LLP**
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303-2284
Phone: 650-617-4000
Fax: 617-235-9492
james.l.davis@ropesgray.com

Daniel W. Richards (Reg. No. 69,652) (Back-Up)
**ROPES & GRAY LLP**
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303-2284
Phone: 650-617-4000
Fax: 617-235-9492
daniel.richards@ropesgray.com

Customer No. 28120

Mailing address for all PTAB correspondence:
**ROPES & GRAY LLP**, IPRM—Floor 43
Prudential Tower, 800 Boylston Street,
Boston, MA 02199-3600

Petitioner consents to electronic service of documents to the email addresses of the counsel identified above.

## III.   PAYMENT OF FEES

The USPTO is authorized to charge any fees due during this proceeding to Deposit Account No. 18-1945, under Order No. AKTI-011-653.

4

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

## IV.  REQUIREMENTS FOR *INTER PARTES* REVIEW

### A.  Grounds for Standing

§42.104(a): Petitioner certifies that the '745 is available for IPR. Petitioner and the real parties-in-interest are not barred or estopped from requesting IPR challenging the Claims on the grounds identified herein.

### B.  Identification of Challenge

§§42.104(b)-(b)(1): Petitioner requests IPR of claims 1-7, and that the Board cancel the same as unpatentable.

#### 1.  Specific Art on Which the Challenge is Based

Petitioner relies on the following prior art:

| Name | US Patent/ Publication | Exhibit | Filed | Published/ Issued | Prior art under at least |
|------|------------------------|---------|-------|-------------------|--------------------------|
| Tso | 6,421,733 | 1004 | 9/8/1997 | 7/16/2002 | §§102(b)/(e) |
| Huang | 6,438,576 | 1005 | 3/29/1999 | 8/20/2002 | |
| Lawler | 5,905,522 | 1006 | 8/31/1995 | 5/18/1999 | §102(b) |
| Samaniego | 2002/0078093 | 1007 | 8/14/2001 | 6/20/2002 | |

The '745's priority date is no earlier than 11/7/2005, when Application 11/269,916 was filed. The '745 cannot claim priority to the earlier-filed purported priority applications (09/425,326 and 09/929,904) because none of the '745's named inventors is "name[d] … in the previously filed application[s]." 35 U.S.C. §120. A

5

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

valid priority claim requires the "involved application" and the "earliest application" to "share at least one common inventor." *Polaris Wireless, Inc. v. TruePosition Inc.*, IPR2013-00323, Pap. 62, *25, *aff'd* 622 F. App'x 915 (Fed. Cir. 2015); *see also* Exs. 1002, 1034-1035. Moreover, the Examiner found that the Claims do not "receive the priority date of" 09/427,326 because that application does not provide written description support for the Claims. Ex. 1002, 165; *see In re NTP, Inc.*, 654 F.3d 1268, 1277 (Fed. Cir. 2011) (earlier application's "written description" must "satisfy the requirements of §112").

### 2.  Statutory Grounds on Which the Challenge is Based

| Ground | Claims | References |
|---|---|---|
| 1 (§103) | 1-5 | Tso in view of Huang |
| 2 (§103) | 6-7 | Tso in view of Huang, Lawler |
| 3/4 (§§102/103) | 1-7 | Samaniego |
| 5 (§103) | 2-4 | Samaniego in view of Tso |
| 6 (§103) | 6-7 | Samaniego in view of Lawler |

## V.  '745 PATENT AND PROSECUTION HISTORY

Claims 1-7 recite methods for processing media using cached intermediate content items. '745, 1:22-26, 17:39-41, 23:9-39. Figure 21 shows an example embodiment (Madisetti, ¶40).

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332



*FIG. 21*

A **server** receives a request from a user's **browser**. '745, 19:7-15. The server extracts from the request information specifying the requested **original media content**, and **content generation** and **transformation (*e.g.*, "dynamic content processing")** operations to apply to that content. '745, 19:15-23. A **parser** determines whether a fully processed "primary" version of the requested media is

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

cached and if so, returns the cached content to the requester. '745, 19:24-27. Otherwise, the parser searches for previously-generated intermediate media in cache; if such media is found, transformation operations are applied to that media, and the resulting generated media is returned to the browser. 19:27-36, 20:1-2. If intermediate media was not cached, the requested media is generated using the content generation and transformation operations and then returned to the browser. *Id.* 20:1-2; Madisetti, ¶41.

During prosecution, the Claims were allowed, without rejection, in a first action. Ex. 1002, '745 FH, 156-57, 267-78; Madisetti, ¶¶42, 44. In a Notice of Allowance, the Examiner stated that "support for the claimed subject matter has been found in … 09929904"—which published as **Samaniego**. Ex. 1002, 165; Ex. 1007; Madisetti, ¶43.

Notably, the Applicant filed a Request to Correct Inventorship during prosecution changing named inventors. Ex. 1002, 220-25. None of the originally-named or newly-identified inventors is named on **Samaniego** or the patent that issued therefrom. *See* Exs. 1001-1002, 1007, 1012, 1035.

## VI.    §325(D) AND §314(A) DISCRETION DO NOT APPLY

### A.    §325(d)

Under *Advanced Bionics v. Med-El Elektromedizinische Gerate*, IPR2019-01469, Pap. 6, *8-9, the Board should not exercise §325(d) discretion.

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

**This Petition's grounds are not the same or substantially the same as the prosecution art or arguments.** None of the cited references was considered as art during prosecution. The Examiner did not issue any rejections before allowance. The Examiner did find that Samaniego fully supports the Claims, but did not consider that Samaniego is prior art. *See* Ex. 1002, 150-213. As explained below, the Claims are anticipated and/or obvious under the identified Grounds. *See* §IX.

**Even if the art or arguments were substantially the same, the Examiner erred in a manner material to the patentability of the Claims.** The Examiner "did not expressly consider" any cited references as prior art, rendering it difficult, if not impossible, to explain "how the Examiner might have considered the arguments presented in the Petition." *Bowtech, Inc. v. MCP IP, LLC*, IPR2019-00379, Pap. 14, *20 (declining to exercise §325(d) discretion). Even if any art considered by the USPTO was substantially similar to these references (none is), the Examiner would have erred in not rejecting the Claims. It was also error not to consider Samaniego as prior art during prosecution in light of the inventorship difference.

**B.      §314(a)**

The co-pending litigation also does not warrant the exercise of discretion under §314(a) under *Fintiv*.

1: Following institution, Petitioner intends to seek a stay of the Delaware case pending the outcome of this IPR and concurrently-filed IPR2023-00329 and

9

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

IPR2023-00330.

2: No trial date is set.

3: The case is in the pleading stage and the court has not ruled on the initial motion to dismiss.

4: After the final written decision, which is expected before trial even without a stay, the same grounds, arguments, and evidence could not be presented in the litigation.

5: The litigation and PTAB parties are the same.

6: The merits of this Petition are compelling as shown herein.

## VII.  LEVEL OF ORDINARY SKILL

A person of ordinary skill in the art ("POSITA") as of the '745's claimed priority date would have had a bachelor's degree in computer systems, computer science, or the equivalent thereof, and at least two years of experience with networked media delivery or related technologies. Madisetti, ¶¶45-46, 48-49. More education can supplement practical experience, and vice-versa. *Id.*

To the extent PO contends the '745 is entitled to a priority date earlier than November 7, 2005 (it is not—*see* §IX.B.1), the Claims are still unpatentable. Madisetti, ¶¶47, 50-51.

## VIII.  CLAIM CONSTRUCTION

Claim terms subject to IPR are construed using *Phillips v. AWH Corp.*, 415

10

F.3d 1303, 1313 (Fed. Cir. 2005). §42.100(b). Only terms necessary to resolve the controversy need construction. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor*, 868 F.3d 1013, 1017 (Fed. Cir. 2017). Because the prior art asserted herein discloses embodiments within the Claims' indisputable scope, the Board need not construe the Claims' outer bounds. All claim terms should be construed according to their plain and ordinary meaning. Madisetti, ¶¶52-53.

### A.    Preambles

Regardless of whether the preambles are limiting, the prior art discloses them. *See* §IX; Madisetti, ¶54.

### B.    "content generation operations"

The specification provides examples of "content creation commands": *e.g.*, converting media to a specified type/bit-depth, scaling to a specified size, and saving to a specified file. '745, 21:16-22:39. A POSITA would have understood "content generation operations" to encompass the disclosed "content creation commands," including the exemplary commands above, which are disclosed in the prior art (*see* §§IX.A, IX.C). Madisetti, ¶¶55-56.

### C.    "transformation operations"

The '745 does not clearly define "transformation operations" and uses a form of "transform" only once outside of its claims, when discussing prior art. *See* '745, 3:56. However, the specification discloses "proprietary tags" for implementing

"media processing script commands": *e.g.*, "SetResolution" and "Colorize" operations. '745, 10:27-15:20. A POSITA would have understood "transformation operations" to at least encompass the media processing script commands, including the exemplary commands above, which are disclosed in the prior art (*see* §§IX.A, IX.C). Madisetti, ¶¶57-59.

## IX.    GROUNDS OF UNPATENTABILITY

This Petition is supported by the Declaration of Dr. Vijay Madisetti, which describes the prior art's scope and content at the time of the '745. Madisetti, ¶¶1-34, 60-64. The art renders the Claims unpatentable under each of the Grounds.

### A.    Ground 1: Tso in view of Huang (Claims 1-5)

#### 1.    Tso

Tso discloses a networked "system for dynamically transcoding data." Tso, 1:13-14; Madisetti, ¶65. Figure 3 shows an embodiment of the system:

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332



FIG.3

Tso, Fig. 3; Madisetti, ¶66. A **network client** includes a browser and sends a **request for "image, video, or HTML" content** to a **transcoding server**. Tso, 4:6-10.

The request packet stores "selection criteria." Tso, 6:64-8:9. "Selection criteria" specify, *e.g.*, the "particular content" being requested (Tso, 7:4-7); "content characteristics, such as its data type, size, and dimension" (Tso, 7:20-33—an example of the claimed content generation operations (*see* §V))—and "the degree of alteration desired" for content and other "rules or programs to run for customizing content" including "resolution" (Tso, 7:20-29, 7:60-8:9—examples of the claimed transformation operations (*see* §V)). Madisetti, ¶¶66-67. Criteria also specify a "dynamically update[d]" "current processing load." Tso, 6:64-7:14. The system applies these criteria and "combinations thereof" to select "transcode service providers" used to provide a "virtually limitless range" of "transcoding services."

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

Tso, 3:48-65, 7:15-17, 8:10-14; Madisetti, ¶67.

The **transcoding server** receives the request and hands it to a transcoder, which includes a "**parser**," "**transcode service providers**," and a "**cache interface**" connected to "**cache memory**." Tso, 3:8-17, 3:66-4:5, 4:14-19; Madisetti, ¶68.

Figs. 8-9 show relevant parts of Tso's transcoding process:



FIG.8    FIG.9

Tso, Figs. 8-9; Madisetti, ¶69. First, the client **sends a content request**. Tso, 3:11-

16, 14:21-25. The server issues a "GetScaledObject()" call to **determine if the requested version of the content is cached**. Tso, 14:25-30. If so, the **content is retrieved** and **returned to the client**. Tso 14:30-32. Otherwise, **the parser uses "selection criteria" to determine whether additional transcoding is required**. Tso, 14:47-50, 7:15-8:9. **Any required transcoding is then performed** using transcode service providers. Tso, 14:50-55, 10:37-49. Different transcode service providers perform different transcoding operations, and additional providers are "dynamically added" to provide new transcoding "features" or "algorithms." *Id.*; Tso, 4:23-37; Madisetti, ¶70.

Both "original" and "several different" "transcoded" versions of content are cached. Tso, 4:1-5, 6:13-23. Once the requested version of the content is generated and cached, the content is **returned to the client's browser**. Tso, 6:42-50, 14:52-57; Madisetti, ¶71.

Tso also discloses using multiple-thread processing on servers to handle concurrent requests for content: the content is retrieved only once, and "appropriate versions" are delivered to multiple clients "concurrently." Tso, 5:43-50, 6:51-63, 7:60-8:9; Madisetti, ¶72.

Tso also discloses using these teachings to "collaboratively" transcode content using multiple servers and clients. Tso, 14:47-15:6, 16:10-14. During collaborative transcoding, servers partially transcode content before sending it to clients or other

servers to complete transcoding; servers thus send, receive, and further transcode partially-transcoded content. *Id.*; Madisetti, ¶73.

### 2. Huang and Motivation to Modify Tso with Huang's Teachings

Huang teaches networked "object rendering" in which "rendering" includes, *e.g.*, transcoding that "renders" content "into different forms or resolutions" or from color to "black-and-white." Huang, 1:17-22, 1:57-58, 6:59-63; Madisetti, ¶74.[2] Proxy servers cache partially-transcoded content, and retrieve such cached partially-transcoded content to complete rendering in response to client requests. Huang, 7:34-36, 8:4-11, 9:4-14; Madisetti, ¶74. Fig. 4 shows an embodiment of this process:

---

[2] As used herein, "rendering" refers to transcoding. These "resolution" and "bit depth" rendering operations describe similar operations to Tso's "data type, type of encoding/compression," "resolution," and "number of colors" transcoding operations. *See* Tso, 7:15-8:9; Madisetti, ¶74.

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332



FIG.4

Huang, Fig. 4; Madisetti, ¶¶75-76. In response to a request, the proxy server **searches for a sufficiently "detailed" cached version** of the content for the request. Huang, 7:23-36. If one is found, the server **performs any additional needed rendering**, and then **caches** and **returns** the rendered content. Huang, 7:53-8:11; Madisetti, ¶76.

Content is stored along with Receiver Hint Information ("RHI") and "object-specific descriptor" "meta-information." Huang, 5:42-52. A server uses the RHI to determine whether "complete or partial rendering" is required, "partition" the rendering process into "two or more steps," and, when performing rendering, modify

the RHI to "reflect the processing that [the server] performed." Huang, 6:9-22, 6:56-68. When receiving a new request for previously-cached content, RHI is used to determine if "further rendering is necessary" and whether to "complete the entire rendering process" locally. Huang, 7:43-64. Rendering steps can occur in different orders: *e.g.*, "steps with the most bandwidth reduction" or steps to "reduce load unbalancing" can be performed first. Huang, 4:33-37; Madisetti, ¶77.

Tso and Huang are analogous prior art in the '745's same field and are reasonably pertinent to the '745's alleged problems of automating media delivery and improving overhead and speed for Web page generation. '745, 1:23-26, 4:52-58, 5:1-10, 6:6-10; Tso, 1:10-31, 1:59-2:5, 4:1-5; Huang, 1:20-26, 2:1-10, 2:37-44; Madisetti, ¶78.

While **Tso** discloses servers sending, receiving, and further transcoding partially-transcoded content (*see* §IX.A.1), **Huang** teaches tracking, retrieving from local cache, and further rendering partially transcoded content, and organizing rendering into steps. *E.g.,* Tso, 5:39-41, 14:64-15:6; Huang, 6:63-67; Madisetti, ¶79. A POSITA would have been motivated to modify **Tso** with **Huang's** partial rendering teachings for at least the following independent reasons. Madisetti, ¶79.

**First**, **Tso** and **Huang** disclose complementary mechanisms for improving processing efficiency. **Tso's** teachings of storing "several different versions" of content to avoid "re-transcod[ing]" content, sending/receiving partially-transcoded

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

content, a client requesting cached content that requires "additional transcoding," and using partially-transcoded content for, *e.g.*, "staged" or "collaborative" transcoding, provide **Tso** with partially-transcoded cached content. *See* Tso, 4:1-5, 4:39-61, 5:35-42, 6:13-17, 14:57-15:6, 15:66-16:14; *see also* §IX.A.1. For example, partially or fully-transcoded content may be further transcoded "to greyscale for users lacking a color display." Tso, 17:9-15. **Tso** further teaches that such transcoding of already-cached content improves speed and efficiency by eliminating "the need to re-retrieve" or "re-transcode" "content." Tso, 4:1-5. **Huang** explicitly teaches that retrieving partially-rendered content from local cache also advantageously allows a server to fully render content without unnecessary re-rendering and re-retrieval. Huang, 6:63-67, 7:42-8:11. **Huang** thus provides detailed teachings explaining how to further improve speed and efficiency by utilizing local previously-cached content, including "partially rendered" versions, to avoid "repeating" "rendering operations." Huang, 6:63-67, 2:9-13. Thus, whether retrieving a fully-transcoded file from Tso's cache as "partially rendered" content for further transcoding as suggested by Huang, or retrieving a partially transcoded version for further transcoding (*e.g.*, Tso, 14:57-15:6), both paths would improve Tso's speed and efficiency. Madisetti, ¶80. A POSITA would have been motivated to improve **Tso** with **Huang's** teachings to allow a server with its own locally-cached and partially-rendered/transcoded copy of content to also complete

19

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

rendering/transcoding on its own, which advantageously avoids unnecessary re-rendering/transcoding and re-retrieval of content. *Id.*; Huang, 7:23-50, 2:8-13; Tso, 4:1-5.

**Second, Huang** provides additional detailed teachings of tracking transcoding status of content, as referenced by **Tso**. **Tso** broadly teaches using "GetProperties()" and "SetProperties()" calls to track transcoding status, but leaves it to a POSITA to implement this function. *E.g.*, Tso, 5:36-42, 14:30-36. **Huang** provides additional details of how to track transcoding steps applied to content by managing available versions of content on a server. Huang, 5:60-6:23, 8:12-16. Applying these RHI teachings to **Tso** advantageously allows splitting transcoding/rendering into separate "steps," caching "partially" transcoded/rendered versions, and tracking the transcoding/rendering status of each cached version in a manner that allows the server to configure rendering steps to, *e.g.*, maximize "bandwidth reduction" or reduce "load unbalancing" while avoiding "repeating" transforming/rendering steps on a server. Huang, 4:24-39, 6:9-23, 6:63-67. For example, it would have been obvious to adjust the "size" of content first to obtain "the most bandwidth reduction first." Huang, 4:24-39. Madisetti, ¶¶81-82. *E.g.*, Ex. 1036 (Delgrossi), 173; Ex. 1037 (Fox), 1446; Ex. 1008 (Delp), 3:61-4:2.

In light of the above teachings, a POSITA would have had a reasonable expectation of success in modifying **Tso** with **Huang's** teachings of reusing

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

partially-processed content. **Tso** already teaches caching retrieving specific versions of content, and both sending and receiving partially-transcoded content. Modifying **Tso** with **Huang's** teachings would require using **Tso's** already-taught functions, *e.g.*, "GetScaledObject()" and "Get/SetProperties()," to additionally retrieve cached partially-transcoded content and track its properties as taught by Huang. Tso, 5:36-42; 12:53-13:11; Madisetti, ¶83. Indeed, such use of partially-transcoded content was well-known. *E.g.*, Ex. 1008, Abstract; Ex. 1009, 4:2-4. Modifying **Tso** with **Huang's** teachings would have been a straightforward and predictable application of those teachings. Madisetti, ¶83.

### 3.    Claim Chart

| '745 | Tso in view of Huang |
|---|---|
| [1.pre]**[3]** A method in a host computer for developing transformation processing operations to optimize media content playback to a plurality of playback devices | **Tso discloses a method in a host computer** (*e.g.*, "server") **for developing transformation processing operations** (*e.g.*, using "selection criterion" to "provide a virtually limitless range of dynamic transcoding services") **to optimize media content playback** (*e.g.*, "compress and/or scale" media including "image, video, or HTML" to optimize or "reduce[] user-visible latencies") **to a plurality of playback devices** (*e.g.*, "multiple users (i.e., clients)," "network client computer[s]") **connected with the host computer in a network** (*e.g.*, "an ISP's network," "Internet 18"**). *E.g.*, Tso:** |

---

[3] Petitioner charts preambles to the extent they are limiting without contending they are limiting for purposes of the Petition.

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| connected with the host computer in a network, the method comprising: | **Tso** discloses that "a network server computer" develops a process for "transcoding" operations by using combinations of "selection criteria" to provide a "virtually limitless range of dynamic transcoding services" for "image, video, or HTML" content. Tso, 2:44-47, 3:45-60, 8:10-13, Fig. 3. This content is sent to "multiple users" across, *e.g.*, the Internet and is optimized to reduce "user-visible latencies." Tso, 3:17-30, 16:63-17:15; Madisetti, ¶¶84-86. |
| | • **Fig 3** |
| |  |
| | FIG.3 |
| | • **2:44-47** ("Embodiments of the present invention provide the ability to ***dynamically transcode information transmitted between***, for example, a ***network server computer and a network client computer***.") |
| | • **3:17-30** ("***Transcoder 20 may be implemented***, for example, ***as a software module installed in a network proxy***, in a client device, in a ***network server device, or in a content server device***. … ***Remote transcoding server 34 may be coupled, for example, to*** an ISP's network, a corporate network, or anywhere on ***Internet 18***, ***and may provide multiple users (i.e., clients) with a means to obtain content*** on Internet 18.") |
| | • **3:45-60** ("[T]ranscoder 20 is coupled to HTTP remote proxy 36. Parser 22 manages the transcoding of data to be transmitted from transcoding server 34 to network client 12. To this end, parser 22 controls ***transcode service*** |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| | *providers 24 to selectively transcode content based on a predetermined selection criterion.* For example, one or more **transcode service providers 24 may provide the capability to compress and/or scale different types of data content, such as image, video, or HTML**….") |
| | • **8:10-13** ("***Applying*** the above-listed **selection criteria, or combinations thereof, embodiments of the present invention may be used to provide a virtually limitless range of dynamic transcoding services**.") |
| | • **16:63-17:15** ("The unique features of such embodiments **enhance the ability of these computers to access data** on the network in a timely fashion **with reduced user-visible latencies** ….") |
| | • ***See also* 2:8-12, 2:50-3:6, 6:55-63, 7:15-8:9, 15:7-28, 16:63-17:15, 22:13-18, Fig. 5.** |
| [1.a] receiving a first request from a first playback device for media content; | **Tso discloses receiving a first request** (*e.g.*, "HTTP request") **from a first playback device** (*e.g.*, "user," "network client"; *see* [1.pre]) **for media content** (*e.g.*, "image" or "video" "data content")**.** |
| | ***E.g.*, Tso:** |
| | *See* [1.pre]. |
| | **Tso** also discloses a "transcoding server" receiving a "HTTP request" for image or video data from a "network client." Madisetti, ¶¶87-89. |

23

| '745 | Tso in view of Huang |
|---|---|
| | • **Fig. 3**<br><br><br><br>• **9:49-65** ("*Network client 12, via browser 32, transmits an HTTP request for the hypertext object to transcoding server 34* over client/server communications link 14.")<br><br>• *See also* **3:7-16, 3:39-60, Fig. 5.** |
| [1.b] wherein the first request contains information, the information indicating a first original media content, first content generation operations, and first transformation operations; | **Tso discloses wherein the first request contains information** (*e.g.*, request "packet" contains "selection criteri[a]"), **the information indicating a first original media content** (*e.g.*, indicating "particular content," "requested hypertext object," which can be saved as the "original version"), **first content generation operations** (*e.g.*, indicating "content characteristics" specifying "data type, type of encoding/compression" or "size"), **and first transformation operations** (*e.g.*, indicating "network client" properties, "content characteristics" specifying a "resolution," or "content provider preferences" specifying how to "customize content").<br><br>*E.g.*, **Tso:**<br><br>*See* [1.pre]-[1.a].<br><br>**Tso** also discloses that request packets "selection criteri[a]" specifying the "particular content" requested and transcoding parameters used by a server's "parser" to "selectively invoke" one or more "transcode service providers." Tso, 6:64-7:14.<br><br>The "selection criteria" specify content generation operations: *e.g.*, "content characteristics" including "data type, type of |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| | encoding/compression," and "size." Tso, 7:15-8:9.[4] Madisetti, ¶¶90-92. |
| | The "selection criteria" also specify transformation operations: *e.g.*, "client" and additional "content characteristics" such as "number of colors," "encoding/compression," or "resolution," and "content provider preferences" including "the degree of alteration desired for its content." Tso, 7:20-8:4.[5] Madisetti, ¶93. |
| | • **6:64-7:7** ("As noted above, *parser 22 may selectively invoke one of transcode service providers 24 based upon satisfaction of a predetermined selection criterion. Such selection criterion may comprise*, for example, *information contained in* a header portion of *a data packet* …. [T]he predetermined selection criterion may comprise … *particular content*, key words, structures (for example, heading levels), and so on.")<br><br>• **7:15-8:9** ("The following discussion provides still more *examples of the types of information which may be used to dictate which of transcode service providers 24 are invoked*. It should be noted, however, that these examples are provided by way of illustration only, and are not |

[4] A POSITA would have understood these to disclose content generation operations consistent with, e.g., the "save" and "scale" content generation operations in '745 Table E, which save media to a "specified file" and scale media to a "specified size." '745, 21:20-22:38; Madisetti, ¶93.

[5] A POSITA would have understood these to disclose transformation operations consistent with the '745 "media processing script command" transformation operations including, e.g., "Set Resolution" and "Colorize." '745, 10:50-15:20; Madisetti, ¶94.

25

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| | intended to limit in any way the scope of the invention claimed herein. The predetermined *selection criterion* may comprise: (1) *network client 12, such as a display dimension, resolution, number of colors*, … (3) *content characteristics, such as its data type, type of encoding/compression, size, and dimension*; … (8) *content provider preferences, including the degree of alteration desired for its content, … rules or programs to run for customizing content* (for example, news or advertising, custom language translation software) *based on user or client characteristics*….") |
| | • **14:37-46** ("*If parser 22 determines that the requested hypertext object does not exist* in the server-side cache memory 30, HTTP remote proxy 36 issues an HTTP request to retrieve the hypertext object from Internet 18 (Step 190). … [I]f the object is found, HTTP remote proxy 36 passes the handle for the incoming data stream to parser 22, which in turn initiates *caching of an original version of the retrieved hypertext object* (Step 230).") |
| | • **17:9-15** ("Embodiments of the present invention may also be advantageously used for … *converting color images to greyscale images for users lacking a color display*….") |
| | • *See also* **9:26-41, 9:49-65, 10:16-49.** |
| [1.c] determining whether a previously-generated first intermediate media content is available for reuse, the previously-generated first | **Tso discloses determining whether a previously-generated media content is available for reuse** (*e.g.*, use "GetScaledObject()" to "request[] a particular version of that object, such as a high-quality rendition" from "cache" "determine whether a … version of the requested hypertext object already exists" in "cache" and, if "not found," "create … a placeholder"), **and media content created using the first original media and the first set of content generation operations** ("transcoded version[] of content" created using original media (*see* [1.b]) and content generation operations (*see* [1.b]))**.** |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|------|----------------------|
| intermediate media content having been created using the first original media content and the first set of content generation operations; and | ***E.g.*, Tso:**<br><br>*See* [1.pre], [1.b].<br><br>**Tso** also discloses using a "GetScaledObject()" call to retrieve from cache a "particular version of [a media] object" that has been transcoded—*e.g.*, a version transcoded with the claimed content generation operations—to avoid the "need to…re-transcode the content." Tso, 4:1-5, 6:9-28. If the system determines that the item is "not found" in cache, then the system creates "a placeholder" for the item to be cached. Tso, 6:9-28. Madisetti, ¶¶95-96, 98.<br><br>**Tso** further discloses that each server creates and receives partially-transcoded content, and caches transcoded versions of content. Tso, 4:1-5, 5:36-41, 14:47-15:6, 15:66-16:14; §IX.A.1. As a result, a POSITA would have understood that a server responsible for performing only a partial transcoding caches that partially-transcoded version of content. *Id.*; Madisetti, ¶99.<br><br>**Tso** is agnostic to the order in which transcoding steps are performed, and teaches adding new "features" using new "transcode service providers" without affecting existing providers. Tso, 4:23-29. Because providers can perform transcoding in any order, Tso not only renders obvious, but affirmatively discloses, first converting content to a particular "encoding/compression" or "size" (i.e., according to the claimed content generation operations) before performing additional transcoding operations. Madisetti, ¶100; *see* §IX.A.1. |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| | • **Figs. 8 and 9** |



FIG.8    FIG.9

• **4:1-5** ("*Server-side cache memory* 30 may be used to *store both original and transcoded versions of content for later transmission to network client 12 without the need to re-retrieve the content from Internet 18 or to re-transcode the content*.")

• **4:23-29** ("The WOSA architecture … enables *additional transcode service providers 24 to be dynamically added to the system* to provide new features and/or better transcoding algorithms, while at the same time *not requiring changing or retesting other software components in the system*.")

• **5:36-41** ("The GetProperties() and SetProperties() calls retrieve and store *information about cached objects,* including information maintained by transcode service provider 24 *used to determine transcoding properties and transcoding status of a cached object*. *Transcode service provider 24 may use such information*, for example, *to determine current compression progress for scaled data access and staged refinements*.")

• **6:9-28** ("The *GetScaledObject*() call … is also used to request an object from server-side cache memory 30; however, it *adds support for requesting a particular*

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| | *version of that object, such as a high-quality rendition*. … *[W]hen network client 12 requests a hypertext object, HTTP remote proxy 36 uses* either the GetObject() or *GetScaledObject() call* (depending on if network client 12 is capable of receiving scaled/transcoded datatypes) *to retrieve the hypertext object* from parser 22. *If the hypertext object is not found*, parser 22 uses the CreateEntry() call to *create* an entry (in effect, *a placeholder*) in server-side cache memory 30 for the new object.") |
| | • **14:47-15:6** ("Upon receipt, HTTP local proxy 48 initiates caching of the transcoded hypertext object (Step 270). In addition, *client-side parser 50 determines whether any further processing is required* before the hypertext object is rendered …. *If additional transcoding is required, client-side parser 50 passes the handle to an appropriate transcode service provider* 52 (Step 300).") |
| | • **15:66-16:14** ("[A]n embodiment of the present invention may use *a special proxy-to-proxy protocol that extends the existing request/ response structures to indicate whether and what sort of transcoding has already been performed on the content*. Such a specialized protocol … *enables multiple proxies to work collaboratively*, yet still transparently to users, client software, existing "standard" proxies and content servers.") |
| | • *See also* **4:38-47, 4:62-5:7, 5:36-42, 13:39-44, 14:21-15:6.** |
| | **Huang discloses determining whether a previously-generated first intermediate media content is available for reuse** (*e.g.*, determining that "a copy of the requested object can be found in the local cache" for which "further rendering is necessary")**, the previously-generated first intermediate media content having been created using the first original media content and the first set of operations** (*e.g.*, the copy found in local cache is "partially rendered" using "only one" of "two or more steps" tracked with "RHI" information). |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| | ***E.g.*, Huang:** |
| | In addition to **Tso's** teachings of servers sending, receiving, and caching partially transcoded content, **Huang** further teaches a server determines if a partially-rendered—*i.e.*, intermediate—version of content is cached and, if so, "further rendering" the "partially rendered" content on which, *e.g.*, "only one" of "two or more steps" was performed. Huang, 4:24-39, 6:9-23, 6:63-67, 7:42-8:11; §IX.A.2. Content rendering status is tracked with "RHI" information. Huang, 6:9-23, 6:56-58, 7:42-8:11; Madisetti, ¶¶97, 101. The server selects an order to perform rendering steps based on, *e.g.*, load balancing or bandwidth reduction. Huang, 4:24-39. |
| | As discussed in §IX.A.2, a POSITA would have been motivated to modify **Tso** with **Huang's** teachings to advantageously avoid re-retrieval and re-transcoding as previously performed on partially-transcoded content, and perform transcoding steps in an order that improves the efficiency of the system, advantageously streamlining content generation. Tso, 14:47-15:6, 15:66-16:14; Huang, 6:63-67, 7:42-8:11; Madisetti, ¶102. Applying **Huang's** teachings, a POSITA would have found it obvious for a server to use **Tso's** GetScaledObject() and GetProperties() calls to retrieve and check the transcoding status of a cached copy of content, including determining previously-performed transcoding/rendering steps, before further transcoding content using that partially-transcoded version instead of re-retrieving and re-transcoding original content. *Id.* |
| | When transcoding, a POSITA also would have found it obvious to apply **Huang's** teaching of performing "bandwidth reduction" transcoding steps by first performing **Tso's** "size"-based transcoding (a content generation operation) prior to performing other types of transcoding—improving "bandwidth" consumption of transcoded content. Huang, 4:24-39. Content transcoded for size is then stored as "partially-rendered" content in cache used to "avoid repeating some object rendering operations." Huang, 6:63-67. As a result, subsequent searches for partially-transcoded content would locate partially- |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| | transcoded cached versions of content on which content generation operations, but not transformation operations, had been performed, rendering obvious this element. *Id.*; Madisetti, ¶103. |

> - **4:24-39** ("A selection method is provided for ***each intermediate node to decide dynamically and independently of other nodes what portion of the required rendering to perform locally using the RHI information.*** The selection method can include steps of (a) ***dividing a remaining rendering operation into steps***; (b) ***selecting one or more rendering steps to be performed locally*** in order to optimize a given objective function, using the RHI information as an input parameter; and (c) ***performing the one or more rendering steps selected for the current node***. The objective function can be to ***perform the rendering steps with the most bandwidth reduction first, and/or to perform the rendering steps so as to reduce load unbalancing*** among the remaining nodes on the path to the requesting client device node.")
>
> - **6:9-23** ("When a requested object passes through the proxy network, ***any proxy server*** 110, 111, 112 ***can perform a complete or partial rendering based on the associated RHI***. For example, ***if the entire rendering process can be partitioned into two or more steps, a given one of the proxy servers (e.g., 110) may decide to perform only one of the rendering steps***, and to then forward the partially rendered object to another proxy server (e.g., 111). ***The proxy server 110 also modifies the RHI to reflect the processing that it performed***, and forwards the modified RHI as well to the proxy server 111.")
>
> - **6:56-58** ("An object renderer … performs object rendering according to the ***RHI associated with a particular object***….")

U.S. Patent No. 9,158,745

Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| | • **6:63-67** ("Proxy server logic 203 may also include a *cache manager 207* which *maintains a local copy of the partially rendered or completely rendered objects in order to avoid repeating some object rendering operations with the same proxy server*.") |
| | • **7:42-8:11** ("*If a copy of the requested object can be found in the local cache, at step 402, the proxy server checks the cached object against the RHI to see if any further rendering is necessary. … By checking the RHI, the proxy server 110, 111, 112 can determine if any further rendering is necessary*. If no further rendering is necessary, the proxy server modifies the RHI to indicate its local condition for providing rendering services and returns the object at step 403. *If further rendering is found to be necessary*, based on the RHI or the requesting device, then *the proxy server* executes at step 405 a selection function to *determine whether* or not it wishes *to perform the rendering locally*. … If the proxy server instead decides to perform the rendering locally, it checks the RHI at step 407 to *determine if it wishes to complete the entire rendering process*, or just some part of the required rendering process. … *After* the rendering process is complete (*either a complete or partial rendering*), the cache manager 207 is called at step 410 to determine whether or not to *cache a copy of the rendered object locally*. *The proxy server* 110, 111, 112 *then modifies the RHI at step 406* to reflect its local condition and *returns the* rendered (*completely rendered or partially rendered*) *object along with the modified RHI*.") |
| | • *See also* **3:32-47, 8:50-59.** |
| [1.d] responsive to determining that a previously-generated first intermediate | **Tso discloses performing the first set of transformation operations** (*see* [1.b])**.** <br><br> *See* [1.pre]-[1.c]. <br><br> **Huang discloses responsive to determining that a previously-generated first intermediate media content is available** (*e.g.*, "if a copy of the requested object can be found in the local |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| media content is available, creating a first optimized media content for the first playback device by performing the first set of transformation operations on the previously-generated first intermediate media content; and | cache" for which "further rendering is necessary"), **creating a first optimized media content for the first playback device** (*e.g.*, creating a "completely rendered … object") **by performing the first set of operations on the previously-generated first intermediate media content** (*e.g.*, "proxy server" "decides to perform the rendering locally" and "complete the entire rendering process").

***E.g.*, Huang:**

*See* [1.b]-[1.c].

As discussed in [1.c], **Tso** in view of **Huang** renders obvious the recited determination; **Huang** further discloses that if a "partially rendered" object is found in cache, the node creates an optimized media content by "complet[ing] the entire rendering process" based on "RHI" information stored with the content. Huang, 7:42-8:11, 6:9-23; *see* [1.c]. Applying this teaching to **Tso's** teaching of performing transformation operations (*see* [1.b]) renders obvious this element. *See* §IX.A.2 (motivation to modify ("MTM")); Madisetti, ¶¶104-07.

- **7:42-8:11, 6:9-23** (*see* [1.c])
- *See also* **Abstract, 3:17-48, 4:2-15, 5:44-55, 6:63-67, 10:46-56.** |
| [1.e] responsive to determining that a previously-generated first intermediate media content is not available, creating a first optimized media content for the first | **Tso discloses responsive to determining that a previously-generated first media content is not available** (*e.g.*, responsive to "determin[ing]" that "a copy of the required version" does not "resid[e] in server-side cache memory"), **creating a first optimized media content for the first playback device** (*e.g.*, "retriev[ing] the hyper text object" and "transcode[] the data stream appropriately" for "network client 12"), **by using the first original media content and the first set of content generation operations, and performing the first set of transformation operations** (*see* [1.b]-[1.d]).

***E.g.*, Tso:**

*See* [1.pre], [1.b]-[1.d]. |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| playback device by creating a first intermediate content using the first original media content and the first set of content generation operations, and performing the first set of transformation operations on the first intermediate media content; and | **Tso** also discloses that if the system determines that the required version is not cached, then the system retrieves from the Internet and transcodes the original content for the client using the content generation and transformation operations, and caches the resulting transcoded content (*see* [1.b]-[1.d]). Madisetti, ¶¶108-09, 111.<br><br>• **Figs. 8-9**<br><br><br>FIG.8   FIG.9<br><br>• **10:24-49** ("Upon being invoked, *parser 22* first calls cache interface 28 with the requested hypertext object to *determine whether a copy of the required version already resides in server-side cache memory 30*. For purposes of illustration, assume no entry exists in server-side cache memory 30 for the requested hypertext object. *HTTP remote proxy 36 then invokes a call to retrieve the hypertext object from Internet 18* over server/network communications link 16. … *Transcode service provider 24 then transcodes the data* stream appropriately, *and* HTTP remote proxy 26 *transmits the transcoded data stream to network client 12*.") |

34

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| | • *See also* **3:43-60, 4:62-66, 5:36-42, 6:9-50, 6:64-66, 14:21-63, 14:37-63.** |
| | **Huang further discloses the first intermediate media content** (*see* [1.c]) **and creating a first optimized media content for the first playback device** (*e.g.*, creating a "completely rendered … object") **by creating a first intermediate content using the first original media content** (*e.g.*, creating and maintaining a "partially rendered … object" in "cache" "based on objects retrieved from the content servers") **and the first set of operations** (*e.g.*, operations required for "partially rendered … object")**, and performing additional operations on the first intermediate media content** (performing the "further rendering" required to generate a "completely rendered" object)**. |
| | ***E.g.*, Huang:** |
| | In addition to **Tso's** teaching of transcoding content that has not been cached using multiple transcode service providers selected using selection criterion, as discussed for [1.c], **Huang** further teaches generating optimized content based on objects retrieved from a content server by "stag[ing]" rendering and storing "partially rendered" content items. Huang, 6:63-67, 5:42-44, 7:36-41; Madisetti, ¶¶110-12. |
| | As discussed in §IX.A.2 and for [1.c] (MTM), a POSITA would have found it obvious to modify **Tso** with this teaching to advantageously cache the "partial" transcoding output from each of the transcode service providers. For example, in addition to transcoding the final version of content, modifying **Tso** with these teachings, the partially-transcoded output from **Tso's** content generation operation transcode service providers is cached as intermediate media content, as taught by **Huang**, in order to "avoid repeating" transcoding steps. *Id.*; Madisetti, ¶113. |
| | • **5:42-44** ("***Object renderings are performed*** by the proxies 110, 111, 112 ***based on objects retrieved from the content servers*** 120, 121.") |
| | • **6:63-67, 7:42-8:11** (*see* [1.c]) |

U.S. Patent No. 9,158,745

Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| | • **7:36-41** ("***If the requested object cannot be found*** in the cache, at step 404, ***the proxy server*** 110, 111, 112 modifies the associated RHI to indicate its ability for providing rendering services and then ***sends the request*** and the modified RHI to another proxy server or ***to the content server*** ….")<br><br>• ***See also*** **Abstract, 2:32-44, 3:32-37.** |
| [1.f] sending the first optimized media content to the first playback device. | **Tso discloses sending the first optimized media content to the first playback device** (*e.g.*, "transmit[]" the "transcoded data stream" to "network client[] 12")**.**<br><br>***E.g.*, Tso:**<br><br>*See* [1.pre], [1.c].<br><br>**Tso** also discloses that after generating the "transcoded version" of the content, the server "transmits" a "data stream for the transcoded hypertext object to network client 12." Madisetti, ¶¶114-16.<br><br>• **6:51-63** ("***Multiple-thread processing improves the efficiency of the present embodiment by not waiting for a hypertext object to be received*** in its entirety by HTTP remote proxy 36, ***or added in its entirety to server-side cache*** memory 30, ***before beginning to send the object to network client 12***. Another benefit of multiple-thread processing is that ***parser 22 may efficiently process requests for the same hypertext object from multiple network clients 12. The hypertext object need only be retrieved from Internet 18 once, and appropriate versions may be transmitted to such multiple network clients 12 concurrently***.")<br><br>• **10:24-49** (*see* [1.e]).<br><br>• ***See also* 6:24-50, 14:47-15:6.** |
| [2.pre] The method of claim 1, | ***See* claim 1.**<br><br>Madisetti, ¶117. |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| further comprising: | |
| [2.a] receiving a second request from a second playback device for media content; wherein the second request contains information, the information indicating a second original media content, second set of content generation operations, and second set of transformation operations; | **Tso discloses [2.a]** as it discloses that "multiple network clients 12" send "requests" for media content containing the claimed information as discussed in [1.a]-[1.b] and thus discloses a second request from a second network client. Madisetti, ¶¶118-20.<br><br>• **6:51-63** (*see* [1.f])<br>• **3:45-60** (*see* [1.a]) |
| [2.b] wherein the second request is received substantially concurrently with receiving the first request; | **Tso discloses wherein the second request is received substantially concurrently with receiving the first request** (*e.g.*, "process requests" from "multiple network clients" and "concurrently" deliver "appropriate versions" of content to each of those "clients"**)**.<br><br>***E.g.*, Tso:**<br>*See* [1.a].<br><br>**Tso** also discloses using "multiple-thread processing" to "concurrently" transmit appropriate versions of content to |

U.S. Patent No. 9,158,745

Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| | multiple clients in response to requests from those clients; two such requests that are processed and served concurrently are received substantially concurrently. Madisetti, ¶¶121-23. <br><br> • **6:51-63** (*see* [1.f]) <br><br> • *See also* **4:62-5:7.** |
| [2.c] wherein the first original media content and the second original media content are the same media content; | **Tso discloses wherein the first original media content and the second original media content are the same media content** (*e.g.*, two network clients request "the same hypertext object")**.** <br><br> ***E.g.*, Tso:** <br><br> *See* [1.c], [2.b]. <br><br> **Tso** also discloses that the system concurrently serves content in response to two client requests for the same hypertext object. Madisetti, ¶¶124-26. <br><br> • **6:51-63** (*see* [1.f]) |
| [2.d]-[2.g] | *See* [1.c]-[1.f], [2.a]-[2.c]. <br><br> **Tso in view of Huang** renders obvious these elements, which recite performing the same steps with respect to the second request as recited in [1.c]-[1.f] with respect to the first request. Madisetti, ¶¶127-34. |
| [3]/[4] The method of claim 2, wherein the first set of content generation operations and the second set of content generation operations are [the same (claim 3)/ | *See* **claim 2.** <br><br> **Tso discloses that the first set of content generation operations and the second set of content generation operations are [the same/different]** (*see* [1.b], [2.a], the same or different content generation operations)**, and the first set of transformation operations and the second set of transformation operations are different** (*see* [1.b], [2.a], different transformation operations)**.** <br><br> ***E.g.*, Tso:** <br><br> *See* [1.b]-[1.e]; claim 2. <br><br> Claims 3-4 are the same, except for reciting "the same" or "different" content generation operations. Madisetti, ¶135. |

U.S. Patent No. 9,158,745

Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| different (claim 4)], and the first set of transformation operations and the second set of transformation operations are different. | As explained for [1.b] and [1.d]-[1.e], **Tso** also discloses specifying different "content generation" and "transformation" operations using "selection criteria." Tso, 6:64-7:14, 7:15-9. Because combinations of such criteria can be used to generate "virtually limitless" transformations, a POSITA would have understood Tso to disclose a second request for content that contains either the same or different content generation operations and different transformation operations from the first set of operations—*e.g.*, operations to generate a different data type, resolution, or number of colors for the content. Madisetti, ¶¶136-37.<br><br>• **6:50-63** (*see* [1.f])<br><br>• **8:10-13** (*see* [1.pre]) |
| [5.a] The method of claim 1, further comprising: determining whether a previously-generated first optimized media content is available for reuse, wherein the previously-generated first optimized media content was created using the first original media content, the first content generation | *See* **claim 1.**<br><br>**Tso discloses determining whether a previously-generated first optimized media content is available for reuse** (*e.g.*, "determine whether a copy of the required version already resides in server-side cache memory 30"; *see* [1.c/1.e])**, wherein the previously-generated first optimized media content was created using the first original media content, the first content generation operations, and the first transformation operations** (*e.g.*, previously-generated "appropriate version[]" generated using the same "network client" "selection criterion" and "content characteristics"; *see* [1.b]-[1.e])**.**<br><br>***E.g.*, Tso:**<br><br>*See* [1.b]-[1.e]; claim 1.<br><br>**Tso** also discloses that a server's parser searches for the required version of the content—i.e., a version generated with the same content generation and transformation operations—in server-side cache memory. Madisetti, ¶¶138-40.<br><br>• **10:24-49** (*see* [1.e])<br><br>• ***See also* 3:43-60, 4:62-66, 5:36-42, 6:9-50, 6:64-66, 14:21-63, 14:37-63.** |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | Tso in view of Huang |
|---|---|
| operations, and the first transformation operations; | |
| [5.b] responsive to determining that the previously-generated first optimized media content is available, sending the previously-generated first optimized media content to the first playback device. | **Tso discloses responsive to determining that the previously-generated first optimized media content is available** (*e.g.*, if "the required version already resides in" cache)**, sending the previously-generated first optimized media content to the first playback device** (*e.g.*, sending "transcoded versions … without the need to … re-transcode the content")**.**<br><br>***E.g.*, Tso:**<br><br>*See* [1.d], [1.f], [5.a].<br><br>**Tso** also discloses that when the "required version" is already cached, the cached version is transmitted to the client. Madisetti, ¶¶141-43.<br><br>• **4:1-5** (*see* [1.c])<br>• **10:24-36** (*see* [1.e]) |

## B.    Ground 2: Tso in view of Huang and Lawler (Claims 6-7)

### 1.    Lawler

Lawler teaches, in an interactive television or televideo (IT) system providing image and video content, using an alternative format of content to avoid exceeding "[t]he capacity of CPU 66." Ex. 1006 (Lawler), 4:59-5:6, 5:57-62, 10:3-8; Madisetti, ¶¶144-45. Fig. 4 summarizes an embodiment:

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332



When a system "**lacks the resources required**" for a "**preferred format**," the system uses "**an alternative format that requires fewer IT system resources**." Lawler, 6:14-16, 2:53-55. Alternative formats include, *e.g.*, lower, "VHS" quality instead of higher, "S-VHS" quality streaming video; 8-bit instead of 24-bit "graphic code"; or "lower resolution or quality" versions. Lawler, 6:2-35; Madisetti, ¶¶146-47.

### 2. Motivations to Modify Tso in view of Huang with Lawler's Teachings

Like **Tso** and **Huang, Lawler** is analogous art in the same field as the '745, and reasonably pertinent to automating media delivery and reducing overhead and

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

time to generate Web pages. Lawler, 1:20-26 ("allocating resources of an [IT] system for delivering programming to viewers"), 2:31-33; 3:1-4, 4:59-5:6; *see also* §§IX.A.1-2; Madisetti, ¶148.

Both **Tso** and **Huang** teach considering processing resources when determining how to transcode content. *E.g.*, Tso, 7:15-31; Huang, 6:63-67, 2:9-13. A POSITA would have been motivated to modify **Tso's** (as modified by **Huang's**) teachings with Lawler's teachings of "alternative" formats that consume fewer resources to avoid "interrupting acceptable delivery of the programming" for at least the following reasons. **Lawler**, 2:47-61, 5:40-6:18, 9:25-35; Madisetti, ¶149.

**First, Tso** already teaches using "system load" as a "selection criterion" when deciding how to transcode content. Tso, 7:15-31. **Lawler's** detailed "CPU" capacity teachings provide additional details for how to implement **Tso's** "system load" teachings by using this criterion to decide whether to use an "alternative format." Lawler, 5:57-6:18. A POSITA would have found it obvious based on these complementary teachings to select an "alternative format" when CPU capacity use is too high. Madisetti, ¶150.

**Second, Tso** and **Lawler** recognize that, as known in the art, efficient and reliable service is advantageous. Tso, 6:55-58; Lawler, 11:42-50, 2:1-9; *see also* Starnes, Abstract, 2:66-3:5, 4:55-5:4, 6:14-18; Madisetti, ¶151. A POSITA would have been motivated to apply **Lawler's** teachings to advantageously avoid

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

"interrupting acceptable delivery of the programming" by using alternative formats when needed. Lawler, 5:57-6:50; Madisetti, ¶151.

**Third**, **Lawler** teaches that using alternative, lower-quality content requires "fewer [*e.g.*, by "one-half"] IT system resources." Lawler, 6:7-50, 2:53-61. A POSITA would have been motivated to modify **Tso** with **Lawler's** teachings of such alternative formats (*e.g.*, reduced quality based on resolution or bitrate) to advantageously reduce "system load." *Id.*; Tso, 7:15-31; *see also* Starnes, 2:24-41; Madisetti, ¶152.

**Fourth, Lawler** teaches that alternative content may vary by using, *e.g.*, lower-bit graphics or lower resolution content. Lawler, 6:7-12, 6:37-50. A POSITA would have found it obvious to modify **Tso** with these teachings because these are additional detailed teachings of "content characteristics" and "content provider preferences" for a content provider to change the quality of content. Tso, 7:15-8:9; Madisetti, ¶153.

A POSITA would have had a reasonable expectation of success in applying **Lawler's** teachings. **Lawler** provides additional detail for **Tso's** teachings of using "current processing load" to select transcoding processes (Tso, 7:7-14), and **Tso** recognizes that higher quality transcoding requires additional resources. Tso, 16:50-54. Modifying **Tso** with **Lawler's** teachings thus is nothing more than a straightforward application of using **Tso**'s teachings of "current processing load" as

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

a selection criterion when determining how to transcode content to improve the

system's efficiency when servicing user requests. Madisetti, ¶154.

### 3. Claim Chart

| '745 | Tso in view of Huang and Lawler |
|---|---|
| [6.a] The method of claim 1, further comprising: determining whether the host computer has sufficient processing resources to create the first optimized media content for the first playback device; | *See* **claim 1.**<br><br>**Tso discloses determining whether the host computer has sufficient processing resources** (*e.g.*, "dynamically updat[ing]" the "current processing load" to use as a "predetermined selection criterion") **and creating the first optimized media content for the first playback device** (*see* [1.d]-[1.e]**).**<br><br>***E.g.*, Tso:**<br><br>*See* [1.d]-[1.e]; claim 1.<br><br>**Tso** also discloses that the parser uses a "dynamically updated" "current processing load" as a selection criterion. Madisetti, ¶¶155-56, 158.<br><br>• **7:7-31** ("Still further, *the predetermined selection criterion may comprise* a condition of the device on which transcoding server 34 is installed (for example, *a current processing load*), a condition of a device to which transcoding server 34 is coupled, or a condition of a communications link. Transcoding server 34 may provide the ability to *dynamically update such predetermined selection criteria*. …")<br><br>**Lawler discloses determining whether the host computer has sufficient processing resources for the first optimized media content for the first playback device** (*e.g.*, making "an inquiry as to whether" "CPU 66" has "sufficient capacity" to meet the "ProcessorRequirement").<br><br>***E.g.*, Lawler:**<br><br>**Lawler** discloses that a server checks whether the CPU has sufficient capacity to provide content in the preferred format. Lawler, Fig, 4, 9:24-27. Modifying **Tso** with **Lawler's** |

teachings (*see* §IX.B.2), it would have been obvious to determine whether the system has sufficient "CPU" capacity (*i.e.*, processing load) for the preferred (*i.e.*, optimized) media content for playback. Madisetti, ¶¶157-59.

- **Fig. 4:**



FIG. 4

- **9:25-35** ("Decision block 130 represents an ***inquiry as to whether*** IT system 10 has available the resources to meet the resource requirements of the preferred medium. … [C]entral control node … inquires of ***CPU 66*** whether it and memory system 68 at station controller ***have sufficient capacity to meet the*** RAMRequirement and ***ProcessorRequirement.***")

- ***See also*** Abstract, 10:3-8, 2:53-3:3, 2:1-4, 5:40-53.

| | |
|---|---|
| [6.b] responsive to determining that the host computer does | **Tso not only renders obvious, but discloses creating the first optimized content** (*see* [6.a]) **and a first set of alternate content generation operations or first set of alternate transformation operations** (*see* [1.b]-[1.d], [3]/[4]). |

| not have sufficient processing resources to create the first optimized media content, determining an alternate first set of content generation operations or an alternate first set of transformation operations; | As discussed for [6.a] and [1.b]-[1.d], Tso teaches that the system uses selection criteria including "current processing load," "file size," and "resolution" to determine how to transcode content among "virtually limitless" transcoding options. Tso, 6:64-7:7, 7:15-8:9. Using "current processing load," content generation operations (*e.g.*, "file size"), and transformation operations (*e.g.*, "resolution" and "number of colors") as selection criteria discloses using, *e.g.*, a smaller file size and/or lower resolution based on "processing load" as alternative content generation and/or transformation operations, respectively. Madisetti, ¶¶160, 163. |
|---|---|
| | **Lawler discloses responsive to determining that the host computer does not have sufficient processing resources** (*see* [6.a]**), determining an alternate media content** (*e.g.*, "identif[ying]" "an alternative format that requires fewer IT system resources"). |
| | ***E.g.*, Lawler:** |
| | In addition to **Tso's** and **Lawler's** teachings of determining that a server does not have sufficient processing resources (*see* [6.a]), and **Tso's** teaching of different content generation and transformation operations, **Lawler** further discloses using an alternative format that requires fewer server resources, rather than a preferred format, when CPU capacity is consumed so that the system can continue to reliably serve content to users. Lawler, 2:53-61; Madisetti, ¶¶162-64. A POSITA would have been motivated to modify **Tso** with this teaching, yielding a system in which the system uses an alternative format when the system's CPU capacity selection criterion indicates that the server does not processing resources for the preferred format. *See* Lawler, 2:53-3:3; Tso, 7:7-31; Madisetti, ¶164; §IX.B.2. |
| | • **2:53-61** ("The IT system also ***identifies alternative resources for delivering the programming in an alternative format that requires fewer IT system resources***. For example, ***an alternative format to the preferred high-resolution digital video signal format could be a conventional-resolution digital video signal that corresponds to a standard VHS quality video signal***. |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| | |
|---|---|
| | ***Such an alternative format could require only one-half the level of some resources*** required by the preferred format.") <br><br> • **9:25-35** (*see* [6.a]) <br><br> • *See also* **6:13-18.** |
| [6.c] creating an alternate first optimized media content using the alternate first set of content generation operations or the alternate first set of transformation operations. | **Tso discloses creating an alternate first optimized media content using the alternate first set of content generation operations** (*see* [6.b], [1.b]-[1.d]) **or the alternate first set of transformation operations** (*see* [6.b], [1.b]-[1.c])**.** <br><br> ***E.g.*, Tso:** <br><br> As explained for [1.b]-[1.d], Tso discloses generating content using content generation and transformation operations specified by the selection criteria. This includes the alternate operations discussed in [6.b]. Madisetti, ¶¶165-67. |
| [7.a] The method of claim 6, wherein the first optimized media content is at a first level of quality and the alternate first optimized media content is at a second level of quality, wherein the first level of quality is higher than | *See* **claim 6.** <br><br> **Lawler further discloses the first optimized media content is at a first level of quality** (*e.g.*, "preferred format" is "higher resolution or quality")**, and an alternate first optimized media content is at a second level of quality, wherein the first level of quality is higher than the second level of quality** (*e.g.*, "[t]he alternative format" is "lower resolution or quality")**.** <br><br> ***E.g.*, Lawler:** <br><br> *See* claim 6. <br><br> Lawler also discloses that the first "preferred" format is "higher" quality, and the "alternative" format is "lower" quality. Madisetti, ¶¶168-70; *see also* §§IX.B.2-IX.B.3, [6.a]-[6.b] (discussing MTM). <br><br> • **6:7-12** ("The ***preferred format*** of dedicated programming services typically ***provides higher resolution or quality*** at the expense of greater IT system resources requirements. ***The alternative format provides the dedicated*** |

U.S. Patent No. 9,158,745

Petition for *Inter Partes* Review - IPR2023-00332

| the second level of quality | ***programming services at a lower resolution or quality that requires fewer IT system resources***.") <br>• ***See also* 2:53-61.** |
|---|---|
| [7.b] wherein a level of quality of a media content is measured based on a compression format, a bit rate, and an image resolution of a media content sent to a playback device. | **Tso discloses wherein a level of quality of a media content is measured based on a compression format** (*e.g.*, use "more resource-intensive compression algorithms" for "better quality content") **of a media content sent back to a playback device** (*e.g.*, "content" sent back to system "users")**.** <br><br> ***E.g.*, Tso:** <br><br> **Tso** discloses selecting more "resource-intensive compression algorithms" to generate "better" quality media content. Madisetti, ¶¶171-72, 174. <br><br> • **16:50-54** ("Still further, transcoding server 34 may ***use more resource-intensive compression algorithms***, for example, ***to provide better quality content*** for the same latency at the expense of slowing down access for non VIP users.") <br><br> • ***See also* 7:31-33, 8:25-28, 11:19-24, 12:26-32, 12:61-13:5, 16:2-5.** <br><br> **Lawler discloses wherein a level of quality of a media content is measured based on a bit rate** (*e.g.*, quality is measured based on "24-bit" vs. "8-bit")**, and an image resolution of a media content sent to a playback device** (*e.g.*, "high-resolution" vs. "conventional-resolution" of "programming services" sent back to a user's device)**.** <br><br> ***E.g.*, Lawler:** <br><br> **Lawler** discloses that "preferred" formats are "higher" quality, and that lower quality formats use lower (*e.g.* 8-bit) bitrate and resolution. Modifying **Tso** with **Lawler's** teachings of using alternative lower quality content (*see* §IX.B.2), a POSITA would have found it obvious to measure quality using **Lawler's** teachings of bitrate and resolution, in addition to **Tso's** teaching of compression. Madisetti, ¶¶173-76. <br><br> • **2:53-61** (*see* [6.b]) |

|  | • **6:7-12** (*see* [7.a]) |
|  | • **6:37-50** ("For example, a preferred format of S-VHS quality digital video for video on-demand previews could have a first alternative format of VHS quality digital video, and subsequent ***alternative modes in the form of 24-bit graphics and 8-bit graphics***.") |
|  | • ***See also*** **7:44-58, 4:59-65, Tables 1, 3A-3F.** |

### C.    Grounds 3/4: Samaniego (Claims 1-7)

#### 1.    Samaniego

Samaniego, published 6/20/2002, is §102(b) prior art as of that date (*see* §IV.B.1). PO cannot dispute Samaniego's disclosure of the Claims because the '745's and Samaniego's specifications are substantively identical. *See* Ex. 1013; *compare* '745 *with* Samaniego; Madisetti, ¶¶177-78. If the '745's specification supports the Claims, then those same disclosures in Samaniego anticipate the Claims.

PO is estopped from disputing that Samaniego discloses the Claims. The Examiner considered and expressly found that "support for the claimed subject matter has been found in" Samaniego's application. Ex. 1002, 165; Madisetti, ¶178; *see also* 35 U.S.C. §120; *Transco Prod. Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 557 n.6 (Fed. Cir. 1994) (parent must provide a "proper disclosure" for priority) (quoting MPEP §201.11). Applicant's "silence during the original prosecution creates an estoppel" barring PO from now challenging this finding. *Ex*

*Parte Smith*, 2010 WL 3269939, at *6 (B.P.A.I. Aug. 17, 2010); *see also Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1425 n.8 (Fed. Cir. 1994) (conduct that "played a material role in the issuance of the patent usually suffices [for estoppel to apply]."); *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1576 (Fed. Cir. 1985) ("tak[ing] advantage of an error by the PTO" violates "duty of square dealing and full disclosure").

PO is therefore estopped. Nonetheless, to the extent required, Grounds 4-6 explain why Samaniego alone and in view of Tso or Lawler also renders obvious the Claims.

### 2.    PO Intentionally Changed Inventorship

Original assignee Equilibrium and its current CEO Sean Barger intentionally identified different inventors in Samaniego and the '745. Before Samaniego's filing in 2001, Mr. Barger left Equilibrium, and did not return until 2004, when his company (AMPS d/b/a Equilibrium) acquired Equilibrium's assets. *See* Ex. 1014. Before Mr. Barger returned, Mr. Samaniego left Equilibrium in 2003 to join imaging software company Scene7, which became the exclusive distributor for Equilibrium's MediaRich, which Equilibrium alleges practices the '745. *See* Exs. 1014-1016. In September 2004, Mr. Barger sued Mr. Samaniego, Scene7, and Equilibrium's prior ownership alleging misconduct when transferring assets to Scene7. *See* Ex. 1020.

While this litigation was ongoing, Mr. Barger and Equilibrium filed

Application No. 11/269,916 ("'916")—an alleged "continuation-in-part" but, as discussed in §IX.C.1, with a substantively identical specification to Samaniego. *See generally* Ex. 1010; Ex. 1021. The '916 and Samaniego initially named the same inventors (*see* Ex. 1010, 68-70; Ex. 1034, 8), but the USPTO in 2005 raised that those named inventors did not sign the application. Ex. 1010, 76-77. In response, Mr. Barger and Equilibrium amended the application, adding Mr. Barger as an inventor, and attested that the applicant was unable to reach any of the original named inventors—an attestation that was blatantly false given Mr. Barger's ongoing and active litigation against Mr. Samaniego. *See* Ex. 1010, 78-98; Ex. 1020, 1. Mr. Barger and Equilibrium then filed Application Nos. 12/173,747 and 12/238,842, both again with substantively identical specifications to Samaniego (*see* Exs. 1026-1029), both of which replaced all of Samaniego's named inventors with new named inventors. *See* Ex. 1026, 76-87; Ex. 1027, 77-86; Ex. 1007. The '745 issued from a continuation of 12/238,842. Equilibrium thus intentionally changed inventorship in the '745—despite maintaining the same specification.

Samaniego therefore qualifies as invalidating prior art under pre-AIA §102(b) that the USPTO already found discloses the claims.

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

### 3.    Claim Chart

| '745 | *E.g.*, Samaniego |
|---|---|
| **[1.pre]** <span style="color:green">**A method in a host computer for**</span> <span style="color:red">**developing transformation processing operations to optimize media content playback**</span> <span style="color:cyan">**to a plurality of playback devices connected**</span> <span style="color:green">**with the host computer**</span> <span style="color:blue">**in a network**</span>, the method comprising:[6] | • **Fig. 1:** <br><br>• **[0002]** ("[T]he invention relates to an <span style="color:green">**Internet server-based software system that provides**</span> <span style="color:red">**delivery of automated graphics and other media**</span> to Web sites <span style="color:blue">**for access by an end user or consumer**</span>.")<br><br>• **[0094]** ("The <span style="color:green">**system 100 is attached to**</span> <span style="color:blue">**a Web server 110, which is connected to multiple client browsers 120(a-d) via the Internet 130**</span>.")<br><br>• **[0148]** ("FIG. 21 is a schematic diagram showing the process flow of a proprietary enabled <span style="color:cyan">**page**</span> |

---

[6] Color is used consistently through Grounds 3-6 to show disclosures from the cited art. Madisetti, ¶179.

U.S. Patent No. 9,158,745

Petition for *Inter Partes* Review - IPR2023-00332

| '745 | *E.g.,* Samaniego |
|------|-------------------|
| | delivered to a Web browser …. A content generation procedure 2140 is created with instructions on how the media is to be transformed to create the desired Web page content.") <br><br> • *See also* [0049], [0065], [0091], [0096]-[0097], [0137], [0140], [0148], Figs. 3, 7, 9, 21; Madisetti, ¶¶180-81. |
| **[1.a]** receiving a first request from a first playback device for media content; | • **[0148]** ("[T]he browser contacts the system 100 requesting media specified in the URL.") <br><br> • *See also* [0108]-[0110], [0138], [0143], Figs. 7, 9; Madisetti, ¶¶182-83. |
| **[1.b]** wherein the first request contains information, the information indicating a first original media content, first content generation operations, and first transformation operations; | *See* [1.a] for previously-recited elements. <br><br> • **[0148]** ("…[T]he browser contacts the system 100 requesting media specified in the URL. The system parses the URL 2100 to determine the content generation procedure 2140 to execute, … any dynamic content processing 2150 to be performed by dynamic media procedures, ….") <br><br> • *See also* [0064], [0066], [0090]-[0092], [0097], [0102], [0108], [0111], [0134], [0135], [0143], Figs. 7, 9, 10; Madisetti, ¶¶184-85. |
| **[1.c]** determining whether a previously-generated first intermediate media content is available for reuse, the previously-generated first intermediate media content having been created using the first original media | *See* [1.b] for previously-recited elements. <br><br> **Samaniego's** system performs a "secondary lookup" for a cached version of content created using the first set of content generation operations. If that version does not exist, the system creates and caches this intermediate version for future requests. Madisetti, ¶¶186-87. <br><br> • **[0148]-[0149]** ("Upon receipt of the page 301, the browser contacts the system 100 requesting media specified in the URL. The system parses the URL 2100 to determine the content |

U.S. Patent No. 9,158,745

Petition for *Inter Partes* Review - IPR2023-00332

| '745 | *E.g.*, Samaniego |
|---|---|
| **content and the first set of content generation operations**; and | **generation procedure 2140 to execute**, … **In the case of media generation requiring dynamic content processing, a unique secondary lookup key corresponding to intermediate media is generated 2130. If intermediate media 2170 corresponding to this key is found,** … [a] unique key is generated for the derivative 2130 and passed to the media caching system 2120. **If the media caching system finds no such intermediate image, such intermediate image is generated according to instructions specified by the content generation procedure**….").<br><br>• *See also* **[0064], [0065], [0104], [0108], [0111], [0140], [0143]-[0146], [0152].** |
| **[1.d] responsive to determining that a previously-generated first intermediate media content is available, creating a first optimized media content for the first playback device by performing the first set of transformation operations on the previously-generated first intermediate media content**; and | *See* [1.a]-[1.c] for previously-recited elements.<br><br>• **[0149]** ("**If intermediate media 2170 corresponding to this key is found, such media is passed directly to the dynamic media content system 2150 having dynamic media procedures, wherein appropriate action is taken to generate the required derivative from the intermediate media data.**")<br><br>• *See also* **[0065], [0103], [0105], [0108], [0111], [0112]-[0114], [0125], [0136], [0138], [0143], [0145], [0147], [0148], [0150]-[0152], Figs. 6, 7, 9, 20; Madisetti, ¶¶188-89.** |
| **[1.e] responsive to determining that a previously-generated first intermediate media content is not available, creating a first optimized media** | *See* [1.a]-[1.c] for previously-recited elements.<br><br>• **[0097]** ("**Web images 420 are Web versions of the original images. Web images 420 are ready for retrieval by the Web server 110** to be delivered to a Web browser 120. … **HTML** |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | *E.g.*, Samaniego |
|---|---|
| content for the first playback device by creating a first intermediate content using the first original media content and the first set of content generation operations, and performing the first set of transformation operations on the first intermediate media content; and | pages 460 have references to Web images 420...") <br><br> • [0149] ("If the media caching system finds no such intermediate image, such intermediate image is generated according to instructions specified by the content generation procedure, cached by the media cache system 2120 as a secondary cached media 2170, and passed to the dynamic media system 2150. Again, appropriate action is taken to generate the required derivative from the intermediate image data.") <br><br> • *See also* [0064]-[0065], [0105], [0108], [0111]-[0114], [0125], [0136], [0138], [0140], [0143], [0145], [0147]-[0148], [0150]-[0151], Figs. 6, 7, 9, 20; Madisetti, ¶¶190-91. |
| [1.f] sending the first optimized media content to the first playback device. | *See* [1.a], [1.d]-[1.e] for previously-recited elements. <br><br> • [0151] ("The resulting image is handed to the media cache system 2120 for caching and returned to the browser 120."); <br><br> • *See also* [0108], [0111], [0138], [0147], [0149], Figs. 7, 10, 18; Madisetti, ¶¶192-93. |
| [2.pre] The method of claim 1, further comprising: | *See* claim 1. <br> Madisetti, ¶¶194-95. |
| [2.a] receiving a second request from a second playback device for media content; wherein the second request contains information, the information indicating a second original media | Samaniego discloses [2.a] as it discloses that "multiple client browsers" send "requests" for media content containing the claimed information as discussed in [1.a]-[1.b] and thus discloses a second request from a second client browser. Madisetti, ¶¶196-97. <br><br> • [0137] ("Multiple client browsers 120a-120d communicate with both the Web server 110 and the image server 100 via the Internet 130.") |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | *E.g.,* Samaniego |
|---|---|
| content, second set of content generation operations, and second set of transformation operations; | • **[0135]** ("[G]enerated media is cached such that **further requests for the same media** require little overhead.")<br><br>*See also* **[0065], [0092], [0135], [0108] [0110]-[0111], [0137]-[0138], [0140], [0143], Figs. 7, 9, 17-18, 20.** |
| **[2.b] wherein the second request is received substantially concurrently with receiving the first request;** | **PO is estopped from disputing this limitation is disclosed** (*see* §IX.C.1-2)**.** As shown in Fig. 1 (*see* [1.pre]), multiple clients communicate with the Web server over the Internet, which not only renders obvious, but discloses, a server receiving substantially concurrent requests from multiple clients due to the number of clients in the Internet. Madisetti, ¶198; *see also* [2.a].<br><br>*See also* **[0138]** (*see* **[1.pre], [2.a]), [0054], [0065], [0090]-[0094], [0126], [0136]-[0138], [0140], [0143], [0146], [0149], Figs. 1, 17-19.** |
| **[2.c]** wherein the first original media content and the second original media content are the same media content; | • **[0135]** ("[T]he generated media is cached so that further requests for the same media require little overhead.")<br><br>• *See also* **[0066], [0091]-[0092], [0099], [0136]-[0138], [0143], Fig. 6; Madisetti, ¶¶199-200.** |
| **[2.d]-[2.g]** | *See* [1.c]-[1.f]. These elements recite performing the same steps with respect to the second request as recited in [1.c]-[1.f] with respect to the first request. Madisetti, ¶¶201-04. |
| **[3]/[4]** The method of claim 2, wherein the first set of content generation operations and the second set of content generation operations are [the same/ different], and the first set of | *See* **claim 2.**<br><br>*See* [1.b]-[1.c]. Samaniego discloses handling requests for content using "**script commands**" and "**content creation commands**." This not only renders obvious, but discloses, the same media content being subjected to the same or different script commands and/or content creation commands based on different requests. Madisetti, ¶¶205-06. |

56

U.S. Patent No. 9,158,745

Petition for *Inter Partes* Review - IPR2023-00332

| '745 | *E.g.*, Samaniego |
|---|---|
| **transformation operations and the second set of transformation operations are different.** | • **[0114]** ("**Table B herein below provides the claimed script commands according to a preferred embodiment of the invention. Additional commands may be added as needed.**")<br><br>• **[0136]** ("Because the invention takes the original media, content generation procedures, and proprietary URL tags as inputs for generating the Web media, it is possible to **modify any of these inputs and have the system automatically update the media** on the associated Web pages.")<br><br>• **[0156]** ("Table E below is a list of **example supported content creation commands according to a preferred embodiment of the invention. Additional commands may be added as necessary**.")<br><br>• *See also* **Tables B, E, [0139], [0046]-[0050].** |
| **[5]** The method of claim 1, further comprising: **determining whether a previously-generated first optimized media content is available for reuse, wherein the previously-generated first optimized media content was created using the first original media content, the first content generation operations, and the** | *See* **claim 1.**<br><br>*See* [1.c]. The system performs a "primary" lookup for media generated using content generation and transformation (*e.g.*, "dynamic content processing") operations. If such content is available, the system "immediately" returns the content to the browser. Madisetti, ¶¶207-08.<br><br>• **[0148]-[0149]** ("Upon receipt of the page 301, **the browser contacts the system 100 requesting media specified in the URL. The system parses the URL 2100 to determine the content generation procedure 2140 to execute**, … any **dynamic content processing 2150 to be performed by dynamic media procedures**…. **The parser generates a unique primary lookup key 2110 for the specified resulting media. If** |

U.S. Patent No. 9,158,745

Petition for *Inter Partes* Review - IPR2023-00332

| '745 | *E.g.*, Samaniego |
|---|---|
| **first transformation operations; responsive to determining that the previously-generated first optimized media content is available, sending the previously-generated first optimized media content to the first playback device.** | **the key corresponds to an existing generated media 2180, such media is returned immediately to the browser 120**….")<br><br>• *See also* [0064]-[0065], [0104], [0108], [0111], [0138], [0152], Figs. 7, 10, 22. |
| **[6.a]** The method of claim 1, further comprising: **determining whether the host computer has sufficient processing resources to create the first optimized media content for the first playback device;** | *See* claim 1.<br><br>**PO is estopped from disputing that this limitation is disclosed (*see* §IX.C.1).**<br><br>**Samaniego** discloses that the system uses "web server traffic" and "client connection speed," which are variables impacting host processing resources, as "input[s]" to "optimize" requested images. Samaniego, [0135], Table C. This not only renders obvious, but discloses, that the system "optimizes" content based on these variables by determining whether there are sufficient processing resources to generate requested content. Madisetti, ¶¶209-10.<br><br>• **[0135]** ("**The system takes as input the client connection, server traffic,** … **to generate optimized media for the client.**")<br><br>• **Table C** ("**Optimizes Web server traffic by adjusting the bandwidth of graphics; Optimizes images for client connection speed**; Allows clients to **specify the quality of images** on a Web site")<br><br>• *See also* **[0044], [0051], [0065], [0091], [0102], [0108], [0111], [0134]-[0135], [0140], [0143],** |

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

| '745 | *E.g.*, Samaniego |
|---|---|
| | [0148]-[0149], [0152], Figs. 6, 7, 10, 20, 22, Tables E-F. |
| **[6.b]** responsive to determining that the host computer does not have sufficient processing resources to create the first optimized media content, determining an alternate first set of content generation operations or an alternate first set of transformation operations; | PO is estopped from disputing that this limitation is disclosed (*see* §IX.C.1). *See* [6.a]. **Samaniego** also discloses determining whether the host computer has sufficient processing resources to generate optimized media (*see* [6.a]), as well as content generation operations and transformation operations (*see* [1.b]-[1.d]). When there are insufficient processing resources, Samaniego not only renders obvious, but discloses, that the content is "optimized" by, *e.g.*, adjusting the bandwidth of graphics. Samaniego, Table C; Madisetti, ¶¶211-12. |
| **[6.c]** creating an alternate first optimized media content using the alternate first set of content generation operations or the alternate first set of transformation operations. | PO is estopped from disputing that this limitation is disclosed (*see* §IX.C.1). **Samaniego** not only renders obvious, but discloses, performing the content generation and transformation operations that were determined to create optimized media content. *See* [6.a]-[6.b], [1.b]-[1.d]); Madisetti, ¶¶213-14. |
| **[7]** The method of claim 6, wherein the first optimized media content is at a first level of quality and the alternate first optimized media content is at a second level of quality, wherein the first | *See* claim 6. PO is estopped from disputing that this limitation is disclosed (*see* §IX.C.1). *See* [6.a]-[6.c], [1.f]. **Samaniego** discloses that content sent to the client is "optimized" for "web server traffic" and "client connection speed" by, *e.g.*, adjusting graphics bandwidth. Samaniego, Table C. The "save" command permits selecting a lossy "JPG" or lossless "PNG" compression format. Samaniego, Tables B-C. "Convert" permits changing a bit rate or "bit- |

U.S. Patent No. 9,158,745

Petition for *Inter Partes* Review - IPR2023-00332

| '745 | *E.g.*, Samaniego |
|---|---|
| **level of quality is higher than the second level of quality; wherein a level of quality of a media content is measured based on a compression format, a bit rate, and an image resolution of a media content sent to a playback device**. | depth". *Id.* And **SetResolution specifies an image resolution**. *Id.* These disclosures not only render obvious, but disclose, **generating these lower quality (alternate) graphics using these parameters in order to use fewer processing resources**. Madisetti, ¶¶215-16.<br><br>• **Table B** ("**Convert**(rtype @ <bit-depth> {dither @ <value 0..10>])<br>This command **converts the image to the specified type/bit-depth**.<br>…<br>**Save**<br>Save([type @ <image-type>])<br>This command **saves a media to the specified file**.<br>**Set Resolution**<br>SetResolution([dpi @ <value>] [xdpi @ <value>] [ydpi @ <value>])<br>This command **changes the DPI of the image in memory**.")<br><br>• **Table C** ("Reads and writes **various file formats:**<br>**BMP, GIF, JPG, PNG, TIF, PICT, TGA, PSD, FPX**;<br>**Optimizes Web server traffic by adjusting the bandwidth of graphics**;<br>**Optimizes images for client connection speed**;<br>Allows clients to **specify the quality of images** on a Web site")<br><br>• *See also* **[0005], [0032], Tables E-F (similar to Tables B-C)**. |

## D.    Ground 5: Samaniego in View of Tso (Claims 2-4).

To the extent it is argued that **Samaniego** does not disclose [2.b], **Tso** teaches

60

"concurrently" handling two client requests for the same content. *See* §IX.A.3 (claim 2). A POSITA would have been motivated to apply these teachings to **Samaniego**. With its substantially common specification, **Samaniego** is in the same field as the '745. *Compare* Samaniego *with* '745; Madisetti, ¶217.

While **Samaniego** teaches that it is advantageous to avoid "regeneration of images," **Tso** teaches using multiple-thread processing to avoid generating two copies of the same image concurrently. Samaniego, [0054]; Tso, 6:45-50; Madisetti, ¶¶218-19. **Samaniego** also teaches optimizing web server traffic by adjusting graphics bandwidth, while **Tso** teaches adjusting the transcoding of content based on processing load, and reducing the content quality for non-VIP clients. Samaniego, [0115], Table C; Tso, 6:39-54; Madisetti, ¶219. A POSITA would have been motivated to modify **Samaniego** with **Tso's** teachings to achieve the beneficial and predictable results of handling concurrent requests and ensuring priority customers are efficiently provided with high quality content. Madisetti, ¶219.

**First**, **Tso's** multiple-thread processing complements **Samaniego's** teaching of handling multiple requests without regenerating the same content by avoiding processing each request separately. Tso, 6:51-63; Samaniego, [0110]; Madisetti, ¶220. A POSITA would have been motivated to modify **Samaniego** with **Tso's** teachings to reduce this excess processing. Madisetti, ¶220.

**Second**, **Tso** teaches that multiple-thread processing improves system

efficiency because the system does not "wait[] for a hypertext object" before reusing original items. Tso, 6:51-63; Madisetti, ¶221. **Samaniego** teaches that such improvements to the "speed" to "add images, video, and sound to sites" are advantageous. Samaniego, [0045]; Madisetti, ¶221.

**Third**, **Tso's** teaching of managing processing load complements **Samaniego's** teaching of adjusting the quality of images based on client "connection speed" and "server traffic." Samaniego, [0115], Table C. **Tso** discloses using the "condition of the device" to adjust content processing—which expands on **Samaniego's** teaching by identifying similar parameters to "server traffic," including "current processing load" at a transcoding server. Tso, 6:64-7:14. A POSITA would have found it obvious to further consider "current processing load" at a server when determining how to adjust the bandwidth of images to beneficially maximize the use of server processing resources. Madisetti, ¶222.

In light of these teachings, a POSITA would have had a reasonable expectation of success in modifying **Samaniego** with **Tso's** teachings of multiple thread processing. Indeed, **Tso** teaches that its disclosed multiple thread access to cached objects uses a "standard" interface and does not "require any particular configuration" for the cache, while **Samaniego** teaches using a cache to avoid regenerating content for subsequent requests. Tso, 4:48-5:7, 5:2-7; Samaniego, [0135], [0138]. A POSITA therefore would have found it straightforward and

obvious to modify **Samaniego** with **Tso's** teachings, yielding a system in which **Samaniego's** teachings are used to concurrently serve content to multiple users using multiple thread processing. Madisetti, ¶223. A POSITA likewise would have had a reasonable expectation of success because **Tso** merely discloses using factors to consider when adjusting the bandwidth of images that are similar to those already disclosed in **Samaniego**. Madisetti, ¶223.

### E.    Ground 6: Samaniego in View of Lawler (Claims 6-7).

To the extent it is argued that **Samaniego** does not disclose using alternate content generation or transformation operations when the host computer does not have sufficient processing resources or measuring quality using bit rate or resolution, a POSITA would have been motivated to apply **Lawler's** teachings of selecting alternative, lower quality media formats to **Samaniego**. As discussed above in §IX.B.1, **Lawler,** like **Samaniego** is in the same field as the '745. Madisetti, ¶224.

**Samaniego** discloses using server load—which a POSITA would have understood includes processing capacity—to determine the content generation and transformation operations. Samaniego, [0091], [0135]. **Lawler** provides supplemental teachings of selecting alternative, lower quality content, including lower in quality based on bit rate or resolution, depending on CPU processing capacity to avoid interrupting delivery of content to clients. *E.g.*, **Lawler**, 2:47-61, 5:57-6:18, 9:25-35; Madisetti, ¶225. A POSITA thus would have been motivated to

modify **Samaniego** with **Lawler's** teachings for at least the following independent reasons. Madisetti, ¶225.

**First,** both **Samaniego** and **Lawler** describe systems for transmitting content to multiple clients. *E.g.*, Samaniego, [0094]; Lawler, 5:40-56, 6:13-16. **Lawler discloses** that such systems suffer from capacity limitations when serving multiple clients in such systems because "deliver[ing] programming to multiple subscribers or viewers" can result in "[c]apacity limitations" when "IT system 10 lacks the resources required to provide the service in the requested format." **Lawler**, 5:40-56; 6:13-16. A POSITA would have been motivated to modify **Samaniego** with **Lawler's** teachings of using "alternative" formats to advantageously avoid interrupting content delay to clients when serving multiple clients concurrently. Lawler, 6:14-16, 2:53-55; Madisetti, ¶226.

**Second**, **Samaniego** discloses that it would be advantageous to service requests with "little overhead." Samaniego, [0135]. A POSITA would have recognized that **Lawler's** teaching of using alternative requirements advantageously reduces overhead as described in **Samaniego** by using "less resources" for alternative content when additional processing capacity is unavailable. Lawler, 7:18-43; *see also id.* 5:40-56; 6:13-16; Madisetti, ¶227.

**Third, Lawler** provides complementary teachings of measuring quality. **Samaniego** discloses that its system allows clients to "specify the quality" of

content, and that it would be advantageous to allow a system to specify an "optimum quality" for content, and describes a system that allows "image quality and compression to be set." Samaniego, [0052], [0032], [0045], Tables C, F. A POSITA would have found it obvious to further modify **Samaniego's** teachings of quality based on compression with **Lawler's** teachings of measuring quality using bit rate and resolution, yielding a system that is able to measure quality using bit rate, resolution, and compression. Lawler, 6:7-12, 2:53-61, 6:37-50; Madisetti, ¶228.

In light of the above teachings, a POSITA would have had a reasonable expectation of success in applying **Lawler's** teachings. Indeed, **Samaniego** already teaches that "system features" include optimizing web server traffic by "adjusting the bandwidth of graphics." Samaniego, Tables C, F. Modifying **Samaniego** with **Lawler's** teachings would have been a straightforward application of those teachings in a manner that advantageously improves the efficiency of the system in servicing many user requests. Madisetti, ¶229.

With respect to [6.a], as disclosed in §IX.C.3([6.a]), **Samaniego** discloses that the system uses "server traffic" as an input when generating optimized media. Samaniego, [0051], [0065], [0091], [0135], Tables C, F. **Lawler** further discloses determining whether the host computer has sufficient processing resources for the first optimized media content for the first playback device (*see* §IX.B.3) by, *e.g.*, determining whether the system "has available the resources," including "capacity"

in "CPU 66," to satisfy a "ProcessorRequirement" for generating content. Lawler, Fig. 4, 9:25-35. A POSITA would have been motivated to modify **Samaniego**'s teaching of using "server traffic" as an input with this teaching from **Lawler**, yielding a system in which **Samaniego**'s system uses a determination of whether the server has sufficient processing resources as an input when generating optimized media for content—rendering this element obvious. Madisetti, ¶230.

With respect to [6.b], as discussed in §IX.C.3 ([1.b]-[1.d], [6.b]), **Samaniego** discloses that the server determines content generation and transformation operations based on system inputs. Samaniego, [0066], [0094], [0097], [0148]-[0149]. **Lawler** further discloses responsive to determining that the host computer does not have sufficient processing resources, determining an alternate media content (*see* §IX.B.3) by, *e.g.*, "identif[ying] alternative resources" for delivering media content "in an alternative format that requires fewer IT system resources." Lawler, 2:53-61. A POSITA would have been motivated to modify **Samaniego** with this teaching, yielding a system in which, when in [6.a] the system uses processing resources as an input and determines that it does not have enough resources, the system responds by using alternative content generation or transformation operations for which it does have available processing resources—disclosing this element. Madisetti, ¶231.

With respect to [6.c], as discussed in §IX.C.3 ([6.c], [1.b]-[1.d]), **Samaniego**

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

discloses creating optimized media content using content generation operations and transformation operations. Samaniego, [[0066], [0148]-[0149]. A POSITA would have been motivated to modify **Samaniego** with **Lawler's** teachings as discussed above for [6.a]-[6.b] to generate alternative content generation and transformation operations; the resulting system generates media using the alternative, rather than preferred, content generation or transformation operations—disclosing this element. Madisetti, ¶232.

With respect to [7.a], as discussed above for claim 6, **Samaniego** in view of **Lawler** renders obvious generating the first optimized media. **Lawler** further discloses the first optimized media content is at a first level of quality, and an alternate first optimized media content is at a second level of quality, wherein the first level of quality is higher than the second level of quality (*see* §IX.B.3) by using, *e.g.*, an alternative media format that "requires fewer IT system resources." Lawler, 2:53-61; Madisetti, ¶233. A POSITA would have been motivated to modify **Samaniego** with this teaching to generate media of an alternative format that uses fewer processing resources when the determination in [6.a] indicates there are insufficient processing resources; this alternative format is of a lower quality because "higher resolution or quality" is generated "at the expense of greater IT system resources requirements." Lawler, 2:53-61, 5:40-6:12; Madisetti, ¶233.

With respect to [7.b], as disclosed above in §IX.C.3 ([7.b]), **Samaniego**

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

discloses wherein a level of quality of a media content is measured based on a compression format (Samaniego, [0032]). **Lawler** further discloses wherein a level of quality of a media content is measured based on a bit rate, and an image resolution of a media content sent to a playback device *see* §IX.B.3). Madisetti, ¶234. A POSITA would have been motivated to modify **Samaniego** by applying **Lawler's** teachings to measure quality using bit rate and image resolution by using these properties in addition to compression format to measure quality because each of these features separately affects the processing required to generate the alternative format of content—and therefore the quality of content that can be generated. Lawler, 2:53-61, 4:59-65, 5:40-6:12; Madisetti, ¶234.

## X.    SECONDARY CONSIDERATIONS

There is no evidence in the '745's prosecution history or elsewhere supporting any secondary considerations arguments, or evidence of nexus to any Challenged Claim. *See generally* '745 FH; Madisetti, ¶235. Indeed, as demonstrated by the prior art referenced herein, any purported solutions to problems or unexpected results in the '745 were already well known. *Id.* To the extent PO asserts the existence of any secondary considerations in its responses, Petitioner reserves the right to address any such evidence.

## XI.    CONCLUSION

Substantial, new, and noncumulative technical teachings have been presented

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

for the '745's Claims, which are anticipated and obvious for the reasons set forth above. Madisetti, ¶¶236-41. There is a reasonable likelihood that Petitioner will prevail as to the Claims. *Inter partes* review of claims 1-7 is accordingly requested.

Respectfully submitted,

Dated: January 10, 2023

By: */Scott McKeown/*
Name: Scott McKeown
Counsel for Petitioner

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

## CERTIFICATE OF COMPLIANCE

Pursuant to §42.24(d), the undersigned certifies that the foregoing Petition for *Inter Partes* Review of U.S. Patent No. 9,158,745 contains, as measured by the word-processing system used to prepare this paper, 13,979. This word count does not include the items excluded by §42.24 as not counting towards the word limit.

Respectfully submitted,

Dated: January 10, 2023             By: */Daniel W. Richards/*
                                        Name: Daniel W. Richards
                                        Counsel for Petitioner

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2023, I caused a true and correct copy of the foregoing Petition for *Inter Partes* Review of U.S. Patent No. 9,158,745 and supporting exhibits to be served via express mail on the Patent Owner at the following correspondence address of record as listed on PAIR:

22862 - GLENN PATENT GROUP
c/o Perkins Coie LLP
P.O. Box 1247
Seattle, WA 98111-1247
UNITED STATES

____

A courtesy copy was also sent via electronic mail to the Patent Owner's litigation counsel at the following addresses:

Jason R. Bartlett (jbartlett@mkwllp.com)
Jason A. Crotty (jcrotty@mkwllp.com)
Marc J. Pernick (mpernick@mkwllp.com)
MAURIEL KAPOUYTIAN WOODS LLP
450 Sansome Street, Suite 1005
San Francisco, CA 94111
Tel: (415) 738-6228

Steven Callahan (scallahan@ccrglaw.com)
Christopher T. Bovenkamp (cbovenkamp@ccrglaw.com)
CHARHON CALLAHAN ROBSON &
GARZA, PLLC
3333 Lee Parkway, Suite 460
Dallas, TX 75219
Tel: (214) 521-6400

David E. Moore (#3983)

U.S. Patent No. 9,158,745
Petition for *Inter Partes* Review - IPR2023-00332

Bindu A. Palapura (#5370)
Brandon R. Harper (#6418)
Carson R. Bartlett (#6750)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
bharper@potteranderson.com
cbartlett@potteranderson.com

_____

Dated: January 10, 2023

By: /Jonathan Bradford/
Name: Jonathan Bradford
**ROPES & GRAY LLP**

# EXHIBIT 8

PATENT APPLICATION SERIAL NO. _____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

08/17/2001 WABRHAM1 00000047 071445   09929904

01 FC:201        355.00 CH
02 FC:202         40.00 CH

PTO-1556
(5/87)

*U.S. GPO: 1999-459-082/19144

**PATENT APPLICATION FEE DETERMINATION RECORD**
Effective October 1, 2000

Application or Docket Number

*09929904*

## CLAIMS AS FILED - PART I

| | (Column 1) | (Column 2) |
|---|---|---|
| TOTAL CLAIMS | *13* | |
| FOR | NUMBER FILED | NUMBER EXTRA |
| TOTAL CHARGEABLE CLAIMS | *13* minus 20= | *0* |
| INDEPENDENT CLAIMS | *4* minus 3 = | *1* |
| MULTIPLE DEPENDENT CLAIM PRESENT | | ☐ |

* If the difference in column 1 is less than zero, enter "0" in column 2

| SMALL ENTITY TYPE ☐ | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | FEE | | RATE | FEE |
| BASIC FEE | 355.00 | OR | BASIC FEE | 710.00 |
| X$ 9= | | OR | X$18= | |
| X40= | *40.0* | OR | X80= | |
| +135= | | OR | +270= | |
| TOTAL | *39C.0* | OR | TOTAL | |

## CLAIMS AS AMENDED - PART II

**AMENDMENT A**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
| Total | * | Minus | ** | = | X$ 9= | | OR | X$18= | |
| Independent | * | Minus | *** | = | X40= | | OR | X80= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | | | +135= | | OR | +270= | |
| | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT B**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | | ADDI-TIONAL FEE | OR | | ADDI-TIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | RATE | | | RATE | |
| Total | * | Minus | ** | = | X$ 9= | | OR | X$18= | |
| Independent | * | Minus | *** | = | X40= | | OR | X80= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | | | +135= | | OR | +270= | |
| | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT C**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | | ADDI-TIONAL FEE | OR | | ADDI-TIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | RATE | | | RATE | |
| Total | * | Minus | ** | = | X$ 9= | | OR | X$18= | |
| Independent | * | Minus | *** | = | X40= | | OR | X80= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | | | +135= | | OR | +270= | |
| | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875 (Rev. 8/00)

Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE

BEST AVAILABLE COPY

**BEST AVAILABLE COPY**

## CLAIMS ONLY

| SERIAL NO. | FILING DATE |
|---|---|
| 09929904 | 05/14/01 |

APPLICANT(S)

### CLAIMS

| | AS FILED | | AFTER 1st AMENDMENT | | AFTER 2nd AMENDMENT | |
|---|---|---|---|---|---|---|
| | IND. | DEP. | IND. | DEP. | IND. | DEP. |
| 1 | / | | | | | |
| 2 | | / | | | | |
| 3 | / | | | | | |
| 4 | | / | | | | |
| 5 | / | | | | | |
| 6 | | / | | | | |
| 7 | | / | | | | |
| 8 | | / | | | | |
| 9 | | / | | | | |
| 10 | | / | | | | |
| 11 | / | | | | | |
| 12 | | / | | | | |
| 13 | | / | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |
| 21 | | | | | | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |
| 26 | | | | | | |
| 27 | | | | | | |
| 28 | | | | | | |
| 29 | | | | | | |
| 30 | | | | | | |
| 31 | | | | | | |
| 32 | | | | | | |
| 33 | | | | | | |
| 34 | | | | | | |
| 35 | | | | | | |
| 36 | | | | | | |
| 37 | | | | | | |
| 38 | | | | | | |
| 39 | | | | | | |
| 40 | | | | | | |
| 41 | | | | | | |
| 42 | | | | | | |
| 43 | | | | | | |
| 44 | | | | | | |
| 45 | | | | | | |
| 46 | | | | | | |
| 47 | | | | | | |
| 48 | | | | | | |
| 49 | | | | | | |
| 50 | | | | | | |
| TOTAL IND. | 4 | | | | | |
| TOTAL DEP. | 9 | | | | | |
| TOTAL CLAIMS | 13 | | | | | |

| | * | | * | | * | |
|---|---|---|---|---|---|---|
| | IND. | DEP. | IND. | DEP. | IND. | DEP. |
| 51 | | | | | | |
| 52 | | | | | | |
| 53 | | | | | | |
| 54 | | | | | | |
| 55 | | | | | | |
| 56 | | | | | | |
| 57 | | | | | | |
| 58 | | | | | | |
| 59 | | | | | | |
| 60 | | | | | | |
| 61 | | | | | | |
| 62 | | | | | | |
| 63 | | | | | | |
| 64 | | | | | | |
| 65 | | | | | | |
| 66 | | | | | | |
| 67 | | | | | | |
| 68 | | | | | | |
| 69 | | | | | | |
| 70 | | | | | | |
| 71 | | | | | | |
| 72 | | | | | | |
| 73 | | | | | | |
| 74 | | | | | | |
| 75 | | | | | | |
| 76 | | | | | | |
| 77 | | | | | | |
| 78 | | | | | | |
| 79 | | | | | | |
| 80 | | | | | | |
| 81 | | | | | | |
| 82 | | | | | | |
| 83 | | | | | | |
| 84 | | | | | | |
| 85 | | | | | | |
| 86 | | | | | | |
| 87 | | | | | | |
| 88 | | | | | | |
| 89 | | | | | | |
| 90 | | | | | | |
| 91 | | | | | | |
| 92 | | | | | | |
| 93 | | | | | | |
| 94 | | | | | | |
| 95 | | | | | | |
| 96 | | | | | | |
| 97 | | | | | | |
| 98 | | | | | | |
| 99 | | | | | | |
| 100 | | | | | | |
| TOTAL IND. | | | | | | |
| TOTAL DEP. | | | | | | |
| TOTAL CLAIMS | | | | | | |

*MAY BE USED FOR ADDITIONAL CLAIMS OR ADMENDMENTS

FORM PTO-2022 (1-98)

U.S.DEPARTMENT OF COMMERCE
Patent and Trademark Office

*U.S. GPO: 1998-443-593/89152



JC759 U.S. PTO
08/14/01

PTO/SB/05 (4/98)
Approved for use through 09/30/2000. OMB 0651-0032
Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

Please type a plus sign (+) inside this box → [+]

# UTILITY
# PATENT APPLICATION
# TRANSMITTAL
(Only for new nonprovisional applications under 37 C.F.R § 1.53(b))

| | |
|---|---|
| Attorney Docket No. | EQUI0001CIP |
| First Inventor or Application Identifier | Samaniego et al. |
| Title | Automated Media Delivery System |
| Express Mail Label No. | EL816158533US |

**APPLICATION ELEMENTS**
See MPEP chapter 600 concerning utility patent application contents.

ADDRESS TO:  Assistant Commissioner for Patents
Box Patent Application
Washington, DC 20231

1. [X] * Fee Transmittal Form (e.g., PTO/SB/17)
(Submit an original and a duplicate for fee processing)

2. [X] Specification [Total Pages 35]
(preferred arrangement set forth below)
- Descriptive title of the Invention
- Cross References to Related Applications
- Statement Regarding Fed sponsored R & D
- Reference to Microfiche Appendix
- Background of the Invention
- Brief Summary of the Invention
- Brief Description of the Drawings (if filed)
- Detailed Description
- Claim(s)
- Abstract of the Disclosure

3. [X] Drawing(s) (35 U.S.C. 113) [Total Sheets 23]

4. Oath or Declaration [Total Pages 4]
a. [X] Newly executed (original or copy)
b. [ ] Copy from a prior application (37 C.F.R. § 1.63(d))
(for continuation/divisional with Box 16 completed)
i. [ ] DELETION OF INVENTOR(S)
Signed statement attached deleting inventor(s) named in the prior application, see 37 C.F.R. §§ 1.63(d)(2) and 1.33(b).

* NOTE FOR ITEMS 1 & 13: IN ORDER TO BE ENTITLED TO PAY SMALL ENTITY FEES, A SMALL ENTITY STATEMENT IS REQUIRED (37 C.F.R. § 1.27), EXCEPT IF ONE FILED IN A PRIOR APPLICATION IS RELIED UPON (37 C.F.R. § 1.28).

5. [ ] Microfiche Computer Program (Appendix)

6. Nucleotide and/or Amino Acid Sequence Submission
(if applicable, all necessary)
a. [ ] Computer Readable Copy
b. [ ] Paper Copy (identical to computer copy)
c. [ ] Statement verifying identity of above copies

**ACCOMPANYING APPLICATION PARTS**

7. [X] Assignment Papers (cover sheet & document(s))
8. [X] 37 C.F.R.§3.73(b) Statement [ ] Power of (when there is an assignee) Attorney
9. [ ] English Translation Document (if applicable)
10. [ ] Information Disclosure Statement (IDS)/PTO-1449 [ ] Copies of IDS Citations
11. [ ] Preliminary Amendment
12. [X] Return Receipt Postcard (MPEP 503) (Should be specifically itemized)
13. [X] * Small Entity Statement (PTO/SB/09-12) [ ] Statement filed in prior application, Status still proper and desired
14. [ ] Certified Copy of Priority Document(s) (if foreign priority is claimed)
15. [ ] Other: ........................

**16.** If a CONTINUING APPLICATION, check appropriate box, and supply the requisite information below and in a preliminary amendment.
[ ] Continuation  [ ] Divisional  [X] Continuation-in-part (CIP)  of prior application No: 09 / 425,326
Prior application: Examiner  Unassigned  Group / Art Unit: Unassigned

For CONTINUATION or DIVISIONAL APPS only: The entire disclosure of the prior application, from which an oath or declaration is supplied under Box 4b, is considered a part of the disclosure of the accompanying continuation or divisional application and is hereby incorporated by reference. The incorporation can only be relied upon when a portion has been inadvertently omitted from the submitted application parts.

**17. CORRESPONDENCE ADDRESS**

[X] Customer Number or Bar Code Label | 22862 | or [ ] Correspondence address below
(Insert Customer No. or Attach bar code label here)

| Name | |
|---|---|
| Address | |
| City | | State | | Zip Code | |
| Country | | Telephone | | Fax | |

| Name (Print/Type) | Michael A. Glenn | Registration No. (Attorney/Agent) | 30,176 |
|---|---|---|---|
| Signature | | Date | 8/14/01 |

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Box Patent Application, Washington, DC 20231.

PTO/SB/17 (6/99)
Approved for use through 09/30/2000  OMB 0651-0032
Patent and Trademark Office  U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

# FEE TRANSMITTAL
# for FY 1999

*Patent fees are subject to annual revision*

*Small Entity payments must be supported by a small entity statement, otherwise large entity fees must be paid  See Forms PTO/SB/09-12*
*See 37 C F R §§ 1 27 and 1 28*

| Complete if Known | |
|---|---|
| Application Number | Unassigned |
| Filing Date | Herewith |
| First Named Inventor | Samaniego et al. |
| Examiner Name | Unassigned |
| Group / Art Unit | Unassigned |
| Attorney Docket No. | EQUI0001CIP |

| TOTAL AMOUNT OF PAYMENT | ($) 475.00 |
|---|---|

## METHOD OF PAYMENT (check one)

1. [X] The Commissioner is hereby authorized to charge indicated fees and credit any over payments to

Deposit Account Number: 07-1445

Deposit Account Name: Michael A. Glenn

[X] Charge Any Additional Fee Required Under 37 CFR §§ 1 16 and 1 17

2. [ ] **Payment Enclosed:**
[ ] Check  [ ] Money Order  [ ] Other

## FEE CALCULATION

### 1. BASIC FILING FEE

| Large Entity | | Small Entity | | | |
|---|---|---|---|---|---|
| Fee Code | Fee ($) | Fee Code | Fee ($) | Fee Description | Fee Paid |
| 101 | 760 | 201 | 380 | Utility filing fee | 355.00 |
| 106 | 310 | 206 | 155 | Design filing fee | |
| 107 | 480 | 207 | 240 | Plant filing fee | |
| 108 | 760 | 208 | 380 | Reissue filing fee | |
| 114 | 150 | 214 | 75 | Provisional filing fee | |

**SUBTOTAL (1)** ($) 355.00

### 2. EXTRA CLAIM FEES

| | Extra Claims | | Fee from below | | Fee Paid |
|---|---|---|---|---|---|
| Total Claims | 13 | -20** = | 0 | X 9 | 0.00 |
| Independent Claims | 4 | - 3** = | 1 | X 40 | 40.00 |
| Multiple Dependent | | | | | |

*\*\*or number previously paid, if greater, For Reissues, see below*

| Large Entity | | Small Entity | | | |
|---|---|---|---|---|---|
| Fee Code | Fee ($) | Fee Code | Fee ($) | Fee Description | |
| 103 | 18 | 203 | 9 | Claims in excess of 20 | |
| 102 | 78 | 202 | 39 | Independent claims in excess of 3 | |
| 104 | 260 | 204 | 130 | Multiple dependent claim, if not paid | |
| 109 | 78 | 209 | 39 | ** Reissue independent claims over original patent | |
| 110 | 18 | 210 | 9 | ** Reissue claims in excess of 20 and over original patent | |

**SUBTOTAL (2)** ($) 40.00

### 3. ADDITIONAL FEES

| Large Entity | | Small Entity | | | |
|---|---|---|---|---|---|
| Fee Code | Fee ($) | Fee Code | Fee ($) | Fee Description | Fee Paid |
| 105 | 130 | 205 | 65 | Surcharge - late filing fee or oath | |
| 127 | 50 | 227 | 25 | Surcharge - late provisional filing fee or cover sheet | |
| 139 | 130 | 139 | 130 | Non-English specification | |
| 147 | 2,520 | 147 | 2,520 | For filing a request for reexamination | |
| 112 | 920* | 112 | 920* | Requesting publication of SIR prior to Examiner action | |
| 113 | 1,840* | 113 | 1,840* | Requesting publication of SIR after Examiner action | |
| 115 | 110 | 215 | 55 | Extension for reply within first month | |
| 116 | 380 | 216 | 190 | Extension for reply within second month | |
| 117 | 870 | 217 | 435 | Extension for reply within third month | |
| 118 | 1,360 | 218 | 680 | Extension for reply within fourth month | |
| 128 | 1,850 | 228 | 925 | Extension for reply within fifth month | |
| 119 | 300 | 219 | 150 | Notice of Appeal | |
| 120 | 300 | 220 | 150 | Filing a brief in support of an appeal | |
| 121 | 260 | 221 | 130 | Request for oral hearing | |
| 138 | 1,510 | 138 | 1,510 | Petition to institute a public use proceeding | |
| 140 | 110 | 240 | 55 | Petition to revive - unavoidable | |
| 141 | 1,210 | 241 | 605 | Petition to revive - unintentional | |
| 142 | 1,210 | 242 | 605 | Utility issue fee (or reissue) | |
| 143 | 430 | 243 | 215 | Design issue fee | |
| 144 | 580 | 244 | 290 | Plant issue fee | |
| 122 | 130 | 122 | 130 | Petitions to the Commissioner | |
| 123 | 50 | 123 | 50 | Petitions related to provisional applications | |
| 126 | 240 | 126 | 240 | Submission of Information Disclosure Stmt | |
| 581 | 40 | 581 | 40 | Recording each patent assignment per property (times number of properties) | 80.00 |
| 146 | 760 | 246 | 380 | Filing a submission after final rejection (37 CFR § 1 129(a)) | |
| 149 | 760 | 249 | 380 | For each additional invention to be examined (37 CFR § 1 129(b)) | |

Other fee (specify) _____
Other fee (specify) _____

* Reduced by Basic Filing Fee Paid

**SUBTOTAL (3)** ($) 80.00

## SUBMITTED BY

| | | Complete (if applicable) | |
|---|---|---|---|
| Name (Print/Type) | Michael A. Glenn | Registration No. (Attorney/Agent) | 30,176 | Telephone | 650-474-8400 |
| Signature | | Date | 8/14/01 |

Burden Hour Statement  This form is estimated to take 0 2 hours to complete  Time will vary depending upon the needs of the individual case  Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC 20231  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS  SEND TO  Assistant Commissioner for Patents, Washington, DC 20231



Please type a plus sign (+) inside this box → [+]

PTO/SB/05 (4/98)
Approved for use through 09/30/2000. OMB 0651-0032
Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## UTILITY PATENT APPLICATION TRANSMITTAL
*(Only for new nonprovisional applications under 37 C.F.R § 1.53(b))*

| | |
|---|---|
| Attorney Docket No. | **EQUI0001CIP** |
| First Inventor or Application Identifier | Samaniego et al. |
| Title | Automated Media Delivery System |
| Express Mail Label No. | EL816158533US |

### APPLICATION ELEMENTS
*See MPEP chapter 600 concerning utility patent application contents.*

**ADDRESS TO:** Assistant Commissioner for Patents
Box Patent Application
Washington, DC 20231

1. [X] * **Fee Transmittal Form** *(e.g., PTO/SB/17)* *(Submit an original and a duplicate for fee processing)*
2. [X] **Specification** [Total Pages 35] *(preferred arrangement set forth below)*
   - Descriptive title of the Invention
   - Cross References to Related Applications
   - Statement Regarding Fed sponsored R & D
   - Reference to Microfiche Appendix
   - Background of the Invention
   - Brief Summary of the Invention
   - Brief Description of the Drawings *(if filed)*
   - Detailed Description
   - Claim(s)
   - Abstract of the Disclosure
3. [X] **Drawing(s)** *(35 U.S.C. 113)* [Total Sheets 23]
4. **Oath or Declaration** [Total Pages 4]
   a. [X] Newly executed (original or copy)
   b. [ ] Copy from a prior application (37 C.F.R. § 1.63(b)) *(for continuation/divisional with Box 16 completed)*
      i. [ ] **DELETION OF INVENTOR(S)**
         Signed statement attached deleting inventor(s) named in the prior application, see 37 C.F.R §§ 1.63(d)(2) and 1 33(b).

*NOTE FOR ITEMS 1 & 13: IN ORDER TO BE ENTITLED TO PAY SMALL ENTITY FEES, A SMALL ENTITY STATEMENT IS REQUIRED (37 C.F.R. § 1.27), EXCEPT IF ONE FILED IN A PRIOR APPLICATION IS RELIED UPON (37 C.F.R. § 1 28).*

5. [ ] Microfiche Computer Program *(Appendix)*
6. Nucleotide and/or Amino Acid Sequence Submission *(if applicable, all necessary)*
   a. [ ] Computer Readable Copy
   b. [ ] Paper Copy (identical to computer copy)
   c. [ ] Statement verifying identity of above copies

### ACCOMPANYING APPLICATION PARTS

7. [X] Assignment Papers (cover sheet & document(s))
8. [X] 37 C.F.R.§3.73(b) Statement *(when there is an assignee)*  [ ] Power of Attorney
9. [ ] English Translation Document *(if applicable)*
10. [ ] Information Disclosure Statement (IDS)/PTO-1449  [ ] Copies of IDS Citations
11. [ ] Preliminary Amendment
12. [X] Return Receipt Postcard (MPEP 503) *(Should be specifically itemized)*
13. [X] * Small Entity Statement (PTO/SB/09-12)  [ ] Statement filed in prior application, Status still proper and desired
14. [ ] Certified Copy of Priority Document(s) *(if foreign priority is claimed)*
15. [ ] Other: ......................................

16. **If a CONTINUING APPLICATION**, check appropriate box, and supply the requisite information below and in a preliminary amendment.
   [ ] Continuation  [ ] Divisional  [X] Continuation-in-part (CIP)  of prior application No: 09 / 425,326
   Prior application: Examiner Unassigned    Group / Art Unit: Unassigned
   **For CONTINUATION or DIVISIONAL APPS only:** The entire disclosure of the prior application, from which an oath or declaration is supplied under Box 4b, is considered a part of the disclosure of the accompanying continuation or divisional application and is hereby incorporated by reference. The incorporation can only be relied upon when a portion has been inadvertently omitted from the submitted application parts.

### 17. CORRESPONDENCE ADDRESS

[X] Customer Number or Bar Code Label | 22862 *(Insert Customer No or Attach bar code label here)* | or [ ] Correspondence address below

| Name | |
|---|---|
| Address | |
| City | State | Zip Code |
| Country | Telephone | Fax |

| | | |
|---|---|---|
| Name *(Print/Type)* | Michael A. Glenn | Registration No. *(Attorney/Agent)* 30,176 |
| Signature | | Date 8/14/01 |

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Box Patent Application, Washington, DC 20231.

PTO/SB/17 (6/99)
Approved for use through 09/30/2000  OMB 0651-0032
Patent and Trademark Office  U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

# FEE TRANSMITTAL
## for FY 1999

*Patent fees are subject to annual revision*

*Small Entity payments must be supported by a small entity statement, otherwise large entity fees must be paid  See Forms PTO/SB/09-12*

*See 37 C.F.R. §§ 1.27 and 1.28*

**TOTAL AMOUNT OF PAYMENT**  (\$)  475.00

### Complete if Known

| | |
|---|---|
| Application Number | Unassigned |
| Filing Date | Herewith |
| First Named Inventor | Samaniego et al. |
| Examiner Name | Unassigned |
| Group / Art Unit | Unassigned |
| Attorney Docket No. | EQUI0001CIP |

## METHOD OF PAYMENT (check one)

**1.** [X] The Commissioner is hereby authorized to charge indicated fees and credit any over payments to

Deposit Account Number  07-1445

Deposit Account Name  Michael A. Glenn

[X] Charge Any Additional Fee Required Under 37 CFR §§ 1.16 and 1.17

**2.** [ ] **Payment Enclosed:**
[ ] Check  [ ] Money Order  [ ] Other

## FEE CALCULATION

### 1. BASIC FILING FEE

| Large Entity Fee Code | Fee (\$) | Small Entity Fee Code | Fee (\$) | Fee Description | Fee Paid |
|---|---|---|---|---|---|
| 101 | 760 | 201 | 380 | Utility filing fee | 355.00 |
| 106 | 310 | 206 | 155 | Design filing fee | |
| 107 | 480 | 207 | 240 | Plant filing fee | |
| 108 | 760 | 208 | 380 | Reissue filing fee | |
| 114 | 150 | 214 | 75 | Provisional filing fee | |

**SUBTOTAL (1)**  (\$) 355.00

### 2. EXTRA CLAIM FEES

| | Extra Claims | | Fee from below | | Fee Paid |
|---|---|---|---|---|---|
| Total Claims | 13 | -20** = | 0 | X 9 | 0.00 |
| Independent Claims | 4 | -3** = | 1 | X 40 | 40.00 |
| Multiple Dependent | | | | | |

**or number previously paid, if greater, For Reissues, see below*

| Large Entity Fee Code | Fee (\$) | Small Entity Fee Code | Fee (\$) | Fee Description |
|---|---|---|---|---|
| 103 | 18 | 203 | 9 | Claims in excess of 20 |
| 102 | 78 | 202 | 39 | Independent claims in excess of 3 |
| 104 | 260 | 204 | 130 | Multiple dependent claim, if not paid |
| 109 | 78 | 209 | 39 | ** Reissue independent claims over original patent |
| 110 | 18 | 210 | 9 | ** Reissue claims in excess of 20 and over original patent |

**SUBTOTAL (2)**  (\$) 40.00

## FEE CALCULATION (continued)

### 3. ADDITIONAL FEES

| Large Entity Fee Code | Fee (\$) | Small Entity Fee Code | Fee (\$) | Fee Description | Fee Paid |
|---|---|---|---|---|---|
| 105 | 130 | 205 | 65 | Surcharge - late filing fee or oath | |
| 127 | 50 | 227 | 25 | Surcharge - late provisional filing fee or cover sheet | |
| 139 | 130 | 139 | 130 | Non-English specification | |
| 147 | 2,520 | 147 | 2,520 | For filing a request for reexamination | |
| 112 | 920* | 112 | 920* | Requesting publication of SIR prior to Examiner action | |
| 113 | 1,840* | 113 | 1,840* | Requesting publication of SIR after Examiner action | |
| 115 | 110 | 215 | 55 | Extension for reply within first month | |
| 116 | 380 | 216 | 190 | Extension for reply within second month | |
| 117 | 870 | 217 | 435 | Extension for reply within third month | |
| 118 | 1,360 | 218 | 680 | Extension for reply within fourth month | |
| 128 | 1,850 | 228 | 925 | Extension for reply within fifth month | |
| 119 | 300 | 219 | 150 | Notice of Appeal | |
| 120 | 300 | 220 | 150 | Filing a brief in support of an appeal | |
| 121 | 260 | 221 | 130 | Request for oral hearing | |
| 138 | 1,510 | 138 | 1,510 | Petition to institute a public use proceeding | |
| 140 | 110 | 240 | 55 | Petition to revive - unavoidable | |
| 141 | 1,210 | 241 | 605 | Petition to revive - unintentional | |
| 142 | 1,210 | 242 | 605 | Utility issue fee (or reissue) | |
| 143 | 430 | 243 | 215 | Design issue fee | |
| 144 | 580 | 244 | 290 | Plant issue fee | |
| 122 | 130 | 122 | 130 | Petitions to the Commissioner | |
| 123 | 50 | 123 | 50 | Petitions related to provisional applications | |
| 126 | 240 | 126 | 240 | Submission of Information Disclosure Stmt | |
| 581 | 40 | 581 | 40 | Recording each patent assignment per property (times number of properties) | 80.00 |
| 146 | 760 | 246 | 380 | Filing a submission after final rejection (37 CFR § 1.129(a)) | |
| 149 | 760 | 249 | 380 | For each additional invention to be examined (37 CFR § 1.129(b)) | |

Other fee (specify) _____

Other fee (specify) _____

* Reduced by Basic Filing Fee Paid

**SUBTOTAL (3)**  (\$) 80.00

## SUBMITTED BY

*Complete (if applicable)*

| Name (Print/Type) | Michael A. Glenn | Registration No. (Attorney/Agent) | 30,176 | Telephone | 650-474-8400 |
|---|---|---|---|---|---|
| Signature | | | | Date | 8/14/01 |

Burden Hour Statement  This form is estimated to take 0.2 hours to complete  Time will vary depending upon the needs of the individual case  Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC 20231  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS  SEND TO  Assistant Commissioner for Patents, Washington, DC 20231

# Automated Media Delivery System

## BACKGROUND OF THE INVENTION

### TECHNICAL FIELD

The invention relates to software systems.  More particularly, the invention relates to an Internet server-based software system that provides delivery of automated graphics and other media to Web sites for access by an end user or consumer.

### DESCRIPTION OF THE PRIOR ART

Most Web sites today are primarily handmade.  From the guy publishing a simple online technology newsletter from his home, to the Fortune 1000 company's multi-tiered site with hundreds of pages of text, images, and animations, the Web developer and each of his HTML-coding and graphics-producing coworkers toil page by page and image by image.  Thousands of established online companies employ hundreds of highly-skilled workers just to produce and maintain their Web sites.  After all, the Web is now a major selling vehicle and marketing medium for many of these companies.  The Web has even sprouted service industries such as, for example, public companies with multi-billion dollar valuations created just to consult and produce Web sites for others.

Most Web developers who use established WYSIWYG tools in the industry still must produce each page on their Web site one by one.  The same rate applies to preparing and placing images, animations, and other visual assets.  Each page represents its own set of issues ranging from whether to use GIF, JPEG, or PNG file formats, to finding the optimum bit depth for each image to ensure the fastest downloading through the different browsers of the consumer.  The bottlenecked state of the customer's workflow to produce graphics for Web pages can be described as follows:

**Current Workflow for Creating Web Graphics**

- Original Artwork/Asset Creation
  - Use third-party point products
- Asset Editing
  - Scale/reduce/slice
- Asset Format Conversion

1

- JPEG/GIF/PNG
- Asset Staging
  - Place in Web file system
  - Edit HTML
- Create/Modify HTML for particular page
- Store HTML on Web server
- View final pages
- Repeat process for each version of each graphic on each page

Estimated time
  - Two hours per page times the number of pages

Also, from a user's perspective, the current state of the art is to offer the consumer zooming and panning capabilities so that by clicking on an image the consumer can view more closely or from a different angle. On the horizon are pages with three-dimensional imagery that enable a user to move around a page that can look more like a room than a brochure. While interesting, these features are merely incremental improvements to a consumer's surfing experience.

D. C. A. Bulterman, *Models, Media, and Motion: Using the Web to Support Multimedia Documents,* Proceedings of 1997 International Conference on Multimedia Modeling, Singapore, 17-20 Nov. 1997 discloses "an effort underway by members of industry, research centers and user groups to define a standard document format that can be used in conjunction with time-based transport protocols over the Internet and intranets to support rich multimedia presentations. The paper outlines the goals of the W3C's Synchronized Multimedia working group and presents an initial description of the first version of the proposed multimedia document model and format."

*Text and Graphics on UMI's ProQuest Direct: The Best (yet) of both Worlds,* Online, vol. 21, no. 2, pp. 73-7, March- April 1997 discloses an information system that offers "periodical and newspaper content covering a wide range of business, news, and professional topics… letting the user search both text and graphics and build the product to suit. Articles can be retrieved in varying levels of detail: citation, abstracts, full text, and text with graphics. Images come in two flavors: Page Image, a virtual photocopy, and Text+Graphics, in which graphics are stored separately from the text and are manipulable as discrete items. …[The system] comes in two versions: Windows and Web."

John Mills Dudley, *Network-Based Classified Information Systems*, AU-A-53031/98 (27/08/98) discloses a "system for automatically creating databases containing industry, service, product and subject classification data, contact data, geographic location data (CCG-data) and links to web pages from HTML, XML, or SGML encoded web pages posted on computer networks such as Internets or Intranets....The... databases may be searched for references (URLs) to web pages by use of enquiries which reference one or more of the items of the CCG-data. Alternatively, enquiries referencing the CCG-data in the databases may supply contact data without web page references. Data duplication and coordination is reduced by including in the web page CCG-data display controls which are used by web browsers to format for display the same data that is used to automatically update the databases."

Cordell *et al*, *Automatic Data Display Formatting with A Networking Application*, U.S. Patent No. 5,845,084 (Dec. 1, 1998) discloses a placeholder image mechanism. "When a data request is made, the data transfer rate is monitored. When the receive data transfer rate is slow, and the data contains an embedded graphical image of unknown dimensions, a small placeholder image is automatically displayed for the user instead of the actual data. The small placeholder image holds a place on a display device for the data or the embedded graphical image until the data or embedded graphical image is received. When embedded graphical image is received, the placeholder image is removed, and the display device is reformatted to display the embedded graphical image."

Jonathon R. T. Lewis, *System For Substituting Tags For Non-Editable Data Sets In Hypertext Documents And Updating Web Files Containing Links Between Data Sets Corresponding To Changes Made To The Tags*, U.S. Patent No. 5,355,472 (Oct. 11, 1994) discloses a "hypertext data processing system wherein data sets participating in the hypertext document may be edited, the data processing system inserting tags into the data sets at locations corresponding to the hypertext links to create a file which is editable by an editor and the data processing system removing the tags, generating a revised data set and updating the link information after the editing process. Its main purpose is to preserve the linking hierarchy that may get lost when the individual data sets get modified."

Wistendahl *et al*, *System for Mapping Hot Spots in Media Content Interactive Digital Media Program*, U.S. Patent No. 5,708,845 (Jan. 13, 1998) discloses a "system for allowing media content to be used in an interactive digital media (IDM) program [that] has Frame Data for the media content and object mapping data (N Data) representing

the frame addresses and display location coordinates for objects appearing in the media content. The N Data are maintained separately from the Frame Data for the media content, so that the media content can be kept intact without embedded codes and can be played back on any system. The IDM program has established linkages connecting

5 the objects mapped by the N Data to other functions to be performed in conjunction with display of the media content. Selection of an object appearing in the media content with a pointer results in initiation of the interactive function. A broad base of existing non-interactive media content, such as movies, videos, advertising, and television programming can be converted to interactive digital media use. An authoring system for

10 creating IDM programs has an object outlining tool and an object motion tracking tool for facilitating the generation of N Data. In a data storage disk, the Frame Data and the N Data are stored on separate sectors. In a network system, the object mapping data and IDM program are downloaded to a subscriber terminal and used in conjunction with presentation of the media content."

15 Rogers *et al*, *Method for Fulfilling Requests of A Web Browser*, U.S. Patent No. 5,701,451 (Dec. 23, 1997) and Lagarde *et al*, *Method for Distributed Task Fulfillment of Web Browser Requests*, U.S. Patent No. 5,710,918 (Jan. 20, 1998) disclose essentially "improvements which achieve a means for accepting Web client requests for

20 information, obtaining data from one or more databases which may be located on multiple platforms at different physical locations on an Internet or on the Internet, processing that data into meaningful information, and presenting that information to the Web client in a text or graphics display at a location specified by the request."

25 Tyan *et al*, *HTML Generator*, European Patent Application No. EP 0843276 (May 20, 1998) discloses "generating an HTML file based on an input bitmap image, and is particularly directed to automatic generation of an HTML file, based on a scanned-in document image, with the HTML file in turn being used to generate a Web page that accurately reproduces the layout of the original input bitmap image."

30 TrueSpectra has a patent pending for the technology employed in its two products, IrisAccelerate and IrisTransactive. These products are designed for zooming and panning and simple image transformations and conversions, respectively. They support 10 file formats and allow developers to add new file formats via their SDK.

35 They do not require the use of Flashpix for images. However, their documentation points out that performance is dependent on the Flashpix format. The system would be very slow if a non-Flashpix format was used.

4

TrueSpectra allows the image quality and compression to be set for JPEGs only. The compression setting is set on the server and all images are delivered at the same setting.

5    TrueSpectra has a simple caching mechanism. Images in the cache can be cleared out automatically at certain times and it does not have any dependency features for image propagation. The Web server needs to be brought down in order to update any original assets.

10    TrueSpectra does not require plug-ins to operate features such as zooming/panning or compositing. The alternative to plug-ins is using their Javascript or active server page technology. These technologies are used by many Web sites to provide interactivity, but not all Web browsers work correctly with these technologies.

15    TrueSpectra relies on Flashpix as its native file format and does not support media types such as multi-GIFs and sound formats. Flashpix files are typically larger than most file formats. Access to files is faster for zooming and panning, but appears to be quite slow.

20    The key to IrisTransactive is the compositing subsystem. It requires three things to build a shopping solution using image composition.

1) The original images must be created. It is suggested that the image be converted to Flashpix for better performance.

2) All of the individual images must be described in XML using the image composer program. The program allows the editor to specify anchor points, layer attributes, and layer names. The resulting file is between 5k and 50k.

3) The Web designer must place HTML referring to the XML in the Web site. By specifying parameters to the XML, the Web designer can turn on or off layers.

30    The herein above process for compositing images enables Web designers to create shopping sites. However, a lot of overhead is the result. The XML documents add 5k-50k to a Web site. The compositing commands that are embedded in the HTML are difficult to understand. And, because the compositing feature requires several steps to implement, it is not suitable for every image on a Web site. The process seems to be
35    designed for the specific purpose of shopping.

MediaBin(TM) is limited to activities behind the firewall automating only the "post-creative busywork." In addition, MediaBin requires the use of an application server to

function through a web interface. Thus images may not be directly added to any existing web page.

5    Macromedia's Generator operates by embedding variables in their proprietary Flash format. Therefore the actual imaging operations are somewhat limited and cannot be controlled directly from a web page request.

MGI Software sells point solutions that require end-users to download a viewer to process a proprietary image format.

10    PictureIQ offers a server-side image-processing appliance that provides a limited set of Photoshop functionalities. This appliance runs on the web-page server, processes information embedded in the web page, and rewrites the web page with image data.

15    The disclosed prior art fail to provide systems and methodologies that result in a quantum leap in the *speed* with which they can modify and add images, video, and sound to sites, in the *volume* of data they can publish internally and externally, and in the *quality* of the output. The development of such an automated media delivery system would constitute a major technological advance.

20    It would be advantageous to empower an end user with flexibility and control by providing *interactive* page capabilities.

It would be advantageous from an end user's perspective to generate Web pages that
25    contain *active* graphics. For example, clicking on a Corvette image will cause a simple menu to pop up suggesting alternative colors and sizes in which to see the car. Clicking on portions of the image, such as a fender, can call up a close-in view of the fender.

It would be advantageous to provide an automated graphics delivery system that
30    becomes part of the *Web site infrastructure* and operates as part of the *Web page transaction* and that thereby provides a less expensive and less time-consuming process.

It would be advantageous to provide a system for automated processing and delivery
35    of media (images, video, and sound) to a Web server whereby it eliminates the laborious post-production and conversion work that must be done before a media asset can be delivered on a Web server.

It would be advantageous to create a dynamic Web site, wherein images are generated on demand from original assets, wherein only the original assets need to be updated, and wherein updated changes propagate throughout the site.

5  It would be advantageous to provide a system that generates media based on current Web server traffic thereby optimizing throughput of the media through the Web server.

It would be advantageous to provide a system that generates media that is optimized for the Web client, wherein client connection speed determines optimum quality and file 10  size.

It would be advantageous to provide a system that generates media, whereby the media is automatically uploaded.

15  It would be advantageous to provide a system that automatically caches generated media so identical requests can be handled without regeneration of images.

It would be advantageous to provide a system that resides behind the Web server, thereby eliminating security issues.

20  It would be advantageous to provide a system wherein the client browser does not require a plug-in.

It would be advantageous to provide a system wherein the system does not require 25  any changes to a Web server.

It would be advantageous to provide a system wherein the system manages the Web server media cache.

30  It would be advantageous to provide a system wherein the Web media is generated only if requested by a client browser.

It would be advantageous for a system to reduce the need for a Web author to create different versions of a Web site, the system automatically handling image content.

35  It would be advantageous to provide dynamic imaging capabilities, have a more complete set of image processing functionality, and be controlled directly through an image URL.

7

It would be advantageous to provide an end-to-end solution requiring only a standard browser that is completely controllable using the proprietary tags contained within a simple image link in the web page.

It would be advantageous to run an image application as a separate server controlled directly by single image requests to that server, such that any web server, even one that is only sending static HTML can access imaging features.

## SUMMARY OF THE INVENTION

An automatic graphics delivery system that operates in parallel with an existing Web site infrastructure is provided. The system streamlines the post-production process by automating the production of media through content generation procedures controlled by proprietary tags placed within URLs embedded within Web documents. The author simply places the original media in the system, and adds proprietary tags to the URLs for accessing that media. The system automatically processes the URL encoded tags and automatically produces derivative media for the web site from the original media.

The system takes as input the client connection, server traffic, content generation procedures, and proprietary tags placed within the URL to generate optimized media for the client. The need for the Web author to create different versions of a Web site is reduced because the image content of the site is automatically handled by the system. In addition, generated media is cached such that further requests for the same media require little overhead.

Because the invention takes the original media, content generation procedures, and proprietary URL tags as inputs for generating the Web media, it is possible to modify any of these inputs and have the system automatically update the media on the associated Web pages.

## BRIEF DESCRIPTION OF THE DRAWINGS

Fig. 1 is a schematic diagram showing the placement of the system within a current Web infrastructure according to the invention;

8

Fig. 2 is a schematic diagram showing how a typical Web site delivers an HTML document and its graphics to a Web browser according to the prior art;

5      Fig. 3 is a schematic diagram showing delivery of an HTML document and media to a Web browser according to the invention;

Fig. 4 is a schematic diagram showing the components involved in Web site administration according to the prior art;

10     Fig. 5 is a schematic diagram showing the components of the system involved in Web site administration according to the invention;

Fig. 6 is a simple overview showing the components of the system according to the invention;

15     Fig. 7 is a schematic diagram showing the process flow of a proprietary enabled page delivered to a Web browser according to the invention;

20     Fig. 8 is a flow chart showing an authoring process according to the invention;

Fig. 9 is a flow chart showing an HTML parsing process according to the invention;

Fig. 10 is a flow chart showing a media creation process according to the invention;

25     Fig. 11 is a screen shot showing an administration tool according to the invention;

Fig. 12 displays a structure of a database record used for the system according to the invention;

30     Fig. 13 shows original media to be processed according to the invention;

Fig. 14 shows a portion on an HTML document with a proprietary tag according to the invention;

35     Fig. 15 shows an HTML document and an HTML document source according to the invention;

9

Fig. 16 shows a generated GIF image according to the invention;

Fig. 17 is a schematic diagram of an image system within a typical Web infrastructure according to the invention;

5

Fig. 18 is a schematic diagram showing delivery of an HTML document and original media according to the invention;

Fig. 19 is a schematic diagram showing components of Web site administration

10    according to a preferred embodiment of the invention;

Fig. 20 is a simple overview showing components of the image system according to a preferred embodiment of the invention;

15    Fig. 21 is a schematic diagram showing process flow of a proprietary enabled page delivered to a Web browser according to a preferred embodiment of the invention;

Fig. 22 shows a flowchart of a content generation procedure according to a preferred embodiment of the invention; and

20    Fig. 23 is a flow chart showing an authoring process according to a preferred embodiment of the invention.

25    ## DETAILED DESCRIPTION OF THE INVENTION

An automatic graphics delivery system that operates in parallel with an existing Web site infrastructure is provided. The system streamlines the post-production process by automating the production of media through content generation procedures controlled by

30    proprietary tags placed within URLs embedded within Web documents. The author simply places the original media in the system, and adds proprietary tags to the URLs for accessing that media. The system automatically processes the URL encoded tags and automatically produces derivative media for the web site from the original media.

35    The system takes as input the client connection, server traffic, content generation procedures, and proprietary tags placed within the URL to generate optimized media for the client. The need for the Web author to create different versions of a Web site is

reduced because the image content of the site is automatically handled by the system. In addition, the generated media is cached so that further requests for the same media require little overhead.

5    Because the invention takes the original media, content generation procedures, and proprietary URL tags as inputs for generating the Web media, it is possible to modify any of these inputs and have the system automatically update the media on the associated Web pages.

10    A detailed description of such automatic media delivery system operating in parallel with existing Web site infrastructure is found below in the section under the heading as such.

Fig. 1 is a schematic diagram showing the placement of the system within a current Web infrastructure according to a preferred embodiment of the invention. The system 100 is attached to a Web server 110, which is connected to multiple client browsers 120(a-d) via the Internet 130.

Fig. 2 is a schematic diagram showing how a typical Web site delivers an HTML document and its graphics to a Web browser according to the prior art. An original media 200 is passed to post-production systems 210, wherein the media 200 is manipulated by hand and prepared for the Web. The result is a Web media 220. The Web media 220 and an associated HTML document 230 referring to the media 220 by media tags are input to a Web server 110 for a Web browser 120 to view via the Internet 130.

Fig. 3 is a schematic diagram showing delivery of an HTML document and media to a Web browser according to a preferred embodiment of the invention. An original media 200 and an HTML document embedded with proprietary media tags 300 are input into the system 100. The system 100 generates a Web-safe media 220 and a modified HTML document 230 that refers to the Web media, and automatically loads them onto the Web server 110 for view by a Web browser 120 via the Internet 160.

Fig. 4 is a schematic diagram showing components involved in Web site administration according to the prior art. Original media assets 400 are original images, video, or sound that have not been prepared for the Web. Web sites usually need to manage the placement of media on the network for easy retrieval by Web designers. Post-production systems 410 vary from Web site to Web site. Post-production systems 410 are usually custom procedures that Web designers use to convert an original

11

media, such as an image, to one that can be displayed on the Web. Post-production systems 410 also upload finished images to Web image systems. Web images 420 are Web versions of the original images. Web images 420 are ready for retrieval by the Web server 110 to be delivered to a Web browser 120. Any image to be modified or updated must pass through the herein above three components before it can be delivered to the Web browser 120. HTML pages 460 have references to Web images 420.

Fig. 5 is a schematic diagram showing the components involved in Web site administration according to a preferred embodiment of the invention. Web site administration is simplified using the claimed invention. Asset management, automatic image manipulation, automatic image conversion, automatic image upload, and automatic disk management 500 are provided by the claimed invention.

Fig. 6 is a simple overview showing the components of the system according to a preferred embodiment of the invention. HTML with proprietary tags 300 is the original HTML document that is embedded with proprietary tags which describe how the images are to be manipulated for the Web. Java servlet engine 600 is a third-party product that allows the system 100 to interface with the Web server 110 and execute Java servlet code. The Web server 110 is third-party software that delivers Web pages to a Browser 120. The Browser 120 views Web pages that are sent from the Web server 110. Modified HTML with system created images 230 are a final result of the system. Modified HTML 230 is a standard HTML document without proprietary embedded tags and with standard Web graphics.

**The System.**

A preferred embodiment of the system 100 is provided.

HTML parsing subsystem 610 parses through an HTML document and searches for proprietary tags. If it finds a proprietary tag it hands it to a media caching subsystem 620 for further processing. The media caching subsystem 620 returns a standard HTML tag. The HTML parsing subsystem 610 then replaces the proprietary tag it found with the returned tag. The parsing subsystem 610 then continues searching for a next proprietary tag, repeating the process herein above. The process is finished when no more proprietary tags can be found.

The media caching subsystem 620 determines if an image has been created for the requested proprietary tag. If the image has already been created and the files that built

that image have not been modified, the media caching subsystem 620 returns an HTML tag that refers to a previously-generated image. If the image has not been created, the media caching subsystem 620 hands the HTML tag to a media creation subsystem 630. The media creation subsystem 630 returns an image to the media

5   caching subsystem 620. The media caching subsystem 620 adds the created image and the HTML tag to a media cache database 640.

The media cache database 640 contains references to the created images 645. In a preferred embodiment, the references are the script used to create the image, the

10  names of the images used to create the image, the dates of those files, and the HTML that represents the created image. The media caching subsystem 620 performs lookups in this database to determine if the image has been created. If the image has not been created the media caching subsystem 620 calls upon the media creation subsystem 630 to create the image and then store the results in the media cache

15  database 640.

The media creation subsystem 630 takes a proprietary tag from the media caching subsystem 620 and generates an image. The image is generated by deciphering the tag and handing it to the media processing engine 650. After the image is created, the

20  media creation subsystem returns the name of the newly created image to the media caching subsystem 620.

The media processing engine 650 interprets the proprietary tag and generates the image. The media processing engine 650 looks up images in a media repository to

25  obtain the location of the original file.

The media repository 660 contains original images 665 used in the system 100.

Fig. 7 is a schematic diagram showing the process flow of a proprietary enabled page

30  delivered to a Web browser according to a preferred embodiment of the invention. An original media 200 is created. The media 200 is placed into the system 100 in the media repository 660. Similarly, an HTML document with proprietary tags 300 is created and placed on a Web server 110. A user requests a Web page from a Web browser 120. The Web server 110 passes the requested page to an HTML parser

35  610. The HTML parser 610 parses HTML looking for media tags. The parser 610 looks up media tags in a media tags database 640. If the media tag is found, then the system 100 produces a modified HTML document 230. Otherwise, the media creation subsystem 630 uses the media tag to generate a Web media 220. The generated

Web media 220 is placed in a media cache subsystem 620. The proprietary media tag is converted by a converter 700 to a standard HTML tag that refers to the generated media 220 in cache. The media tag and the HTML equivalent are stored in the media tags database 640. Media tags are replaced by standard HTML equivalent to provide

5    a modified HTML document 230. The modified HTML document 230 is delivered to the Web server 110. The Web server 100 delivers the modified HTML document 230 to the browser 120 via the Internet for a user to view.

Fig. 8 is a flow chart showing an authoring process according to a preferred embodiment

10    of the invention. The process starts (800) when a user adds an original graphic to the system (810). The user then creates an HTML document that contains proprietary media tags (820). The user then places the HTML document on a Web server (830) and ends the authoring process (840).

15    Fig. 9 is a flow chart showing an HTML parsing process according to a preferred embodiment of the invention. The process starts (900) when a consumer requests a Web page (910). A Web server hands the request of the Web page to the system (920). The system parses the Web page (930). The system looks for a media tag (940). If found, the system retrieves the HTML equivalent of the media tag (950) and

20    replaces the media tag with the HTML equivalent tag (960). The system continues parsing the Web page for tags (970) by returning to step (940). When no more tags are found, the system delivers the modified Web page to the Web server (980) and therein ends the process (990).

25    Fig. 10 is a flow chart showing a media creation process according to a preferred embodiment of the invention. The process starts (1000) when the system requests an HTML equivalent to a proprietary media tag (1010). The Media tag is combined with bandwidth information (1020). The subsystem checks if the media tag already exists in the media tag database (1030). If it does, the subsystem checks if any of the original assets used to create the media have been changed (1040). If not, then the

30    subsystem retrieves the HTML equivalent tag from the database (1050) and returns the HTML equivalent tag to the requesting system (1060). If any of the original assets used to create the media have been changed (1040), then the subsystem removes the media tag entry from the media database (1070) and creates the media using the media

35    tag (1080). The subsystem then stores the media in a media cache (1090). The subsystem generates the HTML referring to the generated media (1100) and places the media tag and the HTML equivalent in the media tag database (1110). The HTML equivalent is returned to the requesting system (1060) and the process stops (1120).

14

The differences between using HTML and the proprietary tags disclosed herein are noted. HTML allows Web designers to create Web page layouts. HTML offers some control of the images. HTML allows the Web designer to set the height and width of an

5    image. However, all of the other image operations disclosed herein are supported by the claimed invention and are not supported by HTML.

Table A herein below provides the claimed proprietary tags according to a preferred embodiment of the invention. The use of the term "freeride" refers to an internal code

10   name for the invention.

<div align="center">Table A</div>

**Tags**

15   **Generate image**

&lt;freerideimage&gt; mediascript &lt;/freerideimage&gt;
Generate a standard Web image.
**Generate thumbnail image linked to full image**
&lt;freerideimagethumbnail&gt; mediascript &lt;xs=size ys=size /freerideimagethumbnail&gt;

20   Generate a thumbnail of specified size and link it to the full size version.

**Generate zoom and pan image**
&lt;freerideimagezoom&gt; mediascript &lt;/freerideimagezoom&gt;

25   Generate a zoomable/panable image.

**Security**

&lt;freerideimagesecure&gt; &lt;/freerideimagesecure&gt;
Specifies that all images found between these tags are secured images and the system

30   will determine access before generating.

Table B herein below provides the claimed script commands according to a preferred embodiment of the invention. Additional commands may be added as needed.

35

<div align="center">Table B</div>

**Media processing script commands**

40   **Add Noise**

Noise_AddNoise( [amount=&lt;value 1..999&gt;] [gaussian] [grayscale] )

<div align="center">15</div>

This command adds noise to the image.

**Adjust HSB**

AdjustHsb([hue @ <value ±255>]  [saturation @ <value ±255>]  [brightness @ <value ±255>])

5  This command allows the HSB of an image to be altered. This can be applied to images of all supported bit-depths.

**Adjust RGB**

AdjustRgb( [brightness @ <value ±255>] [contrast @ <value ±255>] [red @ <value ±255>]
10  [green @ <value ±255>] [blue @ <value ±255>] [noclip @ <true, false>] [invert @ <true, false>] )

This command allows the contrast, brightness, and color balance of an image to be altered.

**Blur**

Blur( radius @ <value 0..30>)

15  This command applies a simple blur filter on the image.

**Blur Convolve**

Blur_Blur()

This command commands perform a simple 3x3 convolution for blurring.

20  **Blur Convolve More**

Blur_MoreBlur()

This command commands perform a stronger 3x3 convolution for blurring.

25  **Blur Gaussian**

Blur_GaussianBlur( [radius=<value 0.1..250>] )

This command applies a Gaussian blur to the image.

**Blur Motion**

30  Blur_MotionBlur( [distance=<value 1..250>] [angle=<degrees>] )

This command applies motion blurring to the image using the specified distance and angle.

**Brush Composite**

Composite( source @ {<User-Defined Media Object name>} [x @ <pixel>] [y @ <pixel>]
35  [onto] [opacity @ <value 0..255>] [color @ <color in hexadecimal>] [colorize @ <true, false>]
[saturation @ <value 0..255>] )

This command composites the specified "brush" (foreground) image onto the current "target" (background) image.

40  **Colorize**

Colorize( color @ <color in hexadecimal> [saturation @ <value 0..255>] )

This command changes the hue of the pixels in the image to the specified color.

**Convert**

45  Convert( rtype @ <bit-depth> {dither @ <value 0..10>} )

This command converts the image to the specified type/bit-depth.

16

## Convolve

Convolve( Filter @ <filtername> )

This command applies a basic convolution filter to the image. In a user interface driven system, the filters could be stored in files and edited/created by the user.

## Crop/Resize Canvas

Crop( [xs @ {<pixels>, <percentage + "%">}] [ys @ {<pixels>, <percentage + "%">}] [xo @ <left pixel>]
[yo @ <top pixel>] [padcolor @ <color in hexadecimal>] [padindex @ <value 0..255>] )

This command crops the media to a specified size.

## Discard

Discard()

This command removes the designated Media Object from memory.

## Drop Shadow

DropShadow( [dx @ <pixels>] [dy @ <pixels>] [color @ <color in hexadecimal>] [opacity @ <value 0..255>] [blur @ <value 0..30>] [enlarge @ <true, false>])

This command adds a drop shadow to the image based on its alpha channel.

## Equal

Equal( source @ {<User-Defined Media Object name>})

This command compares the current media with the one specified. If the media are different in any way, an error value is returned.

## Equalize

Equalize( [brightness @ <-1, 0..20>] [saturation @ <-1, 0..20>])

This command equalizes the relevant components of the media. Equalization takes the used range of a component and expands it to fill the available range.

## Export Channel

ExportGun( Channel @ <channelname> )

This command exports a single channel of the source as a grayscale image.

## Find Edges

Stylize_FindEdges( [threshold=<value 0..255>] [grayscale] [mono] [invert] )

This command finds the edges of the image based on the specified threshold value.

## Fix Alpha

FixAlpha()

This command adjusts the RGB components of an image relative to its alpha channel.

## Flip

Flip( <horizontal, vertical> @ <true, false> )

This command flips the media vertically or horizontally.

17

**Frame Add**

FrameAdd( Source @ <filename> )

This command adds the given frame(s) to the specified Media Object.

**Glow/Halo**

Glow( Size @ <value 0..30> [halo @ <value 0..size>] [color @ <color in hexadecimal>] [opacity @ <value 0..255>] [blur @ <value 0..30>] [enlarge @ <true, false>] )

This command produces a glow or halo around the image based on the image's alpha.

**High Pass**

Other_HighPass( [radius=<value 0.1..250>] )

This command replaces each pixel with the difference between the original pixel and a Gaussian blurred version of the image.

**Import Channel**

ImportGun( channel @ <channel name> source @ {<User-Defined Media Object name>} [rtype @ <bit-depth>])

This command imports the specified source image (treated as a grayscale) and replaces the selected channel in the original.

**Load**

Load( Name @ <filename> [type @ <typename>] [transform @ <true, false>] )

This command loads a media from the specified file.

**Maximum**

Other_Maximum( [radius=<value 1..10>] )

This command scans the area specified by the radius surrounding each pixel, and then replaces the pixel with the brightest pixel found.

**Minimum**

Other_Minimum( [radius=<value 1..10>] )

This command scans the area specified by the radius surrounding each pixel, and then replaces the pixel with the darkest pixel found.

**Normalize**

Normalize( [clip @ <value 0..20>] )

This command expands the volume of the sample to the maximum possible.

**Pixellate Mosaic**

Pixellate_Mosaic( [size=<value 2..64>] )

This command converts the image to squares of the specified size, where each square contains the average color for that part of the image.

**Pixellate Fragment**

Pixellate_Fragment( [radius=<value 1..16>] )

This command produces four copies of the image displaced in each direction (up, down, left, right) by the specified radius distance and then averages them together.

18

**Quad Warp**

QuadWarp( [tlx=<position>] [tly=<position>] [trx=<position>] [try=<position>]  [blx=<position>] [bly=<position>] [brx=<position>] [bry=<position>] [smooth] )

5    This command takes the corners of the source image and moves them to the specified locations, producing a warped effect on the image.

**Reduce to Palette**

Reduce( [colors @ <num colors>] [netscape @ <true, false>] [b&w @ <true, false>] [dither @ <value 0..10>] [dithertop @ <value 0..10>] [notbackcolor] [pad @ <true, false>] )

10    This command applies a specified or generated palette to the image.

**Rotate**

Rotate( Angle @ <value 0..359> [smooth @ <true, false>] [enlarge @ <true, false>] [xs @ <pixels>]

15    [ys @ <pixels>] )

This command rotates the media by the specified angle in degrees.

**Rotate 3D**

Rotate3d( [anglex @ <angle ±89>] [angley @ <angle ±89>] [distance @ <value>] )

20    This command rotates the image in 3D about either the x-axis or y-axis.

**Save**

Save([type @ <image-type>])

This command saves a media to the specified file.

25    **Scale**

Scale( [xs @ {<pixels>, <percentage + "%">}] [ys @ {<pixels>, <percentage + "%">}] [constrain @ <true, false>] [alg @ {"fast", "smooth", "outline"}] [x1 @ <pixels>] [y1 @ <pixels>] [x2 @ <pixels>] [y2 @ <pixels>] )

30    This command scales the image to the specified size.

**Select**

Selection( [source @ <User-Defined media Object>}] [remove @ <true, false>] [invert @ <true, false>]

35    [backcolor] [color=<color>] [index=<value>] [opacity @ <value 0..255>] )

This command manages the selected region for the current Media Object.

**Set Color**

SetColor( [backcolor @ <color in hexadecimal>] [forecolor @ <color in hexadecimal>]

40    [backindex @ <value 0..255>] [foreindex @ <value 0..255>] [transparency @ ("on","off")] )

This command allows the background color, foreground color, and transparency state of an image to be set.

**Set Resolution**

45    SetResolution( [dpi @ <value>] [xdpi @ <value>] [ydpi @ <value>] )

This command changes the DPI of the image in memory.

**Sharpen**

Sharpen_Sharpen()

50    This command sharpens the image by enhancing the high-frequency component of the image.

19

**Sharpen More**

Sharpen_SharpenMore()

This command sharpens the image by enhancing the high-frequency component of the image, but is stronger than the standard sharpening.

5

**Stylize  Diffuse**

Stylize_Diffuse( [radius=<value 0..>] [lighten] [darken] )

This command diffuses the image by randomizing the pixels within a given pixel radius.

10      **Stylize  Embose**

Stylize_Emboss( [height=<value 1..10>] [angle=<degrees>] [amount=<percentage 1..500>])

This command converts the image to an embossed version.

**Text Drawing**

15      DrawText( Text @ <string> Font @ <font file>  [size @ <value>]
[color @ <color in hexadecimal>] [smooth @ <true, false>] [<left, right, top, bottom> @ <true, false>]
[x @ <pixel>] [y @ <pixel>] [wrap @ <pixel-width>] [justify @ {left,center,right}] [angle @ <angle>])

20      This command composites the specified text string onto the image.

**Text Making**

MakeText( text @ <string> font @ <font file> [path @ <path to font directory>] [size @ <value 1..4095>]
25      [color @ <color in hexadecimal>] [smooth @ <true, false>] [wrap @ <pixel-width>]
[justify @ {left,center,right}] [angle @ <angle>] )

This command creates a new image that includes only the specified text.

**Trace Contour**

30      Stylize_TraceContour( [level=<value 0..255>] [upper] [invert] )

This command traces the contour of the image at the specified level (for each gun).

**Unsharpen Mask**

Sharpen_UnsharpMask( [amount=<percentage 1..500>] [radius=<value 0.1..250>]
[threshold=<value 0..255>] )

35      This command enhances the edges and detail of an image by exaggerating differences between the image and a gaussian blurred version of the same image.

**Zoom**

Zoom( [xs @ <pixels>] [ys @ <pixels>] [scale @ <value>] [x @ <left pixel>] [y @ <top pixel>] )

40      This command zooms in on a specified portion of the media and fits it to the specified size. This constitutes a crop followed by a scale.

Table C herein below provides a list of features provided by  a preferred embodiment

45      of the invention.   It is noted that the list of features included in Table C is by  no means

20

complete. In other embodiments, the list of features is expanded or reduced as needed.

5                                    Table C -System Feature List

- Reads and writes various file formats:
    BMP, GIF, JPG, PNG, TIF, PICT, TGA, PSD, FPX;
- Supports many image processing operations;
- Dynamically creates Web images from original assets;
10
- Dynamically creates thumbnail images;
- Dynamically creates images that can be panned and zoomed without browser plug-ins or special file formats;
- Automatically propagates changes of original assets throughout a Web site;
- Uses an intelligent caching mechanism:
15
    Clean up image cache on demand;
    Eliminates orphaned image files; and
    Optimizes Web server cache by providing most recent images;
- Renders TrueType fonts on the server instead of browser;
- Uses intelligent scaling of line drawings;
20
- Allows Web designers to manipulate images with proprietary tags;
- Preserves original image assets;
- Optimizes Web server traffic by adjusting the bandwidth of graphics;
- Optimizes images for client connection speed;
- Allows clients to specify the quality of images on a Web site; and
25
- Allows Web designers to dynamically create images by manipulating proprietary tags in their applications (server or client side).

Fig. 11 is a screen shot showing an administration tool according to a preferred embodiment of the invention. Specifically, Fig. 11 shows an administration page that
30   contains cached images of generated scripts. The use of the term "freeride" refers to an internal code name for the invention.

Fig. 12 displays a structure of a database record used for the system according to a preferred embodiment of the invention. A Script Table 1200 has 5 columns, Media
35   Script 1210, HTML Equivalent 1220, Bandwidth 1230, Generated File 1240, and Dependency List 1250. A Dependency Table 1260 has two columns, File Name 1270 and Modification Date 1280.

**Snowboard Store Example.**

Background.

The snowboard store highlights several features of the claimed system. The snowboard store is an imaginary store that allows a user to configure his or her
5   snowboard. The store consists of five logos, five board colors, and four boards. The consumer clicks on the buttons to change the snowboard represented in the middle of the screen. When the consumer has configured the snowboard they the snowboard can be purchased by selecting a buy button.

10   Prior Art Method.

To create the snowboard site today, the Web designer must render all possible combinations of the board. The number of combinations is five logos x five board colors x four boards = 100. The designer also must render all the buttons. The creation process is very tedious and involves a lot of production work. Typically, most Web
15   sites do not even attempt such an endeavor. Also, other issues must be addressed, such as, for example, updating the Web site and scripting. For example, updating a single logo involves updating a minimum of 20 images.

The prior art method sustains a graphic intensive site that requires management of at
20   least 100 images. Updates to the Web site are time-consuming and prone to human error.

The Claimed Method.

A preferred embodiment of the method scripts the image creation process in HTML to create a dynamic Web site. There is no need to create over 100 images. The claimed
25   system generates images on demand. The Web site only needs to create original assets. The scripting process involves writing the proprietary scripts. In the current example herein, scripting buttons is very simple. Once one button is created, simply copy and paste the HTML to create another button or many buttons. Only the name of the image to be overlaid on the button must be changed. The Webmaster then creates
30   a simple program that reads what object a user has clicked on and generates a proprietary tag. The tag is then sent to the claimed system to generate a center image.

The claimed method allows the creation of all 100 combinations automatically. When the
35   Web site receives an updated image, only the original image needs to be updated. Any change to the original image automatically propagates throughout the system. The Web site is easier to manage. Testing of the Web site is easier because there is no

need to test all 100 combinations. A small subset of combinations will guarantee adequate coverage.

**Processing of an Image Tag Example (Fig. 13-16).**

5 Fig. 13 shows two original images 1300 and 1310 to be processed according to a preferred embodiment of the invention.

Fig. 14 shows a portion on an HTML document with a proprietary tag 1400, <freerideimage></freerideimage> according to a preferred embodiment of the invention.

10 The use of the term "freeride" refers to an internal code name for the invention.

Fig. 15 shows an HTML document 1500 as viewed in a browser and an HTML document source 1510, according to a preferred embodiment of the invention. The use of the term "freeride" refers to an internal code name for the invention.

15 Fig. 16 shows a generated GIF image 1600 according to a preferred embodiment of the invention.

**Automatic media delivery system operating in parallel with existing Web site**

20 **infrastructure.**

It should be noted that the words, media, graphics, and images are used herein interchangeably.

An automatic graphics delivery system that operates in parallel with an existing Web

25 site infrastructure is provided. The system streamlines the post-production process by automating the production of media through content generation procedures controlled by proprietary tags placed within URLs embedded within Web documents. The author simply places the original media in the system, and adds proprietary tags to the URLs for accessing that media. The system automatically processes the URL encoded tags

30 and automatically produces derivative media for the web site from the original media.

The system takes as input the client connection, server traffic, content generation procedures, and proprietary tags placed within the URL to generate optimized media for the client. The need for the Web author to create different versions of a Web site is

35 reduced because the image content of the site is automatically handled by the system. In addition, the generated media is cached so that further requests for the same media require little overhead.

Because the invention takes the original media, content generation procedures, and proprietary URL tags as inputs for generating the Web media, it is possible to modify any of these inputs and have the system automatically update the media on the associated Web pages.

5

A preferred embodiment of the invention is described with reference to Fig. 17. Fig. 17 is a schematic diagram of an image system within a typical Web infrastructure according to the invention. The image system 100 is placed in parallel to an existing Web server 110. The image system 100 may be on-site or off-site to the Web infrastructure.

10 Multiple client browsers 120a-120d communicate with both the Web server 110 and the image server 100 via the Internet 130.

The delivery of an HTML document and media according to a preferred embodiment of the invention is described with reference to Fig. 18. Resource locators (URLs) are placed within HTML documents 301 accessible to the Web server 110. These URLs

15 direct browsers to generate requests for media to the system 100. The system processes such URLs by interpreting the proprietary tags, executing the indicated image generation procedures on the original media 200, and returning derivative Web-safe media to client browsers 120a-120d via the Internet 130. Additionally, such generated media is cached on the image server 100 and, therefore need not be

20 regenerated for subsequent requests.

Web site administration according to another preferred embodiment of the invention is described with reference to Fig. 19. Fig. 19 is a schematic diagram showing the components of Web site administration according to a preferred embodiment of the

25 invention, whereby Web site administration is simplified. The preferred embodiment provides, but is not limited to the following services: asset management, automatic image manipulation, automatic image conversion, automatic image upload, automatic image customization based on browser characteristics, automatic disk management,

30 automatic control of proxy caching, and image delivery 501.

Fig. 20 is a simple overview showing components of the system according to a preferred embodiment of the invention. HTML pages with proprietary URL tags 301 describe how referenced media therein is to be manipulated for Web. Browsers 120

35 send such tags to the image system 100 as media requests. A server 2000 within the image system 100 receives the media requests, decodes the URL tags, and retrieves any media that already exists in the media caching system 2010. Non-existent media is

subsequently generated by a media creation system 2020 using original media 2050 stored in a media repository 2040 and using content generation procedures 2030.

The Image System.

5    Following is a detailed description of the preferred embodiment of the invention with reference to Fig. 21 below.

The system receives a request for media through a URL containing proprietary tags for controlling image generation. The system parses this URL to determine the content

10    generation procedure to execute, input to the content generation procedure, post-processing directives for, for example, zoom/pan/slice, browser properties, and any cache control directives. Such data is handed to a media caching subsystem that returns the requested image if found. If the image is not found, the information is handed to the media generation subsystem that executes the specified content generation procedure

15    to produce a derivative image. The media generation subsystem returns one or more images to the media caching system for subsequent reuse.

The media caching subsystem is a mechanism for associating final or intermediate derivative media with the procedure, input, and user characteristics used to generate said

20    media, specified through proprietary tags within the requested URL. This system may be implemented using a database, file system, or any other mechanism having capability to track such associations.

The media generation subsystem executes a primary content generation procedure to

25    produce a derivative image whose identifier is provided to the media caching subsystem. This derivative image is composed of one or more original images acquired from the media repository. This media is then passed to the dynamic image content system, if necessary, to generate a subsequent derivative media suitably modified for the needs of zooming, panning, or slice. The resulting media is passed to

30    the user profile system where it is again modified to account for any specific user browser characteristics specified using the proprietary URL tags. This media is then returned to the browser, along with any cache control directives encoded within the URL, and its identifier is passed to the media caching system for subsequent retrieval.

35    The dynamic content system operates on intermediate derivative images to generate image subsets or scalings used by Web site designers to implement zooming in on an image, panning across an image, slicing an image into parts, and the like for special W e b

25

page effects. The input to this system is cached by the media caching system such that the intermediate image need not be regenerated.

The user profile system operates on the final image about to be returned to the browser and may modify the image to account for individual needs of Web site users. The designer of a site is able to implement freely custom post-processing of images to meet the specific needs of their clients.

Fig. 21 is a schematic diagram showing the process flow of a proprietary enabled page delivered to a Web browser according to a preferred embodiment of the invention. Original media 200 is created and placed into the system 100 in a media repository 2040. A content generation procedure 2140 is created with instructions on how the media is to be transformed to create the desired Web page content. An HTML page 301 is created for the Web site comprising the system 100, the page containing one or more URLs directing a browser 120 to request the specified content generation procedure 2140 from the system 100 using input parameters specified with proprietary tags encoded within the URL. The browser 120 requests the Web page 301 from the Web site 110. Upon receipt of the page 301, the browser contacts the system 100 requesting media specified in the URL. The system parses the URL 2100 to determine the content generation procedure 2140 to execute, any corresponding input parameters to be used by such procedure, any dynamic content processing 2150 to be performed by dynamic media procedures, any user profile information 2160 to be used to modify the resulting image, and any cache control HTTP headers 2190 the site instructs to accompany the resulting image.

The parser generates a unique primary lookup key 2110 for the specified resulting media. If the key corresponds to an existing generated media 2180, such media is returned immediately to the browser 120 through a media cache 2120, and the transaction is complete. Otherwise, a media generation occurs. In the case of media generation requiring dynamic content processing, a unique secondary lookup key corresponding to intermediate media is generated 2130. If intermediate media 2170 corresponding to this key is found, such media is passed directly to the dynamic media content system 2150 having dynamic media procedures, wherein appropriate action is taken to generate the required derivative from the intermediate media data. A unique key is generated for the derivative 2130 and passed to the media caching system 2120. If the media caching system finds no such intermediate image, such intermediate image is generated according to instructions specified by the content generation procedure, cached by the media cache system 2120 as a secondary cached media

26

2170, and passed to the dynamic media system 2150. Again, appropriate action is taken to generate the required derivative from the intermediate image data.

5  The resulting image after any dynamic media processing is complete, is checked to ensure that the image is in a valid Web image format. If not, the image is automatically converted into a valid format.

10  The final media is passed to a user profile system 2160 wherein browser characteristics specified through proprietary tags within the URL are inspected, and appropriate modification to the media is performed, based on such characteristics. The resulting image is handed to the media cache system 2120 for caching and returned to the browser 120.

15  Fig. 22 shows a flowchart of the content generation procedure according to a preferred embodiment of the invention. A URL containing proprietary tags (2200) is parsed (2210) to determine the content generation procedure to execute, any dynamic modifications to the media, user profile characteristics, and proxy-cache control. A unique final lookup key is generated for the media (2220) and the media cache is checked (2230). If the indicated media exists, control passes to proxy-cache control (2290) and
20  the media is delivered to the browser (2295). Otherwise, dynamic media system tags are separated from content generation control tags (2240) and a unique intermediate image lookup key is generated (2250). The cache is then checked for such intermediate media (2261). If such intermediate media is found, it is used directly for dynamic processing, if required. Otherwise, content is generated (2262) and cached (2263), and
25  the result is evaluated for dynamic processing (2270). If dynamic processing is required, the media is operated upon by the dynamic content generator (2271), otherwise it is evaluated for valid content type (2272). If the content type is invalid, the media is automatically converted to a valid type (2273). The resulting image is then customized by the user profiling system (2280) for specified browser or client attributes.
30  Finally, any cache-control directives specified are attached to the response (2290) and the media is delivered to the browser (2295).

Fig. 23 is a flow chart showing an authoring process according to a preferred embodiment of the invention. The process starts (2300) when a user adds an original
35  graphic or other media (2310) to the system. The author then creates a content generation procedure (2320) containing instruction on how the original media should be processed to generate the desired Web page content. The user then creates an HTML document (2330) that refers to that image by using a URL pointing to a content

generation procedure on the image server. The system ends (2340). The authoring subsystem assists the Web site designer with choosing parameters and with designing the content generation procedure such that the desired Web site graphic is obtained.

5    It should be appreciated that differences exist between specifying an image with a URL and requesting an image using a content creation process that interprets proprietary parameters encoded within a URL. That is, URLs allow Web site designers to load specific graphic images into a Web page. In contrast and according to the invention, URLs containing proprietary content creation tags initiate a process whereby graphic

10    images for a site are automatically produced.

Table D below is a list of example proprietary URL tags used for content generation within the system according to the preferred embodiment of the invention. Additional tags may be added to the system as necessary.

15

<div align="center">Table D — Tags</div>

f=function

    Names the content creation procedure used to generate all or part of the desired graphic.

args=arguments

20        Supplies page dependent parameters used to control the content creation procedure from within the Web page.

cr=crop rectangle

    Specifies that portion of the image generated by the content generation procedure to be returned to the browser.

25    st=slice table

    Specifies a rectangular grid to be placed over the image produced by the content generation procedure, each portion of which can be returned to the browser.

sp= slice position

    Specifies that portion of the slice table grid placed over the image generated by the content

30    creation procedure to be returned to the browser.

is=image size parameter

    Specifies scale factors to be applied to any portion of an image generated by any combination of a content generation procedure, arguments, crop rectangles, slice tables, and slice positions.

p=user profile string

> Specifies a user profile identifier used to modify the final image prior to returning the image to the browser, thus allowing clients to modify the image returned to the browser to account for individual browsing conditions.

5     c=cache control

> Specifies a proxy-cache control string to accompany the returned image within an HTTP header.

10 Table E below is a list of example supported content creation commands according to a preferred embodiment of the invention. Additional commands may be added as necessary.

### Table E — Content Creation Commands

Adjust HSB

> Allows the HSB of an image to be altered.

Adjust RGB

> Allows the contrast, brightness, and color balance of an image to be altered.

Colorize

> Alters the hue of the pixels in the image to that of the specified *color*.

Brush Composite

> Composites the specified brush image onto the current target image.

Convert

> Converts the rasters to the specified type/bit-depth.

Crop

> Crops the media to the specified size.

Dropshadow

> Adds a drop shadow to the image, based on the alpha-channel.

Equalize

> Performs an equalization on the relevant components of the media.

FixAlpha

> Adjusts the RGB components of an image relative to its alpha-channel.

Flip

Flips the media vertically or horizontally.

Glow

Produces a glow or halo around the image.

Load

Loads in a media from the specified file.

Normalize

Similar to equalize, but for audio.

Reduce

Reduces the image to a specified palette.

Rotate

Rotates the media clockwise by the specified *angle* in degrees.

Save

Saves the media to the specified file.

Scale

Scales the media to the specified size.

SetColor

Allows the background color, foreground color, and transparency state of the media to be set.

Text Drawing

Composites the specified text onto the image.

Text Making

This command, instead of compositing text onto the target, creates a new image that just encloses the text.

Zoom

Zooms in on a specified portion of the media, and fits it to the specified size. Effectively this constitutes a crop followed by a scale.

Table F below lists comprises some, and is not limited to all major features of a preferred embodiment of the invention.    Additional features may be added as necessary.

Table F - System Features

30

Reads and writes various file formats;

Supports many image processing operations;

Dynamically creates Web images from original assets;

5       Dynamically creates thumbnail images;

Dynamically and efficiently creates images that can be panned, zoomed, or sliced from original assets without Browser plugins;

Automatically propagates changes in original assets throughout the Web site;

Uses an intelligent caching mechanism for both final and intermediate graphics, comprising:

10       Clean up cache on demand;

      Eliminates orphaned Web files; and

      Optimizes Web server cache by providing most recent images;

Renders True-Type fonts on server instead of browser;

Uses intelligent scaling of line drawings;

15       Allows Web designers to manipulate images using a combination of content generation procedures and proprietary URL tags;

Preserves original image assets;

Optimizes Web server traffic by adjusting the bandwidth of graphics;

Optimizes images for client connection speed;

20       Allows clients to specify the quality of images on a Web site;

Allow site-specific customized image optimizations for a variety of purposes; and

Allows Web designers to dynamically create images by manipulating proprietary URL tags in applications.

25       Accordingly, although the invention has been described in detail with reference to a particular preferred embodiment, persons possessing ordinary skill in the art to which this invention pertains will appreciate that various modifications and enhancements may be made without departing from the spirit and scope of the claims that follow.

## CLAIMS

1.    A method for generating and delivering Web page content comprising media, said method comprising:

    parsing a URL containing proprietary tags to determine:

        a content generation procedure to execute and corresponding input to said procedure;

        dynamic modifications to perform on said media;

        user profile characteristics; and

        proxy-cache control;

    generating a unique final lookup key for said media;

    checking a media cache, using said final lookup key;

    if said media exists in said media cache, then

        passing control to said proxy-cache control; and

        delivering said media;

    if said media does not exist in said media cache, then

        separating dynamic media system tags from content generation control tags; and

        generating a unique intermediate image lookup key;

        checking said media cache using said intermediate image lookup key;

    if said intermediate media exists in said media cache, then

        using said intermediate media for further processing;

    if said intermediate media does not exist in said media cache, then

        generating  and caching said media, using said intermediate image lookup key;

        determining if dynamic processing is required and, if affirmative, then

        operating upon said media by a dynamic content generator;

        determining if content type is valid and, if negative, then

        converting said media automatically to a valid type;

        customizing said media for specified browser or client attributes using a user profiling system;

        attaching any specified cache-control directives to a response; and

        delivering said media.

2.    The method of Claim 1, wherein dynamic processing comprises directives for zoom, pan, slice, and the like.

3.    A method for an end user to generate Web page content comprising media, said method comprising:

adding original media to an image system;

creating a content generation procedure containing instruction for processing said original media for said Web page content; and

creating an HTML document referring to said processed media by using a URL pointing to said content generation procedure on said image system.

4.    The method of Claim 3, further comprising:

providing an authoring subsystem, said subsystem assisting with choosing parameters and with designing said content generation procedure.

5.    An apparatus for generating Web-safe media, using an HTML page having a URL, said URL having encoded proprietary tags, said apparatus comprising:

a server for receiving media requests and delivering said Web-safe media;

a media repository for storing original media;

a content generation procedure containing instructions for transforming said original media into said Web-safe media;

a URL tag parser for determining:

said content generation procedure to execute and any corresponding input parameters to be used by said procedure for generating a primary media to be cached;

dynamic content processing to be performed, if necessary by dynamic media procedures;

user profile information, if any to be used for modification of a resulting image; and

cache control HTTP headers, if any to accompany said resulting image;

a unique primary lookup key generated by said parser and associated with said primary cached media, wherein said primary cached media, if existing, is delivered as said Web-safe media through a media cache; and

a unique secondary lookup key corresponding to intermediate media requiring said dynamic media processing by said dynamic media procedures, thereby generating corresponding derivative intermediate media, and said unique secondary lookup key corresponding to said derivative intermediate media stored in a secondary media cache.

6.    The apparatus of Claim 5, wherein any of said original media, said content generation procedure, and said proprietary URL tags are modified, thereby rendering an automatically updated Web-safe media.

33

7.    The apparatus of Claim 5, wherein said apparatus is configured in parallel to a Web server infrastructure, said existing Web server infrastructure providing said media requests.

5    8.    The apparatus of Claim 7, wherein said apparatus is configurable to work either on-site or off-site to said Web server infrastructure.

9.    The apparatus of Claim 5, wherein said primary cached media is composed of one or more original media images acquired from said media repository.

10    10.    The apparatus of Claim 5, wherein said derivative intermediate media is suitably modified for the needs of zooming, panning, slicing, or the like.

11.    An apparatus for delivering an HTML document and derivative Web-safe media, comprising:

15    means for placing within said HTML document universal resource locators, herein referred to as URLs, said URLs having proprietary tags, and said HTML document accessible to a Web server by a browser;

means for through a browser said URLs generating a request for media from an image system;

20    means for said image system:

processing said URLs by interpreting proprietary tags;

executing an image generation procedure on said media, said procedure indicated within said tags; and

25    returning derivative Web-safe media and said HTML document.

12.    The apparatus of Claim 11, wherein said generated media is cached on said image system, and, whereby upon subsequent requests for said cached media, said image system retrieves and delivers said cached media.

30    13.    The apparatus of Claim 11, wherein original media is stored in a media repository.

# Automated Media Delivery System

5

## ABSTRACT

An automatic graphics delivery system that operates in parallel with an existing W e b site infrastructure is provided. The system streamlines the post-production process b y automating the production of media through content generation procedures controlled b y proprietary tags placed by an author within URLs embedded within Web documents.

10

35



Fig 1



Original Media

200 ∼

210 ∼

Media Post
Production
Systems

Media is manipulated by
hand and prepared for the
Web

220 ∼

Generated Web    media

∼ 230

HTML refering to media tags

110 ∼

Web Server

160 ∼

Internet

Fig. 2
(PRIOR ART)

120 ∼

Web Browser

Fig. 3



Fig. 4 (PRIOR ART)



Fig. 5



460

HTML Pages

100

500

Asset Management
Automatic Manipulation
Automatic Conversion
Automatic Upload
Automatic Disk Management

110

Web Server

System

120

Browser



Fig. 6



Fig. 7

~ 100

System

Proprietary media tag is converted to standard HTML that refers to media in cache

Original media is created ~ 200

Media is place in syste

620

Media cache

Generated media is placed in media cache

Media repository ~ 660

Media tag and the HTML equivalent are stored in media tags database

Media tag to HTML converter ~ 700

Parser parses HTML looking for media tags.

220

630

generated Web media

Media tags database

640

Parser looks up media tags in database. If media tag is found then produce Modified HTML

HTML parser ~ 610

Media creation system

Media tag is used to generate Web media

Media tags are replaced by standard HTML equivalent in HTML document.

~ 230

Modified HTML

Web Server passes requested web page to parser

Modified HTML document is delivered to Web Server

~ 300

HTML is created with media tags and placed on Web Server

Original HTML

Web Server Delivers modified HTML to Browser

~ 110

Web Server

Internet ~ 130

User views Web page

User requests a Web page

~ 120

# Authoring Flowchart



*Fig. 8*

# HTML Parsing Flowchart



Fig. 9

# Me 'ia Creation Flowchart



Fig. 10

Fig. 11



# Equilibrium Freeride Adminstration

Clear the Freeride Database

Check Dependencies

## Media Currently in the Freeride Database

| MediaScript | Bandwidth | Generated File(s) | Dependencies |
|---|---|---|---|
| #include "includesboard.ms" BoardLogo(); | 112k | "/ImageServerCache/3264321469_3764525602_3-0.gif" | bgcolor.tga 9206748320000 includesboard.ms 9367610267811 page_title.tga 9206748360000 |
| #include "includesboard.ms" BoardLogo(); | 112k | "/ImageServerCache/3264321469_3764525602_3-0.gif" | top_right.tga 9206748320000 |
| var i = new Media(); i.Load(name @ 130); i.Save(type @ "jpeg"); | 112k | "/ImageServerCache/3397748569_3956878100_3-0.jpg" | |
| #include "includesboard.ms" ChooseLogo(1); | 112k | "/ImageServerCache/3978861969_3739952276_3-0.gif" | includesboard.ms 9367610267811 logo1.tga 9206748380000 |

# Database Description



Fig. 12

Fig. 13

**Original Images**



## HTML Document with Proprietary Tag

```
image.html
```

```
<html>
<head>
<title>
Title Frame
</title>3
</head>
<body>
<imgsrc= <freerideimage>var i = new Media(); i.Load(name @ logo3.tga);
i.Scale(ys @ 65, constrain  @ true, alg @ "smooth",); i.Crop(xs @ 80, ys @ 80,
padcolor @ 0xffffff); var i2 = new Media(); i2.Load(name @
thumbnail_mask,tga); i.Composite(source @ i2); i.Scale(xs @ 60, ys @ 60, alg
@ "smooth"); i.Reduce(); i.Save(type @ "gif"); </freerideimage>
heigth=60 width=60 border=0><br>
</body>
</html>
```

Fig. 14

Fig. 15

**HTML document viewed in browser**



1500

**HTML document source**



1510

**Generated GIF image**



~ 1600

Fig. 16



Fig. 17



Fig. 18



Fig. 19



Fig. 20



Fig. 21



Fig. 22



Fig. 23

Attorney Docket No.  EQUI0001CIP

## DECLARATION FOR PATENT APPLICATION

As a below named inventor, I hereby declare that:

My residence, post office address, and citizenship are as stated below next to my name;

I believe I am the original, first, and sole inventor (if only one name is listed below) or an original, first, and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

# Automated Media Delivery System

the specification of which (check one)  X is attached hereto, or ___ was filed on _____ as Application Serial No. _____ and was amended on _____ (if applicable).

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, Section 1.56(a).

===========================================================
I hereby claim foreign priority benefits under Title 35, United Sates Code, Section 119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

Prior Foreign Application(s)                                    Priority Claimed
                                                                Yes        No

_____                          ____      ____
Number    Country    Day/Month/Year Filed

_____                          ____      ____
Number    Country    Day/Month/Year Filed

===========================================================

POWER OF ATTORNEY:  As a named inventor, I hereby appoint the following attorney(s) and/or agent(s) to prosecute this application and transact all business in the Patent and Trademark Office connected therewith:

     MICHAEL A. GLENN, Reg. No. 30,176
     DONALD M. HENDRICKS, Reg. No. 40,355
     KIRK D. WONG, Reg. No. 43,284
     EARLE JENNINGS, Reg. No. 44,804
     CHRIS PEIL, Reg. No. 45,005

SEND CORRESPONDENCE TO:

     MICHAEL A. GLENN, 3475 Edison Way, Suite L, Menlo Park, CA 94025

===========================================================

Attorney Docket No. EQUI0001CIP

I hereby claim the benefit under Title 35, United States code, Section 120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, Section 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, Section 1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

| 60/226,043 | 8/16/00 | Provisional-Pending |
| Application Ser. No. | Filing Date | Status: Patented, Pending, Abandoned |

| 09/425,326 | 10/21/1999 | Pending |
| Application Ser. No. | Filing Date | Status: Patented, Pending, Abandoned |

====================================================================

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full name of sole or first inventor:    **CHRISTOPHER SAMANIEGO**

Inventor's signature _____        8-9-01
                                                                          Date

Residence    461 Second Street, San Francisco, California 94107

Post Office Address _____

Citizenship    United States of America

Full name of second joint inventor:    **NELSON H. "ROCKY" OFFNER**

Inventor's signature _____        8/9/01
                                                                          Date

Residence    172 Ardmore Road, Kensington, California 94707

Post Office Address _____

Citizenship    United States of America

Full name of third joint inventor:    **ADRIAN D. THEWLIS**

Inventor's signature _____        8/9/01
                                                                          Date

Residence    439 Sherwood Drive, Apt. 204, Sausalito, California 94965

Post Office Address _____

Citizenship    Australia

Attorney Docket No.  EQUI0001CIP

Full name of fourth joint inventor: _____ DAVID R. BOYD _____

Inventor's signature _____  8/9/01 _____
                                                                    Date

Residence _____ 1256 Kearny Street, San Francisco, California  94133 _____
_____

Post Office Address _____

Citizenship _____ United States of America _____


Full name of fifth joint inventor: _____ DAVID C. SALMON _____

Inventor's signature _____  _____
                                                                    Date

Residence _____ 42 Sandalwood Court, San Rafael, California 94903 _____

Post Office Address _____

Citizenship _____ United States of America _____


Full name of sixth joint inventor: _____ JOSHUA N. DEVAN _____

Inventor's signature _____  _____
                                                                    Date

Residence _____ 25 Stetson Avenue, Lower,  Kentfield, California 94904 _____

Post Office Address _____

Citizenship _____ United States of America _____

Attorney Docket No.  EQUI0001CIP

Full name of fourth joint inventor: _____ DAVID R. BOYD _____

Inventor's signature _____

Date

Residence _____ 1256 Kearny Street, San Francisco, California  94133 _____

Post Office Address _____

Citizenship ____ United States of America _____

Full name of fifth joint inventor: _____ DAVID C. SALMON _____

Inventor's signature _David C. Salmon_____   8/9/2001

Date

Residence_____ 42 Sandalwood Court, San Rafael, California 94903 _____

Post Office Address _____

Citizenship ____ United States of America _____

Full name of sixth joint inventor: _____ JOSHUA N. DEVAN _____

Inventor's signature _John N. Devan_____   8/9/2001

Date

Residence _____ 25 Stetson Avenue, Lower,  Kentfield, California 94904 _____

Post Office Address _____

Citizenship ____ United States of America _____

Attorney Docket No. EQUI0001CIP

Applicant/Patentee: _____ Christopher Samaniego, Nelson H. "Rocky" Offner, Adrian D. Thewlis, David R. Boyd, David C. Salmon, and Joshua N. Devan _____

Serial or Patent No. _____Atty    Docket    No.
_____ EQUI0001CIP _____

Filed or Issued: _____

For:  AUTOMATED MEDIA DELIVERY SYSTEM _____

## VERIFIED STATEMENT (DECLARATION) CLAIMING SMALL ENTITY STATUS
## 37 CFR 1.9(f) and 1.27(c)--SMALL BUSINESS CONCERN

I hereby declare that I am
[ ] the owner of the small business concern identified below:
[ X ] an official empowered to act on behalf of the small business concern identified below:

NAME OF CONCERN:  __EQUILIBRIUM _____

ADDRESS:  1101 Fifth Avenue, Suite 200, San Rafael, CA 94901 _____

I hereby declare that the above identified small business concern qualifies as a small business concern as defined in 13 CFR 121.3-18, and reproduced in 37 CFR 1.9(d), for purposes of paying reduced fees under 41(a) and (b) of Title 35, U.S. Code, in that the number of employees of the concern, including those of its affiliates, does not exceed 500 persons.  For purposes of this statement, (1) the number of employees of the business concern is the average over the previous fiscal year of the concern of the persons employed on a full-time, part-time or temporary basis during each of the pay periods of the fiscal year, and (2) concerns are affiliates of each other when either, directly or indirectly, one concern controls or has the power to control the other, or a third party or parties controls or has the power to control both.

I hereby declare that rights under contract or law have been conveyed to and remain with the small business concern identified above with regard to the invention entitled: AUTOMATED MEDIA DELIVERY SYSTEM, by inventor(s) Christopher Samaniego, Nelson H. "Rocky" Offner, Adrian D. Thewlis, David R. Boyd, David C. Salmon, and Joshua N. Devan , described in

[ X ] the specification filed herewith.
[ ] application Serial No. _____filed _____
[ ] patent #_____ issued _____

Attorney Docket No. EQUI0001CIP

If the rights held by the above-identified small business concern are not exclusive, each individual, concern or organization having rights to the invention is listed below* and no rights to the invention are held by any person, other than the inventor, who could not qualify as a small business concern under 37 CFR 1.9(d) or by any concern which would not qualify as a small business concern under 37 CFR 1.9(d) or a nonprofit organization under 37 CFR 1.9(e). *Note: separate verified statements are required from each named person, concern or organization having rights to the invention averring to their status as small entities. (37 CFR 1.27)

Name: _____

Address: _____

[ ] individual    [ ] small business concern    [ ] nonprofit organization

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate. (37 CFR 1.28(b)).

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 1001 of Title 18 of the U.S. Code, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this verified statement is directed.

NAME OF PERSON SIGNING:  David Monks _____

TITLE IN ORGANIZATION:  Chief Executive Officer _____

ADDRESS OF PERSON SIGNING: 1101 Fifth Avenue, Suite 200, San Rafael, CA 9490194965 _____

SIGNATURE _____ DATE 8/9/01

# United States Patent & Trademark Office
## Office of Initial Patent Examination -- Scanning Division



Application deficiencies found during scanning:

☐ Page(s)_____ of _____ were not present
for scanning.                              (Document title)


☐ Page(s)_____ of _____ were not present
for scanning.                              (Document title)


☑ *Scanned copy is best available.*

drawings



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
WASHINGTON, D.C. 20231
www.uspto.gov

| APPLICATION NUMBER | FILING/RECEIPT DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NUMBER |
|---|---|---|---|
| 09/929,904 | 08/14/2001 | Christopher Samaniego | EQUI0001CIP |

22862
GLENN PATENT GROUP
3475 EDISON WAY
SUITE L
MENLO PARK, CA 94025

**CONFIRMATION NO. 9393**
**FORMALITIES LETTER**

*OC000000006577024*

Date Mailed: 09/19/2001

## NOTICE TO FILE CORRECTED APPLICATION PAPERS

### *Filing Date Granted*

This application has been accorded an Application Number and Filing Date. The application, however, is informal since it does not comply with the regulations for the reason(s) indicated below. Applicant is given **TWO MONTHS** from the date of this Notice within which to correct the informalities indicated below. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a)

The required item(s) identified below must be timely submitted to avoid abandonment:

- Substitute drawings in compliance with 37 CFR 1.84 because:

    - drawing sheets do not have the appropriate margin(s) (see 37 CFR 1.84(g)). Each sheet must include a top margin of at least 2.5 cm. (1 inch), a left side margin of at least 2.5 cm. (1 inch), a right side margin of at least 1.5 cm. ( 5/8 inch), and a bottom margin of at least 1.0 cm. (3/8 inch);

---

*A copy of this notice **MUST** be returned with the reply.*

Customer Service Center
Initial Patent Examination Division (703) 308-1202

PART 3 - OFFICE COPY

Express Mail mailing label no. EL556193075US
Date of Deposit: October 19, 2001
I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to the Commissioner of Patents and Trademarks, Washington, D. C. 20231.

*Jessica Pallach*

Jessica Pallach

**PATENT**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re the application of )
)                                        Examiner:  Unassigned
Samaniego et al. )
)                                        Art Unit:  Unassigned
Serial No. 09/929,904 )
)
Filed:  August 14, 2001 )
)                                        October 19, 2001
For:  <u>Automated Media Delivery System</u> )

<u>RESPONSE TO NOTICE TO FILE MISSING PARTS</u>

Commissioner of Patents
   and Trademarks
BOX MISSING PARTS
Washington, D.C.   20231

Sir:

        In response to the Notice to File Missing Parts of Application--Filing Date Granted mailed August 27, 2001, enclosed herewith are the following:

- 23 Sheets of Formal Drawings;
- Copy of Missing Parts Notice; and
- Return Postcard

        Applicant believes that there is no fee due with this submission. However, the Commissioner is authorized to charge any additional fees that may be due and credit any overpayments to Deposit Account No. 07-1445 (Order No. EQUI0001CIP).  A copy of this sheet is enclosed for accounting purposes.

                        Respectfully submitted,

                        Kirk D. Wong
                        Reg. No. 43,284

Customer No. 22862

Attorney Docket No. EQUI0001CIP



## UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
WASHINGTON, D.C. 20231
www.uspto.gov

| APPLICATION NUMBER | FILING/RECEIPT DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NUMBER |
|---|---|---|---|
| 09/929,904 | 08/14/2001 | Christopher Samaniego | EQUI0001CIP |

22862
GLENN PATENT GROUP
3475 EDISON WAY
SUITE L
MENLO PARK, CA 94025

**CONFIRMATION NO. 9393**
**FORMALITIES LETTER**

*OC000000006578419*

Date Mailed: 09/19/2001

## NOTICE TO FILE CORRECTED APPLICATION PAPERS

### *Filing Date Granted*

This application has been accorded an Application Number and Filing Date. The application, however, is informal since it does not comply with the regulations for the reason(s) indicated below. Applicant is given **TWO MONTHS** from the date of this Notice within which to correct the informalities indicated below. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a)

The required item(s) identified below must be timely submitted to avoid abandonment:

- Substitute drawings in compliance with 37 CFR 1.84 because:

    - drawing sheets do not have the appropriate margin(s) (see 37 CFR 1.84(g)). Each sheet must include a top margin of at least 2.5 cm. (1 inch), a left side margin of at least 2.5 cm. (1 inch), a right side margin of at least 1.5 cm. ( 5/8 inch), and a bottom margin of at least 1.0 cm. (3/8 inch);

---

*A copy of this notice **MUST** be returned with the reply.*

Customer Service Center
Initial Patent Examination Division (703) 308-1202
PART 2 - COPY TO BE RETURNED WITH RESPONSE

*1/23*



*FIG. 1*

*2/23*



*FIG. 2*
*(PRIOR ART)*

3/23



FIG. 3

*4/23*



**FIG. 4**
*(PRIOR ART)*

5/23



*FIG. 5*

6/23



FIG. 6

*7/23*



*FIG. 7*

*8/23*

AUTHORING FLOWCHART



*FIG. 8*

*9/23*

HTML PARSING FLOWCHART



*FIG. 9*

10/23

MEDIA CREATION FLOWCHART



FIG. 10



*FIG. 11*

12/23

DATABASE DESCRIPTION



FIG. 12

*13/23*

ORIGINAL IMAGES



*FIG.13*

*14/23*

HTML DOCUMENT WITH PROPRIETARY TAG

1400

```
image.html

<html>
<head>
<title>
Title Frame
</title>
</head>
<body>
<imgsrc= <renderimage>var i = new Media(), i.Load(name @ logo3.tga);
i.Scale(ys @ 05, constrain @ true, alg @ "smooth"); i Crop(xs@ 80,ys@80,
padcolor @ Oxffff)' var i2 = new Media(); i2.Load(name @
thumbnail_mask.tga), i.Composite(source @ i2); i.Scale(xs @ 80, ys@80,alg
@ "smooth"), i.Reduce(); iSave(type @ "gif"), </renderimage>
height=80 width=80 border=)><br>
</body>
</html>
```

*FIG.14*

15/23

HTML DOCUMENT VIEWED IN BROWSER



HTML DOCUMENT SOURCE



*FIG.15*

*16/23*

GENERATED GIF IMAGE



— *1600*

*FIG.16*

*17/23*



*FIG. 17*

18/23



FIG. 18

19/23



**FIG. 19**

*460* HTML Pages

*110* Web Server

*120* Browser

System *100*

*501*
Asset Management
Automatic Manipulation
Automatic Conversion
Automaice Upload
Automatic Customization
Automatic Disk Management
Proxy-cache control
Delivery

20/23



FIG. 20

21/23



FIG. 21

*22/23*



*FIG. 22*

23/23



*FIG. 23*

# Refine Search

## Search Results -

| Terms | Documents |
|---|---|
| (L11 or L12 or L13) and L8 | 4 |

**Database:**

US Pre-Grant Publication Full-Text Database
US Patents Full-Text Database
US OCR Full-Text Database
EPO Abstracts Database
JPO Abstracts Database
Derwent World Patents Index
IBM Technical Disclosure Bulletins

**Search:**

 

Refine Search

Recall Text    Clear    Interrupt

---

## Search History

**DATE: Monday, November 01, 2004**    Printable Copy    Create Case

| Set Name | Query | Hit Count | Set Name |
|---|---|---|---|
| | side by side | | result set |
| | *DB=USPT,EPAB,JPAB,DWPI,TDBD; PLUR=YES; OP=ADJ* | | |
| L15 | (L11 or L12 or L13) and L8 | 4 | L15 |
| L14 | (L11 or L12 or L13) and L1 | 34 | L14 |
| L13 | 709/203.ccls. | 2386 | L13 |
| L12 | 715/517.ccls. | 282 | L12 |
| L11 | 715/501.1.ccls. | 605 | L11 |
| L10 | L9 and header$1 | 12 | L10 |
| L9 | L8 and profil$3 | 27 | L9 |
| L8 | L7 and (custom$8 same (content$1 or media)) | 45 | L8 |
| L7 | L2 and database$1 | 97 | L7 |
| L6 | L5 and header$1 | 56 | L6 |
| L5 | L4 and profil$3 | 65 | L5 |
| L4 | L3 and (custom$8 same (content$1 or media)) | 90 | L4 |
| L3 | L1 and database$1 | 174 | L3 |
| L2 | HTML and unique tag$1 | 104 | L2 |
| L1 | HTML and (proprietary same (tag$1 or element$1)) | 190 | L1 |

*handwritten: 09/929,804*

END OF SEARCH HISTORY

h    e b    b   cg b    e e ch

# Hit List

| Clear | Generate Collection | Print | Fwd Refs | Bkwd Refs | Generate OACS |
|-------|---------------------|-------|----------|-----------|---------------|

## Search Results - Record(s) 1 through 34 of 34 returned.

☐ 1.    Document ID: US 6792575 B1

**Using default format because multiple data bases are involved.**

L14: Entry 1 of 34                                    File: USPT                          Sep 14, 2004

US-PAT-NO: 6792575
DOCUMENT-IDENTIFIER: US 6792575 B1

TITLE: Automated processing and delivery of media to web servers

DATE-ISSUED: September 14, 2004

INVENTOR-INFORMATION:
| NAME | CITY | STATE | ZIP CODE | COUNTRY |
|------|------|-------|----------|---------|
| Samaniego; Christopher | San Francisco | CA | | |
| Offner; Nelson H. "Rocky" | Kensington | CA | | |
| Thewlis; Adrian D. | Sausalito | CA | | |
| Boyd; David R. | San Francisco | CA | | |

US-CL-CURRENT: 715/513; 345/735, 709/203, 709/219, 715/501.1, 715/517

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences Attachments | Claims | KWIC | Draw Desc | Image |
|------|-------|----------|-------|--------|----------------|------|-----------|----------------------|--------|------|-----------|-------|

---

☐ 2.    Document ID: US 6782425 B1

L14: Entry 2 of 34                                    File: USPT                          Aug 24, 2004

US-PAT-NO: 6782425
DOCUMENT-IDENTIFIER: US 6782425 B1

TITLE: Session based security profile for internet access of an enterprise server

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences Attachments | Claims | KWIC | Draw Desc | Image |
|------|-------|----------|-------|--------|----------------|------|-----------|----------------------|--------|------|-----------|-------|

---

☐ 3.    Document ID: US 6772216 B1

L14: Entry 3 of 34                                    File: USPT                          Aug 3, 2004

US-PAT-NO: 6772216
DOCUMENT-IDENTIFIER: US 6772216 B1

TITLE: Interaction protocol for managing cross company processes among network-distributed applications

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences Attachments | Claims | KWIC | Draw Desc | Image |
|------|-------|----------|-------|--------|----------------|------|-----------|----------------------|--------|------|-----------|-------|

h        e    b        b    g   e e e f            e                ef        b        e

☐ **4.   Document ID: US 6769009 B1**

L14: Entry 4 of 34                    File: USPT                         Jul 27, 2004

US-PAT-NO: 6769009
DOCUMENT-IDENTIFIER: US 6769009 B1

TITLE: Method and system for selecting a personalized set of information channels

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw Desc | Image |

---

☐ **5.   Document ID: US 6763388 B1**

L14: Entry 5 of 34                    File: USPT                         Jul 13, 2004

US-PAT-NO: 6763388
DOCUMENT-IDENTIFIER: US 6763388 B1

TITLE: Method and apparatus for selecting and viewing portions of web pages

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw Desc | Image |

---

☐ **6.   Document ID: US 6757898 B1**

L14: Entry 6 of 34                    File: USPT                         Jun 29, 2004

US-PAT-NO: 6757898
DOCUMENT-IDENTIFIER: US 6757898 B1

TITLE: Electronic provider--patient interface system

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw Desc | Image |

---

☐ **7.   Document ID: US 6757720 B1**

L14: Entry 7 of 34                    File: USPT                         Jun 29, 2004

US-PAT-NO: 6757720
DOCUMENT-IDENTIFIER: US 6757720 B1

TITLE: Profile service architecture

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw Desc | Image |

---

☐ **8.   Document ID: US 6662343 B1**

L14: Entry 8 of 34                    File: USPT                         Dec 9, 2003

US-PAT-NO: 6662343
DOCUMENT-IDENTIFIER: US 6662343 B1

TITLE: Cool ice automatic footer text on HTML pages

h       e  b       b  g  e e e f       e          ef       b    e



---

☐ 9.   **Document ID: US 6654758 B1**
L14: Entry 9 of 34                        File: USPT                        Nov 25, 2003

US-PAT-NO: 6654758
DOCUMENT-IDENTIFIER: US 6654758 B1

TITLE: Method for searching multiple file types on a CD ROM

---

☐ 10.   **Document ID: US 6640238 B1**
L14: Entry 10 of 34                       File: USPT                        Oct 28, 2003

US-PAT-NO: 6640238
DOCUMENT-IDENTIFIER: US 6640238 B1
**\*\* See image for Certificate of Correction \*\***

TITLE: Activity component in a presentation services patterns environment

---

☐ 11.   **Document ID: US 6594692 B1**
L14: Entry 11 of 34                       File: USPT                        Jul 15, 2003

US-PAT-NO: 6594692
DOCUMENT-IDENTIFIER: US 6594692 B1
**\*\* See image for Certificate of Correction \*\***

TITLE: Methods for transacting electronic commerce

---

☐ 12.   **Document ID: US 6578068 B1**
L14: Entry 12 of 34                       File: USPT                        Jun 10, 2003

US-PAT-NO: 6578068
DOCUMENT-IDENTIFIER: US 6578068 B1

TITLE: Load balancer in environment services patterns

---

☐ 13.   **Document ID: US 6571282 B1**
L14: Entry 13 of 34                       File: USPT                        May 27, 2003

h      e  b      b  g  e  e  e  f        e            e  f      b    e

```
US-PAT-NO: 6571282
DOCUMENT-IDENTIFIER: US 6571282 B1
```

TITLE: Block-based communication in a communication services patterns environment

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |
|------|-------|----------|-------|--------|----------------|------|-----------|--|--|--------|------|-----------|-------|

☐ 14.   Document ID: US 6496850 B1

L14: Entry 14 of 34                    File: USPT                    Dec 17, 2002

```
US-PAT-NO: 6496850
DOCUMENT-IDENTIFIER: US 6496850 B1
```

TITLE: Clean-up of orphaned server contexts

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |
|------|-------|----------|-------|--------|----------------|------|-----------|--|--|--------|------|-----------|-------|

☐ 15.   Document ID: US 6446117 B1

L14: Entry 15 of 34                    File: USPT                    Sep 3, 2002

```
US-PAT-NO: 6446117
DOCUMENT-IDENTIFIER: US 6446117 B1
```

TITLE: Apparatus and method for saving session variables on the server side of an on-line dat
base management system

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |
|------|-------|----------|-------|--------|----------------|------|-----------|--|--|--------|------|-----------|-------|

☐ 16.   Document ID: US 6438594 B1

L14: Entry 16 of 34                    File: USPT                    Aug 20, 2002

```
US-PAT-NO: 6438594
DOCUMENT-IDENTIFIER: US 6438594 B1
```

TITLE: Delivering service to a client via a locally addressable interface

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |
|------|-------|----------|-------|--------|----------------|------|-----------|--|--|--------|------|-----------|-------|

☐ 17.   Document ID: US 6434568 B1

L14: Entry 17 of 34                    File: USPT                    Aug 13, 2002

```
US-PAT-NO: 6434568
DOCUMENT-IDENTIFIER: US 6434568 B1
```

TITLE: Information services patterns in a netcentric environment

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |
|------|-------|----------|-------|--------|----------------|------|-----------|--|--|--------|------|-----------|-------|

h      e  b      b  g  e  e  e  f      e        e  f      b      e

☐ 18.  Document ID: US 6411995 B1

L14: Entry 18 of 34                    File: USPT                    Jun 25, 2002

US-PAT-NO: 6411995
DOCUMENT-IDENTIFIER: US 6411995 B1

TITLE: Cool ice workstation directory/file browser

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |
|------|-------|----------|-------|--------|----------------|------|-----------|--|--|--------|------|-----------|-------|

---

☐ 19.  Document ID: US 6374247 B1

L14: Entry 19 of 34                    File: USPT                    Apr 16, 2002

US-PAT-NO: 6374247
DOCUMENT-IDENTIFIER: US 6374247 B1

TITLE: Cool ice service templates

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |
|------|-------|----------|-------|--------|----------------|------|-----------|--|--|--------|------|-----------|-------|

---

☐ 20.  Document ID: US 6370532 B1

L14: Entry 20 of 34                    File: USPT                    Apr 9, 2002

US-PAT-NO: 6370532
DOCUMENT-IDENTIFIER: US 6370532 B1

TITLE: Cool ICE batch interface

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |
|------|-------|----------|-------|--------|----------------|------|-----------|--|--|--------|------|-----------|-------|

---

☐ 21.  Document ID: US 6360249 B1

L14: Entry 21 of 34                    File: USPT                    Mar 19, 2002

US-PAT-NO: 6360249
DOCUMENT-IDENTIFIER: US 6360249 B1

TITLE: Enterprise interaction hub for managing an enterprise web system

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |
|------|-------|----------|-------|--------|----------------|------|-----------|--|--|--------|------|-----------|-------|

---

☐ 22.  Document ID: US 6356949 B1

L14: Entry 22 of 34                    File: USPT                    Mar 12, 2002

US-PAT-NO: 6356949
DOCUMENT-IDENTIFIER: US 6356949 B1

TITLE: Automatic data collection device that receives data output instruction from data
consumer

h      e b      b g e e e f          e.          ef      b      e



☐  23.  Document ID: US 6353850 B1

L14: Entry 23 of 34                    File: USPT                          Mar 5, 2002

US-PAT-NO: 6353850
DOCUMENT-IDENTIFIER: US 6353850 B1

TITLE: Force feedback provided in web pages



☐  24.  Document ID: US 6351746 B1

L14: Entry 24 of 34                    File: USPT                          Feb 26, 2002

US-PAT-NO: 6351746
DOCUMENT-IDENTIFIER: US 6351746 B1

TITLE: Cool ice icons



☐  25.  Document ID: US 6317777 B1

L14: Entry 25 of 34                    File: USPT                          Nov 13, 2001

US-PAT-NO: 6317777
DOCUMENT-IDENTIFIER: US 6317777 B1
** See image for Certificate of Correction **

TITLE: Method for web based storage and retrieval of documents

☐  26.  Document ID: US 6314422 B1

L14: Entry 26 of 34                    File: USPT                          Nov 6, 2001

US-PAT-NO: 6314422
DOCUMENT-IDENTIFIER: US 6314422 B1

TITLE: Method for softlinking between documents in a vehicle diagnostic system

☐  27.  Document ID: US 6243750 B1

L14: Entry 27 of 34                    File: USPT                          Jun 5, 2001

h      e   b      b  g ee ef        e        ef   b   e

US-PAT-NO: 6243750
DOCUMENT-IDENTIFIER: US 6243750 B1

TITLE: Method and system for measuring Web site access requests

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |

---

☐ 28.   Document ID: US 6240442 B1

L14: Entry 28 of 34                    File: USPT                    May 29, 2001

US-PAT-NO: 6240442
DOCUMENT-IDENTIFIER: US 6240442 B1

TITLE: Systems and methods for executing application programs from a memory device linked to server at an internet site

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |

---

☐ 29.   Document ID: US 6161126 A

L14: Entry 29 of 34                    File: USPT                    Dec 12, 2000

US-PAT-NO: 6161126
DOCUMENT-IDENTIFIER: US 6161126 A

TITLE: Implementing force feedback over the World Wide Web and other computer networks

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |

---

☐ 30.   Document ID: US 6125385 A

L14: Entry 30 of 34                    File: USPT                    Sep 26, 2000

US-PAT-NO: 6125385
DOCUMENT-IDENTIFIER: US 6125385 A

TITLE: Force feedback implementation in web pages

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |

---

☐ 31.   Document ID: US 6065043 A

L14: Entry 31 of 34                    File: USPT                    May 16, 2000

US-PAT-NO: 6065043
DOCUMENT-IDENTIFIER: US 6065043 A
** See image for **Certificate of Correction** **

TITLE: Systems and methods for executing application programs from a memory device linked to server

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |

h      e  b      b  g  e  e  f          e          ef      b      e

□ 32.   Document ID: US 6029175 A

L14: Entry 32 of 34          File: USPT           Feb 22, 2000

US-PAT-NO: 6029175
DOCUMENT-IDENTIFIER: US 6029175 A
** See image for **Certificate of Correction** **

TITLE: Automatic retrieval of changed files by a network software agent



□ 33.   Document ID: US 5937160 A

L14: Entry 33 of 34          File: USPT           Aug 10, 1999

US-PAT-NO: 5937160
DOCUMENT-IDENTIFIER: US 5937160 A

TITLE: Systems, methods and computer program products for updating hypertext documents via electronic mail

□ 34.   Document ID: US 5838910 A

L14: Entry 34 of 34          File: USPT           Nov 17, 1998

US-PAT-NO: 5838910
DOCUMENT-IDENTIFIER: US 5838910 A

TITLE: Systems and methods for executing application programs from a memory device linked to server at an internet site



| Terms | Documents |
|---|---|
| (L11 or L12 or L13) and L1 | 34 |

**Display Format:** [ - ]   [ Change Format ]

Previous Page     Next Page     Go to Doc#

# Hit List

| Clear | Generate Collection | Print | Fwd Refs | Bkwd Refs | Generate OACS |

**Search Results** - Record(s) 1 through 4 of 4 returned.

☐  1.   Document ID: US 6363363 B1

**Using default format because multiple data bases are involved.**

L15: Entry 1 of 4                              File: USPT                        Mar 26, 2002

```
US-PAT-NO: 6363363
DOCUMENT-IDENTIFIER: US 6363363 B1

TITLE: System, method and article of manufacture for managing transactions in a high
availability system

DATE-ISSUED: March 26, 2002

INVENTOR-INFORMATION:
NAME                    CITY                  STATE    ZIP CODE    COUNTRY
Haller; Daniel R.       Menlo Park            CA
Nguyen; Trong           Sunnyvale             CA
Rowney; Kevin T. B.     San Francisco         CA
Berger; David A.        San Mateo             CA
Kramer; Glenn A.        San Francisco         CA

US-CL-CURRENT: 705/40; 705/26, 705/27, 705/77, 709/203, 709/230, 709/245, 709/249, 709/250
```

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw Desc | Image |

---

☐  2.   Document ID: US 6205485 B1

L15: Entry 2 of 4                              File: USPT                        Mar 20, 2001

```
US-PAT-NO: 6205485
DOCUMENT-IDENTIFIER: US 6205485 B1
```
**\*\* See image for Certificate of Correction \*\***

```
TITLE: Simulcast WEB page delivery using a 3D user interface system
```

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw Desc | Image |

---

☐  3.   Document ID: US 5931917 A

L15: Entry 3 of 4                              File: USPT                        Aug 3, 1999

```
US-PAT-NO: 5931917
DOCUMENT-IDENTIFIER: US 5931917 A

TITLE: System, method and article of manufacture for a gateway system architecture with syste
administration information accessible from a browser
```

h        e  b      b  g e e e f          e              ef      b    e

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |

☐  **4.  Document ID: US 5812134 A**

L15: Entry 4 of 4                          File: USPT                              Sep 22, 1998

US-PAT-NO: 5812134
DOCUMENT-IDENTIFIER: US 5812134 A

TITLE: User interface navigational system & method for interactive representation of
information contained within a <u>database</u>

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw Desc | Image |

| Clear | | Generate Collection | | Print | | Fwd Refs | | Bkwd Refs | | Generate OACS |

| Terms | Documents |
|---|---|
| (L11 or L12 or L13) and L8 | 4 |

**Display Format:** [ - ]   [ Change Format ]

<u>Previous Page</u>        <u>Next Page</u>        <u>Go to Doc#</u>



### UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/929,904 | 08/14/2001 | Christopher Samaniego | EQUI0001CIP | 9393 |

22862    7590    11/02/2004

GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK, CA  94025

| EXAMINER |
|---|
| BASHORE, WILLIAM L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2176 | |

DATE MAILED: 11/02/2004

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 09/929,904 | CHRISTOPHER SAMANIEGO |
| | Examiner | Art Unit |
| | William L. Bashore | 2176 |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE _3_ MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a).  In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment.  See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on _19 October 2001_.

2a)☐ This action is **FINAL**.        2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) _1-13_ is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) _1-13_ is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance.  See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner.  Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08)
    Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application (PTO-152)

6)☐ Other: _____.

Application/Control Number: 09/929,904                                    Page 2

Art Unit: 2176

## DETAILED ACTION

1.     This action is responsive to communications: original application filed 8/14/2001, with priority to

**10/21/1999.**

2.     Claims 1-13 are pending. Claims 1, 3, 5, 11 are independent claims.

### Claim Rejections - 35 USC § 112

3.     The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

**Regarding claims 2, 10**, the phrase "and the like" renders the claim(s) indefinite because the claim(s)

include(s) elements not actually disclosed (those encompassed by "and the like"), thereby rendering the scope of

the claim(s) unascertainable.  See MPEP § 2173.05(d).

### Claim Rejections - 35 USC § 103

4.     The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set

forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

5.     **Claims 1, 3-9, 11-13 are rejected under 35 U.S.C. 103(a) as being unpatentable over Davis et al.**

**(hereinafter Davis), U.S. Patent No. 5,937,160 issued August 1999.**

Application/Control Number: 09/929,904                                          Page 3
Art Unit: 2176

     **In regard to independent claim 1**, Davis teaches updating a hypertext document (residing on a server) via an e-mail message (Davis Abstract). Davis teaches a target web page containing special tags (<RPM> tags) identifying where content from said e-mail is to be inserted, said e-mail containing CGI commands (Davis Figure 7, 14A, column 9 lines 26-37, column 10 lines 30-41). Davis also teaches said e-mail incorporating revisions/additions to other data formats, including graphics, audio, video, etc. (i.e. Web media) (Davis column 3 lines 36-42).

     Davis does not specifically teach parsing of data, as claimed. However, it is known in the art that in order for URL/HTML content to be interpreted, the tags and data must be parsed for identification of each said tag and data, therefore it would have been obvious to one of ordinary skill in the art at the time of the invention to incorporate parsing to search for specific tags within an HTML document, providing the benefit of parsing to efficiently find tags.

     Davis teaches a hypertext page containing proprietary HTML tags indicating where data (from the incoming e-mail) is to be inserted and/or modified (Davis column 10 lines 30-41, column 14 lines 65-67 to column 15 lines 1-34). Davis does not specifically teach that said proprietary tags are related to an original media, or lookup keys. However, Davis teaches that an incoming e-mail can include additions to other media formats associated with the hypertext document (i.e. graphics, audio, video media, etc.) (Davis column 3 lines 36-41). Since Davis's proprietary <RPM> tag is replaced by the e-mail's contents (Davis Abstract), and since special tags (i.e. <RPMTD>) can be included within said e-mail and/or HTML document (Davis column 3 lines 49-52, column 15 lines 20-25), the combined teachings provides the suggestion of a proprietary tag related to original (i.e. video) media. Davis also teaches its invention can be bundled with databases (for storing data, repository purposes, etc.) (Davis column 17 lines 19-23), providing the suggestion of utilizing primary/secondary keys for query purposes. It would have been obvious to one of ordinary skill in the art at the time of the invention to interpret Davis as explained above, providing Davis the benefit of adding multimedia to a web page, for enhancement purposes and the increased organization that databases bring.

     Davis teaches generating a web page (on a server) incorporating replacement of proprietary tags with

Application/Control Number: 09/929,904                                    Page 4
Art Unit: 2176

e-mail content, said content comprising CGI commands and other media related data (Davis Abstract, Figure 14A). Davis also teaches hypertext revisions can take the form of other data formats associated with a hypertext document (i.e. graphics, audio, video, etc.) (Davis column 3 lines 35-42).

Davis teaches an e-mail submission including CGI commands, said submission replaces various hypertext code, resulting in a final document (Davis Figures 14A, 14D-1). Within said Figure 14D1, the applied CGI creates a "Profile Questionaire" submission form (below item 95), when activated, therefore supporting a plurality of media operations (i.e. editing of an input form, etc.).

Davis teaches "real time" (dynamic) web page updating utilizing e-mail submissions (Davis column 8 lines 40-46).

Davis teaches a cache used in a computer for holding data related to communication purposes (Davis column 6 lines 55-59). Since typical operating systems generally incorporate specific (i.e. intelligent) algorithms to manage hardware/software caches for temporarily storing frequently used data, it would have been obvious to one of ordinary skill in the art at the time of the invention to incorporate an intelligent caching mechanism for holding various data, providing the benefit of caching for quicker data access.

**In regard to independent claim 3**, claim 3 incorporates substantially similar subject matter as claimed in claim 1, and is rejected along the same rationale.

**In regard to dependent claim 4**, Davis teaches an e-mail authoring subsystem (Davis Abstract).

**In regard to independent claim 5**, claim 5 reflects the apparatus comprising computer readable instructions used for implementing the methods as claimed in claim 1, and in further view of the following, is rejected along the same rationale.

Davis teaches Web page headers (Davis column 8 lines 31-39).

Application/Control Number: 09/929,904                                      Page 5
Art Unit: 2176

**In regard to dependent claim 6**, claim 6 incorporates substantially similar subject matter as claimed in claim 1, and in further view of the following, is rejected along the same rationale.

Davis teaches "real time" (dynamic) web page updating utilizing e-mail submissions (Davis column 8 lines 40-46).

**In regard to dependent claims 7, 8**, Davis teaches utilizing various editors on a computer (i.e. client/server) for creating and sending an e-mail for submission, as well as a target Web page residing on a Web server, or other server (Davis Abstract, column 8 lines 45-50, column 10 lines 7-14).

**In regard to dependent claim 9**, claim 3 incorporates substantially similar subject matter as claimed in claim 5, and is rejected along the same rationale.

**In regard to independent claim 11, and dependent claims 12, 13**, claims 11, 12, 13 reflect the apparatus comprising computer readable instructions used for implementing the methods as claimed in claim 1, and are rejected along the same rationale.

6.      **Claims 2, 10 are rejected under 35 U.S.C. 103(a) as being unpatentable over Davis, as applied to claims 1 and 5 above, and further in view of Halliday et al. (hereinafter Halliday), U.S. Patent No. 5,880,740 issued March 1999.**

**In regard to dependent claim 2**, Davis does not specifically teach panning/zooming. However, Halliday teaches manipulation of HTML based composite graphic images utilizing changes in image size (i.e. zooming, panning, etc.) (Halliday column 3 lines 40-46). It would have been obvious to one of ordinary skill in

Application/Control Number: 09/929,904                                              Page 6
Art Unit: 2176

the art at the time of the invention to apply Halliday's zooming feature into Davis's updatable web pages,

providing Davis the benefit of zooming/panning to see image more clearly.


**In regard to dependent claim 10**, claim 10 reflects the system comprising computer executable

(process) methods as claimed in claim 2, and is rejected along the same rationale.



### *Conclusion*

7.      Any inquiry concerning this communication or earlier communications from the examiner should be

directed to William L. Bashore whose telephone number is (571) 272-4088. The examiner can normally be

reached on 11:30am - 8:00pm EST.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Joseph Feild

can be reached on (571) 272-4090. The fax phone number for the organization where this application or

proceeding is assigned is 703-872-9306.

        Information regarding the status of an application may be obtained from the Patent Application

Information Retrieval (PAIR) system. Status information for published applications may be obtained from

either Private PAIR or Public PAIR. Status information for unpublished applications is available through

Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you

have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-

9197 (toll-free).




William L. Bashore
Patent Examiner AU 2176
October 31, 2004

| | Notice of References Cited | | Application/Control No. 09/929,904 | Applicant(s)/Patent Under Reexamination CHRISTOPHER SAMANIEGO | |
|---|---|---|---|---|---|
| | | | Examiner William L. Bashore | Art Unit 2176 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-5,937,160 | 08-1999 | Davis et al. | 709/203 |
| | B | US-5,880,740 | 03-1999 | Halliday et al. | 345/629 |
| | C | US-6,456,305 | 09-2002 | Qureshi et al. | 345/800 |
| | D | US-5,870,552 | 02-1999 | Dozier et al. | 709/219 |
| | E | US-6,563,517 | 05-2003 | Bhagwat et al. | 345/735 |
| | F | US-6,009,436 | 12-1999 | Motoyama et al. | 707/102 |
| | G | US-6,591,280 | 07-2003 | Orr, Stephen Jonathan | 715/513 |
| | H | US-5,895,476 | 04-1999 | Orr et al. | 715/517 |
| | I | US-6,623,529 | 09-2003 | Lakritz, David | 715/536 |
| | J | US-5,890,170 | 03-1999 | Sidana, Ashmeet S. | 715/501.1 |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.



## UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
WASHINGTON, D.C. 20231
www.uspto.gov

Bib Data Sheet

**CONFIRMATION NO. 9393**

| SERIAL NUMBER 09/929,904 | FILING DATE 08/14/2001 RULE | CLASS 707 715 | GROUP ART UNIT 2171 2176 | ATTORNEY DOCKET NO. EQUI0001CIP |
|---|---|---|---|---|

**APPLICANTS**

Christopher Samaniego, San Francisco, CA;
Nelson H. Rocky Offner, Kensington, CA;
Adrian D. Thewlis, Sausalito, CA;
David R. Boyd, San Francisco, CA;
David C. Salmon, San Rafael, CA;
Joshua N. Devan, Kentfield, CA;

** CONTINUING DATA ***************************
THIS APPLICATION IS A CIP OF 09/425,326 10/21/1999    *ok* *uly*
AND CLAIMS BENEFIT OF 60/226,043 08/16/2000    *ok uly*

** FOREIGN APPLICATIONS ********************

IF REQUIRED, FOREIGN FILING LICENSE GRANTED ** SMALL ENTITY **
** 09/18/2001

| Foreign Priority claimed ☑ yes ☐ no | STATE OR COUNTRY CA | SHEETS DRAWING 23 | TOTAL CLAIMS 13 | INDEPENDENT CLAIMS 4 |
|---|---|---|---|---|
| 35 USC 119 (a-d) conditions met ☑ yes ☐ no ☐ Met after Allowance | | | | |
| Verified and Acknowledged  *Wilaque F. Bashou* Examiner's Signature    Initials | | | | |

**ADDRESS**

22862

**TITLE**

Automated media delivery system

| FILING FEE RECEIVED 395 | FEES: Authority has been given in Paper No. _____ to charge/credit DEPOSIT ACCOUNT No. _____ for following: | ☐ All Fees |
|---|---|---|
| | | ☐ 1.16 Fees ( Filing ) |
| | | ☐ 1.17 Fees ( Processing Ext. of time ) |
| | | ☐ 1.18 Fees ( Issue ) |
| | | ☐ Other |
| | | ☐ Credit |

## Index of Claims

| | |
|---|---|
| Application No. | Applicant(s) |
| 09/929,904 | CHRISTOPHER SAMANIEGO |
| Examiner | Art Unit |
| William L. Bashore | 2176 |

| | | | | |
|---|---|---|---|---|
| √ | Rejected | — | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| Claim (Final) | Claim (Original) | Date 10/31/04 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | √ | | | | | | | |
| | 2 | √ | | | | | | | |
| | 3 | √ | | | | | | | |
| | 4 | √ | | | | | | | |
| | 5 | √ | | | | | | | |
| | 6 | √ | | | | | | | |
| | 7 | √ | | | | | | | |
| | 8 | √ | | | | | | | |
| | 9 | √ | | | | | | | |
| | 10 | √ | | | | | | | |
| | 11 | √ | | | | | | | |
| | 12 | √ | | | | | | | |
| | 13 | √ | | | | | | | |
| | 14 | | | | | | | | |
| | 15 | | | | | | | | |
| | 16 | | | | | | | | |
| | 17 | | | | | | | | |
| | 18 | | | | | | | | |
| | 19 | | | | | | | | |
| | 20 | | | | | | | | |
| | 21 | | | | | | | | |
| | 22 | | | | | | | | |
| | 23 | | | | | | | | |
| | 24 | | | | | | | | |
| | 25 | | | | | | | | |
| | 26 | | | | | | | | |
| | 27 | | | | | | | | |
| | 28 | | | | | | | | |
| | 29 | | | | | | | | |
| | 30 | | | | | | | | |
| | 31 | | | | | | | | |
| | 32 | | | | | | | | |
| | 33 | | | | | | | | |
| | 34 | | | | | | | | |
| | 35 | | | | | | | | |
| | 36 | | | | | | | | |
| | 37 | | | | | | | | |
| | 38 | | | | | | | | |
| | 39 | | | | | | | | |
| | 40 | | | | | | | | |
| | 41 | | | | | | | | |
| | 42 | | | | | | | | |
| | 43 | | | | | | | | |
| | 44 | | | | | | | | |
| | 45 | | | | | | | | |
| | 46 | | | | | | | | |
| | 47 | | | | | | | | |
| | 48 | | | | | | | | |
| | 49 | | | | | | | | |
| | 50 | | | | | | | | |

Claims 51–100 and 101–150: no entries.

***Search Notes***

| Application No. | Applicant(s) |
|---|---|
| 09/929,904 | CHRISTOPHER SAMANIEGO |
| Examiner | Art Unit |
| William L. Bashore | 2176 |

## SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| 715 | 501.1 | 10/31/2004 | WLB |
| 715 | 517 | 10/31/2004 | WLB |
| 709 | 203 | 10/31/2004 | WLB |
| 715 | 513 | 10/31/2004 | WLB |
| 345 | 629 | 10/31/2004 | WLB |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## INTERFERENCE SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

## SEARCH NOTES
## (INCLUDING SEARCH STRATEGY)

| | DATE | EXMR |
|---|---|---|
| WEST 2.2 (search enclosed) | 10/31/2004 | WLB |
| Searched related patent 6,792,575 | 10/31/2004 | WLB |
| | | |
| | | |
| | | |
| | | |
| | | |

U.S. Patent and Trademark Office

Part of Paper No. 20041031

02/02/2005 WED 11:38  FAX 650 474 8401 GLENN PATENT GROUP          ☑001/010

RECEIVED
CENTRAL FAX CENTER

FEB 0 2 2005

PTO/SB/97 (08-03)
Approved for use through 07/31/2006, OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# Certificate of Transmission under 37 CFR 1.8

## Attorney Docket No.  EQUI0001CIP

I hereby certify that this correspondence is being facsimile transmitted to the United States Patent and Trademark Office

on  2/2/2005
_____
Date

*[signature]*
_____
Signature

Della Revecho
_____
Typed or printed name of person signing Certificate

Note: Each paper must have its own certificate of transmission, or this certificate must identify each submitted paper.

1.   Amendment and Response (9 pages)

This collection of information is required by 37 CFR 1.8. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1.8 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA  22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

RECEIVED
CENTRAL FAX CENTER

FEB 0 2 2005

**Certificate of Transmission Under 37 C.F.R. §1.8**                 Date of Transmission 2/02/2005

I hereby certify that this document and the documents referred to herein as attached are being transmitted via facsimile to the United States Patent and Trademark Office, Attn: Examiner Bashore, William L. to facsimile number (703) 872-9306 on the above indicated date of transmission.

Della Revecho

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**Applicant:** Christopher Samaniego        **Docket No. :**        EQUI0001CIP

**Serial No.** 09/929,904                **Group Art Unit:**    2176

**Filed:** August 14, 2001                **Examiner:**        Bashore, William L

**Title:** AUTOMATED MEDIA DELIVERY SYSTEM

February 2, 2005

Commissioner of Patents

Mail Stop Non-Fee Amendment

P.O. Box 1450

Alexandria, Virginia 22313-1450

### AMENDMENT AND RESPONSE

Examiner,

    In response to the Office Action mailed November 2, 2004, Applicant respectfully submits the following amendment in the above referenced application and requests the consideration of the following remarks.

- 1 -

**35 USC Section 112 Rejection:**

Examiner stated that Claims 2 and 10 are rejected due to the indefiniteness under 35 USC 112. Applicant amends the claims and deletes "the like" in the Claims 2 and 10.

Therefore, Applicant respectfully requests that the rejection be withdrawn.

**35 USC 103 Rejection:**

Claims 1, 3-9, 11-13 are rejected under 35 U.S.C. 103 (a) as being unpatentable over <u>Davis</u> et al., U.S. Patent No. 5,937,160 issued August 1999.

Examiner indicated in the office action that <u>Davis</u> teaches a target web page containing special tags (<RPM>) tags), identifying where content from said email is to be inserted, said email containing CGI commands (<u>Davis</u> Figure 7, 14A,column 9, lines 26-37, column 10 lines 30-41).

Applicant respectfully reminds Examiner that <u>Davis</u> in Figure 7, (14A, and column 9, lines 26-37, column 10 lines 30-41) did not suggest emails contain CGI commands. Instead, <u>Davis</u> teaches an EOM command, which is a mark to indicate the end of the content to be used to replace <RPM> tag. A person skilled in the art would understand that a CGI command is not the same as an EOM command.

Most importantly, <u>Davis</u> in Figure 7, (14A, and column 9, lines 26-37, column 10 lines 30-41) did not teach a method of generating and delivering web page content comprising media that comprises parsing a URL containing proprietary tags to determine a content generation procedure to execute and corresponding input to said procedure. Instead, <u>Davis</u> teaches a method of updating a hypertext document residing on a server via an email message.

- 2 -

02/02/2005 WED 11:39  FAX 650 474 8401 GLENN PATENT GROUP                    ☑004/010

In addition, in <u>Davis</u>, the <RPM> tag is in the target webs page instead of the URL that is taught by the instant application.  <u>Davis</u> teaches a method of generating of revising a static hypertext document stored within a server in communication with a computer network, said static hypertext document having at least one designated area there within configured to receive content revisions from a user, wherein each designated area therewithin configured to receive content revisions from a user, wherein each designated area is identified by a respective markup tag that is not visible when the static hypertext document is displayed via a browser.

A person skilled in the art would understand that the <RPM> tag in the HTML web page is not the same as in the URL.  The subject matter of <u>Davis</u> is completely different from that of the instant application.

Claims 3 and its dependent claim 4, Claims 6-13 are rejected under the same rationale presented in the rejection of the Claim 1.

Applicant respectfully submits that these claims are not obvious because of the same reason stated above.

Claims, 2, 10 are rejected under 35 USC 103 as being unpatentable over Davis, as applied to claims 1 and 5 above, and further in view of <u>Halliday</u> et al, U.S. Patent No. 5, 880740 issued March 1999.

Applicant respectfully submits that these claims are not obvious because of the same reason stated above.

In addition, nowhere in either <u>Davis</u> or <u>Halliday</u> suggests the same subject matter as the instant application.

Therefore, Applicant respectfully requests that the rejections be withdrawn.

- 3 -

02/02/2005 WED 11:39  FAX 650 474 8401  GLENN PATENT GROUP                    ☒005/010

## SUMMARY

Claim 2 and 10 are amended. Claims 1-13 are pending.  No new matter has been added.  Applicant respectfully submits that, in view of the amendments and discussion set forth herein, the pending claims are patentable over the prior art.

The examiner is invited to call Ivy Y. Mei at 650-474-8400 to discuss the pending claims.

Respectfully Submitted,

Michael A. Glenn
Reg. No. 30,176

Customer number 22862

- 4 -

02/02/2005 WED 11:39  FAX 650 474 8401  GLENN PATENT GROUP                    ☒006/010

## AMENDMENTS TO THE CLAIMS

Please amend claims as follows.

1. (Original)        A method for generating and delivering Web page content comprising media, said method comprising:

parsing a URL containing proprietary tags to determine:

a content generation procedure to execute and corresponding input to said procedure;

dynamic modifications to perform on said media;

user profile characteristics; and

proxy-cache control;

generating a unique final lookup key for said media;

checking a media cache, using said final lookup key;

if said media exists in said media cache, then

passing control to said proxy-cache control; and

delivering said media;

if said media does not exist in said media cache, then

separating dynamic media system tags from content generation control tags; and

generating a unique intermediate image lookup key;

checking said media cache using said intermediate image lookup key;

if said intermediate media exists in said media cache, then

using said intermediate media for further processing;

if said intermediate media does not exist in said media cache, then

generating and caching said media, using said intermediate image lookup key;

determining if dynamic processing is required and, if affirmative, then

operating upon said media by a dynamic content generator;

- 5 -

determining if content type is valid and, if negative, then
converting said media automatically to a valid type;
customizing said media for specified browser or client attributes using a user profiling system;
attaching any specified cache-control directives to a response; and
delivering said media.

2. (Currently Amended) The method of Claim 1, wherein dynamic processing comprises directives for zoom, pan, and slice, and the like.

3. (Original)                A method for an end user to generate Web page content comprising media, said method comprising:
adding original media to an image system;
creating a content generation procedure containing instruction for processing said original media for said Web page content; and
creating an HTML document referring to said processed media by using a URL pointing to said content generation procedure on said image system.

4. (Original)                The method of Claim 3, further comprising:
providing an authoring subsystem, said subsystem assisting with choosing parameters and with designing said content generation procedure.

5. (Original)                An apparatus for generating Web-safe media, using an HTML page having a URL, said URL having encoded proprietary tags, said apparatus comprising:
a server for receiving media requests and delivering said Web-safe media;
a media repository for storing original media;

- 6 -

a content generation procedure containing instructions for transforming said original media into said Web-safe media;

a URL tag parser for determining:

said content generation procedure to execute and any corresponding input parameters to be used by said procedure for generating a primary media to be cached;

dynamic content processing to be performed, if necessary by dynamic media procedures;

user profile information, if any to be used for modification of a resulting image; and

cache control HTTP headers, if any to accompany said resulting image;

a unique primary lookup key generated by said parser and associated with said primary cached media, wherein said primary cached media, if existing, is delivered as said Web-safe media through a media cache; and

a unique secondary lookup key corresponding to intermediate media requiring said dynamic media processing by said dynamic media procedures, thereby generating corresponding derivative intermediate media, and said unique secondary lookup key corresponding to said derivative intermediate media stored in a secondary media cache.

6. (Original)  The apparatus of Claim 5, wherein any of said original media, said content generation procedure, and said proprietary URL tags are modified, thereby rendering an automatically updated Web-safe media.

7. (Original)  The apparatus of Claim 5, wherein said apparatus is configured in parallel to a Web server infrastructure, said existing Web server infrastructure providing said media requests.

- 7 -

8. (Original)   The apparatus of Claim 7, wherein said apparatus is configurable to work either on-site or off-site to said Web server infrastructure.

9. (Original)   The apparatus of Claim 5, wherein said primary cached media is composed of one or more original media images acquired from said media repository.

10. (Currently Amended)              The apparatus of Claim 5, wherein said derivative intermediate media is suitably modified for the needs of zooming, panning, and slicing, or the like.

11. (Original)              An apparatus for delivering an HTML document and derivative Web-safe media, comprising:

    means for placing within said HTML document universal resource locators, herein referred to as URLs, said URLs having proprietary tags, and said HTML document accessible to a Web server by a browser;

    means for through a browser said URLs generating a request for media from an image system;

    means for said image system:

        processing said URLs by interpreting proprietary tags;

        executing an image generation procedure on said media, said procedure indicated within said tags; and

        returning derivative Web-safe media and said HTML document.

12. (Original)              The apparatus of Claim 11, wherein said generated media is cached on said image system, and, whereby upon subsequent requests for said cached media, said image system retrieves and delivers said cached media.

- 8 -

13. (Original)            The apparatus of Claim 11, wherein original media is stored in a media repository.

- 9 -

## PATENT APPLICATION FEE DETERMINATION RECORD
### Effective October 1, 2000

**Application or Docket Number**

09929904

### CLAIMS AS FILED - PART I

| | (Column 1) | (Column 2) |
|---|---|---|
| TOTAL CLAIMS | 13 | |
| FOR | NUMBER FILED | NUMBER EXTRA |
| TOTAL CHARGEABLE CLAIMS | 13 minus 20= | 0 |
| INDEPENDENT CLAIMS | 4 minus 3 = | 1 |
| MULTIPLE DEPENDENT CLAIM PRESENT | | ☐ |

* If the difference in column 1 is less than zero, enter "0" in column 2

| SMALL ENTITY TYPE ☐ | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | FEE | | RATE | FEE |
| BASIC FEE | 355.00 | OR | BASIC FEE | 710.00 |
| X$ 9= | | OR | X$18= | |
| X40= | 40.00 | OR | X80= | |
| +135= | | OR | +270= | |
| TOTAL | 395.00 | OR | TOTAL | |

### CLAIMS AS AMENDED - PART II

**AMENDMENT A**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | 13 | Minus | 20 | = |
| Independent | 1 | Minus | 4 | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | ☐ |

| SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
| X$ 9= | | OR | X$18= | |
| X40= | | OR | X80= | |
| +135= | | OR | +270= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT B**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | | Minus | | = |
| Independent | | Minus | | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | ☐ |

| SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
| X$ 9= | | OR | X$18= | |
| X40= | | OR | X80= | |
| +135= | | OR | +270= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT C**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | | Minus | | = |
| Independent | | Minus | | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | ☐ |

| SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
| X$ 9= | | OR | X$18= | |
| X40= | | OR | X80= | |
| +135= | | OR | +270= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

* If the entry in column 1 is less than the entry in column 2, writ "0" in column 3.
** If the "Highest Number Previously Paid F r" IN THIS SPACE is less than 20, ent r "20."
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
Th "Highest Number Previously Paid F r" (Total or Independent) is the highest number found in the appropriat box in column 1.

FORM PTO-875
Rev. 8/00)

Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE

## Best Available Copy

# PORTAL

Subscribe (Full Service)   Register (Limited Service, Free)   Login

USPTO

Search:  ● The ACM Digital Library   ○ The Guide

Web based media database

**SEARCH**

*5/29/2005   09/727,904*

THE ACM DIGITAL LIBRARY

🕭 Feedback  Report a problem  Satisfaction survey

Terms used **Web** **based** **media** **database**                    Found **48,121** of **155,867**

Sort results by     | relevance ▼

Display results     | expanded form ▼

Try an Advanced Search
Try this search in The ACM Guide

💚 Save results to a Binder
❓ Search Tips
☐ Open results in a new window

Results 1 - 20 of 200        Result page: **1**  2  3  4  5  6  7  8  9  10  next
Best 200 shown                                          Relevance scale ☐ ◻ ◼ ◼ ◼

1  Mediators over taxonomy-based information sources                                 ◼
   Yannis Tzitzikas, Nicolas Spyratos, Panos Constantopoulos
   March 2005 **The VLDB Journal — The International Journal on Very Large Data Bases**,
            Volume 14 Issue 1
   Full text available: 📄 pdf(428.09 KB)   Additional Information: full citation, abstract

   We propose a mediator model for providing integrated and unified access to multiple
   taxonomy-based sources. Each source comprises a taxonomy and a database that indexes
   objects under the terms of the taxonomy. A mediator comprises a taxonomy and a set of
   relations between the mediator's and the sources' terms, called articulations. By combining
   different modes of query evaluation at the sources and the mediator and different types of
   query translation, a flexible, efficient scheme ...

   **Keywords**: Approximate query translation, Information integration, Mediators, Taxonomies

2  Image Retrieval from the World Wide Web: Issues, Techniques, and Systems           ◼
   M. L. Kherfi, D. Ziou, A. Bernardi
   March 2004 **ACM Computing Surveys (CSUR)**, Volume 36 Issue 1
   Full text available: 📄 pdf(294.13 KB)   Additional Information: full citation, abstract, references, index terms

   With the explosive growth of the World Wide Web, the public is gaining access to massive
   amounts of information. However, locating needed and relevant information remains a
   difficult task, whether the information is textual or visual. Text search engines have existed
   for some years now and have achieved a certain degree of success. However, despite the
   large number of images available on the Web, image search engines are still rare. In this
   article, we show that in order to allow people to profi ...

   **Keywords**: Image-retrieval, World Wide Web, crawling, feature extraction and selection,
   indexing, relevance feedback, search, similarity

3  An analysis of XML database solutions for the management of MPEG-7 media           ◼
   descriptions
   Utz Westermann, Wolfgang Klas
   December 2003 **ACM Computing Surveys (CSUR)**, Volume 35 Issue 4
            Additional Information: full citation, abstract, references, index terms,

Results (page 1): Web based media database
Page 2 of 6
Case 1:22-cv-00677-RGA    Document 78-1    Filed 03/20/24    Page 554 of 663 PageID #: 2757

Full text available: 📄 pdf(448.76 KB)                    review

> MPEG-7 constitutes a promising standard for the description of multimedia content. It can be expected that a lot of applications based on MPEG-7 media descriptions will be set up in the near future. Therefore, means for the adequate management of large amounts of MPEG-7-compliant media descriptions are certainly desirable. Essentially, MPEG-7 media descriptions are XML documents following media description schemes defined with a variant of XML Schema. Thus, it is reasonable to investigate curren ...

> **Keywords**: MPEG-7, XML database systems, multimedia databases

---

4  Context-aware Web Information Systems                                    ■
Aleksander Binemann-Zdanowicz, Roland Kaschek, Klaus-Dieter Schewe, Bernhard Thalheim
January 2004 **Proceedings of the first Asian-Pacific conference on Conceptual modelling - Volume 31**
Full text available: 📄 pdf(413.81 KB)    Additional Information: full citation, abstract, references

> Apart from completeness usability, performance and maintainability are the key quality aspects for Web information systems. Considering usability as key implies taking usage processes into account right from the beginning of systems development. Context-awareness appears as a promising idea for increasing usability of Web Information Systems. In the present paper we propose an approach to context-awareness of Web Information Systems that systematically distinguishes among the various important k ...

> **Keywords**: SiteLang, Web Information Systems, Web services, context-aware information systems, media objects

---

5  Towards second and third generation web-based multimedia               ■
Jacco van Ossenbruggen, Joost Geurts, Frank Cornelissen, Lynda Hardman, Lloyd Rutledge
April 2001 **Proceedings of the 10th international conference on World Wide Web**
Full text available: 📄 pdf(563.48 KB)  Additional Information: full citation, references, citings, index terms

> **Keywords**: SMIL, XML, XSLT, multimedia, transformations

---

6  Supporting active database learning and training through interactive multimedia    ■
Claus Pahl, Ronan Barrett, Claire Kenny
June 2004 **ACM SIGCSE Bulletin , Proceedings of the 9th annual SIGCSE conference on Innovation and technology in computer science education**, Volume 36 Issue 3
Full text available: 📄 pdf(130.80 KB)    Additional Information: full citation, abstract, references, index terms

> The learning objectives of a database course include aspects from conceptual and theoretical knowledge to practical development and implementation skills. We present an interactive educational multimedia system based on the virtual apprenticeship model for the knowledge- and skills-oriented Web-based education of database course students. Combining knowledge learning and skills training in an integrated environment is a central aspect of our system. We show that tool-mediated independent learnin ...

> **Keywords**: database courseware, knowledge and skills, multimedia, tool-mediated independent learning, virtual apprenticeship theory

---

7  Multimedia: Towards a multimedia formatting vocabulary                 ■

Jacco van Ossenbruggen, Lynda Hardma, Joost Geurts, Lloyd Rutledge
May 2003  **Proceedings of the 12th international conference on World Wide Web**

Full text available: 📄 pdf(189.77 KB)     Additional Information: full citation, abstract, references, index terms

Time-based, media-centric Web presentations can be described declaratively in the XML world through the development of languages such as SMIL. It is difficult, however, to fully integrate them in a complete document transformation processing chain. In order to achieve the desired processing of data-driven, time-based, media-centric presentations, the text-flow based formatting vocabularies used by style languages such as XSL, CSS and DSSSL need to be extended. The paper presents a selection of u ...

**Keywords**: Cuypers, document transformation, formatting objects, hyper-media, multimedia

8   Learning I: Researchexplorer: gaining insights through exploration in multimedia scientific data

Bo Gong, Rahul Singh, Ramesh Jain
October 2004  **Proceedings of the 6th ACM SIGMM international workshop on Multimedia information retrieval**

Full text available: 📄 pdf(927.08 KB)     Additional Information: full citation, abstract, references, index terms

An increasing amount of heterogeneous information about scientific research is becoming available on-line. This potentially allows users to explore the information from multiple perspectives and derive insights and not just raw data about a topic of interest. However, most current scientific information search systems lag behind this trend; being text-based, they are fundamentally incapable of dealing with multimedia data. An even more important limitation is that their information environmen ...

**Keywords**: event, exploration, interaction environment, isight, multimedia data, research event, spatio-temporal data

9   Mining multimedia data

Osmar R. Zaïane, Jiawei Han, Ze-Nian Li, Jean Hou
November 1998  **Proceedings of the 1998 conference of the Centre for Advanced Studies on Collaborative research**

Full text available: 📄 pdf(377.84 KB)     Additional Information: full citation, abstract, references, citings, index terms

Data Mining is a young but flourishing field. Many algorithms and applications exist to mine different types of data and extract different types of knowledge. Mining multimedia data is, however, at an experimental stage.We have implemented a prototype for mining high-level multimedia information and knowledge from large multimedia databases. MultiMedia Miner has been designed based on our years of experience in the research and development of a relational data mining system, DBMiner, in the Inte ...

**Keywords**: data cube, data mining, data warehousing, image analysis, information retrieval, multimedia, world-wide web

10  The internet as an engine of scholarship

Joseph S. Fulda
March 2000  **ACM SIGCAS Computers and Society**, Volume 30 Issue 1

Full text available: 📄 pdf(1.21 MB)     Additional Information: full citation

Results (page 1): Web based media database
Case 1:22-cv-00677-RGA    Document 78-1    Filed 03/20/24    Page 556 of 663 PageID #: 2759
Page 4 of 6

**11** sTeam: structuring information in team-distributed knowledge management in cooperative learning environments
August 2001 **Journal on Educational Resources in Computing (JERIC)**

Full text available: 📄 pdf(179.03 KB)    Additional Information: full citation, abstract, references, index terms, review

Learning is a socially embedded design process. But most of todays hypermedia systems fail to properly support the design-related and the social aspects of learning. Authoring and Web-publishing systems aim to support the authors design processes. Consequently, the activities of learners are confined to selecting and reading. Based on some fundamental reflections on the role of technology in learning processes, we conclude that top priority must be given to the construction of infrastructur ...

**Keywords**: cooperative learning, cooperative support, learner-centered approaches, sTeam (structuring information in a team), web-based learning and teaching

**12** Reusability and adaptability of interactive resources in Web-based educational systems
Abdulmotaleb El Saddik, Stephan Fischer, Ralf Steinmetz
March 2001 **Journal on Educational Resources in Computing (JERIC)**

Full text available: 📄 pdf(257.16 KB)    Additional Information: full citation, abstract, references, citings, index terms, review

The production of interactive multimedia content is in most cases an expensive task in terms of time and cost. Hence, optimizing production by exploiting the reusability of interactive multimedia elements is mandatory. Reusability can be triggered by a combination of resuable multimedia components and the appropriate use of metadata to control the components as well as their combination. In this article, we discuss the reusability aspects of interactive multimedia content in web ...

**13** Building a successful e-business: the FedEx story
Ali F. Farhoomand, Pauline S. P. Ng, William L. Conley
April 2003 **Communications of the ACM,** Volume 46 Issue 4

Full text available: 📄 pdf(325.80 KB)    Additional Information: full citation, abstract, references, index terms
🖥 html(22.10 KB)

The company famous for transporting goods from anywhere to anywhere around the globe has used its impressive information infrastructure to expand into a channel logistics business.

**14** Web engineering: A visual environment for dynamic web application composition
Kimihito Ito, Yuzuru Tanaka
August 2003 **Proceedings of the fourteenth ACM conference on Hypertext and hypermedia**

Full text available: 📄 pdf(1.56 MB)    Additional Information: full citation, abstract, references, citings, index terms

HTML-based interface technologies enable end-users to easily use various remote Web applications. However, it is difficult for end-users to compose new integrated tools of both existing Web applications and legacy local applications such as spreadsheets, chart tools and database. In this paper, the authors propose a new framework where end-users can wrap remote Web applications into visual components called *pads*, and functionally combine them together through drag & drop-paste operations. ...

**Keywords**: hypermedia, intelligentPad, personalization, web application linkage, web application wrapping

**15** Effective access to large audiovisual assets based on user preferences
S. Ioannou, G. Moschovitis, K. Ntalianis, K. Karpouzis, S. Kollias
November 2000 **Proceedings of the 2000 ACM workshops on Multimedia**
Full text available: 🔁 pdf(1.01 MB)    Additional Information: full citation, abstract, references, index terms

Current multimedia databases contain a wealth of information in the form of audiovisual, as well as text data. Even though efficient search algorithms have been developed for either media, there still exists the need for abstract presentation and summarization of the results of database users' queries. Moreover, multimedia retrieval systems should be capable of providing the user with additional information related to the specific subject of the query, as well as suggest other topics which us ...

**Keywords**: multimedia databases, query expansion, text-based search, user profiling, web access

**16** Database techniques for the World-Wide Web: a survey
Daniela Florescu, Alon Levy, Alberto Mendelzon
September 1998 **ACM SIGMOD Record**, Volume 27 Issue 3
Full text available: 🔁 pdf(1.79 MB)    Additional Information: full citation, citings, index terms

**17** Surveys: Structured databases on the web: observations and implications
Kevin Chen-Chuan Chang, Bin He, Chengkai Li, Mitesh Patel, Zhen Zhang
September 2004 **ACM SIGMOD Record**, Volume 33 Issue 3
Full text available: 🔁 pdf(393.19 KB)    Additional Information: full citation, abstract, references, citings

The Web has been rapidly "deepened" by the prevalence of databases online. With the potentially unlimited information hidden behind their query interfaces, this "deep Web" of searchable databses is clearly an important frontier for data access. This paper surveys this relatively unexplored frontier, measuring characteristics pertinent to both exploring and integrating structured Web sources. On one hand, our "macro" study surveys the deep Web at large, in April 2004, adopting the random IP-sa ...

**18** Hypermedia semantics: Finding the story: broader applicability of semantics and discourse for hypermedia generation
Lloyd Rutledge, Martin Alberink, Rogier Brussee, Stanislav Pokraev, William van Dieten, Mettina Veenstra
August 2003 **Proceedings of the fourteenth ACM conference on Hypertext and hypermedia**
Full text available: 🔁 pdf(396.48 KB)    Additional Information: full citation, abstract, references, citings, index terms

Generating hypermedia presentations requires processing constituent material into coherent, unified presentations. One large challenge is creating a generic process for producing hypermedia presentations from the semantics of potentially unfamiliar domains. The resulting presentations must both respect the underlying semantics and appear as coherent, plausible and, if possible, pleasant to the user. Among the related unsolved problems is the inclusion of discourse knowledge in the generation pro ...

**Keywords**: RDF, SMIL, clustering, concept lattices, discourse, hypermedia, narrative,

semantics

**19** EIU's ViewsWire: new wine in a new bottle

Peter Lovelock, Ali F. Farhoomand

December 2000 **Proceedings of the twenty first international conference on Information systems**

Full text available: pdf(516.64 KB)    Additional Information: full citation, references, index terms

**20** Contextualizing the information space in federated digital libraries

M. P. Papazoglou, J. Hoppenbrouwers

March 1999 **ACM SIGMOD Record**, Volume 28 Issue 1

Full text available: pdf(695.20 KB)    Additional Information: full citation, abstract, citings, index terms

Rapid growth in the volume of documents, their diversity, and terminological variations render federated digital libraries increasingly difficult to manage. Suitable abstraction mechanisms are required to construct meaningful and scalable document clusters, forming a cross-digital library information space for browsing and semantic searching. This paper addresses the above issues, proposes a distributed semantic framework that achieves a logical partitioning of the information space accordi ...

Results 1 - 20 of 200          Result page: **1**   2   3   4   5   6   7   8   9   10    next

The ACM Portal is published by the Association for Computing Machinery. Copyright © 2005 ACM, Inc.

Terms of Usage · Privacy Policy · Code of Ethics · Contact Us

Useful downloads: Adobe Acrobat   QuickTime   Windows Media Player   Real Player

# Refine Search

## Search Results -

| Terms | Documents |
|-------|-----------|
| (L6 or L7 or L8) and (L5 or L4) | 42 |

**Database:**
US Pre-Grant Publication Full-Text Database
US Patents Full-Text Database
US OCR Full-Text Database
EPO Abstracts Database
JPO Abstracts Database
Derwent World Patents Index
IBM Technical Disclosure Bulletins

**Search:**

[ Refine Search ]

[ Recall Text ]   [ Clear ]        [ Interrupt ]

## Search History

**DATE:** Sunday, May 29, 2005    Printable Copy    Create Case

| Set Name side by side | Query | Hit Count | Set Name result set |
|-----------|-------|-----------|----------|
| *DB=PGPB,USPT,USOC,EPAB,JPAB,DWPI,TDBD; PLUR=YES; OP=ADJ* | | | |
| L9 | (L6 or L7 or L8) and (L5 or L4) | 42 | L9 |
| L8 | 709/203.ccls. | 5359 | L8 |
| L7 | 715/513|517.ccls. | 1246 | L7 |
| L6 | 715/501.1.ccls. | 1027 | L6 |
| L5 | (L4 or L2 or L1) and (profil$3 and header$1) | 186 | L5 |
| L4 | L3 and (custom$8 same (content$1 or media)) | 338 | L4 |
| L3 | (L1 or L2) and database$1 | 945 | L3 |
| L2 | HTMl and unique tag$1 | 382 | L2 |
| L1 | HTML and (proprietary same (tag$1 or element$1)) | 663 | L1 |

END OF SEARCH HISTORY

09/929,904

# Hit List

| Clear | Generate Collection | Print | Fwd Refs | Bkwd Refs |
|-------|---------------------|-------|----------|-----------|

| Generate OACS |
|---------------|

**Search Results** - Record(s) 1 through 42 of 42 returned.

---

☐ 1.  Document ID: US 20050081144 A1

L9: Entry 1 of 42                    File: PGPB                    Apr 14, 2005

PGPUB-DOCUMENT-NUMBER: 20050081144
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20050081144 A1

TITLE: Document creation system and method using knowledge base, precedence, and integrated rules

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw De |

---

☐ 2.  Document ID: US 20040177148 A1

L9: Entry 2 of 42                    File: PGPB                    Sep 9, 2004

PGPUB-DOCUMENT-NUMBER: 20040177148
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20040177148 A1

TITLE: Method and apparatus for selecting and viewing portions of web pages

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw De |

---

☐ 3.  Document ID: US 20040148571 A1

L9: Entry 3 of 42                    File: PGPB                    Jul 29, 2004

PGPUB-DOCUMENT-NUMBER: 20040148571
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20040148571 A1

TITLE: Method and apparatus for adapting web contents to different display area

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw De |

---

☐ 4.  Document ID: US 20040049737 A1

L9: Entry 4 of 42                    File: PGPB                    Mar 11, 2004

PGPUB-DOCUMENT-NUMBER: 20040049737

PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20040049737 A1

TITLE: System and method for displaying information content with selective horizontal scrolling

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw De |

---

☐ 5.  Document ID: US 20040049589 A1

L9: Entry 5 of 42            File: PGPB            Mar 11, 2004

PGPUB-DOCUMENT-NUMBER: 20040049589
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20040049589 A1

TITLE: Arrangement and a method relating to session management in a portal structure

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw De |

---

☐ 6.  Document ID: US 20030177202 A1

L9: Entry 6 of 42            File: PGPB            Sep 18, 2003

PGPUB-DOCUMENT-NUMBER: 20030177202
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20030177202 A1

TITLE: Method and apparatus for executing an instruction in a web page

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw De |

---

☐ 7.  Document ID: US 20030078960 A1

L9: Entry 7 of 42            File: PGPB            Apr 24, 2003

PGPUB-DOCUMENT-NUMBER: 20030078960
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20030078960 A1

TITLE: Architecture and process for creating software applications for multiple domains

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw De |

---

☐ 8.  Document ID: US 20030014500 A1

L9: Entry 8 of 42            File: PGPB            Jan 16, 2003

PGPUB-DOCUMENT-NUMBER: 20030014500
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20030014500 A1

TITLE: Transactional data communications for process control systems

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw De |

---

☐ 9.   Document ID: US 20030014483 A1

L9: Entry 9 of 42              File: PGPB              Jan 16, 2003

PGPUB-DOCUMENT-NUMBER: 20030014483
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20030014483 A1

TITLE: Dynamic networked content distribution

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw De |

---

☐ 10.   Document ID: US 20020169885 A1

L9: Entry 10 of 42              File: PGPB              Nov 14, 2002

PGPUB-DOCUMENT-NUMBER: 20020169885
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20020169885 A1

TITLE: Digital television application protocol for interactive television

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw De |

---

☐ 11.   Document ID: US 20020169851 A1

L9: Entry 11 of 42              File: PGPB              Nov 14, 2002

PGPUB-DOCUMENT-NUMBER: 20020169851
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20020169851 A1

TITLE: Internet-based system for dynamically creating and delivering customized content within remote web pages

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw De |

---

☐ 12.   Document ID: US 20020129094 A1

L9: Entry 12 of 42              File: PGPB              Sep 12, 2002

PGPUB-DOCUMENT-NUMBER: 20020129094

Case 1:22-cv-00677-RGA   Document 78-1   Filed 03/20/24   Page 563 of 663 PageID #: 2766

Page 4 of 11

PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20020129094 A1

TITLE: Software and method for automatically sending a data object that includes user demographics

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw D.. |
|------|-------|----------|-------|--------|----------------|------|-----------|-----------|-------------|--------|------|----------|

☐  13.   Document ID:  US 20020038349 A1

L9: Entry 13 of 42              File: PGPB              Mar 28, 2002

PGPUB-DOCUMENT-NUMBER: 20020038349
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20020038349 A1

TITLE: Method and system for reusing internet-based applications

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw D.. |
|------|-------|----------|-------|--------|----------------|------|-----------|-----------|-------------|--------|------|----------|

☐  14.   Document ID:  US 20010037361 A1

L9: Entry 14 of 42              File: PGPB              Nov 1, 2001

PGPUB-DOCUMENT-NUMBER: 20010037361
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20010037361 A1

TITLE: Methods and systems for transactional tunneling

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw D.. |
|------|-------|----------|-------|--------|----------------|------|-----------|-----------|-------------|--------|------|----------|

☐  15.   Document ID:  US 20010037359 A1

L9: Entry 15 of 42              File: PGPB              Nov 1, 2001

PGPUB-DOCUMENT-NUMBER: 20010037359
PGPUB-FILING-TYPE: new
DOCUMENT-IDENTIFIER: US 20010037359 A1

TITLE: System and method for a server-side browser including markup language graphical user interface, dynamic markup language rewriter engine and profile engine

| Full | Title | Citation | Front | Review | Classification | Date | Reference | Sequences | Attachments | Claims | KWIC | Draw D.. |
|------|-------|----------|-------|--------|----------------|------|-----------|-----------|-------------|--------|------|----------|

☐  16.   Document ID:  US 6859910 B2

L9: Entry 16 of 42              File: USPT              Feb 22, 2005

US-PAT-NO: 6859910
DOCUMENT-IDENTIFIER: US 6859910 B2

TITLE: Methods and systems for transactional tunneling

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw De |

---

☐   17.   Document ID:  US 6834306 B1
    L9: Entry 17 of 42              File: USPT              Dec 21, 2004

US-PAT-NO: 6834306
DOCUMENT-IDENTIFIER: US 6834306 B1

TITLE: Method and apparatus for notifying a user of changes to certain parts of web pages

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw De |

---

☐   18.   Document ID:· US 6792575 B1
    L9: Entry 18 of 42              File: USPT              Sep 14, 2004

US-PAT-NO: 6792575
DOCUMENT-IDENTIFIER: US 6792575 B1

TITLE: Automated processing and delivery of media to web servers

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw De |

---

☐   19.   Document ID:  US 6779178 B1
    L9: Entry 19 of 42              File: USPT              Aug 17, 2004

US-PAT-NO: 6779178
DOCUMENT-IDENTIFIER: US 6779178 B1

TITLE: System and method for personalizing electronic mail messages

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | | Claims | KWIC | Draw De |

---

☐   20.   Document ID:  US 6772216 B1
    L9: Entry 20 of 42              File: USPT              Aug 3, 2004

US-PAT-NO: 6772216
DOCUMENT-IDENTIFIER: US 6772216 B1
** See image for **Certificate of Correction** **

TITLE: Interaction protocol for managing cross company processes among network-

distributed applications

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | Claims | KWIC | Draw De |

---

☐  **21.   Document ID:** US 6769009 B1

L9: Entry 21 of 42                    File: USPT                    Jul 27, 2004

US-PAT-NO: 6769009
DOCUMENT-IDENTIFIER: US 6769009 B1

TITLE: Method and system for selecting a personalized set of information channels

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | Claims | KWIC | Draw De |

---

☐  **22.   Document ID:** US 6763388 B1

L9: Entry 22 of 42                    File: USPT                    Jul 13, 2004

US-PAT-NO: 6763388
DOCUMENT-IDENTIFIER: US 6763388 B1

TITLE: Method and apparatus for selecting and viewing portions of web pages

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | Claims | KWIC | Draw De |

---

☐  **23.   Document ID:** US 6763343 B1

L9: Entry 23 of 42                    File: USPT                    Jul 13, 2004

US-PAT-NO: 6763343
DOCUMENT-IDENTIFIER: US 6763343 B1

TITLE: Preventing duplication of the data in reference resource for XML page generation

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | Claims | KWIC | Draw De |

---

☐  **24.   Document ID:** US 6757898 B1

L9: Entry 24 of 42                    File: USPT                    Jun 29, 2004

US-PAT-NO: 6757898
DOCUMENT-IDENTIFIER: US 6757898 B1

TITLE: Electronic provider--patient interface system

| Full | Title | Citation | Front | Review | Classification | Date | Reference | | Claims | KWIC | Draw De |



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| 22862 | 7590 | 06/06/2005 |
|---|---|---|

GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK, CA 94025

| EXAMINER |
|---|
| BASHORE, WILLIAM L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2176 | |

DATE MAILED: 06/06/2005

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/929,904 | 08/14/2001 | Christopher Samaniego | EQUI0001CIP | 9393 |

TITLE OF INVENTION: AUTOMATED MEDIA DELIVERY SYSTEM

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | YES | $700 | $300 | $1000 | 09/06/2005 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE REFLECTS A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE APPLIED IN THIS APPLICATION. THE PTOL-85B (OR AN EQUIVALENT) MUST BE RETURNED WITHIN THIS PERIOD EVEN IF NO FEE IS DUE OR THE APPLICATION WILL BE REGARDED AS ABANDONED.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check box 5a on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and 1/2 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL should be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). Even if the fee(s) have already been paid, Part B - Fee(s) Transmittal should be completed and returned. If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 12/04) Approved for use through 04/30/2007.

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>    Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
or <u>Fax</u>    **(703) 746-4000**

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

22862    7590    06/06/2005

GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK, CA 94025

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (703) 746-4000, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/929,904 | 08/14/2001 | Christopher Samaniego | EQUI0001CIP | 9393 |

TITLE OF INVENTION: AUTOMATED MEDIA DELIVERY SYSTEM

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | YES | $700 | $300 | $1000 | 09/06/2005 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| BASHORE, WILLIAM L | 2176 | 707-501100 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use of a Customer Number is required.

**2. For printing on the patent front page, list**

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :  ☐ Individual  ☐ Corporation or other private group entity  ☐ Government

**4a. The following fee(s) are enclosed:**

☐ Issue Fee

☐ Publication Fee (No small entity discount permitted)

☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s):**

☐ A check in the amount of the fee(s) is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The Director is hereby authorized by charge the required fee(s), or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status (from status indicated above)**

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.    ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

The Director of the USPTO is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.
NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

 U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/929,904 | 08/14/2001 | Christopher Samaniego | EQUI0001CIP | 9393 |

22862      7590      06/06/2005
GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK, CA 94025

| EXAMINER |
|---|
| BASHORE, WILLIAM L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2176 | |

DATE MAILED: 06/06/2005

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 754 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 754 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571) 272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at (703) 305-8283.

Page 3 of 3

| ***Notice of Allowability*** | Application No. | Applicant(s) | |
|---|---|---|---|
| | 09/929,904 | SAMANIEGO ET AL. | |
| | Examiner | Art Unit | |
| | William L. Bashore | 2176 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *2/2/2005*.

2. ☒ The allowed claim(s) is/are *1-2, 5-10, renumbered as 1-8 respectively*.

3. ☒ The drawings filed on *14 August 2001* are accepted by the Examiner.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All  b) ☐ Some*  c) ☐ None  of the:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

      1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____ .

    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of

    Paper No./Mail Date _____ .

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☒ Notice of References Cited (PTO-892)        5. ☐ Notice of Informal Patent Application (PTO-152)

2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)    6. ☐ Interview Summary (PTO-413),
                                                          Paper No./Mail Date _____ .

3. ☐ Information Disclosure Statements (PTO-1449 or PTO/SB/08),  7. ☒ Examiner's Amendment/Comment
    Paper No./Mail Date _____

4. ☐ Examiner's Comment Regarding Requirement for Deposit    8. ☐ Examiner's Statement of Reasons for Allowance
    of Biological Material                                  9. ☐ Other _____ .

*William L. Bashore*

**WILLIAM BASHORE**
**PRIMARY EXAMINER**

May 29, 2005

Application/Control Number: 09/929,904                                                    Page 2

Art Unit: 2176

## EXAMINER'S AMENDMENT

1.      Claims 1-2, 5-10 (renumbered as 1-8 respectively), are allowed. The following is an examiner's

amendment to the claims.

Permission for this amendment has been granted by Applicant via telephone call to Michael A. Glenn

on May 25, 2005, and to Ivy Y. Mei on May 27, 2005.

2.      Please amend the claims as follows:

Please cancel claims 3-4, 11-13 without prejudice.

Please replace claim 1 with the following claim:

1. (Currently Amended) A computer implemented method for generating and delivering Web page

content comprising media, said method comprising:

parsing a URL containing proprietary tags to determine:

a content generation procedure to execute and corresponding input to said procedure;

dynamic modifications to perform on said media;

user profile characteristics; and

proxy-cache control;

generating a unique final lookup key for said media;

checking a media cache, using said final lookup key;

if said media exists in said media cache, then

passing control to said proxy-cache control; and

delivering said media;

if said media does not exist in said media cache, then

Application/Control Number: 09/929,904                                      Page 3

Art Unit: 2176

             separating dynamic media system tags from content generation control tags; and

             generating a unique intermediate image lookup key;

             checking said media cache using said intermediate image lookup key;

        if said intermediate media exists in said media cache, then

             using said intermediate media for further processing;

        if said intermediate media does not exist in said media cache, then

             generating and caching said media, using said intermediate image lookup key;

      determining if dynamic processing is required and, if affirmative, then

             operating upon said media by a dynamic content generator,

             determining if content type is valid and, if negative, then

                converting said media automatically to a valid type;

             customizing said media for specified browser or client attributes using a user

profiling system;

             attaching any specified cache-control directives to a response; and

             delivering said media.

3.      Any inquiry concerning this communication or earlier communications from the examiner should be directed to William L. Bashore whose telephone number is (571) 272-4088. The examiner can normally be reached on 11:30am - 8:00pm EST.

4.      If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Joseph Feild can be reached on (571) 272-4090. The fax phone number for the organization where this application or proceeding is assigned is 703-872-9306.

Application/Control Number: 09/929,904                                    Page 4

Art Unit: 2176

5.      Information regarding the status of an application may be obtained from the Patent Application

Information Retrieval (PAIR) system. Status information for published applications may be obtained from

either Private PAIR or Public PAIR. Status information for unpublished applications is available through

Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you

have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-

9197 (toll-free).

**WILLIAM BASHORE**
**PRIMARY EXAMINER**

May 29, 2005

| *Notice of References Cited* | Application/Control No. 09/929,904 | Applicant(s)/Patent Under Reexamination SAMANIEGO ET AL. | |
|---|---|---|---|
| | Examiner William L. Bashore | Art Unit 2176 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US- | | | |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Zaiane et al., Mining multimedia data, 1998 ACM Conference of the Center for Advanced Studies on Collaborative research, November 1998, pages 1-18. |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

*Issue Classification*

| | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 09/929,904 | SAMANIEGO ET AL. |
| | Examiner | Art Unit |
| | William L. Bashore | 2176 |

# ISSUE CLASSIFICATION

| ORIGINAL | | CROSS REFERENCE(S) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| CLASS | SUBCLASS | CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) | | | | | | |
| 715 | 501.1 | 715 | 513 | 517 | | | | | |
| INTERNATIONAL CLASSIFICATION | | 709 | 203 | | | | | | |
| G 0 6 F | 15/00 | | | | | | | | |
| G 0 6 F | 17/00 | | | | | | | | |
| G 0 6 F | 15/16 | | | | | | | | |
| | / | | | | | | | | |
| | / | | | | | | | | |

| (Assistant Examiner)     (Date) | **WILLIAM BASHORE PRIMARY EXAMINER** | Total Claims Allowed: 1-8 | |
|---|---|---|---|
| *S. Clapman* 6-2-05 (Legal Instruments Examiner)     (Date) | *William L. Bashore* 5/29/2005 (Primary Examiner)     (Date) | O.G. Print Claim(s) 1 | O.G. Print Fig. 7 |

| ☐ Claims renumbered in the same order as presented by applicant | ☐ CPA | ☐ T.D. | ☐ R.1.47 |
|---|---|---|---|

| Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | 31 | | 61 | | 91 | | 121 | | 151 | | 181 |
| 2 | 2 | | 32 | | 62 | | 92 | | 122 | | 152 | | 182 |
| | 3 | | 33 | | 63 | | 93 | | 123 | | 153 | | 183 |
| | 4 | | 34 | | 64 | | 94 | | 124 | | 154 | | 184 |
| 3 | 5 | | 35 | | 65 | | 95 | | 125 | | 155 | | 185 |
| 4 | 6 | | 36 | | 66 | | 96 | | 126 | | 156 | | 186 |
| 5 | 7 | | 37 | | 67 | | 97 | | 127 | | 157 | | 187 |
| 6 | 8 | | 38 | | 68 | | 98 | | 128 | | 158 | | 188 |
| 7 | 9 | | 39 | | 69 | | 99 | | 129 | | 159 | | 189 |
| 8 | 10 | | 40 | | 70 | | 100 | | 130 | | 160 | | 190 |
| | 11 | | 41 | | 71 | | 101 | | 131 | | 161 | | 191 |
| | 12 | | 42 | | 72 | | 102 | | 132 | | 162 | | 192 |
| | 13 | | 43 | | 73 | | 103 | | 133 | | 163 | | 193 |
| | 14 | | 44 | | 74 | | 104 | | 134 | | 164 | | 194 |
| | 15 | | 45 | | 75 | | 105 | | 135 | | 165 | | 195 |
| | 16 | | 46 | | 76 | | 106 | | 136 | | 166 | | 196 |
| | 17 | | 47 | | 77 | | 107 | | 137 | | 167 | | 197 |
| | 18 | | 48 | | 78 | | 108 | | 138 | | 168 | | 198 |
| | 19 | | 49 | | 79 | | 109 | | 139 | | 169 | | 199 |
| | 20 | | 50 | | 80 | | 110 | | 140 | | 170 | | 200 |
| | 21 | | 51 | | 81 | | 111 | | 141 | | 171 | | 201 |
| | 22 | | 52 | | 82 | | 112 | | 142 | | 172 | | 202 |
| | 23 | | 53 | | 83 | | 113 | | 143 | | 173 | | 203 |
| | 24 | | 54 | | 84 | | 114 | | 144 | | 174 | | 204 |
| | 25 | | 55 | | 85 | | 115 | | 145 | | 175 | | 205 |
| | 26 | | 56 | | 86 | | 116 | | 146 | | 176 | | 206 |
| | 27 | | 57 | | 87 | | 117 | | 147 | | 177 | | 207 |
| | 28 | | 58 | | 88 | | 118 | | 148 | | 178 | | 208 |
| | 29 | | 59 | | 89 | | 119 | | 149 | | 179 | | 209 |
| | 30 | | 60 | | 90 | | 120 | | 150 | | 180 | | 210 |

Part of Paper No.  20050527

### Search Notes

| Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|
| 09/929,904 | SAMANIEGO ET AL. |
| **Examiner** | **Art Unit** | |
| William L. Bashore | 2176 | |

#### SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| 715 | 501.1 | 5/29/2005 | WLB |
| 715 | 517 | 5/29/2005 | WLB |
| 709 | 203 | 5/29/2005 | WLB |
| 715 | 513 | 5/29/2005 | WLB |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

#### SEARCH NOTES (INCLUDING SEARCH STRATEGY)

| | DATE | EXMR |
|---|---|---|
| WEST 2.2 (updated search enclosed) | 5/29/2005 | WLB |
| ACM (search enclosed) | 5/29/2005 | WLB |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

#### INTERFERENCE SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| **715** | **501.1** | **5/29/2005** | **WLB** |
| 715 | 513, 517 | 5/29/2005 | WLB |
| 709 | 203 | 5/29/2005 | WLB |
| | | | |

### Index of Claims

| | |
|---|---|
| Application/Control No. | Applicant(s)/Patent under Reexamination |
| 09/929,904 | SAMANIEGO ET AL. |
| Examiner | Art Unit |
| William L. Bashore | 2176 |

| | | | | | |
|---|---|---|---|---|---|
| √ | Rejected | − | (Through numeral) Cancelled | N | Non-Elected |
| = | Allowed | ÷ | Restricted | I | Interference |
| A | Appeal | | | | |
| O | Objected | | | | |

| Claim | | Date | Claim | | Date | Claim | | Date |
|---|---|---|---|---|---|---|---|---|
| Final | Original | 5/27/05 | Final | Original | | Final | Original | |
| 1 | 1 | = | | 51 | | | 101 | |
| 2 | 2 | = | | 52 | | | 102 | |
| | 3 | | | 53 | | | 103 | |
| | 4 | | | 54 | | | 104 | |
| 3 | 5 | = | | 55 | | | 105 | |
| 4 | 6 | = | | 56 | | | 106 | |
| 5 | 7 | = | | 57 | | | 107 | |
| 6 | 8 | = | | 58 | | | 108 | |
| 7 | 9 | = | | 59 | | | 109 | |
| 8 | 10 | = | | 60 | | | 110 | |
| | 11 | | | 61 | | | 111 | |
| | 12 | | | 62 | | | 112 | |
| | 13 | | | 63 | | | 113 | |
| | 14 | | | 64 | | | 114 | |
| | 15 | | | 65 | | | 115 | |
| | 16 | | | 66 | | | 116 | |
| | 17 | | | 67 | | | 117 | |
| | 18 | | | 68 | | | 118 | |
| | 19 | | | 69 | | | 119 | |
| | 20 | | | 70 | | | 120 | |
| | 21 | | | 71 | | | 121 | |
| | 22 | | | 72 | | | 122 | |
| | 23 | | | 73 | | | 123 | |
| | 24 | | | 74 | | | 124 | |
| | 25 | | | 75 | | | 125 | |
| | 26 | | | 76 | | | 126 | |
| | 27 | | | 77 | | | 127 | |
| | 28 | | | 78 | | | 128 | |
| | 29 | | | 79 | | | 129 | |
| | 30 | | | 80 | | | 130 | |
| | 31 | | | 81 | | | 131 | |
| | 32 | | | 82 | | | 132 | |
| | 33 | | | 83 | | | 133 | |
| | 34 | | | 84 | | | 134 | |
| | 35 | | | 85 | | | 135 | |
| | 36 | | | 86 | | | 136 | |
| | 37 | | | 87 | | | 137 | |
| | 38 | | | 88 | | | 138 | |
| | 39 | | | 89 | | | 139 | |
| | 40 | | | 90 | | | 140 | |
| | 41 | | | 91 | | | 141 | |
| | 42 | | | 92 | | | 142 | |
| | 43 | | | 93 | | | 143 | |
| | 44 | | | 94 | | | 144 | |
| | 45 | | | 95 | | | 145 | |
| | 46 | | | 96 | | | 146 | |
| | 47 | | | 97 | | | 147 | |
| | 48 | | | 98 | | | 148 | |
| | 49 | | | 99 | | | 149 | |
| | 50 | | | 100 | | | 150 | |

09/02/2005 FRI 15:49  FAX 650 474 8401  GLENN PATENT GROUP    ⌀003/004



SEP 0 2 2005

PART B — FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), to: **Mail**    Mail Stop ISSUE FEE
                                                                  Commissioner for Patents
                                                                  P.O. Box 1450
                                                                  Alexandria, Virginia 22313-1450
                                          or **Fax**    (703) 746-4000

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| | | |
|---|---|---|
| 22862 | 7590 | 06/06/2005 |

GLENN PATENT GROUP
3475 EDISON WAY, SUITE L
MENLO PARK, CA 94025

09/06/2005 TBESHAH2 00000040 071445    09929904

01 FC:2501    700.00 DA
02 FC:1504    300.00 DA
03 FC:8001     20.00 DA

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (703) 746-4000, on the date indicated below.

Della Revecho _____ (Depositor's name)
_R. Simecho_ _____ (Signature)
2 September 2005 _____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/929,904 | 08/14/2001 | Christopher Samaniego | EQUI0001CIP | 9393 |

TITLE OF INVENTION: AUTOMATED MEDIA DELIVERY SYSTEM

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | YES | $700 | $300 | $1000 | 09/06/2005 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| BASHORE, WILLIAM L | 2176 | 707-501100 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).
☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.
☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use of a Customer Number is required.

2. For printing on the patent front page, list
(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1. Glenn Patent Group
2. Michael A. Glenn
3. _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                          (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Automated Media Processing Solutions, Inc. dba Equilibrium, \/AMPS\, Inc.    Mill Valley, California  USA

Please check the appropriate assignee category or categories (will not be printed on the patent): ☐ Individual  ☒ Corporation or other private group entity  ☐ Government

| 4a. The following fee(s) are enclosed: | 4b. Payment of Fee(s): |
|---|---|
| ☒ Issue Fee | ☐ A check in the amount of the fee(s) is enclosed. |
| ☒ Publication Fee (No small entity discount permitted) | ☐ Payment by credit card. Form PTO-2038 is attached. |
| ☒ Advance Order - # of Copies ___10___ | ☒ The Director is hereby authorized by charge the required fee(s), or credit any overpayment, to Deposit Account Number 07-1445 (Glenn Patent Group) (enclose an extra copy of this form). |

5. Change in Entity Status (from status indicated above)
☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.    ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

The Director of the USPTO is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.
NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature  _Julia R. Thomas_ _____    Date _2 September 2005_

Typed or printed name  Julia A. Thomas    Registration No. _52,283_

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 12/04) Approved for use through 04/30/2007.    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

SEP/02/2005 FRI 15:49  FAX 650 474 8401  GLENN PATENT GROUP                                      ☑002/004

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

**Applicant:** Samaniego et al             **Docket No. :**      EQUI0001CIP
**Serial No.** 09/929,904                  **Group Art Unit:**   2176
**Filed:** August 14, 2001                 **Examiner:**         Bashore,
William
**Title:** Automated Media Delivery System

Date: 02 September 2005

Commissioner of Patents
Mail Stop - Issue Fee
P.O. Box 1450
Alexandria, VA  22313-1450

### ISSUE FEE AUTHORIZATION

Sir:

Enclosed are the following documents:

1. Certificate of Fax Transmission (1 sheet); and
2. Part B – Issue Fee Transmittal (1 page);

The Commissioner is authorized to charge the Issue Fee of $ 1,000.00, $30.00 for 10 soft copies, and any other fees that may be due, and credit any overpayments to Deposit Account No. 07-1445 (Customer No. 22862).   Enclosed is a copy of this sheet for accounting purposes.

Respectfully submitted,

Julia A. Thomas
Reg. No. 52,283

Customer No. 22862

09/02/2005 FRI 15:49  FAX 650 474 8401 GLENN PATENT GROUP                    ☑001/004

PTO/SB/97 (08-03)
Approved for use through 07/31/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

## Certificate of Transmission under 37 CFR 1.8

Attorney Docket No. EQUI0001CIP
I hereby certify that this correspondence is being facsimile transmitted to the United
States Patent and Trademark Office

on 09/02/2005
            Date

_Signature_

Della Revecho
Typed or printed name of person signing Certificate

Note: Each paper must have its own certificate of transmission, or this certificate
      must identify each submitted paper.

Enclosed with this cover-sheet are the following documents:
1. Issue Fee Authorizaton (1 page in duplicate); and
2. Part B – Issue Fee Transmittal (1 page);

This collection of information is required by 37 CFR 1.8. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1.8 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA  22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re patent of: Samaniego *et al.* | Art Unit: 2176 |
| U.S. Patent No: 6,964,009 B1 | Confirmation No. 9393 |
| Issued: November 8, 2005 | Examiner: BASHORE, W.L. |
| For: **AUTOMATED MEDIA DELIVERY SYSTEM** | Atty. Docket: EQUI0001CIP |

**Petition Under 37 C.F.R. § 1.324(a) to Correct Inventorship in a Patent**

Commissioner for Patents                                     *Attn: Mail Stop Petition*
PO Box 1450
Alexandria, VA 22313-1450

Commissioner:

It is hereby petitioned that the United States Patent and Trademark Office correct inventorship in the above-captioned patent.

The above-captioned patent, U.S. Patent No. 6,964,009, has been asserted as prior art in *inter partes* review petitions IPR2023-00330 and IPR2023-00332. The patents involved in the *inter partes* reviews (U.S. Patent No. 8,495,242 and U.S. Patent No. 9,158,745) have been asserted in *Equil IP Holdings LLC v. Akamai Technologies, Inc.*, DDE-1-22-cv-00677 (D.Del.).

U.S. Patent No: 6,964,009

The Office is requested to change the inventorship in this patent from: Christopher Samaniego; Nelson H. "Rocky" Offner; Adrian D. Thewlis; David R. Boyd; David C. Salmon; Joshua N. Devan ("the current named inventors") to the following:

    (1) Christopher Samaniego;

    (2) Nelson H. "Rocky" Offner;

    (3) Adrian D. Thewlis;

    (4) David R. Boyd;

    (5) David C. Salmon;

    (6) Joshua N. Devan;

    **(7) Sean Barger.**

Further, the Office is requested to issue a certificate naming corrected inventors.

This request is accompanied by:

    (1)    A statement under 37 C.F.R. § 1.324(b)(1) from Sean Barger to be added as an inventor, stating that the error in inventorship was made without deceptive intention on his part;

    (2)    An oath or declaration under 37 C.F.R. § 1.63 executed by the inventor to be added, Sean Barger;

    (3)    Statements under 37 C.F.R. § 1.324(b)(1) from the current named inventors stating that they agree to the change or have no disagreement in regard to the requested change;

    (4)    A statement from the Assignee, Equil IP Holdings LLC, under 37 C.F.R. §1.324(b)(2) agreeing to the change of inventorship in the patent;

    (5)    A statement under 37 C.F.R. § 3.73(b), with accompanying assignment; and

    (6)    The processing fee as set forth under 37 C.F.R. § 1.20(b), in the amount of $160.00.

The above-listed items are filed electronically.

U.S. Patent No: 6,964,009

The U.S. Patent and Trademark Office is hereby authorized to charge any fee

deficiency, or credit any overpayment, to our Deposit Account No. 19-0036.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

/Jason A. Fitzsimmons  #65,367/

Jason A. Fitzsimmons, Registration No. 65,367
**Signed under 37 C.F.R. § 1.34, Acting in a
Representative Capacity for Assignee**

Date: April 3, 2023

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

- 3 -

PTO/SB/96 (07-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(b)

Applicant/Patent Owner: **EQUIL IP HOLDINGS LLC**

Application No./Patent No.: 6,964,009    Filed/Issue Date: November 8, 2005

Titled: AUTOMATED MEDIA DELIVERY SYSTEM

**EQUIL IP HOLDINGS LLC**, a    corporation

(Name of Assignee)    (Type of Assignee, e.g., corporation, partnership, university, government agency, etc.)

states that it is:

1. [X] the assignee of the entire right, title, and interest in;

2. [ ] an assignee of less than the entire right, title, and interest in
(The extent (by percentage) of its ownership interest is _____ %); or

3. [ ] the assignee of an undivided interest in the entirety of (a complete assignment from one of the joint inventors was made)

the patent application/patent identified above, by virtue of either:

A. [ ] An assignment from the inventor(s) of the patent application/patent identified above. The assignment was recorded in the United States Patent and Trademark Office at Reel_____, Frame_____, or a copy* is attached.

**OR**

B. [X] A chain of title from the inventor(s), of the patent application/patent identified above, to the current assignee as follows:

1. From: Christopher Samaniego; Nelson H. "Rocky" Offner; Adrian D. Thewlis; David R. Boyd; David C. Salmon; Joshua N. Devan    To: EQUILIBRIUM

_The document was recorded in the United States Patent and Trademark Office at
Reel_012085_, Frame_0435_, or a copy* is attached.

2. From: EQUILIBRIUM TECHNOLOGIES    To: AUTOMATED MEDIA PROCESSING SOLUTIONS, INC. DBA EQUILIBRIUM, "AMPS", INC.

The document was recorded in the United States Patent and Trademark Office at
Reel_015783_, Frame_0656_, or a copy* is attached.

3. From: AUTOMATED MEDIA PROCESSING SOLUTIONS, INC.    To: EQUIL IP HOLDINGS LLC

The document was recorded in the United States Patent and Trademark Office at
Reel_058470_, Frame_0339_, or a copy* is attached.

[X] Additional documents in the chain of title are listed on a supplemental sheet(s).

[X] *As required by 37 CFR 3.73(b)(1)(i), if a copy/copies is/are attached, the documentary evidence of the chain of title from the original owner to the assignee was, or concurrently is being, submitted for recordation pursuant to 37 CFR 3.11.

[NOTE: A separate copy (i.e., a true copy of the original assignment document(s)) must be submitted to Assignment Division in accordance with 37 CFR Part 3, to record the assignment in the records of the USPTO. See MPEP 302.]

The undersigned (whose title is supplied below) is authorized to act on behalf of the assignee.

/Jason A. Fitzsimmons #65,367/

Signature    2023-04-03
             Date

Jason A. Fitzsimmons (Signed under 37 C.F.R. § 1.34)    65,367
Printed or Typed Name    Title or Registration Number

This collection of information is required by 37 CFR 3.73(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

## Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re patent of: Samaniego *et al.* | Art Unit: 2176 |
| U.S. Patent No: 6,964,009 B1 | Confirmation No. 9393 |
| Issued: November 8, 2005 | Examiner: BASHORE, W.L. |
| For: **AUTOMATED MEDIA DELIVERY SYSTEM** | Atty. Docket: EQUI0001CIP |

**Supplemental Sheet to Chain of Title, Item B of the Statement Under 37 CFR 3.73(b) (PTO/SB/96)**

4.    **From:** Sean BARGER

      **To:** EQUIL IP HOLDINGS, LLC

      (Assignment attached herewith, to be recorded)

Appl. No. 09/929,904
U.S. Patent No. 6,964,009

# ASSIGNMENT

In consideration of the sum of One Dollar ($1.00) or equivalent and other good and valuable consideration paid to the undersigned Inventor: **SEAN BARGER** hereby sells and assigns to **EQUIL IP HOLDINGS LLC**, a corporation formed under the laws of Delaware, whose mailing address is 500 Tamal Plaza, Suite 528, Corte Madera, California 94925 (hereafter referred to as the Assignee), his entire right, title and interest, including the right to sue for past infringement and to collect for all past, present and future damages, for the United States of America (as defined in 35 U.S.C. § 100) and throughout the world,

(a) in the invention(s) known as **AUTOMATED MEDIA DELIVERY SYSTEM** for which application(s) for patent in the United States of America has a filing date of August 14, 2001 (also known as United States Application No. 09/929,904), now issued as U.S. Patent No. 6,964,009, in any and all applications thereon, in any and all Letters Patent(s) therefor, and

(b) in any and all applications that claim the benefit of the patent application listed above in part (a), including non-provisional applications, continuing (continuation, divisional, or continuation-in-part) applications, reissues, extensions, renewals and reexaminations of the patent application or Letters Patent therefor listed above in part (a), to the full extent of the term or terms for which Letters Patents issue, and

(c) in any and all inventions described in the patent application listed above in part (a), and in any and all forms of intellectual and industrial property protection derivable from such patent application, and that are derivable from any and all continuing applications, reissues, extensions, renewals and reexaminations of such patent application, including, without limitation, patents, applications, utility models, inventor's certificates, and designs together with the right to file applications therefor; and including the right to claim the same priority rights from any previously filed applications under the International Agreement for the Protection of Industrial Property, or any other international agreement, or the domestic laws of the country in which any such application is filed, as may be applicable;

all such rights, title and interest to be held and enjoyed by the above-named Assignee, its successors, legal representatives and assigns to the same extent as all such rights, title and interest would have been held and enjoyed by the undersigned Inventor had this assignment and sale not been made.

The undersigned Inventor agrees to execute all papers necessary in connection with the application(s) and any non-provisional, continuing (continuation, divisional, or continuation-in-part), reissue, reexamination or corresponding application(s) thereof and also to execute separate assignments in connection with such application(s) as the Assignee may deem necessary or expedient.

Appl. No. 09/929,904
U.S. Patent No. 6,964,009

The undersigned Inventor agrees to execute all papers necessary in connection with any judicial or administrative proceeding, including but not limited to an interference, derivation, post-grant proceeding, or patent enforcement action (judicial or otherwise) related to the application(s) or any non-provisional, continuing (continuation, divisional, or continuation-in-part), reissue or reexamination application(s) thereof or Letters Patent(s) therefor and to cooperate with the Assignee in every way possible in obtaining evidence and assisting with such judicial or administrative proceeding.

The undersigned Inventor hereby represents that he/she has full right to convey the entire interest herein assigned, and that he/she has not executed, and will not execute, any agreement in conflict therewith.

The undersigned Inventor hereby grants the patent practitioners associated with **CUSTOMER NUMBER 26111** the power to insert in this assignment any further identification that may be necessary or desirable in order to comply with the rules of the United States Patent and Trademark Office for recordation of this document.

The undersigned Inventor hereby represents that he/she understands that the patent practitioners associated with **CUSTOMER NUMBER 26111** are the legal representatives of, and attorneys for, the assignee, and are <u>NOT</u> the legal representatives of, and attorneys for, the Inventor.

IN WITNESS WHEREOF, executed by the undersigned Inventor on the date opposite his/her name.

Date: _____03/31/2023_____          Signature of Inventor: _____

Sean Barger

20045196.1

## STATEMENT FOR CORRECTION OF INVENTORSHIP

I, Christopher Samaniego, make this statement in support of the accompanying Request to Correct Inventorship under 35 U.S.C. 256.

I am currently named as an inventor on U.S. applications/patents identified below:

| U.S. Application No. | U.S. Patent No. | Title |
|---|---|---|
| 09/425,326 | 6,792,575 B1 | Automated processing and delivery of media to web servers |
| 09/929,904 | 6,964,009 B2 | Automated media delivery system |
| 60/226,043 | | Automated media delivery system |

I hereby state that I agree and/or have no disagreement to the change of inventorship to add Sean Barger as a co-inventor on each of the above-identified U.S. applications/patents.

Date: _March 20, 2023_                 By: _Christopher Samaniego_
                                            Christopher Samaniego

1

**UNITED STATES
PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC PAYMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| 09/929,904 | 04/03/2023 03:39:25 PM ET | EQUI0001CIP |

## Title of Invention

AUTOMATED MEDIA DELIVERY SYSTEM

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | 6964009 |
| CONFIRMATION # | 9393 | FILED BY | Simran Parmar |
| PATENT CENTER # | 61854906 | AUTHORIZED BY | Jason Fitzsimmons |
| CUSTOMER # | 22862 | FILING DATE | 08/14/2001 |
| CORRESPONDENCE ADDRESS | - | FIRST NAMED INVENTOR | Christopher Samaniego |

## Payment Information

| PAYMENT METHOD | PAYMENT TRANSACTION ID | PAYMENT AUTHORIZED BY |
|---|---|---|
| CARD / 1008 | E202343F41107013 | Simran Parmar |

PRE-AUTHORIZED ACCOUNT
190036

PRE-AUTHORIZED CATEGORY
37 CFR 1.16 (National application filing, search, and examination fees); 37 CFR 1.17 (Patent application and reexamination processing fees); 37 CFR 1.19 (Document supply fees); 37 CFR 1.20 (Post Issuance fees); 37 CFR 1.21 (Miscellaneous fees and charges)

| FEE CODE | DESCRIPTION | ITEM PRICE($) | QUANTITY | ITEM TOTAL($) |
|---|---|---|---|---|
| 1816 | PROCESSING FEE FOR CORRECTING INVENTORSHIP IN A PATENT | 160.00 | 1 | 160.00 |
| | | | **TOTAL AMOUNT:** | **$160.00** |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

## STATEMENT FOR CORRECTION OF INVENTORSHIP

I, Joshua N. Devan, make this statement in support of the accompanying Request to Correct Inventorship under 35 U.S.C. 256.

I am currently named as an inventor on U.S. applications/patents identified below:

| U.S. Application No. | U.S. Patent No. | Title |
|---|---|---|
| 09/929,904 | 6,964,009 B2 | Automated media delivery system |
| 60/226,043 | | Automated media delivery system |

I hereby state that I agree and/or have no disagreement to the change of inventorship to add Sean Barger as a co-inventor on each of the above-identified U.S. applications/patents.

Date: _Feb. 13, 2023_          By: _____

                                              Joshua N. Devan

**USPTO**

**UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION #<br>**09/929,904** | RECEIPT DATE / TIME<br>**04/03/2023 03:39:25 PM ET** | ATTORNEY DOCKET #<br>**EQUI0001CIP** |
|---|---|---|

## Title of Invention

AUTOMATED MEDIA DELIVERY SYSTEM

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | 6964009 |
| CONFIRMATION # | 9393 | FILED BY | Simran Parmar |
| PATENT CENTER # | 61854906 | FILING DATE | 08/14/2001 |
| CUSTOMER # | 22862 | FIRST NAMED INVENTOR | Christopher Samaniego |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Jason Fitzsimmons |

## Documents

# TOTAL DOCUMENTS: 11

| DOCUMENT | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|
| Statement-for-Correction-of-Inventorship-Thewlis.pdf | 1 | Oath or Declaration filed | 23 KB |
| Statement-for-Correction-of-Inventorship-Devan.pdf | 1 | Oath or Declaration filed | 147 KB |
| Statement-for-Correction-of-Inventorship-Boyd.pdf | 1 | Oath or Declaration filed | 18 KB |
| Statement-for-Correction-of-Inventorship-Salmon.pdf | 1 | Oath or Declaration filed | 16 KB |
| Statement-for-Correction-of-Inventorship-Samaniego.pdf | 1 | Oath or Declaration filed | 260 KB |

| Statement-for-Correction-of-Inventorship-Offner.pdf | 1 | Oath or Declaration filed | 273 KB |
| Statement-for-Correction-of-Inventorship-Barger.pdf | 1 | Oath or Declaration filed | 14 KB |
| Statement-Under-37-CFR-3_73b.PDF | 5 | Assignee showing of ownership per 37 CFR 3.73 | 50 KB |
| Statement-Under-37-CFR-1_324b1-of-Assignee.pdf | 1 | Oath or Declaration filed | 18 KB |
| Petition-to-Correct-Inventorship-Under-37-CFR-1_324.pdf | 3 | Petition for review by the Office of Petitions | 20 KB |
| 37-CFR-1_63 Declaration.pdf | 1 | Oath or Declaration filed | 172 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| Statement-for-Correction-of-Inventorship-Thewlis.pdf | 87EB28ABCA3E7C5310804269694E1957D8E979076EB56ABDA E577880F0B959071ACCFD74EEB059E924D7ABCC3FFCFC752 527998255FFC311D81B37E729DFA0FB |
| Statement-for-Correction-of-Inventorship-Devan.pdf | 85F586C07B4EAD0C136C93DA1CCF469252F09B55E0BD06281 85C462C47F92673AA2AC0D281639B3D8E09A7541444A203946 68A2BA579791C509CF5D4C38AE3DF |
| Statement-for-Correction-of-Inventorship-Boyd.pdf | 7376ACB2325CAD4DEA9FC13FD470ABDB10C69500338D6C9A 01AE8DF46268648396048AB9E86431759AD85BB5184CA5396D 8FF43E8491292F9BFE4EC2C5B140BD |
| Statement-for-Correction-of-Inventorship-Salmon.pdf | FBFA9D3FA2C410DBCDF9216152FDEBE6D1EDA988F8E02840 5D003894A7A088B4FFD615AECA33AF8318DCD04487A0A06E3 9503807826B4C6566BB07DBDD081D3D |

| Statement-for-Correction-of-Inventorship-Samaniego.pdf | DA384A3C779A4BDE6E48854B6344BD10DFCA110A6A743BD3 82CC304DA9DE7328F8E0819509A287BA23B7E2DE3F3F2A08E D942A31F55694E6454BD9170F1173F5 |
| Statement-for-Correction-of-Inventorship-Offner.pdf | 0CB3379749FF20422DE9F89761307D35ED27562D59947D1A86 E4F304AA2A6423CB2C1D5717759D73046E1A0E44775C31EA2 350B695A72F2B75EAA72AB99AAE97 |
| Statement-for-Correction-of-Inventorship-Barger.pdf | CFD7C7BF97C1603390AF63F20A6AF78990B30FCFFDC9D7DF 803CD9CA64FCB6D56BB5EEA1016A9FC5C3C17575207502F4F 1525EA0909AD13D2BCA02C5423ED7F7 |
| Statement-Under-37-CFR-3_73b.PDF | 48C5ECA7864C45488A510717492E1FCCB4F3F961A426F6F34 DFD740F8ABAAC959B2EA65E24C4C9806507712E5CCE7ACDA A6B53A01624BA4315D5AAE95F4202D7 |
| Statement-Under-37-CFR-1_324b1-of-Assignee.pdf | C1CF270ECA2965CF1E511E85562A757C60E35A1861553E799 E4DD70BE50F2C30C6966AF118017CC2778A124224784AF793F 98E3EED108DC6DE48B5559B0B26E3 |
| Petition-to-Correct-Inventorship-Under-37-CFR-1_324.pdf | C6318B574CC4734BAA336F08CC6A9004F88E4EE741D614FCC 50AADB6FF6D692857C87DEE7224AEA1517211EB3039AA8633 518E6ABFB708874F9203AC875AD1EB |
| 37-CFR-1_63 Declaration.pdf | C7F61428614D894884123A5DF49345F871AE3B194E4192E9DD 4ADF9F7A3E66C2258DE7103186B593A450C3DC8897F37494A F91D183D63CC17ACAD5AA3B2DA944 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an

international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re patent of: Samaniego *et al.* | Art Unit: 2176 |
| U.S. Patent No: 6,964,009 B1 | Confirmation No. 9393 |
| Issued: November 8, 2005 | Examiner: BASHORE, W.L. |
| For: **AUTOMATED MEDIA DELIVERY SYSTEM** | Atty. Docket: EQUI0001CIP |

## Statement Under 37 C.F.R. § 1.324(b)(1) of Assignee

Commissioner for Patents                                        *Attn: Mail Stop Petition*
PO Box 1450
Alexandria, VA 22313-1450

Commissioner:

Equil IP Holdings LLC, Assignee of the entire right, title, and interest of the inventors to be added to U.S. Patent No. 6,964,009 B1 (see Reel No. 058470, Frame No. 0339), consents to the change in inventorship to have Sean Barger added as co-inventor. I have read and understood 37 C.F.R. § 11.18(b).

Signed on behalf of Assignee Equil IP Holdings LLC:

SIGNATURE: _____

BY: Sean Barger

TITLE: Manager

DATE: 03/31/2023

20029372.1

- 1 -

**DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION**

| Title of Invention | **AUTOMATED MEDIA DELIVERY SYSTEM** |
|---|---|

As the below named inventor, I hereby declare that:

| This declaration is directed to: | ☐ The attached application, or |
|---|---|
| | ☒ United States application or PCT international application number <u>09/929,904</u> filed on <u>August 14, 2001</u> (now US Pat. No. 6,964,009). |

The above-identified application was made or authorized to be made by me.

I believe that I am an original, first inventor or an original, first joint inventor of the subject matter which is claimed.

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims.

I am aware of and acknowledge the duty to disclose to the U.S. Patent and Trademark Office all information known to me to be material to patentability as defined in 37 CFR 1.56.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

LEGAL NAME OF INVENTOR:    <u>SEAN BARGER</u>

COUNTRY OF CITIZENSHIP:    <u>United States of America</u>

MAILING ADDRESS:    <u>222 Marguerite Avenue</u>

<u>Mill Valley, CA 94941</u>

Signature: _____    Date:   <u>April 3, 2023</u>

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re patent of: Samaniego *et al.* | Art Unit: 2176 |
| U.S. Patent No: 6,964,009 B1 | Confirmation No. 9393 |
| Issued: November 8, 2005 | Examiner: BASHORE, W.L. |
| For: **AUTOMATED MEDIA DELIVERY SYSTEM** | Atty. Docket: EQUI0001CIP |

**STATEMENT FOR CORRECTION OF INVENTORSHIP
UNDER 37 C.F.R. § 1.324(b)(1) BY INVENTOR**

I, Sean Barger, make this statement in support of the accompanying Petition Under 37 C.F.R. § 1.324(a) to Correct Inventorship in a Patent, pursuant to 35 U.S.C. 256.

The inventorship error of failing to include myself, Sean Barger, as an inventor of U.S. Patent No. 6,964,009 occurred without any deceptive intention on my part. I have read and understand 37 C.F.R. § 11.18(b).

Executed this  31st  day of  March  2023.

_____
Sean Barger

**STATEMENT FOR CORRECTION OF INVENTORSHIP**

I, David C. Salmon, make this statement in support of the accompanying Request to

Correct Inventorship under 35 U.S.C. 256.

I am currently named as an inventor on U.S. applications/patents identified below:

| U.S. Application No. | U.S. Patent No. | Title |
|---|---|---|
| 09/929,904 | 6,964,009 B2 | Automated media delivery system |
| 60/226,043 | | Automated media delivery system |

I hereby state that I agree and/or have no disagreement to the change of inventorship to

add Sean Barger as a co-inventor on each of the above-identified U.S. applications/patents.

Date: _____**2/20/2023**_____          By: _____

David C. Salmon

1

## STATEMENT FOR CORRECTION OF INVENTORSHIP

I, David R. Boyd, make this statement in support of the accompanying Request to Correct Inventorship under 35 U.S.C. 256.

I am currently named as an inventor on U.S. applications/patents identified below:

| U.S. Application No. | U.S. Patent No. | Title |
|---|---|---|
| 09/425,326 | 6,792,575 B1 | Automated processing and delivery of media to web servers |
| 09/929,904 | 6,964,009 B2 | Automated media delivery system |
| 60/226,043 | | Automated media delivery system |

I hereby state that I agree and/or have no disagreement to the change of inventorship to add Sean Barger as a co-inventor on each of the above-identified U.S. applications/patents.

Date: _____2/14/23_____          By: _____

David R. Boyd

1

## STATEMENT FOR CORRECTION OF INVENTORSHIP

I, Adrian D. Thewlis, make this statement in support of the accompanying Request to Correct Inventorship under 35 U.S.C. 256.

I am currently named as an inventor on U.S. applications/patents identified below:

| U.S. Application No. | U.S. Patent No. | Title |
|---|---|---|
| 09/425,326 | 6,792,575 B1 | Automated processing and delivery of media to web servers |
| 09/929,904 | 6,964,009 B2 | Automated media delivery system |
| 60/226,043 | | Automated media delivery system |

I hereby state that I agree and/or have no disagreement to the change of inventorship to add Sean Barger as a co-inventor on each of the above-identified U.S. applications/patents.

Date: 2/8/2023

By: _____

Adrian D. Thewlis

1

## STATEMENT FOR CORRECTION OF INVENTORSHIP

I, Nelson "Rocky" H. Offner, make this statement in support of the accompanying Request to Correct Inventorship under 35 U.S.C. 256.

I am currently named as an inventor on U.S. applications/patents identified below:

| U.S. Application No. | U.S. Patent No. | Title |
|---|---|---|
| 09/425,326 | 6,792,575 B1 | Automated processing and delivery of media to web servers |
| 09/929,904 | 6,964,009 B2 | Automated media delivery system |
| 60/226,043 | | Automated media delivery system |

I hereby state that I agree and/or have no disagreement to the change of inventorship to add Sean Barger as a co-inventor on each of the above-identified U.S. applications/patents.

Date: 3-20-2023

By: _____

Nelson "Rocky" H. Offner

1



**JASON A. FITZSIMMONS**
DIRECTOR
202-772-8701
JFITZSIMMONS@STERNEKESSLER.COM

April 24, 2023

Commissioner for Patents                              *Confirmation No. 9393*
PO Box 1450                                                         *Art Unit 2176*
Alexandria, VA  22313-1450                    *Attn: Mail Stop Post Issue*

     Re:    U.S. Utility Patent No. 6,964,009
           For:  **AUTOMATED MEDIA DELIVERY SYSTEM**
           First Named Inventor:  Christopher SAMANIEGO

Commissioner:

     Transmitted herewith for appropriate action is a document entitled **Supplemental Statement for Correction of Inventorship under 37 C.F.R. § 1.324(b)(1) by Inventor**, which is submitted electronically.

     The U.S. Patent and Trademark Office is hereby authorized to charge any fee deficiency, or credit any overpayment, to our Deposit Account No. 19-0036.

                   Respectfully submitted,

                   STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

                   /Jason A. Fitzsimmons  #65,357/

                   Jason A. Fitzsimmons, Registration No. 65,367
                   Signed under 37 C.F.R. § 1.34, Acting in a
                   Representative Capacity for Assignee

JAF/wcf
Enclosure

20157202.DOCX

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re patent of: Samaniego *et al.* | Art Unit: 2176 |
| U.S. Patent No: 6,964,009 B1 | Confirmation No. 9393 |
| Issued: November 8, 2005 | Examiner: BASHORE, W.L. |
| For: **AUTOMATED MEDIA DELIVERY SYSTEM** | Atty. Docket: EQUI0001CIP |

## SUPPLEMENTAL STATEMENT FOR CORRECTION OF INVENTORSHIP UNDER 37 C.F.R. § 1.324(b)(1) BY INVENTOR

I, Sean Barger, make this statement in support of the accompanying Petition Under 37 C.F.R. § 1.324(a) to Correct Inventorship in a Patent, pursuant to 35 U.S.C. 256, to add myself as an inventor of U.S. Patent No. 6,964,009.

I hearby state that I agree and/or have no disagreement to the change of inventorship to add myself, Sean Barger, as a co-inventor on U.S. Application No. 09/929,904 (now U.S. Patent No. 6,964,009).

Executed this 24th day of April 2023.

_____
Sean Barger

- 1 -

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 47892814 |
| **Application Number:** | 09929904 |
| **International Application Number:** | |
| **Confirmation Number:** | 9393 |
| **Title of Invention:** | AUTOMATED MEDIA DELIVERY SYSTEM |
| **First Named Inventor/Applicant Name:** | Christopher  Samaniego |
| **Customer Number:** | 22862 |
| **Filer:** | Jason Alan Fitzsimmons/William Flanigen |
| **Filer Authorized By:** | Jason Alan Fitzsimmons |
| **Attorney Docket Number:** | EQUI0001CIP |
| **Receipt Date:** | 24-APR-2023 |
| **Filing Date:** | 14-AUG-2001 |
| **Time Stamp:** | 16:50:06 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Miscellaneous Incoming Letter | Cover-Letter-5275-001IPR0.pdf | 20183<br>dbd1baf54cb3a11ab484cf6ec3cd4eb249fa82c5 | no | 1 |

**Warnings:**

**Information:**

| 2 | Oath or Declaration filed | Supplemental-Statement-for-Correction-of-Inventorship-5275-001IPR0.pdf | 15153 <br><br> 2b763f3c8003c72434e40b2808e5fb5f8a1c 358a | no | 1 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | |
|---|---|
| **Total Files Size (in bytes):** | 35336 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/929,904 | 08/14/2001 | Christopher Samaniego | EQUI0001CIP | 9393 |

22862        7590        04/27/2023
GLENN PATENT GROUP
c/o Perkins Coie LLP
P.O. Box 1247
Seattle, WA 98111-1247

| EXAMINER |
|---|
| BASHORE, WILLIAM L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2176 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 04/27/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentprocurement@perkinscoie.com



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

Patent No.:  6964009
Issue Date:  11/08/2005
Appl. No.:  09/929,904
Filed:  08/14/2001

## PART (A) RESPONSE FOR CERTIFICATES OF CORRECTION

This is a decision on the Certificate of Correction request filed ____.

The request for issuance of Certificate of Correction for the above-identified correction(s) under the provisions of 37 CFR 1.322 and/or 1.323 is hereby:

(Check one)
☐ Approved          ☐ Approved in Part          ☐ Denied

Comments: ____

## PART (B) PETITION UNDER 37 CFR 1.324 OR 37 CFR 1.48

☑ This is a decision on the petition filed 03 April 2023 to correct inventorship under 37 CFR 1.324.

☐ This is a decision on the request under 37 CFR 1.48, petition filed ____. In view of the fact that the patent has already issued, the request under 37 CFR 1.48 has been treated as a petition to correct inventorship under 37 CFR 1.324.

The petition is hereby:     ☑ Granted          ☐ Dismissed

Comment: See Continuation Sheet

The patented filed is being forwarded to Certificate of Corrections Branch for issuance of a certificate naming only the actual inventor or inventors.

/KAVITA STANLEY/
Supervisory Patent Examiner, Art Unit 2176
Technology Center 2100
Phone: (571)272-8352

Certificates of Correction Branch email: CustomerServiceCoC@uspto.gov CoC Central Phone Number: (703) 756-1814

**Continuation Sheet (PTOL-306)**

**Application No.** 09/929,904

Continuation of PART (B): A Supplemental Statement for Correction of Inventorship under 37 CFR 1.324(b)(1) by Inventor was filed on 4/24/2023 and has been considered in this decision.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/929,904 | 08/14/2001 | Christopher Samaniego | EQUI0001CIP | 9393 |

22862        7590        05/09/2023
GLENN PATENT GROUP
c/o Perkins Coie LLP
P.O. Box 1247
Seattle, WA 98111-1247

| EXAMINER |
|---|
| BASHORE, WILLIAM L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2176 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/09/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentprocurement@perkinscoie.com

| Response to the Request for Certificate of Correction | Patent No.<br>6964009 | Applicant(s)<br>Samaniego et al. |
|---|---|---|
| | Issue Date<br>11/08/2005 | Docket No.<br>EQUI0001CIP |

This is in response to the request for a Certificate of Correction filed <u>24 April 2023</u>

☑ **Request Denied** - Consideration has been given to your request for the issuance of a Certificate of Correction under the provisions of 37 CFR 1.322 and/or 37 CFR 1.323. The Request is improper and denied for the reason(s) below:

1. ☐ Assignees' names and addresses (assignment data) printed in a patent, are based solely on information supplied in the appropriate space for identifying the assignment data on the Issue Fee Transmittal Form (PTOL-85b). Any request for a patent to be corrected to state the name of the assignee, must state that the assignment was submitted for recordation as set forth in 37 CFR 3.11 before issuance of the patent. Petition under 3.81 is to be filed for consideration of correction to assignee. The petition fee set forth in 37 CFR 1.17(i)(1) (currently $140, $70, $35 for large, small and micro entities, respectively.

2. ☐ The alleged error in _____, is in fact an Amendment and/or Change made by the examiner and considered to be in accordance with the permissible amendments enumerated in the Manual of Patent Examining Procedure (MPEP) Section 1302.04. Applicant did not file objection or amendment under 37 CFR 1.312 prior to payment of the issue fee.

3. ☐ A petition under CFR 1.182 is required to correct the alleged errors in spelling or order of inventor's names, since inventor's names are printed solely in accordance with the type-written names, and in the order of the type-written names on the Application Data Sheet (ADS). The required fee currently under rule 1.17(f) (small entity $200, large entity $400, micro entity fee $100).

4. ☐ With respect to the alleged error in changing the inventor name on the patent due to clerical error in ADS/OATH of related patents. The inventors name is printed in accordance with the OATH/ADS submitted at the time of filing the application. However, your attention is directed to C.F.R. 1.324, wherein a request is being made to change, add or delete inventor(s), after issuance of the patent.

5. ☐ With respect to the alleged error in _____, comparison of the printed patent with the corresponding location in the application file reveals that there is no discrepancy.

6. ☐ With respect to 37 CFR 1.72, the title should be brief but technically accurate and descriptive and should contain fewer than 500 characters. Inasmuch as the words "new," "improved," "improvement of," and "improvement in" are not considered as part of the title of an invention, these words should not be included at the beginning of the title of the invention and will be deleted when the Office enters the title into the Offices computer records, and when any patent issues.

7. ☐ The fee for correction under 37 CFR 1.323 is set forth in 37 CFR 1.20(a). ☐Partial fee ☐No fee was received with your request. Full fee payment is required before further action is taken on this request.

8. ☐ With respect to the request for corrected Letters Patent (Grant), corrections to the original Letters Patent are made under the provisions of Rule 1.322(b), not Rule1.323, unless a petition is granted.

9. ☑ Other Comments: <u>See Continuation Sheet</u>

*Further correspondence concerning this matter should be filed and directed to the Certificates of Correction Branch.*

Legal Instrument Examiner: <u>/VALERIE JACKSON/</u>               Phone: <u>(571)272-3423</u>
LIE, ODM
Certificates of Correction Branch email: <u>CustomerServiceCoC@uspto.gov</u>        CoC Central Phone Number: (703)756-1814

*If applicable, information regarding a petition under 37 CFR 1.183 should be directed to the attention of the Commissioner for Patents using the FAX number (571) 273-8300*

**Continuation Sheet (PTO-998)**

**Patent No.** 6964009

Continuation of Other Comments: With respect to the alleged error in the certificate of correction, the SPE approved the request on 4/27/2023, a PTO/SB/44 (09-07)1050 form is needed to be completed. In view of the foregoing, your request is hereby denied.



**UNITED STATES
PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION #<br>**09/929,904** | RECEIPT DATE / TIME<br>**05/09/2023 03:45:15 PM ET** | ATTORNEY DOCKET #<br>**EQUI0001CIP** |
|---|---|---|

## Title of Invention

AUTOMATED MEDIA DELIVERY SYSTEM

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | 6964009 |
| CONFIRMATION # | 9393 | FILED BY | Robert Kyei |
| PATENT CENTER # | 62061703 | FILING DATE | 08/14/2001 |
| CUSTOMER # | 22862 | FIRST NAMED INVENTOR | Christopher Samaniego |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Jason Fitzsimmons |

## Documents

# TOTAL DOCUMENTS: 3

| DOCUMENT | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|
| 2023-05-09-Transmittal-Form-5275-0000000.PDF | 1 | Transmittal Letter | 178 KB |
| 2023-05-09-Request-COC-5275-0000000.PDF | 2 | Request for Certificate of Correction | 102 KB |
| 2023-05-09-COC-5275-0000000.PDF | 2 | Request for Certificate of Correction | 149 KB |

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|

| 2023-05-09-Transmittal-Form-5275-0000000.PDF | 0EBC63EC64E32567EE2B68AB02ACC52565CB4CAE865EC3DE CF351B6623B7C234D9002344ABD33171E15715DD2766D67344 2B217E7B5206BE5139890C443A5079 |
| 2023-05-09-Request-COC-5275-0000000.PDF | D81C3F841574624E0431C49335D83431AC82DA3BDD18C0FA8 21E652657BD6A618E43FC0E71B3DA60F5FEF5D7008DBD3DC A05A62B217BD527F41D3F7F341CB652 |
| 2023-05-09-COC-5275-0000000.PDF | 68CDC4416395C2707D9555F5867BE1C6D03AD8D3079EA44CE 639D4ADF27ED89301A8B8FC4A24353550723339905C20569A2 A5CBA556FA84CFE3F7DE729AFF699 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.



**UNITED STATES
PATENT AND TRADEMARK OFFICE**

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC PAYMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| 09/929,904 | 05/09/2023 03:45:15 PM ET | EQUI0001CIP |

## Title of Invention

AUTOMATED MEDIA DELIVERY SYSTEM

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility - Nonprovisional Application under 35 USC 111(a) | PATENT # | 6964009 |
| CONFIRMATION # | 9393 | FILED BY | Robert Kyei |
| PATENT CENTER # | 62061703 | AUTHORIZED BY | Jason Fitzsimmons |
| CUSTOMER # | 22862 | FILING DATE | 08/14/2001 |
| CORRESPONDENCE ADDRESS | - | FIRST NAMED INVENTOR | Christopher Samaniego |

## Payment Information

| PAYMENT METHOD | PAYMENT TRANSACTION ID | PAYMENT AUTHORIZED BY |
|---|---|---|
| CARD / 1005 | E202359F48219713 | Robert Kyei |

| FEE CODE | DESCRIPTION | ITEM PRICE($) | QUANTITY | ITEM TOTAL($) |
|---|---|---|---|---|
| 2811 | CERTIFICATE OF CORRECTION | 160.00 | 1 | 160.00 |
| | | | TOTAL AMOUNT: | $160.00 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**

If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

PTO/SB/21 (07-09)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# TRANSMITTAL FORM

*(to be used for all correspondence after initial filing)*

| | |
|---|---|
| Application Number | 09/929,904 |
| Filing Date | 08/14/2001 |
| First Named Inventor | Christopher SAMANIEGO |
| Art Unit | 2176 |
| Examiner Name | WILLIAM L BASHORE |
| Attorney Docket Number | EQUI0001CIP |

Total Number of Pages in This Submission

## ENCLOSURES    *(Check all that apply)*

- [ ] Fee Transmittal Form
  - [x] Fee Attached
- [ ] Amendment/Reply
  - [ ] After Final
  - [ ] Affidavits/declaration(s)
- [ ] Extension of Time Request
- [ ] Express Abandonment Request
- [ ] Information Disclosure Statement
- [ ] Certified Copy of Priority Document(s)
- [ ] Reply to Missing Parts/ Incomplete Application
  - [ ] Reply to Missing Parts under 37 CFR 1.52 or 1.53

- [ ] Drawing(s)
- [ ] Licensing-related Papers
- [ ] Petition
- [ ] Petition to Convert to a Provisional Application
- [ ] Power of Attorney, Revocation Change of Correspondence Address
- [ ] Terminal Disclaimer
- [ ] Request for Refund
- [ ] CD, Number of CD(s)
  - [ ] Landscape Table on CD

- [ ] After Allowance Communication to TC
- [ ] Appeal Communication to Board of Appeals and Interferences
- [ ] Appeal Communication to TC **(Appeal Notice, Brief, Reply Brief)**
- [ ] Proprietary Information
- [ ] Status Letter
- [x] Other Enclosure(s) (please identify below):
  Request for Certificate of Correction and Form PTO/SB/44

**Remarks**

Conf. No. 9393

Online Credit Card Payment Authorization for $160.00 to cover:
$160.00 - Request for Certificate of Correction Fee

The U.S. Patent and Trademark Office is hereby authorized to charge any fee deficiency, or credit any over payment, to our Deposit Account No. 19-0036.

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT

| | |
|---|---|
| Firm Name | Sterne, Kessler, Goldstein & Fox P.L.L.C. |
| Signature | /Jason A. Fitzsimmons  #65,367/ |
| Printed name | Jason A. Fitzsimmons (under 37 C.F.R. § 1.34) |
| Date | May 9, 2023 |
| Reg. No. | 65,367 |

## CERTIFICATE OF TRANSMISSION/MAILING

I hereby certify that this correspondence is being facsimile transmitted to the USPTO or deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on the date shown below:

| Signature | |
|---|---|
| Typed or printed name | Date |

This collection of information is required by 37 CFR 1.5. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| U.S. Patent No.: 6,964,009 | Confirmation No.: 9393 |
| Date of Patent: November 8, 2005 | Art Unit: 2176 |
| First Named Inventor: Christopher SAMANIEGO | Atty. Docket: EQUI0001CIP |
| Patentee: EQUIL IP HOLDINGS LLC | |
| Title: **AUTOMATED MEDIA DELIVERY SYSTEM** | |

## Request for Certificate of Correction
## Under 37 C.F.R. § 1.323 For Applicant's Mistake

***Attn: Certificate of Correction Branch***

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

Commissioner:

It is hereby requested that a Certificate of Correction under 37 C.F.R. § 1.323 be issued for the above-captioned United States Patent. This Certificate of Correction is being requested due to mistakes which appear in the printed patent. The mistakes are of a clerical or typographical nature, or of a minor character. Patentee submits that correction of these errors does not introduce new matter.

Specifically, the printed patent contains the following errors for which a Certificate of Correction is respectfully requested:

On Face Page, Col. 1, Field (75), in "Inventors", add -- **Sean Barger**, Mill Valley, CA (US)--.

- 2 -

U.S. Patent No.: 6,964,009

## *Remarks*

The above-noted corrections do not involve such changes in the patent as would constitute new matter or would require reexamination.

A completed Form PTO/SB/44 accompanies this request, with the above-noted corrections printed thereon. Accordingly, a Certificate of Correction is believed proper and issuance thereof is respectfully requested.

This request is accompanied by payment of the fee set forth in 37 C.F.R. § 1.20(a). Fee payment is provided through online credit card payment. The Commissioner is hereby authorized to charge any fee deficiency, or credit any overpayment, to our Deposit Account No. 19-0036.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

/Jason A. Fitzsimmons  #65,367/

Jason A. Fitzsimmons, Registration No. 65,367
Signed under 37 C.F.R. § 1.34, Acting in a
Representative Capacity for Assignee

Date:  May 9, 2023

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

20238950

Atty. Dkt. No. EQUI0001CIP

PTO/SB/44 (09-07)
Approved for use through 03/31/2023. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.
(Also Form PTO-1050)

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

Page 1 of 1

PATENT NO.         : 6,964,009 B2

APPLICATION NO.  : 09/929,904

ISSUE DATE          : November 8, 2005

INVENTOR(S)        : Samaniego, et al.

It is certified that an error appears or errors appear in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On Face Page, Col. 1, Field (75), in "Inventors", add --**Sean Barger**, Mill Valley, CA (US)--.

MAILING ADDRESS OF SENDER (Please do not use customer number below):

Sterne, Kessler, Goldstein & Fox P.L.L.C.
1100 New York Avenue, N.W.
Washington, DC, 20005

This collection of information is required by 37 CFR 1.322, 1.323, and 1.324. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1.0 hour to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Attention Certificate of Corrections Branch, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address:  COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/929,904 | 08/14/2001 | Christopher Samaniego | EQUI0001CIP | 9393 |

22862        7590        05/31/2023
GLENN PATENT GROUP
c/o Perkins Coie LLP
P.O. Box 1247
Seattle, WA 98111-1247

| EXAMINER |
|---|
| BASHORE, WILLIAM L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2176 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/31/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentprocurement@perkinscoie.com



**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

Patent No.:   6964009
Issue Date:   11/08/2005
Appl. No.:    09/929,904
Filed:        08/14/2001

## PART (A) RESPONSE FOR CERTIFICATES OF CORRECTION

This is a decision on the Certificate of Correction request filed <u>09 May 2023</u>.

The request for issuance of Certificate of Correction for the above-identified correction(s) under the provisions of 37 CFR 1.322 and/or 1.323 is hereby:

(Check one)
☑ Approved          ☐ Approved in Part          ☐ Denied

Comments:  _____

## PART (B) PETITION UNDER 37 CFR 1.324 OR 37 CFR 1.48

☐ This is a decision on the petition filed _____ to correct inventorship under 37 CFR 1.324.

☐ This is a decision on the request under 37 CFR 1.48, petition filed _____. In view of the fact that the patent has already issued, the request under 37 CFR 1.48 has been treated as a petition to correct inventorship under 37 CFR 1.324.

The petition is hereby:        ☐ Granted          ☐ Dismissed

Comment:  _____

The patented filed is being forwarded to Certificate of Corrections Branch for issuance of a certificate naming only the actual inventor or inventors.

/WILLIAM L BASHORE/
Supervisory Patent Examiner, Art Unit 2175
Technology Center <u>2100</u>
Phone: <u>(571)272-4088</u>

Certificates of Correction Branch email: CustomerServiceCoC@uspto.gov CoC Central Phone Number: (703) 756-1814

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 6,964,009 B2 | Page 1 of 1 |
| APPLICATION NO. | : 09/929904 | |
| DATED | : November 8, 2005 | |
| INVENTOR(S) | : Samaniego et al. | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

Column 1, Item (75), in "Inventors", add --**Sean Barger**, Mill Valley, CA (US)--.

Signed and Sealed this
Thirteenth Day of June, 2023

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

# EXHIBIT 9

Trials@uspto.gov                                             Paper 15
571-272-7822                                          Date: July 21, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

AKAMAI TECHNOLOGIES, INC.,
Petitioner,

v.

EQUIL IP HOLDINGS LLC,
Patent Owner.

————————————

IPR2023-00332
Patent 9,158,745 B2

————————————

Before RICHARD M. LEBOVITZ, ROBERT J. WEINSCHENK, and
SHARON FENICK, *Administrative Patent Judges*.

LEBOVITZ, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2023-00332
Patent 9,158,745 B2

# I.  INTRODUCTION

## A.  *Background and Summary*

Akamai Technologies, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1–7 ("the challenged claims") of U.S. Patent No. 9,158,745 B2 (Ex. 1001, "the '745 patent"). Equil IP Holdings LLC ("Patent Owner") filed a Preliminary Response (Paper 8, "Prelim. Resp.") to the Petition.

Subsequent to the filing of the Petition and Preliminary Response, we authorized Petitioner (Ex. 1040 (PTAB email dated May 18, 2023)) to file a Preliminary Reply Brief (Paper 12, "Prelim. Reply Br.") limited to addressing (1) Patent Owner's arguments under 35 U.S.C. § 325(d); and (2) Patent Owner's arguments relating to the correction of inventorship in U.S. Patent No. 6,964,009 ("the '009 patent") and its effect on the prior art status of a piece of art included in several of the asserted grounds. We also authorized Patent Owner to file a responsive Preliminary Sur-reply (Paper 13, "Prelim. Sur-reply").

An *inter partes* review may not be instituted unless "the information presented in the petition . . . and any response . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a).

After considering the Petition, the Preliminary Response, the Preliminary Reply Brief, the Preliminary Sur-reply, and the evidence of record, for the reasons explained below, we determine that Petitioner has not demonstrated a reasonable likelihood that it would prevail in establishing the unpatentability of at least one claim challenged in the Petition. Hence, we deny the Petition and do not institute an *inter partes* review.

2

IPR2023-00332
Patent 9,158,745 B2

### B. Real Parties in Interest

The parties identify themselves as the only real parties in interest.
Pet. 3; Paper 4, 1.

### C. Related Matters

Petitioner and Patent Owner identify the following proceeding as a
related matter involving the '745 patent: *Equil IP Holdings LLC v. Akamai
Technologies, Inc.*, No. 1:22-cv-00677 (D. Del.). Pet. 3; Paper 4, 1.

### D. The '745 Patent (Exhibit 1001)

The '745 patent, titled "Optimization of Media Content Using
Generated Intermediate Content," issued on October 13, 2015, from
Application No. 13/752,110 ("the '110 application") filed January 28, 2013.
Ex. 1001, codes (45), (21), (22).

The '745 patent claims priority to a chain of ancestor patent
applications, including Application No. 09/929,904 ("the '904 application"),
filed on August 14, 2001, which issued as the '009 patent. Ex. 1001, code
(60). The published version of the '904 application, US Pub. No.
2002/0078093 A1 (Ex. 1007 ("Samaniego")), is cited by Petitioner as prior
art in three of the patentability challenges to the '745 patent claims. Pet. 6.
We address the status of Samaniego as a printed publication in more detail
below.

The '745 patent discloses an "automatic graphics delivery system that
operates in parallel with an existing Web site infrastructure." Ex. 1001, 7:6–
7. The system is described as "streamlin[ing] the post-production process by
automating the production of media," requested by a user from a browser,

IPR2023-00332
Patent 9,158,745 B2

"through content generation procedures controlled by proprietary tags placed within URLs embedded within Web documents." Ex. 1001, 7:8–11. The disclosed system "automatically processes the URL encoded tags and automatically produces derivative media for the web site from the original media" which is available for viewing by a user. Ex. 1001, 7:13–16.

The '745 patent explains that the proprietary tags are used "to generate optimized media" by automated processing of the tags upon request of the media by a client. Ex. 1001, 5:65–6:1. This process, according to the '745 patent, reduces the "need for the Web author to create different versions of a Web site" for clients. Ex. 1001, 6:1–6:3. The '745 patent also discloses that "generated media is cached such that further requests for the same media require little overhead." Ex. 1001, 6:3–5.

An embodiment of the process described in the '745 patent is illustrated in Figure 21, reproduced below:



IPR2023-00332
Patent 9,158,745 B2

Figure 21, reproduced above, shows a flow chart of a process including delivery of an HTML web page with proprietary tags to browser 120, followed by the transfer of the delivered HTML web page from browser 120 to server 2000. Server 2000 is shown as being part of system 100. System 100 comprises URL tag parser 2100 for processing the proprietary tags. System 100 also comprises content generation procedures 2140 and dynamic media procedures 2150 that are performed on the media. Media cache 2120 is also part of system 100.

　　More specifically, with reference to Figure 21, a user through browser 120 makes a request to web server 110 for web page 301. Ex. 1001, 19:12–14. Web page 301 is labeled in Figure 21 as an "HTML Page with Proprietary URL Tags." The proprietary URL tags contain the information that direct browser 120 "to request the specified content generation procedure 2140 from the system 100 using input parameters specified with proprietary tags encoded within the URL." Ex. 1001, 19:9–12. The content generation procedures are performed on the media. Ex. 1001, 19:5–7. Browser 120 receives web page 301 with the proprietary tags and provides them to server 2000; the server is part of system 100. Ex. 1001, 19:14–15; Fig. 21. Thus, system 100 receives the proprietary tags specifying content generation procedure 2140 from a user.

　　System 100 comprises URL tag parser 2100 which parses the proprietary URL tags embedded in web page 301 that are sent to server 2000 "to determine the content generation procedure 2140 to execute, any corresponding input parameters to be used by such procedure, [and] any dynamic content processing 2150 to be performed by dynamic media procedures" on the media. Ex. 1001, 19:15–20. The '745 patent discloses

IPR2023-00332
Patent 9,158,745 B2

examples of the proprietary tags and commands used in these procedures,
e.g., tags listed in Tables A and D (Ex. 1001, 10:27–46; 20:52–21:15),
media processing script commands in Table B (*id.* at 10:51–15:20), and
content creation commands in Table E (*id.* at 21:15–22:38).

The '745 patent further discloses that system 100 generates lookup
key 2110 for the requested media. Ex. 1001, 19:23–24. When "intermediate
content" is found in media cache 2120, "such media is passed directly to the
dynamic media content system 2150 having dynamic media procedures,
wherein appropriate action is taken to generate the required derivative from
the intermediate media data." Ex. 1001, 19:30–35. However, when the
intermediate content is not found, the '745 patent discloses that "such
intermediate image is generated according to instructions specified by the
content generation procedure, . . . and passed to the dynamic media system
2150," where "appropriate action is taken to generate the required derivative
from the intermediate image data." Ex. 1001, 19:36–43.

The resulting media, after the dynamic processing is completed, is
passed to a user profile system, appropriate modifications are made, and the
media is cached and returned to the browser 120 for viewing by the user. Ex.
1001, 19:44–20:2.

### E.  *Illustrative Claim*

Claim 1 is only the only independent challenged claim. Claims 2–7
depend from claim 1. Claim 1 is reproduced below (bracketed numbering
added from the Petition (Pet. vii–viii) and additional numbering added
herein for clarity and reference to the specific limitations in the claim):

IPR2023-00332
Patent 9,158,745 B2

[1.pre] A method in a host computer for developing transformation processing operations to optimize media content playback to a plurality of playback devices connected with the host computer in a network, the method comprising:

[1.a] receiving a first request from a first playback device for media content;

[1.b] wherein the first request contains information, the information indicating a [1.b.i] first original media content, [1.b.ii] first content generation operations, and [1.b.iii] first transformation operations;

[1.c] determining whether a previously-generated first intermediate media content is available for reuse, the previously-generated first intermediate media content having been created using the first original media content and the first set of content generation operations; and

[1.d] responsive to determining that a previously-generated first intermediate media content is available, creating a first optimized media content for the first playback device by performing the first set of transformation operations on the previously-generated first intermediate media content; and

[1.e] responsive to determining that a previously-generated first intermediate media content is not available, creating a first optimized media content for the first playback device by creating a first intermediate content using the first original media content and the first set of content generation operations, and performing the first set of transformation operations on the first intermediate media content; and

[1.f] sending the first optimized media content to the first playback device.

IPR2023-00332
Patent 9,158,745 B2

### F. Evidence

The following evidence of unpatentability submitted by Petitioner is relied on in this decision:

| Evidence | Exhibit No. |
|---|---|
| Barger et al., US 9,158,745 B2, issued Oct. 13, 2015 ("the '745 patent") | 1001 |
| Declaration of Vijay K. Madisetti ("Madisetti Declaration") | 1003 |
| Tso et al., US 6,421,733 B1, issued July 16, 2002 ("Tso") | 1004 |
| Huang et al., US 6,438,576 B1, issued Aug. 20, 2002 ("Huang") | 1005 |
| Lawler, US 5,905,522, issued May 18, 1999 ("Lawler") | 1006 |
| Samaniego et al., US 2002/0078093 A1, published Jun. 20, 2002 ("Samaniego") | 1007 |

### G. Asserted Grounds

Petitioner asserts that the challenged claims are unpatentable based on the following grounds (Pet. 6):

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 1–5 | 103 | Tso in view of Huang |
| 6, 7 | 103 | Tso in view of Huang, Lawler |
| 1–7 | 102/103 | Samaniego |
| 2–4 | 103 | Samaniego in view of Tso |
| 6, 7 | 103 | Samaniego in view of Lawler |

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. §§ 102 and 103. Because the '745 patent has an effective filing date before the effective date of the applicable AIA amendments, we refer to the pre-AIA version of § 103.

IPR2023-00332
Patent 9,158,745 B2

## II.    ANALYSIS

### A.    *Level of Ordinary Skill in the Art*

Citing the testimony of Petitioner's declarant, Dr. Vijay Madisetti, Petitioner argues that a person of ordinary skill in the art ("POSITA") would have had "a bachelor's degree in computer systems, computer science, or the equivalent thereof, and at least two years of experience with networked media delivery or related technologies." Pet. 10 (citing Ex. 1003 ¶¶ 45–46, 48–49). Patent Owner does not dispute Petitioner's statement of the level of ordinary skill in the art. Prelim. Resp. 8.

Petitioner's definition of a POSITA is consistent with the level of skill disclosed in the prior art of record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). We therefore adopt Petitioner's definition for the purpose of this Decision.

### B.    *Claim Construction*

In an *inter partes* review proceeding, a patent claim is construed using the same standard applied in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of the claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b).

Petitioner requests that we construe the "content generation operations" recited in limitations [1.b], [1.c], and [1.e] of claim 1 to encompass the "content creation commands" disclosed in the '745 patent, e.g., "converting media to a specified type/bit-depth, scaling to a specified size, and saving to a specified file." Pet. 11 (citing Ex. 1001, 21:16–22:39).

IPR2023-00332
Patent 9,158,745 B2

Petitioner also requests we construe the "transformation operations" recited in claim limitations [1.b], [1.d], and [1.e] to encompass the disclosed "media processing script commands," for example, "SetResolution" and "Colorize." Pet. 11–12 (citing Ex. 1001, 10:27–15:20). Petitioner cites the Madisetti Declaration to support its claim construction. Ex. 1003 ¶¶ 55–59.

Petitioner's construction of "content generation operations" and "transformation operations" are not disputed by Patent Owner. Prelim. Resp. 9.

As held in *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999), only those terms that are "in controversy, and only to the extent necessary to resolve the controversy," need to be construed. *See also Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (applying *Vivid* to *inter partes* reviews). Here, a construction of "content generation operations" and "transformation operations" is not necessary to resolve the unpatentability issues before us. Consequently, we do not address Petitioner's proffered claim constructions.

### C. Ground 1 based on Tso and Huang; Ground 2 based on Tso, Huang, and Lawler

Petitioner argues that claims 1–5 would have been obvious to one of ordinary skill in the art based on Tso and Huang (Ground 1) and claims 6 and 7 would have been obvious based on Tso, Huang, and Lawler (Ground 2). Pet. 6. Patent Owner disputes Petitioner's arguments. Prelim. Resp. 32–40.

### 1.    Tso (Ex. 1004)

We begin the analysis with a discussion of Tso.

10

IPR2023-00332
Patent 9,158,745 B2

A network client in Tso makes a request for a hypertext object. Ex. 1004, 9:56–58. Tso describes a network client comprising a browser that communicates with a transcoding server comprising transcoding software. This configuration is illustrated in Figure 3 of Tso, reproduced below:



Figure 3 of Tso is reproduced above. Figure 3 is a block diagram showing the network client, transcoding server, and internet. Each element is labeled with a number, 12 is the network client, 34 is the transcoding server, 20 is the transcoder, 22 is the parser, 24 is the transcode server providers, and 16 is the server/network communications link from transcoding server 34 to internet 18. Figure 3 shows network client 12 communicating with transcoding server 34, and transcoding server 34 communicating with internet 18. The discussion below references Figure 3.

The transcoding software in Tso's system comprises transcoder 20 which includes parser 22 and transcode service providers 24. Ex. 1004, 3:7–11.

Parser 22 of transcoder 20 "is configured to act upon data received by transcoder 20, such as a request for a network object generated by a client device [12] or a reply to such a request provided by a content server device."

IPR2023-00332
Patent 9,158,745 B2

Ex. 1004, 3:11–14. Parser 22 "is responsible for selectively invoking one or more of transcode service providers 24 based upon a predetermined selection criterion." [2] Ex. 1004, 3:14–16. The transcode service provider 24 "selectively transcode[s] content based on a predetermined selection criterion." Ex. 1004, 3:48–51. Transcode service provider 24 can compress and scale different types of content, and "provide a wide variety of transcoding functions." Ex. 1004, 3:51–65.

The system further comprises HTTP proxy server 36 which accesses the internet through communication link 16. Ex. 1004, 3:31–33. When network client 12 requests a hypertext object, HTTP proxy server 36 first attempts to retrieve the object from parser 22. Ex. 1004, 6:24–28. If the object is not found by parser 22, parser 22 creates an entry which is returned to HTTP proxy server 36. Ex. 1004, 6:28–31. HTTP proxy server 36 requests the object from internet 18. Ex. 1004, 6:31–33. "As a data stream for the hypertext object is returned, HTTP remote proxy 36 calls parser 22" and passes the data stream to the parser. Ex. 1004, 6:33–37. "Parser 22 selects an appropriate transcode service provider 24 based, for example, on the content type of the data stream." Ex. 1004, 6:37–39. Transcode service provider 24 subsequently provides the transcoding functions to the incoming data stream. Ex. 1004, 3:42–44, 63–65.

"The parser [22] is configured to selectively invoke the transcode service provider in response to a predetermined selection criterion." Ex.

---

[2] Tso uses the singular form "criterion" throughout its disclosure, despite grammatically treating it in some instances as the plural form of the word. We use the term "criterion" as the singular form and "criteria" as the plural form.

IPR2023-00332
Patent 9,158,745 B2

1004, 2:16–18; *see also* Ex. 1004, 3:14–16, 6:64–66 ("parser 22 may selectively invoke one of transcode service providers 24 based upon satisfaction of a predetermined selection criterion."). The selection criteria may comprise information "contained in a header portion of a data packet received by transcoding server 34." Ex. 1004, 6:67–7:2. The "predetermined selection criterion" may alternatively "comprise information contained in a data portion of such a data packet." Ex. 1004, 7:4–6. The "predetermined selection criterion may comprise a condition of the device on which transcoding server 34 is installed." Ex. 1004, 7:8–9. Tso lists nine examples of predetermined selection criteria. Ex. 1004, 7:20–8:9.

### 2. *Petitioner's proposed ground*

We now turn to Petitioner's proposed ground of unpatentability based on Tso and Huang.

The first step [1.a] of claim 1 recites "receiving a first request from a first playback device for media content." Petitioner asserts that the "Network client" 12 of Tso teaches the claimed "playback device." Pet. 24 (emphases omitted) (Petitioner-annotated version of Fig. 3 of Ex. 1004). Petitioner identifies the disclosure in Tso of a "Network client 12, via browser 32" that "transmits an HTTP request for the hypertext object to transcoding server 34 over client/server communications link 14" (Ex. 1004, 9:45–65) as teaching the claim limitation. Pet. 23–24; *see also id.* at 24 (citing Ex. 1004, 3:12–13 ("request for a network object generated by a client device"), Fig. 5 (showing "Network Client" 12 comprising "Browser" which sends HTTP requests to the internet via a transcoding server)).

IPR2023-00332
Patent 9,158,745 B2

Step [1.b] of the claim recites "wherein the first request contains information, the information indicating a [1.bi] first original media content, [1.bii] first content generation operations, and [1.biii] first transformation operations." Thus, the information in the request from the playback device must indicate these three different items. Petitioner contends that a request "packet" from the network client in Tso contains information indicating all three pieces of information. Pet. 24 (citing Ex. 1004, 6:64–7:14).

Petitioner identifies the following disclosures from Tso as meeting the claimed "information" requirements of the claim (Pet. 24–25):

[1.b.i] the "media content," which is Tso's "requested hypertext object" (Ex. 1004, 10:25–27);

[1.b.ii] the "first content generation operations," which are Tso's "content characteristics," specifying "data type, type of encoding/compression" or "size" (Ex. 1004, 7:31–33); and

[1.b.iii] the "first transformation operations," which are Tso's "network client" properties, "content characteristics" specifying "number of colors," "resolution," and "content provider preferences" including "degree of alteration desired for its content" (Ex. 1004, 7:21–22, 60–62).

The Madisetti Declaration is cited by Petitioner to support the correspondence between Tso's disclosure of predetermined selection criteria and content generation operations. *See* Ex. 1003 ¶¶ 90–94. Dr. Madisetti testified that a person of ordinary skill in the art "would have understood" Tso's "content characteristics" to include "for example, 'data type, type of encoding/compression,' and 'size.'" Ex. 1003 ¶ 93 (citing Ex. 1004, 7:15–8:9). Dr. Madisetti testified "that these types of characteristics specify content generation operations that are consistent with, for example, the

14

IPR2023-00332
Patent 9,158,745 B2

'save' and 'scale' content generation operations described in Table E of the '745 patent" and that the operations "allow saving media to a 'specified file' and scaling media to a 'specified size.'" Ex. 1003 ¶ 93 (citing Ex. 1001, 21:20–22:38.

Dr. Madisetti testified that a person of ordinary skill in the art would have understood Tso's "'client' characteristics such as a 'number of colors,' additional 'content characteristics' such as 'encoding/compression' or 'resolution,' and 'content provider preferences' including, for example, 'the degree of alteration desired for its content'" to serve as the claimed transformation operations, such as the media processing script commands disclosed in the '745 patent. Ex. 1003 ¶ 94 (citing Ex. 1004, 7:20–8:4; Ex. 1001, 7:20–8.4); *see also* Pet. 25 n.5.

To address the requirement in the claim that the "information" in [1.b] is received from the playback device, Petitioner relies on the disclosure in Tso that the predetermined selection criteria are stored in a "request packet." Pet. 24–25 (citing Ex. 1004, 6:64–7:14; 7:15–8:9). Dr. Madisetti specifically testified, also citing Ex. 1004, 6:64–8:9, that "[t]he 'request packet' *sent by the client* carries 'information' in both its 'header' and 'data portion[s]' that includes 'selection criterion,' which is used to specify what transcoding should be applied to the content." Ex. 1003 ¶ 66 (emphasis added); *see also* Ex. 1003 ¶ 36.

Step [1.c] of claim 1 recites "determining whether a previously-generated first intermediate media content is available for reuse, the previously-generated first intermediate media content having been created using the first original media content and the first set of content generation operations." For this limitation, Petitioner cites Tso's disclosure of a

15

IPR2023-00332
Patent 9,158,745 B2

"GetScaledObject()" call by a server to determine "if the requested version of the content is cached. Tso, 14:25-30."[3] Pet. 15. "If so," Petitioner explains, Tso teaches that "the content is retrieved and returned to the client. Tso 14:30-32." Pet. 15. "The GetScaledObject () call is . . . used to request an object from server-side cache memory 30." Ex. 1004, 6:9–13. Petitioner cites Tso's teaching that the server-side cache stores "both original and transcoded versions of content for later transmission to network client 12 without the need to re-retrieve the content from Internet 18 or to re-transcode the content." Ex. 1004, 4:1–5 (as cited in Pet. 27). Thus, Petitioner asserts that the availability of media for "reuse" in step [1.c] corresponds to the use of media cached in the server-side cache of Tso.

To meet limitation [1.c] of claim 1 that "the previously-generated first intermediate media content having been created using the first original media content and the first set of content generation operations," Petitioner argues that Tso teaches "each server creates and receives partially-transcoded content, and caches transcoded versions of content." Pet. 27 (citing Ex. 1004, 4:1–5, 5:36–41, 14:47–15:6, 15:66–16:14). Petitioner contends that "a POSITA would have understood that a server responsible for performing only a partial transcoding caches that partially-transcoded version of content." Pet. 27 (citing Ex. 1003 ¶ 99). Petitioner also contends that Tso is "agnostic" about the order in which transcoding steps are performed, making it obvious to perform content generation operations

---

[3] Ex. 1004, 14:26–30: "GetScaledObject [[00bf] [00a8] call to server-side cache interface 28 to determine whether a non-transcoded version of the requested hypertext object already exists in the server-side cache memory 30 (Step 170)."

IPR2023-00332
Patent 9,158,745 B2

before additional transcoding operations are performed on the media content. Pet. 27 (citing Ex. 1003 ¶ 100).

Petitioner further cites disclosure in Huang for [1.c] of "determining whether a previously-generated first intermediate media content is available for reuse." Pet. 29–30 (emphasis omitted). Specifically, Petitioner argues that after a request for an object is made, the proxy server in Huang searches for a sufficiently "detailed" cached version of the content for the request. Pet. 17 (citing Ex. 1005, 7:23–36). If one is found, Petitioner argues that Huang discloses that the server performs any additional needed rendering, and then caches and returns the rendered content. Pet. 17 (citing Ex. 1005, 7:53–8:11; Ex. 1003 ¶ 76). Again, Petitioner analogizes the "reuse" in the claim with searching for cache versions of the media content.

Petitioner also asserts that Huang discloses the second part of [1.c] that "the previously-generated first intermediate media content having been created using the first original media content and the first set of content generation operations." Pet. 29–30 (emphasis omitted). Petitioner relies on Huang's disclosure of a "partially-rendered" object in cache (Ex. 1005, 6:63–67) which Huang teaches can be further processed by completing "the entire rendering process" based on "RHI" (receiver hint information) (Ex. 1005, 6:12) stored with the content. Pet. 17, 29–30 (further citing Ex. 1005, 7:42–8:11). Petitioner's position is apparently that the partial-rendering of an object using only one of two sets of rendering operations indicates that the partial rendered copy was made using only the first set of content generation operations as required by [1.c] of the claim.

Petitioner asserts that it would have been obvious to apply Huang's teaching about caching partially-coded content to Tso "to advantageously

17

IPR2023-00332
Patent 9,158,745 B2

avoid re-retrieval and re-transcoding as previously performed on partially-transcoded content, and perform transcoding steps in an order that improves the efficiency of the system, advantageously streamlining content generation." Pet. 30. Petitioner argues that it would have been obvious "to use Tso's GetScaledObject() and GetProperties() calls to retrieve and check the transcoding status of a cached copy of content, including determining previously-performed transcoding/rendering steps, before further transcoding content using that partially-transcoded version instead of re-retrieving and re-transcoding original content" as described in Huang. Pet. 30.

In step [1.d] of claim 1, "responsive to determining that a previously-generated first intermediate media content is available," "a first optimized media content for the first playback device" is created "by performing the first set of transformation operations on the previously-generated first intermediate media content." Huang is argued by Petitioner to describe this limitation of the claim. Pet. 32–33 (citing Ex. 1005, 6:9–23).

Petitioner asserts that Huang's teaching of completing rendering on a partially rendered object makes limitation [1.d] obvious to one of ordinary skill in the art when applied to Tso's disclosure of performing transformation operations. Pet. 33 (citing Ex. 1003 ¶¶ 104–107).

Claim 1 additionally recites [1.e] "creating a first optimized media content for the first playback device by creating a first intermediate content using the first original media content and the first set of content generation operations" "responsive to determining that a previously-generated first intermediate media content is *not* available." (Emphasis added.)

IPR2023-00332
Patent 9,158,745 B2

Petitioner identifies Figure 8 of Tso as disclosing "responsive to determining that a previously-generated first intermediate media content is *not* available." Pet. 34 (emphasis added) (reproducing Figure 8 of Tso showing "OBJECT IN CACHE" with a choice of "Y" or "NO," i.e., "not available."). Petitioner asserts that Tso, after finding that the intermediate content is not available, creates "a first intermediate content using the first original media content and the first set of content generation operations." Pet. 34 (citing Ex. 1004, 10:24–49).

Petitioner also argues that Huang describes limitation [1.e]. Pet. 35. Petitioner points to the disclosure in Huang that "[i]f the requested object cannot be found in the cache, . . . the proxy server . . . modifies the associated RHI to indicate its ability for providing rendering services and then sends the request and the modified RHI to another proxy server or to the content server." Pet. 35–36 (citing Ex. 1005, 7:36–41; Ex. 1003 ¶¶ 110–112) (emphases omitted). Petitioner asserts it would have been obvious to modify Tso with Huang's teaching "to advantageously cache the 'partial' transcoding output from each of the transcode service providers . . . in order to 'avoid repeating' transcoding steps." Pet. 35 (citing Ex, 1005, 6:63–67).

The last step of claim 1 is "[1.f] sending the first optimized media content to the first playback device." Petitioner cites Tso as disclosing this limitation ("HTTP remote proxy 36 transmits a data stream for the transcoded hypertext object to network client 12 (Step 260)." Pet. 36 (citing Ex. 1004, 6:55–57).

### 3. *Patent Owner's arguments*

Patent Owner asserts that Petitioner fails to demonstrate a reasonable

IPR2023-00332
Patent 9,158,745 B2

likelihood that Tso discloses limitation [1.b] of independent claim 1 of
"wherein the first request," which is [1.a] received from "a first playback
device," "contains information, the information indicating . . . [1.bii] first
content generation operations." Prelim. Resp. 35. Generally, Patent Owner
does not dispute Petitioner's mapping of the claim limitations to Tso and
Huang nor the reason to combine the references. However, while Patent
Owner does not disagree with Petitioner's mapping of the claimed [1.b.ii]
"content generation operations" to certain of Tso's "content characteristics,"
Patent Owner argues that Petitioner "fails to show that Tso's transcoding
server 34 receives Tso's content characteristics from Tso's network client
12," where network client 12 serves as the claimed playback device. Prelim.
Resp. 36 (emphasis omitted).

Patent Owner argues that "neither Petitioner nor Dr. Madisetti
provides any explanation or support for their position that Tso's transcoding
server 34" receives a "request packet" from the network client 12. Prelim.
Resp. 39 (citing Pet. 24–25; Ex. 1003 ¶¶ 91–92). Patent Owner asserts that
neither Petitioner nor Dr. Madisetti explain "why a POSITA would have
understood that the content characteristics are received from the network
client 12 despite Tso's express and contrary teachings that such information
is received from the internet 18." Prelim. Resp. 39 (citing Ex. 1004, 10:32–
44). Because Petitioner contends that the network server 12 corresponds to
the claimed playback device and the playback device is required by the
claim to originate the first request and the information [1.b] in it ("a first
request from a first playback device"), Patent Owner asserts that because
network server 12 in Tso does not originate the content characteristics (the
claimed "content generation operations"), Petitioner has not established a

20

IPR2023-00332
Patent 9,158,745 B2

reasonable likelihood that it will prevail in the challenge based on Grounds 1 and 2.

### 4.    Discussion

Patent Owner argues, as indicated above, that the patentability challenge should be denied because Tso does not describe the "information" [1.b.ii] contained in the "first request" as being from the "first playback device" as required by claim 1, but instead discloses that the information [1.b.ii] is received from the "Internet 18." Prelim. Resp. 36–37. Petitioner maps the "information" in [1.b] of claim 1 to the "predetermined selection criterion" disclosed by Tso. Pet. 24–25. Consequently, we must turn to the discussion of the "predetermined selection criterion" by Tso.

It is correct, as testified by Dr. Madisetti (Ex. 1003 ¶¶ 66, 91, 92), that Tso discloses predetermined "selection criterion may comprise, for example information contained in . . . a data packet received by transcoding server 34." Ex. 1004, 6:66–7:2. However, contrary to Dr. Madisetti's testimony,[4] the cited disclosure in Tso does not identify the sender of the packet as the network client 12 nor does Tso state that any of the nine disclosed predetermined selection criteria are contained in a data packet. Dr. Madisetti's statement is conclusory, omitting any reasoning as to why one of ordinary skill in the art would have concluded that the "content characteristics" are received in a data packet from the network client 12, when such information is not explicitly stated in the portion of Tso

---

[4] "The 'request packet' *sent by the client* carries 'information' in both its 'header' and 'data portion[s]' that includes 'selection criterion,' which is used to specify what transcoding should be applied to the content. Tso, 6:64-8:9." Ex. 1003 ¶ 66 (emphasis added) (footnote omitted).

IPR2023-00332
Patent 9,158,745 B2

referenced by Dr. Madisetti. We do not accord weight to conclusory expert testimony. *See TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1359 n.5, 1360 (Fed. Cir. 2019).

The "predetermined selection criterion" (the asserted "information" of step [1.b]) is described by Tso as being used by the parser 22 to "selectively invoke the transcode service provider." Ex. 1004, 2:16–18. Tso lists nine examples of the criteria. Ex. 1004, 7:20–8:9. Tso discloses that a selection criterion can comprise information in the header of a *data packet* received by transcoding server 34. Ex. 1004, 6:66–7:3. But in this section Tso does not disclose the source of the data packet. Petitioner asserts it comes from the network client 12. Patent Owner's argument is that it comes from the internet. Prelim. Resp. 36–37 (citing Ex. 1004, 9:49–10:49). To address this issue, we revisit the architecture of Tso's system.

Tso discloses a transcoding server 34 which includes HTTP proxy server 36, parser 22, and transcode service providers 24. Tso, Fig. 3 (reproduced above). Tso teaches "[n]etwork client 12, via browser 32, transmits an HTTP request for the hypertext object to transcoding server 34 over client/server communications link 14." Ex. 1004, 9:54–56. The request is passed to the internet 18 by HTTP remote proxy 36. Ex. 1004, 3:31–34; 9:56–60. When a requested hypertext object is found on internet 18, "HTTP remote proxy 36 begins receiving an HTTP data stream [from internet 18] representing the hypertext object. HTTP remote proxy 36 passes the handle for this incoming data stream to parser 22." Ex. 1004, 10:32–36. Parser 22, which is part of the transcoding server 34, "dynamically determines whether the data stream satisfies any applicable *predetermined selection criteria*." Ex. 1004, 10:37–38 (emphasis added). Parser 22 makes this determination

22

IPR2023-00332
Patent 9,158,745 B2

"by interrogating a MIME type in the content-type header record that appears at the beginning of the incoming HTTP data stream." Ex. 1004, 10:40–44. "If parser 22 detects a match for a predetermined selection criterion, the HTTP stream handle is given to the appropriate transcode service provider 24." Ex. 1004, 10:44–47. The transcode service provider 24 "then transcodes the data stream appropriately, and HTTP remote proxy 26 transmits the transcoded data stream to network client 12." Ex. 1004, 10:47–49.

Thus, Tso discloses that parser 22 determines whether the HTTP data stream from internet 18 satisfies a predetermined selection criterion, consistent with Patent Owner's contention that the criterion comes from the internet. When parser 22 interrogates the header of a data packet from the HTTP object (i.e., the "media" of claim 1) obtained from the internet, the parser determines whether the "content characteristics" in the packet header match any of the predetermined criteria. *See* Ex. 1004, 10:40–44. But none of this disclosure, as argued by Patent Owner, teaches that the predetermined selection criteria are received in a media request from the playback device as required by claim 1.

We return to the disclosure in Tso at column 6, line 64 to column 7, line 2, cited by Petitioner as teaching the claimed "[1.a] receiving a first request from a first playback device for media content; [1.b] wherein the first request contains information, the information indicating . . . [1.b.ii] first content generation operations." *See* Pet. 13, 24.[5]

---

[5] "Tso also discloses that request packets 'selection criteri[a]' specifying the 'particular content' requested and transcoding parameters used by a server's 'parser' to "selectively invoke' one or more 'transcode service providers.'

IPR2023-00332
Patent 9,158,745 B2

The pertinent disclosure from Tso is copied below:

As noted above, parser 22 may selectively invoke one of transcode service providers 24 based upon satisfaction of a predetermined selection criterion. Such selection criterion may comprise, for example, information contained in a header portion of a *data packet* received by transcoding server 34, such as a MIME type, a URL (Uniform Resource Locator), a last modified time indicator and so on.

Ex. 1004, 6:64–7:3 (emphasis added).

Patent Owner's argument appears to be that the "data packet" described by Tso at column 6, line 64 to column 7, line 3, is a reference to the process described at column 10, lines 40–44, in which parser 22 interrogates the HTTP data stream packets for the predetermined selection criteria. Prelim. Resp. 38–39. Patent Owner's contention that the "predetermined selection criterion" are received by parser 22 from internet 18 in Tso's example at column 10, lines 27–38, is supported by the evidence. Petitioner does not identify disclosure in Tso of where the parser, or any other component of Tso's system, receives the selection criteria in a request for media by a user browser. In particular, Petitioner does not identify a specific teaching in Tso of where the parser receives the media's "(3) content characteristics, such as its data type, type of encoding/compression, size, and dimension" (Ex. 1004, 7:31–33) which Petitioner asserts corresponds to the claimed "first content generation operations" contained in the first request sent by the recited playback device. Pet. 24–25.

---

Tso, 6:64-7:14."

IPR2023-00332
Patent 9,158,745 B2

Petitioner contends that [1.b.ii] "first content generation operations," such as the "content characteristics," are received from a first playback device, but as asserted by Patent Owner, Tso identifies these characteristics as coming from data packet stream from the internet and received by the parser. Because Petitioner did not identify receiving a first request from a playback device comprising limitation [1.b.ii] "first content generation operations," the evidence before us does not support a reasonable likelihood that Petitioner will prevail in their challenge to claims 1–5 based on Tso and Huang.

The additionally cited Lawler (Ex. 1006), as making claims 6 and 7 obvious in combination with Tso and Huang, is not asserted by Petitioner to describe a first request from a playback device comprising limitation [1.b.ii] "first content generation operations" as recited in claim 1. Pet. 40–41. Consequently, the evidence also does not support a reasonable likelihood that Petitioner will prevail in their challenge to claims 6 and 7 based on Tso, Huang, and Lawler.

### D. Grounds 3 and 4 based on Samaniego; Ground 4 based on Samaniego and Tso; Ground 5 based on Samaniego and Tso; Ground 6 based on Samaniego and Lawler

The '745 patent claims priority to a chain of continuation and divisional applications, including the '904 application, filed on August 14, 2001. Ex. 1001, code (60). The '904 application subsequently issued as the '009 patent. The '904 application was published on June 20, 2002 as U.S. Pub. No. 2002/0078093 A1 ("Samaniego"). Ex. 1007, code (10), (43). In Grounds 3 and 4, Samaniego is cited by Petitioner as section 102(b) prior art to the '745 patent. Pet. 49–68.

IPR2023-00332
Patent 9,158,745 B2

In the Petition, Petitioner argues that claim 1 of the '745 patent is not entitled to the priority date of the '904 application or its ancestor because none of the '745 patent's named inventors are "name[d] . . . in the previously filed application[s]," a requirement of 35 U.S.C. § 120 to claim the benefit of the filing date of an earlier filed application. Pet. 5–6. Based on this reasoning, Petitioner asserts that the earliest filing date that the '745 patent can be accorded is November 7, 2005 when Application No. 11/269,916,[6] which shares common inventors with the '745 patent, was filed. Pet. 2. Samaniego was published June 20, 2002, more than two years before that November 7, 2005 filing date and, therefore, according to Petitioner, is 35 U.S.C. § 102(b) prior art to the '745 patent. Pet. 2. Consequently, Petitioner challenges the patentability of claims 1–7 as anticipated or obvious in view of Samaniego, claims 2–4 as obvious in view of Samaniego and Tso, and claims 6 and 7 as obvious in view of Samaniego and Lawler. Pet. 49–68.

Petitioner asserts that Patent Owner cannot dispute that Samaniego discloses the subject matter of challenged claims 1–7 because the specifications of the '745 patent and Samaniego "are substantively identical." Pet. 49 (citing Ex. 1013 (Petitioner's redline comparison between the specifications of the '745 patent and Samaniego, showing substantial identity). Petitioner also asserts that Patent Owner is estopped from disputing that Samaniego discloses the claimed subject matter because the Examiner found support for it in Samaniego. Pet. 49 (citing Ex. 1002, 165; Ex. 1003 ¶ 178). Patent Owner acknowledges that the specifications of the '745 patent and Samaniego are substantively identical and admits there is

---

[6] Application No. 11/269,916 is listed as a "continuation-in-part" of the '904 application. Ex. 1001, code (60).

IPR2023-00332
Patent 9,158,745 B2

written description support in Samaniego for the '745 patent claims. Prelim. Resp. 10.

Patent Owner responds in the Preliminary Response that Petitioner's argument that Samaniego is prior art is moot because a petition was filed under 37 C.F.R. § 1.324 to correct the inventorship of the '009 patent by adding Sean Barger as a co-inventor. Prelim. Resp. 10–11 (citing Ex. 2003). Mr. Barger is also listed as a co-inventor of the '745 patent and, therefore, Patent Owner asserts all the requirements under 35 U.S.C. § 120 for getting the benefit of an earlier filing date are met. Prelim. Resp. 9. Patent Owner thus asserts that the inventorship correction to the '009 patent cures the 35 U.S.C. § 120 defect in the '745 patent's priority claim. Petitioner, however, disputes the propriety and effect on the '745 patent of the inventorship correction. Prelim. Reply Br. 1. We thus first turn to 35 U.S.C. § 256, which authorizes correction of the named inventor(s) of an issued patent.

Under section 256(a), "[w]henever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may . . . issue a certificate correcting such error." The requirements to correct inventorship under 35 U.S.C. § 256(a) are listed in 37 C.F.R. § 1.324. Patent Owner filed a petition pursuant to section 1.324(b) to correct the inventorship of the '009 patent by adding Sean Barger as a named inventor. The petition was filed on April 3, 2023, approximately three months after the filing date of this Petition. Ex. 2003, 3. The section 1.324(b) petition was granted (Ex. 2012). A Certificate of Correction correcting inventorship was approved (Ex. 2013) and subsequently entered in the '009 patent on June 13, 2023, adding the name of Sean Barger as a co-inventor of the '009 patent. Ex. 2014.

IPR2023-00332
Patent 9,158,745 B2

Petitioner argues in the Preliminary Reply Brief that section 256 "limits its effects to only inventorship errors in the patent being corrected." Prelim. Reply Br. 1. Petitioner, in support of this argument, asserts that Section 256 is "a savings provision" to avoid invalidity under section 102(f)[7] of the patent in which correction is sought. Prelim. Reply Br. 2 (citing *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998)). Petitioner further asserts that any retroactive effect of a Certificate of Correction under section 256 must be authorized by Congress. Prelim. Reply Br. 2. Petitioner contends that a Certification of Correction, as expressly stated in sections 254 and 255, has only a prospective effect on "the trial of actions for causes thereafter arising" after the Certificate of Correction has issued. Prelim. Reply Br. 2–3. In addition, Petitioner argues that section 256(b) expressly refers to correcting an inventorship in the patent "in which such error occurred" and therefore restricts the correction to "errors of inventorship implicating §102(f)" in the patent in which the inventorship error occurred. Prelim. Reply Br. 3. Thus, Petitioner's principal argument is that the inventorship correction to the '009 patent cannot be applied retroactively in this proceeding to cure the section 120 defect in the '745 patent's priority claim to the filing date of the '009 patent. *Id.* at 1.

Patent Owner argues that "[n]othing in the statute indicates that the effect of [inventorship] corrections are limited solely to the patent being corrected." Prelim. Sur-reply 1–2. Patent Owner asserts that Petitioner is reading a "prospective" requirement into section 256 which is not there.

---

[7] 35 U.S.C. § 102(f) (pre-AIA) states that "A person shall be entitled to a patent unless – . . . [the person] did not . . . invent the subject matter sought to be patented."

IPR2023-00332
Patent 9,158,745 B2

Prelim. Sur-reply 2. To support this position, Patent Owner cites *Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1329 (Fed. Cir. 2001) which held "[a]bsent fraud or deceptive intent, the correction of inventorship does not affect the validity or enforceability of the patent for the period before the correction." Prelim. Sur-reply 3. Thus, Patent Owner argues retroactive effect is given to a Certificate of Correction correcting inventorship under section 256. Prelim. Sur-reply 3.

To begin, the language of section 256 indicates that a certificate of correction issued pursuant to the statute is applied retroactively to the patent in which the correction is made. *See Roche Palo Alto LLC v. Ranbaxy Labs. Ltd.*, 551 F. Supp. 2d 349, 358 (D.N.J. 2008).[8] Section 256(b) expressly states that "[t]he error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section." This statutory language has been interpreted to mean that, despite an initial error being made in the naming of the inventor(s), once this error has been corrected, it is as if the patent was valid from the beginning and the defect in inventorship had never happened. *See Viskase*, 261 F.3d at 1329; *see also Emerson Electronic Co. v. Sipco LLC*, IPR2016-00984, Paper 52 at 11–21 (PTAB January 24, 2020) (Decision on Remand) (distinguishing the retroactive effect of section 256 from sections 254 and 255 which are prospective).

Next, we must consider whether the correction to the inventorship of the '009 patent can retroactively correct the '745 patent's priority claim to

---

[8] "[T]here are many federal cases that have given retrospective effect to a Certificate of Correction when it regards correction of inventorship, albeit all of these cases involve petitions under Section 256."

IPR2023-00332
Patent 9,158,745 B2

the '009 patent under 35 U.S.C. § 120. If so, Samaniego would no longer be available as prior art because the '745 patent would then have an inventor in common with the '009 patent and the '904 application from which it issued and upon which Samaniego is based.

We begin with 35 U.S.C. § 256. According to *Merry Mfg. Co. v. Burns Tool Co.*, 206 F. Supp. 53, 58 (N.D. Ga 1962), *aff'd.*, 335 F.2d 239 (5th Cir. 1964), "Section 256 of Title 35 of the United States Code is a codification of the law as it was established by the Court of Appeals for the District of Columbia [in] *In re Roberts*, 49 App.D.C. 250, 263 F. 646." (Emphasis added).

*In re Roberts*, 263 F. 646 (D.C. Cir. 1920) was an appeal from a decision of the Patent Office "refusing to treat" an application by sole inventor Roberts "as a continuation of a joint application embracing the same subject-matter, theretofore filed by appellant [Roberts] and another [Roberts' son] under a mistake of fact." *Roberts*, 263 F. at 646.[9] In an interference between the application of Bruckman and the joint application of Roberts and his son, it was discovered that Roberts' son was not an inventor of the joint application and priority was awarded to Bruckman. *Roberts*, 263 F. at 646–647. "[T]he Patent Office declined to consider the present application [by Roberts alone] as a continuation of the former joint application, the result being that the Bruckman patent, having issued more than two years prior to the filing of the present application, became a statutory bar to its allowance." *Roberts*, 263 F. at 647. The question framed by the D.C. Court of Appeals was "whether, in a case like the present, where

---

[9] We recognize that the statutes in place when *Roberts* was decided are not the same as they were when the '009 and '745 patents were filed.

IPR2023-00332
Patent 9,158,745 B2

it appears that a joint application has been filed through mistake or inadvertence and without fraudulent intent, the sole inventor, one of the joint applicants, is estopped from taking any advantage of that application."

*Roberts*, 263 F. at 647. On this question, the court held:

> All that was sought in the new application [by Roberts alone] was the elimination of one of the joint applicants, to whom credit mistakenly had been given for the particular invention involved. There was identity of subject-matter, and it is difficult to perceive any reason for not permitting the rectification of such a mistake by an amendment eliminating the superfluous applicant.

*Roberts*, 263 F. at 648.

The court therefore concluded that the "second application" by Roberts as sole inventor was "filed merely to correct a formal error" in the first application, and thus properly could be given benefit of the first application. *Roberts*, 263 F. at 648–49. The court further explained:

> To prevent a possible failure of justice, the present application should have been considered as a continuation of the abortive application. As already suggested, we perceive no reason why the mistake could not have been rectified by a simple amendment, but in any event the sole inventor should not be deprived of his day in court by the raising of artificial barriers against him. He claimed his invention, and, through mistake, gave his son credit where no credit was due. The elimination of the son ought not to deprive the father, the sole inventor, of the benefit of his original application; and we so rule.

*Roberts*, 263 F. at 649.

*In re Schmidt*, 293 F.2d 274 (CCPA 1961) involved the impact that an inventorship correction in an earlier-filed application, pursuant to 35 U.S.C. § 116, had on a later-filed continuation application that sought to claim

IPR2023-00332
Patent 9,158,745 B2

benefit under 35 U.S.C. § 120[10] to the filing date of the earlier, corrected

application. *Schmidt* considered sections 116 and 256 parallel for

inventorship correction purposes and held that "the same inventor" as used

in section 120 "embraces the possibility permitted by sections 116 and 256

that the earlier application may be corrected thereunder by changes in the

name or names of the applicants under the conditions stated in section 116."

*Schmidt*, 293 F.2d at 279. A patent was removed as prior art when *Schmidt*

held "that appellant was entitled under section 116 to correct the errors in the

intermediate application filed in the names of joint inventors and under

section 120 was entitled as 'the same inventor' to the benefits of the filing

dates of the earlier co-pending applications." *Schmidt*, 293 F.2d at 279.

*Schmidt* cited *Roberts* as approving this practice. *Schmidt*, 293 F.2d at 279;

*see also Weil v. Fritz*, 572 F.2d 856, 863 (CCPA 1978) (stating that *Schmidt*

was correctly decided).

　　　While the statutes at the time *Schmidt* and *Roberts* were decided are

different from those in place when the '745 and '009 patents were filed, the

legal principles reflected in these cases suggest that the inventorship

correction to the '009 patent can be applied retroactively to cure the defect in

the '745 patent's section 120 priority claim. Specifically, in *Roberts*, the

subsequently-filed patent application by Roberts alone was given benefit of

the previously-filed first patent application to Roberts and son, despite the

error in naming the son as a co-inventor in the first application. Similarly,

---

[10] *Schmidt* involved an interpretation of the statutory language of 35 U.S.C.
§ 120 requiring that the continuing application for which benefit of the
earlier application is sought must be filed by "the same inventor." *Schmidt*,
293 F.2d at 277. Section 120 has since been amended and no longer contains
this language.

IPR2023-00332
Patent 9,158,745 B2

the Patent Owner of the '745 patent seeks the benefit of the earlier-filed '009 patent, despite the initial error in naming the inventors of the '009 patent. This error otherwise forecloses the inventors of the '745 patent from claiming priority to the '009 patent. As explained in *Roberts*, to deny the second application the benefit of priority of the first application would deprive an inventor of their invention because of a mistake which could be corrected. *Schmidt* further approved the practice of curing a defect in a claim to priority under section 120 by making an inventorship correction in an earlier-filed application. *See also Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363, 1371 (Fed. Cir. 2001) ("'Incorrect inventorship is a technical defect in a patent that may be easily curable.' . . . Rule 324 permits such an easy cure." (quoting *Canon Comput. Sys., Inc. v. Nu–Kote Int'l, Inc.*, 134 F.3d 1085, 1089 (Fed. Cir. 1998))) (opinion corrected, 275 F.3d 1344 (Fed. Cir. 2001)); *see also Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1554 (Fed. Cir. 1997) (discussing "the availability of section 256 to the policy of rewarding the actual inventor").

We are not persuaded by Petitioner's argument that inventorship correction under section 256 limits a Certificate of Correction to the patent "in which such error occurred" and "has only a confined effect that does not retroactively impact the '745 [patent]." Prelim. Reply Br. 3 (quoting from section 256(b)). Section 256(b) states: "The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section." This statement indicates that a defect in naming the inventors does not invalidate the patent—the purpose for which section 256 was enacted. Petitioner argues that because the statute refers to correcting an inventorship

33

IPR2023-00332
Patent 9,158,745 B2

error in the patent, it cannot be used to correct an error in any other patent, such as a descendant of the corrected patent. However, the only patent expressly mentioned in section 256 is the patent in which the error occurred. Unlike sections 254 and 255 which expressly state that the change "shall have the same effect and operation in law" for "causes . . . arising" after a certificate of correction has been issued, no such constraint appears in section 256.

Our reviewing court has "interpreted § 256 broadly as a 'savings provision' to prevent patent rights from being extinguished simply because the inventors are not correctly listed." *Chou v. University of Chicago*, 254 F.3d 1347, 1358 (Fed. Cir. 2001) (citing *Pannu*, 155 F.3d at 1349). Petitioner has not a supplied an adequate reason to limit the effect of the certificate of correction to the ancestor patent of the '745 patent. *In re Schmidt*, in particular, appears to be consistent with the result that an inventorship correction to an intermediate or ancestor patent can be used to correct a defect in a section 120 priority claim in a later filed patent.

Petitioner contends that Patent Owner failed to raise the inventorship defect timely. Prelim. Reply Br. 3. Citing *Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1296 (Fed. Cir. 2000), Petitioner argues "requiring a patentee to 'check a patent when it is issued' is not 'asking too much.'" Prelim. Reply Br. 3. Petitioner asserts that Patent Owner knew of the inventorship issue "since at least 2008—before the '745 was filed— when it filed a related application removing Samaniego's inventors and replacing them with an entirely new set of inventors. *See* Ex. 1026, 79–87." Prelim. Reply Br. 3. Despite this alleged knowledge, Petitioner contends that Patent Owner did nothing to correct the inventorship during the life of the

34

IPR2023-00332
Patent 9,158,745 B2

'745 patent. Prelim. Reply Br. 3. Petitioner argues that "the public has been on notice that the '745 was invalid over Samaniego given the discontinuity in inventorship." *Id*. Petitioner asserts that it "relied on this discontinuity and filed a petition seeking to invalidate these claims based on this deficiency." *Id.*

In response, Patent Owner argues "there is no concern that the public was not aware of the priority claim" because the '745 patent "claims priority to the '009 patent on its face." Prelim. Sur-reply 3; *see* Ex. 1001, code (60). Patent Owner contends that the requirements of Section 120 are met for the claim of priority to the '009 patent. Prelim. Sur-reply 4. Patent Owner asserts that the inventorship correction under section 256 is an administrative correction and formality to list the proper inventors on the '009 patent.

We agree with Patent Owner. Despite Petitioner's arguments about untimeliness[11] and lack of notice, the USPTO granted Patent Owner's request under 37 C.F.R. § 1.324 to correct inventorship of the '009 patent.

---

[11] Petitioner has not established that the asserted "delay" in filing the certification of correction is a factor that should have been considered in determining whether to enter a certificate of correction of inventorship should be entered. Petitioner has not identified any statutory language in Section 256 which makes "timeliness" a factor to consider when correcting inventorship of a patent. In this regard, we point out that "diligence is not a requirement to correct inventorship under section 256." *Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1554 (Fed. Cir. 1997); *see also Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1162 (Fed. Cir. 1993) ("Since the defense of patent invalidity based on incorrect inventorship can be raised at any time, correction of inventorship should be similarly available at any time.").

IPR2023-00332
Patent 9,158,745 B2

Ex. 2012 (Decision Granting Inventorship Petition). A Certificate of Correction, signed by the Director of the USPTO, was subsequently entered in the '009 patent. Ex. 2013 (Decision Approving Request for Certificate of Correction), Ex. 2014 (Certificate of Correction correcting inventorship).

Regarding Petitioner's allegations that, due to the conduct of Patent Owner, "[t]he Board . . . should not permit [Patent Owner] to change the inventorship of Samaniego" (Pet. 43–44), Petitioner has not described under what principle or caselaw the Board should act. *See* Prelim. Reply 1 n.1.

For the foregoing reasons, we decide Samaniego is not prior art to the '745 patent. Following correction of the inventorship of the '009 patent, and with no dispute by Petitioner that all other requirements under section 120 necessary for the '745 patent to claim the benefit of the filing date of the '009 patent are met (*see* Prelim. Resp. 9–11), Samaniego is excluded as prior art. Accordingly, Petitioner has not demonstrated a reasonable likelihood that it would prevail in proving the unpatentability of claims 1–7 based on Samaniego alone, or Samaniego in combination with Tso or Lawler.

## III. §§ 325(D) & 314(A) DISCRETION

The institution of *inter partes* review is discretionary. *See Harmonic Inc. v. Avid Tech, Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) ("[T]he PTO is permitted, but never compelled, to institute an IPR proceeding").

Patent Owner argues that institution should be denied under 35 U.S.C. § 325(d) because Tso (Ex. 1004) was previously considered by the Examiner and under 35 U.S.C. § 314(a) because four of Petitioner's six grounds are "facially deficient." Prelim. Resp. 1–2.

36

IPR2023-00332
Patent 9,158,745 B2

Because we have considered the grounds of unpatentability on the merits, and decide not to institute, we do not address the sections 325(d) and 314(a) issues raised in this proceeding.

## IV.    CONCLUSION

After considering the Petition, the Preliminary Response, the Preliminary Reply Brief, the Preliminary Sur-reply, and the evidence of record, and for the reasons discussed above, we determine that Petitioner has not demonstrated a reasonable likelihood that it would prevail in establishing the unpatentability of at least one claim challenged in the Petition. Hence, we deny the Petition and do not institute an *inter partes* review.

## V. ORDER

Accordingly, it is

ORDERED that the Petition is denied and no trial is instituted.

IPR2023-00332
Patent 9,158,745 B2

PETITIONER:

Scott McKeown
James L. Davis, Jr.
Daniel W. Richards
ROPES & GRAY LLP
scott.mckeown@ropesgray.com
james.l.davis@ropesgray.com
daniel.richards@ropesgray.com


PATENT OWNER:

Christopher T. Bovenkamp
Ararat Kapouytian
CHARHON CALLAHAN ROBSON & GARZA, PLLC
cbovenkamp@ccrglaw.com
akapouytian@mkwllp.com

Jason A. Fitzsimmons
Richard M. Bemben
Michael D. Specht
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
jfitzsimmons-ptab@sternekessler.com
rbemben-ptab@sternekessler.com
mspecht-ptab@sternekessler.com